**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| PRESTON WOOD & ASSOCIATES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:16-cv-01427 |
| | § | |
| RZ ENTERPRISES USA, INC. D/B/A | § | |
| OPPIDAN HOMES, OPPIDAN HOMES | § | Jury Trial Demanded |
| VIII LTD., CAMERON ARCHITECTS, | § | |
| INC., and UL, INC. D/B/A URBAN | § | |
| LIVING, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S SUPPLEMENTAL TRIAL BRIEF ON DMCA CLAIMS**

Plaintiff Preston Wood & Associates, LLC ("PWA") files this Supplemental Trial Brief on its DMCA claims.

**I.      PWA Has Established the Elements of a DMCA § 1202(b) Claim.**

PWA again notes that Judge Atlas' order denying defendants' motion to dismiss or for summary judgment (Docket #122) accurately sets forth the law and authorities regarding PWA's DMCA § 1202(b) claims.   As detailed therein and in Part III of PWA's Trial Brief, § 1202 of the Digital Millennium Copyright Act (17 U.S.C. § 1201 *et seq.*) protects the integrity of "copyright management

-1-

information," which the statute defines broadly to include things like the name of the author or copyright owner, copyright notices, and the terms and conditions for use of the work.  *See* 17 U.S.C. § 1202(c).

DMCA § 1202(b) provides as follows:

> **(b)** Removal or Alteration of Copyright Management Information.—
> No person shall, without the authority of the copyright owner or the law—
>
> **(1)** intentionally remove or alter any copyright management information,
>
> **(2)** distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> **(3)** ***distribute,*** import for distribution, or publicly perform works, ***copies of works***, or phonorecords, ***knowing that copyright management information has been removed or altered without authority of the copyright owner or the law***,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b) (emphasis added).  DMCA § 1203(c)(3)(B) imposes statutory damages on violators for "each violation" of DMCA § 1202:

-2-

**(c)** AWARD OF DAMAGES—

    **(1)** IN GENERAL.—Except as otherwise provided in this title, a person committing a violation of section 1201 or 1202 is liable for either—

        **(A)** the actual damages and any additional profits of the violator, as provided in paragraph (2), or

        **(B)** statutory damages, as provided in paragraph (3).

    . . .

    **(3)**  **(B)** At any time before final judgment is entered, a complaining party may elect to recover an award of statutory ***damages for each violation of section 1202*** in the sum of not less than $2,500 or more than $25,000.

17 U.S.C. § 1203(c) (emphasis added).

    In this case, the evidence is undisputed that the copies of the PWA's architectural works at issue (as embodied in PWA's marketing sheets, CAD files, and construction plans) that were provided to Urban Living contained extensive and explicit copyright management information, in the form of PWA's logo, name, copyright notice, and use restrictions.  Indeed, <u>every</u> sheet of PWA's construction plans contained (along the left hand margin) this explicit warning:

    This copyright notice and associated text is © copyright management information under the Digital Millennium Copyright Act, 17 U.S.C. § 1202, and are included to police and deter copyright infringement.

> Any reproduction or distribution of this document without this copyright management information appearing intact and unmodified is prohibited, and will constitute copyright infringement and a violation of the Digital Millennium Copyright Act.

Indeed, this warning was on the plans that Cameron generated from PWA's CAD files (PX 104) – *the very plans that Urban Living admits it used to create its marketing materials*. *See* Urban Living's Answer to PWA Interrogatory No. 13 (quoted on p.6 *infra*)).

Nor is there any question that Urban Living actually knew of the need to maintain PWA's copyright management information on all uses of PWA works. Besides PWA's explicit DMCA warning on its plans (which was also found on Cameron's derivatives), Urban Living also acknowledged and agreed in the parties' contract (PX 001, section 4) that it was required to maintain PWA's copyright management information on all uses of PWA works – and marketing materials were specifically covered:

Other two-dimensional derivative works (including marketing materials)  must include the following legend:

Architectural work depicted © [date] Preston Wood Associates, LLC

Maintenance of these legends is a strict condition precedent to PWA's licensing of such creation and distribution of derivative works.

PX 001 (p.3).  As Judge Atlas pointed out in her order (Docket #130, p.12), this was a clear condition precedent to Urban Living's license to reproduce and create derivatives of PWA's works on things like marketing materials.  *See also Boatman v. United States Racquetball Ass'n*, 33 F. Supp. 3d 1264, 1276 (D. Colo. 2014) (defendant's violation of a contractual obligation to maintain the plaintiff's copyright management information created an inference that the defendant was aware that its failure to do so would result in copyright infringement). Further, the plans that Cameron created and sent to Urban Living contained an explicit warning about the need to maintain PWA's copyright management information and the consequences of not doing so.

When Urban Living used copies of PWA's architectural works in its marketing materials for the four projects at issue (PX 105-111), it chose to disregard all the warnings and contractual acknowledgements of the need to maintain PWA's copyright management information.  None of Urban Living's marketing materials contain the required PWA copyright management information; indeed, they do not reference PWA at all.

There is thus no question that Urban Living created marketing materials that included PWA's architectural works, that such materials did not include PWA's

copyright management information, and that Urban Living knew that the creation and distribution of such materials would be, and would enable and facilitate, acts of copyright infringement.  That is all that is required for liability under § 1202(b).

## II.  Urban Living's "Distribution" of Copies That Violated § 1202.

The Agreed and Stipulated Facts read to the jury included the following:

> Urban Living has created marketing materials for Nagle Park Place, Patterson Street Landing, Stanford Street Landing, and Eado Place, in the form of floorplans, elevation drawings, and renderings.

> Urban Living has distributed copies of such marketing materials for Nagle Park Place, Patterson Street Landing, Stanford Street Landing, and Eado Place, in the form of floorplans, elevation drawings, and renderings.  *Such distribution included distributions via Urban Living's webpages for those projects, e-mail distributions to prospective purchasers and real estate agents, and e-mail transmissions to other persons.*

(italicized emphasis added).  Further, Urban Living's answer to PWA Interrogatory 13 (which also was read to the jury) admitted that it "distributed" the marketing materials in question through its website, among other means:

**INTERROGATORY NO. 13:**

Identify each and every distribution of any plan, drawing, sketch, or other two-dimensional representation (excluding photographs of constructed buildings) of any Infringing House or Infringing Plan, including all floorplan and elevation drawings used in advertising and marketing any Infringing House. Include in your answer when such drawing, sketch, or other two-dimensional representation was created, who created it, and the dates and manners of each of its distributions.  This interrogatory is intended to include each iteration of each webpage that included floorplans of any house in any Infringing Project, and for each such iteration the data regarding the dates and the number of pageviews of it.

**Answer:**

Advertising materials for Nagle Park Place were created and distributed, along with floorplans, on www.har.com and www.urbanliving.com, on or around August of 2015. The advertising materials were created by Andy Rayner or Tamisha Ross, who are a part of the Media Team in Urban Living. Cameron Architects, Inc. created the plans, which were ultimately used to create the marketing plans. The Media Team and Sales Consultants are in charge of the creation or maintenance of the webpage(s). The marketing materials are created and maintained by the Media Team on the webpage(s). The Sales Consultants notify the Media Team when updates are necessary. The pageviews for the www.urbanliving.com webpage averages 685 per month.

DMCA § 1203(c)(3)(B) provides for statutory damages for "each violation" of § 1202.  PWA contends that "each violation" means exactly what it says: "each violation."  The number of § 1202(b)(3) violations is thus the number of times Urban Living distributed a copy of PWA's work (in the form of marketing materials that included floorplans or elevations of PWA works) without PWA's copyright management information.

The number of times that the Urban Living website distributed the offending marketing materials to individual visitors is set out in PX 113.  For example, for the Nagle project:



In addition, the testimony of Vinod Ramani was that Urban Living also transmitted between eight and fifteen thousand e-mails that distributed the offending Nagle marketing materials.

## III.  Websites "Distribute" Materials to End Users.

Urban Living's admissions in this case – that they "distributed" their marketing materials via the Urban Living website – are legally accurate.  When a user visits a website, that causes a distinct "distribution" of materials from the website to the user.  *See, e.g., Live Face on Web, LLC v. Unlimited Office Sols., LLC*, 2014 WL 7011527, at *3 (D.N.J. Dec. 11, 2014); *Live Face on Web, LLC v. Emerson Cleaners, Inc.*, 66 F. Supp. 3d 551, 555–56 (D.N.J. 2014); *see also New York Times Co., Inc. v. Tasini,* 121 S.Ct. 2381, 2393 (2001) ("The crucial fact is that the Databases, like the hypothetical library, store and retrieve articles separately within a vast domain of diverse texts. Such a storage and retrieval system effectively overrides the Authors' exclusive right to control the individual

-8-

reproduction and distribution of each Article.")  Put differently, while distribution can occur when a defendant puts copyrighted material on a website, it also occurs each time a user obtains the copyrighted material by visiting the website.

## IV.   *McClatchey* **Should Not Be Followed.**

Urban Living does not, and cannot, dispute that its website actually distributed the offending marketing materials to each of the unique pageview visitors shown in its records.  Instead, relying on a portion of *McClatchy v. Associated Press,* 2007 WL 1630261 (E.D. Pa. 2007) and cases that cite it, Urban Living contends that the number of § 1202(b)-violating distributions is not measured by the number of times a defendant sends ("distributes") offending copies to parties via a website, but by the number of time the defendant posts offending materials <u>to</u> its website.

This Court should not follow *McClatchey* and its progeny for two reasons.

1. *<u>McClatchey</u> Did Not, and Should Not, Apply to
   Website Distributions that Violate § 1202(b).*

*McClatchey* did not involve a webpage like the ones in question, where individual users go to the website, which then transmits the images to them as separate and distinct distributions (*i.e.*, pageviews).  Instead, *McClatchey* involved

a wire service making a photograph available to its 1,147 subscribers (with no evidence, apparently, as to how many actually viewed or used it). *McClatchey* held that in that situation, the AP committed only one act – making the photograph available to its subscribers.

That is not the situation in this case. As detailed above, when a user visits a website, there is a "distribution" of materials from the website to the user. As was described in Samantha Wood's testimony, a website simply distributes the same images to a prospective customer that previously were distributed by physically delivering a paper copy. Thus, even accepting the *McClatchey* invention of an "each violative act committed by a defendant" supplemental element to a DMCA § 1202 violation, that still does not mean that each pageview is not a separate distribution (*i.e.*, a "violative act") committed by Urban Living.

The fact that Urban Living uses a website to distribute marketing materials to customers (*i.e.*, rather than have Urban Living employees physically deliver individual copies of requested marketing plans to each prospective customer, it uses a website to do so) does not mean that Urban Living is not the party making each one of those distributions. *Cf. Live Face on Web, LLC v. Unlimited Office Sols., LLC*, 2014 WL 7011527, at *3 (D.N.J. Dec. 11, 2014) (claim that a website

-10-

caused a distribution of copyrighted code to each website visitor stated a claim against the website's owner for violations of copyright owner's exclusive distribution right under 17 U.S.C. § 106(3)).  Thus, each time Urban Living sent offending marketing materials to a customer, it violated DMCA § 1202:

> [I]f the Defendants shared the same image *multiple times,* that would be multiple acts in violation of the DMCA. *McClatchy's* reasoning does not apply because it is based on a single act, not a single photograph. Under *McClatchy*'s line of reasoning, if the defendant had sent 1,147 emails, that would result in 1,147 violations even if the emails contained the same copyrighted photo.

*Design Basics, LLC v. Drexel Bldg. Supply, Inc.,* 2016 WL 5794746, at *3 (E.D. Wis. 2016), *on reconsideration in part,* 2017 WL 354258 (E.D. Wis. 2017).

2. *The words "each violation" are clear, and must be given their plain meaning.*

The stated basis for the *McClatchey* holding was that court's belief that the words "each violation" in § 1203(c)(3)(B) are somehow ambiguous or otherwise do not mean exactly what they say.  The *McClatchey* court thus felt free to speculate on Congress' likely intent (which it divined without reference to any legislative history or other authority), and thus engrafted "each violative act performed by defendant" onto the statute.  *McClatchey*, op. at 6.

Decisions that fail to follow the plain language of § 1202 in other contexts

have been soundly rejected, including by Judge Atlas in this case.  For example,

Urban Living previously argued (Docket #114, p.7) for the application of *Textile*

*Secrets Int'l, Inc. v. YaYa Brand Inc.*, 524 F.Supp.2d 1184, 1192-93 (C.D. Cal.

2007), which engrafted a "electronic or technological measures" limitation onto the

DMCA § 1202(c) definition of "copyright management information."  Judge Atlas

agreed with the Third Circuit (and virtually every other court that has addressed the

issue) that *Textile Secrets* is wrong, because the language of the DMCA is clear.

Docket #122, pp. 5-6; *see also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d

295, 303-05 (3d Cir. 2011) (refusing to follow the *IQ Group / Textile Secrets*

approach as inconsistent with the plain language of the statute); *Williams v.*

*Cavalli*, 2015 WL 1247065, at *3 (C.D. Cal. 2015) (same); *Leveyfilm, Inc. v. Fox*

*Sports Interactive Media, LLC,* 999 F.Supp.2d 1098, 1101 (N.D.Ill.2014) (same);

*Agence France Presse v. Morel,* 769 F.Supp.2d 295, 306 (S.D.N.Y.2011) (same);

*Brown v. Stroud*, 2011 WL 2600661, at *3 (N.D. Cal. 2011) (same); *Associated*

*Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461–62 (S.D.N.Y. 2009)

(same).

Contrary to the approach of cases like *Textile Secrets* and *McClatchey,* the

Fifth Circuit applies unambiguous statutes as they are written:

As the Supreme Court stated, "When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances ... [such as] where the application of the statute as written will produce a result 'demonstrably at odds with the intentions of its drafters.' " *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)) (citations omitted); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."); *United States v. Rodriguez–Rios,* 14 F.3d 1040, 1044 (5th Cir.1994) (en banc).

. . .

**We are a federal appellate court, not a super-legislature; we are not vested with plenary authority to re-evaluate the policy choices made by our elected representatives.** *See* The Federalist No. 78 (Alexander Hamilton) ("The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure for that of the legislative body.")

*Johnson v. Sawyer*, 120 F.3d 1307, 1319, 1322 (5th Cir. 1997) (emphasis added;

internal citations and quotation marks omitted).

In interpreting DMCA § 1202, Judge Ellison has exhibited the judicial

restraint the Fifth Circuit requires:

When a statute's language is clear, our role is to enforce that language "according to its terms." Because this Court does not find that the terms of Section 1202 are sufficiently ambiguous such that resort to

> legislative history is necessary, this Court does not adopt the findings
> in *Textile Secrets.* Because there is no textual support for Morris's
> contention that Section 1202 should be limited to technological
> processes, this Court declines to import such a limitation.

*Interplan Architect, Inc. v. C.L. Thomas, Inc.,* No. CIV.A.408CV03181, 2009 WL 6443117, at *5 (S.D. Tex. Nov. 13, 2009) (internal citations omitted). Judge Atlas did the same in this case (Docket #122, pp.5-6), and this should be this Court's approach now. Because the words "each violation" are not ambiguous, there is no reason to follow the *McClatchey* school of judicial legislating, and consistent with controlling Fifth Circuit precedent those words should be given their plain meaning.

This respect for the plain language of the statute also applies to the remedies Congress mandated for DMCA violations. As other courts have held when applying other DMCA provisions, any issues as to the size of potential judgments under the DMCA should be addressed by Congress – not by courts rewriting or ignoring that law:

> That is not to deny the appeal of Tri–State's argument concerning the
> disproportionate nature of a potential award of statutory damages in
> excess of $43 million. Many other courts have chafed at awarding
> such large sums in the DMCA context. *See Nexon Am., Inc. v. Kumar,*
> No. 2:11–cv–6991–ODW(PJWx), 2012 WL 1116328, at *7 (C. D
> .Cal. Apr. 3, 2012) (although "minimum award here likely" bore
> "little plausible relationship to [p]laintiff's actual damages [,] ... the

-14-

> Court is powerless [to] deviate from the DMCA's statutory
> minimum") (awarding $3.5 million in statutory damages, representing
> the estimated number of circumventions multiplied by the $200 per-
> violation minimum); *Reeves,* 2010 WL 4054095, at *3 (concluding
> that, although $85 million in statutory damages based on 427,393
> "acts of circumvention" may seem "unreasonably large, Congress has
> mandated this approach and the Court is unable to deviate from it.").
> **Like those courts, this Court is constrained to follow the statutory
> language, whatever the apparent inequities. Any criticism of the
> range mandated by the language of the DMCA's statutory
> damages provision should be addressed to Congress, not to the
> Court.**

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-726

CBA, 2012 WL 3306600, at *14 (E.D.N.Y. June 13, 2012) (emphasis added),

*report and recommendation adopted,* No. 11 CV 726 CBA RLM, 2012 WL

3306575 (E.D.N.Y. Aug. 13, 2012).   As the Third Circuit held, in a case

interpreting DMCA § 1202:

> If there is a difficulty here, it is a problem of policy, not of logic. Such
> an interpretation might well provide an additional cause of action
> under the DMCA in many circumstances in which only an action for
> copyright infringement could have been brought previously. Whether
> or not this result is desirable, it is not *absurd,* as might compel us to
> make a more restrictive reading of § 1202' s scope.

*Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 302 (3d Cir. 2011).  Indeed,

that statutory damages awarded under Title 17 may properly be a very large

multiple of any actual damages is well settled, and does not provide a basis for not

following the law as written.   *See, e.g., Sony BMG Music Entertainment v. Tenenbaum*, 660 F.3d 487 (1st Cir. 2011) (music downloading case; reversing district court's reduction of $675,000 statutory damage awarded under § 504(c)), *appeal after remand*, *Sony BMG Music Entertainment v. Tenenbaum*, 719 F.3d 67 (1st Cir. 2013) (affirming award of statutory damages).

## IV.   Urban Living "removed or altered" PWA's Copyright Management Information from "copies" of the work.

Urban Living also argues that because they did not physically remove PWA's copyright management information from a "copy" of PWA's work, they cannot have violated § 1202.   Stated differently, Urban Living argues that because it merely *redrew* floorplans, elevations, and rendering of PWA's architectural works without PWA's copyright management information, that somehow did not "remove or alter" PWA's copyright management information from a "copy" of the work.   Urban Living cites no authority for this proposition, which Judge Atlas has already rejected in this case.   As detailed below, Urban Living's argument ignores the definitions of "copies" and of an "architectural work" under the Copyright Act and controlling Fifth Circuit caselaw.   It is also contradicted by DMCA § 1202 caselaw on point.

-16-

Under the Copyright Act,

An "architectural work" is the design of a buildings *as embodied in any tangible medium of expression*, including a building, architectural plans, or drawings.

"Copies" are material objects, other than <u>phonorecords</u>, in which a work is fixed by any method now known or later developed, *and from which the work can be perceived, reproduced, or otherwise communicated*, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

17 U.S.C. § 101 (definitions of "architectural work" and "copies"; emphasis added).

A "copy" is not, as Urban Living posits, limited to a literal copy of a work. Instead, it is much broader, and includes all material objects from which the work can be perceived.  As such, unauthorized derivatives of a protected work are also considered to be "copies" under the Copyright Act.  As the Fifth Circuit has held:

The language of LSI's modified MPO program is likewise similar to that of K–T's materials: their paragraphs are about the same size, their phrases are similar, their ideas are presented in the same order; in short, parts of the modified MPO program are but a transparent, syntactic rearrangement of portions of K–T's copyrighted materials. While no longer identical to those materials, the modified MPO program still bears many telltale signs of its origins. *It is still a copy— still a child of infringement*.

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 536 (5th Cir. 1994)

-17-

(emphasis added).   This is consonant with settled copyright law regarding the broad meaning of the term "copying," which is not limited to literal reproduction. *See Gates Rubber Co. v. Bando Chemical  Industries*, 9 F.3d 823, 832 n.6 (10th Cir. 1993) ("'Copying' . . . is a shorthand reference to any infringement of the copyright owners exclusive rights that are set out at 17 U.S.C. § 106"); *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) ("Copying is a 'shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106'").

As such, *any* tangible embodiment of the protected design (whether in the form of a constructed building, marketing brochures, construction plans, etc.) constitute "copies" of the architectural work.   *See, e.g., Palmetto Builders & Designers, Inc. v. UniReal, Inc.*, 342 F. Supp. 2d 468, 473 (D.S.C. 2004) (constructed building was "copy" of protected architectural work).   This was, of course, was the reason for the Architectural Works Copyright Protection Act of 1990 – to expand copyright protection of building designs to *any* embodiment of that design.   *See, e.g., Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 188-190 (2d Cir. 2012) (discussing history and reasons for adoption of the AWCPA).

As such, when Urban Living reproduced PWA's architectural works (in the form of floorplans, elevations, renderings, etc.) in floorplan drawings and renderings that were included in its marketing materials, it created additional "copies" of PWA's architectural works.  *See Ranieri v. Adirondack Dev. Grp., LLC*, 164 F. Supp. 3d 305, 334 (N.D.N.Y. 2016) ("[C]opyright protection extends to simplified floor plans, that is, promotional cut sheets, of copyright architectural plans. . . . [B]ecause it is undisputed that C.B. Prime used Plaintiff's drawings in its advertisements to market and sell the subject properties without Plaintiff's permission, C.B. Prime is liable for infringement. . . ." (internal citations omitted)); *see also Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F.Supp. 709 (S.D.N.Y. 1995) (defendants creation and distribution of advertising materials that included copies of plaintiff's floorplans was evidence of copyright infringement).

When it created these "copies" of PWA's architectural works, Urban Living unquestionably removed or altered the copyright management information that had been on PWA's marketing materials and construction plans.  Urban Living removed this information despite unambiguous warnings on the plans themselves not to do so, and despite explicitly agreeing to maintain PWA's copyright

management information as a condition of the use of PWA's works.   This is exactly what DMCA § 1202 prohibits.

Caselaw also rejects Urban Living's interpretation of the DMCA.   In *Boatman v. United States Racquetball Ass'n*, 33 F. Supp. 3d 1264 (D. Colo. 2014) a photographer provided images bearing copyright notices to a customer.   As in this case, the licensing agreement between the parties required that any use of an image must include the copyright notice as a condition of use.   The photographer also provided a text file of the copyright notice "so that the Defendant could be sure to add the copyright watermark to any photograph after any editing took place." 33 F.Supp.2d at 1276.   When the customer subsequently used those images in its materials without including the required copyright notice, the photographer asserted claims for both copyright infringement and violations of DMCA 1202. Like Urban Living, the defendant claimed there was no evidence that it "removed" any copyright management information (*i.e.*, the defendant claimed that it did not "remove" plaintiff's CMI, it just failed to include it).   Just as Judge Atlas ruled in this case, the *Boatman* court rejected this argument, finding that it was reasonable to infer that the defendant had effectively removed or altered the copyright management information.   *Id.*

-20-

Other caselaw supports PWA's view of DMCA § 1202.  For example, in *Interplan Architect, Inc. v. C.L. Thomas, Inc.*, 2009 WL 6443117 (S.D. Tex. 2009), an architect was accused of creating derivative plans from the plaintiff's works, and of violating DMCA § 1202 by not maintaining the plaintiff's title block and copyright notices on such derivative works.  This was held to state a claim under DMCA § 1202.  *Interplan Architects*, op. at *3-5.  In *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461–62 (S.D.N.Y. 2009), the defendant was accused of rewriting and then republishing AP news articles, and in so doing did not include the AP's copyright management information.  This was held to state a claim under DMCA § 1202.  608 F.Supp.2d at 457-58, 461-62.

## Conclusion

The language of DMCA § 1202(b) and § 1203(c)(3)(B) is unambiguous. This Court should apply it as written, as required by the Fifth Circuit.

Respectfully submitted,

Patrick Zummo
State Bar No. 22293450
Two HoustonCenter
909 Fannin, Suite 3500
Houston, Texas77010
(713) 651-0590 (Telephone)
(713) 651-0597 (Facsimile)
pzummo@zoomlaw.com

*/s/ Louis K. Bonham*
Louis K. Bonham
State Bar No. 02597700
Osha Liang L.L.P.
909 Fannin Street, Suite 3500
Houston, Texas 77010
(713) 228-8600 (Telephone)
(713) 228-8778 (Facsimile)
bonham@oshaliang.com

ATTORNEYS FOR PLAINTIFF
PRESTON WOOD & ASSOCIATES, LLC

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record via electronic filing, on this the 27th day of August 2018.

*/s/ Louis K. Bonham*
Louis K. Bonham