<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3
   PRESTON WOOD & ASSOCIATES, LLC,     )
 4                                     )
            Plaintiff,                 )   NO. H-16-CV-1427
 5                                     )
   v.                                  )   August 22, 2018
 6                                     )
   CAMERON ARCHITECTS, INC.,           )
 7 STEPHEN CAMERON, and UL, INC.,      )
   d/b/a URBAN LIVING, and             )
 8 VINOD RAMANI,                       )
                                       )
 9          Defendants.

10
                              TRIAL
11            BEFORE THE HONORABLE DAVID HITTNER
                         AND A JURY
12
                           VOLUME 1
13                    PAGES 1-1 to 1-83

14

15 For the Plaintiff:        Patrick A. Zummo
                             Attorney at Law
16                           909 Fannin, Suite 3500
                             Houston, TX 77010
17
                             Louis K. Bonham
18                           Califf T. Cooper
                             Osha Liang, LLP
19                           909 Fannin, Suite 3500
                             Houston, TX 77010
20
   For the Defendants:       Justin Strother
21                           Michael W. Belleville
                             Strother Law Firm, PLLC
22                           3000 Weslayan, Suite 348
                             Houston, TX  77027
23 Court Reporter:
                             Bruce Slavin, RPR, CMR
24
   Proceedings reported by mechanical stenography and produced
25 by computer-aided transcription.
</pre>

1                      I N D E X

2

3                                              Page

4

5    Jury Selection                          1-1

6    Preliminary Instructions to the Jury    1-69

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Venire panel present)

2         THE COURT:   Thank you, ladies and gentlemen.

3    Please be seated.

4              I'm Dave Hittner, one of the Judges of the

5    United States District Court of the Southern District of

6    Texas.  I want to welcome you on the next step and maybe the

7    first step on your jury service.

8                   As you know, you come from a number of

9    different counties that come down by phone.  So, I always

10   ask this first.

11                   Those of you that this is the first time on

12   this jury service, you've come up to a courtroom, if you'd

13   please raise your hand.

14                   (Show of hands)

15                   Okay.  So, we have a couple of hands that went

16   up.  You've been up in other courtrooms?  How many have been

17   up to other courtrooms?

18                   (Show of hands)

19                   Oh.  All right.

20                   Well, this is a little bit different.

21   Everything is different.  Nothing's 100 percent.  So, I say

22   99 percent of the folks that have sat on juries while I've

23   been a judge have found it to be a very positive experience

24   and, hopefully, you will, too.

25                   As far as how long I've been doing this, I was

1   in state court as an elected state judge for about seven and

2   a half years.  I've been over here 32 years.

3              And everyone says, 'Well, you've been here

4   this long.  How come you have such a small courtroom?'

10:27   5   Because some of the others are monsters in this courthouse.

6              This, traditionally, was the courtroom that

7   all junior judges started from and, as soon as they could,

8   they'd beat it off the eighth floor.  The only difference is

9   I stayed and started accumulating all the offices.

10:27   10             So, I've got more office space than any other

11   judge in the building; so, I'm not trading that.

12             And that pole.  Everybody says, 'Well, you've

13   got that pole.'

14             Well, I first got down here and I heard from

10:27   15   somebody, 'A federal judge can do anything, you know, if he

16   or she wants to.'

17             'I want to get rid of that pole.'

18             So, they're looking at me.  So, they did a

19   quick survey.  They found out that that pole is a

10:28   20   weight-bearing pole for the whole building.  And they said

21   they could theoretically get around it.

22             You get rid of that pole by getting steel

23   girders like they have on bridges and so forth and kind of

24   bridge across it even though it has to go up and down the

10:28   25   whole building.  And they said they couldn't guarantee

1    everything wouldn't crash in on the eighth floor.  So, I

2    need the pole.

3              And I had some high-profile case a number of

4    years ago.  They upgraded everything here, including putting

10:28    5    in those TV cameras, and we have folks that -- we have a

6    hearing amplification for folks who may have a hearing

7    problem.  We've got those two boxes of infrared transmitters

8    for this whole building and so -- for this whole courtroom.

9              So, it tends to work.  So, I've never moved

10:28   10    and I'm not going to -- kicking and screaming, perhaps, one

11    of these days moving out.

12              Everybody serves on jury duty.  So, I'm glad

13    you're here.

14              If you look to the corner of the jury box,

10:29   15    those are my juror badges hanging up there on the corner of

16    the jury box.

17              When I was a state court trial judge, I served

18    on a state court jury right in that same building, actually,

19    on the same floor my own courtroom was.  And since I've been

10:29   20    to federal court, I've been called down to jury duty once to

21    the City of Houston Traffic Court and the other one is the

22    Justice of the Peace Court.

23              So, we all serve.  All I can tell you is that

24    we're going to move this case along as quickly as we

10:29   25    possibly can consistent with the interests of the parties.

1    Sometimes people don't have a real handle on what jury duty

2    is about.

3                 I had one case that lasted quite a while.  One

4    of the jurors was a teacher, and I got a card from her

5    class.  Apparently, maybe they were getting rid of -- they

6    were tired of the substitute.  So, all the kids got together

7    and they wrote me a letter.

8                 By the way, I'll read it to you in a moment

9    because the text is really cute.  But it was so impressive I

10   actually had it enlarged, and that's that big, square --

11   what is it? -- rectangular -- what is it? -- frame right

12   next to the jury room door.  So, if you get selected, this

13   is what it says on there.

14                Each of the youngsters drew a stick figure of

15   themselves with their name under it, and this was the

16   letter.  It says:  "Dear Mr. Judge, Please let my teacher

17   come back to school soon.  We really do miss her."

18                So, that was nice to see.  The teacher had

19   about another week to go, got off jury duty and went back to

20   her class.  It was a second grade class in Katy Independent

21   School District, and it goes back a ways to March 2006.

22                Let's talk about this type of court.  Okay?

23   This is -- The district court on the federal level is the

24   highest level of the trial court in the federal system.  So,

25   this is the last stop we actually have jurors in the box.

1          In effect, ancillary to this court are the

2     United States magistrate judges and their courts, the U.S.

3     bankruptcy courts.  And almost every federal agency has

4     their own appellate process within the system, like the

10:31   5     Energy Department and the Veterans Administration.

6          If you think that you've been denied benefits

7     or you're granted benefits with their appellate system, you

8     can bring it to the one-judge court.  I sit as an appeals

9     court occasionally from the bankruptcy court and from the

10:31  10     magistrate's court.

11          We also handle appeals from the Social

12     Security Administration.  If people are denied benefits or

13     if they're granted benefits and the -- what is it? -- and

14     the administrative hearing examiners disagree, granted

10:32  15     benefits a certain way and the government disagrees, the

16     agencies, they can appeal in here.

17          But, in any event, this is the last stop for

18     the trial level.  Okay?  Cases move on up the ladder, so to

19     speak, from here if the lawyers feel it's necessary.

10:32  20          So, the next step up is the United States

21     Court of Appeals.  There are 12 Courts of Appeal, basically,

22     in the United States, regular cases.

23          Each of the states are divided into -- Each

24     areas of the country are divided into different circuits.

10:32  25     We are in the Fifth Circuit.  So, all appeals from this

1    court go to the United States Court of Appeals for the Fifth

2    Circuit, taking in the states of Texas, Louisiana and

3    Mississippi.

4                    So, all trials, what happens is, if they want

10:33    5    an appeal, they'll ask the court reporter to type up the

6    transcript, the attorneys will write briefs and then they

7    can go and argue the case in front of the United States

8    Court of Appeals for the Fifth Circuit.

9                    The headquarters of the court is in

10:33   10    New Orleans.  Historically, it's in New Orleans.  But the

11    judges come from all three states.

12                    So, an appeal, let's say, from this courtroom

13    will go to the U.S. Court of Appeals for the Fifth Circuit,

14    but the judges for all three states -- In this building, I

10:33   15    think we have about six circuit judges residing here, the

16    ones from Texas and, of course, Louisiana and Mississippi.

17    They're all spread out through those states.

18                    Very often you go.  The judges, if they grant

19    oral argument, will hear 20 minutes a side from the attorney

10:33   20    standing at a podium.  The judges sit three judges.  No

21    evidence is presented, no jury.  They just argue what's

22    right or wrong with the transcript of the case or the

23    rulings the judge made or whatever.

24                    And then the judges go back.  They fly in from

10:34   25    the different states.  For instance, an appeal from this

1   court could be heard at random, because they select the

2   judges at random by a computer, by two judges who reside in

3   Louisiana and one from Mississippi, but they make up the

4   Court of Appeals panel.

10:34   5          Now, after they come down with their ruling

6   either affirming or reversing or partially affirming or

7   firmly reversing, it comes on back.  A person has a right to

8   request, civil and criminal, an appeal to the United States

9   Supreme Court.

10:34   10          Of course, the Supreme Court sits in

11   Washington made up of nine justices, and they hear appeals

12   from all of the circuit courts and, also, from all the

13   Supreme Courts of all the states.  But they don't have to

14   take every case that comes in.

10:35   15          It's a lot different than our Courts of

16   Appeals.  They pick and choose.  And each year at the end of

17   the session I have my staff call up to the Supreme Court and

18   find out how many cases they recently had.

19          The recent -- The most recent statistics are

10:35   20   as follows from the whole country:  6,475 cases were

21   appealed to the U.S. Supreme Court, meaning -- well,

22   actually, requested to be heard -- and the Court actually

23   wrote opinions on just 62 cases.

24          So, in effect, you get one crack at the Court

10:35   25   of Appeals and just a rare case is accepted by the Supreme

*Jury Selection*

1   Court to rule.  So, it's going to be a case of major

2   constitutional importance.  Or there's another reason

3   they'll take a case:  if there's what they call a conflict

4   of the circuits.

10:36   5           The Ninth Circuit is the largest statewide

6   regional one.  That's in California.  Let's look at that.

7   California, Washington, Oregon, the whole West Coast, over

8   to Nevada and -- what is it? -- Arizona and then you've --

9   Those are the western states.

10:36   10          Let's say they decide a case a certain way and

11   just, by chance, let's say, a year later the Second Circuit,

12   which is New York, Vermont and -- what is it? -- Connecticut

13   over there decide a case almost exactly the same, but they

14   decide it differently.  So, that's a conflict of the

10:36   15   circuits.  That's another reason why the U.S. Supreme Court

16   might take a case.

17          But that's how the system works.  This is the

18   last stop of trials with juries, and we're glad to have you

19   here.

10:36   20          I want to tell you about the workday

21   generally.  I know you were a little early today.

22   Generally, we begin at 10:00 a.m. and we adjourn at

23   6:00 p.m.

24          This allows the jurors who sit on the case to

10:37   25   get here after the rush hour and to leave after the rush

*Jury Selection*

1    hour and allows me to come in from 9:00 to 10:00 and during

2    the lunch hour to hear other matters, criminal matters,

3    civil matters, like sentencings, rearraignments, summary

4    judgment hearings, defaults and things like that.  So,

10:37   5    that's basically the schedule.

6              We've all seen a lot of TV trials.  I don't

7    watch much because it's like working, and it's not very

8    accurate.  But -- what is it?  *JAG*?  Is that still on?  *Law*

9    *& Order* and *Judging Amy*.  There's also -- What is it?  What

10:37  10    is it?  *The Good Wife* was on, but now what is it?  It's on

11    the CBS pay station.

12              But, anyhow, we got lots going on on TV.

13    *Judge Judy*, of course.  That Judge Judy -- By the way,

14    kidding aside, last year in the *TV Guide*, she's the highest

10:38  15    paid performer on television, all of TV.  I kid you not.

16    40 million a year.  I don't know.  Maybe I'll put my name in

17    for the next one around.  We all grew up, a lot of us, on

18    Judge Wopner.  Remember?  *The People's Court*.

19              In any event, kids always bring you down aside

10:38  20    from pictures like that.  I remember I was -- You know, show

21    and tell, bring your parents to school as to what he or she

22    does.

23              And years ago I was out talking to one of my

24    kids' courts -- kids' classrooms and some little girl raised

10:38  25    her hand and wanted to know was I as important as

1    Judge Judy.  I said, "No.  I'm not.  Not really."

2                    But, in any event, you've seen a lot on TV.  A

3    federal trial has never been videoed.  It's never been

4    videoed.  It's all state court.  It's not to criticize.

10:39   5    It's just that we're different.

6                    We're going to talk about two things.  You

7    don't know yet whether this is a civil or a criminal case.

8    Okay?  I'll tell you in a moment.  But let's talk about the

9    burden of proof, the burden of proof in a civil case.

10:39   10                   Let's say it's a contract matter, maybe a

11   personal injury.  You occasionally get them over here,

12   contract banking or whatever.  All right?

13                   The plaintiff, that name, that's the person

14   who brings the lawsuit.  The defendant is against whom it's

10:39   15   brought.  This is a civil case.

16                   The jury, if you sit -- If it's a civil case,

17   you're -- the plaintiff must prove his or her case by a

18   preponderance of the credible evidence.

19                   So, what does that mean?  By the way, you'll

10:39   20   get written instructions on this at the end.  Preponderance

21   of the credible evidence.  Lawyers often use this.  You

22   picture the scales of justice.  A very slight tipping is a

23   preponderance of the evidence.  Very slight tipping.

24                   Now, if this is a criminal case, the

10:40   25   government must prove its case against the defendant beyond

1    a reasonable doubt.  That's not beyond all doubt, not beyond

2    a shadow of a doubt.  But it's beyond a reasonable doubt.

3              Again, you'll get an instruction that this is

4    a criminal case.  But, again, picture those scales of

10:40  5    justice.  Beyond a reasonable doubt is a much heavier

6    tipping of the scale.

7              As the lawyers come and visit with you or if I

8    ask you a question -- Let's say it's a medical case and you

9    have some background in the medical community.  We don't

10:40  10    want anybody in there getting to be an expert on their own.

11              So, the bottom line would be -- or let's say

12    it was a criminal case.  Maybe you or a close relative is a

13    police officer.  You know, they're going to ask you some

14    questions.

10:40  15              The bottom line is this:  If that -- Whatever

16    it is that you may have a concern about or a background

17    about, the question is:  Would that prohibit you from being

18    fair and impartial on this case -- and here's the key

19    phrase -- without having heard any of the evidence?

10:41  20              I can't impress upon you the importance of

21    that, being fair and impartial without having heard any of

22    the evidence.

23              I analogize it each time to this:  Like an

24    Olympic 100-meter dash.  All of the runners are in the

10:41  25    starting blocks together, starting equal.  Then that

1    starting gun goes off and then, in effect, the contest

2    begins.

3             I don't want to relate this to a footrace or

4    even to a horse race where all the animals are in the stall

10:41  5    and then the bell goes and out come the horses.  But what it

6    is we're looking for is can you give both sides an equal

7    shake without having heard any of the evidence, everybody

8    equal at the start.

9             Then, of course, you start listening to both

10:42 10    sides.  And, eventually, you will get the instructions from

11    the judge, either in a civil case, fill in the blanks and

12    how much money, if any, or in a criminal case, guilt or

13    innocence.

14             So, right at this point, that's the basic

10:42 15    question.  You don't know anything about the case.  But I'll

16    try this.

17             Anything about what I've said so far that

18    would prohibit you from being fair and impartial in this

19    case without having heard any of the evidence yet?

10:42 20             All right.  We got no hands.  Good.

21             Now, let me tell you about this case.  This

22    case is a civil case.  Nobody's going to jail or anything

23    else.  Okay?  It's a civil case.  Really interesting.

24             I'm going to read you a statement of the facts

10:42 25    in just a moment because the attorneys and I worked a good

1    part of yesterday getting all the evidence down so we can

2    move it along today.

3              By the way -- And I always mention this and,

4    of course, there's been some other criminal matters in

10:43    5    the -- what is it? -- in the public eye recently, a lot of

6    it in federal court.

7              In federal court -- okay? -- only the judge

8    does the sentencing.  So, if you were a juror in a federal

9    criminal case, you would decide guilt or innocence, but you

10:43    10    would not decide the penalty.  The penalty is up to the

11    judge in the federal court.

12              Of course, you know, in the state court

13    system, almost all of it, the jury says guilt or innocence

14    and, if it's guilty, then they come back for the sentencing

10:43    15    phase.  There's only one case where you come back in, and

16    that's a death penalty case.

17              When you have a death penalty case in federal

18    court, then, just like all the state system, you'll come

19    back in and decide what the punishment should be.  Aside

10:43    20    from that, the jury does not.

21              Also, just as a little bit of background,

22    there is no parole in the federal system, and that's not to

23    be criticizing of any state system, which is different.

24              In state court, let's say you get a certain

10:44    25    sentence.  You're eligible for parole after maybe a quarter

*Jury Selection*

1    of your time or a half of your time.  That is not the case

2    in any federal sentence.

3                    In federal court, you will serve the entire

4    time.  The only possibility is, if you behave yourself, the

10:44   5    most you can get is 54 days a year good time after the first

6    year.

7                    So, if you see a case coming down where a

8    person is sentenced to a year, a year and a day, that one

9    day means that they may be eligible for good time because

10:44   10    good time accrues if your sentence is more than one year.

11    So, just keep that in mind.

12                    Again, no parole at all.  So, any federal

13    sentence, you will serve at least -- I think it's 89 to

14    90 percent of your sentence.  The Parole Commission was

10:45   15    abolished in 1986 in federal court.  So, we have no parole.

16                    I'm going to read you now just a brief

17    description of the case, and then I'm going to turn it over

18    to the attorneys, who are going to visit with you about the

19    case.

10:45   20                    Oh.  Oh.  One other thing.

21                    The attorneys are going to be on a timing

22    order.  They'll get a worksheet like this every day because

23    the promise I make to the jury is that this case will move

24    along.

10:45   25                    Those of you that have sat on state court

 1    juries know that the judge doesn't have that much of a role

 2    in the case.

 3               In federal court, the judge can jump in and

 4    mix it up a lot more than they can in the state system.  But

 5    I also have the great equalizer.  That's what I tell the

 6    jury.  I've got a chess clock.  Okay?

 7               Now, they're going to have a certain amount of

 8    time.  There's the clock.  That's on.  They're going to have

 9    a certain amount of time to question their witnesses and to

10    cross-examine the other witnesses, and I will be setting

11    that time today.  All right?

12               When the time is up, they sit down.  No more

13    questions.  So, if you see me touching the buttons, there --

14    that guy is up, this guy makes an objection, right down; it

15    goes the other way.  So, the time runs.  When the time is

16    up -- That's the deal I make with you.

17               This is going to be, the attorneys have

18    stated, an extremely short case for federal court.  We're

19    talking about testimony, whenever it begins, of well less

20    than a week.  It's going to go quickly.  And, again, they

21    will move along and -- consistent with the rights.

22               Now, keep in mind both sides have waited to

23    get to today.  This is their day in court.  That's what our

24    whole system is geared for.

25               If they couldn't work out any kind of a

1    settlement -- which is fine -- they come to court and they

2    submit it to a cross-section of the community.  That's what

3    you are, a cross-section of the community, to render a

4    verdict on this disputed fact pattern.

10:47  5              Okay.  Let's tell you what the case is about,

6    and then we're turning it over to the attorneys.

7              This is a copyright case.  The Plaintiff --

8    Remember, the Plaintiff, who happens to be sitting at this

9    table -- they may be shifting to the other table during the

10:47  10   trial so they can be closer to the jury -- but the Plaintiff

11   is a design firm known as Preston Wood & Associates, LLC,

12   legal -- what is it? -- legal -- limited legal corporation?

13        MR. ZUMMO:  Limited liability company.

14        THE COURT:  Okay.  There it is.  That's what it

10:47  15   stands for.  It's a company.

16              The Plaintiff is a design firm, Preston Wood &

17   Associates.  The Defendants are a real estate firm known as

18   "UL", the two initials, "Inc.", Incorporated, doing business

19   as Urban Living; its owner, Vinod Ramani -- it's

10:48  20   R-a-m-a-n-i; and an architecture firm, Cameron Architects,

21   Inc., and its owner, Stephen Cameron.

22              So, on the Plaintiff's side, we have Preston

23   Wood & Associates.  On the defense side, UL, Inc., doing

24   business as Urban Living, its owner, a Mr. Ramani; an

10:48  25   architectural firm, Cameron Architects, Inc., and its owner,

1    Mr. Cameron.

2            Now, the Plaintiff -- This is what they're

3    alleging.  You haven't heard any evidence.  The Plaintiff

4    alleges that the Defendants have infringed the copyrights of

10:48   5    Preston Wood's architectural plans, drawings and building

6    designs.

7            Preston Wood also alleges that the Defendants

8    have violated federal copyright law by distributing copies

9    of Preston Wood's works that had Preston Wood copyright

10:49   10    management information removed or altered from the plans.

11            Preston Wood seeks to recover the profits that

12    the Defendants made from their allegedly infringing

13    activities as well as other damages allowed by law.  That's

14    what the Plaintiff says.

10:49   15            Now, what does the defense on the other side

16    say?

17            The Defendants say that Preston Wood's works

18    include many unprotectable elements, and they deny that the

19    works at issue in this case infringe on the protectable

10:49   20    parts of Preston Wood's works.

21            Further, they disagree as to what portion, if

22    any, of the Defendants' profits are attributable to the

23    protectable parts of Preston Wood's works.

24            It may sound complicated, but we've talked

10:49   25    about it.  The skill of the lawyers -- and they're all

1    experienced federal jury practitioners -- is going to get

2    it -- it's ready and you're going to understand it.  We're

3    going to have some experts come.

4            And that's why I've never tired of doing what

10:50    5    I do.  I learn all sorts of things about all sorts of

6    businesses.  I know how to dredge a canal.  I know how to

7    sandblast a bridge.  I know how to load rice bags into the

8    hold down in Galveston -- what is it? -- the design of

9    swimming pools, all sorts of things.  And we have people

10:50   10    sometimes, you know, with advanced degrees going to be

11    called, perhaps, as experts in these areas.

12            Anyhow, that's what the case is about.

13            Once again, without hearing anything else,

14    anybody feel, based upon those facts, you can be fair --

10:50   15    that you couldn't be fair and impartial without having heard

16    any of the evidence yet?

17            Yes, ma'am.  That's Juror No --

18            PROSPECTIVE JUROR:  7.

19            THE COURT:  No. 7.  We'll call you up later.  Okay?

10:51   20            All right.  Each side has been granted a

21    maximum of 30 minutes.  The clock goes on -- By the way, the

22    actual time that they're going to be required to adhere to

23    for the whole trial doesn't start during the voir dire.

24            "Voir dire" is a French term meaning "to see"

10:51   25    or "to speak" or whatever.  Basically, it is what -- the

1    attorneys have time to visit with you and maybe have a

2    question about what you have filled out here.  They know

3    they're not going to ask any question on here.

4                    I've tried cases everywhere from, I guess,

10:51   5    Arizona over to New York on the federal side, and this is

6    the most comprehensive juror information form I've ever

7    seen.

8                    About 30 years ago I was a member of the

9    small committee here that actually worked this up.  So, this

10:51   10    is what makes the voir dire go quickly, and it will.

11                    But, anyhow, they got 30 minutes.  So, at this

12    time -- The Plaintiff, remember, has got the burden of

13    proof.  And they have the burden of proof; so, they'll go

14    first.

10:52   15                    All right.  Counsel for the Plaintiff, go

16    right ahead.

17            MR. ZUMMO:  Thank you, Your Honor.

18                    My name is Pat Zummo.  I'm a lawyer here in

19    Houston, and I have the pleasure and the honor in this

10:52   20    courtroom in this trial to represent --

21            THE COURT:  Mr. Zummo --

22            MR. ZUMMO:  Yes, sir.

23            THE COURT:  -- as I mentioned, if you want to walk

24    up and down, you may, but you need the microphone.  Do you

10:52   25    want the microphone?  No.  Do you want the portable mic?

*Jury Selection*

```
 1              MR. ZUMMO:  I do not need it.

 2              THE COURT:  Okay.  Then, pull the mic in, please,

 3    sir.

 4              MR. ZUMMO:  I have the honor of representing

 5    Preston Wood & Associates, which is a home design firm.

 6    And, as a starting point, I'd like to introduce the owners

 7    and the people who are responsible for Preston Wood &

 8    Associates, Preston Wood --

 9              THE COURT:  Stand up so everybody in the back...

10              MR. ZUMMO:  -- and Samantha Wood.  We --

11              THE COURT:  Now, you've got to sit down.  We can't

12    see Miss Wood.  No.  No.  You're being blocked by your

13    husband -- no pun intended.

14              MR. ZUMMO:  That's not the way their marriage

15    works.

16              You'll hear us refer to Samantha as "Sam"

17    throughout this trial.  Preston and Sam have operated that

18    business in different forms for around 40 years.

19              I also want to introduce my co-counsel in this

20    case.

21              First, Louis Bonham is an attorney who used to

22    live and work in Houston, but for well over 10 years he's

23    lived in Austin, and then Califf Cooper, who is an attorney

24    here in Houston.  They're both with a law firm called Osha

25    Liang, which is here in Houston, but has other offices.
```

1           Does anybody know any of the -- Sam, Preston

2    or any of the lawyers that we've introduced so far?

3           PROSPECTIVE JUROR:  I know Preston.

4           MR. ZUMMO:  You do, ma'am?  Well, then, we -- as

5    Judge Hittner said, we'll talk to you --

6           THE COURT:  Oh.  You do?

7           PROSPECTIVE JUROR:  Uh-huh.

8           THE COURT:  Why don't you stand up and tell us

9    about it.  Who do you know?

10           PROSPECTIVE JUROR:  I know Preston.

11           THE COURT:  Stand up, ma'am, please.

12              Who do you know?

13           PROSPECTIVE JUROR:  I know Preston.

14           THE COURT:  Okay.

15           MR. ZUMMO:  I believe you're Mrs. ██████?

16           PROSPECTIVE JUROR:  No.

17           MR. ZUMMO:  Oh.  ████████.  ████████.

18           PROSPECTIVE JUROR:  ██████.

19           MR. ZUMMO:  And you're an architect?

20           PROSPECTIVE JUROR:  I'm an architect.

21           THE COURT:  Okay.  Good.  Then, we will call you up

22    later.  I just want to make sure.  Thanks so much.

23           MR. ZUMMO:  Your Honor, can I ask Mr. Strother to

24    introduce his parties and his clients at his --

25           THE COURT:  Yes.  Go right ahead.

1          MR. STROTHER:  Use the microphone?

2          THE COURT:  No.  They'll hear you from right there.

3          MR. STROTHER:  Okay.  I'm Justin Strother and I

4    represent the Defendants in the case.

10:54   5          Next to me is Vinod Ramani.  He is the owner

6    and principal of Urban Living, which is the real estate

7    brokerage.

8          Next to him is Stephen Cameron.  He is the

9    owner and he's the architect of Cameron Architects.

10:54   10         Across the table from me is my associate, Mike

11   Belleville.

12         And next to him is Angela Cameron.  She's

13   Stephen's wife and she also handles the finances of the

14   firm, the architectural firm.

10:54   15         Thank you.

16         MR. ZUMMO:  Thank you.

17         THE COURT:  Wait a second.  You didn't introduce

18   your other associate.

19         MR. STROTHER:  I introduced Mr. Belleville and

10:55   20   Ms. Cameron.

21         THE COURT:  Oh.  You have.  Okay.

22         MR. ZUMMO:  So, does anyone know any of the

23   Defendants or their lawyers?  Okay.

24         I'm going to ask you about two other people

10:55   25   who are going to be witnesses in this case.

1          There is an architect here in Houston named

2    Suzanne Labarthe with the firm of Rogers Labarthe.

3          Does anyone know Suzanne?

4          Thank you, ma'am.

10:55    5          And then there's an architecture professor at

6    the University of Houston named Leonard Bachman, and he's

7    expected to testify.

8          Does anybody know Professor Bachman?

9          Thank you.

10:55   10          As Judge Hittner said, he's going to give you

11   instructions at the conclusion of the case on what the law

12   is that applies to this particular copyright infringement

13   case.

14          In our system, we have a split of the jobs in

10:55   15   the courtroom.  The Judge is in charge of the law, and the

16   Judge is also the person who ensures that the rules are

17   being followed so that both sides get a fair trial.

18          What the jury does in our system is answer

19   specific questions that we have about the facts of the case,

10:56   20   basically:  What is it that actually happened?  What really

21   happened?  And we often say that the jury is the sole judge

22   of the facts.

23          And the reason we use juries for this is it

24   just -- Over generations, what we've learned is that, when

10:56   25   you have arguments over what happened, questions about the

1    evidence, is it believable evidence and reliable evidence or

2    not, one of the best ways to judge that evidence and decide

3    if it's believable is to bring together a group of people.

4                    In this case, we're going to have eight people

10:56    5    selected for the jury, and what that means is that we will

6    have the benefit of eight lifetimes of experience in dealing

7    with people in understanding what to believe and what not to

8    believe.

9                    And there are a lot of times when a group of

10:57    10    people may not be the best way to decide something, but what

11    we've learned in our system is, when it comes to judging

12    believability and credibility of witnesses and other

13    evidence, putting a group of eight people, or twelve people

14    in some other cases, together gives us the best solution to

10:57    15    who do you believe and what really happened here.

16                    So, what -- I'm going to ask some questions

17    about, you know, can we all follow these jobs, can we all do

18    the jobs that we're going to have.

19                    First of all, is there anybody who thinks you

10:57    20    will not be able to follow Judge Hittner's instructions on

21    the law?  I wouldn't expect that.

22                    THE COURT:  I wouldn't expect it either.

23                    MR. ZUMMO:  Right.

24                    I'm going to pick on two people because we

10:58    25    actually have two lawyers on this panel.  And we get those

 1   information sheets that you filled out.  We get them far

 2   enough in advance to understand your background.

 3                    But is it Ms. ████, Juror No. 17?  You're a

 4   lawyer?

10:58   5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  Ma'am, would you stand up, please.

 7          PROSPECTIVE JUROR:  Yes.

 8          MR. ZUMMO:  And then, Mr. ████, you're a lawyer?

 9          PROSPECTIVE JUROR:  Yes.

10:58   10         MR. ZUMMO:  I'm going to put you two on the spot.

11          THE COURT:  No, you're not.  No, you're not.

12              Have a seat.

13          MR. ZUMMO:  Okay.

14          THE COURT:  In other words, if you have any

10:58   15   specific questions about them, we don't work one to the

16   other.  Remember, we talked about state court may be

17   different.  If you have a question that you spot, valid, you

18   want to talk to the lawyer about their position, you may ask

19   them one at a time.

10:58   20         MR. ZUMMO:  Well, as lawyers -- Juror No. 17, as a

21   lawyer, do you think you'll have any problem following the

22   Judge's instructions on the law of this case?

23          PROSPECTIVE JUROR:  No.

24          MR. ZUMMO:  And, Mr. ████, the same question to

10:59   25   you.  As a lawyer, will you have any problem following

1    Judge Hittner's instructions as they apply to the law of

2    this case?

3         PROSPECTIVE JUROR:  No.

4         MR. ZUMMO:  I wouldn't expect any different answer

10:59  5    on that.

6              As jurors, if you're selected on our jury,

7    you'll be asked to evaluate the believability of the

8    witnesses.

9              People can be believable or not believable for

10:59  10    a lot of reasons.  Maybe somebody thinks they saw something,

11    but they didn't really see it.  Sometimes people have a

12    memory problem that they don't remember things accurately.

13    Sometimes people are just not being honest.

14              And in our -- There are some folks that -- and

10:59  15    this is not being critical, but there are some people who

16    have reservations about wanting to sit in judgment on the

17    honesty or the believability of other people.

18              Is there anyone on this panel who has any

19    moral, philosophical, religious reason that you would not be

11:00  20    able to judge the credibility or the believability of the

21    witnesses that testify in this trial?

22              Nobody's answered.  That means everybody can

23    do the job of a juror here.

24              The -- This lawsuit, as Judge Hittner said,

11:00  25    involves copyright infringement claims, and the copyrights

1   that we are here about are copyrights in building designs,

2   building plans and building drawings.

3        I want to ask a general question about

4   copyright law.  Is there anyone here who has a problem or a

11:00  5   concern about the fact that some things are protected by

6   copyright?

7        I see no hands.

8        Is there anyone who thinks that, while you

9   might agree that copyright law is appropriate, you don't

11:01  10  think that building designs or architectural plans are

11  deserving of copyright protection?

12        I don't see any hands.

13        So, at the end of this case, can we understand

14  that nobody who's picked on this jury will have any problem

11:01  15  following Judge Hittner's instructions as to --

16        THE COURT:  Well, we already had that.  Next

17  question, please.

18        MR. ZUMMO:  I want to ask about some -- whether you

19  may have particular experiences that are relevant to the

11:01  20  people and the parties that are in this case.

21        Is there anybody on this panel who has been --

22  worked as an architect or a home designer or have you worked

23  in that business?

24        And, Ms. ██████, we know that you're an

11:02  25  architect.

*Jury Selection*

1    Has anybody else -- Have you ever worked in

2  that business?

3         MR. ZUMMO:  Juror No. 15.

4         THE COURT:  Yes, sir.  Do you want to stand, sir,

11:02  5  please.

6         PROSPECTIVE JUROR 15:  ███████████.

7         MR. ZUMMO:  Yes, sir.  And what's the nature of

8  that work that you've done in that business?

9         PROSPECTIVE JUROR 15:  Marketing rep.

11:02  10        MR. ZUMMO:  Thank you, sir.

11        Is anyone here -- Are you working now or have

12  you ever worked in the business of being a homebuilder or a

13  real estate developer?

14        I don't see any hands.

11:02  15        Has anyone ever worked -- One of the parties

16  in this case is a real estate firm that part of their

17  business is to bring together home designers and builders.

18        Has anybody ever worked in that type of a real

19  estate business?

11:02  20        I don't see any hands.  Thank you.

21        And has anyone here ever been a realtor, a

22  real estate agent or a real estate broker or worked for that

23  kind of a company?

24        There's no hands.  Thank you.

11:03  25        So, we really only have --- Let me ask this,

1  then:  For all of those businesses, whether it's architects

2  and home designers, realtors, homebuilders, developers,

3  other real estate firm -- and I'm not limiting this to

4  people who have worked in that business -- has anybody ever

11:03  5  had an experience with one of those businesses or those

6  professionals that would make you not be able to be a fair

7  and impartial juror on this case without having heard any of

8  the evidence in this case?

9       PROSPECTIVE JUROR 24:  24.

11:03  10       THE COURT:  All right.  Yes, sir.  Juror No. --

11       PROSPECTIVE JUROR 24:  24.

12       THE COURT:  24.  We'll call you up later, sir.

13       MR. ZUMMO:  So, besides Juror No. 24, does anyone

14  else have an experience or do you have an opinion or a

11:03  15  concern about the businesses that I listed or the types of

16  professionals that I listed that would make it difficult for

17  you to be where you could not be a fair and impartial juror

18  in this case before you've heard any of the evidence?

19       Thank you.

11:04  20       The particular designs, the types of houses

21  that are at issue in this case, are what are known as

22  townhouses.  And I have a question about the subject of

23  townhouse development in Houston, and I'd like to just ask

24  it this way.

11:04  25       Some people think that the -- it's a good

1    thing that new houses -- new townhouses are being built in

2    neighborhoods, that that's a positive thing for development

3    of our community and our economy.

4            Other people have concerns that building new

11:04    5    townhouses in older neighborhoods is hurting the character

6    of those neighborhoods or hurting the people who live in

7    these neighborhoods.  And this is sometimes called

8    "gentrification".

9            Is there anybody on this panel who falls into

11:05    10    that second group?

11            Juror No. 15?

12            PROSPECTIVE JUROR 15:  Yes.

13            MR. ZUMMO:  Can you just stand up so...

14            And your name, sir?

11:05    15            PROSPECTIVE JUROR 15:  ███████████.

16            MR. ZUMMO:  All right, sir.  And, Mr. ██████ you

17    just have a concern about that type of development?

18            PROSPECTIVE JUROR 15:  Yes.

19            MR. ZUMMO:  And who else raised their hand, please?

11:05    20            Juror No. 27.

21            PROSPECTIVE JUROR 27:  The same as before.

22            MR. ZUMMO:  And your name, please?

23            PROSPECTIVE JUROR 27: ████████████.

24            MR. ZUMMO:  And Juror No. 28?

11:05    25            PROSPECTIVE JUROR 28:  Same.

1      MR. ZUMMO:  The same concern.  Does anyone else on

2   the panel have a concern that, despite the positive economic

3   development that may be occurring, that building townhouses

4   or new homes in older neighborhoods can be a concern?

11:05   5              Thank you all for listening to and considering

6   that question.

7              One of the issues in this case, as Judge

8   Hittner explained, is that, under the copyright law, we

9   believe, and we think Judge Hittner will instruct you, that,

11:06  10   if the jury finds that there has been infringement, the

11   copyright owner can recover the profits of the

12   infringer from the infringer.

13              Is there anyone who has a problem with that

14   concept, that if someone infringes another person's

11:06  15   copyright, that the copyright owner can recover the profits

16   from the infringer?

17              I don't see any hands.

18              In connection with that, in the system, the

19   way Congress wrote the law, Congress split the burden of

11:06  20   proving these profits, and the law specifically says that --

21   and we believe Judge Hittner will instruct you as to this --

22   that the copyright owner has to prove what the defendants'

23   gross revenues were from the infringement and the defendant

24   has to prove any expenses that the defendant says should be

11:07  25   deducted from the revenue or any other deductions for what

1    are called "factors not attributable to the copyrighted

2    work".

3              Is there anyone on this panel who has a

4    problem with that way that the law was written, to say that

11:07   5    one side has the burden of proving revenues and the other

6    side has the burden of proving deductions?

7              There's no hands.

8              And then the last subject about the law that I

9    would like to ask you about is we believe that Judge Hittner

11:07   10   will also instruct this jury that, under certain

11   circumstances when certain requirements are met, a business

12   owner can be held responsible for infringements that are

13   committed by the business.

14             If that is what the law turns out to be, is

11:08   15   there anyone on this panel who will have a problem with

16   following that law?

17             Well, as I said a minute ago, we have these

18   information forms.  I only have, I think, four specific

19   questions for some of the jurors -- some of the panel

11:08   20   members based on these forms, and I'd just like to ask you

21   those now.

22             Juror No. 2.

23        PROSPECTIVE JUROR 2:  ███████████.

24        MR. ZUMMO:  Your company is called -- Is it Cima

11:08   25   Inspection?

```
 1                 PROSPECTIVE JUROR 2:  That's where I formally work.
 2         Right.
 3                 MR. ZUMMO 2:  And what type of business is that?
 4                 PROSPECTIVE JUROR 2:  It's an oil and gas vessel
 5         and tank inspection company.
 6                 MR. ZUMMO:  Thank you.
 7                 Ms. ███████, Juror No. 4.
 8                 PROSPECTIVE JUROR 4:  Yes.
 9                 MR. ZUMMO:  You've been at Texas Gulf Bank for
10         eight months.  Is the bank -- Is it working in banking?
11                 THE COURT:  That's Missouri City.
12                 MR. ZUMMO:  Oh.  Missouri -- Okay.  I'm sorry.
13         That was it.  Okay.
14                 How long have you been at Texas Gulf Bank?
15                 PROSPECTIVE JUROR 4:  Almost three years next
16         month.
17                 MR. ZUMMO:  I just misread the form.  Sorry to
18         bother you with that.
19                 And then -- let's see -- Juror No. 6,
20         Ms. ███████.
21                 PROSPECTIVE JUROR 6:  Yes.
22                 MR. ZUMMO:  It says that your husband is retired.
23                 What was your husband's type of work before he
24         retired?
25                 PROSPECTIVE JUROR 6:  Core analysis.  It was in the
```

11:08  5
11:09  10
11:09  15
11:09  20
11:09  25

*Jury Selection*

1      oil field company.

2              MR. ZUMMO:  Analyzing those cores that they bring

3      up out of the well?

4              PROSPECTIVE JUROR 6:  Yes.  Core welder

5      specialties.

6              MR. ZUMMO:  Thank you, ma'am.

7                      And then Juror No. 15, Mr. ███████.

8                      First of all, I would like to thank you for

9      serving our country in the Air Force.  And your highest rank

10     was an E-5.

11                      What was your specialty?

12             PROSPECTIVE JUROR 6:  Accounting.

13             MR. ZUMMO:  Well, Judge Hittner has told you and

14     shown you his three --

15             THE COURT:  An E-5 is staff sergeant?

16             PROSPECTIVE JUROR 6:  Yes, sir.

17             THE COURT:  Okay.

18             MR. ZUMMO:  A lot of times lawyers have a hard time

19     getting picked on juries, but I had the honor, also, and the

20     privilege of being selected for a jury in state court in the

21     mid-1990s.

22             THE COURT:  Who was the judge?

23             MR. ZUMMO:  Judge Katie Kennedy.

24             THE COURT:  One thing is you never forget who the

25     judge is one way or the other.

1      Okay.  Go on.

2            MR. ZUMMO:  And it was a very good experience for

3    me not just as a citizen but as a lawyer, because I saw it

4    from the jury side of the rail.  I actually saw how things

11:10   5    that I thought were normal for lawyers to do just bore you

6    to tears.

7            So, ever since then, I have tried to move my

8    cases along because I understand now that we don't have to

9    ask the same question five times to make sure people got it.

11:11   10           I hope that we can do that during this trial,

11   and I hope that -- You know, I had 30 minutes and I've taken

12   less than that 30 minutes, and I hope that we can continue

13   to move things along quickly so that this is a fair,

14   efficient, good trial and a good experience for all of you.

11:11   15           We do appreciate your being here and assisting

16   us in this dispute.  I personally think that the jury system

17   is the very best way to resolve conflicts, and I'm glad that

18   you're here now.

19           Thank you, Your Honor.

11:11   20           THE COURT:  Thank you.

21           All right.  We'll now hear from the defense.

22           Counsel.

23           MR. STROTHER:  May I please the Court.

24           THE COURT:  Yes, sir.

11:11   25           MR. STROTHER:  Good morning.

1    PROSPECTIVE JURORS:  Good morning.

2    MR. STROTHER:  And thank you, Mr. Zummo.

3         Let me begin by saying I think that those who

4    are selected for this trial are going to see a good trial.

11:12  5    The attorneys on the other side from me are skilled.

6         You may see a professional slug-fest between

7    the attorneys, but I think that we get along on a personal

8    level, and I think that those of you who are selected will

9    profit from that.

11:12 10    While it's true that those who are going to be

11    on this jury are going to be the finder of fact, this isn't

12    necessarily what some people would call a he said/she said.

13    I don't think that you're going to see a lot of dispute

14    about what happened and what didn't happen, but there will

11:12 15    be some of it.

16         I think your job is going to be a little more

17    complicated than that, and it gets into some of the defenses

18    that Judge Hittner told you the Defendants were going to be

19    raising in this case.  I'm going to ask you about your

11:12 20    feelings about some of those defenses in a minute.

21         But first let me ask -- First of all,

22    Mr. Zummo asked a number of questions that I was good to

23    ask; so, while I have 30 minutes, I will probably only take

24    half of that time.

11:13 25    We know that we have an architect there on the

1    panel, but are there any people out there that have

2    architects in the family?

3              Yes, ma'am.  Juror No. 6.  Who in your family

4    is an architect?

11:13    5              PROSPECTIVE JUROR 6:  Yeah.  My son-in-law.

6              MR. STROTHER:  Okay.  Yes, ma'am.  No. 18.

7              PROSPECTIVE JUROR 18:  My husband.

8              MR. STROTHER:  Okay.  As to both of you, is there

9    anything about having an architect in your family that you

11:13   10    think, without hearing any of the evidence, is going to make

11    you biased one way or the other?

12              THE COURT:  Hold it.  Juror 27.  We had another

13    hand up.

14              MR. STROTHER:  I'm sorry, sir.

11:13   15              No. 27, who in your family?

16              PROSPECTIVE JUROR 27:  My wife.

17              MR. STROTHER:  Do you think there's anything about

18    you being married to an architect that would make you biased

19    in this case without hearing any of the facts?

11:13   20              PROSPECTIVE JUROR 27:  [Indicating negatively].

21              THE COURT:  You're shaking your head "no".  I want

22    to make sure our court reporter --

23              PROSPECTIVE JUROR 27:  No.  I don't think so.

24              MR. STROTHER:  What about -- Are there any

11:14   25    homebuilders in your family, people that are responsible for

1  building homes or maybe even a subcontractor that does

2  something significant to build a home?

3            Yes, sir.  Juror No. 26.

4            THE COURT:  Yes, sir.  Do you want to stand up,

11:14  5  please.

6            PROSPECTIVE JUROR 26:  My uncle.  He's a

7  homebuilder.  He works for David Weekley.

8            MR. STROTHER:  Okay.  Thank you very much.

9            And I'll follow up your answer -- thank you --

11:14  10  with a question.  Is there anything about your uncle being a

11  homebuilder with David Weekley that you think would make you

12  biased in this case without hearing any of the evidence?

13            PROSPECTIVE JUROR 26:  No.

14            MR. STROTHER:  Have any of you or have any of your

11:14  15  close family members ever hired an architect to do any work?

16            Yes, sir.  No. 15.

17            PROSPECTIVE JUROR 15:  Yes.

18            MR. STROTHER:  Is there anything about that

19  experience that would make you biased in this case one way

11:15  20  or the other without hearing any of the evidence?

21            PROSPECTIVE JUROR 15:  No.

22            MR. STROTHER:  Was that for a residence or --

23            PROSPECTIVE JUROR 15:  Yes.

24            MR. STROTHER:  Anyone else?

11:15  25            And, as Mr. Zummo said, the designs at issue

1    in this case have to do with townhomes.

2                    Have any of you shopped for a townhome in the

3    Houston market in the past 20 or 30 years?  Keep your hands

4    up and let me make sure I write your numbers down, please.

11:15   5                    Juror No. 18 and Juror No. 26.

6                    Yes, ma'am.  Juror No. 12.

7                    Was there someone on the front row that had

8    their hand raised?

9                    Let me broaden the question before I ask the

11:15  10    follow-up.  Is there anyone that has participated with a

11    family member or a close friend in shopping for a townhome

12    in the Houston market in the past 30 years?

13                    Yes, ma'am.

14              PROSPECTIVE JUROR:  A townhome would be

11:16  15    considered --

16              THE COURT:  I can't hear, whoever it is.  Ma'am,

17    who is it -- Yes, ma'am.

18              PROSPECTIVE JUROR:  I said a townhome would

19    consider also as city homes, the new style of the buildings?

11:16  20              MR. STROTHER:  Thank you for your question.  Let me

21    see if I can answer what I mean by a "townhome" and what I

22    think -- I think everyone will agree.

23                    Generally, we're talking new construction that

24    are usually multi-story and -- but they're separate family

11:16  25    residences.  Right?  They're not talking about like a

1    condominium design.  But there are usually multiple

2    townhomes identical to each other and it's part of the same

3    development.

4              So, some of the developments in this case

11:16  5    would pertain to two townhomes and up to maybe 16 or

6    20 townhomes, and I could be off on that number.

7              Does that help answer your question?

8              PROSPECTIVE JUROR:  Yes, sir.

9              MR. STROTHER:  Let me go back to the question

11:17  10   because some of you raised your hands and I didn't get a

11   chance to write your numbers down.

12              6, 7 and 8 raised your hands.

13              Was there anyone else in the back that had

14   helped a close family member or friend shop for a townhome

11:17  15   in the Houston market?

16              No. 18 as well.

17              So, to all of you that answered that question,

18   is there anything about your experience in that regard that

19   you think would make you biased or unfair in this case

11:17  20   without hearing any of the evidence?

21              Mr. ██████████ --

22              PROSPECTIVE JUROR 15:  Yes.

23              MR. STROTHER:  -- you said that you did -- I'm

24   sorry -- you're a market rep?

11:17  25              PROSPECTIVE JUROR 15:  Yes.

1           MR. STROTHER:  What kind of work were you doing and

2   for whom?

3           PROSPECTIVE JUROR 15:  Commercial.

4           MR. STROTHER:  Was this for architecture?

11:17   5           PROSPECTIVE JUROR 15:  Yes.

6           MR. STROTHER:  May I ask who your employer was?

7           PROSPECTIVE JUROR 15:  Trevathan Marketing Group.

8           MR. STROTHER:  Thank you, sir.

9           PROSPECTIVE JUROR 15:  Uh-huh.

11:18   10          MR. STROTHER:  I believe that, in this case, you're

11  going to have an admission from my clients that at least --

12  Let me back up.

13          I believe we're going to be talking about five

14  townhome developments, and I believe that my clients are

11:18   15  going to admit that, at least with regard to one of those

16  developments, the plans used to construct some of those

17  units used the Preston Wood plans as a starting point.

18          I have some questions about my client's

19  defenses to see if you would be biased against them, without

11:18   20  hearing any of the evidence, of course.

21          One of the points is what Mr. Zummo brought

22  up, is that the Plaintiff is suing the Defendants for their

23  profits.  It's called "disgorgement" or I call it

24  "disgorgement of profits".

11:18   25          And he mentioned the issue that they have the

1    burden of proof on proving the gross revenue -- or I would

2    say "gross profit" -- and then the burden shifts over to my

3    clients to then put on proof of what expenses they connect

4    to those gross profits, therefore, getting to net profits.

11:19    5            So, one of the defenses that my clients are

6    going to raise is by saying, 'Okay.  If we earned X dollars

7    from the sale of this townhome, we have expenses that were

8    incurred to sell that townhome.'

9            Is there anyone that is innately biased or

11:19    10   prejudiced against my client for taking that position?

11           PROSPECTIVE JUROR 7:  [Raising hand].

12           MR. STROTHER:  Yes, ma'am.

13           THE COURT:  Yes, ma'am.  We'll talk to you later.

14           That defense goes a little bit further

11:19    15   because, while my clients will be putting on evidence of

16   direct expenses, they will also be putting on evidence of

17   their overhead that they would also like to connect to the

18   gross profits received.

19           Are there any of you that are innately biased

11:19    20   or prejudiced against that position?

21           PROSPECTIVE JUROR 7:  [Raising hand].

22           MR. STROTHER:  Yes, ma'am.  No. 7.

23           Yes, sir.  No. 21.

24           THE COURT:  Yes, sir.  Do you want to stand up,

11:20    25   please.

*Jury Selection*

1       MR. STROTHER:  Just to confirm, you would be biased

2   against my client, arguing that overhead should be deducted

3   from their gross profits?

4       PROSPECTIVE JUROR 21:  Yes.

11:20   5       MR. STROTHER:  I should preface most -- maybe all

6   of these questions with:  We anticipate that Judge Hittner

7   is going to give you written instructions about what you

8   should and should not consider.

9           So, my question about overhead would be:  If

11:20   10  Judge Hittner instructed you -- Juror No. 21, for example,

11  if Judge Hittner instructed you that you are to consider

12  overhead --

13      THE COURT:  Excuse me.  I'm not going to pin down

14  that way.  So, you can rephrase the question.

11:20   15      MR. STROTHER:  Yes, Your Honor.  I'll move on.

16      THE COURT:  Now, do you want to call 24 up later or

17  not?  Are you ready to move on?

18      MR. STROTHER:  I'm ready to move on, Your Honor.

19      THE COURT:  Okay.

11:20   20      MR. STROTHER:  I think you meant No. 21, Your

21  Honor?

22      THE COURT:  21, rather.

23      MR. STROTHER:  Thank you.

24          One of the instructions that we anticipate the

11:20   25  Court might instruct you about is that copyrightable works

1    are composed of protectable and unprotectable elements.

2            If that instruction is given, my clients would

3    be arguing that that copyrighted plans that Preston Wood had

4    copyrighted had some non-protected and non-protectable

11:21    5    elements.

6            Are there any of you out there that are

7    innately biased or prejudiced against my client taking that

8    position?

9            PROSPECTIVE JUROR:  [Raising hand].

11:21    10    MR. STROTHER:  Yes, ma'am.  No. 7.

11            Is there anyone that agrees with Ms. ████?

12            THE COURT:  No.  Rephrase it.  It's not agreeing

13    with one versus the other.

14            MR. STROTHER:  I'm sorry, Your Honor.

11:21    15    THE COURT:  Just ask the general questions or

16    specific to one juror.

17            MR. STROTHER:  Yes, Your Honor.

18            Is there anyone else who believes that they

19    would be biased or prejudiced against my client for taking

11:21    20    the position that the copyrighted plans have some

21    non-protectable elements in those plans?

22            And, finally, on the defenses for now, another

23    issue that you will certainly be asked to determine, guided

24    by the Court's instructions, is what percentage of profits

11:22    25    were attributable to things other than the infringement.

1          My clients will come up with some examples of

2    things that led to, for example, the sales price of a

3    townhome being what it was, whether it be the cost of the

4    land or something like that.

11:22   5          Are there any of you out there who are

6    innately biased or prejudiced against my client if they take

7    that position?

8          PROSPECTIVE JUROR 15:  [Raising hand].

9          MR. STROTHER:  Yes, sir.

11:22  10          THE COURT:  Okay.  Thank you, sir.  We'll call you

11    back up.  Okay.  That's No. --

12          MR. STROTHER:  15.

13          THE COURT:  -- 15.  Okay.

14          MR. STROTHER:  Ladies and gentlemen, I appreciate

11:22  15    it.  Thank you for your time.  And we look forward to

16    presenting our case to those of you that are ultimately

17    selected.

18          THE COURT:  All right.  I told you it was going to

19    move quickly, and it did.

11:22  20          All right.  May I see the attorneys up here

21    with your sheets, please.

22               (At the bench)

23          THE COURT:  I have to call forward 7, 15 and 24.

24    Correct?

11:23  25          MR. ZUMMO:  Also, 21 said he was innately biased.

```
 1          THE COURT:  But you can -- Let's see.  That was in
 2    answer to whose question?
 3          MR. ZUMMO:  In answer to Mr. Strother's.
 4          THE COURT:  You said you didn't want to call him
 5    up.  Right?
 6          MR. STROTHER:  No.  I said I was -- I'm sorry.  I
 7    was finished asking the question.
 8          THE COURT:  That's right.  You didn't ask him to
 9    come forward.
10          MR. ZUMMO:  He's probably out of reach anyway.
11          THE COURT:  All right.  What number is that?
12          MR. ZUMMO:  No. 21.
13          THE COURT:  Let's call up 21.
14          MR. STROTHER:  Your Honor, you also mentioned
15    calling up the attorney, Juror No. 17.
16          THE COURT:  I don't remember doing that.
17          MR. ZUMMO:  Well, she's a prosecutor, Your Honor.
18    That's important to me.
19          THE COURT:  Prosecutor.  A whole family of
20    prosecutors.
21          MR. ZUMMO:  Right.
22          THE COURT:  No, I'm not calling her up.
23              If you wanted someone to call up, you just
24    keep asking questions till it got to the point...  And I
25    would just add I will allow you to call that other one up.
```

*Jury Selection*

|  |  |  |
|---|---|---|
|  | 1 | All right.  They're going to come up this |
|  | 2 | side.  So, when they come up, just step back and let them go |
|  | 3 | right in front of the microphone.  You don't -- If you want |
|  | 4 | to step down....  But, in any event -- |
| 11:25 | 5 | MR. STROTHER:  May I ask for some clarification?  I |
|  | 6 | misunderstood you with regard to Juror No. 17.  I thought |
|  | 7 | you were bringing her up.  So, I -- |
|  | 8 | THE COURT:  I'm not bringing anybody up. |
|  | 9 | MR. STROTHER:  Could I explain, Your Honor?  My |
| 11:25 | 10 | client, Ms. Cameron, knows her. |
|  | 11 | THE COURT:  Come here.  Come on. |
|  | 12 | MR. STROTHER:  My client, Angela Cameron, knows |
|  | 13 | Juror No. 17.  I didn't ask any questions because I |
|  | 14 | misunderstood the Court's instruction. |
| 11:25 | 15 | THE COURT:  What instruction did you misunderstand? |
|  | 16 | MR. STROTHER:  When he was asking about attorneys |
|  | 17 | and you said you don't need to ask any more questions or -- |
|  | 18 | I thought that you were writing down that she was coming up. |
|  | 19 | THE COURT:  No. |
| 11:25 | 20 | MR. STROTHER:  I misunderstood that. |
|  | 21 | THE COURT:  You didn't go into it, though, did you? |
|  | 22 | MR. STROTHER:  I didn't.  But she -- |
|  | 23 | THE COURT:  She knows -- |
|  | 24 | MR. STROTHER:  My client knows her. |
| 11:25 | 25 | THE COURT:  Well, what do you want to do? |

```
 1              MR. ZUMMO:  Mr. Strother's client is a public
 2     defender and 17 is a prosecutor.  So, they probably know
 3     each other as adversaries in the courtroom.
 4              THE COURT:  Well --
 5              MR. ZUMMO:  I don't know that she needs to --
 6              THE COURT:  I'm not going to call her up.  But now
 7     we know about it, anyhow.
 8              All right.  The first one is ███████.  This
 9     is No. 7.  Right?
10                        (In open court)
11              THE COURT:  All right.  No. 7, Miss ██████, do
12     you want to come up, please.
13                        (At the bench)
14              THE COURT:  How are you doing?
15              PROSPECTIVE JUROR 7:  Fine.
16              THE COURT:  There's your microphone right there.
17              You have a concern about sitting on this jury
18     or not?
19              PROSPECTIVE JUROR 7:  Yeah.
20              THE COURT:  Okay.
21              Questions.
22              MR. ZUMMO:  What is your concern?  What makes you
23     think you can't be fair and impartial?
24              PROSPECTIVE JUROR 7:  Well, being an architect and
25     seeing how plans and designs --
```

```
11:27

11:27

11:27

11:27

11:27

11:28
```

1      THE COURT:  Keep your voice down.

2      PROSPECTIVE JUROR 7:  This is recording.  I

3  understand.

4          Seeing how they are abused often, I have a

5  certain bias towards that and attitude towards that.

6      THE COURT:  Do you think you can be fair and

7  impartial in this case without having heard any of the

8  evidence?  On this case.

9      PROSPECTIVE JUROR 7:  I don't think I would be

10  fair.

11      THE COURT:  Okay.  Any questions?

12          Thank you, ma'am.

13      THE COURT:  Just thank you, ma'am.  Take your seat.

14  Thank you.

15          All right.  Come on in.

16          Do we have any challenge on No. 7?

17      MR. ZUMMO:  We move to strike No. 7 for cause, Your

18  Honor.

19      MR. STROTHER:  No objection.

20      THE COURT:  The next one I have is 15, bias or

21  prejudice.  That's Mr. ███████, his last segment.

22                  (In open court)

23      THE COURT:  Mr. ███████, please, No. 15.

24                  (At the bench)

25      THE COURT:  There's the microphone.  Stand right in

*Jury Selection*

```
 1   front of it.
 2            PROSPECTIVE JUROR 15:  Your Honor, I think --
 3            THE COURT:  You can look at me.  It will pick it
 4   up.  If Bruce can't pick it up he'll let me know.  Okay?
 5            PROSPECTIVE JUROR 15:  Your Honor, I think I'm a
 6   little too familiar with Urban Living.
 7            THE COURT:  Oh.  Okay.  You know that firm?
 8            PROSPECTIVE JUROR 15:  Yes.
 9            THE COURT:  Okay.
10            PROSPECTIVE JUROR 15:  And I know their work.
11            THE COURT:  So, you feel you couldn't be fair and
12   impartial on this case, having known at least one of the
13   parties?
14            PROSPECTIVE JUROR 15:  Yes.
15            THE COURT:  Any questions?
16            MR. ZUMMO:  No questions.
17            THE COURT:  Any questions?
18            MR. STROTHER:  No questions.
19            THE COURT:  Thank you, sir.  Have a seat.
20                Come on in.
21                All right.  Do you join in that challenge?
22            MR. STROTHER:  Yes, Your Honor.
23            MR. ZUMMO:  Yes, sir.
24            THE COURT:  By agreement?
25            MR. ZUMMO:  Yes, sir.
```

11:28 (lines 5, 10, 15, 20, 25)

*Jury Selection*

1          THE COURT:  The next one is 21.

2                          (In open court)

3          THE COURT:  Mr. ████████, No. 21, please.

4                          (At the bench)

11:29   5          THE COURT:  He made a comment relative to which

6     questions?

7          MR. ZUMMO:  I postured about overhead.

8          THE COURT:  Oh, yeah.

9               That's the microphone.

11:29   10               All right.  You had a concern, sir, concerning

11    overhead and that's why I cut you off.

12               So, would you explain what your concern is or

13    what your feeling is.

14          PROSPECTIVE JUROR 21:  I was afraid that -- eat up

11:29   15    the profits by charging their salaries and overhead.  So,

16    they're profiting from something they shouldn't have gained.

17    I just don't think that's fair.

18          THE COURT:  He answered that to your question.  You

19    go first, follow up.

11:30   20          MR. STROTHER:  Sir, if Judge Hittner instructs you

21    that you are to include overhead, are you going to be able

22    to follow that instruction?

23          PROSPECTIVE JUROR 21:  I think, if he tells me to,

24    I would.

11:30   25          MR. ZUMMO:  I don't have any other questions, Your

```
 1   Honor.

 2              THE COURT:  All right.  Thank you, sir.

 3                   Do we have any challenge on No. 21?

 4              MR. STROTHER:  Your Honor, I move to strike him for

 5   cause.

 6              THE COURT:  Response?

 7              MR. ZUMMO:  No objection.

 8              THE COURT:  No objection.  Okay.

 9              MR. ZUMMO:  Make it easy.

10              THE COURT:  No objection to 21, ██████.

11                   The last one we have is 24.

12              MR. ZUMMO:  When I asked the general question about

13   all of the different businesses, if you had an experience

14   that would make you not be fair and impartial -- So, we

15   don't know what his particular concern is, Your Honor.

16              THE COURT:  That's number -- is it a man?

17              MR. ZUMMO:  It's a man, ██████.

18                   (In open court)

19              THE COURT:  Mr. ██████, No. 24, please.  Do you

20   want to come up, sir, please.

21                        (At the bench)

22              THE COURT:  Yes, sir.  There's your microphone.

23                   Yes, sir.  What was your concern?

24              PROSPECTIVE JUROR 24:  I work for an oil company

25   and we work with a lot of architects directly.
```

11:30 (line 5)
11:30 (line 10)
11:31 (line 15)
11:31 (line 20)
11:31 (line 25)

*Jury Selection*

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  Okay.                                            |
|       | 2  | PROSPECTIVE JUROR 24:  So, question was?                     |
|       | 3  | THE COURT:  And the question was?                            |
|       | 4  | PROSPECTIVE JUROR 24:  I think the question was any          |
| 11:31 | 5  | relation with -- any connection with the architects, and I  |
|       | 6  | just thought to say that I do work with the architects.      |
|       | 7  | THE COURT:  Okay.  Well, you raised your hand,               |
|       | 8  | what, during your --                                         |
|       | 9  | MR. ZUMMO:  My questions.                                    |
| 11:31 | 10 | THE COURT:  Yeah.  Go on.  Follow up.                        |
|       | 11 | MR. ZUMMO:  The question that I asked -- and I hope          |
|       | 12 | I wasn't unclear -- is:  Is there anything about your        |
|       | 13 | experience with the businesses, such as architects, that    |
|       | 14 | would mean that you could not be fair and impartial as a     |
| 11:32 | 15 | juror in this case before you've heard any evidence?         |
|       | 16 | PROSPECTIVE JUROR 24:  No.                                   |
|       | 17 | MR. ZUMMO:  And you could not be fair?                       |
|       | 18 | PROSPECTIVE JUROR 24:  I could be fair, yes, but I           |
|       | 19 | just wanted to mention that I do work with the architects.   |
| 11:32 | 20 | MR. ZUMMO:  You haven't had negative experiences --          |
|       | 21 | PROSPECTIVE JUROR 24:  No.                                   |
|       | 22 | MR. ZUMMO:  -- that would make you think all                 |
|       | 23 | architects are either good or bad?                           |
|       | 24 | PROSPECTIVE JUROR 24:  No.                                   |
| 11:32 | 25 | THE COURT:  Both sides start equal?  Both sides.             |

*Jury Selection*

1       PROSPECTIVE JUROR 24:  Yes.

2       THE COURT:  Questions?

3       MR. STROTHER:  No.

4       THE COURT:  Thank you, sir.

11:32   5       PROSPECTIVE JUROR:  Thank you.

6       THE COURT:  Do we have a challenge on 21?

7       MR. STROTHER:  No.

8       MR. ZUMMO:  No.

9       THE COURT:  All right.  Being a state practitioner,

11:32   10  I didn't want to catch you flat-footed.  All right?  In the

11      federal system, we have eight on the jury.

12          (Case manager whispers to the Court)

13      THE COURT:  What?

14      CASE MANAGER:  The catch-all question.

11:32   15      THE COURT:  Oh, yeah.  That's right.

16      Just stay right here.  That catch-all question I

17      forgot.

18              (In open court)

19      THE COURT:  All right.  I said it was going to move

11:33   20  along fast, and it is.  I'm going to ask you one last

21      question.  Okay?  Then we'll get right along to the jury

22      selection.

23          If there's anything I haven't asked, the

24      attorneys haven't asked, and it's not on your sheet that you

11:33   25  feel you would have a concern about serving as a juror on

1    this case, an extremely short case for federal court,

2    really, if you would, raise your hand at this time.  Okay.

3                        (At the bench)

4            THE COURT:  Come on up, Ellen.

11:33   5            Who is the first one?  No. 16.

6            MR. ZUMMO:  The very first one on Page 2.

7                   (In open court)

8            THE COURT:  Miss ████, please, No. 16.  Do you

9    want to come up, please.

11:34  10                   (At the bench)

11           THE COURT:  Yes, ma'am.  There's your microphone.

12    Come on up.

13                Yes, ma'am.  What's your concern?

14           PROSPECTIVE JUROR 16:  It's just that I will be

11:34  15    traveling Friday evening from Houston to Atlanta and won't

16    be returning until Monday.

17           THE COURT:  What time -- when will you be returning

18    Monday?

19           PROSPECTIVE JUROR 16:  The flight comes in at 8:00

11:34  20    in the morning.

21           THE COURT:  8:00 in the morning?

22           PROSPECTIVE JUROR 16:  Yes.

23           THE COURT:  Okay.  And Friday what time is the

24    plane?

11:34  25           PROSPECTIVE JUROR 16:  Leaves at 8:00 p.m.

1          THE COURT:  At night?

2          PROSPECTIVE JUROR 16:  Yes.

3          THE COURT:  Okay.  Number one, I told the attorneys

4     we're going to adjourn early on Friday.

11:34    5          PROSPECTIVE JUROR 16:  Okay.

6          THE COURT:  We're going to adjourn at 4:30.  And if

7     you get in at 8:00 -- We usually begin at 10:00.  Would that

8     be okay with you?

9          PROSPECTIVE JUROR 16:  I think so.

11:34   10          THE COURT:  And if by any chance the flight is

11    late, you can either check and wait on it or, you know, we

12    have to go with at least six jurors.  So, there's a way to

13    work with this.  Okay?  I'm just saying there's a way to

14    work with this.

11:35   15          PROSPECTIVE JUROR 16:  Okay.

16          THE COURT:  Any problem with that?

17          PROSPECTIVE JUROR 16:  No.

18          THE COURT:  Okay.  Thank you, ma'am.

19          PROSPECTIVE JUROR 16:  Okay.

11:35   20          THE COURT:  Come on up.

21               Do we have any challenge on 16?

22          MR. ZUMMO:  No, Your Honor.

23          MR. STROTHER:  No.

24          THE COURT:  Now, keep in mind, if the plane is

11:35   25    late, we'll talk about it as to -- Let's see how late it's

```
 1    going to be and, if she's on the jury, we can go with seven
 2    instead of eight.  Okay?  That's why we have a little bit of
 3    flexibility.
 4             CASE MANAGER:  28.
 5                       (In open court)
 6             THE COURT:  28.  Juror No. 28, Mr. ████████,
 7    please.
 8                       (At the bench)
 9             THE COURT:  How are you doing?  There's the
10    microphone.  Just step back about a half a step.  That's it.
11             PROSPECTIVE JUROR 28:  Yeah.  My issue is really a
12    hardship issue.  I'm hosting a large group of corporate
13    visitors into West Texas and New Mexico next week.
14             THE COURT:  When next week?
15             PROSPECTIVE JUROR 28:  Monday through Friday.
16             THE COURT:  Are you running the program?
17             PROSPECTIVE JUROR 28:  Yes.  I am the manager and I
18    am running the program.
19             THE COURT:  Okay.  Questions?
20             MR. STROTHER:  No questions, Your Honor.
21             MR. ZUMMO:  No questions, Your Honor.
22             THE COURT:  Thank you, sir.
23                  Will you agree on excusing 28?
24             MR. ZUMMO:  Yes, sir.
25             MR. STROTHER:  Yes, Your Honor.
```

11:35  (line 5)
11:36  (line 10)
11:36  (line 15)
11:36  (line 20)
11:36  (line 25)

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | THE COURT:  Now -- That's it, Ellen.  Right?                           |
|       | 2  | Okay.  Now, the reason why -- I was about to                          |
|       | 3  | do this.  Ellen is adding it all up.  We have eight on the            |
|       | 4  | jury.  Right?  We have three strikes each in federal court.           |
| 11:36 | 5  | So, 14 is in the panel.  So, we already have out No. 6.               |
|       | 6  | Right?                                                                 |
|       | 7  | MR. ZUMMO:  7.                                                         |
|       | 8  | THE COURT:  No.  In the lower panel.  14, right, is                   |
|       | 9  | in the panel.                                                         |
| 11:37 | 10 | CASE MANAGER:  Correct.                                                |
|       | 11 | THE COURT:  No. 7 is out.                                              |
|       | 12 | CASE MANAGER:  Correct.                                                |
|       | 13 | THE COURT:  That's it for right now, the lower                        |
|       | 14 | panel right now.  And then Mr. ██████.  That would put                |
| 11:37 | 15 | minus one in the lower.  That would put 15 in the panel.              |
|       | 16 | But 15 is also out; so, now we have No. 16 in the panel.              |
|       | 17 | All right?                                                             |
|       | 18 | MR. STROTHER:  Yes, Your Honor.                                        |
|       | 19 | THE COURT:  Now, also -- This is up to you.                           |
| 11:37 | 20 | We have -- also, 21 is out and 28 is out.  So,                        |
|       | 21 | how many does that leave?                                             |
|       | 22 | CASE MANAGER:  11.                                                     |
|       | 23 | THE COURT:  11.  So, it would be 10.                                   |
|       | 24 | Now, this is where you get a little bit                               |
| 11:38 | 25 | different.  We have three and three strikes.  All right?              |

1    No. 16 right now is in the panel.  You can't go further than

2    that.

3              But counting up all the jurors to the end,

4    there's another 10 that haven't been struck.  If you want,

11:38    5    I'll give each guy an additional five.  That will be eight

6    strikes and eight strikes and use the whole panel.  It's

7    strictly up to you.  You've never heard that before.

8         MR. STROTHER:  I've never heard that before.

9              That's an interesting idea, but I'm going to

11:38   10    reject it, Your Honor.

11         MR. ZUMMO:  I'm glad to go with the three.

12         THE COURT:  No. 16, right, Ellen?

13              No. 16 is in the panel.  So, you need to make

14    your strikes 1 through 16 with the understanding that No. 7

11:38   15    is out and No. 15 is out.

16              All right.  It's now 11:40, let's say.  How

17    much time does the Plaintiff want to make the strikes?

18         MR. ZUMMO:  Ten minutes.

19         MR. STROTHER:  Ten minutes, Your Honor.

11:39   20         THE COURT:  Okay.  Because Ellen has to do -- I

21    need to get them back in at 12:10.  That's what?  That's

22    30 minutes.

23              And then all I'm going to do is give them some

24    instructions and we'll be done.

11:39   25         MR. ZUMMO:  Yes, sir.

1        THE COURT:  So, I need your sheets back in on

2   Ellen's desk -- your strike sheets facedown -- not later

3   than 12:00 noon.  And the jury will come back at 12:10.

4               One of you can use the courtroom, and the

11:39   5   other can go in with your clients into the jury room or in

6   the back or whatever.

7               Any other questions?

8        MR. STROTHER:  No, Your Honor.

9        MR. ZUMMO:  No, Your Honor.

11:39  10        THE COURT:  I'm going to give them a little bit of

11   instructions and then you can get going.

12                    (In open court)

13        THE COURT:  All right.  Let me tell you about jury

14   alleged-called selection.

11:39  15               Each of the attorneys in federal court have

16   the right to strike through a certain number of names.

17   We've considered some excuses to strike through a certain

18   number of names.

19               After they make their strikes separately, they

11:40  20   give Ellen the sheets, she will put the two sheets side by

21   side and she'll go over it with a long ruler.  The first

22   eight names she comes to that has no strike on either the

23   Plaintiff's sheet or the defense sheet forms the jury.

24               So, everybody was visiting with you about

11:40  25   being selected to serve on a jury.  That's not it.  In other

1   words, they wanted other people off more than you.  So, in

2   effect, it's a matter of elimination rather than a matter of

3   selection, so to speak.

4         So, that's how juries work, civil cases,

11:40  5   criminal cases or whatever.  In other words, after we look

6   at the sheet where there's no strikes on either the

7   Plaintiff or the defense, or in a criminal case the

8   government or the defense, that forms the jury.

9         In order to give the attorneys time to do this

11:41  10  and consult with their clients, we're going to take a short

11  break.

12        I will tell you what the schedule is going to

13  be.  We're going to adjourn quickly for the day after we

14  announce who's on the jury and I give you about another

11:41  15  10 minutes more.

16        So, we're going to move the case right clear

17  and everybody ought to be out of here not less than -- I'm

18  thinking about 12:30 today -- okay? -- 1:00 at the very

19  latest.  I'm just letting you know that as far as your

11:41  20  scheduling for the rest of the day goes.

21        But we're going to take a break and the

22  attorneys are going to make their strikes and we're going to

23  get you back in at 12:10.  At 12:10, I'll announce who's on

24  the jury.

11:41  25        Those of you that have not been selected,

1    you'll get some additional instructions and you'll be free

2    to leave.

3                And the others, you've got about 10 minutes

4    more with instructions and then Ellen will visit with you

11:42    5    quickly in the jury room and that'll be it for the day.

6                The case will move along very quickly.  By the

7    way, when I say it's an extremely short case for federal

8    court, it really is.

9                I had a good challenge years ago in the 1990s.

11:42    10    I handled all three City Hall bribery cases.  The first one

11    went almost four months; the second one, about three months;

12    the other, two and a half months.

13                A couple of years ago, in a major criminal

14    case, my colleague, Judge Werlein, had a case scheduled for

11:42    15    seven months and it ended in the fifth month.

16                And about -- God, it's been 50, maybe 60 --

17    no -- even more than that -- 60-plus years ago in New York

18    there was IBM civil litigation that lasted over one year

19    with the same jury.  In this case the testimony will be over

11:42    20    well within one week, well within one week.

21                Now, when you take a break, you're not to

22    discuss this case with anyone -- okay? -- including each

23    other.  I do want to say, though, you're not excused from

24    jury duty.  You've got to come back.

11:43    25                Why do I say that?  Well, in state court, a

1      voir dire like this may go on much longer, maybe half a day,

2      but much longer than it does in federal court where we have

3      all the information, and it moves quickly.  Okay?

4                   So, we took a break in the voir dire, got the

11:43   5      jury back in, and one juror was missing.  And, so, where is

6      that juror?  Then we confirmed that he had said he had

7      enough of this darn jury duty; he's going back to work.

8                   Well, we knew where he worked.  It was that

9      simple.  Now -- Because it was all listed.  So, the

11:43   10     bailiff -- Here we have U.S. marshals assisting in court,

11     and then, in the state court, it was a deputy sheriff.

12                  Called his name.  No-show.

13                  So, what I did, I got ahold of the sheriff's

14     department and said, "Give this guy the full business.  We

11:43   15     know where he works."

16                  Now, some of you that are a bit older, just a

17     few, remember, before the trolly -- before the train came

18     down Main Street, further down Main Street towards Allen's

19     Landing, there were two groups of stores you found there, a

11:44   20     number of pawnshops -- that's p-a-w-n -- and you've got shoe

21     stores.

22                  So, by the way, why do I spell that out?  I

23     was down here about ten years telling about this same

24     story -- okay? -- when one of the court reporters come up

11:44   25     and said, "Just for sure, how do you spell what you were

1    saying?  What kind of" --

2                I said, "P-a-w-n.  Why?"

3                She said, "Oh, my goodness."  All the court

4    reporters for the first ten years I was down here were

11:44  5    sending the transcripts out p-o-r-n.

6                "Now, wait a minute."

7                Okay.  We cleaned that up pretty quick.  No

8    pun intended.

9                But, anyhow, I tell them, "Give him the full

11:44  10   business.  Give him the full business.  So, send the

11   sheriff's car out," I said, "with the sirens going and the

12   lights flashing and pull up in front of the shoe store."

13               He's fitting a woman with a pair of shoes.

14   They go in.  They collar him.  They cuff him.  They bring

11:45  15   him back right in front of the same jury panel because, see,

16   voir dire is going on.

17               And I had talked to the sheriff's deputy ahead

18   of time.  And I held the guy in contempt of court and

19   sentenced him to three days in the county jail and a

11:45  20   100-dollar fine.

21               I was told he had some money in his pocket.

22   So, he goes down and pays his fine.

23               Then, as we discussed, they brought him back

24   up in front of the whole group.

11:45  25               And I said, "As an alternative to the

1    jailhouse, I'll give you an alternative.  For the next seven

2    business days, at 9:00 in the morning and 12:00 noon, you

3    report back to the central jury room and listen to those

4    juror lectures over and over and over again."

11:45    5    And he did that.  He took that option.  But it

6    wasn't -- If you've been on state jury duty, now they do it

7    all with video.  In other words, they have a judge on a

8    video or whatever explaining it to you.

9    Back then, when we were all running for

11:46    10    office, you had 400 voters in the morning, 400 in the

11    afternoon.  So, whoever was assigned as the jury judge

12    looked forward to it because, aside from instructions, maybe

13    a little bit of campaign business mixed in, meeting all the

14    voters.

11:46    15    So, he had to listen to that same stuff over

16    and over for 14 times.  He took that instead.  So, he saved

17    his time from the jailhouse.

18    I had one juror during a case.  A beautiful

19    day out.

11:46    20    During a trial it came back, "Where's

21    Mr. So-and-So?"

22    He said, "I don't know."  He said, "Well, we

23    saw him in the tunnels during the lunch break."

24    And I sent the marshals out looking for him.

11:46    25    They got a description.

1        He was sacked out, asleep in the sun, in

2   Tranquility Park.  He took a siesta after his lunch.

3        Aside from that, I've never had a problem.

4   I'm not going to have one here, I know, especially after

11:47   5   that story.

6        So, we're going to take a break.  The

7   attorneys are going to make their strikes.  And we will see

8   you back outside of this courtroom ready to resume at ten

9   minutes after 12 o'clock.  We'll see you at that time.

11:48  10        (Brief recess)

11        (Venire panel present)

12   THE COURT:  Thank you.  Please be seated.

13        Ladies and gentlemen, when you come forward,

14   would you be seated in the jury box.

12:18  15        The first four will be in the front row, the

16   second four in the back row.

17   CASE MANAGER:  Juror No. 2, ███████████.  Juror

18   No. 3, ██████████.  Juror No. 9, ███████████.  Juror

19   No. 10, ███████████.  Juror No. 11, ██████████.  Juror

12:19  20   No. 12, █████████████.  Juror No. 13, ███████████████.

21   And Juror No. 14, ███████████.

22        THE COURT:  Ladies and gentlemen, those of you that

23   have not been selected, I certainly want to thank you for

24   your service and, hopefully, you've gained a bit of an

12:20  25   insight into how the system works in your short visit with

*Preliminary Instructions to the Jury*

1    us.

2              This now completes this session of your jury

3    service, but don't forget you need to check on the telephone

4    to see if there are any other cases that may get ready to go

12:20    5    to court.

6              But, in any event, this completes your jury

7    service for today.  Thank you.  You do not need to check out

8    with the central jury room and, as far as I'm concerned,

9    you're excused.  Thank you so much.

12:20    10             Ladies and gentlemen of the jury, please

11    stand, raise your right hand, take the juror's oath.

12                        (Jury sworn)

13         THE COURT:  Thank you.  Please be seated.

14             I'm sure the first thing on your mind is how

12:21    15    long are you going to be here.  We're going to move the case

16    along.  The attorneys sure did it during the voir dire.

17             We hope the rest of the case will move as

18    swiftly as possible.  As I say, the clock permanently goes

19    on when we get back together.

12:21    20             Due to a longtime scheduling conflict at this

21    point, we're going to give you the initial instructions,

22    talk to the attorneys.

23             Instead of having even opening statements

24    today, we're going to put that off till tomorrow.  We'll get

12:21    25    right into it tomorrow.  And the schedule generally -- I'll

1    read down the schedule generally.

2            This is the following schedule:  We start at

3    10:00 a.m. in the morning and adjourn at 6:00 p.m. in the

4    evening.  We take a lunch break at about one o'clock --

12:22   5    1:00 to 2:15 because you're coming in later.  Okay?

6            And we take a break every hour and a half as

7    the time goes along.  All of those starting times are

8    approximate, except we try to get underway right on

9    schedule.  And if we're running late or whatever, we will

12:22   10    let you know.  We're not going to let you stay in there.

11            Also, if I take a break with the attorneys to

12    discuss some evidence or whatever and we can't do it in a

13    short conference here, we'll ask you to step into the jury

14    room, but the clock will keep running.  The clock will keep

12:22   15    running while you're in there.

16            If we do something that's in the middle of

17    trial and I need to discuss it with the attorneys, there's

18    no need for you to be sitting around while we just whisper

19    up here.

12:22   20            I do permit you to take notes, but Bruce

21    Slavin is our official court reporter.  If I need anything

22    read back, I'm going to ask him and not you for your notes.

23    So, they're just for your own recollection if you desire.

24            By the way, the profession of court reporting

12:23   25    has come a long way since a lot of us started practicing

1    law.

2            When we started in this, they had -- Actually,

3    I had someone who was a pen writer.  There were a couple of

4    pen writers in state court.  Used to use the Gregg shorthand

12:23   5    with the -- flipping it with the -- And they all had -- what

6    is it? -- not even ballpoint pens.  They all used fountain

7    pens, traditionally.

8            In the older stenotype machines, a paper tape

9    would come up.  As the typing went on, a paper tape would

12:23  10    come up and then flop back into the pile of paper behind the

11    stenotype machine.

12            Now everything is computerized.  After about

13    five years of being a court reporter, a lot of the court

14    reporters have their own dictionary, like shorthand within

12:23  15    shorthand.

16            But the bottom line, if I need anything read

17    back, it's not going to be from a paper tape.  He will look

18    on his screen.

19            He's got a small screen or he can put it on a

12:24  20    larger screen, and he can read it in actual letters right

21    off that.  And they also have, if I remember correctly, the

22    graphics of the paper tape.

23            Is that correct, Bruce?

24            THE COURT REPORTER:  Yes, sir.

12:24  25            THE COURT:  You still have the graphics coming up,

*Preliminary Instructions to the Jury*

1    if necessary.

2              So, in any event, as you will see, there are

3    eight persons on the jury.  There are no alternates in civil

4    cases.  So, everybody will deliberate.

12:24    5              Just because you're sitting in a certain seat

6    does not mean you're an alternate.  There are no alternates.

7    All eight of you will deliberate on this case.

8              You've taken an oath, which states you're

9    going to decide this case based upon the evidence --

12:24   10              Oh.  Before I forget, if we're still in trial,

11   if we are, next Tuesday -- On Tuesdays, we begin at 11:30 in

12   the morning instead of 10:00.  But during deliberations --

13   jury deliberations, you just keep going.  I get in a little

14   later just on that one morning each week.

12:24   15              You've taken an oath, which states you're

16   going to decide this case based upon the evidence and the

17   evidence alone.  I want to discuss that with you at this

18   time.

19              First of all, we don't want you to determine

12:25   20   who you like and who you dislike and decide the case

21   accordingly.  Therefore, you'll have no contact with anyone

22   relative to the case.

23              You may, of course, say "good morning" and

24   "good afternoon" as you pass them in the hall, but you may

12:25   25   say nothing further.  And you may not extend any favors or

*Preliminary Instructions to the Jury*

1    accept any favors, however slight, to or from anyone

2    involved in this case.

3            When you get home this evening, I'm sure

4    friends and family will be asking have you been selected to

12:25    5    serve on a jury.  Of course, you may tell them that you

6    have.  And I always mention that you can tell them it's a

7    civil case, not a criminal case.

8            But aside from that, you're not to discuss

9    this case with anyone, including each other, until the whole

12:25    10   case is over, until I read you the instructions, until the

11   attorneys sum up, and then you go back in and start

12   deliberating on this case.

13            You're not to make any private investigation

14   concerning this case.  You're not to talk to your own lawyer

12:26    15   or anyone else you might think would have any kind of expert

16   knowledge relative to this.

17            So, you'll listen to the testimony as it comes

18   in and you'll make up your mind based upon the testimony and

19   any exhibits that are admitted.

12:26    20           About ten years ago they suggested federal

21   judges in the country mention this to juries and, certainly,

22   I will:  No Google research.  Okay?  No texting.  No

23   tweeting or whatever the young people do that maybe you're

24   all tuned into at this time.  Okay?

12:26    25           What we're saying is we need you to decide the

1  case from what you hear in the courtroom, what's legally

2  admitted evidence.

3             And, again, it's true what the attorneys say.

4  In fact, in my final instructions, you'll get this

5  admonition, that there are two judges in this case.  I'm the

6  judge of the law, but you're the judges of the facts.

7             We have the jury to decide, listening to a

8  fact pattern and then, after deliberation, rendering its

9  verdict based upon that fact pattern.

10            If you have any problems during the course of

11  the trial, let a member of the staff know.  And should you

12  be delayed in arriving at the courthouse any day, you need

13  to let us know.

14            And during that first break you take in a few

15  minutes, Ellen will give you all the contact information and

16  how to call in if there's a medical emergency or a car

17  breakdown or something like that, because we can't do

18  anything without all eight of you here.

19            If at any time you have a problem hearing, let

20  me know.  Raise your hand.  We may have a marshal sitting

21  here from time to time or just get our attention, and we'll

22  pull the microphone in or I'll ask the witness to speak up.

23            As far as breaks go, we take a break at about

24  every hour and a half as the testimony goes along.

25            And this goes for the attorneys, any of the

1    parties, any witnesses and the jurors.  If anybody needs to

2    take a break at any time, let me know, and we can always

3    take ten minutes.  No big deal.  If anybody needs to take a

4    break for whatever reason, let me know, we'll take a short

12:28   5    break, come right back in and keep going.

6              When you return from each break, you'll remain

7    in the jury room.  And when you come back in, you'll be

8    lined up in the order that you're sitting now.  Everybody

9    remain standing until all the jurors are in place.  Then

12:28   10   we'll all be seated at the same time.

11             Also, as you're aware, the jury room is small

12   and enclosed.  Of course, there's no smoking in there or in

13   any part of the building.  It's a smoke-free facility.  But,

14   certainly, you're free to do so on any of your extended

12:28   15   breaks outside of the courtroom.

16             Keep in mind both sides have waited for a

17   while to get to court.  And I make a priority, also, of

18   hearing civil cases because sometimes it's more difficult in

19   federal court based upon some of the criminal docket.

12:29   20             Now, I don't think I have any criminal stuff

21   later this week.  Do I, Ellen?

22        CASE MANAGER:  No, sir.

23        THE COURT:  I'll have to check next week.  When you

24   come back -- Yeah.  We'll be in trial a little bit next

12:29   25   week.

1        If I have any sentencings or rearraignments

2   where someone has pled "not guilty" and changes his or her

3   plea, I read them their rights.  And very often they come in

4   from the lockup and I'll ask the jury, "Do you want to see a

12:29    5   sentencing?  Come on in."

6            In other words, usually, it's done during the

7   noon hour somewhere.  Usually we do it right at the end of

8   your lunch break.

9            And if anybody wants to come in, I'll give you

12:29   10   that opportunity, if I'm doing any criminal work, so you can

11   see what goes on a little on the criminal side of the

12   docket.

13            I think I've introduced most folks here

14   because -- what is it? -- I used to get that question all

12:29   15   the time.  "Who are all these people?"

16            Well, we have the official court reporter.

17   You'll soon meet Ellen Alexander, our case manager.  I have

18   an administrative assistant who works with me in my office.

19            I also have two attorneys with me for two

12:30   20   years each.  One comes on and one comes off each year.

21   You'll notice there are three here now.  This is the

22   shift-over week.

23            So, Jeremy will be leaving, going to a private

24   firm.  And then, after a year, he's going to go clerk for

12:30   25   the next step up.

1          I guess it was -- you didn't get enough down

2     here.  Right?

3               LAW CLERK:  Yes, sir.

4               THE COURT:  And then, in a few hours, actually, the

12:30  5     senior clerk and our newest clerk, Pat, is just off two

6     years clerking for the chief justice of the Supreme Court of

7     Idaho.

8               Now, also, during the year I've got law

9     students who are with me just for the semester just to see

12:30  10    how courts operate.  We help them working with some of the

11    opinions and so forth.

12              So, from time to time, you'll see some

13    additional young people on the wall.  They're on -- They're

14    from one of the three local law schools.  So, I have four

12:31  15    all set up for the fall semester.  It's already fall.

16              We're going to adjourn today.  The first thing

17    you do when we come back and the clock goes on -- okay? --

18    is -- what is it? -- opening statements.

19              Opening statements is nothing more than what

12:31  20    the attorneys feel the evidence will show, and it's going to

21    be couched as, 'We assume the evidence will be....,' 'We

22    assume the evidence will be....' or 'We anticipate the

23    evidence is going to be this.'  That's it.

24              Then, once they're done doing that, we call

12:31  25    the first witness and we get rolling.  So, that's what we

1  have.  We certainly thank you for being here.

2          When we adjourn in just a moment, you'll step

3  into the jury room.

4          Ellen will visit with you for what?  About

12:31  5  five minutes?

6          CASE MANAGER:  Yes, sir.

7          THE COURT:  And then you'll be free for the day.

8          I want the attorneys to remain here for about

9  two or three minutes.  I've got one other thing I need to

12:32  10  visit with you about.

11          Ladies and gentlemen, if you would, please

12  stand.  Thank you.  We'll see you tomorrow.  Enter the jury

13  room right there.

14          And I want to talk to the lawyers for just a

12:32  15  minute.

16                (Jury not present)

17          THE COURT:  What's the status of the time?  Have

18  you got time ready for me?

19          MR. ZUMMO:  Plaintiff would request eight total

12:32  20  hours, Your Honor.

21          THE COURT:  Okay.  Plaintiff wants eight hours

22  total.

23          And how about the defense?

24          MR. STROTHER:  Your Honor, I'd like eight hours as

12:33  25  well.

1    THE COURT:  Keeping in mind a lot that will be

2    going on you may put on.

3         But, in any event -- All right.  What I will

4    do, later today you will get the timing order.  Okay?  You

12:33    5    will get the timing order as to how much time you have.  And

6    then I can draw up that sheet.  But that's what I needed.

7         You will see, in all of my years, we can

8    assume about five and a half hours a day -- five to five and

9    a half hours per day max or, beyond that, it wears you out.

12:33    10    I know the late -- what is it? -- Lucius Bunton out in -- He

11    was out in --

12    MR. ZUMMO:  Pecos.

13    THE COURT:  -- Pecos, yeah.  He would go all out.

14    I don't do that.  But I think that, in all of my years,

12:33    15    between five and five and a half hours a day is about it.

16         But we'll get this to you today.  So, check

17    your -- what is it? -- check the court docket.  It'll be

18    electronically filed.  I'll get that done today.

19         All right.  What else do you want to talk

12:34    20    about?

21    MR. ZUMMO:  One thing came to me when Ms. Alexander

22    read the name of the case.  Originally, the first Defendant

23    was RZ Enterprises.  We settled with them.  And I'm a little

24    concerned that, if the jury hears that, they're going to

12:34    25    start wondering who is that.

```
 1              THE COURT:  So, what's your suggestion?
 2              MR. ZUMMO:  Maybe go to the next defendant.
 3              THE COURT:  You want to realign --
 4              MR. ZUMMO:  Just to say Preston Wood v. Urban
 5    Living.
 6              THE COURT:  Okay.  In other words, omit who?
 7    Omit --
 8              MR. ZUMMO:  -- RZ Enterprises.
 9              THE COURT:  Again.
10              MR. ZUMMO:  RZ --
11              THE COURT:  -- Enterprises?
12              MR. ZUMMO:  Yes, Your Honor.
13                   And there is an entity Oppidan.
14              THE COURT:  What?
15              MR. ZUMMO:  Oppidan.
16              THE COURT:  How do you spell it?
17              MR. ZUMMO:  O-p-p-i-d-a-n.
18              THE COURT:  -d-a-m?
19              MR. ZUMMO:  -n, as in "nanny".
20              THE COURT:  Omit all reference, right --
21              MR. ZUMMO:  Yes, Your Honor.
22              THE COURT:  -- as to these two.  That's a good
23    point.
24                   What else?
25              MR. ZUMMO:  That's all I have on that.
```

1          We have -- Between ourselves, Your Honor, we

2     don't want to invoke the rule as to my husband and wife

3     clients and the Camerons, if that's okay with the Court.

4          THE COURT:  Okay.  That's by agreement.  You want

12:35  5   it invoked as to everyone else?

6          MR. ZUMMO:  I guess so.  But I don't think we have

7     any other witnesses except experts.

8          THE COURT:  I always exempt the experts.

9          MR. ZUMMO:  Thank you, Your Honor.

12:35  10        THE COURT:  They can stay in.

11         MR. ZUMMO:  Yes, sir.

12         THE COURT:  Ellen, a couple of things.

13             Oh.  Yes.  What else?

14         MR. STROTHER:  We do have a witness I subpoenaed.

12:35  15   I subpoenaed Mr. Wooten.  And, of course -- Two other.

16     RZ Enterprises.

17         MR. ZUMMO:  Okay.

18         MR. STROTHER:  So, there are two other witnesses.

19     And, of course, the rule should be invoked with regard to

12:36  20   them.

21         THE COURT:  All right.  Then, when they come in,

22     let me know.

23             The rule has been invoked.  Therefore, when

24     you see someone come in who's under the rule, you explain to

12:36  25   them that they're to remain out of the courtroom, not to

 1    discuss it with anyone, they may discuss it with the

 2    attorneys, and then, when they take the stand, they'll be

 3    free of the rule at that time.

 4                    Ellen.

12:36  5              CASE MANAGER:  Yes, sir.

 6              THE COURT:  Off the record.

 7                    (Off-the-record discussion)

 8              THE COURT:  Anything further from the Plaintiff?

 9              MR. ZUMMO:  One last question.

12:37 10              THE COURT:  Yes, sir.

11              MR. ZUMMO:  What is the Court's practice on when

12    the admitted -- or agreed facts are read to the jury?

13              THE COURT:  Say again.

14              MR. ZUMMO:  When will the Court read the agreed

12:37 15    facts?

16              THE COURT:  Whenever you want.

17              MR. ZUMMO:  I guess we would like the Court to

18    start the trial with those, please.

19              THE COURT:  When we start the trial?

12:37 20              MR. ZUMMO:  Yes, Your Honor.

21              THE COURT:  Just make sure I have what you want me

22    to read.

23              MR. ZUMMO:  Yes, sir.

24              THE COURT:  And I'll explain to them that this is

12:37 25    agreed between the parties, no additional proof is

1    necessary.

2            MR. ZUMMO:  Thank you.

3            THE COURT:  Yes, sir.

4            MR. STROTHER:  Nothing, Your Honor.

12:37   5            THE COURT:  Okay.  Thanks.

6                We'll see everybody tomorrow.  Off the record.

7

8                    COURT REPORTER'S CERTIFICATE

9            I, BRUCE SLAVIN, certify that the foregoing is a

10   correct transcript from the record of proceedings in the

11   above-entitled matter, to the best of my ability.

12

13                            *s/Bruce Slavin*
                            _____
14                            BRUCE SLAVIN, RPR, CM

15

16

17

18

19

20

21

22

23

24

25







1-5













