```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
 2                           HOUSTON DIVISION

 3
    PRESTON WOOD & ASSOCIATES, LLC,    )
 4                                     )
            Plaintiff,                 )   NO. H-16-CV-1427
 5                                     )
    v.                                 )   August 24, 2018
 6                                     )
    CAMERON ARCHITECTS, INC.,          )
 7  STEPHEN CAMERON, UL, INC., d/b/a   )
    URBAN LIVING, and VINOD RAMANI     )
 8                                     )
            Defendants.                )
 9

10
                             TRIAL
11            BEFORE THE HONORABLE DAVID HITTNER
                        AND A JURY
12
                          VOLUME 3
13                 PAGES 3-1 to 3-211

14

15  For the Plaintiff:        Patrick A. Zummo
                              Attorney at Law
16                            909 Fannin, Suite 3500
                              Houston, TX 77010
17
                              Louis K. Bonham
18                            Osha Liang, LLP
                              909 Fannin, Suite 3500
19                            Houston, TX 77010

20  For the Defendants:       Justin Strother
                              Strother Law Firm, PLLC
21                            3000 Weslayan, Suite 348
                              Houston, TX  77027
22
    Court Reporter:           Bruce Slavin, RPR, CMR
23

24
    Proceedings reported by mechanical stenography and produced
25  by computer-aided transcription.
```

1                              I N D E X

2

3                                                          Page

4    **SUZANNE LABARTHE**

5    Direct Examination Continued by Mr. Zummo        3-3
     Cross-Examination by Mr. Strother                3-16
6

7    Interrogatory Responses                          3-25

8    Plaintiff Rests                                  3-29

9    Defendants' Motion for JMOL                      3-29

10

11   **LEONARD BACHMAN**

     Direct Examination by Mr. Strother               3-39
12   Cross-Examination by Mr. Zummo                    3-65

13   **ANGELA CAMERON**
     Direct Examination by Mr. Strother               3-79
14   Direct Examination by Mr. Bonham                  3-95

15

16   **STEPHEN CAMERON**

     Direct Examination by Mr. Strother               3-106
17   Direct Examination by Mr. Bonham                  3-127
     Redirect Examination by Mr. Strother             3-134
18   Voir Dire Examination by Mr. Bonham              3-136
     Redirect Examination by Mr. Bonham               3-136
19

20   **VINOD KEWALRAMANI**

21   Direct Examination by Mr. Strother               3-138

22

23

24

25

*Labarthe - Direct by Mr. Zummo*

1                          (Jury present)

2              THE COURT:  Be seated, please.

3                   Go right ahead, please.

4              MR. ZUMMO:  May we have the screen down and the

10:11    5    lights down again, Your Honor?

6              THE COURT:  Do you use your computer?  We'll get

7    your computer on.

8                    DIRECT EXAMINATION CONTINUED

9    By Mr. Zummo:

10:12   10    Q.  Good morning, Miss Labarthe.

11    A.  Good morning.

12    Q.  We were about to start talking about the third floor

13    comparison between the Preston Wood D5-214 and the Cameron

14    Nagle claims when we broke yesterday.

10:12   15              Are you ready to go with your observations on

16    the third floors?

17    A.  Yes, I am.

18    Q.  Did you find any creative decisions in the creation by

19    Preston Wood of the third floor for the D5-214 plan?

10:12   20    A.  Well, the arrangement of spaces within the third floor

21    planner have -- Yes.  I believe, yes, they did, have

22    creative arrangement.

23    Q.  And did you find any of those creative -- any evidence

24    of those creative decisions copied in the Cameron Nagle

10:13   25    third floor plan?

*Labarthe - Direct by Mr. Zummo*

1   A.  Yes.

2   Q.  Can you tell us what you found when you compared the two

3   plans.

4   A.  Okay.  On the left here is the --

10:13   5        THE COURT:  Can we make it a little larger, if you

6   have that ability?

7              Hang on.

8        THE WITNESS:  Do you want it zoomed out?

9        THE COURT:  Yeah.

10:13   10       THE WITNESS:  Yeah.

11       THE COURT:  Zoom out a little bit more.  Okay.

12   A.  So, on the left-hand side is the Preston Wood plan.

13   And, again, it has the curved wall overlooking the backyard

14   in this case that was similar to what was below in the

10:13   15   second floor living area.

16             The stairs that we talked about yesterday,

17   here they are coming up to the third floor.  As they arrive

18   at the third floor, there's a step here and another step

19   here.

10:14   20             And what he was doing is setting a different

21   ceiling height so that -- I think Preston Wood may have

22   explained this to you when he went through the same plan --

23   so that this area on the floor below, which is the kitchen,

24   has a slightly lower ceiling height.

10:14   25             So, just by virtue of how this stair was

*Labarthe - Direct by Mr. Zummo*

1   designed, it enabled the ceiling below it to be higher than

2   is typical.  So, I think it was maybe 12 feet instead of --

3   It was maybe 11 or 12 feet instead of 10 feet.

4           So, other than that, the -- which I think is,

10:15   5   you know, a pretty interesting decision and move.  So, he

6   has to have this corner that goes back to get to the master

7   suite.  The laundry is tucked here into the closet off of

8   the hallway.

9           And then entering the master suite is a pair

10:15   10   of doors and then a longer vanity along one wall and a

11   shorter vanity along this wall.  I think he was referring to

12   that as "his and hers", but I don't know.  That seems like

13   that might be his.  I don't know.

14           And then over here on this side it has a

10:15   15   walk-in shower and a tub that's mounted in a -- what we call

16   a deck.  And then in -- and then a toilet compartment.

17           Then, here, there are a pair of doors leading

18   into a large walk-in closet.  I won't speculate as to which

19   side is his and hers.

10:15   20           So, there -- within this volume of space for a

21   closet and a master bath, there are many, many different

22   possible configurations of these separate desired

23   components.

24           So, I thought this was, you know, pretty

10:16   25   interesting.  I think lots of times people don't want to

*Labarthe - Direct by Mr. Zummo*

1    share their vanities because one person may be a neater

2    person than the other.  So, I always think -- I see a lot of

3    clients wanting that, and that's a nice way to do it.

4              Then there's another pair of doors that enters

10:16   5    into here.  So, this arrangement within the master bath

6    suite I think is -- could have been done many different

7    ways, and this was a interesting, creative way to do it.

8              The other thing is here he angled the door --

9    the wall where the door into the toilet compartment is to

10:16   10   help give a bigger sense of open space within the bathroom.

11             Now, if you look at the mirror image, which is

12   what we called yesterday the "mirror flip" of this plan, you

13   can see that, although the master suite has now moved in

14   this configuration to the front over the garage doors,

10:17   15   whereas here it was in the back overlooking the backyard,

16   the components of the master bath remain quite similar down

17   to even having a pair of small doors versus a single door or

18   a pocket door or, you know, many different decisions on how

19   to go from one space into the next.

10:17   20             You still have the long vanity, the separate

21   shorter vanity, the walk-in shower and tub, although they

22   are flipped in this condition.

23             The shower was close to the short vanity in

24   this plan.  The tub is closer to the short vanity.  But,

10:17   25   nevertheless, they occupy the same basic space within the

*Labarthe - Direct by Mr. Zummo*

1    overall.

2                    Also, there is this angled wall again

3    similar -- the same as this over here and then the closet.

4                    So, there are modifications that --

10:18   5            THE COURT:  Ma'am, you can move the mic out -- back

6    a little bit.  You seem a little bit loud.

7                    THE WITNESS:  Thank you.

8                    THE COURT:  No.  You're carrying just fine.

9                    THE WITNESS:  Okay.  So, I would say the major

10:18  10   thing that has changed between this plan and this plan is

11   the stair.

12                   So, because the stair was positioned where it

13   was and it's coming up from down below, in both cases, it

14   started back in the back and is coming this way toward the

10:18  15   front of the house as you move from second to third floor.

16                   In this case, because they have -- Cameron

17   Architects put the master bedroom in the front, and he's got

18   to get to the -- access to the bedroom.

19                   What happened was -- The solution he's come up

10:19  20   with to get back there is that he needed more steps.  So,

21   quite a lot of -- So, this is what we call "split stairs".

22                   So, it comes up from the -- starts about down

23   here on the second floor, comes up to this landing, but that

24   isn't high enough to just have a flat corridor to get back

10:19  25   here.  He has to add more steps here and then here.

*Labarthe - Direct by Mr. Zummo*

1        So, if you're in the master suite, this is how

2    it would work.  You come out your door, go down to the

3    landing and then come back up to get to the rest of the --

4    till you get to that bedroom in the back.  So, it's sort of,

10:19    5    I would say, a split landing here and then a split stair.

6        So, that was the main difference, and it was

7    really precipitated by taking the exact position of the

8    stair in the Preston Wood plan.  And instead of designing it

9    maybe differently, maybe there could have been a more

10:20    10    efficient way to do it than putting in all these steps.

11        You know, taking that as a given from the

12    Preston Wood plan, this is sort of the solution that they

13    came up with, which seems a bit awkward and takes a lot of

14    extra steps.  I think there could have been a simpler

10:20    15    solution, but, you know, this is what this resulted in.

16    Q.  I'd like to ask you a question, and it will include

17    asking you to make an assumption about a legal term.

18        I'd like you to assume with me that the Court

19    will instruct the jury in this case that the definition of

10:20    20    an "architectural work" is the design of a building, which

21    is the arrangement and composition of spaces and elements.

22        Can you make that assumption for me?

23    A.  Yes.  Yes, I can.

24    Q.  Are the Preston Wood plans that you have studied and the

10:21    25    other plans that you heard Mr. Wood talk about yesterday --

*Labarthe - Direct by Mr. Zummo*

1    from your understanding of those plans, are each of those

2    Preston Wood plans that we've discussed in this case

3    architectural works under that definition?

4    A.   Yes, they are.

10:21   5    Q.   As an "architectural work" being a combination or

6    arrangement of spaces and elements, if the designer of a

7    home changes one of the decisions the designer made about

8    some aspect of the home, does that sometimes require changes

9    in other parts of the home?

10:21  10    A.   Well, yes.

11    Q.   Can you give us an example.

12    A.   Well, if one were to -- Let's say you have the client in

13    and they want to -- Let's say they start with something like

14    this and they say, 'Well, but I want the bedroom to be

10:22  15    3 feet bigger.  I want a bigger bedroom.'

16              Well, now you have less space to -- especially

17    within a townhouse where you're restricted by the

18    boundaries, you have property lines.  You can't just push a

19    wall out to enlarge it, you know.

10:22  20              So, it becomes a kind of domino effect.  When

21    one thing changes, it requires other changes to go along --

22    to follow along.

23    Q.   Is what you called the "extra-step solution" in the

24    Cameron Nagle third floor plan one example of that domino

10:22  25    effect?

*Labarthe - Direct by Mr. Zummo*

1    A.  Yes.  I think it was.  It was a result of shifting the

2    master -- flipping the master from back to front and needing

3    access both ways.

4              But without changing the position of the

10:23  5    stair, this was the effect that -- There may have been other

6    solutions.  This was the solution that was arrived at for

7    that.

8    Q.  In addition to comparing elevations, comparing floor

9    plans, did you also compare the details that are included in

10:23  10   these two sets of drawings?

11   A.  Oh.  Yes, I did.

12   Q.  Can you tell the jury what we are looking at here,

13   the -- what these details are and where they are in the

14   exhibit.

10:23  15   A.  Okay.  These are -- Just as you looked at on the --

16   yesterday where we talked about the front elevation -- so,

17   that's a flat two-dimensional rendering of what you're

18   looking at.  These are flat two-dimensional drawings of

19   cabinets.  So, they're vertical.  They're drawings of what

10:24  20   occurs in the vertical plane.

21              So, it's called "millwork" and that means, in

22   this case, cabinetry, built-ins.  So, these are built-ins

23   that are within the kitchen in the Preston Wood example, and

24   this is a built-in from the living room side, some

10:24  25   bathrooms, master bath, so forth.

*Labarthe - Direct by Mr. Zummo*

1          The art niche.  Here we go.  So, when I looked

2     at the Cameron millwork elevations, I found that, even

3     though his kitchen had redistributed the components, such as

4     the oven and the refrigerator and the sink and different

10:24   5     things, that he had not altered the Preston Wood millwork

6     drawings.  He just copied them identically even though, in

7     this case, they bear no resemblance to the layout of the

8     kitchen that he had modified.

9     Q.  What does that -- or do you draw any conclusion from

10:25   10    that?

11    A.  Well, that he didn't -- he left it up to builder, but

12    that he -- this was a copy -- a direct copy of the Preston

13    Wood project.

14    Q.  And he copied elements that he actually wasn't going to

10:25   15    be using in his version of the design?

16    A.  They weren't usable.  I mean, they were not reflective

17    of the -- These drawings are an exact copy of the Preston

18    Wood drawing.  They are not reflective of what occurs in the

19    plan of the Cameron changes.

10:25   20    Q.  And yesterday I asked you about whether the font on the

21    Preston Wood design on the page we were looking at was

22    similar to the font of the Cameron design that we were

23    looking at and you said, on that page, they looked different

24    to you.

10:26   25          After we left the court yesterday, did you

*Labarthe - Direct by Mr. Zummo*

1    review the plans again to compare the fonts?

2    A.   I did.

3    Q.   What did you find?

4    A.   Because my general impression in looking at these two

10:26    5    projects was that the fonts also were similar and that

6    jumped out at me.  And, so, as I said yesterday, sometimes

7    when you change computer programs or whatever, you know, the

8    fonts will automatically change.  Maybe this font may not

9    have been loaded in the computer -- in Cameron's computer.

10:26   10             But when I looked back at the two sets side by

11   side, out of seven sheets of drawings, five out of those

12   seven sheets were identical fonts.  And, so, this is the

13   font.

14             And I think Mr. Wood mentioned that he had a

10:26   15   staff member at one time that loved to, you know, pick

16   different fonts and stuff.  This is a font that you don't

17   see a lot, but we see it a lot in architectural drawings

18   because it is a sort of -- This is how we were taught to

19   print when we did all our drawings by hand.

10:27   20             So, it's a kind of a computer rendering of an

21   architect's block-lettering style.  And, so, it's very

22   distinctive.  You don't see it a lot except maybe in some

23   architectural drawings.

24             So, that was the identical font that I noticed

10:27   25   in almost all the drawings, but not all.

Labarthe - Direct by Mr. Zummo

1    Q.   And do we see it, for example, on the cabinet details?

2    A.   Yes.  This is the same.  This is an identical font.

3    Q.   Did you also compare a Preston Wood plan that was called

4    the 1171 to a Cameron plan that was called Mount Vernon?

10:27   5    A.   Yes, I did.

6    Q.   What did you find when you compared those two plans?

7    A.   In these two projects, I found that they were nearly

8    identical.  They were -- It took me a while, but I did

9    notice two very, very small changes within the Cameron plan.

10:28   10   I can point those out.  They're very minor.

11   Q.   So, if we were to go like we did on the earlier

12   comparison floor by floor, elevation by elevation -- Do you

13   think we even need to do that?

14   A.   No.

10:28   15   Q.   Why do you think we don't need to do that?

16   A.   Because they are substantially the same design.

17   Q.   What were the two differences that you did find?

18   A.   On the Cameron -- Let's see.  On the Cameron second

19   floor plan -- Do we have that up?

10:29   20        This is the Preston Wood plan.  If you look at

21   this area -- this wall area in the living room and -- Over

22   here, in the Cameron plan, he's added a balcony projecting

23   off the wall, which leads me to believe that they had a

24   wider lot.

10:29   25        Maybe it was a corner lot or something; so,

*Labarthe - Direct by Mr. Zummo*

1    they wanted to do something more to embellish that facade

2    and they had the space to do it.  They weren't limited by

3    the prescription of this exact width of lot.

4                    So, this is a flat wall on the Preston Wood

10:30    5    drawing, and here we find this minor variation, which is a

6    projecting balcony.

7                    Basically, it's the same depth and width as

8    the projecting balcony on the front elevation, which is

9    here.  That occurred in both.  And this was really a

10:30    10    reiteration of that in its width and depth and detail.

11    Q.  Is that something that could have been done by taking

12    CAD and making a copy of the Preston Wood balcony and then

13    adding the second balcony?

14    A.  Yes.  Easily.

10:30    15    Q.  And then what was the second change that you found?

16    A.  The second minor change that I found was on the third

17    floor.  So, on this side, we have the Preston Wood third

18    floor plan and, again, this wall.

19                    So, it's the same wall that the balcony below

10:31    20    projected out about here and -- Rather, on this -- on the

21    Cameron design, the balcony below projected out here.

22    Basically, it's the same design.

23                    Over here in the walk-in closet off of the

24    master suite, there is a small projection that's 6 feet wide

10:31    25    and 1 foot off the main wall, which here it was a flat wall.

*Labarthe - Direct by Mr. Zummo*

1      MR. ZUMMO:  Ms. Cooper, can you blow that up, the

2  Cameron plan.

3  A.  So, this is the projection.  So, it is 1 foot by 6 feet.

4  So, it added 6 square feet of what we call air-condition

10:31  5  square footage and -- to the project.

6      Interestingly, though, I went back to see if

7  that was accounted for in what we call the "gross area

8  summary" of the building, which is generally in a little

9  table.  I think it may be here on this plan.  And that

10:32  10  additional 6 feet of square footage wasn't accounted for.

11      In other words, the square footage summary on

12  the Cameron plan is identical to the Preston Wood square

13  footage summary even though 6 square feet were added.  And,

14  likewise, approximately 30 or 31 square feet of balcony was

10:32  15  not added to the area.

16  Q.  Thank you, Ms. Labarthe.

17      MR. ZUMMO:  We pass the witness.

18      THE COURT:  Okay.

19      MR. STROTHER:  Your Honor, may I proceed?

10:32  20      THE COURT:  Sure.  Go right ahead.

21      MR. STROTHER:  Your Honor, at some point, I'm going

22  to use my computer for the screen.  Could we switch over?

23      THE COURT:  Okay.

24      MR. STROTHER:  Thank you.

10:32  25      THE COURT:  Does that got you?

3-16

*Labarthe - Cross by Mr. Strother*

 1          MR. STROTHER:  It will when I go back over there.

 2     Yes.  Well, here.  Let's try.

 3                    (Off-the-record discussion)

 4                    CROSS-EXAMINATION

10:33  5     By Mr. Strother:

 6     Q.  Good morning, Miss Labarthe.

 7     A.  Good morning.

 8     Q.  I think that my questions to you are going to be fairly

 9     limited.  I wouldn't be surprised if they were 10 or

10:33 10     15 minutes, maybe less.

11              It's kind of a silly question, but I want to

12     make sure the jury understands.

13              You are getting paid for your opinion

14     testimony.  True?

10:33 15     A.  Yes, I am.

16     Q.  That's not a surprise.  You understand that people like

17     you, experts, do get paid in cases to provide opinions?

18     A.  True.

19     Q.  You won't be shocked to learn that we're paying our

10:33 20     witness as well.

21     A.  Right.

22     Q.  I just didn't want to give them the impression that we

23     were the only ones paying our witness.

24              Were you retained to offer an opinion about

10:34 25     whether the plans were copied?

*Labarthe - Cross by Mr. Strother*

1   A.   Yes.

2   Q.   Okay.  I'm asking because I want to make sure that we're

3   kind of on the same page when I ask the rest of my

4   questions.

10:34   5            When you were in the courtroom yesterday, did

6   you learn that the Defendants don't deny that Cameron

7   Architects started with D5-214 for the Nagle Street plan?

8   A.   I heard that.

9   Q.   And did you hear Mr. Cameron say that, without a doubt,

10:34  10   he essentially duplicated the Preston Wood & Associates plan

11   for the Mount Vernon address?

12   A.   Okay.  Yes.

13   Q.   Right?

14   A.   Yes.

10:34  15   Q.   With regard to D5-214, did you ever look into whether

16   there were any problems with the stair design?

17   A.   I noticed that there was an indication on a section that

18   the headroom looked like the dimension had been taken from a

19   point that was not exactly where it should have been.

10:35  20   Q.   Did you perform any analysis of what the ramifications

21   would be on how the plan would need to be altered to make

22   that appropriate headroom?

23   A.   I did look at it briefly.  I did not try to redesign it.

24   Q.   That's okay.

10:35  25   A.   Yeah.

*Labarthe - Cross by Mr. Strother*

1    Q.  I just want to make sure I know what you were asked to

2    do and what you've done.

3    A.  Right.  I wasn't asked to do that, but I found it in --

4    Q.  Okay.

10:35   5    A.  Yeah.

6    Q.  Thank you.

7              Have you been to any of the built properties,

8    any of the built townhomes, based upon the first set of

9    Nagle plans?

10:35   10   A.  I have not.

11   Q.  Have you looked at any photos to find out if things like

12   the radius stairs were built that way?

13   A.  I have not.

14   Q.  And by "radius stairs" what I'm referring to is the

10:35   15   landing on the -- I guess the garage floor, where you were

16   pointing about the curve at the end.

17   A.  Right.

18   Q.  I'm sorry.

19             You said you haven't seen any photos to --

10:36   20   A.  I have not.

21   Q.  I do want to show you the drawings again.  I'm not going

22   to go into a lot of detail about what might be similar and

23   what might not be similar, but there were a couple of things

24   we talked about that caught my attention.

10:36   25             Do you recognize these to be the two second

*Labarthe - Cross by Mr. Strother*

1    floor drawings, one on the right from Preston Wood &

2    Associates and the one on the left from Cameron Architects?

3    A.  Yes.  I believe those are the two, yes.

4    Q.  One of the things I wanted to ask you about -- I've got

10:37  5    a pointer that I'm going to use -- I'm going to try to use.

6                One of the things I wanted to ask you about

7    was this curved wall in the living room, the curved exterior

8    wall.

9                I recall your testimony being that that was

10:37  10    a -- I don't remember your adjective -- a special feature of

11    the PWA design.

12    A.  I don't remember my adjective either.

13    Q.  If you would like, you can use whatever adjective you

14    want.

10:37  15                You pointed it out as being something that

16    caught your eye, I guess.

17    A.  It was a major feature within the elevations, I think,

18    and, also, the plan, yes.

19    Q.  So, what's your opinion about the removal of that

10:38  20    feature in the Cameron Architects plan?  It doesn't appear

21    on the top or bottom of this drawing.

22    A.  Well, I wondered about that.  So, I -- Well, there were

23    a couple of things.

24                Number one is it's less expensive not to build

10:38  25    that cantilevered wall.  The second thing is, since -- So, I

*Labarthe - Cross by Mr. Strother*

1    went to look at the site plans because I figured there must

2    have been some reason why, in the very first place, the

3    Cameron plan flipped the major living spaces from the front

4    to the back -- I mean, the back to the front.

10:38    5              And, so, in doing that, I noticed that there

6    was a difference in the site plans for where the two project

7    townhouse designs were to be located.

8              And in the Cameron -- I mean, in the Preston

9    Wood site plan, there was a potential view in the direction

10:39   10    where the curved wall occurred.

11             In the other plan, there was no potential view

12   unless you want to look directly into the living room of

13   the -- of another property about 7 feet, 3 inches, away or

14   so.

10:39   15             So, I mean, marketing-wise, that makes a lot

16   of sense.  As an architect, I would have said, 'Yeah.  We

17   don't want to be looking into someone else's backyard.

18   Let's do a different plan.'

19             So, to me, that was one of the major reasons

10:39   20    why there was no -- Well, there were two.  I think it was a

21   cost factor.  Simple.  Find the plan.  Makes it easier to

22   build, less expensive.  And there was no reason to have a

23   big curved feature looking at another building so close

24   to....

10:40   25   Q.  Okay.  So, at least two external factors, I guess:

*Labarthe - Cross by Mr. Strother*

1    market demand and cost.

2              Would you say market demand would be or would

3    you characterize that as something different?

4    A.   The view potential?

10:40    5    Q.   You mentioned marketing.

6    A.   Well, you know, I'm not a marketing expert, but I think,

7    as an architect, I would always hope to take care of -- take

8    advantage of a view.  So, something site-specific, then....

9    Q.   Or site specificity I guess you could say.

10:40    10              Site specificity and cost of construction

11    could have led to the change?

12    A.   Well, those are my inferences.

13    Q.   Okay.

14    A.   I mean, I don't have a detailed history of why those

10:40    15    changes were made.

16    Q.   But you heard Mr. Wood testify that site specificity --

17    the view of downtown Houston is why he added this feature to

18    that particular plan.

19    A.   He talked about that in regard to several plans, and I

10:41    20    can't recall whether it was this one specifically.  I think

21    so, but....

22    Q.   Fair enough.

23              My guess is you're not going to agree with

24    what I'm about to ask you to agree to, but let me try.

10:41    25              Wouldn't you say moving all of these rooms

1    around altered the character of the plan?

2    A.  Well, of course, it altered it, but I don't think -- I

3    think that there are certain features that make something

4    really stand out and noticeable.

5              And some of those features include things like

6    the stair, and that didn't change, at least on the main

7    living room level.

8              The curved wall at the bottom of the stair,

9    the way the stair spills out and so forth, I think that

10   creates a fairly significant style -- stylistic move.

11   Q.  Let me flip the PWA plan so that we're looking at the

12   stair in the exact same place as the Cameron Architect plan.

13             The Cameron Architect plan over here, when you

14   put the stairwell in the same place, has a different size

15   living room that the stairwell does not pour out into, as it

16   does over here.  Correct?

17   A.  That's right.

18   Q.  Isn't that a pretty significant change?

19   A.  Well, there are degrees of significance.  So, I don't

20   know.  I don't know how to answer that.

21   Q.  What about having a balcony off of the living room as

22   opposed to not having a balcony off of the living room?

23   A.  Well, again, I think -- I don't really understand the --

24   I mean, I think the degrees of significance are probably

25   what you're asking for, and I don't know how to measure

10:41

10:41

10:42

10:42

10:43

*Labarthe - Cross by Mr. Strother*

1   degrees of significance.  I think there are still, you know,

2   substantial similarities between the two.  So....

3   Q.  I think your testimony yesterday was that the stairs

4   into the breakfast room was a very different concept.

10:43   5   A.  I don't think I said it's a different concept.

6   Q.  Maybe you didn't say "concept".

7   A.  No.

8   Q.  Do you remember what you said?

9   A.  No.  But I didn't say "concept", I don't think.

10:43   10   Q.  I think you said you didn't think it was as good of a

11   design to have the stairs going into the breakfast....

12   A.  I have, you know, seen that before.  It's a less formal,

13   perhaps, move, yeah.

14   Q.  I understand that you're not a marketing expert, but do

10:44   15   you think that an ultimate homebuyer would view these two

16   plans as different, given the different shape of the living

17   room and the balcony coming off the living room, the stairs

18   going into the breakfast rather than the living room?

19   A.  Well, I can only speak for myself.

10:44   20   Q.  Okay.

21   A.  So, I would prefer, I believe, not having such a

22   formal-looking stair emptying into a breakfast room.  But

23   that's -- You know, that's trying to be me as a homebuyer,

24   not any other -- I don't know the market, really.

10:44   25   Q.  Understood.  I'm wrapping up with you.

*Labarthe - Cross by Mr. Strother*

1    Do you remember that, when you gave your

2    opinions in the form of a report in this case, you listed

3    the things you reviewed to reach those opinions?

4    A.   Yes.

10:45    5    Q.   One of the things you mentioned reading was Copyright

6    Office Circular 41.

7    Do you base your opinion, in part, on your

8    review of that document or did you just review it

9    incidentally?

10:45    10    A.   I'd have to refresh my memory on that.

11    Q.   May I show you your report.

12    A.   No.  No.  Not my report.  The Circular 41, what it

13    specifically says.

14    Q.   Okay.  As you sit here today, you don't remember if you

10:45    15    based your opinion on it one way or the other?

16    A.   Well, I'm familiar with it, but my opinions were my

17    opinions based on looking at the plans --

18    Q.   Okay.  That's okay.

19    A.   -- the plans and elevations.

10:45    20    Q.   Thank you.

21    MR. STROTHER:  I have no further questions, Your

22    Honor.

23    THE COURT:  Okay.

24    MR. ZUMMO:  We have no redirect, Your Honor.

10:45    25    THE COURT:  Thank you, ma'am.  You may step down.

1    You're excused.  You're free to leave.

2              Call your next witness.

3         MR. BONHAM:  Your Honor, we have some short

4    discovery responses that we wish to read into the record and

10:46    5    then that will be all for our case.

6         THE COURT:  Okay.  Go right ahead.

7         MR. BONHAM:  I'll just read them in.

8         THE COURT:  All right.

9         MR. BONHAM:  And I've let Mr. Strother know these

10:46   10    are coming.

11              This is the interrogatory to Urban Living,

12    Interrogatory No. 13 and the answer.  And this is from

13    Preston Wood & Associates' interrogatories to Urban Living

14    and their second amended answer.

10:46   15              "Interrogatory No. 13:  Identify" -- Can you

16    switch over to the machine.

17         THE COURT:  Okay.

18         MR. BONHAM:  We've got it up on the screen so that

19    they're not just....

10:46   20         THE COURT:  Yeah.

21         MR. BONHAM:  And, if I could, Your Honor, could you

22    explain to the jury what an "interrogatory" is.

23         THE COURT:  Right.

24              As the case proceeds, one side can send

10:46   25    questions to the other -- written questions to the other,

 1    known as "interrogatories".  Then the other side has to

 2    respond.

 3              So, that's what we're looking at here.  Now,

 4    these interrogatories, what, were sent by the Plaintiff to

10:47   5    the defense, asking them questions relevant to the case.

 6    And that's what we have.

 7              MR. BONHAM:  Thank you, Your Honor.

 8              THE COURT:  That's what we're looking at.

 9              MR. BONHAM:  I've got it up on the screen, but I'll

10:47  10    read it in for the record.

11              Interrogatory No. 13:  "Identify each and

12    every distribution of any plan, drawing, sketch or other

13    two-dimensional representation (excluding photographs of

14    constructed buildings) of any infringing house or infringing

10:47  15    plan, including all floor plan and elevation drawings used

16    in advertising and marketing any infringing house.

17              "Include in your answer when such drawing,

18    sketch or other two-dimensional representation was created,

19    who created it, and the dates and manners of each of its

10:47  20    distributions.

21              "This interrogatory is intended to include

22    each iteration of each web page that included floor plans of

23    any house in any infringing project and, for each iteration,

24    the data regarding the dates and the number of page views of

10:48  25    it."

1          The answer:  "Advertising materials for Nagle

2     Park Place were created and distributed along with floor

3     plans on www.har.com and www.urbanliving.com on or around

4     August of 2015.

10:48   5          "The advertising materials were created by

6     Andy Raynor or Tamisha Ross, who are part of the media team

7     in Urban Living.

8          "Cameron Architects, Inc., created the plans

9     which were ultimately used to create the marketing plans.

10:48   10     The media team and sales consultants were in charge of the

11     creation or maintenance of the web pages.  The marketing

12     materials are created and maintained by the media team on

13     the web pages.

14          "The sales consultants notify the media team

10:48   15     when updates are necessary.  The page views for the

16     www.urbanliving.com web page averages 685 per month."

17          Next I'm going to read some responses to

18     requests for admission.  And, again, if I could ask the

19     Court to explain what those are.

10:49   20          THE COURT:  In other words, again, early on in a

21     case you can make a statement, 'Do you deny or admit the

22     following?'  And that's basically what we're going to do.

23     Correct?  These are inquiries.  'Do you admit or deny?'

24          MR. BONHAM:  These are from Urban Living's second

10:49   25     amended responses to Preston Wood's requests for admission.

1            "Request for Admission No. 10(e):  Admit that

2   for the project identified as 0 Nagle Street in

3   Paragraph 134 of your first amended answer and counterclaim

4   there were marketing materials that included floor plans or

10:49  5   elevations of a unit in the project that were distributed or

6   otherwise made available to the public.

7            "Response:  Admit.

8            "Request for Admission No. 10(f):  Admit that

9   for the project identified as 0 Nagle Street in

10:50 10  Paragraph 134 of your first amended answer and counterclaim

11  there were marketing materials that included floor plans or

12  elevations of a unit in the project that were distributed or

13  otherwise made available to the public and did not include

14  the copyright management information described in

10:50 15  Paragraph 4 of the PWA-UL agreement.

16           "Response:  Admit.

17           "Request for Admission No. 10(g):  Admit that,

18  for the project identified as 0 Nagle Street in

19  Paragraph 134 of your first amended answer and counterclaim,

10:50 20  there were marketing materials that included floor plans or

21  elevations of a unit in the project that were distributed or

22  otherwise made available to the public after January 17,

23  2015.

24           "Response:  Admit."

10:51 25        Thank you, Your Honor.

1           MR. ZUMMO:  With those responses, Your Honor, the

2     Plaintiff rests.

3           THE COURT:  Plaintiff rests, completes its case.

4                All right.  Defense, are you ready to proceed?

10:51  5           MR. STROTHER:  Your Honor, I do have a brief motion

6     I'd like to address.

7           THE COURT:  Okay.  In any case, civil or criminal,

8     when the person who's got the burden of proof completes

9     their case, we take a short break so I can hear some motions

10:51  10    by the other side.  So, we're going to do that.

11               I assume it'll take -- Well, I know it's early

12    for a break.  Give us about ten minutes and then we'll get

13    back in.  Okay?  We'll see you in ten minutes.

14                        (Jury not present)

10:52  15          THE COURT:  Be seated.

16               Defense, what's your position?

17          MR. STROTHER:  Yes, Your Honor.

18               We move for directed verdict on one very

19    precise, specific point.  Under 504(b) of the Copyright Act,

10:52  20    it is true that Plaintiffs have the burden to put on

21    evidence of revenues and then the burden is supposed to

22    shift to Defendants to put on the evidence of expenses that

23    should later be deducted.

24               However, the case law makes it very clear that

10:52  25    "revenues" doesn't just mean revenues.  A case out of the

1    Second Circuit, *Davis v. The Gap*, 246 F.3d 152, says that

2    "revenue" in the statute means, quote, "gross revenue

3    reasonably related to the infringement".

4           THE COURT:  Who has to show that?  You're saying

10:52  5    the Plaintiff has to?

6           MR. STROTHER:  The Plaintiff has that burden.  So,

7    they don't have to just put on evidence of revenue.  They've

8    got to put on gross revenue reasonably related to the

9    infringement and not unrelated revenues.  They've put on

10:53 10   evidence only of revenues, and they've not done a better

11   connection.

12           There's another case that I think is directly

13   on point, and this is *University of Colorado v. American*

14   *Cyanamid*.  I've highlighted it.

10:53 15           This case, which was denied cert. by the

16   United States Supreme Court --

17           THE COURT:  Well, Randy Rader, that's just a

18   federal circuit, isn't it?

19           MR. STROTHER:  It is.  Yes.

10:53 20           THE COURT:  Judge Rader.

21           MR. STROTHER:  Part of this case under the federal

22   circuit was patents.  This involved a prenatal vitamin, but

23   the part that I want to call the Court's attention to is the

24   copyright aspect.

10:53 25           THE COURT:  Hang on.  Where is that?

1         MR. STROTHER:  Page 7 of 8, Your Honor.

2         THE COURT:  I see.  You got it tagged.

3         MR. STROTHER:  Let me give you a brief rundown of

4  the facts of the case.

10:53  5         Some physicians had created a vitamin and --

6         THE COURT:  They created a vitamin?

7         MR. STROTHER:  The physicians.  The University of

8  Colorado physicians.

9         Later on, American Cyanamid reformulated that

10:54  10  vitamin and marketed it, sold it, and they also included

11  some writings that went along with the vitamin.  And that's

12  where the copyright aspect comes into it.

13         The Plaintiffs put on evidence only of

14  American Cyanamid's gross revenue from sales of that

10:54  15  vitamin.  That's it.  But they didn't make any connection.

16         The federal circuit said the University's

17  argument presumes -- Let me back up.

18         Unhighlighted portion.  The University argues

19  that its proof of Cyanamid's gross revenues from sales of

10:54  20  reformulated Materna -- that's the vitamin -- shifted the

21  burden of proof to Cyanamid under 504(b) to prove deductible

22  expenses and to prove those elements of its profits that

23  were attributable to factors other than copyright

24  infringement.

10:54  25         That's where we would be, and that's the

1    argument I've been making, Your Honor, about the 250-dollar

2    amount in context with what else Urban Living's commission

3    was being received for, stuff like land, stuff like the

4    actual construction materials.

10:55   5           The highlighted portion gives the Court's

6    answer.  The University's argument presumes that the

7    sales --

8           THE COURT:  Slow down a bit.  Start again.  I'm

9    following.  The court reporter needs to get it down.

10:55   10          MR. STROTHER:  Yes, Your Honor.

11          The University's argument presumes that the

12   sales of reformulated Materna were due to Cyanamid's

13   copyright infringement.  The University had the burden to

14   show this connection.  They quote to *Nimmer on Copyright*.

10:55   15          THE COURT:  Is that Nimmer out of the U of H?

16          MR. STROTHER:  I don't know, Your Honor.

17          THE COURT:  Okay.  Because he --

18          MR. STROTHER:  Nimmer and Nimmer.

19          MR. ZUMMO:  Different one, Your Honor.

10:55   20          THE COURT:  Different one?

21          MR. ZUMMO:  Yes.

22          MR. STROTHER:  And the trial court found that the

23   University did not meet that burden, and the appellate court

24   detected no clear error in the finding.

10:55   25          That's where we are right now, Your Honor.  I

1    even attempted to help my opposing counsel with different

2    motivation by asking both Mr. and Mrs. Wood to go into

3    detail about whether they were asserting 100 percent of the

4    gross revenues or not.

10:55    5              THE COURT:  Gross revenues of who?

6              MR. STROTHER:  Urban Living.

7              THE COURT:  Your client?

8              MR. STROTHER:  Yes.

9              THE COURT:  Gross revenues from what?  Everything,

10:56   10    all their business, or for just this particular -- on these

11    particular plans?

12              MR. STROTHER:  Just these particular townhomes that

13    are at issue.

14              THE COURT:  Go on.

10:56   15              MR. STROTHER:  And that was met with several

16    objections.  The only answer I was able to get was Miss Wood

17    saying they were just seeking what the law would allow.

18                   So, after the Plaintiff has rested, we still

19    don't have the connection.  Plaintiffs have not put forth

10:56   20    any evidence about -- or made any claim about what portion

21    of the profits after deductible expenses that they're

22    seeking, and they're required to do so before the burden

23    shifts.

24              THE COURT:  All right.  Response.

10:56   25              MR. ZUMMO:  Response, Your Honor, this is an

```
  1  argument that we see very often and it's usually a very
  2  good-faith misunderstanding of the profits that are
  3  involved.
  4           Copyright law distinguishes between direct and
10:56  5  indirect profits.  And in the Davis v. The Gap case --
  6           THE COURT:  I'm not looking at you.  I'm looking
  7  down.  I'm just listening.  So, don't take it personally.
  8  I'm not looking at you.
  9           Go on.
10:57 10           MR. ZUMMO:  The Davis case involved indirect
 11  profits.  Indirect profits are profits --
 12           THE COURT:  Okay.  Now, that's not the one I'm
 13  looking at.
 14           MR. ZUMMO:  Okay.
10:57 15           THE COURT:  The Davis case is what?
 16           MR. ZUMMO:  It's the first one Mr. Strother
 17  referred to.
 18           THE COURT:  Oh.
 19           MR. ZUMMO:  The one that he handed the Court is
10:57 20  another example of indirect profits because the copied
 21  material was put in a patent application.  It was not a case
 22  that the federal circuit -- University of Colorado case did
 23  not involve profits from the direct sale or rental or
 24  transfer of the infringing articles themselves, the
10:57 25  infringing items.
```

 1          In the Fifth Circuit and the -- Probably one

 2     of the clearest opinions, very thorough opinion on this, is

 3     by Judge Ellison, and it was the *Interplan Architects*

 4     opinion.  It's about 100 pages long.

10:58    5          But he addressed this argument and explained

 6     that, in the case law, when the profits come from the sale

 7     of the thing that's infringing, that's a direct profit and

 8     the causal connection is automatically established for

 9     504(b).

10:58   10          If you instead use -- And there's a case I

11     think the Court -- The Court may remember a lawyer, Dana

12     LeJune, who tried a case in the Eastern District of Texas,

13     the *Fair*, which is a store, *v. Vane*.  That's one of the lead

14     Fifth Circuit cases on indirect profits.

10:58   15          In that case the infringing material was used

16     in advertising and the Plaintiff tried to claim that all of

17     the revenues for the period of time that that advertising

18     ran were gross revenues.

19          But because it's not -- the infringing ads

10:59   20     were not themselves sold, the Court required evidence of a

21     causal connection before you could address those profits.

22          In other words, if it's just in the --

23          THE COURT:  Okay.  Remind me of the proof that you

24     say is sufficient that you brought up and that's in the

10:59   25     record right now.

1          MR. ZUMMO:  Right now, it is undisputed that the

2     gross revenues we are seeking come from two sources.  One is

3     commissions on the sales of the townhomes that were based on

4     what we claim to be infringing plans.

10:59   5          THE COURT:  How many?

6          MR. ZUMMO:  We had that stipulation, Your Honor.

7     But for the Nagle Street, it's six townhomes, and our

8     stipulated admitted facts totaled the commissions for all of

9     the townhomes from four other -- from three other projects.

10:59  10              So, that's in our stipulated facts.  Those

11     commissions come from the actual sale of an infringing --

12     what we allege to be an infringing house.  So, those are

13     direct profits.

14          THE COURT:  Okay.  Now, is that all you've got?

11:00  15     And is that sufficient?

16          MR. ZUMMO:  It's all we need, and it's sufficient,

17     Your Honor.

18          THE COURT:  Why do you say that?

19          MR. ZUMMO:  Because the revenues have a causal

11:00  20     connection by law because they come from the sale of the

21     infringing --

22          THE COURT:  Is that sufficient without going into

23     further specificity of a breakdown as looking at this case,

24     which I've not seen before?

11:00  25          MR. ZUMMO:  It is sufficient, Your Honor.  We

         1    require no further breakdown or proof.

         2             THE COURT:  All right.  Then what?  Does any burden

         3    shift at this point?

         4             MR. ZUMMO:  The dual burden kicks in and they now

11:00    5    have to --

         6             THE COURT:  "The dual burden" meaning that you've

         7    shown sufficient, as you see it, under the law --

         8                  Why don't you take that note.

         9             MR. ZUMMO:  I don't even need a note, Your Honor.

11:00   10             THE COURT:  What?

        11             MR. ZUMMO:  I don't need the note.

        12             THE COURT:  What does it say?  You're out of time

        13    or something?

        14             MR. ZUMMO:  Cameron.

11:00   15             THE COURT:  All right.  Go on.

        16             MR. ZUMMO:  But, yes, the -- we've satisfied our

        17    burden.  It's now the burden of the Defendant.

        18             THE COURT:  To show what?

        19             MR. ZUMMO:  Any deductible expenses or any elements

11:01   20    of profit attributable to factors other than the copyrighted

        21    work.

        22             THE COURT:  Response now, please.

        23             MR. STROTHER:  Your Honor, I disagree with counsel.

        24    This case, the *Gap* case and Nimmer state that there's got to

11:01   25    be a connection shown by the Plaintiff, and it doesn't

         1    distinguish between direct or indirect expenses.

         2              This case doesn't involve my client or either

         3    client building the home.  It's the sale of the home.  And

         4    just throwing up revenues that a salesperson makes off the

11:01    5    sale of an infringing home is not good enough to shift the

         6    burden.

         7         THE COURT:  All right.  The motion is overruled at

         8    this time, to be reconsidered at the charge conference.

         9    Okay?  And I'm going to leave it right there.

11:01   10              All right.  Are you ready to proceed, counsel?

        11         MR. STROTHER:  I am, Your Honor.

        12              May I have the computer shifted over?

        13         THE COURT:  Yeah.  I'll tell you what.  It's now

        14    11:02.  It's early for a break.  So, we can start and go

11:02   15    right through for about another hour and a half, let's --

        16              Ellen, tell the jury we'll be back in at --

        17    what is it? -- that we have just taken a break, that we'll

        18    be back in ready to resume at 11:15.

        19              Okay?  That's about 12 minutes.  We'll see you

11:02   20    then.

        21         MR. ZUMMO:  Thank you, Your Honor.

        22                        (Brief recess)

        23                        (Jury present)

        24         THE COURT:  All right.  We're ready to resume and

11:21   25    to move on.

*Bachman - Direct by Mr. Strother'*

1       Defense, call your first witness.

2       MR. STROTHER:  Your Honor, defense calls Professor

3   Leonard Bachman to the stand.

4       **LEONARD BACHMAN, CALLED BY THE DEFENDANT, SWORN**

11:22  5       DIRECT EXAMINATION

6   By Mr. Strother:

7   Q.  Mr. Bachman, good morning.  How are you?

8   A.  I'm fine.  Thank you.

9   Q.  Sorry.  I had a little computer glitch here for a

11:22  10  second.  Got me freaked out.

11      Would you please introduce yourself to the

12  jury.

13  A.  I'm Leonard Bachman.  I've been a professor of

14  architecture at the University of Houston since I started

11:23  15  teaching in 1978.  I got my 30-year pin on my birthday two

16  days ago.  So....

17      THE COURT:  Were you at U of H for the full time?

18      THE WITNESS:  Yes, sir.  I began there as a student

19  in 1973.  In the interim, I've been a practicing and

11:23  20  consulting architect.

21      This is one of those professions where you

22  don't just teach.  You must have currency in the profession

23  and be out there doing things.

24      I've also worked with organizations at the

11:23  25  national level.  I was the president of the Society of

*Bachman - Direct by Mr. Strother'*

1    Building Science Educators.  I've been on the board of the

2    Architectural Research Center's consortium for, I think,

3    going on 12 years.

4              I've worked with the American Institute of

11:23   5    Architects on their national programs, including being a

6    technical coordinator for a national awards program that

7    includes residential projects and commercial.

8              I've published now -- My fifth book will be

9    coming out later this year.  I've done 30 or 40 papers at

11:24   10   conferences and journals.

11   Q.  And are all those books and journals referenced here in

12   your CV, which is Defendants' Exhibit 17, I believe?

13   A.  Yes.  I believe they are.

14   Q.  I'm sorry.  Defendants' Exhibit 19.

11:24   15             Okay.  This was printed out in January of

16   2017.  Do you, offhand, know if there's anything new that

17   needs to be added?

18   A.  No.  It shouldn't be anything pertinent.

19   Q.  You mentioned that you began school at the University of

11:24   20   Houston in 1973.

21             Did that culminate with this bachelor of

22   architecture in 1979?

23   A.  It did.  I studied math for two years first at

24   San Antonio Junior College.

11:24   25   Q.  Okay.

*Bachman - Direct by Mr. Strother'*

1  A.  I did my undergraduate degree in '79.  I finished my

2  master's in '81.

3  Q.  And I believe Miss Labarthe, who has previously

4  testified, also had a master's of architecture.

11:25  5           Can you explain what that degree is.

6  A.  It's the first professional degree in architecture.  So,

7  there is a five-year professional undergraduate degree that

8  allows you to get a license.

9           So, you can do your internship, take your

11:25  10  professional registration exam and become a practicing

11  licensed architect or you can do a four-year undergraduate

12  degree and then do a master's degree.

13           In my case, I did a five-year professional

14  degree, but then I, wanting to teach, needed a master's

11:25  15  degree, which is the terminal degree, we call it, in

16  architecture.  So, I went on to do my master's as well.

17           THE COURT:  How many years is the master's degree?

18           THE WITNESS:  If you have a five-year professional

19  degree, Your Honor, it's one year additional.

11:25  20           THE COURT:  Okay.

21  By Mr. Strother:

22  Q.  Professor Bachman, you mentioned that you were the past

23  president of the Society of Building Science Educators.

24           What is that organization?

11:26  25  A.  This is a collection of people -- Basically, it's a

*Bachman - Direct by Mr. Strother'*

1  support organization for people who teach technology and

2  architecture.

3          The membership is national and widely endorsed

4  and active.  We have very informal backwoods retreats kind

5  of things where you leave your telephone at home and we just

6  talk for a few days.

7  Q.  Has your teaching focused on any specific area in

8  architecture?

9  A.  Well, if you wanted to classify me, I'm more on the

10  technical side of architecture.  My central focus and

11  responsibility at the college is teaching environmental

12  systems, which is heating, cooling, lighting, acoustics,

13  electrical, plumbing code, life safety, the things that make

14  buildings work.

15          But I also teach research methods, and I have

16  a specialty in an area I created called "building systems

17  integration", which is the bridge between the technology

18  side and the design side.

19  Q.  Okay.  Do you also have hands-on residential experience?

20  A.  Yes.

21  Q.  Tell me how far that goes back.

22  A.  Well, when I was an undergraduate, I worked with my

23  mentor, George Wray, and we did houses across Texas.  George

24  was an early solar pioneer that came to UH from University

25  of Arizona.  And I later worked with George in the firm of

*Bachman - Direct by Mr. Strother'*

1   Tackett Lodholz.

2                   But, in 1978, by then, I was on my own.

3   George had left the university and left the firm.  And I

4   fell in with an organization here in Houston that was trying

11:27   5   to mass-produce flood-plain-safe kind of homes.  And we did

6   one in The Woodlands for which I won a national award, one

7   of many awards.

8                   It was a program of the Housing and Urban

9   Development and Department of Energy, and they published a

11:28   10   book of the winners.  I was just one of them.  But, in 1978,

11   as an undergraduate, I was pretty proud of that.

12                   Later, settling in Houston Heights, my wife

13   and I bought a 1913 home, and we remodeled it by our own

14   hands and then began to do, as an investment business, the

11:28   15   buying and remodeling and leasing of historic homes in the

16   Heights.  We did a few of those.

17                   I've worked with builders, architects on

18   projects, large and small, as a consultant, oft times as an

19   energy consultant.

11:28   20                   I've done residential designs for remodels in

21   the Heights.  I'm doing one now for a family in Memorial.

22   I've just finished two years designing my own house, but

23   that probably doesn't count.

24   Q.   In the 2000s were you invited to a committee of the

11:29   25   American Institute of Architects?

*Bachman - Direct by Mr. Strother'*

1   A.   The Committee on the Environment gives an award called

2   The Top Ten.  I was not on the awards jury.  I've been

3   invited, I think, eight years in a row to be on the

4   technical review committee that looks at the submissions --

11:29   5   about 60 of them -- before they go to the actual jury.

6            So, we vetted those for technical details.  We

7   try to help the jury identify the links between the benefits

8   of the energy gadgets and the architectural features that

9   they lead to in the designs.

11:29   10  Q.   Thank you.

11           How long have you lived in Houston?

12  A.   I came here in 1973 to begin my undergraduate work at

13  the University of Houston.

14  Q.   Are you professionally familiar with the design of

11:30   15  townhomes within the loop in Houston?

16  A.   I've seen many.  I've been involved in a few.

17  Q.   So, I asked Miss Labarthe the same question.

18           You're being paid by Defendants for your

19  opinions in this case?

11:30   20  A.   Yes, I am.

21  Q.   And have you been retained to offer opinions in this

22  case?

23  A.   Yes, I have.

24  Q.   Can you tell me what you were asked to render opinions

11:30   25  on.

1   A.  Similarities and differences between different sets of

2   designs.

3   Q.  Were you also asked to look at Preston Wood &

4   Associates' designs and identify any standard elements?

11:30   5   A.  Yes, I was.

6   Q.  Now, before we get into those specific opinions, I want

7   you to educate me and the jury on a couple of things.

8           Do architects look at a residence and say that

9   this residence has a certain style?

11:31   10   A.  Oft times.

11   Q.  So, I'm going to use layperson vocabulary.  If there is

12   vocabulary that you think is more appropriate when talking

13   about architecture, please let me know.

14           So, as a style, I think what I heard Mr. Wood

11:31   15   mention earlier was "Mediterranean".  And I don't remember

16   which plan he was referring to, but I remember hearing that

17   word.  I think I heard Miss Labarthe say something like

18   "Greek" about a different plan as well.

19           Are those styles of residential architecture?

11:31   20   A.  Not so much in Houston.  What we basically see in

21   Houston is a kind of decorative historic imprint onto the

22   elevations.

23           Some of the ones we are looking at here might

24   be called "Tuscan", if you can use the "Mediterranean" term

11:31   25   for it.  But they're basically quasi-historical

*Bachman - Direct by Mr. Strother'*

1    decoration --

2    Q.   Okay.

3    A.   -- that doesn't follow through into the architecture

4    itself or into the interior planning.

11:32  5    Q.   Tell me a little more what you mean by -- Did you say

6    "historical decoration"?

7    A.   Well, the whole -- the epochs of the architecture we've

8    gone through in residences, if you will, especially in

9    mass-produced speculative housing, has kind of ended up with

11:32  10   the plain box decorated with stylistic things --

11   Q.   Okay.

12   A.   -- in a kind of eclectic, not-always-very-successful

13   way.

14   Q.   Within a particular style, are there things that people

11:32  15   would generally expect to see within that style?

16   A.   For it to appear harmonious, you would think that the

17   eclecticism was somehow a little careful, that you wouldn't

18   mix Greek with New England styles or something that was

19   egregious.

11:33  20   Q.   Okay.   Let's look at some of the plans together, please.

21   I'm going to bring you a laser pointer.

22              And I have all of the plans that we're talking

23   about on paper.   If at some point you would like to look at

24   them in a binder, let me know.   I think that looking at them

11:33  25   digitally is going to suit your purposes, but it's up to

*Bachman - Direct by Mr. Strother'*

1    you, Professor.

2                    I want you to look at Defendants' Exhibit 26.

3                    Let me ask you first:  Among the things you

4    reviewed to render your opinions in this case, did you

11:33   5    review a plan created by Preston Wood & Associates?

6    A.  Yes, I did.

7    Q.  Are you familiar with the name Nagle or Nagle Park

8    Place?

9    A.  Yes, I am.

11:34   10    Q.  And do you understand that the Plaintiffs in this case

11    are claiming that a plan used to construct some units at

12    Nagle Park Place infringed on Preston Wood & Associates'

13    plan?

14    A.  Yes.  I understand that.

11:34   15    Q.  For the record, you understand that the Defendants do

16    not deny using Preston Wood & Associates' plan as a starting

17    point for the Nagle plan used to create six of these six

18    units?

19    A.  That's my understanding.  Yes.

11:34   20    Q.  Okay.  I'll represent to you that this first page is an

21    elevation on the front of the Preston Wood plan at issue for

22    Nagle.

23                    Did you look at this plan?

24    A.  Yes, I did.

11:34   25    Q.  Is it okay to look at this first page even though it's

*Bachman - Direct by Mr. Strother'*

1    not full of the technical periphera [phonetic]?

2    A.  Yes.  It's fine for me.

3    Q.  Does this drawing have a style to you?

4    A.  If I had to name it, I would -- this is the one I was

11:35  5    going to call "Tuscan".  Yes.

6    Q.  So, what elements of a Tuscan style in Houston would you

7    expect to see as part of that style?

8    A.  The elements here that are suggestive of Tuscan are the

9    pedimented friezes at the corners, this frieze here, the

11:35  10   circular treatment there.  There are some things that are

11   kind of discordant, like the small eyebrow roof.

12           The heavy cornices over the windows are fairly

13   Tuscan.  You might have to have an arch to span things if

14   this was really masonry construction.

11:35  15   Q.  So, those elements that you just went over -- those are

16   elements that you would expect to see if someone was

17   describing the front elevation of a three-story or

18   four-story Tuscan townhome?

19   A.  Well, the palm tree seems to be added for effect.

11:36  20   Q.  Okay.  So, what I want to do, Professor, is go through

21   the floor plan with you, and I'd like you to call our

22   attention to the elements that you believe are standard or

23   generic.

24           So, I'm going to zoom in on the first floor,

11:36  25   if that's okay with you.

*Bachman - Direct by Mr. Strother'*

1   A.  Please.

2   Q.  I'm going to zoom in significantly; so, we won't be able

3   to see the entire plan.  Just tell me when you'd like me to

4   scroll down -- or, better yet, why don't we start where we

11:36   5   can see the whole plan --

6   A.  Yes, please.

7   Q.  -- and then we can zoom in if we need to.

8                What catches your eye as something that's

9   standard or generic here?

11:36   10   A.  Can I speak to the entire overall opinion or --

11   Q.  Yes, please.

12   A.  I'd rather to do that than start with particular

13   details.

14   Q.  Please.

11:37   15   A.  So, my opinion, which I was asked for and which I

16   rendered carefully, is that we could take this plan and we

17   could take all of the other plans that you can get in any

18   Sunday newspaper home section and put them side by side and

19   this one would not in any way be distinctive.

11:37   20                This is a stock plan of a generic arrangement

21   of rooms comprised entirely of standardized, generic

22   components.

23                The garage is a requirement and essential

24   function addressed to the street.

11:37   25                The entry from there to the interior, a public

*Bachman - Direct by Mr. Strother'*

1    entry, because there's no place else to put it on the front

2    because of the width of the building.

3              The presence of the main spaces being upstairs

4    as the footprint is prohibitive of having general living

11:37  5    spaces downstairs.  So, a kind of guest room, library,

6    study, almost ancillary, but very, very useful kind of space

7    with some address to the outside.  Downstairs.

8              Now if I could see the second floor.

9    Q.  Yes.

11:38  10   A.  So, out of necessity of the floor plate, the primary

11   public living area gets pushed to the second floor and, true

12   to most modern residential speculative housing, it's as open

13   a grand room as construction will allow.

14             Kitchen, living, dining in the necessary sort

11:38  15   of arrangement with a toilet for public --

16   Q.  What do you mean by the "necessary sort of arrangement"

17   when you said kitchen, living, dining?

18   A.  Well, how would you flip them?  If you put the kitchen

19   in the middle, you'd have to go through the kitchen to get

11:38  20   to the dining room or to the living room.

21             And you'd have the kitchen, which would be at

22   the stairway, which would be illegal because you cannot exit

23   through a kitchen.

24             So, the kitchen has to be at one end or the

11:39  25   other, and the dining room probably has to adjoin it.  That

*Bachman - Direct by Mr. Strother'*

1    leaves either a living/dining/kitchen or kitchen/dining/

2    living.  Take your pick.

3    Q.  So, in your opinion, there are really only two ways to

4    organize those three rooms in the second story of a three-

11:39    5    or four-story townhome?

6    A.  Within these narrow constraints, yes.

7    Q.  Continue.

8    A.  The third floor, please.

9            So, again, the separation of semi-private to a

11:39    10    little less private in the master suite, having its own end

11    of the design, and the other bedroom being at the opposite

12    end of the design separated by the other functions that you

13    have to have, the bath and the closet storage areas.

14            But there is nothing here that you wouldn't

11:40    15    find in any other typical townhouse design in terms of the

16    elements, and there's nothing that you'll find here in terms

17    of the arrangements that are in any way innovative or

18    distinctive.

19            There's nothing here to make this different

11:40    20    from other designs because there's no single idea here that

21    is there to be given expression.  It's generic.  It's stock.

22    It's conventional.  It's standardized.  And I don't think

23    anyone has said any different.

24    Q.  What kind of idea would be possible on the third floor

11:40    25    of a townhome where you've got a master suite and a second

1  bedroom?  I lost myself in that sentence, and I forgot what

2  you said.

3          An idea that has a nonstandard expression, I

4  guess, might have been what you said.

11:41  5  A.  That would be the true designer's -- That would be real

6  architecture.  That is the stock and trade, to do something

7  that is distinctive, that is based on an idea.

8          And to invent one here in front of you would

9  be magic.  I wish I could do that.  I could take you back

11:41  10  historically.  Frank Lloyd Wright -- If we go back to the

11  second floor, please.

12  Q.  Yes.

13  A.  Frank Lloyd Wright, most famous of all architects, was

14  working with prairie-style homes for rich and wealthy people

11:41  15  who could afford large horizontal plans of single level and

16  very elaborate detailing and woodwork for a very long time.

17  But after World War II, everybody's client base dried up and

18  there was not much else to do.

19          Frank Lloyd Wright, working with a very

11:41  20  elegant, concise and simple idea about floor plans, said,

21  'Let's eliminate everything.  No basement.  No garages.  No

22  attics.  No pantries.  No separate kitchens.  No servant

23  quarters.  No radiators.'

24          And he invented several things that made the

11:42  25  open flow of space what we see even today in residential

*Bachman - Direct by Mr. Strother'*

1    planning.  Even in the most speculative of plans, we learned

2    from Frank Lloyd Wright that, if you make all of this one

3    room, you don't have to have three small rooms.

4                    And if you open this up to the view, then you

11:42   5    capture that space as well.  The typical suburban ranch

6    house has the great room, the patio doors, and the backyard

7    and the barbecue.  Right?

8                    That comes from Frank Lloyd Wright's idea,

9    which he called "Usonian", because he was trying to find an

11:42  10    authentic style for people of the United States of America

11    from which he derived Usonia as a kind of style.

12                    And he built 60 of these very attractive,

13    still very well known.  Many of these houses are on the

14    National Heritage List.  But that would be an idea that

11:43  15    would make it distinctive.

16                    And if you show me a Frank Lloyd Wright

17    Usonian house in all of its elegant simplicity and you show

18    me another house, I can tell you which one is Frank Lloyd

19    Wright.

11:43  20    Q.  And would you refer to this second floor as an open

21    arrangement?

22    A.  Sure.  It is a clean, convenient response because

23    there's nothing to add.  Right?  We're trying to unclutter

24    it, which also eliminates expense.

11:43  25                    It gives us more space or a sense of more

*Bachman - Direct by Mr. Strother'*

1    space because we don't have separations between rooms.  We

2    have a bigger volume.  It gives us a sense of having, you

3    know, that big, open space here.

4    Q.  I've heard you use the word "arbitrary" in the past when

11:44    5    discussing architecture.

6         Is there anything arbitrary about this design?

7    A.  The fact that this could have been done other ways; and

8    there's no clear reason that it was done this way other than

9    simplicity and economy, convenience, convention,

11:44    10    standardization.  Right?

11         So, the selection of this particular

12    arrangement is equal to any other such arbitrary

13    arrangement.  Otherwise, you could have done it, yes.

14    There's a limited number of ways you could have done it well

11:44    15    and correctly and satisfactorily, but that's merely

16    convention.

17         The fact that this was arrived at was just

18    somebody's idea of a workable arrangement of elements and

19    spaces.  There is no idea here that's being given

11:45    20    expression.  These are standard components and standard

21    arrangements.  It's generic and, to that extent, it's

22    arbitrary -- an arbitrary choice among other choices.

23         Again, you go to the Sunday newspaper, pick

24    out any number of plans, try and see how one of them differs

11:45    25    in significant ways from the other.  There are little clever

*Bachman - Direct by Mr. Strother*

1    things here and there perhaps, but there isn't one idea that

2    gives it an expression that makes it a distinctive design.

3    And that is the separation between things that are

4    authentically well designed, even perhaps achieving

11:45   5    architecture.

6              I don't mean to say that we should build

7    everything in the world to be a magnificent piece of

8    architecture.

9              We don't put the Eiffel Tower next to the

11:45   10   Taj Mahal, next to, you know, Monticello, next -- We don't

11   line all these things up and say every building has to be

12   that great.  They don't.

13             Most good architecture is background

14   architecture.  There's nothing wrong with that.  But to say

11:46   15   that this was a solid piece of thinking, designing and

16   planning is a stretch.

17   Q.  So, let me ask you a question from the other side of

18   this analysis.

19             I know that you were not asked to identify

11:46   20   elements that were duplicated.  But you would admit that,

21   when you compare the Cameron Architect plan that was used to

22   construct the six Nagle townhomes, that there were some

23   elements that were duplicated?

24   A.  Yes.  It's clear that there was kind of a beginning and

11:46   25   starting point and that things had to be reconfigured.

*Bachman - Direct by Mr. Strother'*

1    Q.  Did you look at the two plans together to pick out what

2    you thought were some of the significant differences?

3    A.  I did.  I'd have to have -- Well, let's -- If I had them

4    side by side or if I had my notes, I could elaborate, but by

11:47    5    memory, no.

6    Q.  Let me see if I can put them side by side.  Let's

7    start -- Is there a floor you'd like to start with?

8    A.  Second floor, please.

9    Q.  Okay.  Take me one moment.

11:47    10            The first one I'm going to put up on the

11    screen is the Preston Wood second floor.  And there is the

12    Cameron Architects second floor.

13            Will this do the trick?

14    A.  Yes.  Thank you.

11:48    15    Q.  Okay.

16    A.  So, these are correct to the orientation of the site.

17    These are oriented correctly as they're intended to be on

18    the site?

19    Q.  I believe so.  Yes.

11:48    20    A.  Okay.  So, in the Cameron design, we have a view.

21    Q.  I'm sorry.  The one on the left is the Preston Wood.

22    A.  Preston Wood.  We have an intentional view this

23    direction, which you see is not here, the view of the other

24    direction from the main public living space.

11:48    25            The kitchen is put to entirely one side.  So,

1    the breakfast room can have its own corner nook rather than

2    being in this position with the kitchen where you have to go

3    through the kitchen to get actually to this area.  Right?

4              The balconies then are still at this bottom

11:49   5    end of the building, let me call it.  So, the relation of

6    the balcony to the living space here might be thought of as

7    being better.

8              The stair now is flipped.  There were some

9    difficulties with the stairs.  Shall I address that?

11:49   10   Q.  If you'd like to now, yes.

11   A.  In looking at these drawings, there was a very specific

12   code violation in the original plans where the headroom for

13   the stair so you don't bump your head as you go up was

14   measured not from the top of the stair riser but from the

11:49   15   bottom, which is a seven-and-a-half-inch mistake.

16             And that necessitated, when it got

17   reconfigured, a series of design changes that I think

18   resulted in largely the total reconfiguration of this plan.

19   Because the stair didn't work, the stair had to be reworked

11:50   20   and, in that reworking, everything else got moved around.

21             That is some indication of how tight you're

22   working within this limited floor plate.  So, once that

23   change happened, then the things you see that are different

24   flow from a whole different logic.  Right?

11:50   25             Now we have living, balcony to this side,

*Bachman - Direct by Mr. Strother'*

1    kitchen, breakfast here, whereas here we have kitchen,

2    breakfast, balcony, amalgamated and a "great space", if you

3    want to call it that, here -- right? -- with a view to the

4    other direction.

11:51   5    Q.  Okay.  Would you like to continue with the second floor

6    side by side or move to a different floor?

7    A.  Let's do third floor, please.

8    Q.  That sounds like a game show.

9    A.  For 20.

11:51   10   Q.  The one on the left will be the Cameron Architects plan,

11   and the one on the right will be the Preston Wood plan.

12   A.  So, since the changes --

13   Q.  I said it incorrectly.  I dragged it over.

14              The one on the right is the Cameron Architects

11:51   15   plan.  The one on the left is the Preston Wood & Associates

16   plan.

17   A.  Okay.  Thank you.

18              We can see the bay bow extended.  So, here

19   again, in this plan the idea is to capture this major space

11:51   20   and major view for the master suite.  Right?

21              In this plan, that is simply not the case.

22   This continues, really, what got started on the second floor

23   below with the separation of spaces.  So, now we have

24   bedroom there and master suite to the front.

11:52   25              The disposition of the dressing areas, which

*Bachman - Direct by Mr. Strother'*

1   we really don't know how that would be used or conceived,

2   here isn't that different in its practical use and

3   application, but the configurations are certainly all

4   different because the plan ended up getting flipped.

11:52   5   Q.  Okay.  Do you want to look at the ground floor?

6   A.  Let's do that.

7   Q.  Okay.  First, here is the Preston Wood plan.  Coming up

8   will be the Cameron Architects plan.

9   A.  So, here's the result of being constrained by things

11:53  10   such as the prescribed floor plate and the garage entry,

11   which takes up obviously half of the plan.

12   Q.  What do you mean by "prescribed floor plate"?

13   A.  Okay.  So, there are site boundaries and there are

14   setbacks, and that leaves you with a buildable envelope.

11:53  15   Right?  So, you get a space you can work in and that's about

16   it.

17   Q.  Okay.

18   A.  Because garages -- I think here we're 24 feet.  I can't

19   tell.  Garages vary from 19 feet to 22 to 24 feet sometimes.

11:54  20   But these are probably kept down to about the minimum.  I

21   can't read the dimension here.

22              And then, again, that necessitates a public

23   entry from the side, which are configured slightly

24   differently.

11:54  25              Here we have entry into a room but then

*Bachman - Direct by Mr. Strother'*

1    leading up to the stair to the public space.

2              Here we have a foyer, which is different --

3    right? -- leading to a stair that had to be slightly

4    different than what the designer started with because of the

11:54  5    headroom issue.

6              But the room back here is separate and

7    discreet, whereas this one is semi-combined with the

8    entryway.

9              So, those are different.

11:54  10   Q.  So, looking at these three floors together and comparing

11   the two plans, do you believe that they are substantially

12   similar?

13        MR. ZUMMO:  Objection, Your Honor.  The witness has

14   not been given any assumption of the legal meaning of that

11:55  15   term.

16        THE COURT:  All right.  Rephrase it.

17        MR. STROTHER:  Fair enough.

18   By Mr. Strother:

19   Q.  I'm going to give you the -- I'm going to ask you to

11:55  20   make an assumption about the legal meaning of the phrase

21   "substantially similar".

22              Assume that "substantial similarity" means the

23   copying of the constituent elements of the Preston Wood &

24   Associates work that are original.

11:55  25              With that definition, do you believe that the

*Bachman - Direct by Mr. Strother'*

1    two works are substantially similar?

2    A.  Well, definitions within definitions.  This is not a

3    "yes" or "no" kind of answer.  I want to be as helpful as I

4    can, but to explain what I mean.

11:56    5              Yes, there are degrees of similarity.  What is

6    substantial?  There is some copying, I think, evident.  But

7    if I saw these two sets of drawings independently, I think

8    they would blend in with ten other such sets of drawings

9    that were prepared independently without knowledge of these

11:56    10    plans, and it might be difficult to say which was a copy of

11    what.  So, substantially, I can't really opine to that.

12    Q.  Let me ask you about the Mount Vernon plan.

13              I will put them up there on the screen, if

14    you'd like, but my questions are probably much more concise

11:57    15    about Mount Vernon.

16              Did you compare Mount Vernon plans that I will

17    call "initial Mount Vernon plans" with subsequent Mount

18    Vernon plans to find out if you believe that they were

19    duplicates?

11:57    20    A.  I did.  Are we referring to the Bill Wooten plans?

21    Q.  Yes.

22    A.  Yes.

23    Q.  You know, I think it would be useful to at least put

24    them up on the screen.  Give me a moment.  You know, I made

11:57    25    a mistake, my client pointed out.

*Bachman - Direct by Mr. Strother'*

1          The Bill Wooten plans are the subsequent Nagle

2   Park Place plans.

3   A.   Okay.  Now, just for clarity, please put up what we're

4   talking about.

11:57   5   Q.   Yeah.  Why don't I show you the Bill Wooten plans that

6   you asked about so we can put them in context for the jury.

7   This is still in Exhibit 26.

8          So, factually, do you have an understanding of

9   what the Bill Wooten plans are?

11:58   10          THE COURT:  What exhibit is that?

11          MR. STROTHER:  This is still Exhibit 26, Your

12   Honor, Defendants'.

13          THE COURT:  Now, what is it that we're looking at?

14          MR. STROTHER:  I'll ask Professor Bachman if he

11:58   15   knows.

16          THE COURT:  All right.

17   By Mr. Strother:

18   Q.   Can you identify for the Judge what the Bill Wooten

19   plans are, to your understanding.

11:58   20   A.   They were a new set of plans done from scratch when it

21   was discovered that some mistake or disputed...then had come

22   up over the initial plans and the developed plans.

23   Q.   So, when I was talking about the Cameron Architects

24   plans used for six units, are the Wooten plans what were

11:59   25   used to build the remaining ten units?

Bachman - Direct by Mr. Strother'

1    A.  As I understand it, yes.

2    Q.  Okay.  I don't have any questions for you about it, but

3    I just wanted to identify for the jury that there is a set

4    of something that are referred to as "the Wooten plans".

11:59   5            Do you believe that the Wooten plans are

6    substantially similar to any of the other plans?

7    A.  I do not.

8    Q.  So, it's Mount Vernon.

9            Did you compare the Mount Vernon plans that

11:59   10   were alleged to have -- Strike that.

11           Do you understand that the Defendants agree

12   that the initial Mount Vernon plans were virtual duplicates

13   of the Preston Wood & Associates' plans?

14   A.  Yes, I do.

12:00   15   Q.  Did you compare that set of plans with a third set of

16   plans prepared by Cameron Architects that were actually used

17   and permitted?

18   A.  Yes, I did.

19   Q.  What's your opinion about the similarity between those

12:00   20   plans?

21   A.  May I see them side by side, please?

22   Q.  Yes.  That will take me a moment.

23   A.  I'm sorry.  There's a lot of plans here.  I don't want

24   to get sideways or confused or confusing.

12:00   25   Q.  Professor, we may have to go old-school in this way.

*Bachman - Direct by Mr. Strother'*

1    I'm going to use my binder.

2    A.  Okay.

3            MR. STROTHER:  Your Honor, can we switch over to

4    the overhead camera?

12:00   5            THE COURT:  Okay.  Is the unit on?

6            MR. STROTHER:  Yes, Your Honor.

7            THE COURT:  Okay.

8    By Mr. Strother:

9    Q.  So, the first thing I will show you is the front

12:01   10   elevations side by side.  This is the Preston Wood plan.

11   And then this would be the Cameron Architects plan that was

12   ultimately subsequently permitted.

13           Does this refresh your recollection?

14   A.  Yes, sir, it does.

12:01   15   Q.  Do you have any comments you want to make about the

16   elevations before I show you the floor plans?

17   A.  The elevations are drastically different.

18   Q.  Here is the Preston Wood & Associates plan followed by

19   Cameron Architects' plan.  I may be comparing -- This looks

12:02   20   like this may not be the same kind of drawing.

21           Do I need to give you something different?

22   A.  No.

23   Q.  Okay.

24   A.  So, on the left is the floor plan with the electrical

12:03   25   switching and lighting overdrawn on top of it for extra

*Bachman - Cross by Mr. Zummo*

1    information.

2              But I think you can see that these are

3    drastically different.

4    Q.  I found the correct one.

12:03  5    A.  Oh.

6    Q.  So, I'm going to put the first floor plans as close to

7    each other as I can get them.

8    A.  I think you can see, from the location of the stair and

9    what that causes in the plan, that these are essentially --

12:03  10    well, they're unrecognizable cousins.  You can't tell where

11    one would be similar to the other in meaningful ways.

12    Q.  Here are the second floors.

13    A.  Same comment; that the location of the stairtower to the

14    corner or to side wall makes a radical difference in getting

12:04  15    up, and then you have matriculation from there to the upper

16    floor, which is different yet again.

17              MR. STROTHER:  Okay.  Professor, with that, I'm

18    going to pass the witness.  Thank you.

19              MR. ZUMMO:  May I proceed, Your Honor?

12:04  20              THE COURT:  Go right ahead.

21                      CROSS-EXAMINATION

22    By Mr. Zummo:

23    Q.  Professor Bachman, do you remember meeting me when you

24    gave your deposition?

12:04  25    A.  Yes, sir.  Good morning.

*Bachman - Cross by Mr. Zummo*

1    Q.  It's good to see you again.

2              I want to start with these plans that you just

3    discussed with Mr. Strother because I want to make sure that

4    nobody's trying to confuse or being confused.

12:04    5    A.  Please.

6    Q.  The ones that you just compared side by side, the

7    Preston Wood 1171 to the third -- the second Cameron set of

8    plans --

9    A.  Yes, sir.

12:05   10    Q.  You're not trying to say that the first set of Cameron

11    plans was the same as the second set of Mount Vernon Cameron

12    plans, are you?

13    A.  No.

14    Q.  In fact, you understand -- You said that you understood

12:05   15    that the second set of Cameron plans was provided later.  It

16    was actually after -- It was done after this lawsuit was

17    filed.  Correct?

18    A.  I didn't familiarize with all the sequence here.

19    Q.  But you -- when you looked at the Preston Wood 1171 plan

12:05   20    and compared it to the first version of Cameron's Mount

21    Vernon plan, you concluded that that was identical?

22    A.  Yes.  It was copied.

23    Q.  And do you now understand how it came to be an identical

24    copy?

12:06   25    A.  I don't question.  I was merely comparing them.

*Bachman - Cross by Mr. Zummo*

1  Q.  So, you didn't ask, 'How did this happen?'

2  A.  I wasn't asked to opine about it.  No, sir.

3  Q.  Did you ever -- Did anybody ever tell you that it

4  happened because Mr. Cameron took the CAD files from Preston

12:06  5  Wood for that design, the 1171, and downloaded them onto his

6  own computer and then put his logo on and made a couple of

7  changes and called it his own plan?  Did anybody ever tell

8  you that that's what happened?

9  A.  I -- I feel like I'm being asked to take sides in

12:06  10  conversations about people's intentions and actions, and I'm

11  a little uncomfortable with that, sir.

12  Q.  No, sir.  That wasn't my question.

13       I just asked:  Did anybody ever tell you that

14  that's what happened?

12:07  15  A.  [Pause]  There's been a lot of conversation and drawing,

16  sir.  I concede that that probably was my understanding of

17  the chronology.

18  Q.  And, similarly, do you understand that the chronology of

19  how Mr. Cameron's alleged version of the Nagle plans had so

12:07  20  many similarities to the Preston Wood D5-214 plan was it was

21  the same chronology?

22       Do you have that understanding; that he

23  downloaded the Preston Wood CAD files for the D5-214, then

24  made changes to those, put his logo on it and called it his

12:08  25  own?

*Bachman - Cross by Mr. Zummo*

1   A.  If by "downloaded" you mean he acquired it from Preston

2   Wood Associates, yes.

3   Q.  And you understand "downloading" means taking a digital

4   version and actually installing a copy of that on your own

12:08   5   computer or your own server?

6   A.  My understanding was that he purchased it rather than

7   took it.

8   Q.  So, your -- And, in your understanding of that, was it

9   your understanding that whatever Preston Wood got paid for a

12:08   10   license to use the D5-214 that they retained?

11   A.  I have no absolute knowledge of that.  Just that there

12   was some kind of a good-faith effort to do business as

13   usual.

14   Q.  We're going to look at a document that I hope will help

12:08   15   refresh your memory or clear that up in just one second, but

16   I want to ask you about this phrase because you've used it

17   earlier today and it's used in this document we're going to

18   look at.

19           You said about the third version of a Cameron

12:09   20   plan that it was done -- or a Wooten plan that it was done

21   from scratch?

22   A.  Appeared to be.  Yes, sir.

23   Q.  What do you mean by a plan being done "from scratch"?

24   A.  Without direct knowledge of other designs that might

12:09   25   have been derivative of.

1    Q.   And you've used that term "derivative".

2                    Is that a term that architects use?

3    A.   Certainly.

4    Q.   And I'm going to ask you in terms of what I understand

12:09    5    the Court may instruct the jury to be a legal term of

6    "derivative", and that's one work that is based upon one or

7    more pre-existing works.

8                    Is that definition consistent with your

9    architect definition of a "derivative"?

12:10   10    A.   Nothing is consistent in architectural theory.

11    Q.   Okay.

12    A.   May I elaborate just a little?

13    Q.   Okay.

14    A.   So, to talk a little in context, works of art build upon

12:10   15    what's gone before without replicating it.

16                    So, for example, Campbell draws a soup can.

17    The next guy doesn't come along and paint a string of beans

18    can.  Right?  We move on to something different.

19                    Architecture can't do that.  Architecture is

12:10   20    bound up in, you know, 30,000 years of what's already been

21    done.

22                    So, what we're constantly doing is, frankly,

23    what happens in law.  We work with precedent.  We work with

24    formal precedents and technical precedents and historic

12:11   25    precedents, things that might be called "derivative works".

*Bachman - Cross by Mr. Zummo*

1    And we use those in different ways.  The same way that

2    precedent is used in law to make new law, we use precedent

3    in architecture to make new architecture.

4                   So, everything is derivative because

12:11   5    everything's been done.  I'm sorry.  Ideas come from other

6    ideas without owing their essence to that first idea.

7                   Is that a helpful answer, sir?

8    Q.  I don't know.

9                   Would you tell me what you mean when you said

12:11  10    that one thing was derivative from another, just in terms of

11    an architect, in the context of these designs in this case.

12    A.  I'm trying to remember where I did.

13    Q.  Well, then, let's -- Since you and I have both gotten

14    off in the weeds, let's see if we can find our way back.

12:12  15    A.  I want to be helpful.

16    Q.  I know.  I don't think for a minute that you're trying

17    to dodge a question.  So, don't worry about that.

18    A.  Thank you.

19    Q.  We're trying to converse here.

12:12  20                   Let me just ask:  Was the Cameron version of

21    the Nagle design a derivative of Preston Wood's D5-214

22    design?

23    A.  To some extent.

24    Q.  And, from my understanding of the legal definition,

12:12  25    would you agree that the Cameron Nagle design was based upon

*Bachman - Cross by Mr. Zummo*

1   a pre-existing work, the Preston Wood D5-214?

2   A.  Again, to some extent.

3   Q.  Now, would that be consistent with what you, as an

4   architect, would call a "derivative"?

12:13   5   A.  Here again, everything is continuous rather than

6   dichotomous.  Again, to some extent.

7   Q.  Okay.

8           MR. ZUMMO:  Would you put up Plaintiff's Exhibit 3,

9   please.

12:14   10          THE COURT:  Now, what is that?  What exhibit

11   number?

12          MR. ZUMMO:  This is Plaintiff's Exhibit 103, Your

13   Honor.

14          THE COURT:  103.

12:14   15          MR. ZUMMO:  I misread.

16   By Mr. Zummo:

17   Q.  Have you ever seen the e-mail that's in the middle of

18   the first page of Plaintiff's Exhibit 103?

19   A.  I don't believe so.  No, sir.

12:14   20   Q.  Do you see that the "Subject" line is "Credit for

21   0 Nagle plans"?

22   A.  Yes.  I see that.

23   Q.  And do you see a reference to the D5-214 plan in the

24   text of the e-mail?

12:14   25   A.  Yes, sir, I do.

*Bachman - Cross by Mr. Zummo*

1  Q.  And do you see that the author of that e-mail has an

2  e-mail address at urbanliving.com?

3  A.  I see that.

4  Q.  So, did you know that Urban Living told this to Samantha

12:14  5  Wood at Preston Wood & Associates, that "We will be needing

6  a credit back for Plan D5-214-1921-S-8.  After receiving the

7  CAD file, Stephen realized that there were some major issues

8  with the stairs and ended up having to draw a plan from

9  scratch.  So, we didn't even use this plan"?

12:15  10          Did you know that that e-mail existed?

11  A.  I think I knew some of that anecdotally, but I've never

12  seen the e-mail.

13  Q.  And do you see that in the e-mail this person from Urban

14  Living uses the term "from scratch" that you and I talked

12:15  15  about a few minutes ago?

16  A.  Yes.

17  Q.  So, in the e-mail, Urban Living is telling Preston Wood

18  that Stephen Cameron ended up having to draw a plan from

19  scratch.

12:15  20          Do you see that they said that?

21  A.  I see that they said that in the e-mail.

22  Q.  And you see that she also said, "We didn't even use this

23  plan."

24          Do you see that?

12:16  25  A.  Yes.

*Bachman - Cross by Mr. Zummo*

1  Q.  Based on what you know about the two plans, were either

2  of those statements true or were they false?

3  A.  Were they true, that they were drawn from scratch?

4  Q.  Let's start there.

12:16  5                    Was that a true statement?

6  A.  I would favor that over they were "derivative of".

7  Q.  So, you think that the Cameron Nagle plan was drawn from

8  scratch?

9  A.  More than I think it is a direct copy.

12:16  10  Q.  And are you saying you also agree that the Cameron plan

11  was an example of "We didn't even use the Preston Wood

12  plan"?

13  A.  This is a conversational e-mail, not a technical

14  description of what happened.  So, I am not going to

12:17  15  characterize the subject matter at question as this being a

16  description of what happened.

17  Q.  You're not going to characterize what the e-mail says as

18  a description of what happened?  Is that what you mean?

19  A.  Not in full, no.

12:17  20  Q.  That's because what it describes didn't happen.  It's

21  not true what's said in the e-mail.  Correct?

22  A.  I didn't say that.  No.  I'm saying this is a

23  conversational e-mail.  It can't be a full, verbose

24  description of the problem.

12:17  25  Q.  Do you understand it to be the position of the

*Bachman - Cross by Mr. Zummo*

1    Defendants in this lawsuit that, while they actually copied

2    and made derivatives of Preston Wood's designs, it's all

3    right because what was copied, in their opinion, is not

4    protectable?  Do you understand that to be their position?

12:18  5    A.  "Protectable" is a legal definition that I am not

6    comfortable responding to.

7    Q.  Well, does the e-mail say, 'We think we can copy your

8    plan because nothing in it is protectable'?  Does the e-mail

9    say that?

12:18  10   A.  Of course not.

11   Q.  Why do you say, "Of course not"?

12   A.  There's no language there, sir.

13   Q.  Okay.  If that was what they really believed in May 2014

14   through the end of 2014, when Mr. Cameron was copying the

12:19  15   plan, do you think, as an architect, that that's a proper

16   way to describe how you're using the design?

17        THE WITNESS:  Your Honor, I'm confused by the

18   question.

19        THE COURT:  Rephrase it, please.

12:19  20   By Mr. Zummo:

21   Q.  Let's just try to make it more simple.

22   A.  Please.

23   Q.  I'm going to try.

24        If Urban Living really thought in May 2014

12:19  25   that it was all right to copy Preston Wood's CAD files and

*Bachman - Cross by Mr. Zummo*

1   make derivatives from Preston Wood's CAD files, don't you

2   think that it would have been the right thing to do for

3   Urban Living to just say so?

4   A.  It's conjecture.  I'm sorry.  I'm not going to -- I'm

12:19   5   not going to guess.

6   Q.  So, you don't have an opinion about whether it's right

7   or wrong to say you're not going to use the plan and you're

8   going to draw up something from scratch when you're really

9   going to copy the CAD files and use them?

12:20   10   A.  Again, I don't know that that's a full and verbose

11   description of what actually happened, and I don't want to

12   respond to it.

13   Q.  Would you ever take another designer's or architect's

14   CAD files without their permission and make a copy of them

12:20   15   and call it your own?

16   A.  No.

17   Q.  Would you ever take another architect's or another

18   designer's designs and modify those designs but clearly make

19   a derivative and call it your own --

12:20   20   A.  Yes.

21   Q.  -- without their permission?

22   A.  Yes.

23   Q.  You would?

24   A.  Yes.

12:20   25   Q.  Would you -- In your classes at the University of

*Bachman - Cross by Mr. Zummo*

1    Houston, do you teach aspiring architects that it's all

2    right to take some other person's design and copy it without

3    their permission?

4    A.  Sir, I just spoke to the idea of precedent as being the

12:21   5    only way forward for architecture.

6    Q.  So, you would teach your students that that's okay?

7    A.  We're not talking about the same thing.

8    Q.  Well, I'd like you to listen to my question.

9         Would you teach your students that it's all

12:21   10   right to do what Stephen Cameron did here?

11        MR. STROTHER:  Your Honor, at this point I object.

12   It's gone on for five minute.  He's not an expert in

13   architectural ethics.

14        THE COURT:  Sustained to the form of the question.

12:21   15   By Mr. Zummo:

16   Q.  Do you know of any architecture program anywhere in the

17   country where students are taught that it's appropriate to

18   do what Stephen Cameron did here?

19        MR. STROTHER:  Your Honor, same objection.

12:21   20        THE COURT:  Sustained.

21   Q.  Do you approve of what Stephen Cameron did here?

22        MR. STROTHER:  Your Honor, same objection.

23   A.  I need --

24        THE COURT:  Sustained.  I'm going to let the

12:22   25   jury -- You've heard all the evidence.  You've heard the

*Bachman - Cross by Mr. Zummo*

1    impressions and the expert testimony of two different

2    experts.

3                And, as to that form of the question, I'm

4    going to leave that to the jury.  So, sustain the objection.

12:22    5    By Mr. Zummo:

6    Q.  You said something about --

7                THE COURT:  By the way, it doesn't mean either side

8    can't argue it to the jury in summation.  Okay?  I just want

9    you to know that.

12:22    10                MR. ZUMMO:  I understand, Judge.

11                THE COURT:  But, as to this witness, that line,

12    you've got to move on.

13                MR. ZUMMO:  I'll move on.

14                THE COURT:  Okay.

12:22    15    By Mr. Zummo:

16    Q.  When you were explaining to Mr. Strother your personal

17    design experience with single-family homes, I heard you talk

18    about remodeling homes in the Heights, designing your own

19    home that you worked on for two years.

12:22    20                Do you have a seal as an architect?

21    A.  Yes, I do.  AI-10141.

22    Q.  Are you a member or have you ever been a member of the

23    American Institute of Building Design?

24    A.  No.

12:23    25    Q.  Is there a single townhouse anywhere in Houston that's

*Bachman - Cross by Mr. Zummo*

1    built from plans that has -- that have your seal on them?

2    A.   No.

3    Q.   Is there anybody living in a townhouse anywhere in the

4    world that you personally designed?

12:23   5    A.   There's one in The Woodlands.  Yes.

6    Q.   Is your seal on that design?

7    A.   I wasn't an architect at the time.

8    Q.   Now, I ask that because -- Tell me if I heard you say

9    this correctly -- Well, first of all, have you ever met

12:23   10   Preston Wood?

11   A.   I have not.

12   Q.   Can you point him out in the courtroom?

13   A.   I could not.  No, sir.

14   Q.   Have you ever talked to him, you know, like, over the

12:23   15   phone?

16   A.   I have no familiarity with him whatsoever.

17   Q.   Have you ever read any description or any testimony from

18   Mr. Wood on his design process, his thought process, to

19   create the designs that we've seen in this lawsuit?

12:24   20   A.   I have not.

21   Q.   Did I hear you correctly during your direct examination

22   that to say that the Preston Wood design that you were

23   looking at was a solid piece of thinking, designing and

24   planning is a stretch?  Did you say that?

12:24   25   A.   I did.

A. Cameron - Direct by Mr. Strother

1  Q.  And you can say that about somebody who spent 40 years

2  learning to design townhomes and managed to make a living

3  and built a successful company designing townhomes for

4  40 years without ever hearing why he made the decisions he

12:24  5  made to create that design?

6  A.  Sir, I didn't say it about a person.  I said it about a

7  design.

8        MR. ZUMMO:  I don't have any other questions, Your

9  Honor.

12:25  10        THE COURT:  Okay.  Go right ahead.

11        MR. STROTHER:  No more questions, Your Honor.

12        THE COURT:  Thank you, sir.  You may step down.

13  You're excused.  You're free to leave.

14          Call your next witness.

12:25  15        MR. STROTHER:  Your Honor, Defendants call Angela

16  Cameron to the stand.

17        THE COURT:  Raise your right hand.

18      **ANGELA CAMERON, CALLED BY THE DEFENDANTS, SWORN**

19        MR. STROTHER:  Your Honor, could we switch over to

12:25  20  my laptop?

21        THE COURT:  Yeah.  Hang on one second.

22        MR. STROTHER:  Thank you.

23            DIRECT EXAMINATION

24  By Mr. Strother:

12:26  25  Q.  Miss Cameron, would you please introduce yourself to the

A. Cameron - Direct by Mr. Strother

1    jury.

2    A.   My name is Angela Cameron.   I'm married to Stephen

3    Cameron, owner of Cameron Architects.

4    Q.   Miss Cameron, do you need a glass of water?

12:26    5    A.   No.   I'm just scared.   I've never testified before.

6    Q.   Okay.

7             THE COURT:   You're all right.   You'll do fine.

8    Q.   Well, let's get one thing out of the way.

9             What is it that you do for a living?   Because

12:26    10   this is a little funny.

11   A.   It is very funny.   I am an appellate lawyer.   So, that

12   means I stay out of the courtroom and I write papers.

13            THE COURT:   Well, welcome to the trial aspect.

14            THE WITNESS:   I grade all their papers and say what

12:26    15   they did wrong.

16            THE COURT:   And then, ultimately, then either the

17   State Court of Appeals or, in my mind, the Circuit, they're

18   going to rule on it.

19            MR. ZUMMO:   Your Honor, I'd object because I think

12:26    20   what appellate lawyers do is they come on after the battle

21   and shoot the wounded.

22            THE WITNESS:   That's true, too.

23            THE COURT:   All right.   I'm going to tell that --

24   Most of my colleagues on the appeals court have heard this.

12:26    25            When I took over the state court, when I was

A. Cameron - Direct by Mr. Strother

1    elected on the state court, there was one judge -- some of

2    you may not remember -- Wilmer Hunt.  His picture is still

3    up in the courthouse.  For 23 years, he was judge of that

4    trial court.  Then Judge Pressler came in and then I did.

12:27  5          And they would say about Judge Hunt, when he

6    got an appeal opinion down from the Court of Appeals --

7    okay? -- he would turn to the last page to see if he was

8    affirmed or reversed and, if he got reversed, he'd say,

9    "Well, they can reverse me, but they can't make me read it,"

12:27 10   and he'd toss it in the trash can.

11          Now, that's not what we do around here.  And I

12   know my colleagues on the Court of Appeals have heard me

13   tell that story.

14          But we're ready to proceed.  Go on.

12:27 15     MR. STROTHER:  Okay.

16   By Mr. Strother:

17   Q.  Just to make sure there's no confusion for the jury,

18   first of all, you're not here to testify as a lawyer about

19   anything?

12:27 20   A.  Absolutely not.

21   Q.  And, in fact, in your practice, do you do civil law?

22   A.  No.  I'm a criminal defense attorney.

23   Q.  All right.  What do you have to do with Cameron

24   Architects?

12:28 25   A.  I'm married to the owner.

1    Q.   Okay.

2    A.   As far as -- I am not employee.  I -- We're a

3    mom-and-pop store.  He does the business part.  I do the

4    books and I do them from my house.  I write the checks.  I

12:28   5    write the -- you know, pay the bills, essentially, just like

6    I do our personal bills.

7    Q.   Are you the bookkeeper for Cameron Architects?

8    A.   I'm the only one who does the books.  I don't know if

9    I'd even qualify as a bookkeeper.

12:28   10   Q.   Do you use any accounting software?

11   A.   I use a program called "Quicken".  I don't know if

12   that's an accounting software as such.  It's more like a

13   check register-type thing.

14   Q.   When it comes time every year to have Cameron Architects

12:28   15   do their taxes, how does Cameron Architects do their taxes?

16   A.   Well, what happens is Quicken has an ability to run a

17   report -- Can I back up?

18   Q.   Yes.  Please.

19   A.   As expenses come in through the year, I input them into

12:29   20   the computer and at the end of the year I can say, 'Run

21   register report from January 1 to December 31st.'

22            What that does is it -- Because, as I'm

23   putting them in, I'll say, well, this is payroll or this is

24   printing or this is -- whatever it is.  Then the year -- It

12:29   25   runs this report and it adds up all of the things in those

A. Cameron - Direct by Mr. Strother

1    particular categories.

2              And, so, I take those reports and each

3    account, like the checking account versus the credit card

4    account versus a different checking account -- you have to

12:29    5    run one of those for each register.

6              So, at the end of the year I do that.  And

7    then I make an Excel spreadsheet, and this column is --

8    Like, our current operating account is at Chase.  So, it

9    says "Chase".  And then the next one says "SWA" because it's

12:30    10    a Southwest Airlines card.  And then the next one may be

11    "Cash".

12              So, I have the columns going down like this up

13    and down for the different accounts and then the different

14    categories going the other way.  I add all those up, put it

12:30    15    on a different page, and I send that to an accountant who

16    does our taxes.

17    Q.  Okay.  Do you understand that Cameron Architects has

18    been sued for copyright infringement?

19    A.  Yes.

12:30    20    Q.  And do you understand that one of the questions the jury

21    is likely to be asked is:  What are the gross revenues that

22    Cameron Architects earned and what are the deductible

23    expenses?

24    A.  Correct.

12:30    25    Q.  Have you gone back and compiled Cameron Architect's

1    records in that regard so the jury can look at things and do

2    their calculation?

3    A.  Yes.

4    Q.  Okay.  I want to go over some of those with you.

12:30    5           First of all, from a financial standpoint, do

6    you know if Cameron Architects was involved in any form or

7    fashion for the following three projects:  EaDo Place,

8    Patterson Street or Stanford Street?

9    A.  We were not.

12:31   10    Q.  Was Cameron Architects retained to do anything for any

11    of those projects?

12    A.  I had never heard of those projects until this lawsuit.

13    Q.  Let's talk about the Mount Vernon project really

14    quickly.

12:31   15           Did anyone ever pay anything to Cameron

16    Architects for any work on the Mount Vernon project?

17    A.  No.

18    Q.  I believe Mr. Cameron got some questions from opposing

19    counsel regarding a release.

12:31   20           Were you here for that testimony?

21    A.  Yes, I was.

22    Q.  A couple of quick questions about that concept.

23           Is your husband a lawyer?

24    A.  No.

12:31   25    Q.  Do you think he has any clue what "release" means?

A. Cameron - Direct by Mr. Strother

1    MR. BONHAM:  Objection, Your Honor.  Speculation.

2    THE COURT:  Sustained.

3    MR. STROTHER:  Okay.

4  By Mr. Strother:

12:31  5  Q.  Okay.  Do you know who the builder was on the Mount

6  Vernon project?

7  A.  I think someone said yesterday, but I don't remember.

8  Q.  A Mr. Bindal?

9    MR. BONHAM:  Objection, Your Honor.  She said she

12:32  10  doesn't know.

11    THE COURT:  Say again.

12    MR. BONHAM:  Objection.  She just testified she

13  doesn't know.

14    THE COURT:  Okay.  Next question.

12:32  15    MR. STROTHER:  Okay.  Your Honor, I think she said

16  that she heard them say it yesterday but she didn't

17  recognize the name, and I was repeating the name to her.

18    THE COURT:  All right.  Then, come at it a

19  different way.

12:32  20  By Mr. Strother:

21  Q.  Do you recognize the name "Mr. Bindal"?

22  A.  I have seen that name or heard it in this courtroom.

23  Q.  Is Cameron Architects going to seek money from the

24  builder of Mount Vernon?

12:32  25  A.  Absolutely not.

*A. Cameron - Direct by Mr. Strother*

1   Q.   Has Cameron Architects executed a legal release of that,

2   though?

3   A.   No.   And we never have on anybody who hasn't paid us.

4   Q.   Well, I mean, why isn't Cameron Architects seeking to be

12:32   5   paid for those plans?

6   A.   Because we got sued and I'm not going to bring that --

7   go after somebody else over a problem.   That's just bringing

8   more people into this mess.

9   Q.   Okay.   Let's focus on the Nagle project.

12:33   10                  I'm going to show you Exhibit 7 from

11   Defendants' exhibits.

12                  Is this a check that the builder of Nagle paid

13   to Cameron Architects?

14   A.   It is a check that is designated it's for Nagle.   I

12:33   15   don't know who signed it.

16   Q.   Do you recognize the name Oppidan or "Oppidan" down

17   here?

18   A.   Yes.

19   Q.   Is this 100 percent of the money that came in the door

12:33   20   to Cameron Architects for those plans?

21   A.   Yes.

22   Q.   It's true, however, that Cameron Architects was hired

23   and was going to be paid more than that.   Right?

24   A.   I think that's what the contract that was introduced

12:34   25   yesterday said, but this is all we got.

*A. Cameron - Direct by Mr. Strother*

1    Q.  Okay.  Do you know why Cameron Architects only got that

2    much?

3    A.  Because this lawsuit started, is my understanding, but

4    to -- That's my understanding.

12:34   5    Q.  Okay.  Let me -- And did Cameron Architects have an

6    arrangement with Urban Living to pay any money that it

7    received on this project?

8    A.  Yes.  We had a 50-50 referral fee agreement.

9    Q.  I'd like to show you a document that's in evidence as

12:34   10   Plaintiff's Exhibit No. 11.

11                Did you create this document from your Quicken

12   files?

13   A.  It's actually an Excel spreadsheet.  I got the numbers

14   from the register reports I was talking about.

12:35   15   Q.  If we need it, I think the laser pointer is still up

16   there with you.  Would you look and see.

17   A.  Yes, sir.

18   Q.  If you ever need to point something out, please do.

19   A.  Okay.

12:35   20   Q.  Tell me what this spreadsheet calculates.

21   A.  Well, first off, can...?

22   Q.  Yes.

23   A.  This is an incorrect spreadsheet.  This was the first

24   one that I prepared.  As I said, we're a mom-and-pop store.

12:35   25   We don't do business reports.  I don't -- Either we have

A. Cameron - Direct by Mr. Strother

1    money in the account or we don't, and that's how we spend

2    it.

3             For this, in response to discovery, I was

4    asked to calculate overhead.  I'm not an accountant.  I'm

12:35  5   not a bookkeeper.  I googled it and it said expenses --

6    direct expenses for that particular project would be direct

7    expenses and other things would not.

8             That's -- This list here on the left are the

9    things that were payments made by Cameron Architects in the

12:36  10  year 2014 for those different categories.  This was the

11   first one I made.  This is an incorrect overhead --

12   calculation.

13   Q.  And I want the jury to fully understand that error in a

14   moment.  I don't want to hide it from them.

12:36  15           Tell them what the error was, and then let's

16   go back and clean it up.

17   A.  Okay.  The only error on this one is, if you look down

18   at "Working hours per year", right there, I calculated it

19   there's 40 hours in a week times 52 weeks.  I was -- That's

12:36  20  how that number went there.  That really probably should be,

21   and on the second spreadsheet is, by 80 because we had two

22   employees.

23             And, as a result, we are not claiming a net

24   loss of 3,500 -- 35 whatever, 3,578.  We got a profit about

12:37  25  209 -- I want to say it's $210-ish.  Give me a calculator.

A. Cameron - Direct by Mr. Strother

1    I'll redo the math for you.

2    Q.  We'll do that after -- I just want them to understand

3    the spreadsheet first, and then you can give the correct

4    figure there.

12:37  5    A.  Okay.

6    Q.  Because it's just one simple math mistake.

7    A.  What do you want to know about the spreadsheet?

8    Q.  Well, first of all, talk about what direct costs are.

9    A.  Okay.  In this case, the direct costs were the payroll

12:37  10   cost, which was a total of $1,721.11.

11                    Where that number came from?

12   Q.  Sure.

13   A.  Our two employees -- why the timesheet -- and they go,

14   you know, Monday, two hours on this, three hours on that,

12:37  15   whatever.  We went through their timesheets and pulled out

16   the number of hours for the Nagle project.

17   Q.  Can we look at those two exhibits really quickly?

18   A.  Sure.

19   Q.  The first one will be Exhibit 9, which is the timesheet

12:38  20   for Keith Sapp.

21   A.  Yes.

22   Q.  So, tell me -- and I can turn to any pages that you need

23   me to -- tell me what you did with this timesheet.

24   A.  Okay.  On the right side -- You see the left column

12:38  25   where it says .3 with a little asterisk right there?

A. Cameron - Direct by Mr. Strother

1        Can you make that a little bigger, please.

2   Okay.  And scoot it over.  Keep going.

3        See, here, he said he spent three hours on

4   Nagle.  And then underneath that on a different project it

12:38   5   was 1.5.

6        So, what I did is I took the spreadsheet and,

7   if he had a Nagle, I put it over here on the end.  And then

8   I added it up and it was 10.5 hours.

9        So, I did that with all of his timesheets to

12:38   10   come to a total number.  I did that for both employees.

11        And if we can go back to the overhead thing --

12   spreadsheet.

13        So, those totaled.

14        Then I took their total hours by what they got

12:39   15   paid and I came up with that number, that $1,727.11.  That

16   does include FICA.

17   Q.  Okay.  That includes the employer's payroll taxes?

18   A.  Yes.

19   Q.  All right.

12:39   20   A.  Not TWC.  Not employment, but just the matching portion

21   of what is taken out for the employee.  It's 6.2 percent for

22   Social Security and 1.45 percent for Medicare.

23   Q.  Okay.  So, you've explained payroll costs.  Now let's

24   talk about the overhead costs.

12:39   25   A.  Okay.

A. Cameron - Direct by Mr. Strother

1    Q.   Let's start over here.  And tell me where you pulled

2    these numbers from.

3    A.    Those -- When I was talking to you earlier about the

4    different register reports, I listed an accountant.  That's

12:40  5    not toward any particular project.  So, that's an overhead,

6    was my understanding -- advertising, automobile, all of

7    these type things -- and then that's where those came from,

8    is from those register reports.

9              And I added the different columns for the

12:40  10   different accounts, being the credit card account or the

11   different bank account -- actual, like, checking-type

12   accounts, and got the total.

13             Like, for the top one, I can tell you our

14   accountant -- I paid her out of our Chase account.  It may

12:40  15   have been Comerica at that time, but that was one check that

16   was paid.

17   Q.   Okay.  Let's see if you can explain what the register

18   reports are.

19   A.   Okay.  That's the breakdown like -- It was Chase.  I was

12:40  20   wrong.  UL had it -- It opened in April of 2014, a separate

21   account to put UL money in.  And then those are the totals.

22   That -- These totals, that far right column, is transferred

23   to the other -- first page.

24   Q.   Okay.  How did you decide which categories to include in

12:41  25   this calculation?

*A. Cameron - Direct by Mr. Strother*

1   A.  Well, there's not that many direct expenses.  It would

2   be payroll on that particular plan.  The others I did not --

3   I also excluded any other payroll-type expenses because

4   that's not fair -- that's not part of overhead.  Those

12:41   5   expenses go to those projects.

6           So, I mean, it was more of a question of what

7   I thought was direct and what I thought would be fair.  I

8   mean, like, I can't charge overhead for a professional fee

9   that I paid to the City on Jack Black's plan.  That's a

12:42   10   direct expense to Jack Black's plan.

11   Q.  Okay.  Let me continue asking you about this column over

12   here.

13           Is this generally a calculation where you have

14   costs minus income equals this sum here?

12:42   15   A.  Profit?  Loss of profit?  That's my understanding, is

16   income minus expenses equals profit.

17   Q.  Okay.

18   A.  There is one thing on here that -- Yes.  The $11,450 was

19   paid to Cameron Architects.  However, at a later date, we

12:42   20   wrote a check to Urban Living for 5,725.  That's that

21   50 percent.

22   Q.  Okay.  All right.  I realize that this is an incorrect

23   calculation.  Tell us how you came up with it, and then I

24   want you to correct it.

12:42   25   A.  What I did is I added -- or Quicken -- not Quicken --

A. Cameron - Direct by Mr. Strother

1    sorry -- Excel added those numbers to get to the 143,578.40.

2              And then I took 40 hours a week times 52 weeks

3    in a year to get 2,080.  And I believe I divided 1,4- -- I'm

4    sorry -- 143,578.40 by 2,080 to come up with a number of

12:43    5    $69.03.

6    Q.  Okay.  And that number, how does that play into your

7    calculation of the overhead costs over here?

8    A.  Then I took the 109 hour -- 109.75 hours that our

9    employees spent on the Nagle plan and times'd it times that

12:43    10    69.03, and that came up with overhead costs of $7,576.04.

11    Q.  And now let's do the correction.

12              So, walk me through what the calculation is.

13    And if you need me to calculate a number, I can do so.

14    A.  Okay.  Well, the proper calculation would be -- Since we

12:44    15    had two employees, it would be 52 times 80, is my

16    understanding.

17    Q.  Which would be double that number of 2,080?

18    A.  Yes.  And then you would divide the same 143,000 by

19    whatever that number was.  Since we're basically doing it in

12:44    20    half, it would basically cut that $69.03 in half.  So, I

21    think that comes out to right at -- I had it memorized.  Now

22    I don't.  I want to say 34.51.

23    Q.  That's correct.

24    A.  Okay.

12:45    25    Q.  So, what do you do with that $34.51?

*A. Cameron - Direct by Mr. Strother*

1    A.  You take that and you multiply it times that 109.75.

2    And I can't do that in my head.  I'm a lawyer, not a

3    mathematician.

4    Q.  Is that the number that you were talking about?

12:45   5    A.  I don't think it's 41 cents.  I think it's something

6    else.

7    Q.  Okay.  Let me do that again.

8            You said it right the first time.  $34.51.

9    A.  Okay.  That sounds right.

12:45   10   Q.  So, that number, 7,576 and four pennies, that would be

11   divided by 2.  Right?

12   A.  You could do it that way or you could do the 109.75

13   times 34.51.

14   Q.  And that would be 3,787.47?

12:46   15   A.  Without seeing your calculator, I can't answer that.

16   Q.  Okay.  But your testimony is this net loss described

17   here would instead change to around a 200-dollar net profit?

18   A.  200, 210, something like that.

19   Q.  Okay.  Mr. Bonham had asked questions of Mr. Cameron,

12:46   20   suggesting that he is habitually not a truth-teller.

21           Do you remember that testimony?

22   A.  Yes, I do.

23   Q.  Okay.  Do you agree or disagree with that?

24   A.  He's absolutely 100 percent incorrect.

12:47   25           MR. STROTHER:  I pass the witness.

1                    CROSS-EXAMINATION

2    By Mr. Bonham:

3    Q.  Ms. Cameron, I'm going to be very brief on this.

4    A.  Okay.

12:47  5    Q.  When you're talking about Defense Exhibit 11, which is

6    your series of reports --

7              THE COURT:  Do you want to leave that up?  Leave

8    it?  "Yes" or "no"?

9              MR. BONHAM:  Take it down, please.

12:47  10             THE COURT:  You're going to use some of yours?

11             MR. BONHAM:  I may.

12             THE COURT:  I'll switch it over in the meantime.

13   Go on.

14             MR. BONHAM:  Thank you, sir.

12:47  15   By Mr. Bonham:

16   Q.  The reports that have been in evidence as Defense

17   Exhibit 11 --

18             MR. BONHAM:  Take that down, please.

19   Q.  -- that are in Exhibit 11, those are not something that

12:47  20   Cameron Architects generated in the ordinary course of its

21   business, are they?

22   A.  It depends on which reports you're talking about.

23   Q.  The ones that Mr. Strother was showing you that do your

24   calculations for what you're contending the profits or

12:48  25   losses are.

1  A.  The spreadsheets are not.  The register reports are.

2  Q.  Let's focus on the spreadsheets for a moment.

3          Those were not generated in the ordinary

4  course of Cameron Architect's business.  Correct?

12:48  5  A.  Correct.

6  Q.  They were generated specifically for this lawsuit?

7  A.  In order to answer your interrogatory.  Yes.

8  Q.  All right.  Now, when we're talking about the

9  overhead -- when you've added up all those categories of

12:48  10  overhead --

11  A.  Yes, sir.

12  Q.  -- do I understand you that the way you did it was you

13  took out expenses that would be specific to other projects?

14  A.  Can I back up for just a minute?

12:48  15  Q.  Sure.

16  A.  I don't think I told a correct statement.

17          When I do my taxes, I do that same

18  spreadsheet.  But because there were things in my tax

19  spreadsheet, I made a new spreadsheet that -- things my tax

12:49  20  spreadsheet would not be applicable to the overhead.

21          So, there is a spreadsheet that's made that is

22  part of ordinary course of business, but that specific one

23  was not.

24  Q.  Again, I'm just asking about --

12:49  25  A.  No.  I don't want to lie.

A. Cameron - Cross by Mr. Bonham

1    Q.  I understand.

2         THE COURT:  Okay.  Next question.  Move on.

3    By Mr. Bonham:

4    Q.  Now, we were talking about the overhead calculations

12:49    5    that you made.

6    A.  Yes, sir.

7    Q.  And, if I understand it correctly, the way you did that

8    was you started with all of the expenses and you took out

9    the ones that were specific to particular projects?

12:49   10    A.  Yes, sir.

11    Q.  And then you take everything else and that's what you

12    were then dividing by the number of hours?

13    A.  By the number of hours in a workweek?

14    Q.  Yes.

12:49   15    A.  Yes, sir.

16    Q.  And then you would multiply that by the number of hours

17    that those two draftsmen were showing on the Nagle project?

18    A.  Yes, sir.

19    Q.  That's the methodology that you were using to calculate

12:50   20    this?

21    A.  Yes, sir.

22    Q.  Okay.  First of all, where did you get that?

23    A.  Google.

24    Q.  Where on Google?

12:50   25    A.  I can't swear, but I believe -- I'm 99 percent sure that

1  it was an article in the *Houston Chronicle*.  Because I don't

2  know how to do that.

3        I typed up "How do you create" -- not

4  "create" -- that's not the right word -- "calculate

12:50  5  overhead?" and I believe I got an article out of the *Houston*

6  *Chronicle* off the internet.  It was off the internet.

7  Q.  So, again, you can't tell us whether or not this was

8  from an accounting society or an expert or just some

9  reporter for the *Chronicle*?

12:50  10  A.  I'm 99 percent sure it was from the *Chronicle*.  But as

11  to the authorship, no, I cannot tell you.

12  Q.  So, in terms of whether or not this is an acceptable

13  methodology in the industry, you don't know?

14  A.  I don't know.

12:51  15  Q.  Now, the expenses that you have on overhead on the

16  calculations you're doing, do those include expenses that

17  Cameron Architects would have incurred whether or not it did

18  the work on Nagle?

19  A.  Yes.  Other than the payroll ones that were what I call

12:51  20  "direct costs".

21  Q.  Correct.  I'm not talking about those.  I'm just focused

22  on your overhead calculations.

23  A.  Okay.

24  Q.  They would include expenses like rent --

12:51  25  A.  Right.

*A. Cameron - Cross by Mr. Bonham*

1   Q.  -- Cameron Architects would have incurred whether or not

2   it had done anything on Nagle or it had ever encountered

3   Urban Living at all?

4   A.  Correct.

12:51   5   Q.  Now, you chose to include the number of hours for the

6   two draftsmen.  Correct?

7   A.  Yes, sir.

8   Q.  But Mr. Cameron also was working during this time,

9   wasn't he?

12:52   10   A.  Yes, sir.

11   Q.  You didn't include his hours, did you?

12   A.  No.  Mr. Cameron doesn't do a timesheet.  And the

13   article I read was talking about how, in a law firm, there's

14   somebody who's a manager -- managing partner and that that

12:52   15   managing partner -- that person's income was part of the

16   indirect overhead as opposed -- because it's not tied to the

17   individual project.  That's why I put it in indirect

18   overhead versus it being a direct expense.

19   Q.  My questions are -- Try it this way.

12:52   20          Mr. Cameron worked on the Nagle project,

21   didn't he?

22   A.  I assume so.

23   Q.  He was the person whose seal was on the plans?

24   A.  Yes.  His seal was on the plans.

12:52   25   Q.  And he would have supervised and spent time working on

*A. Cameron - Cross by Mr. Bonham*

1    that.  Correct?

2    A.  I assume so.  But I'm not in his day-to-day business.

3    Q.  Assume with me that Mr. Cameron -- Again, these

4    draftsmen worked on other projects as well.  Correct?

12:53    5    A.  Correct.

6    Q.  That's why you've done your allocations based on the

7    number of hours that they recorded as having worked on?

8    A.  Correct.

9    Q.  If we assume that Mr. Cameron also worked --

12:53    10    A.  Okay.

11    Q.  -- on the Nagle project, we included his hours, then you

12    would divide by a much larger number.  Instead of it being

13    two employees full-time --

14    A.  -- it would make three.

12:53    15    Q.  Three.

16    A.  Yeah.  If you wanted to do it that way, yeah.

17    Q.  Correct.  And, so, therefore, the numbers would be a lot

18    less in terms of what your overhead allocations would be?

19    A.  Well, I guess.  But that would also -- If I knew what

12:53    20    his hours were, I would take that -- what he got paid out of

21    that and I'd put them onto "direct" and multiply it by --

22    you know, the same way I did the others.

23    Q.  But you made the choice -- Based on this article that

24    you read in the *Chronicle* about how a law firm calculated

12:54    25    things, you made the decision just to use the two

A. Cameron - Cross by Mr. Bonham

1   draftsmen's hours?

2   A.  That's what I thought I was supposed to do.

3   Q.  Now, with respect to Mount Vernon, you indicated that

4   you made a decision not to try to collect that amount that

12:54   5   was promised to be paid.  Correct?

6   A.  We are not trying to collect it.  You're correct.

7   Q.  That was Cameron Architects' decision not to try to

8   collect that receivable?

9   A.  I would say "yes".  It's a decision and it's almost

12:54   10   standard operating procedure in our business.  We eat it

11   most of the time.

12   Q.  And, similarly, on Nagle, you were promised to be paid

13   over $22,000.  Correct?

14   A.  I believe that's what the contract was.

12:55   15   Q.  That's right.

16             And Cameron Architects made the decision not

17   to try to collect the remaining receivable.  Correct?

18   A.  Correct.

19             MR. BONHAM:  Pass the witness.

12:55   20             MR. STROTHER:  Your Honor, I have no further

21   questions.

22             THE COURT:  Thank you, ma'am.  You may step down.

23   You're excused.  You're to free to leave.

24             It's almost one o'clock.  Is this a good time

12:55   25   to break?

1    MR. STROTHER:  Yes, Your Honor.

2    THE COURT:  Okay.  All right.  It's right at a -- a

3  few minutes before 1:00.  We'll take a break at this time.

4  Be back ready to resume at 2:15.  We'll see you at that

12:55    5  time.

6                    (Jury not present)

7    THE COURT:  Everyone at ease here.

8         What's the status of the jury charge?  Have

9  you gone over it and, at least, have points that you agree

12:56   10  or disagree on?

11    MR. STROTHER:  It's a good-looking group of things

12  we don't agree on.

13    THE COURT:  Yeah.  It's 50-some-odd pages.

14    MR. STROTHER:  But it's been vetted.

12:56   15    THE COURT:  What do you mean by "vetted"?

16    MR. STROTHER:  Well, each side knows the other

17  side's intent and desire.

18    MR. BONHAM:  And we've been working on this.  We

19  filed one with the original joint pretrial order.  I filed a

12:56   20  newer one a few days ago.

21    THE COURT:  Yeah.  I agree.  That's good because --

22  Let's put it this way.  Whenever we start the charge

23  conference, I'm going to need -- This is what I generally

24  do.  I mean, I'm welcome to alter it.

12:56   25         But the Plaintiff -- like, in a criminal case,

1   the government -- has got the burden of proof.  I flip

2   through, take a look at the Fifth Circuit pattern.  I get to

3   a page that you disagree on and I stop.  All right?

4            "You object to it why?"  Back and forth.

12:57   5   "What's your alternative?  Let me see."

6            It can be in one document or it can be in a

7   couple of separate ones, but I need to do it that way.

8   Okay?

9            MR. STROTHER:  Right.

12:57   10           THE COURT:  Then what -- It's done, by the way --

11   It's done around that table.  I sit at the end of the table

12   with the court reporter.

13            So, your objections are dictated into the

14   record at the time we're around the table.  So, the next day

12:57   15   or the next -- when the jury comes back in, no more

16   objections.

17            It's all -- You protect your record there.

18   And then one side agrees.  One side or the other runs all

19   the copies.  That way, every juror gets a copy.

12:57   20           I'm not pushing you on that, but that's the

21   one thing I need to have ready, as close as you've got.  I'm

22   going to need a number of copies for myself and my staff so

23   we can all have it.  We'll all sit down there and we just

24   start flipping pages.

12:57   25           MR. BONHAM:  Again, what we've tried to do here --

1  Again, I've been through a few charge conferences with you.

2          THE COURT:  Right.

3          MR. BONHAM:  And, so, the way we've got it

4  formatted -- And I can tell you that a large amount of,

12:58  5  like, the preliminary instructions and some of the

6  instructions that we agree on for copyright, those are taken

7  right out of the charge that you gave in the *Kevin Young v.*

8  *Abshire* case from 15 years ago.

9          THE COURT:  All right.

12:58  10          MR. BONHAM:  Where we disagree, they're listed in

11  italics and it'll have like Plaintiff's proposed,

12  Defendants' proposed or something like that.

13          So, we should be -- I think we're ready with

14  what we've given you to do it the way that you like to do

12:58  15  it.

16          THE COURT:  Whenever the time comes.

17          MR. BONHAM:  They're there and we can run copies of

18  them for your staff immediately, if you'd like.

19          THE COURT:  No.  Because you're going to be maybe

12:58  20  changing it up to the last minute.  But I need you to build

21  in some time to get those copies.

22          Let's see.  One, two, three.  Right?  And

23  we're going to have four interns.  Right?  And they'll be

24  starting on Monday.

12:59  25          So, I'll give you the number we need and then

1    you run additional copies for everybody else.

2                    Whoever is the lead attorney for that side on

3    the charge needs to sit closest to me.  All right?

4    Everybody can chime in because I want to keep it clean.  I'm

12:59   5    sure your clients don't want to do it again.  Okay?

6                    And every once in a while we're going to come

7    to a question that maybe is a real major point -- okay? --

8    and you want it in and he objects.

9                    I say, 'All right.'  If I go with you and he's

12:59   10   right, this may be something you may want to look at again.

11   So, you can confer a little bit.

12                    In other words, we all know that some is

13   reversible error; others, harmless error.  If you all agree,

14   there's no problem.  If you want to get certain wording in

12:59   15   that's not in any of the standard forms, that's fine if both

16   of you agree.

17                    But that's how I work it.  Every once in a

18   while we come to a question.  Now, you heard what he said.

19   Now, if I give it to you -- okay? -- if you lose, you lose

13:00   20   and, if you win, you lose, if he's correct.  And that goes

21   both ways when you object like that.

22                    All right.  I'll see you back at 2:15.  I've

23   got something during the lunch hour, but it doesn't impact

24   you.

13:00   25                    Yes, sir.

S. Cameron - Direct by Mr. Strother

1          MR. STROTHER:  I wanted to alert you, Your Honor,

2  regarding scheduling.  I anticipate finishing my evidence

3  today.  I have limited it to two more witnesses --

4          THE COURT:  All right.

13:00  5          MR. STROTHER:  -- Mr. Ramani --

6          THE COURT:  Let's see what it looks like at the end

7  of the day.  Don't forget we're adjourning today about 4:30.

8          MR. STROTHER:  Understood.

9          THE COURT:  If we have to hold over, no problem.

13:00  10  You're moving quickly.  All right.

11                 (Lunch recess)

12                 (Jury present)

13          THE COURT:  Thank you.  Be seated.

14            All right.  Defense, call your next witness.

14:26  15          MR. STROTHER:  Your Honor, Defendants call Stephen

16  Cameron to the stand.

17          THE COURT:  Mr. Cameron, do you want to again take

18  the stand.  And you're still under oath.

19        **STEPHEN CAMERON, THE DEFENDANT, PREVIOUSLY SWORN**

14:26  20              DIRECT EXAMINATION

21  By Mr. Strother:

22  Q.  Mr. Cameron, good afternoon.  How are you?

23  A.  All right.

24  Q.  All right.  I have called you back up to the stand

14:27  25  because earlier during Plaintiff's case I kind of got in and

*S. Cameron - Direct by Mr. Strother*

1    then out with you without really getting into more detail

2    about who you are and how did Nagle happen, things like

3    that.

4               So, let me begin by asking you to tell the

14:27    5    jury who you are.

6               Where are you from?

7    A.  Oh, my goodness.  I'm pretty much a Houstonian.  I've

8    lived here since I was, like, three, four.  Grew up inside

9    the loop, West U.  Went to Lamar.

14:27    10              Had always worked in drafting and drawing and

11    drew a lot by hand; and, so, that kind of led me into

12    architecture.  I went to Texas Tech and got my bachelor's

13    degree.

14              And then worked for R&T Architects for a

14:28    15    couple of years so I could sit for the exam.  Don't

16    recommend that to just about anybody.  That was brutal.

17    Q.  Before you race all the way to today, let me back you

18    up.

19              We were talking about the story we heard from

14:28    20    Mr. Wood about him having an interest in design from a very

21    early age, and I heard a story from you.

22              When did you get interested in architecture?

23    What's the first time you can remember being --

24    A.  Good grief.  I've always drawn.  You know, it just

14:28    25    started as a kid.

*S. Cameron - Direct by Mr. Strother*

1    Q.  When did you first build something?

2    A.  Well, I did build that little fort in the backyard.  I

3    drew it and designed it and built a fort.  I was always good

4    with my hands.

14:29    5    Q.  Was that the first architectural drawing you ever did?

6    A.  I imagine.  I was pretty young.  Definitely.

7    Q.  What was it that led you to architecture rather than

8    another course of study?

9    A.  I always drew.  I mean, I had been drawing since I could

14:29    10    pick up a pencil.  So, architecture seemed to be the best

11    fit for solving problems and -- Because I like science, but

12    I didn't read so good.  So, I like drawing.  Don't have to

13    talk.

14    Q.  Do you consider yourself not much of a talker?

14:29    15    A.  Not much.

16    Q.  Okay.

17    A.  I listen.

18    Q.  All right.  You had told us about your degree from Texas

19    Tech.

14:29    20             What kind of degree was that?

21    A.  It was a bachelor's of architecture, about a five-year.

22    And then you have to sit for three years before you can take

23    the exam.

24    Q.  When did you take the exam?

14:30    25    A.  In '94.  The first one was '93 and then '94.  Took it

S. Cameron - Direct by Mr. Strother

1    twice for one section, which is not bad.

2    Q.  So, start there.

3            What did you do after you were first a

4    licensed architect?

14:30    5    A.  I was working for Marion Spears at the time.

6    Q.  Who is Marion Spears?

7    A.  He's a -- primarily a residential design firm.  We

8    specialized in the box.

9    Q.  What does that mean?

14:30   10    A.  Well, builder specs, you know, Lennar and Dover and, you

11   know, bunch of the big names back then.  So, we -- You know,

12   we cranked them out.  But we had designed many single-family

13   custom as well.  But, you know, the builder specs were kind

14   of the big niche.

14:31   15            The first project I worked on -- I came in as

16   a night shift by myself because there wasn't enough

17   stations, and the first project was townhomes.  I remember

18   what they looked like, but I can't remember where they were.

19   It was a few days ago.

14:31   20   Q.  What did they look like?

21   A.  Huge.  They were probably -- See, you had a two-car in

22   the front and an entry.  So, they were probably 35 foot wide

23   by 65, 70 foot deep.

24            They were over -- They were up against the

14:31   25   Buffalo Bayou.  And I remember the structures.  Getting to

*S. Cameron - Direct by Mr. Strother*

1    go see them getting built was amazing.  The foundations were

2    simply monstrosities.  But it was fun working on those for

3    the first time.

4    Q.  And that was with Marion Spears?

14:32    5    A.  Yes.

6    Q.  How long were you there?

7    A.  I left in 2000, started my own company.

8    Q.  Okay.

9    A.  But we did townhomes starting in about '94 and

14:32    10    throughout.

11    Q.  All right.  So, how many townhomes have you designed?

12    A.  Oh, hundreds, probably a thousand.

13    Q.  Do you think that they're significantly different from

14    each other?

14:32    15    A.  No.  No.  I found one for a client last week that we did

16    in 2000 that fit perfect.

17    Q.  Interesting you picked the year 2000.  Let me ask you

18    this question.

19         Let me move you to the Mount Vernon project

14:33    20    real fast.  I want to make sure -- Let me try to make sure

21    that the jury understands what happened with the Mount

22    Vernon design.  Okay?

23         Was Cameron Architects retained by someone to

24    use a PWA stock plan for the Mount Vernon project?

14:33    25    A.  Yes.

1    Q.  Do you remember who it was?

2    A.  No.

3    Q.  Was it through Urban Living?

4    A.  Yes.

14:33    5    Q.  After you received the stock plan who worked on it?

6    A.  I don't know.  It was either Chad or Keith.

7    Q.  At the time, did Cameron Architects have two people

8    working under you?

9    A.  Yes.

14:33    10    Q.  And how many people do you have working under you now as

11    far as designers or architects?

12    A.  Just one.

13    Q.  Who is that?

14    A.  Chad.

14:33    15    Q.  Is Chad an architect or designer?

16    A.  Designer.

17    Q.  Okay.  So, back at the time when you had two people

18    working for you plus -- Is Keith a designer or an architect?

19    A.  Drafter.

14:34    20    Q.  A drafter.

21            What's the difference between a drafter and a

22    designer and an architect?

23    A.  Well, a drafter just kind of follows instructions and

24    tries to draw what he's told.  A designer can make decisions

14:34    25    and change, and they solve problems.  Same with an

1    architect.  I mean, we primarily are there to solve the

2    problem and make it work.

3    Q.  Is there a difference between designers and architects?

4    A.  Yes.  I know there's a real good answer for that,

14:34    5    but....

6    Q.  Are there things that designers are not permitted to

7    work on by law, if you know?

8    A.  I think commercial is 5,000 square feet and up; you have

9    to be an architect.  Designers, I don't think there's a

14:35    10    limit on residential.

11    Q.  Okay.  So, let's go back to Mount Vernon.

12            You've already testified that there were very

13    few changes from the original PWA plan and the first

14    iteration of the Mount Vernon plan.  Right?

14:35    15    A.  Yes.

16    Q.  And who instructed you to create a new plan?

17    A.  That project got put on hold for quite a while.

18    Q.  Do you know how long?

19    A.  Not off the top of my head.  I'd have to look at

14:35    20    paperwork.

21    Q.  Over a year?

22    A.  Probably.

23    Q.  Okay.  So, my question was:  Who directed you to -- who

24    directed Cameron Architects to create a different plan?

14:36    25    A.  Well, that would be Urban Living.  I think it was a new

*S. Cameron - Direct by Mr. Strother*

1    builder didn't want that style and wanted something else.

2    Or the lawsuit.  I mean, it was after that.

3    Q.  It was after the lawsuit?

4    A.  Yeah.  Okay.

14:36    5    Q.  No.  I'm asking you.

6                Do you believe it was after the lawsuit that

7    the change was made?

8    A.  Yeah.  Wasn't too long ago.

9    Q.  Is it possible that the lawsuit is what caused the

14:36   10    change in the plan?

11    A.  I don't know.

12    Q.  Fair enough.

13                What did Cameron Architects do to come up with

14    a different plan?

14:36   15    A.  I went to my stock plans and found something that would

16    fit and modified it to solve the new builder's needs.

17    Q.  So, that new plan, which is in evidence -- what year did

18    you create the stock plan?

19    A.  Well, the original one was 2000, but it had several

14:37   20    renditions over the years.  I mean, they all do.

21    Q.  Kind of like the D5-214 family tree we saw?

22    A.  Oh, yeah.  Yeah.  Similar.  Years are different but, you

23    know, same concepts.

24    Q.  What led me to Mount Vernon was the year 2000 because I

14:37   25    recall that that's where the stock plan came from.  So,

S. Cameron - Direct by Mr. Strother

1    let's go back to the year 2000.

2    A.   Okay.

3    Q.   You formed your own company?

4    A.   That was the year we started.

14:37    5    Q.   What did -- Was that Cameron Architects?

6    A.   Yes.  Yes.

7    Q.   What did Cameron Architects set out to do once you

8    started your own company?

9    A.   Well, I liked doing the stuff we were doing at MSA and,

14:37    10    so, we continued that.  And I brought a few clients with me

11    and kept it running.

12                   In 2000, we were primarily doing large custom

13    homes, some townhomes but not many.  By 2005 it had shifted

14    all the way -- 90 degrees the other way, almost all

14:38    15    townhomes and a few custom.

16    Q.   What year did you say?

17    A.   2005.

18    Q.   Okay.  Was that an intentional shift Cameron Architects'

19    part or just where your customers took you?

14:38    20    A.   Just the way the customers go.  Not on purpose.

21    Q.   When did you start doing any kind of business with Urban

22    Living?

23    A.   Hmm.  I had met him a little before 2014.  I think we

24    had done a few things, and I can't remember what the first

14:38    25    thing was.  I think it was an office building repair.

*S. Cameron - Direct by Mr. Strother*

1    Q.  So, you said you had done a few things.  You meant you

2    had done some architectural designs for Urban Living --

3    A.  Right.

4    Q.  -- or one of Urban Living's customers?

14:39    5    A.  Right.  I think it was a restaurant.  So, it was a while

6    back.

7    Q.  Was -- How did the relationship between Urban Living and

8    Cameron Architects, where Urban Living would introduce

9    builders to Cameron Architects and then PWA stock plans

14:39    10    would be used, begin?  Did that sentence make sense?

11    A.  Yeah.  That started somewhere around -- early in 2013.

12    And I think it started rolling up around in May of '13

13    and -- Actually, I don't remember the date when it started.

14    But, yeah, we started doing several projects.  I mean, it

14:40    15    came fast.

16    Q.  Where Cameron Architects was being asked to revise PWA's

17    stock plans?

18    A.  Yes.

19    Q.  So, how did that start?  It's as simple as:  Did Urban

14:40    20    Living talk to you?  Did Preston Wood talk to you or PWA?

21    A.  No.  I had found out or somebody had called and said

22    that they were moving to David Weekley and they had a lot of

23    builders they needed to keep happy and if I would be willing

24    to take over some of the -- because, you know, they were

14:40    25    busy and --

S. Cameron - Direct by Mr. Strother

1    Q.   "They" being Urban Living?

2    A.   No.  I think I talked to Sam first.  No.  I don't know.

3    Maybe I talked to Vinod and then Sam.  I don't remember

4    exactly, but....

14:40    5    Q.   But when you began --

6    A.   They were going to do stock plans and then we would make

7    changes and get them to clients.

8    Q.   Had you had a conversation in 2013 or 2014 with Ms. Wood

9    where you indicated to her that you would be -- Cameron

14:41    10   Architects would be revising PWA plans for Urban Living

11   builders?

12   A.   Did I --

13   Q.   Right.  Did you ever talk with her about that?

14   A.   We had conversations, but I don't know if it was about,

14:41    15   'Hey.  I'm taking over this.'  But we did talk.

16   Q.   About what?

17   A.   Well, I talked to her a few times when we started

18   getting plans on how to work them.

19   Q.   What do you mean by "work them"?

14:41    20   A.   Well, in autoCAD, you have a menu system and plans are

21   drawn with layers and blocks and --

22   Q.   I'm going to interrupt every now and then to have you

23   define terms.

24              What is "autoCAD"?

14:42    25   A.   AutoCAD is a drafting tool.  That's what we draw with.

S. Cameron - Direct by Mr. Strother

```
        1    Q.  Is it a computer program?

        2    A.  It's a computer program, an expensive one.  Occasionally

        3    I wish we'd go back to pencils.

        4    Q.  Do you ever use pencils?  I'm curious.

14:42   5    A.  Yeah.  I mostly draw by hand -- I don't really draft

        6    much -- redlines and designs and stuff.

        7    Q.  Okay.

        8    A.  But the -- Menu system.  To get their plans, we needed

        9    their menu system because they are created in a way with

14:42  10    layers and their blocks.  And, so, they had to send somebody

       11    over and set it up on one or two of our computers.

       12    Q.  Let me -- let me clarify.

       13              PWA sent someone to your office to set your

       14    computers up so that your computers could work on PWA plans?

14:43  15    A.  Yes.

       16    Q.  Do you remember who that was?

       17    A.  Scott.  Scott Harris.

       18    Q.  Was that a Preston Wood & Associates employee?

       19    A.  Yes.

14:43  20    Q.  Okay.

       21    A.  And good friend.

       22    Q.  Okay.  Tell me about that.  I want to know.  Why is a

       23    Preston Wood & Associates employee a good friend of yours?

       24    A.  We went to college together, and we still keep in touch.

14:43  25    Q.  Do you know if he's any longer with PWA?
```

S. Cameron - Direct by Mr. Strother

1    A.   Yeah.  He's still there.  Well, he's at David Weekley,

2    technically.

3    Q.   Okay.

4    A.   He's still with Preston.

14:43    5    Q.   Mr. Wood had moved him and a lot of his employees over

6    to David Weekley as part of their move?

7    A.   Yes.

8    Q.   So, we're at the point where PWA has sent your friend

9    over to install things on your computer so that you can use

14:43    10    PWA plans?

11    A.   A menu.

12    Q.   A menu?

13    A.   Yeah.

14    Q.   Did Cameron Architects agree to a reduced rate to do

14:44    15    these kinds of revisions?

16    A.   What do you mean?

17    Q.   So, on the Nagle plan -- which was originally 16 units,

18    right?

19    A.   Uh-huh.

14:44    20    Q.   "Yes"?

21    A.   Yes.

22    Q.   The contract was for, I think, $22,000 --

23    A.   Yes.

24    Q.   For 16 units.

14:44    25              Is that a normal price that Cameron Architects

*S. Cameron - Direct by Mr. Strother*

1    would charge for that kind of work?

2    A.   Pretty close.

3    Q.   So, no reduced rate, is what I was asking about.

4    A.   No.

14:44    5    Q.   All right.  Do you remember what the first project or

6    plan is that came in the door that was a PWA plan that

7    Cameron Architects had been asked to revise?

8    A.   I don't remember the first one.

9    Q.   Are you familiar with how to use that PWA installed menu

14:45   10    system?

11    A.   Not very well.

12    Q.   Did you personally work within that system to do any of

13    the revisions?

14    A.   No.

14:45   15    Q.   Who was it that was doing the revisions?

16    A.   Well, I hired a guy named Keith to come in and learn

17    that because me and Chad are too used to ours.  He struggled

18    trying to learn how to do it.  He figured it out, but I

19    hired another guy to just take the plans.

14:45   20            Most of the changes were roof -- roof decks,

21    and third floor stair towers usually had to be -- The code

22    had changed.  So, we had to make a couple code changes.

23    Hopefully, that was most of what we did.

24            There were some that the clients really wanted

14:45   25    changed, but, for the most part, the first couple went

*S. Cameron - Direct by Mr. Strother*

1    smoothly.  Didn't have to change much.

2    Q.  So, we're going to be talking about revisions that Keith

3    did, but I want to make it clear to the jury.

4               Do you accept responsibility for Keith's

14:46  5    revisions?

6    A.  I'm the boss.  Yeah.

7    Q.  The buck stops with you?

8    A.  Yeah.  I always see the final redline.

9    Q.  Okay.  So, if mistakes existed in revisions done by

14:46  10   Keith and they went out the door, is that ultimately on you?

11   A.  Yes.  I actually had to buy a roof because he didn't --

12   he cheated.  He didn't fix some redlines I had done and said

13   he did and sent it out for permit and they started building

14   it and we couldn't build that roof.  So, I had to fix it.

14:46  15   Q.  Let's talk about the Preston Wood & Associates plans

16   generally.

17              Do you know how many times one of Urban

18   Living's builder clients hired Cameron Architects to revise

19   one of those plans?

14:47  20   A.  Oh.  There were well over 50 projects.  Hundred.

21   Q.  Hundred different units, you mean, or...?

22   A.  Hundred different lots.  Or maybe even it was 200 lots.

23   Some of them were pretty big developments.

24   Q.  Okay.  Did the PWA plans have characteristic problems,

14:47  25   meaning a problem that you would run into over and over and

S. Cameron - Direct by Mr. Strother

1   over again?

2   A.   There was always something -- an AC chase or a stair --

3   but, you know....

4   Q.   The way you answered the question, I think maybe, no,

14:47   5   there wasn't a characteristic problem.

6   A.   Well, they were all right.

7   Q.   Okay.

8   A.   I mean, every time I go back into one of my plans I find

9   a problem.   There's always something you miss, but not

14:47   10   inherent.

11   Q.   All right.   Let me direct your attention to Nagle.

12              And why don't I begin by asking you about the

13   e-mail we've seen from Fina Reisinger to Ms. Wood.

14              MR. STROTHER:   Your Honor, may I have the overhead

14:48   15   projector?   Thank you.

16   By Mr. Strother:

17   Q.   Okay.   I want to call your attention to the part of the

18   sentence that begins with "Stephen..."

19              "Stephen realized there were some major issues

14:48   20   with the stairs..."

21              First of all, was that correct?

22   A.   Yes.

23   Q.   "...and ended up having to draw a plan from scratch..."

24              Was that correct?

14:49   25   A.   Not entirely.

*S. Cameron - Direct by Mr. Strother*

1  Q.  "...so, we didn't even use this plan."

2              Was that correct?

3  A.  No.

4  Q.  Okay.  Let me ask you:  What was your participation in

14:49  5  that chain of communication, meaning did you ever speak with

6  either Fina Reisinger or Mr. Ramani or -- Down at the bottom

7  I think it says:  "Please coordinate accordingly with Mai."

8              Did you speak to any of those people about the

9  Nagle problem?

14:49  10  A.  I'm sure I talked to Fina.  That's kind of who I was

11  doing most of my communication with.

12  Q.  How did you know that there were major issues with the

13  stairs?

14  A.  It didn't start with the stairs.  It's just, when I

14:49  15  get -- when I get -- I got a thing -- I think they called it

16  a "land package", and that would have the site plan and a

17  lot of paperwork.  It would have the site plan where they

18  were going to divide up, and that's how we figured out what

19  footprint we need.  And they also send the DWGs.

14:50  20  Q.  What are the DWGs?

21  A.  Those are the drawing files, the files from PWA.

22              When I had the first meeting with the new

23  builder, I realized --

24  Q.  Pardon me.  Who would send you the DWGs?

14:50  25  A.  Fina.

S. Cameron - Direct by Mr. Strother

1    Q.  Okay.  Thank you.

2    A.  You know, they'd been working on getting these deals,

3    and then I'm basically a drafter for this stuff.

4              And when I first met with the owner, I

14:50    5    realized that the plans that they had picked didn't work.  I

6    mean, they were just -- Nothing wrong with them.  They just

7    didn't work because of the layout.

8              You know, I needed the living room and the

9    master in the front.  I mean, everybody was seeing it a

14:51   10    bunch of times.  But I had to get that fixed.  And as we go

11    through and redesign it and get things working, we figured

12    out the stairs didn't work and had to move the utility,

13    which changed other things.

14    Q.  So, let me slow this down.

14:51   15              You said you met with the owner.  Is that the

16    builder?

17    A.  Probably.

18    Q.  Okay.

19    A.  I mean, sometimes they're developers, builders.

14:51   20    Sometimes -- I don't usually have much contact.  I'd usually

21    have the one meeting at Urban Living and we'd go from there.

22    Q.  And then the next thing you said is you had to make

23    changes to move the living room and things that the jury has

24    seen.

14:51   25              Break that down for me.  Who determined that

S. Cameron - Direct by Mr. Strother

1    changes needed to be made of that kind?

2    A.   Me.   Well, I mean, it was just logical.

3    Q.   Then who made the changes?

4    A.   Probably Keith or Chad.   One of them was working on it.

14:52  5    Q.   And then you said the stair problem was discovered.

6    Right?   Who discovered that?

7    A.   Probably whoever was working on it.

8    Q.   Either Keith or Chad?

9    A.   Yeah.   Yeah.

14:52  10   Q.   And did they consult you, Keith or Chad about how to fix

11   the stair problem?

12   A.   Yes.

13   Q.   What was the solution?

14   A.   Well, it was already being, I mean, pretty much redrawn.

14:52  15   Q.   Did you instruct your employees to redraw?

16   A.   Yes.   Yes.   They -- Yes.

17   Q.   So, what happened next?

18   A.   Well, it was supposed to be a new plan.   You know, I

19   told Keith "new plan", which means not JPW stuff.   Cameron

14:53  20   Architect's stuff -- menu, blocks, all of that.

21   Q.   Why did you want to start over at that point?

22   A.   It was just -- It had made so many changes that it was

23   just a new plan.   I mean, there wasn't much going to work.

24   Q.   Was that before or after the changes were made due to

14:53  25   the stair problem?

S. Cameron - Direct by Mr. Strother

1    A.  Well, this was after.

2    Q.  Okay.

3    A.  And I didn't think about it.  So, we -- You know, they

4    made all the changes and coming back and...  So, when it

14:53   5    came back for redlines, I mean, I was -- I mean, that's all

6    I did.  I'd go redline all day.

7    Q.  What does "redlining" mean?

8    A.  Just taking the plans, printing them out and checking

9    them.

14:54   10   Q.  With a red pen?

11   A.  Yeah.

12        THE COURT:  "Red pen" meaning you want them out or

13   that you've already checked them or what?

14        THE WITNESS:  No.  I'm writing on them, just making

14:54   15   sure the guys didn't miss code violations so you can get a

16   permit.

17   By Mr. Strother:

18   Q.  And you're saying that you were having to write all over

19   them with red ink?

14:54   20   A.  Yes.  Well, yes.

21        And, you know, I was getting quite irritated

22   with Keith because I had to keep redlining his stuff again

23   and again and he wasn't really following directions very

24   well.  He didn't make it long after that.

14:54   25   Q.  Let's go back to the e-mail on the screen behind you.

*S. Cameron - Direct by Mr. Strother*

1        So, you spoke with Fina about the plans having
2   problems in them?
3   A.  Uh-huh.  Yes.
4   Q.  Why did you bring it to her attention, meaning why did
14:54  5   it matter to you that you were going to have to start over
6   with a new set of plans?
7   A.  Well, I didn't feel that we'd pay for the stock plans if
8   I wasn't going to use it.
9   Q.  Okay.  So, they weren't redrawn from scratch,
14:55  10  ultimately.  Right?
11  A.  Right.
12  Q.  Why did you send them on to -- Where did you send them
13  on after they were finished?
14  A.  Well, once they're finished, they go to the permit
14:55  15  runner -- or the engineer is the next step.  Engineer.  Then
16  permits.  So -- And I probably didn't even notice.  I mean,
17  we were -- I've never been that busy before.
18  Q.  So, this was in May of 2014.
19        How busy was Cameron Architects at that point?
14:55  20  A.  Well, I mean, we had at any given time probably, what,
21  15, 16 projects with Urban Living, and then I had my own
22  business that was still cranking.
23  Q.  So, what were you doing at the time not related to
24  revising PWA plans?  What was Cameron Architects also
14:56  25  working on?

1    A.  Well, just other projects.  I mean, I had other builders

2    and other developers.  I think back then I had a couple

3    restaurants, also.  Yeah.  Wife.

4    Q.  Did, you after this lawsuit was filed, compare the plans

14:56    5    that ultimately came out of your office with the original

6    PWA plan?

7    A.  Yes.

8    Q.  I was going to have you look at a document.  Then I

9    changed my mind.

14:57    10          Do you believe that your office changed that

11    plan enough to where it's no longer the same plan?

12    A.  That's my belief.  Yes.

13    Q.  Mr. Cameron, thank you.

14          MR. STROTHER:  I pass the witness.

14:57    15          THE COURT:  Are you going to need the lights out?

16          MR. BONHAM:  I may, but we'll see with it on.

17          THE COURT:  All right.  Let me know if you need it.

18          MR. BONHAM:  I will, Your Honor.  Thank you.

19                    CROSS-EXAMINATION

14:57    20    By Mr. Bonham:

21    Q.  Mr. Cameron, I believe you told Mr. Strother that you

22    have -- you've designed thousands of townhouses.

23    A.  Probably.

24    Q.  Are they all alike?

14:57    25    A.  There's probably -- There's a lot of differences, but

S. Cameron - Cross by Mr. Bonham

1   they all have the same rooms, same setup.

2   Q.  Your townhouses, you think they're all alike?

3   A.  Yeah.

4   Q.  Now, you mentioned Scott Harris.

14:58   5   A.  Yes.

6   Q.  He's been your friend since college?

7   A.  Yes.

8   Q.  And he's the one you say now came into your office to

9   help you with the Preston Wood AutoCAD system?

14:58   10   A.  The menu system.

11   Q.  Correct.

12   A.  Yes.

13   Q.  And that was after the contract between Preston Wood &

14   Associates and Urban Living was executed.  Right?

14:58   15   A.  Yes.  Pretty sure.

16   Q.  Okay.  Is it your testimony that he was a PWA -- not

17   working with Mr. Wood at Weekley?  Is it your testimony

18   under oath that he was a PWA employee at that time?

19   A.  I'm not sure how to answer that because I don't know.

14:58   20   When -- I'm pretty sure they had moved by then, but I'm not

21   100 percent sure.

22   Q.  So, you don't know whether he was still a PWA employee

23   or whether he was actually working for David Weekley and

24   helping you out because he was your college friend?

14:59   25   A.  No.  He's the one that wrote the menu.  He knew how to

*S. Cameron - Cross by Mr. Bonham*

1    set it up.

2    Q.  No doubt that he knew how to do it.

3         But I think your testimony was that it was a

4    PWA employee who came over during the time of this contract.

14:59    5         How do you know that?

6    A.  I guess I don't.

7    Q.  And I will try to save as much time as we can.  But do

8    you recall testifying in your deposition about what

9    conversations you had with Preston Wood employees?

14:59   10    A.  Uh-huh.

11    Q.  And we talked about this at some length, didn't we?

12    A.  Yes.

13    Q.  And you didn't mention Scott Harris at all during that

14    deposition, did you?

14:59   15    A.  I don't know.  I'm sure you'll look it up.

16         MR. BONHAM:  Would you pull up deposition --

17    Page 23, Line 22 through 26:07.

18         And before we do that, if I could have the

19    document camera, please.

15:00   20    By Mr. Bonham:

21    Q.  I'm putting in front of you what was your answer to

22    Interrogatory No. 6.  And these are from the amended

23    answers, interrogatories of Cameron Architects.

24         You see Interrogatory 6 where it indicates:

15:00   25    "Identify every communication that you or anyone acting on

*S. Cameron - Cross by Mr. Bonham*

1    your behalf had had with any past or present PWA employee

2    since January 1, 2014, concerning any of the infringing

3    products the PWA-Urban Living agreement described in

4    Paragraph 44 of PWA's First Amended Complaint or this

15:00    5    lawsuit."

6                    And your response was:  "It's Defendants'

7    understanding that we seek post-litigation" --

8                    THE COURT:  Slow down, please.

9                    MR. BONHAM:  Sorry.

15:00    10   By Mr. Bonham:

11   Q.  Well, you can see your answer.

12                   Did you, in your answer, say anything about

13   Scott Harris?

14   A.  I did not.

15:01    15                   MR. STROTHER:  Your Honor, I object to improper

16   impeachment.  That question doesn't even ask for that

17   conversation.

18                   MR. BONHAM:  It concerns the PWA-Urban Living

19   agreement.  He's saying, after that agreement, PWA sent an

15:01    20   employee over to show him how to use the AutoCAD system.

21                   MR. STROTHER:  That's a stretch.  I still object as

22   irrelevant.

23                   THE COURT:  Overruled.

24   By Mr. Bonham:

15:01    25   Q.  You don't mention Scott Harris, do you?

 1   A.  No.

 2          MR. BONHAM:  Your Honor, if we could have the front

 3   computer connection.

 4          THE COURT:  What do you want?  Do you want your

15:01 5   computer?

 6          MR. BONHAM:  Tell you what.  I'll do it old-school.

 7          THE COURT:  Hold it a second.

 8             (Off-the-record discussion)

 9          THE COURT:  Do you want to go back to the overhead?

15:02 10         MR. BONHAM:  Sure.  Let's just try and do it

 11   quickly.

 12   By Mr. Bonham:

 13   Q.  This is Page 23 of your deposition.

 14          And I indicated to you:  "Okay.  I'd like to

15:02 15  direct your attention to Interrogatory No. 6.  It's on the

 16   next-to-the last page.  Okay?"

 17          And you see your answer to Interrogatory

 18   No. 6.

 19          And your answer was:  "Yes."

15:02 20         And I said:  "Okay.  Is that true and

 21   correct?"

 22          You said:  "One more time, yes."

 23          I said:  "Okay.  You didn't include the

 24   discussions you had had with Samantha Wood that we just

15:02 25  talked about, though, did you?"

1      You said:  "No.  Because that was -- that was

2   before the thing -- before the first amended complaint or

3   the lawsuit."

4      And I said:  "Okay.  So, again, the only

15:02   5   communication you recall, looking at the second line, is

6   Defendants recall having prelitigation communication with

7   Samantha Wood" --

8      THE COURT:  Slow down, please.

9      MR. BONHAM:  -- "regarding the license agreement.

15:03   10   During those communications, Samantha Wood represented that

11   Plaintiff was going to file this lawsuit."  Do you see that?

12      I said:  "Was that communication -- that was

13   right before the filing of the lawsuit?"

14      "Answer:  Yes."

15:03   15      And then I said:  "That's the only

16   communication that you've identified in response to

17   Interrogatory No. 6.  Correct?"

18      You said:  "The only communication about the

19   lawsuit."

15:03   20      And then I went on.  "Well, doesn't that

21   interrogatory talk about identify every communication that

22   you or anyone acting on your behalf had had with any past or

23   present PWA employees since January 1, 2014, regarding or

24   concerning any of the infringing products of the PWA-Urban

15:03   25   Living agreement described in Paragraph 44 or this lawsuit?

*S. Cameron - Cross by Mr. Bonham*

1    Isn't that what it says?"

2                You said:  "Yes" -- or "Uh-huh."

3                And I said:  "And the only one that you

4    identified was this pre-litigation communication with

15:04  5    Samantha Wood regarding the license agreement."

6                We'll skip down to 26.

7                I said:  "Okay.  Well, did you have any

8    communications with anyone at Preston Wood & Associates

9    regarding the PWA-Urban Living agreement that's defined in

15:04  10    Paragraph 44 of the second or third amended petition?"

11                And your answer was "No," wasn't it?

12    A.  Yes.

13    Q.  You've indicated that you've done over 50 projects using

14    PWA stock plans?

15:04  15    A.  I believe that's right.

16    Q.  And you have the CAD files for all 50 of those projects.

17    Right?

18    A.  If they were sent.

19    Q.  Going back to PX-103 -- I don't think we need to bring

15:05  20    it up -- you were cc'd on that e-mail, weren't you?

21    A.  PX what?

22    Q.  Exhibit --

23                MR. BONHAM:  Bring up 103, please.

24                Your Honor, we need -- Try again.  There we

15:05  25    go.

1          THE WITNESS:  There it goes.

2   By Mr. Bonham:

3   Q.  Doesn't that show you were cc'd on that document?

4   A.  Yes.

15:05  5   Q.  All right.  One last question, Mr. Cameron.

6          You said that your -- in your opinion, your

7   revisions to the Nagle plan made it a new plan?

8   A.  Yes.

9          MR. BONHAM:  Bring it up.

15:05  10  Q.  You're saying that's a new plan?

11  A.  That's an elevation.

12  Q.  Same elevation, though.  Right?

13  A.  Yeah.

14  Q.  The one you copied from their CAD files.  Correct?

15:06  15  A.  From the file.  Yes.

16  Q.  But you think that's a new plan?

17  A.  The plan is new.

18          MR. BONHAM:  Pass the witness.

19          MR. STROTHER:  I do have some redirect, Your Honor.

15:06  20          THE COURT:  Yes, sir.

21                    REDIRECT EXAMINATION

22  By Mr. Strother:

23  Q.  Mr. Cameron, when Scott came over to Cameron Architects'

24  office to install the AutoCAD menu, did you have a

15:06  25  conversation with him about the UL-PWA licensing agreement?

1    A.  No.

2            MR. BONHAM:  Objection, Your Honor.  Hearsay.

3            THE COURT:  Say that again.

4            MR. BONHAM:  Hearsay.  He's asking what he -- Okay.

15:06   5        THE COURT:  Ask your question again.

6            MR. STROTHER:  Did he have a conversation with

7    Scott about the UL-PWA agreement?

8            THE COURT:  Overruled.

9                That was:  Did you have a conversation?

15:07   10       THE WITNESS:  No.

11   By Mr. Strother:

12   Q.  When did you learn about the UL-PWA licensing agreement?

13   A.  I'm not sure.

14   Q.  Here's a good question.  Did Miss Wood send Scott over

15:07   15  to your office to make that installation?

16           MR. BONHAM:  Objection, Your Honor.  How is he

17   going to know that?

18           MR. STROTHER:  Because he might have talked --

19           THE COURT:  Hold it a second.

15:07   20           Do you want to take him on voir dire?

21           MR. BONHAM:  Sure.

22           THE COURT:  This is a procedure -- He can now ask a

23   couple of questions as a follow-up -- or as a precursor to

24   that question.

15:07   25

S. Cameron - Redirect by Mr. Strother

1                    VOIR DIRE EXAMINATION

2    By Mr. Bonham:

3    Q.  You said you didn't know whether or not Scott Harris was

4    even working for PWA at the time.  Right?

15:07  5    A.  I don't know when the dates -- when Preston made the

6    move to David Weekley versus when we started the file

7    system.

8    Q.  All right.

9    A.  I don't know.

15:07  10         MR. BONHAM:  Okay.  Go ahead.

11                    REDIRECT EXAMINATION CONTINUED

12   By Mr. Strother:

13   Q.  Who sent Scott over to your office?

14   A.  I don't know.

15:08  15   Q.  What was the first conversation you had with Miss Wood

16   about PWA plans coming over to Cameron Architect's office?

17   A.  First conversation?

18   Q.  Correct.

19              Did it happen before PWA plans came over to

15:08  20   Cameron Architect's office?

21   A.  I don't think so.

22   Q.  Okay.  Let me show you your deposition because

23   Mr. Bonham -- I don't know if you remember.  He was showing

24   your --

15:08  25              MR. STROTHER:  May I use the overhead, Your Honor?

1    By Mr. Strother:

2    Q.  He was showing the jury that you are an untruthful

3    person and he said, 'Let's just skip over this and go down

4    here.'  And I'd like to read for the jury the part that he

15:08    5    skipped.

6             The question was:  "And the only one you

7    identified was this pre-litigation communication with

8    Samantha Wood regarding the licensing agreement?"

9             And your answer was:  "Maybe I don't

15:09   10    understand.  I had talked -- I had communications with them,

11    talking about plans and ordering files, but nothing about

12    the litigation."

13             What does that answer mean?  What are you

14    saying right there?

15:09   15    A.  Well, I mean, I'd talked to them before.

16    Q.  You had conversations with Miss Wood and other people at

17    PWA about the plans and about ordering files?

18    A.  Yes.

19    Q.  Before the lawsuit was filed?

15:09   20    A.  Oh, yeah.

21    Q.  How many times did you speak to them?

22    A.  Not too many.

23    Q.  Did you speak to them on every plan?

24    A.  Four or five.  No.

15:09   25    Q.  I'm sorry.  I didn't hear your answer.

*Ramani - Direct by Mr. Strother*

```
 1   A.  Four or five, maybe.

 2         MR. STROTHER:  I pass the witness.

 3         MR. BONHAM:  Nothing further.

 4         THE COURT:  Thank you, sir.  You may step down.

 5              Call your next witness.

 6         MR. STROTHER:  Your Honor, Defendants call Vinod

 7   Ramani to the stand, please.

 8         THE COURT:  Do you want to come forward, sir.

 9         MR. STROTHER:  And, Your Honor, I'll be using my

10   laptop during most of this.

11         THE COURT:  Raise your right hand to be sworn.

12         VINOD KEWALRAMANI, DEFENDANT, SWORN

13         THE COURT:  Thank you, sir.  Have a seat.

14                    DIRECT EXAMINATION

15   By Mr. Strother:

16   Q.  Mr. Ramani, would you please introduce yourself to the

17   jury.

18   A.  My name is Vinod Kewalramani, but I also go by "Vinod

19   Ramani".

20   Q.  Is "Ramani" a legal last name or just a name that you're

21   known by?

22   A.  Just known by a shortened version of Kewalramani?

23   Q.  Do you prefer "Mr. Ramani"?  I may call you -- I'll call

24   you "Mr. Ramani".  Do you prefer "Mr. Ramani"?

25   A.  Just "Vinod", please.
```

15:09 (line 5)
15:10 (line 10)
15:10 (line 15)
15:10 (line 20)
15:10 (line 25)

Ramani - Direct by Mr. Strother

1   Q.  In court, it will be "Mr. Ramani".

2   A.  All right.

3           THE COURT:  Let's go.

4           MR. STROTHER:  Yes, sir.

15:10  5   By Mr. Strother:

6   Q.  Okay.  Tell me about your business background.  When did

7   you first get into real estate?

8   A.  In -- I --

9           THE COURT:  Pull that mic in a little bit.

15:10  10          THE WITNESS:  Sorry, Your Honor.

11          THE COURT:  That's fine.

12              By the way, the chair doesn't pull forward.

13  So, if you want to lean back, pull the microphone in and get

14  more comfortable.

15:11  15          THE WITNESS:  Okay, Your Honor.  Thank you.

16              I started doing research on real estate back

17  in 1998 and entered into it in -- end of '98, '99.

18  By Mr. Strother:

19  Q.  What were you doing before real estate?

15:11  20  A.  I owned a business called Global.  We sold what they

21  call FF&E -- furniture, fixtures and equipment -- to hotel

22  chains and retail chains across the country -- Discount

23  Tires, Hampton Inn, Best Western.  It was doing all the

24  interior design finishes for those chains.

15:11  25  Q.  You may be on the cuff of talking a little too quickly.

*Ramani - Direct by Mr. Strother*

1    A.  Oh.  Sorry.

2    Q.  So, back to real estate, you said you began researching

3    in 1998.  Right?

4         THE COURT:  Began in real estate about 1998, early

15:11  5    '99.  Correct?

6         THE WITNESS:  Yes, Your Honor.

7         THE COURT:  All right.  Go on.

8    Q.  What did you begin doing?

9    A.  Originally, I was going to enter into development,

15:11  10   looking for different sites, seeing where there was a need

11   for different type of urban townhome or single-family patio

12   home type of product in the inner city market.

13   Q.  Did your experience in selling the FF&E to your

14   customers back then give you any insight into real estate?

15:12  15   A.  I think so.  I mean, we were involved in, you know, some

16   design aesthetics, helping find the locations for some of

17   the hotels.

18         So, I think that expertise and level of

19   marketing and -- We were doing a substantial -- We were

15:12  20   doing almost 20, 30 hotels, which averaged, you know,

21   800,000 to a million dollars a package.

22         So, there was a lot of coordination and

23   marketing and, also, finding and helping them find the real

24   estate and the product that would go inside those hotels.

15:12  25   It was a critical part of our business at Global, and it

*Ramani - Direct by Mr. Strother*

1    helped me in Urban Living, also.

2    Q.  So, if you wanted to get into development, how did you

3    end up, instead, in real estate sales?

4    A.  When I actually went out to look for a home, I lived out

15:13    5    in Fairfield, which is in Cypress, and I wanted to move back

6    inside to the city or move into the city.

7               And as I started calling realtors to try to

8    get help from them, I felt that I wasn't getting the service

9    or level of service -- I'm sorry.  I hope nobody's a realtor

15:13    10   out there, but there's a lot of people in our industry that

11   aren't full-time realtors in this business.

12              And I don't -- I felt that they were lacking

13   the service.  I called one on a weekend and, I mean, they

14   never called me back or they wouldn't show or open the

15:13    15   doors.  And I was looking for new construction homes at that

16   time.

17              So, I felt there was a disconnect between the

18   developers and the realtors and the level of service in

19   marketing that they deserve to earn the commission.

15:13    20   Q.  So, you saw a market opportunity?

21   A.  I did.  Yes.

22   Q.  Is that when you formed Urban Living?

23   A.  Yes.

24   Q.  Do you know what year that was?

15:14    25   A.  I think we incorporated in '99.  I don't have the exact

Ramani - Direct by Mr. Strother

1    date, but somewhere between '99 to 2000.

2    Q.  So, what did Urban Living set out to do or do

3    differently?

4    A.  I think our number one difference or goal or mission

15:14   5    statement was to actually provide a level of service to the

6    seller, to the buyer, where they would feel that we added

7    value to be able to earn that commission and not just hand

8    us a check for 3 percent or 6 percent by just putting a sign

9    up and writing a contract up.

15:14   10        I felt there was a whole other level of

11    services that you needed to bring to the table to earn that

12    commission.

13    Q.  So, with regard to the 3 or 6 percent commission, did

14    you set out to have Urban Living do something differently?

15:14   15    A.  We did.  The first thing we did is we felt it was

16    important that there was actually a sort of retail showroom

17    that you could come to.

18        My approach was sort of to look at it as if

19    you were going to buy a car, that you could actually go

15:15   20    visit the showroom, look at the car, do your research, meet

21    somebody in finance.  I don't think a lot of dealerships

22    have insurance companies in there.

23        But what we wanted to do is have a place where

24    the consumer or buyer and the builder could meet in the

15:15   25    showroom and do all of the pieces of the transaction under

*Ramani - Direct by Mr. Strother*

1   one roof.

2   Q.   Did Urban Living ultimately do that?

3   A.   We did.  Yes.

4   Q.   When did Urban Living move into its office on

15:15   5   Washington?

6   A.   I think it was in 2000.

7   Q.   Has Urban Living changed over time since 2000?

8   A.   We're always evolving.  I think that's important.  One

9   of the things I always try to tell our employees is one of

15:15   10   the key things that I think that keeps us in business is

11   it's important to differentiate yourself and keep

12   reinventing yourself and keep pushing and offering more

13   services to the buyers and the sellers.  So, yes.

14   Q.   Does Urban Living have any kind of focus with regard to

15:16   15   the real estate it sells?

16   A.   I mean, I'd say almost 99 percent of our business is --

17   Maybe even 100 percent of it.  The majority of it's all

18   inside the loop, in the inner city market -- townhomes,

19   patio homes and single-family homes in the inner city

15:16   20   market; hence, the name "Urban" Living.

21   Q.   Do you believe that there are now imitators out there?

22   A.   Definitely.

23   Q.   Does that bug you?

24   A.   No.  I mean, it's free trade, you know, in the U.S.,

15:16   25   which makes it one of the, I think, great entrepreneurial

*Ramani - Direct by Mr. Strother*

1    countries in the world, and it gives you the ability to have

2    people.  And sometimes it's flattering.

3              I mean, can it be irritating sometimes?  Yes.

4    But the majority of the time, no.  I'm okay with it.  It

15:17   5    helps you become a better businessman and you have to excel

6    and be better at what you do.

7    Q.  Do you think Urban Living leads in any areas in the

8    market?

9    A.  I mean, we sell, I'd say, anywhere from 40 to 50 percent

15:17   10   of the new construction product.  At one time, it was

11   60, 70 percent because -- But because of other people coming

12   into the business field it's dropped a little bit.  But we

13   lead in the high-density townhome, patio home product.

14   Q.  I'd like to go over how a property is sold briefly.

15:17   15   A.  Okay.

16   Q.  And then I want to move into what we've called "UPM".

17   A.  Okay.

18   Q.  So, tell the jury how the transaction takes place.  How

19   does a customer of yours come in and list property for sale?

15:17   20   A.  So, we're going to focus on the developer side because

21   you're saying "list".

22             We do do resales.  So, when we classify -- You

23   know, a resale is as if you had a home and you wanted to

24   sell it.  But I'm going to focus on what the majority of our

15:18   25   business is, and that's the developer side of it.

*Ramani - Direct by Mr. Strother*

1           And we will help the developer acquire the

2      site, recommend what should be built on the site, what

3      finishes, what the -- you know, they were talking about

4      contemporary Mediterranean -- what style would be best

15:18   5      suited for that maybe neighborhood or the product mix that's

6      needed or the consumer demand, price point, and then, you

7      know, do the market analysis on what it will sell for for

8      that price.

9           And then we are very aggressive in the sense

15:18  10      of the marketing side of it.  We do all the graphics, the

11      logos, the web development, anything to do with that sales

12      side of it, I mean, down to ordering the balloons, to the

13      rugs that might go in the front, you know, with their logo.

14      We will help them with all of that.

15:19  15      Q.  Are you describing the normal Urban Living listing

16      agreement or are you describing UPM right now?

17      A.  Urban Living.

18      Q.  Okay.  So, tell me how UPM differs.  That's Urban

19      Project Management.

15:19  20      A.  So, do you want me to talk about how that was created or

21      why or...?

22      Q.  Absolutely.

23      A.  So, we have nothing to do with actually partnering up

24      with the architect.  "UPM", first of all, is "Urban Project

15:19  25      Management".

*Ramani - Direct by Mr. Strother*

1    And because my background was sort of managing

2  these retail and hotels and bringing all the vendors

3  together for them and then earning, you know, sales for

4  other -- mattress or whatever, I wanted to sort of take the

15:19   5  same approach.

6    We were somewhat forced into that not in a bad

7  way, but, I mean, I'm going to tell both of them, in front

8  of you, I have a great deal of respect for Preston and Sam

9  and I still do today.

15:20  10    They were friends of ours.  My wife and I -- I

11  wanted to go to dinner with them multiple times.  I mean, I

12  think they're beautiful people and this is a

13  misunderstanding.

14    But what ended up happening is they sold their

15:20  15  business to David Weekley.  And I think they mentioned --

16    THE COURT:  You "think" they sold their business to

17  Weekley?

18    THE WITNESS:  Well, I know they sold their

19  business.

15:20  20    THE COURT:  All right.

21  A.  So, before that, for years and years and years, a

22  majority of what we would do, to save time and because they

23  had some great stock plans and we had a good relationship

24  with them, is I would say, unless the builder had another

15:20  25  relationship, our go-to was Preston Wood.

*Ramani - Direct by Mr. Strother*

                1        Out of five days a week, sometimes I would be
                2   in their office two, three times a week with developers,
                3   meeting with them or they would come to our office.
                4        This is pre-UPM.  So, I don't know the exact
15:21       5   amount, but I would think there was millions of dollars of
                6   business sent to them.
                7   Q.  And when you said you would meet with them that included
                8   Mr. Wood?
                9   A.  Yes.
15:21     10   Q.  Okay.
              11   A.  He was an integral part and did the, you know, designs
              12   and would help us pick the plans, and we'd work together as
              13   a team, and Sam.
              14        And I can't remember.  There was one other key
15:21     15   employee that was always with them.  I think she's at
              16   Weekley now.  I apologize.  I can't remember her name.
              17        But it was a very good partnership.  We didn't
              18   earn any money from them.  We didn't get any kickback or
              19   referral.  It was based on relationship.
15:21     20        And we had a pipeline -- You have to
              21   understand, when we would go and help -- There was a
              22   developer and a builder.  Right?
              23        So, a developer, I just want you to
              24   understand, could be a banker or could be an attorney, just
15:21     25   somebody wanting to get into the business.

Ramani - Direct by Mr. Strother

1          And we dealt with a lot of new people wanting

2     to enter into the business that didn't have the knowledge.

3     So, our job was to take them from beginning to end -- and

4     that's really what we specialized in -- so they felt that we

15:21   5     added value to earn the commission.

6               So, a lot of times it was, you know, the same

7     thing, partnership with Preston, but we didn't earn the

8     money.

9               But when they decided to sell the business, I

15:22   10    had given my word to a lot of these developers -- and it

11    also affected our business to a certain degree because it

12    was a pipeline business and we had to keep -- It's sort of

13    like a factory.  I mean, if everything stops and the machine

14    breaks down, I mean, we don't earn our commissions.

15:22   15    So, we have to find a solution to pick up when

16    they decided to sell the business.  And, again, I'm not --

17    It's America.  You sell your company.  You make money.  And

18    if there's a better opportunity, that's fine.  But it's my

19    job and responsibility to take care of the developers and

15:22   20    the people that I referred them to.

21              And, so, at that point, you know, Preston was

22    entering into Weekley.  We talked a little bit and then I

23    was turned over to Sam, which we had a relationship with,

24    also, and we started trying to come up with a solution that

15:23   25    would be amicable --

Ramani - Direct by Mr. Strother

```
 1          MR. ZUMMO:  Objection, Your Honor.  This has turned
 2   into a narrative.
 3          THE COURT:  Sustained.  Question and answer,
 4   please.
 5          THE WITNESS:  Sorry.
 6          MR. STROTHER:  Yes, Your Honor.
 7   By Mr. Strother:
 8   Q.  I have a question on my mind that is part of what you're
 9   talking about.  And I'm going to lead you -- I'm not going
10   to lead you.  I'm going to ask you some questions.
11   A.  Okay.
12   Q.  In these meetings, when Mr. Wood was still with the
13   company and you had a builder or developer, Mr. Wood, maybe
14   Miss Wood and you, what sort of things were being discussed?
15   A.  What product mix would be on there, what the site -- A
16   lot of times we would actually do the site plan -- Or,
17   actually, at the beginning, we didn't have anybody; so, they
18   would actually do that.
19          But I would say, "Hey.  Look.  I think here
20   would be ideal for Mediterranean, 2,000 square feet."  The
21   price point is going to drive everything.
22          You know, we first start with location, what
23   the cost of that land is going to be, which then will equal
24   what the sales price or what that market demand is in that
25   marketplace.
```

1    Q.  In those meetings, who was the person that was bringing

2    to the table knowledge about what the actual customer

3    wanted, the homebuyer?

4    A.  We would.  That was me.

15:24    5    Q.  How --

6    A.  We would actually send them -- I think somebody

7    mentioned earlier -- Cameron or somebody -- the land kits.

8    I was really big on, when you find the site -- You know, you

9    can go to HCAD.  You have the size of the lot.

15:24    10          We would put a kit together and it would say:

11    Okay.  Based on this lot, this is the price point.  This is

12    the square footage of the product.  This is what we think

13    should go there.

14          And we would send that to them so it would,

15:24    15    again, sort of compress the time so then the builder and us

16    would not be going in there -- and they could do some of

17    their due diligence, pull their stock plans, and say, "Okay.

18    You guys said 2,000 square feet, Mediterranean.  Here's two,

19    three versions."

15:24    20          And then I would go to their office and say,

21    "Look.  Let's" -- you heard the word "redline" -- "Let's

22    redline these plans.  Let's add a roof deck."

23          And it was a joint deal.  I mean, it wasn't

24    all my input.  I'd say the majority of it was, but then they

15:25    25    added their value as their designer and their team and what

*Ramani - Direct by Mr. Strother*

1    expertise they brought to the table.

2    Q.  So, I think that a moment ago you were talking about how

3    UPM started and how that was related to Mr. Wood's departure

4    from PWA.

15:25   5    A.  Correct.

6    Q.  Why did UPM start at that point?

7    A.  I had to deliver on my word on what I told these

8    developers and, also, had the product mix for our business

9    to be able to sell the homes.

15:25   10   Q.  How did the arrangement first come up, the possibility

11   of Urban Living paying Preston Wood & Associates $250 per

12   use of plan?

13   A.  Sam and I negotiated that.  We went back and forth.  The

14   number was originally a little higher, I think 500 or 700.

15:26   15   Don't hold me to the exact number.

16              And it was just something we both discussed

17   that would be a reoccurring deal.  We would work with them

18   and sort of build some volume up and I think -- You know,

19   they have the stock plans.  We have the clients.

15:26   20              We didn't want to burn the bridge with the

21   developers.  I don't think she wanted to either.  And we

22   wanted to get the product -- when I say "product", the

23   homes -- built and delivered, and it was...

24              That's how we arrived at that.

15:26   25   Q.  So, before that agreement, while Mr. Wood was still at

*Ramani - Direct by Mr. Strother*

1   PWA, how did the process work when there needed to be

2   revisions to those stock plans?

3   A.   They have the staff to do that.

4   Q.   I take it that they would charge more in that situation.

15:26   5   A.   I think on their contracts they had a revision line or

6   custom line if they had to do work to them, yes.  I think it

7   was by hour.

8   Q.   At the time that the license agreement was entered into,

9   did PWA have the ability to revise the plans?

15:27   10   A.   I don't know exactly what the language reads.  I would

11   think "yes".  If they were their plans, they could revise

12   them.  But I don't think they had the support staff to do

13   that.  That's why we had to go out and partner up with these

14   other architects to actually do that.

15:27   15   Q.   And one of the architects is Mr. Cameron, Cameron

16   Architects?

17   A.   Correct.

18   Q.   How did Mr. Cameron -- How did Cameron Architects come

19   into the mix?

15:27   20   A.   I think, as you mentioned before, he had done some

21   commercial work for us and, also, I knew that he had done

22   intense -- a good amount of residential work.

23        I know in Bellaire and West U he had done some

24   single-family homes and some townhomes and he had performed

15:27   25   fairly well on the commercial side of things and there was a

1    few of our other developers that were actually going

2    directly to him before, like we even knew Stephen.

3              I had seen his name on some of the townhome

4    products that he had completed.  And they did fairly well.

15:28    5    So, I thought there might be an opportunity because he

6    really focused more on the single-family.

7              I didn't think he would be competing directly

8    with us in the sense of the new business model that we

9    worked out with PWA.  I mean, I know he had a good selection

15:28    10   of plans, but I didn't want any overlap or conflict with the

11   architect that was already doing a lot of business with

12   developers in townhomes.  So, I felt that it would be a good

13   opportunity to partnership with him to let him do that work.

14   Q.  You've used the word "partnership" a few times and it's

15:28    15   appeared on a few of the documents.

16             Did you -- Did Urban Living and Cameron

17   Architects have a partnership?

18   A.  It wasn't a legal partnership.  I mean, I enjoy doing

19   marketing.  And I want to clarify that.  I don't think he

15:28    20   clearly told you on that and it made him look -- Those

21   contracts were performed -- Or let me rephrase that.

22             Those contracts were written in our office.

23   Fina, the saleslady, and UPM actually produced those

24   contracts.  They were sent to him, but we did all the work.

15:29    25             And, actually -- and I'm pretty sure, because

Ramani - Direct by Mr. Strother

1    their attorneys wanted to review some of our contracts and

2    make sure that addendums and things were there, that those

3    were also sent to Sam and their attorney, because I think

4    one of the things they wanted to definitely add to it was

15:29    5    that addendum with that language in there regarding certain

6    stipulations.  So, we had to let them review it.

7         Now, was it specifically the Cameron one?  No.

8    Because we didn't only partner with Cameron.  We had

9    structural engineers.  We had civil engineers.  We had

15:29   10    replatters; surveyors, which typically do the replatting;

11    soil testing, asbestos testing.

12         And I think, if you look -- I don't know if

13    they're in the exhibits, but every one of them said "in

14    partnership with" because we wanted to promote their brand,

15:29   15    also.

16         We didn't want to hide the people we were

17    partnering up with.  We felt it was important.  We're a

18    marketing company.  We're not trying to hide PWA.  We're not

19    trying to hide Cameron.  We want them to know there's a

15:30   20    group of professional people that we're bringing together.

21    Q.  Okay.  So, tell me about the relationship with PWA when

22    the license agreements began.  How did the system work?

23    A.  I mean, it's sort of spelled out.  I mean, we would --

24    Let me take you through the process.

15:30   25         Again, the first initial part of it is, you

1    know, getting the developer and getting the land kit,

2    finding the land, recommending what would go on that land.

3                    But then we would take it a step further.

4    Instead of now going to PWA's office, we were able to work

15:30    5    with the stock plans.

6                    We then hired -- At that time, we had Fina.  I

7    think we brought Toby on, which was one of their employees

8    which had left -- again, don't hold me to the exact time --

9    but maybe six months to a year before they had sold their

15:30    10    business.  And it might have been a shorter period.  It

11    could have been 60, 90.  I don't know the exact date.

12                    But she was very proficient in Chapter 42

13    code, which is the site plan laying out what type of

14    density, what you can put on that actual site.

15:31    15                    So, we would base the site plans, block them

16    out, again, because the code required -- or there's

17    limitations.  And I think Preston talked about that.

18                    1600-square-foot lot.  You know, you can use

19    60 percent of it, 20-by-40 box.  You know, on

15:31    20    5,000-square-foot unit, you can either put two units or

21    three units.  I won't bore you with all the technical stuff.

22                    But we'd lay that out and then say, 'Okay.

23    Based on this site plan layout, you can sell them for 320 or

24    400,' whatever the number would be, depending on the

15:31    25    different location.  And then we would look at the stock

*Ramani - Direct by Mr. Strother*

1    plans from PWA and see in their library what would work best

2    for that.

3              Then we would issue a purchase order to PWA --

4    "purchase order" meaning, you know, 'Hey.  We're ordering

15:31    5    this here' -- and then we would put the information because

6    they had specifically said, 'We want to know address, who

7    the client is.'  That was all put on there and then sent to

8    them.

9              Then I think at the beginning we weren't

15:32   10    supposed to get the DWG.  I think what they wanted to do --

11    And there could have been some back-and-forth on this.

12              The DWG was supposed to go directly to the

13    partnering architect that was going to do it, and I think

14    that --

15:32   15              THE COURT:  Slow down a bit, please.

16              THE WITNESS:  Sorry.

17              It sort of changed and then I think it started

18    coming to Fina.  Fina would manage that, then send it,

19    because we ended up partnering because we were so busy in --

15:32   20              THE COURT REPORTER:  Slower, please.

21              THE WITNESS:  Sorry.

22              2014 was, by far, in my 20 years of doing

23    this -- or 18, 19 years -- our busiest year.  You know, oil

24    I think was sitting at 90, 100, which our economy still is

15:32   25    heavily dependent.  A lot of people are moving here.  So, we

Ramani - Direct by Mr. Strother

1    were fairly busy.

2                    Toby would then lay that site plan out.  Fina

3    would then issue the purchase order.  Fina would pick the

4    partner that -- or the partners -- structural engineer,

15:33    5    civil -- that we had a group of -- pool of people that we

6    would work with that adequately could handle the business

7    and not backlog it and then send them the request of,

8    'Here's the land kit.  Here's the plan.  This is what we're

9    doing.  And we need to make all these changes to it.'

15:33    10                    And we'd have, as Cameron said, an initial

11    meeting with the developer or builder, typically, at our

12    showroom and go through all the changes and requirements of

13    that specific site.

14    Q.   Would anyone from PWA come to that kind of meeting or

15:33    15    were they out of the process?

16    A.   Once we signed this license agreement, there was nobody

17    from their staff or team that would come to those meetings

18    at all.  No.

19    Q.   Did you keep -- Did UL, Urban Living, keep PWA up to

15:33    20    date on what was being built?

21    A.   We had to by issuing the purchase orders.  So, they

22    knew.

23    Q.   Okay.  What is the next step once the plans have been

24    fully revised and they're ready to go?

15:34    25    A.   I'm going to do a little bit more detail.

Ramani - Direct by Mr. Strother

1          So, once the plans were finally approved from
2     the developer, you know, they would come in.  They would
3     look at everything and say, 'Yes.  We like these.  The site
4     plan looks good.'

15:34  5          Then we would -- Typically, either -- they
6     would hire a permit runner to go run them to the City to get
7     the permit approved.

8          Now, when you're saying "plan", I'm saying
9     structural is done, civil is done, like the engineering part
15:34  10    of it, architectural, plan layout.  Everything is finished.

11         You have a stack of things you have to submit
12    to the City and then that permit runner would take them to
13    the City to get approved.  Now --

14    Q.  So, is there more than just an architectural plan that
15:35  15    has to go to the City before something can be built?

16    A.  Correct.

17    Q.  Okay.

18    A.  Do you want me to go into --

19    Q.  You named it.  I heard structural and engineering.

15:35  20    A.  I mean, there's wastewater letters.  I won't bore you
21    with this.  There's a whole bunch of things that the City
22    requires in order to get the permit.

23    Q.  Okay.  Does Urban Living ever directly build?

24    A.  No.

15:35  25    Q.  Do you have any ability to build within your company?

*Ramani - Direct by Mr. Strother*

1    A.  Not the staff or the team to build, no.

2    Q.  Let's talk about Nagle.

3             What was the fee -- I'm sorry.  You heard my

4    questions to Mr. Cameron.

15:35   5             Was the 22,000-dollar fee for 16 units or less

6    or more?

7    A.  For all 16 units.

8    Q.  So, at 1,375 a unit, do you know how much of the builder

9    amount was going toward those six units?

15:36   10   A.  1,375 times six.

11   Q.  Okay.

12   A.  I don't have a calculator in front of me.  So, I

13   apologize.

14   Q.  How about 8,250?

15:36   15   A.  Correct.  If that's what you have on there, yes.

16   Q.  I'm not going to put the e-mail back up again that has

17   the "from scratch" on it.

18   A.  Right.

19   Q.  Do you think that that was an accurate e-mail?

15:36   20   A.  No.

21   Q.  What went wrong?

22   A.  She shouldn't have -- We were -- And I remember some of

23   this conversation.  We were under the impression that it was

24   being done from scratch.  It wasn't.  It's wrong.  I take

15:36   25   full responsibility for it.  She shouldn't have written it

1    that way.

2              And it's -- I knew the stairs were a problem.

3    I knew that they were being redrawn.  But, apparently, there

4    was a mistake made, and I take accountability for that.

15:37    5              It was done wrong.  They copied some of those

6    things on there.  They did a lot of changes, but it was a

7    mistake.

8    Q.  When did you first find out that the PWA plan actually

9    had been used in some form?

15:37   10   A.  When Aviv, which worked for Oppidan, called me.  And I

11   think this was --

12   Q.  Was Oppidan the builder?

13   A.  Yes.

14   Q.  Okay.

15:37   15   A.  Sorry.

16              Oppidan -- They went by Oppidan -- I think

17   "RDZ" was the initials of their company name.  And he had

18   called because the plans had been misplaced or stolen off

19   the site.

15:37   20              The inspector came out there to check

21   something.  He called Sam and --

22              MR. ZUMMO:  Objection, Your Honor.  This has to be

23   hearsay.

24              MR. STROTHER:  That's true.

15:38   25              THE COURT:  Okay.  Rephrase it, then, or get around

*Ramani - Direct by Mr. Strother*

1  it.

2  By Mr. Strother:

3  Q.  So, my question is trying to figure out when you

4  learned.

15:38  5  A.  I don't have an exact date, but I would think, if we

6  looked at the plans and then went out a year -- Because, you

7  know, it takes almost four to five months, six months, to

8  build these.

9          Permit takes 60, 90 days to get, typically, if

15:38  10  the City is working at full speed.  So, I mean, usually, you

11  can say from permit to about a year out.  And that's

12  probably when that happened.

13  Q.  Did you try to contact PWA when you learned?

14  A.  I think Sam called me.  I don't "think".  I know.

15:38  15  Because she had asked me to come in and meet with her and

16  her attorney.  And, at that time, I said, "No."

17          I mean, look, if there's a mistake made -- I

18  was told they were from scratch and, if they're not --

19  That's when she mentioned, and I didn't know, that the

15:39  20  copyright was still left on there.

21          And then we started looking into -- this is a

22  big problem.  And we offered to pay them the $4,200, and

23  they said, "No."

24          And, so, that was when I had first been

15:39  25  notified.

*Ramani - Direct by Mr. Strother*

1   Q.  How about Mount Vernon?  Who, if you know, is the

2   builder on Mount Vernon?

3   A.  Rajesh Bindal.

4   Q.  Okay.  How did the -- Rewind.

15:39  5          The testimony we've heard, particularly from

6   Mr. Cameron, is that he essentially duplicated a PWA plan to

7   use for Mount Vernon.

8           Do you agree with that?

9   A.  Yes.

15:39  10   Q.  Do you know how that happened from Urban Living's

11   perspective?

12   A.  Yes.

13   Q.  What happened?

14   A.  Again, hindsight, now looking at everything, what had

15:39  15   been happening is Fina sent him the land kit, said, "Use

16   this plan."  Everything was e-mailed to them and a purchase

17   order was not issued to PWA.  All right?

18          When -- Now, '15, '16 markets started

19   imploding.  Gas started dropping, I mean, if you look at the

15:40  20   history, 34, 38.  I'm telling you this so you understand why

21   the project got put on hold.

22   Q.  Before we get to the project being put on hold, I want

23   to examine that mistake a little more.

24   A.  Okay.

15:40  25   Q.  Like I did with Mr. Cameron, you're not trying to not

*Ramani - Direct by Mr. Strother*

1    take responsibility for your employee, are you?

2    A.   No.   I mean, there was almost 40, 50 projects.   Out of

3    the 40, 50 projects, there's two.   And there was much larger

4    projects.

15:40  5              If somebody was -- I know they said there was

6    a trust issue.   Nobody was trying to steal from them.   These

7    are mistakes that were made.   It was wrong, and I take full

8    responsibility for it.

9    Q.   Okay.   So, you said that the product -- I cut you off

15:40  10   when you said the project had been put on hold because of

11   gas or oil going down.

12   A.   Right.   It slowed down tremendously in, I think, May or

13   June of '15, '16.   Things started really slowing down; and,

14   so, a lot of our developers just stopped and put everything

15:41  15   on hold.

16              Then, of course, this lawsuit came up -- was

17   filed.   They asked us -- actually, meaning, I guess,

18   Plaintiff -- asked us -- Preston Wood and their attorneys --

19   to go through and do a full audit.

15:41  20              And we wanted to, also, to see if, 'Look.   Is

21   there any issues on 30, 40, 50 or even any of the other

22   projects that we weren't involved in.'

23   Q.   Mr. Ramani, I am going to interrupt so that we don't get

24   into issues outside of the case.

15:41  25   A.   Okay.   So, ask me the question again.   I apologize.

1  Q.  Sure.  Sure.

2  A.  And I'll answer it directly.  I don't want to cause any

3  problems either.

4  Q.  I have to replay in my head.

15:41  5  I was asking you about the project being put

6  on hold.

7  A.  Okay.  Thank you.

8  So, yes, the project was put on hold.  And I

9  guess before that the question was when did I find out.

15:42  10  Q.  That's the next question, actually.

11  A.  Sorry.

12  So, I think around the end of 2016 or close to

13  when this lawsuit was filed we started going through every

14  single plan, every single project, and, you know, doing an

15:42  15  audit to see if there was any other issues that would come

16  up.

17  And on Mount Vernon, there --

18  MR. ZUMMO:  Objection, Your Honor.  We may need to

19  approach.

15:42  20  MR. STROTHER:  Okay.

21  THE COURT:  Do you need to come up or do you

22  understand what we're talking --

23  MR. STROTHER:  I think I understand.

24  By Mr. Strother:

15:42  25  Q.  I want you to focus on Mount Vernon.

*Ramani - Direct by Mr. Strother*

1    A.  Okay.

2         MR. STROTHER:  Is that in issue?

3         MR. ZUMMO:  I would love to follow up on the audit,

4    but we've discussed this before.

15:42   5         MR. STROTHER:  Yes.

6         THE COURT:  All right.  Go on.

7             All right.  Move around it, then, if you have

8    to.

9         MR. STROTHER:  Yes.

15:42   10   By Mr. Strother:

11   Q.  Did you learn about the Mount Vernon problem before or

12   after the lawsuit was filed?

13   A.  After.

14   Q.  And, so, I think the questions that my opposing counsel

15:43   15   have asked of other witnesses suggests that they think that

16   the change to the Mount Vernon plan, so that the builder is

17   now using a stock Cameron plan instead of a stock PWA plan,

18   is because of the lawsuit.

19   A.  It is.

15:43   20   Q.  That's true.  Right?

21   A.  Yes.

22   Q.  I mean, what do you have to say about that?  Why did the

23   lawsuit cause Urban Living to instruct Stephen Cameron to

24   design something different?

15:43   25   A.  Because I don't want them to feel that we're cheating

1    them, and I don't want to be paying out money when it can be

2    avoided by fixing the problem.

3              And we did reach out and try to pay them first

4    for that, and we were told, "No.  The licensing agreement is

15:43   5    terminated."

6    Q.  Okay.  I'd like to talk to you about how Urban Living

7    calculates its net profit.  So, I'm going to show you a few

8    exhibits.

9              MR. STROTHER:  Your Honor, may I please have the

15:44   10   laptop.

11             You know, I'm going to do something different

12   because I found an exhibit, Exhibit No. 12.  We might as

13   well get into it because my fingers are on it.

14             THE COURT:  Whose exhibit?

15:44   15   MR. STROTHER:  Defendants' Exhibit No. 12.

16             THE COURT:  Defense 12.  All right.

17   By Mr. Strother:

18   Q.  Are these photographs of a finished Nagle unit?

19   A.  Yes.

15:44   20   Q.  Okay.  I'd like to just go through them quickly so the

21   jury can get an understanding of what these look like when

22   they're no longer plans.

23             Is this the entry to one of the Nagle units?

24   A.  Yes.

15:44   25   Q.  And this is one of the six units actually based upon the

*Ramani - Direct by Mr. Strother*

1    D5-214 plan originally?

2    A.  Correct.

3    Q.  Okay.  First of all, does it have the little curve at

4    the bottom of the stairs?

15:45   5    A.  No, it does not.

6    Q.  All right.  What room is this?

7    A.  The first floor bedroom.

8    Q.  This is on the same floor as the garage?

9    A.  Correct.

15:45  10    Q.  Same room?

11    A.  Yes.

12    Q.  Is this the bathroom that is downstairs?  Can you tell?

13    A.  It is, because I can see the shower in the background.

14    Originally, I thought it was maybe the powder in that view.

15:45  15    But because the shower is there -- we typically will put

16    that on the first floor.

17    Q.  I guess you can also see the exterior fence through the

18    window in the shower.

19    A.  Correct.

15:45  20    Q.  Is this just a shower?

21    A.  Yeah.  Just a zoom-in of the tile.

22    Q.  What are we looking at here?

23    A.  Kitchen on the second floor.

24    Q.  The cabinets, are these custom-made?

15:45  25    A.  I think here they used a factory -- Well, I can't tell

1    in that picture, but I think they were done at the factory.

2    But I'm not sure.  I can't tell by this picture.

3    Q.  From every angle, what are we looking at here?

4    A.  Living room and dining room.

15:46    5    Q.  Is the dining room where the chandelier is?

6    A.  Correct.

7    Q.  Is this the same room from a different view?

8    A.  Correct.  If you can go back one, I want to point out

9    something else.

15:46    10            They were really talking about the staircase

11    and how it was grand and had the curves.  They didn't do

12    that on this floor either.

13    Q.  Okay.  What room am I looking at here?

14    A.  I think that's the living room with the doors facing

15:46    15    out.

16            Probably the second bedroom on the third floor

17    or the master.

18    Q.  Okay.  Is this the same room?

19    A.  Yeah.  With the size proportion.  Looking at this, it's

15:47    20    probably the master.  And the double doors, I think they are

21    to the bathroom.

22    Q.  Is this the master closet?

23    A.  Yes.

24    Q.  And is this the master bathroom?

15:47    25    A.  Correct.

1    Q.  Now, a quick question.

2              The selection of the faucets and the

3    countertops and the sinks, are those anything that come from

4    any architect's plans?

15:47   5    A.  No.

6    Q.  At least with regard to these spec townhomes.

7    A.  Correct.

8    Q.  Who chooses those finish materials?

9    A.  That is part of our UPM services.  We have two interior

15:47   10   designers on staff, and then I'm heavily involved with

11   those.

12             Again, with my background from FF&E, I would

13   actually help select all the finishes based on consumer

14   demand and what the trends are at that time frame.

15:48   15   Q.  What bathroom is this?

16   A.  Again, that's probably the tub.  So, it's probably the

17   second bathroom upstairs on the third floor.

18   Q.  Is this the second bedroom on the third floor?

19   A.  I can't tell in that picture.  I apologize.  I mean,

15:48   20   from, again, the size, it most likely is, yes.  And I think

21   it's on the back side.  So, most likely, yes.

22   Q.  Okay.  That's the last picture I have in that exhibit.

23             Okay.  Back to accounting.  First, I'm going

24   to begin with the Nagle project.  This is Defendants'

15:48   25   Exhibit 16.  And I can zoom in when you need me to,

*Ramani - Direct by Mr. Strother*

1    Mr. Ramani.

2                Can you tell us what it is we're looking at.

3    A.   That's the list price -- or the -- I'm sorry -- the

4    sales price.  And I want to -- I'll just keep it simple.

15:49   5                I mean, sometimes we have a list price in

6    there 10-, 15,000 higher.  We have room for negotiation.

7    So, that's the sales price of what the homes actually ended

8    up selling for.

9                The next line is --

15:49   10   Q.   Really quickly:  And these are for the six Nagle homes

11   that were sold?

12   A.   Yes.  Correct.

13   Q.   And these were the six that were built using the plans

14   that Mr. Cameron created based upon the PWA plans.  Right?

15:49   15   A.   Yes.  Correct.

16   Q.   Okay.  Then you were going to the next column.

17   A.   That's your gross commissions.  And, typically, I think

18   on all of these is what they call a co-op transaction where

19   there was an outside realtor involved in it.

15:49   20                So, again, our commissions vary from 5 to

21   6 percent.  On all of these transactions -- again, I'm just

22   looking at it fairly quickly -- they were -- earned

23   3 percent, meaning there was an outside agent.  So, that's

24   the gross commission before we pay our realtor in-house.

15:50   25   Q.   So, if Urban Living had represented both the buyer and

Ramani - Direct by Mr. Strother

1   seller, this could be, possibly, twice as much?

2   A.   Correct.

3   Q.   But, here, you're saying that all of these transactions

4   must have had an independent, different sales agent

15:50   5   representing the buyer?

6   A.   They definitely did.   Otherwise, they would have showed

7   18,000 or 19,000 and some change.

8   Q.   How do you get to net commission here?

9   A.   Our company is set up a little different than typical

15:50   10   real estate companies.   We have -- Again, I'm not going to

11   bore you.

12               But we have a DC and an AC.   "DC" is a

13   "developer consultant" that's on salary.

14               THE COURT:   Slow down just a little.

15:50   15               THE WITNESS:   Sorry.

16               So, the developer consultant earns a smaller

17   amount of commission, five to eight hundred dollars, plus a

18   salary.   And that's why on these transactions we didn't have

19   one of our own realtors, like a 100 percent contract

15:50   20   realtor, earning the 3 percent.

21               So, you'll see, I mean, roughly, about

22   $500 taken out of the gross commission, which is our net

23   commission.

24   Q.   What is the next column?

15:51   25   A.   That is our operating costs.   And we were asked to

1    provide all our expenses, all our -- We're very, very

2    detailed on our books.

3                   We use Quicken.  We have two full-time

4    accountants -- I don't want to use the word "accountant" --

15:51    5    bookkeepers on our staff.

6                   And we have a very detailed general ledger,

7    which the general ledger is the line items of each expense

8    that we have throughout a year by month, by week, by day,

9    that's inputted.

15:51   10                   And, again, because we're not a traditional

11    realtor -- You know, a lot of realtors -- You have an

12    individual realtor working for John Daugherty, Prudential,

13    Gary Greene.  They don't have a lot of expenses besides

14    their car, gas.

15:52   15                   We're a brokerage firm and all the listings

16    are house listings, meaning Urban Living.  So, you know,

17    again, the showroom, the colored brochures -- We spend a

18    substantial amount of money on advertising, close to

19    100,000 a month.

15:52   20                   So, there's a lot of, you know, salaries.  We

21    have almost 50 employees -- salaried employees, not licensed

22    realtors on a 100 percent commission.

23                   So, the only accurate, true way to come up

24    with the number is to either look at an annual basis of what

15:52   25    those expenses are and divide them by the number of homes

1    that you've sold.

2            And what we wanted to do, also -- And there's,

3    I think, additional charts and ledgers and all of that in

4    the exhibits that you'll be able to see the supporting

15:52  5    numbers where we arrived with them.

6            But if we then looked at that period, time

7    frame, of when these homes were actually sold and took those

8    expenses and then divided them, if there was 50 homes that

9    month that were sold, then our expenses -- I'm just

15:53  10   rounding -- you know, divided by your commissions or your

11   expenses then gives you your net profit.

12   Q.  So, to make sure I understand:  Basically, in one row,

13   all of these numbers are -- I guess you what?  You subtract

14   all of these numbers from the sales price?

15:53  15   A.  Well, first, you have to take the 3 percent to earn the

16   gross commission.

17   Q.  Right here [indicating].

18   A.  Then you subtract -- which the checks are in the

19   exhibits -- what was actually paid out to the employee or

15:53  20   the realtor.

21           Then the next line is -- You take the total

22   expense divided by the transactions for that month and then

23   that gives you your operating costs.

24           And then, if you take -- Your net commission

15:54  25   less your operating cost equals your net income or your net

1    profit.

2    Q.  So, from the six Nagle units, Urban Living's net profit

3    after deductible expenses is $16,274.90?

4    A.  Correct.  That's accurate.

15:54    5    Q.  Let's look at some of the additional documents.

6              This is just Page 2 of the same exhibit.  And

7    I know it's completely illegible up there.  We can zoom in

8    when you need.

9              Tell me what it is we're looking at.

15:54   10    A.  These are that general ledger.  Every account in the

11    general ledger -- You know, I'm just using numbers.  It's

12    usually a four-digit number in our accounting system, and

13    they're usually grouped, you know, by payroll -- Like all

14    these people would be payroll, meals, and it keeps going on,

15:55   15    office expenses.  It's all broken out and very detailed.

16    Q.  So, the number -- Let's see if there is a number.

17              The number at the bottom, is this the total

18    overhead expenditures for Urban Living for that particular

19    month?

15:55   20    A.  Correct.

21    Q.  So, I'm going to show you now Exhibit No. 2.  This is

22    Defendants' Exhibit No. 2, which is a list of all of the

23    closings in that month of December.

24              Tell me why this is an important exhibit.

15:55   25    A.  Well, this will give you our total sales and how many

 1   transactions.  So, the key thing here is the transaction

 2   amount.

 3            And I think there should be another page that

 4   will show the commissions that came in, also, which is the

 5   revenue that came into the business out of those

 6   39 transactions.

 7            But I have to have a starting point of how do

 8   you take and arrive at your expenses per transaction, and

 9   the only way to do that is to see what your total

10   transaction volume was.

11            THE COURT:  Before we delve into that, we got

12   underway about, what, 2:15, 2:20.  Correct?

13            MR. ZUMMO:  Yes, Your Honor.

14            THE COURT:  We're now pushing four o'clock.  So, I

15   know we're going to adjourn early today, but let's take just

16   a little break.

17            Let's get back in -- We'll get back in for

18   about 30 minutes, maybe longer, depending upon some

19   information I get while we're there.

20            But at this time just check your watch and

21   we're going to get back ready to resume at 4:10.  We'll see

22   you at that time.

23                      (Brief recess)

24                      (Jury present)

25            THE COURT:  Thank you.  Be seated, please.

*Ramani - Direct by Mr. Strother*

 1          Go right ahead, sir.

 2          MR. STROTHER:  Thank you.

 3          THE COURT:  Oh.  We're going to run a little bit

 4   over with the proposed time.  We're going to complete the

 5   direct exam of this witness -- okay? -- so at least we keep

 6   continuity before we take a break.

 7          All right.  Go right ahead.

 8   By Mr. Strother:

 9   Q.  So, we were talking about accounting, and I believe we

10   had just looked at your list of closings for that particular

11   month, which was Defendants' Exhibit No. 2.

12          The next document I'd like to show you is

13   Defendants' Exhibit No. 3.  Can you tell the jury what this

14   is.

15   A.  That is a check to a transaction coordinator for $50.

16   The transaction coordinator is the person that actually

17   would go to help the inspector or the realtor to open the

18   door.  And, so, we have an employee that focuses on that

19   part of it.

20   Q.  And are there other checks in Exhibit No. 3?

21   A.  Yes.  That's what I was explaining to you on the DC, the

22   development consultant.  That is a salaried employee that

23   earns a smaller amount of the commission, I was telling you,

24   4- to $500.  That's one of those checks.

25   Q.  And can -- Is the "Memo" line helpful on the check to

Ramani - Direct by Mr. Strother

1   determine what the check was actually for?

2   A.  Correct.  It says "Nagle" on that one, of course.

3   Q.  Do these checks appear on this first page where you have

4   the calculation?

16:18  5   A.  The check number doesn't appear, but it's the actual

6   deducted amount from the gross commission.

7   Q.  So, the checks are essentially invisible right here --

8   A.  Correct.

9   Q.  -- between "Gross Commission" and "Net Commission"?

16:18  10  A.  Correct.

11  Q.  Next I'd like you to look at Exhibit No. 4 --

12  Defendants' Exhibit No. 4.

13          Can you tell the jury what Exhibit 4 is.

14  There are 34 pages.

16:18  15  A.  That's the HUD, which is the closing statement.

16          When you purchase a home, you actually end up

17  going to a title company.  The title company creates the

18  actual disbursement, sales price, mortgage, how much cash

19  the buyer or seller would have to bring to the table.

16:19  20         And this is a very detailed line item closing

21  statement that's prepared completely independent from the

22  title company, and it'll also then be able to tie in to the

23  commission checks that they pay us.  So, you'll have the

24  supporting information to see what dollar amount came to us.

16:19  25  Q.  And what is Defendants' Exhibit No. 5?

1    A.  So, that is a -- Okay.  That's probably our bank account

2    because it says -- Yeah.  It should be incoming.

3                   So, we bank with Chase and it says "Chase" on

4    there and then incoming wire.  So, it'll match again, if you

16:19    5    were to look at that transaction and the address, the dollar

6    amount coming into our bank account on that HUD.

7    Q.  And do these appear on the -- Defendants' Exhibit 16?

8    A.  Correct.  I think -- again, I didn't look at them very

9    carefully.  But if you look at the Chase wire incoming, I

16:20   10    think it was 9,735, which will match the first one.  It'll

11    tie in one by one by one.

12    Q.  Okay.  Have you performed this analysis for the other

13    locations -- for the other projects at issue in this case?

14    A.  I think so.  Yes.

16:20   15                   MR. ZUMMO:  Objection, Your Honor.  Under

16    Rule 37(c), no such material has been disclosed to us.

17                   MR. STROTHER:  Your Honor, this is Exhibit 17 that

18    is in evidence that I intend to ask him about.  I'll ask him

19    to identify what it is.

16:20   20                   THE COURT:  Whose 17?  Yours?

21                   MR. STROTHER:  Defendants' Exhibit 17.

22                   THE COURT:  Defendants' 17.  All right.  Rephrase

23    the question.  And I'll keep that in mind.  And I'll -- You

24    check 17 and so will I.  There it is.

16:20   25                   Go on.

*Ramani - Direct by Mr. Strother*

1    By Mr. Strother:

2    Q.  You know, before we go into the exhibit, I think it may

3    be useful for me to get onto the whiteboard and ask you a

4    few questions about the projects and what Urban Living's

5    involvement is.  But I do want to come right back to Exhibit

6    17.

7           MR. STROTHER:  Your Honor, I'm going to use the

8    easel for a moment.

9           THE WITNESS:  I don't have 17.  So, you're going to

10   put it up?

11          MR. STROTHER:  Oh.  Yeah.  I'm going to talk about

12   17 in a minute.

13              Your Honor, is the placement of the easel

14   okay?

15          THE COURT:  Yeah.  It's fine with me.

16          MR. STROTHER:  Okay.

17   By Mr. Strother:

18   Q.  So, the first project and the project that we've been

19   talking mostly about is Nagle.  And, so, we already know

20   what Urban Living's involvement is with that.

21              Mount Vernon is the project we've been talking

22   about second-most.  I believe you've explained that as well.

23              Was Mount Vernon an UPM project?

24   A.  Yes.

25   Q.  So, what function did Urban Living play with Mount

*Ramani - Direct by Mr. Strother*

1    Vernon?

2    A.  Urban Project Management and Urban Living.  And I'm just

3    going to -- Urban Living realtor, but we haven't sold any of

4    them.  They're just finishing them now.

16:22   5              And then UPM being complete, architectural,

6    civil, structural, the project management side of it.  And

7    then same thing with Nagle.

8    Q.  But did -- I might be beating a dead horse.

9              Were the Mount Vernon units built in any way

16:22   10   related to the PWA plans?

11   A.  No.

12   Q.  Then there are three more projects that we haven't heard

13   much about.  One is EaDo, two is Stanford and three is

14   Patterson.

16:23   15             Are you familiar with those three projects?

16   A.  Just let me clarify.  I think EaDo is EaDo Place, but

17   we've been going by "EaDo" on it.

18   Q.  Understood.

19             In fact, Stanford probably has a longer name?

16:23   20   A.  Right.

21   Q.  And Patterson probably has a longer name?

22   A.  Yes.

23   Q.  Are any of those three projects UPM?

24   A.  No.

16:23   25   Q.  What was Urban Living's involvement in those projects?

*Ramani - Direct by Mr. Strother*

1   A.  The only role on those was to do the real estate

2   marketing sales.

3   Q.  Who was the builder for those three projects?

4   A.  Oppidan.

16:23   5   Q.  Who was also the builder on Nagle.  Right?

6   A.  Correct.

7   Q.  And did Urban Living provide or connect any architect

8   with Oppidan for those three projects?

9   A.  No.

16:24   10   Q.  Do you know who the architect was?

11   A.  Bill Wooten.

12   Q.  Bill Wooten?

13   A.  Correct.

14   Q.  Has Urban Living ever used Bill Wooten as an architect?

16:24   15   A.  No.

16   Q.  Has Urban Living ever provided Bill Wooten with any

17   plans, much less PWA plans?

18   A.  No.

19   Q.  Do you have any idea whether Oppidan provided such plans

16:24   20   to Bill Wooten?

21   A.  I don't know.

22   Q.  Why don't you know?

23   A.  I mean, we have -- Their plans are on the website.  Our

24   plans are on websites.  We have a showroom.  You can walk

16:24   25   in.  There's almost 80 to 100 brochures on that shelf.  We

*Ramani - Direct by Mr. Strother*

1   have brochures in brochure boxes in front of the property.

2          So, if -- they have the ability to take

3   anything off the internet, off our shelf, off our website;

4   and, if they distributed it, it wasn't done with our

16:24   5   knowledge.

6          I mean, I would have wanted to earn money and

7   sell it through UPM.  So, it'd be foolish for me to just let

8   them take their plans and not make any money from me or

9   them.  That wasn't done --

16:25   10          THE COURT:  Pull that microphone in, please.

11          THE WITNESS:  Sorry, Your Honor.

12          So, that would have been foolish for -- I'm in

13   business to try to generate income and make money.  We

14   didn't make anything on UPM at all on those projects.

16:25   15   By Mr. Strother:

16   Q.  So, to be clear, Urban Living didn't provide a permit

17   runner to those three projects or design expertise to those

18   three projects?

19   A.  Not architecture.  I'd have to look and see if there's

16:25   20   any quotes in the binder.  Sometimes, you know, they would

21   go get their own architect and we would still want to be

22   involved in those finishes because we think that's critical,

23   that the right finishes go in the home.

24          I'd have to have you look and see -- I can't

16:25   25   tell you off the top of memory if we did do the finishes,

Ramani - Direct by Mr. Strother

1   but I know structural, civil, architectural, we did nothing

2   on any of those three projects.

3   Q.   And by "finishes" can you tell the jury what you mean.

4   A.   Sure.  Earlier you asked me about the plumbing fixtures,

16:25   5   the tile, the carpet.  Again, that's probably one of the

6   most important things, I think, in building or selling a

7   home, is to have the correct finishes in it.

8           And, so, sometimes our interior designers --

9   Even if they had an outside architect, we would still help

16:26   10   pick those finishes in that home.

11   Q.   So, on those three projects and on all non-UPM projects,

12   does Urban Living receive copies of the plans from builders?

13   A.   Yes.

14   Q.   In what form?

16:26   15   A.   Typically, it'll be a PDF.

16   Q.   What does Urban Living do with those plans?

17   A.   We'll put them on the brochure and we'll put them on the

18   website for marketing purposes.

19   Q.   Okay.  So, Nagle is UPM, Mount Vernon is UPM, but EaDo,

16:26   20   Stanford and Patterson are not?

21   A.   Correct.

22   Q.   Okay.  But you understand that Urban Living is still

23   being sued for infringement on those three projects?

24   A.   Correct.

16:27   25   Q.   And, as such, have you produced in this lawsuit Urban

1    Living's expenses and income?

2           MR. ZUMMO:  Objection, Your Honor.  Again, under

3    Rule 37, no such backup information was presented -- was

4    produced.

16:27  5           THE COURT:  All right.  See where it is if you've

6    got it.

7           MR. STROTHER:  Sure.  Let's take a look at

8    Defendant's Exhibit 17.

9           MR. ZUMMO:  And we renew our objection to

16:27  10   Defendant's Exhibit 17, Your Honor, because there was never

11   any backup information produced on anything except expenses

12   on Nagle for January 20 -- or for December 2016.

13          MR. STROTHER:  Your Honor, we have already admitted

14   it into evidence at pretrial.  And, Your Honor, my position

16:27  15   is still the same.  It's in evidence.

16          THE COURT:  Anything further?

17          MR. ZUMMO:  It was never produced, Your Honor.

18   That's what --

19          THE COURT:  Give me the underlying --

16:28  20          MR. ZUMMO:  Under Rule 37, these documents that

21   underlie everything --

22          THE COURT:  That's what I thought.

23          MR. ZUMMO:  -- except Nagle, have never been

24   produced.

16:28  25          THE COURT:  All right.  The easiest thing to do is

*Ramani - Direct by Mr. Strother*

1    I always just pull out the rule.

2              MR. ZUMMO:  37(c), Your Honor.

3              THE COURT:  37(c).

4                   You said that it was supplied.  Is that

16:28   5    correct?

6              MR. STROTHER:  Your Honor, it's Bates-labeled

7    Page 485.  This document --

8              THE COURT:  Where?

9              MR. STROTHER:  On the exhibit.

16:28   10             THE COURT:  At the lower right?

11             MR. STROTHER:  Yes, Your Honor.

12             MR. ZUMMO:  I'd be happy to tender it up.  I have a

13   copy for the Court.

14             THE COURT:  I've got it right here.  485.  Right?

16:28   15             MR. ZUMMO:  Yes, Your Honor.  And this is --

16             MR. STROTHER:  I don't think he's saying it was --

17   that document wasn't produced.

18             THE COURT:  He's saying the underlying documents.

19             MR. ZUMMO:  Correct.  And, as the Court can see,

16:29   20   this was created purely for this litigation.  It has

21   calculations.  This is not some QuickBooks report.  This is

22   a summary that was produced for this lawsuit for this trial.

23             MR. STROTHER:  Mr. Ramani can go into detail about

24   how it was created.  Yes, it was created in response to an

16:29   25   interrogatory, but it is from QuickBooks.

*Ramani - Direct by Mr. Strother*

1          THE COURT:  Where are the underlying documents?

2          MR. STROTHER:  Umm...

3          THE COURT:  All right.  Let's put it this way.  I'm

4     not saying I'm not going to get to this.  Move off this one.

16:29  5     Finish up your direct.  Okay?

6          MR. STROTHER:  Okay.

7          THE COURT:  Then we can rule on it at the end of

8     the day so we don't get bogged -- Or is this it?

9          MR. STROTHER:  This is almost it.  And there are a

16:29  10    couple of areas I can get into.

11         THE COURT:  Get into those.  Then we'll see what

12    time -- We may take a five-minute break.  Let me resolve

13    that so we can move on it quickly.  Okay?

14         MR. STROTHER:  Yes, Your Honor.

16:30  15    THE COURT:  I'd just like us to get moving off that

16    and then see -- If I need more time, we'll let the jury go

17    and we can wrap it up just on that one point when we get

18    back.

19              Go right ahead.

16:30  20    MR. STROTHER:  Yes, Your Honor.

21    By Mr. Strother:

22    Q.  Let me ask you about the line of questioning that

23    Mr. Bonham and Mr. Cameron went into regarding the gentleman

24    who went and set up the menu at Cameron Architect's

16:30  25    computer.

Ramani - Direct by Mr. Strother

1    A.   Okay.

2    Q.   Did you have a conversation with Miss Wood about that

3    topic?

4    A.   Yes.

16:30    5    Q.   What was the conversation?

6    A.   Well, one of the major issues that Cameron was having

7    with using their plans and where we were getting into some

8    of the problems was the menu-ing or what I call the layering

9    system.

16:30    10        And I actually spoke to Sam about it multiple

11    times, saying, "Look.  He's having this problem."  And they

12    had made the decision to actually send Scott Harris to his

13    office.

14        I didn't know they were friends, by the way.

16:31    15    So, I'm going to avoid that topic.

16        But they -- Sam said she was going to send him

17    to his office to set that up because he's the one that

18    actually produced the layering system.

19    Q.   Let me make sure that it's crystal-clear.

16:31    20        You called Sam and said, "There's a problem."

21    Right?

22    A.   Correct.

23    Q.   And then Sam said, "I'm sending Scott to Cameron's

24    office"?

16:31    25    A.   Now, this went back and forth for about two weeks

*Ramani - Direct by Mr. Strother*

1  because I think there was a scheduling issue and she had to

2  get --

3           THE COURT:  Slow down, please.

4           THE WITNESS:  Sorry.  Sorry.

16:31  5           THE COURT:  It went back and forth.  What

6  ultimately happened?

7           THE WITNESS:  Scott ended up at his office to set

8  up that layering menu system.

9  By Mr. Strother:

16:31  10  Q.  How long did it take Sam to get Scott out to the office?

11  A.  If I recall -- again, it's been a while -- but I think

12  it was about two weeks.

13  Q.  Did Miss Wood explain to you why it was going to take

14  that long?

16:31  15  A.  I don't think so.  I don't remember.

16  Q.  Let me ask you about the difference between marketing

17  plans and architectural drawings.

18           What are marketing plans?

19  A.  Just a basic, simple line drawing that reflects the

16:32  20  bedrooms, bathrooms.  Sometimes it will have some of the

21  dimensions in them, not line dimensions like you saw in some

22  of those plans where there was a bunch of lines on them.

23  Just a simple bedroom is 10 by 10.  Living room is 12 by 14.

24           So, it's just a very simplified version of the

16:32  25  plan that we can use online.  And on our marketing brochures

*Ramani - Direct by Mr. Strother*

1    is typically where we would end up putting those.

2    Q.  Are those on Preston Wood's website without copyright

3    information?

4    A.  Yes.

16:32   5    Q.  How do you know?

6    A.  I've been on their website, and I have printouts here

7    that will show that.

8         MR. ZUMMO:  Your Honor, we -- Has this been

9    produced?

16:33  10         MR. STROTHER:  No.  He just --

11         MR. ZUMMO:  We object to any exhibit that hasn't

12    been produced to us prior to trial and that isn't marked as

13    part of the Court's procedures.

14         MR. STROTHER:  I'm entitled to put on a rebuttal

16:33  15    case, and Miss Wood testified that it is not available

16    without copyright, and this document proves absolutely

17    otherwise.  And we just found it.

18              Would you like me to approach, Your Honor, and

19    let you see it?

16:33  20         THE COURT:  No.  I'm just thinking.

21              I don't want to kick cans down the road.  I

22    usually don't.

23              See if they can work it out.  That's what

24    we're waiting on.  If they can't, then the Judge will do it.

16:33  25         MR. BONHAM:  Your Honor, what she testified is that

1    we have our copyright management information on all of our

2    materials.

3              This shows PW&A.  Copyright management

4    information, over 1202, is anything that gives the world

16:34  5    notice who owns it.

6              I also think, if we even had a chance to see

7    this, we would go onto the website and there are going to be

8    all sorts of copyright notices elsewhere.

9              MR. STROTHER:  I'm happy to go on the website live

16:34  10   right now.

11             MR. BONHAM:  Again, you're going to have -- It's

12   right there on top, "PW&A".  This is identifying who owns

13   the work.

14             MR. STROTHER:  Then, they can argue that this

16:34  15   satisfies the statute, but they're leading the Court to

16   believe that it's on this document and it's not.  There is

17   no copyright.

18             MR. BONHAM:  The other thing is, again, Judge, I'd

19   also ask the relevance of it because the question is not

16:34  20   whether or not it's on ours.  It's whether they took it off.

21             THE COURT:  We're kicking that one down the road.

22   Finish up as much as you can with this witness.

23             MR. STROTHER:  Your Honor, that may be it.  Let me

24   look at my --

16:34  25             THE COURT:  If it may be it, then we'll be here for

 1   a while.

 2           But there's no need for you to hang around.

 3   Okay?  Because we're almost through with all the testimony

 4   in the case, generally.  I mean, we're not going to be able

 5   to wrap it up today, but it will move rapidly on Monday.

 6           MR. STROTHER:  Your Honor, I can ask a few more

 7   questions.

 8           THE COURT:  Can or you cannot?

 9           MR. STROTHER:  I can.

10           THE COURT:  Go on.

11   By Mr. Strother:

12   Q.  Mr. Ramani, what is the value of the PWA plan to Urban

13   Living's profits?

14           MR. ZUMMO:  Objection, Your Honor.  That's

15   undisclosed expert testimony.

16           THE COURT:  Hold it.

17           Bruce, read it back again, please.

18           (Question read back by court reporter)

19           MR. ZUMMO:  It's opinion testimony, Your Honor.

20           THE COURT:  Sustained.

21           MR. STROTHER:  Your Honor, Mr. Ramani is the owner

22   and president of Urban Living and has been testifying all

23   afternoon about the profits.

24           I think we asked him what the value of the

25   plan is.  It doesn't require expert testimony.  It's factual

*Ramani - Direct by Mr. Strother*

1    testimony.

2            THE COURT:  Value of whose plans?  Of the

3    Plaintiff's plans?

4            MR. STROTHER:  The PWA plans to Urban Living's

16:35   5    profits on a given project.

6            THE COURT:  Sustain the objection.  I got it.

7    Sustain it.

8    By Mr. Strother:

9    Q.  What is the cost to Urban Living in the context of Urban

16:36  10    Living's profits on any sale?

11    A.  $250.

12    Q.  Let me show you the easel.

13            Mathematically, what portion of the pie is

14    $250?

16:36  15            THE COURT:  Of whose pie?

16            MR. STROTHER:  Urban Living's net profits.

17            THE COURT:  Okay.

18    A.  1 to 2 percent.

19    By Mr. Strother:

16:36  20    Q.  How do you arrive at that mathematical number, 1 to

21    2 percent?

22    A.  Take the commission and back into that $250.

23    Q.  So, if the commission were $25,000, $250 represents

24    1 percent?

16:37  25    A.  Right.

*Ramani - Direct by Mr. Strother*

1  Q.  When it's closer to $10,000, I guess that's around

2  2.5 percent?

3  A.  I'm trying to go on the high side, again, to be fair.

4  Q.  Okay.

16:37  5          MR. STROTHER:  Your Honor, I have more direct for

6  Mr. Ramani, but it's all based upon rulings to come from the

7  Court.

8          THE COURT:  We're going to be here for a while yet.

9  Let's do it this way.  For sure, the testimony will be over

16:37  10  on Monday, and the attorneys have moved it along rapidly.

11              I want to thank them for that.

12              But rather than have you wait around and have

13  me do it and get you back in, it's no hurt just for those

14  couple of subjects, if I allow it in, to wrap up on direct

16:37  15  and then we'll go cross on this witness on Monday.

16              Thank you for your patience.  It's an

17  interesting case.  It's moving along.  We'll see you Monday,

18  10:00 a.m.  Thank you.  And good afternoon.  You can leave

19  your books in the jury room.

16:38  20              (Jury not present)

21          THE COURT:  You can step down, sir.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Now, let me ask you this.  Let's get

24  back to Exhibit 17.

16:38  25              Is it a summary that was created from other

1   documents, sir?

2          MR. STROTHER:  Yes.

3          THE COURT:  Okay.  And where are those documents?

4          MR. STROTHER:  They will be on Urban Living's

16:38   5   computers.  By "documents" I'm including electronic data.

6                 So, this is an exported -- Much of the data is

7   exported.  So, it's on the same computer that this came

8   from.  There could be scans -- Like the other one, there

9   could be scans of checks and HUD statements.

16:39   10         THE COURT:  Okay.  Now, Plaintiff, let me hear you

11   on that.

12         MR. ZUMMO:  I'll give the Court the example.

13                 For January 20- --

14         THE COURT:  What are you looking at?

16:39   15         MR. ZUMMO:  For December 2016.

16         THE COURT:  By the way, just for the record, Bruce,

17   if someone's talking and the Judge is talking, who do you

18   take down?

19         THE COURT REPORTER:  The Judge.

16:39   20         THE COURT:  All right.  Go on.

21         MR. ZUMMO:  This, Your Honor, is my marked-up copy

22   of Defendants' Exhibit 16.

23         THE COURT:  All right.  Hang on.  By the way, do we

24   have an extra copy of your exhibits?  Because my local rules

16:39   25   require another copy right up here.

```
 1              MR. STROTHER:  I'm sorry.

 2                   Do you want me to take those tabs out?

 3              THE COURT:  No.  No.

 4                   All right.  We're looking at 16.  Correct?

 5              MR. ZUMMO:  Yes, Your Honor.  And this is just for

 6      an example.

 7              THE COURT:  Okay.  I got 16.

 8              MR. ZUMMO:  You'll see the first page is their --

 9      I'm sorry.  This is from December.

10              THE COURT:  Yeah.

11              MR. ZUMMO:  This has the six properties with

12      commissions and net commissions.  And then the -- Page 2

13      through the end is a type of accounting report of the

14      expenses for that same month.

15              THE COURT:  So, you're saying that's the backup.

16              MR. ZUMMO:  This is the backup that they did

17      produce.

18              THE COURT:  Okay.  And you're saying you need that

19      for No. 17.

20              MR. ZUMMO:  And I'll add to it if the Court...

21                   I think Mr. Strother and his client made an

22      effort to actually find the backup for the report for that

23      month.

24              THE COURT:  For 16?

25              MR. ZUMMO:  So, we got copies --
```

16:39  (line 5)
16:40  (line 10)
16:40  (line 15)
16:40  (line 20)
16:40  (line 25)

|        |    |                                                           |
|--------|----|-----------------------------------------------------------|
|        | 1  | THE COURT:  Oh.  Oh.  For 16.                             |
|        | 2  | MR. ZUMMO:  For 16.                                        |
|        | 3  | THE COURT:  But they don't have it for 17?                |
|        | 4  | MR. ZUMMO:  We don't have -- At least nothing, to         |
| 16:40  | 5  | my knowledge, in terms of either an expense report or the |
|        | 6  | underlying documents with checks and invoices for any of  |
|        | 7  | these other projects or any other month besides December  |
|        | 8  | 2016 was ever produced to us.                             |
|        | 9  | THE COURT:  Now, let's look at 17.  Do we have            |
| 16:41  | 10 | dates on there?  I guess it has a "close" date on each one.|
|        | 11 | MR. STROTHER:  Yes.                                        |
|        | 12 | THE COURT:  Hang on a second.                             |
|        | 13 | It has a "close" date to the right on each                |
|        | 14 | one.  And on 16 --                                        |
| 16:41  | 15 | MR. ZUMMO:  Under the "Stanford Street" heading,          |
|        | 16 | there's nothing from December --                          |
|        | 17 | THE COURT:  Where?  On which one?                         |
|        | 18 | MR. ZUMMO:  Page 1 of 17.                                 |
|        | 19 | THE COURT:  Okay.                                         |
| 16:41  | 20 | MR. ZUMMO:  They're grouped, Your Honor, by the          |
|        | 21 | project.  So, EaDo Place --                               |
|        | 22 | THE COURT:  Hold it.                                       |
|        | 23 | I'm looking at the first page of 17.                      |
|        | 24 | MR. ZUMMO:  Yes, sir.                                      |
| 16:41  | 25 | THE COURT:  That Live Oak?                                |

|      |    |                                                                      |
|------|----|----------------------------------------------------------------------|
|      | 1  | MR. ZUMMO:  Do you see the Live Oak -- the heading                    |
|      | 2  | above that, the "EaDo Place"?                                         |
|      | 3  | THE COURT:  Oh.  Yeah.  I got it.  Okay.                              |
|      | 4  | MR. ZUMMO:  So, these were done by project.                          |
| 16:41| 5  | THE COURT:  Right.                                                    |
|      | 6  | MR. ZUMMO:  And, so, they have one closing, it                       |
|      | 7  | looks like, in December -- No.  There are no December 16             |
|      | 8  | closings for EaDo.  There are no December '16 closings for           |
|      | 9  | Stanford.  None for Patterson Street.                                 |
| 16:41| 10 | THE COURT:  For what year?                                            |
|      | 11 | MR. ZUMMO:  All they've produced to us is December                   |
|      | 12 | of 2016.                                                             |
|      | 13 | THE COURT:  But you're saying, when you look at                      |
|      | 14 | EaDo Place, you've got closings in 15, 16 and 17.  Correct?          |
| 16:42| 15 | MR. ZUMMO:  Yes, Your Honor.                                          |
|      | 16 | THE COURT:  And you're saying you don't have that                    |
|      | 17 | backup information.                                                   |
|      | 18 | MR. ZUMMO:  That's correct, Your Honor.                              |
|      | 19 | THE COURT:  What do you need it for?                                 |
| 16:42| 20 | MR. ZUMMO:  We would need to see, for example,                       |
|      | 21 | going back to Defendant's 16 --                                      |
|      | 22 | THE COURT:  All right.  Hang on.  I'm trying to                      |
|      | 23 | follow this.  Let me go back and get 16.                             |
|      | 24 | All right.  Here's 16.                                                |
| 16:42| 25 | MR. ZUMMO:  It would be possible to go to the end                    |

1    of 16 where they have their total expenses.

2            THE COURT:  Where is that?

3            MR. ZUMMO:  On this one -- I'll just tell the Court

4    it looks like this, but it's the last page of 16.

16:42  5            THE COURT:  Hang on.  All right.  Go on.  I have

6    it.

7            MR. ZUMMO:  Mr. Ramani, on his direct, showed us

8    that he used that last number to then calculate an overhead

9    deduction --

16:43  10           THE COURT:  What?  That 237,000?

11           MR. ZUMMO:  Yes, Your Honor.  And he used that

12   number to calculate his overhead deduction that went into

13   his calculation of profit for the Nagle project.

14           THE COURT:  Go on.

16:43  15           MR. ZUMMO:  If we don't have even the report that

16   gives us that total for these other projects for the months

17   and years in question, the time period in question, we can't

18   double-check his summary.

19           THE COURT:  Where can they find that?

16:43  20           MR. STROTHER:  Where?  It's not been produced, but

21   it's on QuickBooks at my client's office.

22               By the way, Your Honor, this document was

23   produced months ago.

24           THE COURT:  What document?

16:43  25           MR. STROTHER:  Exhibit 17.

1    THE COURT:  Go on.

2    MR. STROTHER:  It was just produced months ago.

3  They're picking and choosing what they want from this

4  document.

16:43    5    This is the one document that gives them the

6  gross commissions that were received by my client.  And

7  then, by agreement, we entered into the Court's record an

8  agreed fact that these were the gross commissions.  Now,

9  they're saying 'Aaaaaah!  You can't use the rest of it.'

16:44   10    MR. ZUMMO:  The --

11    MR. STROTHER:  And that's unfair.  They waited many

12  months.

13    MR. ZUMMO:  The document was not produced until

14  after Mr. Ramani's deposition.

16:44   15    THE COURT:  Where in the stipulated facts do they

16  refer to this?  I'm looking at that right now.  What number

17  am I looking at?

18    MR. STROTHER:  Your Honor, let me look at my copy

19  of the stipulated facts.

16:44   20    They begin on 26, 27 and 28.

21    THE COURT:  All right.  Now, looking back --

22  looking at 16 -- right? -- the last page of 16, that 237-.

23  Right?  That's 237,000.  That's on the last page of 16.

24    Now, that's not -- Well, here.  You're saying,

16:45   25  then, that -- Oh.  Those are what?  The commissions

1    received?

2              MR. ZUMMO:  No, Your Honor.  The 237- was what they

3    say are their total overhead expenses.

4              THE COURT:  Okay.  Now, what about -- Now, you just

16:45    5    referred me to 25, 26 and -- What?  Is it --

6              MR. STROTHER:  26, 27 and 28.

7              THE COURT:  What are those numbers, 26, 27 and 28?

8    Commissions?

9              MR. STROTHER:  Those are Urban Living's gross

16:45   10    commissions on those three projects, and they're the totals

11    of the columns that appear on Exhibit 17.  And those are the

12    only place those numbers appear.

13              THE COURT:  And --

14              MR. ZUMMO:  We disagree.

16:46   15              MR. STROTHER:  I'm happy to hear you out.

16              THE COURT:  And your position is that's the figure

17    that is key to the case.  Is that correct?

18              MR. STROTHER:  Key to their case.

19              THE COURT:  To their case.

16:46   20                   And that's already in by stipulation.

21              MR. STROTHER:  Yes, Your Honor.

22              THE COURT:  And the position is that -- I'm looking

23    at 17.  Does 17 relate to 26, 27 and 28?

24              MR. STROTHER:  Directly.

16:46   25              THE COURT:  All right.

1      MR. ZUMMO:  They also produced -- With this
2  document were the HUD-1 statements for all of those sales.
3  So, they produced the underlying documents, not just this
4  lawsuit-created summary.

16:46   5      So, we had the underlying documents for the
6  commission income.  We don't have any underlying documents
7  for any expense numbers or summaries.  And we only have a
8  report that we've showed the Court as Defendants' Exhibit 16
9  that gives a printout report for one month.

16:47  10      THE COURT:  All right.  Now, as to 17, what is it
11  that you say you need?  I know you've said it already, but
12  I'm trying to get a handle on it.

13      MR. STROTHER:  Me, Your Honor, or...?

14      THE COURT:  No.

16:47  15      MR. ZUMMO:  We need the underlying documents from
16  which the expense information was derived or prepared that
17  is on Exhibit 17.

18      MR. STROTHER:  All right.  That's their first
19  request, and I'm happy to get it for them.

16:47  20      THE COURT:  All right.  When can you get it for
21  them?

22      MR. STROTHER:  May I ask my client?

23      THE COURT:  Yeah.

24      MR. RAMANI:  I'll do it over the weekend.

16:47  25      THE COURT:  Well, can you get --

1        MR. STROTHER:  Sorry, Your Honor.

2        THE COURT:  Can you get -- Let me ask this.  I'm

3   asking Mr. Strother now.

4            You tell me.  Confer with your client.  When's

16:47   5   the earliest you can get it to the other side --

6        MR. STROTHER:  Yes, Your Honor.

7        THE COURT:  -- to allow you to go into the

8   questions you want to.

9        MR. STROTHER:  Yes, Your Honor.

16:47  10        THE COURT:  All right.  Hold it.  Hold it.  Off the

11   record.

12        MR. STROTHER:  Yeah.

13        THE COURT:  Let's go off the record for a moment.

14            (Off-the-record discussion)

16:50  15        THE COURT:  Back on the record.

16            Okay.  Hold on.

17        MR. STROTHER:  My client can have the underlying

18   information by Sunday morning.

19        THE COURT:  All right.  Just get it to them.

16:50  20        MR. ZUMMO:  Yes, Your Honor.

21        THE COURT:  See what you can do with it.

22            Now, what about that other matter concerning

23   that rebuttal exhibit.  Okay?  Hand it up, somebody.  Let me

24   take at least a look at it and see what -- Okay.

16:50  25            All right.  Now, what's this being offered

1    for?

2         MR. STROTHER:  Your Honor, we believe Miss Wood

3    testified or at least --

4         THE COURT:  Miss who?

16:51  5         MR. STROTHER:  Miss Wood.

6         THE COURT:  Okay.

7         MR. STROTHER:  -- testified -- Let me back up.

8              They have a DMCA claim in which they're

9    alleging that Urban Living, with intent, published PWA

16:51  10   copyrighted information with the copyright management

11   information altered or removed.

12        THE COURT:  Okay.

13        MR. STROTHER:  One of the ways she testified was

14   that there was essentially no way to get that information

16:51  15   that appears in Urban Living's marketing material other than

16   a place that it has the copyright management information on

17   there.

18              That is a screen print from Preston Wood's --

19   PWA's website as of yesterday.

16:51  20        THE COURT:  From PWA's website?

21        MR. STROTHER:  Yes.  And it does not contain what

22   we contend is the copyright management information.

23        THE COURT:  Is this the exact floor plans involved

24   in this case?

16:51  25        MR. STROTHER:  These are, I think, three that are

1    involved in one of the five projects, yes.

2            THE COURT:  All right.  What's the response?

3            MR. ZUMMO:  Judge, we'll just show you the rest of

4    the page from the website.  I don't know the best way to do

16:52  5    it.

6            THE COURT:  Yeah.  Come on up.

7                 What are we looking at here?

8            MR. BONHAM:  This is the home page --

9            THE COURT:  You've got to speak up.  He's got to

16:52  10    pick it up.

11            MR. BONHAM:  If you take PWA's website and you

12    scroll down --

13            THE COURT:  Speak up louder because he's got to

14    take it down.

16:52  15            MR. BONHAM:  Go on to the PWA website.  And this is

16    a new website as of this week.

17            THE COURT:  This is your website?

18            MR. BONHAM:  My client's website.

19            THE COURT:  Yes.

16:52  20            MR. BONHAM:  You scroll down to the bottom and you

21    see there is a copyright notice.

22            THE COURT:  Okay.

23            MR. BONHAM:  We've also got the -- You know, of

24    course, every page has PWA's logo on top.  We can -- You

16:52  25    know, I think it's consistent with her testimony.  And --

1          MR. ZUMMO:  And this website was not a website that

2     was -- It's a fairly new website.

3          MS. WOOD:  [Inaudible speech]

4          THE COURT:  Hold it.

16:52   5               When did it come out?

6          MS. WOOD:  I need to go back and check.  It's been

7     probably 60 days.

8          THE COURT:  What?

9          MS. WOOD:  We have the --

16:53  10          THE COURT:  Within the last 60 days?

11          MS. WOOD:  Yes.

12          THE COURT:  All right.

13          MR. STROTHER:  And Mr. Ramani can testify and

14     Mr. Mock, who has given deposition testimony in this case

16:53  15     for PWA, testified this stuff was on the internet back then.

16     So, that's a sleight of hand and --

17          THE COURT:  What was on the internet?

18          MR. STROTHER:  This.  This is called a "marketing

19     plan", Your Honor.

16:53  20          THE COURT:  This was on their website during the

21     time in question in this case?

22          MR. STROTHER:  Yes.  And I understand Mr. Bonham

23     pointing out at the bottom of one page or some pages it has

24     the copyright information.

16:53  25               This page does not.  You click on it and it

1    goes up.  The DMCA claim doesn't require my client to have

2    been the one that retrieved this information.

3              Instead, my client must have forwarded on the

4    information and the copyright management information must

16:53  5    have been altered or removed.  This breaks that chain.

6              It shows that someone could have taken this,

7    snapped a screenshot of this and forwarded it to Urban

8    Living without having altered or removed copyright

9    management information.  That's our contention.

16:54  10         THE COURT:  All right.  Got it.  Take your seat and

11   we'll talk about it.

12              Go on.

13         MR. ZUMMO:  The exhibit that they're offering is

14   not from the time period in question.  So, if this

16:54  15   screenshot came from yesterday, that's a different website

16   that has only been in place, according to Miss Wood, for

17   about 60 days.

18         MR. STROTHER:  So, 60 days ago PWA spoliated

19   evidence.

16:54  20         THE COURT:  Say that again.

21         MR. STROTHER:  60 days ago PWA spoliated evidence,

22   and we shouldn't have the repercussions of that.

23         THE COURT:  Well, talk about this.  I mean, I got a

24   handle on it.  The question is:  Is it a surprise?  Is it

16:54  25   timely?  Is it relevant?  And would you reasonably have been

1    able to foresee this?

2              So, this can't be really used as rebuttal

3    evidence that you had no inclination might be necessary to

4    be used at trial.

16:54   5         MR. ZUMMO:  The time period in question, Your

6    Honor, was -- We have counts of the times that their plans

7    were on their website or that they were sending out e-mails

8    with our material that didn't have our copyright notice.

9    That was long before 60 days ago.

16:55   10             So, what a new website shows has nothing to do

11   with the time period involved in this lawsuit.  This lawsuit

12   was filed in '16.

13             MR. BONHAM:  '16.

14             MR. ZUMMO:  And it's not spoliation of evidence to

16:55   15   change a website.  And I'm pretty sure we have a backup of

16   the website as it existed before 60 days ago.

17             So, if somebody wanted to preserve our website

18   or make an exhibit, they could have done it at that time.

19   The backup is available today.

16:55   20        MR. STROTHER:  Your Honor, they're suing my client

21   for $500 million.

22             MR. BONHAM:  No, we're not.

23             MR. ZUMMO:  No, we're not.

24             MR. STROTHER:  They're accusing us of 20,000

16:55   25   violations for a maximum of 25,000 violations -- I mean

1   25,000 per violation.

2          This is a serious deal.  Miss Wood led the

3   jury to believe that it was not possible to get a data file

4   like this without the copyright information.  We have got to

16:56  5   rectify that.

6          MR. ZUMMO:  She didn't say anything like that.

7          MR. STROTHER:  Then, they have no evidence.  That's

8   the only piece of evidence that I think I remember hearing

9   that suggests that --

16:56  10         THE COURT:  What -- I'm sorry.  Go on.  Finish.

11         MR. STROTHER:  I just think that that was the only

12  piece of evidence they had that said that you couldn't get

13  this marketing plan without the copyright management

14  information.

16:56  15         THE COURT:  State your objection.  This is the last

16  go-round.  State it for the record and I'm going to rule on

17  it because you need a ruling before next week so you can

18  plan or not plan on it.

19         MR. ZUMMO:  We object to the proffered exhibit

16:56  20  which does not have a number on it yet, which is a

21  screenshot, because it is not relevant to any issue in this

22  lawsuit.

23          It's a web version of the website that is --

24  postdates the events that occurred in this case, and it also

16:57  25  is irrelevant to any 1202 -- 17 USC 1202(b) violation

```
 1   because even the proffered exhibit has "PW plus A" at the

 2   top, which satisfies the requirements of Section 1202 and

 3   the definitions of "copyright management information."

 4           THE COURT:  Well, we're not getting into that.

 5   We're not getting into it.

 6           MR. ZUMMO:  That's why it's not relevant, Your

 7   Honor.

 8           THE COURT:  Not relevant?

 9           MR. ZUMMO:  Yes.

10           THE COURT:  Again, the reasons it's not relevant?

11   I'm trying to protect both sides' records and then I'll

12   rule.

13           MR. ZUMMO:  And it's in addition.  But it's not

14   relevant because this screenshot is from a version of the

15   website that did not exist at the time period that is at

16   issue in this lawsuit and during which we allege the

17   violation of the DMCA occurred.  It's not relevant because,

18   even as proffered, the "PW plus A" logo and information at

19   the top is --

20           THE COURT:  I'm not getting into that.

21           MR. ZUMMO:  And then, third, Your Honor, it's

22   improper impeachment.  It has not been shown to be contrary

23   to anything that Ms. Wood actually said on the witness

24   stand.

25           THE COURT:  Okay.  Your response.
```

1          MR. STROTHER:  It's very relevant.  First and

2     foremost, we submit Defendants' Exhibit 28 to demonstrate to

3     the jury and the Court that it is possible for someone out

4     there -- including my client, frankly -- to click on the

16:58  5     marketing floor plan and be able to download this file

6     without any copyright management information on it, thereby

7     making it so that it's possible someone distributed this

8     without altering or removing the copyright management

9     information.

16:58  10          THE COURT:  I got it.  I got it.

11               Sustain the objection.  All right.  They're

12     out.

13               I'll stop the clock.  I'll get you your time.

14     And we'll see you back -- The key thing here is just to --

16:59  15     And I know you will do the best you can on that jury charge.

16               And as soon as we let the jury go -- We're

17     going to let them go for the day, I mean, especially with

18     that long -- I've done this for years and I found out, if

19     they come in and we'll say, 'We'll get back with you in

16:59  20     three or four hours,' something like this is going to take

21     maybe longer, it's going to take a break in between, and the

22     next thing you know they're stewing in there after hearing,

23     let's say, an hour more testimony and they're waiting three

24     or four hours until we go through it, until we run all the

16:59  25     copies; and then, when we argue it, they still couldn't

1   deliberate on it or be the end of the day.

2                So, that's the plan.  I've done that routinely

3   for years.  Like, if, indeed, you had finished this witness

4   today and wrapped up, they still would've come back Monday.

16:59   5            I've done this over and over again.  The

6   bottom line is we don't want to wear them out nor have them

7   cool their heels downtown with nothing to do.

8                I'll get you your time in just a second.  If

9   you want just a peek at what the clock looks like, here.

17:00   10  Just a peek at the clock.  And I'm just going to write it

11  all down.

12               Okay.  Thanks.

13               Here's the time.

14               We'll see you Monday and we'll wrap it up.

17:01   15  See you Monday.

16               MR. ZUMMO:  Thank you, Your Honor.

17               MR. STROTHER:  Thank you, Your Honor.

18

19                  COURT REPORTER'S CERTIFICATE

20           I, BRUCE SLAVIN, certify that the foregoing is a

21  correct transcript from the record of proceedings in the

22  above-entitled matter, to the best of my ability.

23

24                             *s/Bruce Slavin*
                               BRUCE SLAVIN, RPR, CM
25

## $

**$1,721.11** [1] - 89:10
**$1,727.11** [1] - 90:15
**$10,000** [1] - 193:1
**$11,450** [1] - 92:18
**$16,274.90** [1] - 174:3
**$22,000** [2] - 101:13, 118:22
**$25,000** [1] - 192:23
**$250** [5] - 151:11, 192:11, 192:14, 192:22, 192:23
**$34.51** [2] - 93:25, 94:8
**$4,200** [1] - 161:22
**$50** [1] - 176:15
**$500** [3] - 171:22, 176:24, 207:21
**$69.03** [2] - 93:5, 93:20
**$7,576.04** [1] - 93:10

## '

**'13** [1] - 115:12
**'15** [2] - 162:18, 163:13
**'16** [5] - 162:18, 163:13, 197:8, 207:12, 207:13
**'79** [1] - 41:1
**'81** [1] - 41:2
**'93** [1] - 108:25
**'94** [3] - 108:25, 110:9
**'98** [1] - 139:17
**'99** [4] - 139:17, 140:5, 141:25, 142:1
**'Aaaaaah** [1] - 199:9
**'all** [1] - 105:9
**'do** [2] - 27:21, 27:23
**'hey** [2] - 116:15, 156:4
**'How** [1] - 67:1
**'look** [1] - 163:20
**'okay** [1] - 155:22
**'run** [1] - 82:20
**'we** [2] - 74:7, 156:6
**'We'll** [1] - 210:19
**'Well** [1] - 9:14
**'Yeah** [1] - 20:16
**'yes** [1] - 158:3

## 0

**0** [4] - 28:2, 28:9, 28:18, 71:21

## 1

**1** [9] - 14:25, 15:3,

82:21, 130:2, 132:23, 192:18, 192:20, 192:24, 196:18
**1,375** [2] - 159:8, 159:10
**1,4** [1] - 93:3
**1.45** [1] - 90:22
**1.5** [1] - 90:5
**10** [5] - 5:3, 16:9, 170:6, 188:23
**10(e** [1] - 28:1
**10(f** [1] - 28:8
**10(g** [1] - 28:17
**10.5** [1] - 90:8
**100** [10] - 33:3, 35:4, 86:19, 94:24, 128:21, 143:17, 156:24, 171:19, 172:22, 181:25
**100,000** [1] - 172:19
**103** [4] - 71:12, 71:14, 71:18, 133:23
**109** [1] - 93:8
**109.75** [3] - 93:8, 94:1, 94:12
**10:00** [1] - 193:18
**11** [5] - 5:3, 87:10, 95:5, 95:17, 95:19
**1171** [4] - 13:4, 66:7, 66:19, 67:5
**11:02** [1] - 38:14
**11:15** [1] - 38:4
**12** [8] - 5:2, 5:3, 38:19, 40:3, 166:12, 166:15, 166:16, 188:23
**1202** [3] - 190:4, 208:25, 209:2
**1202(b** [1] - 208:25
**13** [3] - 25:12, 25:15, 26:11
**134** [3] - 28:3, 28:10, 28:19
**14** [1] - 188:23
**143,000** [1] - 93:18
**143,578.40** [2] - 93:1, 93:4
**15** [4] - 16:10, 104:8, 126:21, 197:14
**15,000** [1] - 170:6
**152** [1] - 30:1
**16** [25] - 118:17, 118:24, 126:21, 159:5, 159:7, 169:25, 178:7, 194:22, 195:4, 195:7, 195:24, 196:1, 196:2, 196:14, 197:7,

197:14, 197:21, 197:23, 197:24, 198:1, 198:4, 199:22, 199:23, 201:8
**1600-square-foot** [1] - 155:18
**17** [26] - 28:22, 40:12, 178:17, 178:20, 178:21, 178:22, 178:24, 179:6, 179:9, 179:12, 184:8, 184:10, 193:24, 195:19, 196:3, 196:9, 196:18, 196:23, 197:14, 198:25, 200:11, 200:23, 201:10, 201:17, 208:25
**18** [1] - 156:23
**18,000** [1] - 171:7
**19** [3] - 40:14, 59:19, 156:23
**19,000** [1] - 171:7
**1913** [1] - 43:13
**1973** [3] - 39:19, 40:20, 44:12
**1978** [3] - 39:15, 43:2, 43:10
**1979** [1] - 40:22
**1998** [3] - 139:17, 140:3, 140:4
**1:00** [1] - 102:3

## 2

**2** [8] - 94:11, 174:6, 174:21, 174:22, 176:11, 192:18, 192:21, 195:12
**2,000** [2] - 149:20, 150:18
**2,080** [3] - 93:3, 93:4, 93:17
**2.5** [1] - 193:2
**20** [5] - 58:9, 140:20, 156:22, 184:12, 194:13
**20,000** [1] - 207:24
**20-by-40** [1] - 155:19
**200** [2] - 94:18, 120:22
**200-dollar** [1] - 94:17
**2000** [10] - 110:7, 110:16, 110:17, 113:19, 113:24, 114:1, 114:12, 142:1, 143:6, 143:7
**2000s** [1] - 43:24
**2005** [2] - 114:13,

114:17
**2013** [2] - 115:11, 116:8
**2014** [11] - 74:13, 74:14, 74:24, 88:10, 91:20, 114:23, 116:8, 126:18, 130:2, 132:23, 156:22
**2015** [2] - 27:4, 28:23
**2016** [5] - 164:12, 184:12, 194:15, 196:8, 197:12
**2017** [1] - 40:16
**2018** [1] - 1:5
**209** [1] - 88:25
**210** [1] - 94:18
**210-ish** [1] - 88:25
**22** [2] - 59:19, 129:17
**22,000-dollar** [1] - 159:5
**23** [2] - 81:3, 129:17, 131:13
**237** [1] - 200:2
**237,000** [2] - 198:10, 199:23
**237-** [1] - 199:22
**24** [3] - 1:5, 59:18, 59:19
**246** [1] - 30:1
**25** [1] - 200:5
**25,000** [2] - 207:25, 208:1
**250-dollar** [1] - 32:1
**26** [9] - 47:2, 62:7, 62:11, 133:6, 199:20, 200:5, 200:6, 200:7, 200:23
**26:07** [1] - 129:17
**27** [4] - 199:20, 200:6, 200:7, 200:23
**28** [5] - 199:20, 200:6, 200:7, 200:23, 210:2
**2:15** [3] - 102:4, 105:22, 175:12
**2:20** [1] - 175:12

## 3

**3** [12] - 1:12, 9:15, 20:13, 71:8, 89:25, 142:8, 142:13, 170:23, 171:20, 173:15, 176:13, 176:20
**3,500** [1] - 88:24
**3,578** [1] - 88:24
**3,787.47** [1] - 94:14
**3-1** [1] - 1:13
**3-106** [1] - 2:16

**3-127** [1] - 2:17
**3-134** [1] - 2:17
**3-136** [2] - 2:18, 2:18
**3-138** [1] - 2:21
**3-16** [1] - 2:5
**3-211** [1] - 1:13
**3-25** [1] - 2:7
**3-29** [2] - 2:8, 2:9
**3-3** [1] - 2:5
**3-39** [1] - 2:11
**3-65** [1] - 2:12
**3-79** [1] - 2:13
**3-95** [1] - 2:14
**30** [5] - 15:14, 40:9, 140:20, 163:21, 175:18
**30,000** [1] - 69:20
**30-year** [1] - 39:15
**3000** [1] - 1:21
**31** [1] - 15:14
**31st** [1] - 82:21
**320** [1] - 155:23
**34** [2] - 162:20, 177:14
**34.51** [2] - 93:22, 94:13
**348** [1] - 1:21
**35** [2] - 88:24, 109:22
**3500** [2] - 1:16, 1:18
**37** [2] - 184:3, 184:20
**37(c** [2] - 178:16, 185:2
**37(c)** [1] - 185:3
**38** [1] - 162:20
**39** [1] - 175:6

## 4

**4** [5] - 28:15, 176:24, 177:11, 177:12, 177:13
**40** [9] - 40:9, 79:1, 79:4, 88:19, 93:2, 144:9, 163:2, 163:3, 163:21
**400** [1] - 155:24
**41** [3] - 24:6, 24:12, 94:5
**42** [1] - 155:12
**44** [3] - 130:4, 132:25, 133:10
**485** [2] - 185:7, 185:14
**4:10** [1] - 175:21
**4:30** [1] - 106:7

## 5

**5** [2] - 170:20, 177:25
**5,000** [1] - 112:8
**5,000-square-foot** [1] - 155:20

**5,725** [1] - 92:20
**50** [10] - 92:21, 120:20, 133:13, 133:16, 144:9, 163:2, 163:3, 163:21, 172:21, 173:8
**50-50** [1] - 87:8
**50-some-odd** [1] - 102:13
**500** [1] - 151:14
**504(b** [2] - 29:19, 31:21
**504(b)** [1] - 35:9
**52** [3] - 88:19, 93:2, 93:15

## 6

**6** [13] - 14:24, 15:3, 15:4, 15:10, 15:13, 129:22, 129:24, 131:15, 131:18, 132:17, 142:8, 142:13, 170:21
**6.2** [1] - 90:21
**60** [13] - 44:5, 53:12, 144:11, 155:11, 155:19, 161:9, 205:7, 205:10, 206:17, 206:18, 206:21, 207:9, 207:16
**65** [1] - 109:23
**685** [1] - 27:16
**69.03** [1] - 93:10

## 7

**7** [3] - 20:13, 31:1, 86:10
**7,576** [1] - 94:10
**70** [2] - 109:23, 144:11
**700** [1] - 151:14
**77010** [2] - 1:16, 1:19
**77027** [1] - 1:21

## 8

**8** [1] - 31:1
**8,250** [1] - 159:14
**80** [3] - 88:21, 93:15, 181:25
**800,000** [1] - 140:21

## 9

**9** [1] - 89:19
**9,735** [1] - 178:10
**90** [4] - 114:14, 155:11, 156:24,

161:9
**909** [2] - 1:16, 1:18
**99** [3] - 97:25, 98:10, 143:16

## A

**a.m** [1] - 193:18
**ability** [7] - 4:6, 82:16, 144:1, 152:9, 158:25, 182:2, 211:22
**able** [10] - 33:16, 49:2, 142:7, 151:9, 155:4, 173:4, 177:22, 191:4, 207:1, 210:5
**above-entitled** [1] - 211:22
**Abshire** [1] - 104:8
**absolute** [1] - 68:11
**absolutely** [5] - 81:20, 85:25, 94:24, 145:22, 189:16
**AC** [2] - 121:2, 171:12
**accept** [1] - 120:4
**acceptable** [1] - 98:12
**access** [2] - 7:18, 10:3
**according** [1] - 206:16
**accordingly** [1] - 122:7
**account** [13] - 83:3, 83:4, 83:8, 88:1, 91:10, 91:11, 91:14, 91:21, 174:10, 178:1, 178:6
**accountability** [1] - 160:4
**accountant** [5] - 83:15, 88:4, 91:4, 91:14, 172:4
**accountants** [1] - 172:4
**accounted** [2] - 15:7, 15:10
**accounting** [7] - 82:10, 82:12, 98:8, 169:23, 174:12, 176:9, 195:13
**accounts** [3] - 83:13, 91:10, 91:12
**accurate** [3] - 159:19, 172:23, 174:4
**accusing** [1] - 207:24
**achieving** [1] - 55:4
**acoustics** [1] - 42:12
**acquire** [1] - 145:1
**acquired** [1] - 68:1
**Act** [1] - 29:19
**acting** [2] - 129:25, 132:22

**actions** [1] - 67:10
**active** [1] - 42:4
**actual** [8] - 32:4, 36:11, 44:5, 91:11, 150:2, 155:14, 177:5, 177:18
**add** [6] - 7:25, 53:23, 83:14, 150:22, 154:4, 195:20
**added** [15] - 13:22, 15:4, 15:13, 15:15, 21:17, 40:17, 48:19, 90:8, 91:9, 92:25, 93:1, 96:9, 142:6, 148:5, 150:25
**addendum** [1] - 154:5
**addendums** [1] - 154:2
**adding** [1] - 14:13
**addition** [2] - 10:8, 209:13
**additional** [5] - 15:10, 41:19, 105:1, 173:3, 174:5
**address** [8] - 17:11, 29:6, 35:21, 50:7, 57:9, 72:2, 156:6, 178:5
**addressed** [2] - 35:5, 49:24
**adds** [1] - 82:25
**adequately** [1] - 157:6
**adjective** [3] - 19:10, 19:12, 19:13
**adjoin** [1] - 50:25
**adjourn** [1] - 175:15
**adjourning** [1] - 106:7
**admission** [2] - 27:18, 27:25
**Admission** [3] - 28:1, 28:8, 28:17
**Admit** [1] - 28:8
**admit** [8] - 27:21, 27:23, 28:1, 28:7, 28:16, 28:17, 28:24, 55:20
**admitted** [2] - 36:8, 184:13
**ads** [1] - 35:19
**advantage** [1] - 21:8
**advertising** [7] - 26:16, 27:1, 27:5, 35:16, 35:17, 91:6, 172:18
**aesthetics** [1] - 140:16
**affected** [1] - 148:11
**affirmed** [1] - 81:8
**afford** [1] - 52:15
**afternoon** [3] -

106:22, 191:23, 193:18
**age** [1] - 107:21
**agent** [2] - 170:23, 171:4
**aggressive** [1] - 145:9
**ago** [13] - 39:16, 72:15, 102:20, 104:8, 109:19, 113:8, 151:2, 198:23, 199:2, 206:18, 206:21, 207:9, 207:16
**agree** [14] - 21:23, 21:24, 63:11, 70:25, 73:10, 94:23, 102:9, 102:12, 102:21, 104:6, 105:13, 105:16, 118:14, 162:8
**agreed** [1] - 199:8
**agreement** [19] - 28:15, 87:8, 130:3, 130:19, 132:9, 132:25, 133:5, 133:9, 134:25, 135:7, 135:12, 137:8, 145:16, 151:25, 152:8, 157:16, 166:4, 199:7
**agreements** [1] - 154:22
**agrees** [1] - 103:18
**ahead** [9] - 3:3, 15:20, 25:6, 65:20, 79:10, 136:10, 176:1, 176:7, 186:19
**AI-10141** [1] - 77:21
**aided** [1] - 1:25
**air** [1] - 15:4
**air-condition** [1] - 15:4
**Airlines** [1] - 83:10
**alert** [1] - 106:1
**alike** [2] - 127:24, 128:2
**allege** [2] - 36:12, 209:16
**alleged** [2] - 63:10, 67:19
**alleging** [1] - 203:9
**allocations** [2] - 100:6, 100:18
**allow** [4] - 33:17, 50:13, 193:14, 202:7
**allows** [1] - 41:8
**almost** [13] - 12:25, 50:6, 101:9, 101:24, 114:14, 140:20, 143:16, 161:7,

163:2, 172:21, 181:25, 186:9, 191:3
**alter** [1] - 102:24
**altered** [7] - 11:5, 17:21, 22:1, 22:2, 203:11, 206:5, 206:8
**altering** [1] - 210:8
**alternative** [1] - 103:5
**amalgamated** [1] - 58:2
**amazing** [1] - 110:1
**Amended** [1] - 130:4
**amended** [8] - 25:14, 27:25, 28:3, 28:10, 28:19, 129:22, 132:2, 133:10
**America** [2] - 53:10, 148:17
**American** [6] - 30:13, 31:9, 31:14, 40:4, 43:25, 77:23
**amicable** [1] - 148:25
**amount** [13] - 32:2, 101:4, 104:4, 147:5, 152:22, 159:9, 171:17, 172:18, 175:2, 176:23, 177:6, 177:24, 178:6
**analysis** [4] - 17:20, 55:18, 145:7, 178:12
**ancillary** [1] - 50:6
**AND** [1] - 1:11
**and..** [1] - 125:4
**Andy** [1] - 27:6
**anecdotally** [1] - 72:11
**ANGELA** [2] - 2:13, 79:18
**Angela** [2] - 79:15, 80:2
**angle** [1] - 168:3
**angled** [2] - 6:8, 7:2
**annual** [1] - 172:24
**answer** [28] - 22:20, 25:12, 25:14, 26:17, 27:1, 28:3, 28:10, 28:19, 32:6, 33:16, 61:3, 70:7, 94:15, 96:7, 112:4, 128:19, 129:21, 130:11, 130:12, 131:17, 131:19, 132:14, 133:11, 137:9, 137:13, 137:25, 149:3, 164:2
**answered** [1] - 121:4
**answers** [1] - 129:23
**anticipate** [1] - 106:2
**Antonio** [1] - 40:24
**apologize** [4] -

147:16, 159:13,
163:25, 169:19
**appeal** [1] - 81:6
**Appeals** [3] - 80:17,
81:6, 81:12
**appeals** [1] - 80:24
**appear** [7] - 19:20,
46:16, 177:3, 177:5,
178:7, 200:11,
200:12
**appeared** [2] - 68:22,
153:15
**appellate** [3] - 32:23,
80:11, 80:20
**applicable** [1] - 96:20
**application** [2] -
34:21, 59:3
**approach** [4] - 142:18,
146:5, 164:19,
189:18
**appropriate** [3] -
17:22, 45:12, 76:17
**approve** [1] - 76:21
**approved** [3] - 158:1,
158:7, 158:13
**April** [1] - 91:20
**arbitrary** [5] - 54:4,
54:6, 54:12, 54:22
**arch** [1] - 48:13
**Architect** [3] - 22:12,
22:13, 55:21
**architect** [24] - 20:16,
21:7, 39:20, 41:11,
69:9, 70:11, 71:4,
74:15, 77:20, 78:7,
109:4, 111:15,
111:18, 111:22,
112:1, 112:9,
145:24, 153:11,
156:13, 181:7,
181:10, 181:14,
182:21, 183:9
**architect's** [4] - 12:21,
75:13, 75:17, 169:4
**Architect's** [6] - 83:25,
96:4, 124:20,
136:16, 136:20,
186:24
**architects** [9] - 43:17,
45:8, 52:13, 69:2,
76:1, 111:11, 112:3,
152:14, 152:15
**ARCHITECTS** [1] - 1:6
**Architects** [60] - 7:17,
17:7, 19:2, 19:20,
27:8, 35:3, 40:5,
43:25, 56:12, 58:10,
58:14, 59:8, 62:23,
63:16, 64:11, 80:3,
81:24, 82:7, 82:14,

82:15, 83:17, 83:22,
84:6, 84:10, 84:16,
85:23, 86:1, 86:4,
86:13, 86:20, 86:22,
87:1, 87:5, 88:9,
92:19, 95:20, 98:17,
99:1, 101:16,
107:14, 110:23,
111:7, 112:24,
113:13, 114:5,
114:7, 115:8, 115:9,
115:16, 116:10,
118:14, 118:25,
119:7, 120:18,
126:19, 126:24,
129:23, 152:16,
152:18, 153:17
**Architects'** [4] - 64:19,
101:7, 114:18,
134:23
**architectural** [15] -
8:20, 9:3, 9:5, 12:17,
12:23, 44:8, 69:10,
76:13, 108:5, 115:2,
158:10, 158:14,
180:5, 183:1, 188:17
**Architectural** [1] -
40:2
**architecture** [30] -
39:14, 40:22, 41:4,
41:6, 41:16, 42:2,
42:8, 42:10, 45:13,
45:19, 46:3, 46:7,
52:6, 54:5, 55:5,
55:8, 55:13, 55:14,
69:19, 70:3, 76:5,
76:16, 107:12,
107:22, 108:7,
108:10, 108:21,
182:19
**area** [10] - 4:15, 4:23,
13:21, 15:7, 15:15,
42:7, 42:16, 50:11,
57:3
**areas** [4] - 51:13,
58:25, 144:7, 186:10
**argue** [3] - 77:8,
190:14, 210:25
**argues** [1] - 31:18
**argument** [6] - 31:17,
32:1, 32:6, 32:11,
34:1, 35:5
**Arizona** [1] - 42:25
**arrangement** [14] -
3:20, 3:22, 6:5, 8:21,
9:6, 49:20, 50:15,
50:16, 53:21, 54:12,
54:13, 54:18, 87:6,
151:10
**arrangements** [2] -

51:17, 54:21
**arrive** [3] - 4:17,
175:8, 192:20
**arrived** [4] - 10:6,
54:17, 151:24, 173:5
**art** [1] - 11:1, 69:14
**article** [4] - 98:1, 98:5,
99:13, 100:23
**articles** [1] - 34:24
**asbestos** [1] - 154:11
**aspect** [4] - 9:8, 30:24,
31:12, 80:13
**aspiring** [1] - 76:1
**asserting** [1] - 33:3
**Associates** [14] -
17:10, 19:2, 47:5,
58:15, 60:24, 64:18,
68:2, 72:5, 117:18,
117:23, 120:15,
128:14, 133:8,
151:11
**ASSOCIATES** [1] - 1:3
**Associates'** [5] -
25:13, 45:4, 47:12,
47:16, 63:13
**assume** [7] - 8:18,
29:11, 60:22, 99:22,
100:2, 100:3, 100:9
**assumption** [4] - 8:17,
8:22, 60:14, 60:20
**asterisk** [1] - 89:25
**attempted** [1] - 33:1
**attention** [7] - 18:24,
30:23, 48:22,
121:11, 121:17,
126:4, 131:15
**attics** [1] - 52:22
**attorney** [5] - 81:22,
105:2, 147:24,
154:3, 161:16
**Attorney** [1] - 1:15
**attorneys** [3] - 154:1,
163:18, 193:10
**attractive** [1] - 53:12
**attributable** [2] -
31:23, 37:20
**audit** [3] - 163:19,
164:15, 165:3
**August** [2] - 1:5, 27:4
**authentic** [1] - 53:10
**authentically** [1] -
55:4
**author** [1] - 72:1
**authorship** [1] - 98:11
**autoCAD** [2] - 116:20,
116:24
**AutoCAD** [4] - 116:25,
128:9, 130:20,
134:24
**automatically** [2] -

12:8, 35:8
**automobile** [1] - 91:6
**available** [5] - 28:6,
28:13, 28:22,
189:15, 207:19
**averaged** [1] - 140:20
**averages** [1] - 27:16
**Aviv** [1] - 160:10
**avoid** [1] - 187:15
**avoided** [1] - 166:2
**award** [2] - 43:6, 44:1
**awards** [3] - 40:6,
43:7, 44:2
**awkward** [1] - 8:13

## B

**bachelor** [1] - 40:21
**bachelor's** [2] -
107:12, 108:21
**Bachman** [6] - 39:3,
39:7, 39:13, 41:22,
62:14, 65:23
**BACHMAN** [2] - 2:10,
39:4
**back-and-forth** [1] -
156:11
**background** [5] -
55:13, 139:6, 146:1,
167:13, 169:12
**backlog** [1] - 157:7
**backup** [8] - 184:3,
184:11, 195:15,
195:16, 195:22,
197:17, 207:15,
207:19
**backwoods** [1] - 42:4
**backyard** [5] - 4:13,
6:15, 20:17, 53:6,
108:2
**bad** [2] - 109:1, 146:6
**balconies** [1] - 57:4
**balcony** [14] - 13:22,
14:6, 14:8, 14:12,
14:13, 14:19, 14:21,
15:14, 22:21, 22:22,
23:17, 57:6, 57:25,
58:2
**balloons** [1] - 145:12
**bank** [4] - 91:11,
178:1, 178:3, 178:6
**banker** [1] - 147:24
**barbecue** [1] - 53:7
**base** [3] - 24:7, 52:17,
155:15
**Based** [1] - 100:23
**based** [16] - 18:8,
24:15, 24:17, 36:3,
52:7, 69:6, 70:25,
73:1, 100:6, 147:19,

150:11, 155:23,
166:25, 169:13,
170:14, 193:6
**basement** [1] - 52:21
**basic** [2] - 6:25,
188:19
**basis** [1] - 172:24
**Bates** [1] - 185:6
**Bates-labeled** [1] -
185:6
**bath** [5] - 5:21, 6:5,
6:16, 10:25, 51:13
**bathroom** [6] - 6:10,
167:12, 168:21,
168:24, 169:15,
169:17
**bathrooms** [2] -
10:25, 188:20
**battle** [1] - 80:20
**bay** [1] - 58:18
**Bayou** [1] - 109:25
**beans** [1] - 69:17
**bear** [1] - 11:7
**beating** [1] - 180:8
**beautiful** [1] - 146:12
**become** [2] - 41:10,
144:5
**becomes** [1] - 9:20
**bedroom** [12] - 7:17,
7:18, 8:4, 9:14, 9:15,
51:11, 52:1, 58:24,
167:7, 168:16,
169:18, 188:23
**bedrooms** [1] - 188:20
**BEFORE** [1] - 1:11
**began** [7] - 39:18,
40:19, 43:14, 116:5,
140:2, 140:4, 154:22
**begin** [7] - 44:12,
107:4, 115:10,
121:12, 140:8,
169:24, 199:20
**beginning** [4] - 55:24,
148:3, 149:17, 156:9
**begins** [1] - 121:18
**behalf** [2] - 130:1,
132:22
**behind** [1] - 125:25
**belief** [1] - 127:12
**Bellaire** [1] - 152:23
**below** [7] - 4:14, 4:23,
5:1, 7:13, 14:19,
14:21, 58:23
**benefits** [1] - 44:7
**best** [6] - 108:10,
145:4, 156:1, 204:4,
210:15, 211:22
**Best** [1] - 139:23
**better** [6] - 30:10,
49:4, 57:7, 144:5,

144:6, 148:18
**between** [20] - 3:13, 7:10, 23:2, 34:4, 38:1, 42:17, 44:7, 45:1, 54:1, 55:3, 63:19, 111:21, 112:3, 115:7, 128:13, 141:17, 142:1, 177:9, 188:16, 210:21
**big** [7] - 20:23, 54:3, 109:11, 109:14, 120:23, 150:8, 161:22
**bigger** [5] - 6:10, 9:15, 54:2, 90:1
**Bill** [10] - 61:20, 62:1, 62:5, 62:9, 62:18, 181:11, 181:12, 181:14, 181:16, 181:20
**bills** [2] - 82:5, 82:6
**Bindal** [3] - 85:8, 85:21, 162:3
**binder** [3] - 46:24, 64:1, 182:20
**birthday** [1] - 39:15
**bit** [12] - 4:11, 7:6, 8:13, 32:8, 105:11, 139:9, 144:12, 148:22, 156:15, 157:25, 176:3
**Black's** [2] - 92:9, 92:10
**blend** [1] - 61:8
**block** [2] - 12:21, 155:15
**block-lettering** [1] - 12:21
**blocks** [3] - 116:21, 117:10, 124:20
**blow** [1] - 15:1
**board** [1] - 40:1
**bogged** [1] - 186:8
**BONHAM** [50] - 25:3, 25:7, 25:9, 25:18, 25:21, 26:7, 26:9, 27:24, 85:1, 85:9, 85:12, 95:9, 95:11, 95:14, 95:18, 101:19, 102:18, 103:25, 104:3, 104:10, 104:17, 127:16, 127:18, 129:16, 130:9, 130:18, 131:2, 131:6, 131:10, 132:9, 133:23, 134:9, 134:18, 135:2, 135:4,

135:16, 135:21, 136:10, 138:3, 189:25, 190:11, 190:18, 204:8, 204:11, 204:15, 204:18, 204:20, 204:23, 207:13, 207:22
**Bonham** [19] - 1:17, 2:14, 2:17, 2:18, 2:18, 94:19, 95:2, 95:15, 97:3, 127:20, 129:20, 130:10, 130:24, 131:12, 134:2, 136:2, 136:23, 186:23, 205:22
**book** [2] - 40:8, 43:10
**bookkeeper** [3] - 82:7, 82:9, 88:5
**bookkeepers** [1] - 172:5
**books** [5] - 40:11, 82:4, 82:8, 172:2, 193:19
**bore** [3] - 155:21, 158:20, 171:11
**boss** [1] - 120:6
**bottom** [10] - 19:21, 22:8, 57:4, 57:15, 122:6, 167:4, 174:17, 204:20, 205:23, 211:6
**bought** [1] - 43:13
**bound** [1] - 69:20
**boundaries** [2] - 9:18, 59:13
**bow** [1] - 58:18
**box** [3] - 46:10, 109:8, 155:19
**boxes** [1] - 182:1
**brand** [1] - 154:14
**break** [11] - 29:9, 29:12, 38:14, 38:17, 101:25, 102:3, 123:25, 175:16, 176:6, 186:12, 210:21
**breakdown** [3] - 36:23, 37:1, 91:19
**breakfast** [6] - 23:4, 23:18, 23:22, 57:1, 58:1, 58:2
**breakfast...** [1] - 23:11
**breaks** [2] - 148:14, 206:5
**bridge** [2] - 42:17, 151:20
**brief** [3] - 29:5, 31:3, 95:3

**Brief** [2] - 38:22, 175:23
**briefly** [2] - 17:23, 144:14
**bring** [8] - 46:21, 86:6, 126:4, 133:19, 133:23, 134:9, 142:11, 177:19
**bringing** [4] - 86:7, 146:2, 150:1, 154:20
**brochure** [2] - 182:1, 183:17
**brochures** [4] - 172:17, 181:25, 182:1, 188:25
**broke** [1] - 3:14
**broken** [1] - 174:15
**brokerage** [1] - 172:15
**brought** [4] - 35:24, 114:10, 151:1, 155:7
**BRUCE** [2] - 211:20, 211:24
**Bruce** [3] - 1:22, 191:17, 194:16
**brutal** [1] - 107:16
**buck** [1] - 120:7
**Buffalo** [1] - 109:25
**bug** [1] - 143:23
**build** [14] - 19:24, 20:22, 55:6, 62:25, 69:14, 104:20, 108:1, 108:2, 120:14, 151:18, 158:23, 158:25, 159:1, 161:8
**buildable** [1] - 59:14
**builder** [22] - 11:11, 85:5, 85:24, 86:12, 109:10, 109:13, 113:1, 120:18, 122:23, 123:16, 142:24, 146:24, 147:22, 149:13, 150:15, 157:11, 159:8, 160:12, 162:2, 165:16, 181:3, 181:5
**builder's** [1] - 113:16
**builders** [7] - 43:17, 115:9, 115:23, 116:11, 123:19, 127:1, 183:12
**building** [11] - 8:20, 15:8, 20:23, 38:3, 42:16, 50:2, 55:11, 57:5, 114:25, 120:13, 183:6
**Building** [3] - 40:1, 41:23, 77:23
**buildings** [2] - 26:14,

42:14
**built** [17] - 10:22, 10:24, 18:7, 18:8, 18:12, 53:12, 78:1, 79:3, 108:3, 110:1, 145:2, 151:23, 157:20, 158:15, 170:13, 180:9
**built-in** [1] - 10:24
**built-ins** [2] - 10:22
**bump** [1] - 57:13
**bunch** [4] - 109:11, 123:10, 158:21, 188:22
**burden** [15] - 29:8, 29:20, 29:21, 30:6, 31:21, 32:13, 32:23, 33:22, 37:2, 37:4, 37:6, 37:17, 38:6, 103:1
**burn** [1] - 151:20
**busiest** [1] - 156:23
**business** [37] - 33:10, 43:14, 68:12, 82:3, 87:25, 95:21, 96:4, 96:22, 100:2, 101:10, 114:21, 126:22, 139:6, 139:20, 140:25, 141:11, 143:10, 143:16, 144:12, 144:25, 146:15, 146:16, 146:19, 147:6, 147:25, 148:2, 148:9, 148:11, 148:12, 148:16, 151:8, 153:8, 153:11, 155:10, 157:6, 175:5, 182:13
**businessman** [1] - 144:5
**busy** [5] - 115:25, 126:17, 126:19, 156:19, 157:1
**but...** [3] - 21:21, 112:5, 116:4
**buy** [2] - 120:11, 142:19
**buyer** [5] - 142:6, 142:24, 170:25, 171:5, 177:19
**buyers** [1] - 143:13
**buying** [1] - 43:15
**BY** [2] - 39:4, 79:18

---

### C

**cabinet** [1] - 13:1
**cabinetry** [1] - 10:22

**cabinets** [2] - 10:19, 167:24
**CAD** [10] - 14:12, 67:4, 67:23, 72:7, 74:25, 75:1, 75:9, 75:14, 133:16, 134:14
**calculate** [6] - 88:4, 93:13, 97:19, 98:4, 198:8, 198:12
**calculated** [2] - 88:18, 100:24
**calculates** [2] - 87:20, 166:7
**calculation** [10] - 84:2, 88:12, 91:25, 92:13, 92:23, 93:7, 93:12, 93:14, 177:4, 198:13
**calculations** [5] - 95:24, 97:4, 98:16, 98:22, 185:21
**calculator** [3] - 88:25, 94:15, 159:12
**CALLED** [2] - 39:4, 79:18
**camera** [2] - 64:4, 129:19
**CAMERON** [6] - 1:6, 1:7, 2:13, 2:15, 79:18, 106:19
**Cameron** [138] - 3:13, 3:24, 7:16, 9:24, 11:2, 11:19, 11:22, 13:4, 13:9, 13:18, 13:22, 14:21, 15:2, 15:12, 17:6, 17:9, 19:2, 19:20, 20:3, 20:8, 22:12, 22:13, 27:8, 37:14, 55:21, 56:12, 56:20, 58:10, 58:14, 59:8, 62:23, 63:16, 64:11, 64:19, 66:7, 66:10, 66:11, 66:15, 67:4, 68:19, 70:20, 70:25, 72:18, 73:7, 73:10, 74:14, 76:10, 76:18, 76:21, 79:16, 79:25, 80:2, 80:3, 80:4, 81:23, 82:7, 82:14, 82:15, 83:17, 83:22, 83:25, 84:6, 84:10, 84:15, 84:18, 85:23, 86:1, 86:4, 86:13, 86:20, 86:22, 87:1, 87:5, 88:9, 92:19, 94:19, 95:3, 95:20, 96:4, 98:17, 99:1, 99:8, 99:12, 99:20, 100:3, 100:9, 101:7, 101:16, 106:16,

106:17, 106:22,
110:23, 111:7,
112:24, 113:13,
114:5, 114:7,
114:18, 115:8,
115:9, 115:16,
116:9, 118:14,
118:25, 119:7,
120:18, 124:19,
126:19, 126:24,
127:13, 127:21,
129:23, 134:5,
134:23, 136:16,
136:20, 150:7,
152:15, 152:18,
153:16, 154:7,
154:8, 154:19,
157:10, 159:4,
162:6, 162:25,
165:17, 165:23,
170:14, 186:23,
186:24, 187:6
**Cameron's** [4] - 12:9,
66:20, 67:19, 187:23
**Campbell** [1] - 69:16
**can..** [1] - 87:21
**cannot** [3] - 50:22,
98:11, 191:8
**cans** [1] - 189:21
**cantilevered** [1] -
19:25
**capture** [2] - 53:5,
58:19
**car** [4] - 109:21,
142:19, 142:20,
172:14
**card** [3] - 83:3, 83:10,
91:10
**care** [2] - 21:7, 148:19
**careful** [1] - 46:17
**carefully** [2] - 49:16,
178:9
**carpet** [1] - 183:5
**carrying** [1] - 7:8
**case** [56] - 4:14, 7:16,
8:19, 9:2, 10:22,
11:7, 24:2, 25:5,
25:24, 26:5, 27:21,
29:3, 29:7, 29:9,
29:24, 29:25, 30:12,
30:15, 30:21, 31:4,
34:5, 34:10, 34:15,
34:21, 34:22, 35:6,
35:10, 35:12, 35:15,
36:23, 37:24, 38:2,
41:13, 44:19, 44:22,
47:4, 47:10, 58:21,
70:11, 89:9, 102:25,
104:8, 106:25,
163:24, 178:13,

189:15, 191:4,
193:17, 200:17,
200:18, 200:19,
203:24, 205:14,
205:21, 208:24
**cases** [3] - 7:13,
16:17, 35:14
**cash** [1] - 177:18
**Cash"** [1] - 83:11
**catches** [1] - 49:8
**categories** [5] - 83:1,
83:14, 88:10, 91:24,
96:9
**caught** [2] - 18:24,
19:16
**causal** [3] - 35:8,
35:21, 36:19
**caused** [1] - 113:9
**causes** [1] - 65:9
**cc'd** [2] - 133:20,
134:3
**ceiling** [3] - 4:21, 4:24,
5:1
**Center's** [1] - 40:2
**central** [1] - 42:10
**cents** [1] - 94:5
**cert** [1] - 30:15
**certain** [5] - 22:3,
45:9, 105:14,
148:11, 154:5
**certainly** [2] - 59:3,
69:3
**CERTIFICATE** [1] -
211:19
**certify** [1] - 211:20
**Chad** [7] - 111:6,
111:14, 111:15,
119:17, 124:4,
124:8, 124:10
**chain** [2] - 122:5,
206:5
**chains** [3] - 139:22,
139:24
**chair** [1] - 139:12
**chance** [1] - 190:6
**chandelier** [1] - 168:5
**change** [16] - 12:7,
12:8, 14:15, 14:16,
21:11, 22:6, 22:18,
57:23, 94:17,
111:25, 113:7,
113:10, 120:1,
165:16, 171:7,
207:15
**changed** [8] - 7:10,
119:22, 119:25,
123:13, 127:9,
127:10, 143:7,
156:17
**changes** [24] - 9:7,

9:8, 9:21, 11:19,
13:9, 21:15, 57:17,
58:12, 67:7, 67:24,
112:13, 116:7,
119:20, 119:22,
123:23, 124:1,
124:3, 124:22,
124:24, 125:4,
157:9, 157:12, 160:6
**changing** [2] - 10:4,
104:20
**Chapter** [1] - 155:12
**character** [1] - 22:1
**characteristic** [2] -
120:24, 121:5
**characterize** [3] -
21:3, 73:15, 73:17
**charge** [11] - 27:10,
38:8, 92:8, 102:8,
102:22, 104:1,
104:7, 105:3, 119:1,
152:4, 210:15
**charts** [1] - 173:3
**chase** [1] - 121:2
**Chase** [6] - 83:8,
91:14, 91:19, 178:3,
178:9
**Chase"** [1] - 83:9
**cheated** [1] - 120:12
**cheating** [1] - 165:25
**check** [15] - 82:13,
86:12, 86:14, 91:15,
92:20, 142:8,
160:20, 175:20,
176:15, 176:25,
177:1, 177:5,
178:24, 198:18,
205:6
**checked** [1] - 125:13
**checking** [4] - 83:3,
83:4, 91:11, 125:8
**checking-type** [1] -
91:11
**checks** [9] - 82:4,
173:18, 176:20,
176:24, 177:3,
177:7, 177:23,
194:9, 196:6
**chime** [1] - 105:4
**choice** [2] - 54:22,
100:23
**choices** [1] - 54:22
**chooses** [1] - 169:8
**choosing** [1] - 199:3
**chose** [1] - 99:5
**Chronicle** [5] - 98:1,
98:6, 98:9, 98:10,
100:24
**chronology** [3] -
67:17, 67:18, 67:21

**Circuit** [5] - 30:1, 35:1,
35:14, 80:17, 103:2
**circuit** [4] - 30:18,
30:22, 31:16, 34:22
**circular** [1] - 48:10
**Circular** [2] - 24:6,
24:12
**city** [5] - 140:12,
141:6, 143:18,
143:19
**City** [7] - 92:9, 158:6,
158:12, 158:13,
158:15, 158:21,
161:10
**civil** [7] - 29:7, 81:21,
154:9, 157:5, 158:9,
180:6, 183:1
**claim** [5] - 33:20,
35:16, 36:4, 203:8,
206:1
**claiming** [2] - 47:11,
88:23
**claims** [1] - 3:14
**clarify** [3] - 117:12,
153:19, 180:16
**clarity** [1] - 62:3
**classes** [1] - 75:25
**classify** [2] - 42:9,
144:22
**clean** [3] - 53:22,
88:16, 105:4
**clear** [8] - 29:24,
32:24, 54:8, 55:24,
68:15, 120:3,
182:16, 187:19
**clearest** [1] - 35:2
**clearly** [2] - 75:18,
153:20
**clever** [1] - 54:25
**click** [2] - 205:25,
210:4
**client** [17] - 9:12, 33:7,
38:2, 38:3, 52:17,
61:25, 110:15,
156:7, 195:21,
199:6, 201:22,
202:4, 202:17,
206:1, 206:3,
207:20, 210:4
**client's** [2] - 198:21,
204:18
**clients** [7] - 6:3, 105:5,
114:10, 116:7,
119:24, 120:18,
151:19
**clock** [3] - 210:13,
211:9, 211:10
**close** [6] - 6:23, 20:23,
65:6, 103:21, 119:2,
164:12, 172:18,

196:10, 196:13
**closer** [2] - 6:24,
193:1
**closest** [1] - 105:3
**closet** [7] - 5:7, 5:18,
5:21, 7:3, 14:23,
51:13, 168:22
**closing** [3] - 177:15,
177:20, 197:6
**closings** [5] - 174:23,
176:10, 197:8,
197:14
**clue** [1] - 84:25
**CM** [1] - 211:24
**CMR** [1] - 1:22
**co** [1] - 170:18
**co-op** [1] - 170:18
**code** [7] - 42:13,
57:12, 119:21,
119:22, 125:15,
155:13, 155:16
**colleagues** [2] -
80:24, 81:12
**collect** [4] - 101:4,
101:6, 101:8, 101:17
**collection** [1] - 41:25
**college** [5] - 40:24,
42:11, 117:24,
128:6, 128:24
**Colorado** [3] - 30:13,
31:8, 34:22
**colored** [1] - 172:17
**column** [6] - 83:7,
89:24, 91:22, 92:11,
170:16, 171:24
**columns** [3] - 83:12,
91:9, 200:11
**combination** [1] - 9:5
**combined** [1] - 60:7
**Comerica** [1] - 91:15
**comfortable** [2] -
74:6, 139:14
**coming** [12] - 4:17,
7:13, 7:14, 23:17,
25:10, 40:9, 59:7,
125:4, 136:16,
144:11, 156:18,
178:6
**comment** [1] - 65:13
**comments** [1] - 64:15
**commercial** [4] - 40:7,
112:8, 152:21,
152:25
**Commission** [2] -
177:9
**commission** [20] -
32:2, 141:19, 142:7,
142:12, 142:13,
148:5, 170:24,
171:8, 171:17,

171:22, 171:23, 172:22, 173:16, 173:24, 176:23, 177:6, 177:23, 192:22, 192:23, 201:6
**commissions** [15] - 36:3, 36:8, 36:11, 148:14, 170:17, 170:20, 173:10, 175:4, 195:12, 199:6, 199:8, 199:25, 200:8, 200:10
**committee** [2] - 43:24, 44:4
**Committee** [1] - 44:1
**communication** [11] - 122:5, 122:11, 129:25, 132:5, 132:6, 132:12, 132:16, 132:18, 132:21, 133:4, 137:7
**communications** [3] - 132:10, 133:8, 137:10
**companies** [2] - 142:22, 171:10
**company** [13] - 79:3, 110:7, 114:3, 114:8, 148:17, 149:13, 154:18, 158:25, 160:17, 171:9, 177:17, 177:22
**compare** [8] - 10:9, 12:1, 13:3, 55:21, 61:16, 63:9, 63:15, 127:4
**compared** [4] - 4:2, 13:6, 66:6, 66:20
**comparing** [5] - 10:8, 60:10, 64:19, 66:25
**comparison** [2] - 3:13, 13:12
**compartment** [2] - 5:16, 6:9
**competing** [1] - 153:7
**compiled** [1] - 83:25
**Complaint** [1] - 130:4
**complaint** [1] - 132:2
**complete** [2] - 176:4, 180:5
**completed** [1] - 153:4
**completely** [2] - 174:7, 177:21
**completes** [2] - 29:3, 29:8
**components** [5] - 5:23, 6:16, 11:3, 49:22, 54:20

**composition** [1] - 8:21
**compress** [1] - 150:15
**comprised** [1] - 49:21
**computer** [20] - 1:25, 3:6, 3:7, 12:7, 12:9, 12:20, 15:22, 38:12, 39:9, 67:6, 68:5, 82:20, 117:1, 117:2, 118:9, 131:3, 131:5, 186:25, 194:7
**computer-aided** [1] - 1:25
**computers** [4] - 117:11, 117:14, 194:5
**concede** [1] - 67:16
**conceived** [1] - 59:1
**concept** [4] - 23:4, 23:5, 23:9, 84:22
**concept"** [1] - 23:6
**concepts** [1] - 113:23
**concerning** [3] - 130:2, 132:24, 202:22
**concerns** [1] - 130:18
**concise** [2] - 52:20, 61:14
**concluded** [1] - 66:21
**conclusion** [1] - 11:9
**condition** [2] - 6:22, 15:4
**confer** [2] - 105:11, 202:4
**conference** [2] - 38:8, 102:23
**conferences** [2] - 40:10, 104:1
**configuration** [1] - 6:14
**configurations** [2] - 5:22, 59:3
**configured** [1] - 59:23
**conflict** [1] - 153:10
**confuse** [1] - 66:4
**confused** [3] - 63:24, 66:4, 74:17
**confusing** [1] - 63:24
**confusion** [1] - 81:17
**conjecture** [1] - 75:4
**connect** [1] - 181:7
**connection** [9] - 30:11, 31:15, 32:14, 33:19, 35:8, 35:21, 36:20, 37:25, 131:3
**consider** [1] - 108:14
**consistent** [4] - 69:8, 69:10, 71:3, 204:25
**consortium** [1] - 40:2
**constantly** [1] - 69:22
**constituent** [1] - 60:23

**constrained** [1] - 59:9
**constraints** [1] - 51:6
**construct** [2] - 47:11, 55:22
**constructed** [1] - 26:14
**construction** [6] - 21:10, 32:4, 48:14, 50:13, 141:15, 144:10
**consult** [1] - 124:10
**consultant** [5] - 43:18, 43:19, 171:13, 171:16, 176:22
**consultants** [2] - 27:10, 27:14
**consulting** [1] - 39:20
**consumer** [3] - 142:24, 145:6, 169:13
**contact** [2] - 123:20, 161:13
**contain** [1] - 203:21
**contemporary** [1] - 145:4
**contend** [1] - 203:22
**contending** [1] - 95:24
**contention** [1] - 206:9
**context** [5] - 32:2, 62:6, 69:14, 70:11, 192:9
**continue** [3] - 51:7, 58:5, 92:11
**CONTINUED** [2] - 3:8, 136:11
**continued** [1] - 114:10
**Continued** [1] - 2:5
**continues** [1] - 58:22
**continuity** [1] - 176:6
**continuous** [1] - 71:5
**contract** [7] - 86:24, 101:14, 118:22, 128:13, 129:4, 142:9, 171:19
**contracts** [5] - 152:5, 153:21, 153:22, 153:24, 154:1
**contrary** [1] - 209:22
**convenience** [1] - 54:9
**convenient** [1] - 53:22
**convention** [2] - 54:9, 54:16
**conventional** [1] - 51:22
**conversation** [11] - 67:15, 116:8, 130:17, 134:25, 135:6, 135:9, 136:15, 136:17,

159:23, 187:2, 187:5
**conversational** [2] - 73:13, 73:23
**conversations** [4] - 67:10, 116:14, 129:9, 137:16
**converse** [1] - 70:19
**cool** [1] - 211:7
**cooling** [1] - 42:12
**Cooper** [1] - 15:1
**coordinate** [1] - 122:7
**coordination** [1] - 140:22
**coordinator** [3] - 40:6, 176:15, 176:16
**copied** [10] - 3:24, 11:6, 11:14, 16:25, 34:20, 66:22, 74:1, 74:3, 134:14, 160:5
**copies** [8] - 103:19, 103:22, 104:17, 104:21, 105:1, 183:12, 195:25, 210:25
**copy** [19] - 11:12, 11:17, 14:12, 61:10, 66:24, 68:4, 73:9, 74:7, 74:25, 75:9, 75:14, 76:2, 103:19, 185:13, 194:21, 194:24, 194:25, 199:18
**copying** [3] - 60:23, 61:6, 74:14
**copyright** [29] - 28:14, 30:24, 31:12, 31:23, 32:13, 32:14, 34:4, 83:18, 104:6, 161:20, 189:2, 189:16, 190:1, 190:3, 190:8, 190:17, 203:10, 203:16, 203:22, 204:21, 205:24, 206:4, 206:8, 207:8, 208:4, 208:13, 209:3, 210:6, 210:8
**Copyright** [2] - 24:5, 29:19
**copyrighted** [2] - 37:20, 203:10
**corner** [4] - 5:6, 13:25, 57:1, 65:14
**corners** [1] - 48:9
**cornices** [1] - 48:12
**correct** [70] - 22:16, 27:23, 56:16, 65:4, 66:17, 73:21, 83:24, 89:3, 92:24, 93:23, 96:4, 96:5, 96:16,

98:21, 99:4, 99:6, 100:1, 100:4, 100:5, 100:8, 100:17, 101:5, 101:6, 101:13, 101:17, 101:18, 105:20, 121:21, 121:24, 122:2, 128:11, 131:21, 132:17, 134:14, 136:18, 140:5, 151:5, 152:17, 158:16, 159:15, 167:2, 167:9, 167:19, 168:6, 168:8, 168:25, 169:7, 170:12, 170:15, 171:2, 174:4, 174:20, 175:12, 177:2, 177:8, 177:10, 178:8, 181:6, 181:13, 183:7, 183:21, 183:24, 185:5, 185:19, 187:22, 195:4, 197:14, 197:18, 200:17, 211:21
**correction** [1] - 93:11
**correctly** [5] - 54:15, 56:17, 78:9, 78:21, 97:7
**corridor** [1] - 7:24
**cost** [7] - 20:21, 21:1, 21:10, 89:10, 149:23, 173:25, 192:9
**costs** [9] - 89:8, 89:9, 90:23, 90:24, 92:14, 93:7, 93:10, 171:25, 173:23
**costs"** [1] - 98:20
**counsel** [5] - 33:1, 37:23, 38:10, 84:19, 165:14
**count** [1] - 43:23
**counterclaim** [3] - 28:3, 28:10, 28:19
**countertops** [1] - 169:3
**countries** [1] - 144:1
**country** [2] - 76:17, 139:22
**counts** [1] - 207:6
**couple** [13] - 18:23, 19:23, 45:7, 67:6, 84:22, 103:7, 107:15, 119:22, 119:25, 127:2, 135:23, 186:10,

193:14
**course** [10] - 22:2, 74:10, 74:11, 95:20, 96:4, 96:22, 108:8, 163:16, 177:2, 204:24
**Court** [20] - 1:22, 8:18, 27:19, 30:16, 34:19, 35:11, 35:20, 69:5, 80:17, 81:6, 81:12, 185:13, 185:19, 190:15, 193:7, 194:12, 198:3, 201:8, 210:3
**court** [11] - 11:25, 32:9, 32:22, 32:23, 80:24, 80:25, 81:1, 81:4, 103:12, 139:1, 191:18
**Court's** [4] - 30:23, 32:5, 189:13, 199:7
**Court..** [1] - 195:20
**courthouse** [1] - 81:3
**courtroom** [4] - 17:5, 78:12, 80:12, 85:22
**cousins** [1] - 65:10
**cranked** [1] - 109:12
**cranking** [1] - 126:22
**create** [10] - 27:9, 47:17, 78:19, 79:5, 87:11, 98:3, 98:4, 112:16, 112:24, 113:18
**created** [18] - 26:18, 26:19, 27:2, 27:5, 27:8, 27:12, 31:5, 31:6, 42:16, 47:5, 117:9, 145:20, 170:14, 185:20, 185:24, 193:25, 201:4
**creates** [2] - 22:10, 177:17
**creation** [2] - 3:18, 27:11
**creative** [5] - 3:18, 3:22, 3:23, 3:24, 6:7
**Credit** [1] - 71:20
**credit** [3] - 72:6, 83:3, 91:10
**criminal** [3] - 29:7, 81:22, 102:25
**critical** [2] - 140:25, 182:22
**Cross** [1] - 2:5
**CROSS** [4] - 16:4, 65:21, 95:1, 127:19
**cross** [2] - 2:12, 193:15
**CROSS-**

**EXAMINATION** [4] - 16:4, 65:21, 95:1, 127:19
**DAVID** [1] - 1:11
**David** [6] - 115:22, 118:1, 118:6, 128:23, 136:6, 146:15
**Davis** [4] - 30:1, 34:5, 34:10, 34:15
**day-to-day** [1] - 100:2
**days** [13] - 39:16, 42:6, 102:20, 109:19, 147:1, 161:9, 205:7, 205:10, 206:17, 206:18, 206:21, 207:9, 207:16
**DC** [3] - 171:12, 176:21
**dead** [1] - 180:8
**deal** [4] - 146:8, 150:23, 151:17, 208:2
**dealerships** [1] - 142:21
**deals** [1] - 123:2
**dealt** [1] - 148:1
**December** [11] - 82:21, 174:23, 184:12, 194:15, 195:9, 196:7, 196:16, 197:7, 197:8, 197:11
**decide** [1] - 91:24
**decided** [2] - 148:9, 148:16
**decision** [7] - 5:5, 100:25, 101:4, 101:7, 101:9, 101:16, 187:12
**decisions** [6] - 3:18, 3:24, 6:18, 9:7, 79:4, 111:24
**deck** [2] - 5:16, 150:22
**decks** [1] - 119:20
**decorated** [1] - 46:10
**decoration** [2] - 46:1, 46:6
**decorative** [1] - 45:21
**deducted** [1] - 29:23, 177:6
**deductible** [5] - 31:21, 33:21, 37:19, 83:22, 174:3
**deduction** [2] - 198:9, 198:12
**deep** [1] - 109:23
**Defendant** [1] - 37:17
**DEFENDANT** [3] - 39:4, 106:19, 138:12
**Defendant's** [3] -

172:12
184:8, 184:10, 197:21
**DEFENDANTS** [1] - 79:18
**Defendants** [12] - 1:8, 1:20, 17:6, 29:22, 44:18, 47:15, 63:11, 74:1, 79:15, 106:15, 132:6, 138:6
**Defendants'** [21] - 2:9, 40:12, 40:14, 47:2, 62:12, 86:11, 104:12, 130:6, 166:15, 169:24, 174:22, 176:11, 176:13, 177:12, 177:25, 178:7, 178:21, 178:22, 194:22, 201:8, 210:2
**defense** [7] - 26:5, 29:4, 29:16, 39:1, 39:2, 81:22, 106:14
**Defense** [3] - 95:5, 95:16, 166:16
**define** [1] - 116:23
**defined** [1] - 133:9
**definitely** [4] - 108:6, 143:22, 154:4, 171:6
**definition** [7] - 8:19, 9:3, 60:25, 69:8, 69:9, 70:24, 74:5
**definitions** [3] - 61:2, 209:3
**degree** [15] - 41:1, 41:5, 41:6, 41:7, 41:12, 41:14, 41:15, 41:17, 41:19, 107:13, 108:18, 108:20, 148:11
**degrees** [2] - 22:19, 22:24, 23:1, 61:5, 114:14
**deliberate** [1] - 211:1
**deliver** [1] - 151:7
**delivered** [1] - 151:23
**delve** [1] - 175:11
**demand** [5] - 21:1, 21:2, 145:6, 149:24, 169:14
**demonstrate** [1] - 210:2
**denied** [1] - 30:15
**density** [2] - 144:13, 155:14
**deny** [4] - 17:6, 27:21, 27:23, 47:16
**Department** [1] - 43:9
**departure** [1] - 151:3
**dependent** [1] - 156:25

**deposition** [8] - 65:24, 129:8, 129:14, 129:16, 131:13, 136:22, 199:14, 205:14
**depth** [2] - 14:7, 14:10
**derivative** [10] - 68:25, 69:6, 69:9, 69:25, 70:4, 70:10, 70:21, 71:4, 73:6, 75:19
**derivative"** [1] - 69:1
**derivatives** [2] - 74:2, 75:1
**derived** [2] - 53:11, 201:16
**describe** [1] - 74:16
**described** [4] - 28:14, 94:16, 130:3, 132:25
**describes** [1] - 73:20
**describing** [3] - 48:17, 145:15, 145:16
**description** [6] - 73:14, 73:16, 73:18, 73:24, 75:11, 78:17
**deserve** [1] - 141:19
**design** [39] - 8:20, 11:15, 11:21, 11:22, 13:16, 14:21, 14:22, 17:16, 19:11, 23:11, 42:18, 44:14, 51:11, 51:12, 51:15, 54:6, 55:2, 56:20, 57:17, 67:5, 70:21, 70:22, 70:25, 74:16, 76:2, 77:17, 78:6, 78:18, 78:22, 79:2, 79:5, 79:7, 107:20, 109:7, 110:22, 139:24, 140:16, 165:24, 182:17
**Design** [1] - 77:23
**designated** [1] - 86:14
**designed** [7] - 5:1, 55:4, 78:4, 108:3, 109:12, 110:11, 127:22
**designer** [9] - 9:6, 9:7, 60:4, 111:15, 111:16, 111:18, 111:22, 111:24, 150:25
**designer's** [3] - 52:5, 75:13, 75:18
**designers** [6] - 111:11, 112:3, 112:6, 112:9, 169:10, 183:8
**designing** [6] - 8:8, 43:22, 55:15, 77:18, 78:23, 79:3

**D**

**d/b/a** [1] - 1:7
**D5-214** [12] - 3:13, 3:19, 17:7, 17:15, 67:20, 67:23, 68:10, 70:21, 71:1, 71:23, 113:21, 167:1
**D5-214-1921-S-8** [1] - 72:6
**Dana** [1] - 35:11
**data** [4] - 26:24, 194:5, 194:6, 208:3
**date** [8] - 92:19, 115:13, 142:1, 155:11, 157:20, 161:5, 196:10, 196:13
**dates** [4] - 26:19, 26:24, 136:5, 196:10
**Daugherty** [1] -

**crystal** [1] - 187:19
**crystal-clear** [1] - 187:19
**cuff** [1] - 139:25
**culminate** [1] - 40:21
**curious** [1] - 117:4
**currency** [1] - 39:22
**current** [1] - 83:8
**curve** [2] - 18:16, 167:3
**curved** [6] - 4:13, 19:7, 20:10, 20:23, 22:8
**curves** [1] - 168:11
**custom** [5] - 109:13, 114:12, 114:15, 152:6, 167:24
**custom-made** [1] - 167:24
**customer** [2] - 144:19, 150:2
**customers** [4] - 114:19, 114:20, 115:4, 140:14
**cut** [2] - 93:20, 163:9
**CV** [1] - 40:12
**Cyanamid** [3] - 30:14, 31:9, 31:21
**Cyanamid's** [3] - 31:14, 31:19, 32:12
**Cypress** [1] - 141:5

**Cross-Examination** [1] - 2:5
**cross-Examination** [1] - 2:12

**designs** [15] - 20:7, 43:20, 44:9, 45:2, 45:4, 51:20, 68:24, 70:11, 74:2, 75:18, 78:19, 115:2, 117:6, 147:11

**desire** [1] - 102:17

**desired** [1] - 5:22

**detail** [6] - 14:10, 18:22, 33:3, 107:1, 157:25, 185:23

**detailed** [5] - 21:14, 172:2, 172:6, 174:15, 177:20

**detailing** [1] - 52:16

**details** [5] - 10:9, 10:13, 13:1, 44:6, 49:13

**detected** [1] - 32:24

**determine** [1] - 177:1

**determined** [1] - 123:25

**developed** [1] - 62:22

**developer** [11] - 144:20, 144:25, 145:1, 147:22, 147:23, 149:13, 155:1, 157:11, 158:2, 171:13, 171:16

**developers** [11] - 123:19, 127:2, 141:18, 147:2, 148:10, 148:19, 151:8, 151:21, 153:1, 153:12, 163:14

**Development** [1] - 43:9

**development** [4] - 140:9, 141:2, 145:11, 176:22

**developments** [1] - 120:23

**dichotomous** [1] - 71:6

**dictated** [1] - 103:13

**difference** [7] - 8:6, 20:6, 65:14, 111:21, 112:3, 142:4, 188:16

**differences** [4] - 13:17, 45:1, 56:2, 127:25

**different** [62] - 4:20, 5:21, 6:6, 6:18, 11:4, 11:23, 12:16, 20:18, 21:3, 22:14, 23:4, 23:5, 23:16, 32:19, 32:20, 33:1, 45:1, 45:18, 51:19, 51:23,

57:23, 57:24, 58:6, 59:2, 59:4, 60:2, 60:4, 60:9, 64:17, 64:21, 65:3, 65:16, 69:18, 70:1, 77:1, 83:4, 83:13, 83:15, 85:19, 88:10, 90:4, 91:4, 91:9, 91:10, 91:11, 110:13, 112:24, 113:14, 113:22, 120:21, 120:22, 140:10, 140:11, 155:25, 165:24, 166:11, 168:7, 171:4, 171:9, 206:15

**differentiate** [1] - 143:11

**differently** [4] - 8:9, 59:24, 142:3, 142:14

**differs** [2] - 54:24, 145:18

**difficult** [1] - 61:10

**difficulties** [1] - 57:9

**digit** [1] - 174:12

**digital** [1] - 68:3

**digitally** [1] - 46:25

**diligence** [1] - 150:17

**dimension** [2] - 17:18, 59:21

**dimensional** [4] - 10:17, 10:18, 26:13, 26:18

**dimensions** [2] - 188:21

**dining** [6] - 50:14, 50:17, 50:20, 50:25, 168:4, 168:5

**dinner** [1] - 146:11

**dire** [1] - 135:20

**Dire** [1] - 2:18

**DIRE** [1] - 136:1

**DIRECT** [5] - 3:8, 39:5, 79:23, 106:20, 138:14

**direct** [27] - 2:5, 11:12, 34:4, 34:23, 35:7, 36:13, 38:1, 68:24, 73:9, 78:21, 88:6, 89:8, 89:9, 92:1, 92:7, 92:10, 98:20, 99:18, 100:21, 121:11, 131:15, 176:5, 186:5, 193:5, 193:14, 198:7

**Direct** [6] - 2:11, 2:13, 2:14, 2:16, 2:17, 2:21

**directed** [3] - 29:18, 112:23, 112:24

**direction** [4] - 20:9, 56:23, 56:24, 58:4

**directions** [1] - 125:23

**directly** [8] - 20:12, 30:12, 153:2, 153:7, 156:12, 158:23, 164:2, 200:24

**disagree** [6] - 37:23, 94:23, 102:10, 103:3, 104:10, 200:14

**disbursement** [1] - 177:18

**disclosed** [1] - 178:16

**disconnect** [1] - 141:17

**discordant** [1] - 48:11

**Discount** [1] - 139:22

**discovered** [3] - 62:21, 124:5, 124:6

**discovery** [2] - 25:4, 88:3

**discreet** [1] - 60:7

**discussed** [5] - 9:2, 66:3, 149:14, 151:16, 165:4

**discussing** [1] - 54:5

**discussion** [3] - 16:3, 131:8, 202:14

**discussions** [1] - 131:24

**disposition** [1] - 58:25

**disputed...then** [1] - 62:21

**distinctive** [6] - 12:22, 49:19, 51:18, 52:7, 53:15, 55:2

**distinguish** [1] - 38:1

**distinguishes** [1] - 34:4

**distributed** [6] - 27:2, 28:5, 28:12, 28:21, 182:4, 210:7

**distribution** [1] - 26:12

**distributions** [1] - 26:20

**DISTRICT** [2] - 1:1, 1:1

**District** [1] - 35:12

**divide** [4] - 93:18, 100:12, 122:18, 172:25

**divided** [5] - 93:3, 94:11, 173:8, 173:10, 173:22

**dividing** [1] - 97:12

**DIVISION** [1] - 1:2

**DMCA** [3] - 203:8, 206:1, 209:17

**document** [20] - 24:8, 68:14, 68:17, 87:9, 87:11, 103:6, 127:8, 129:19, 134:3, 176:12, 185:7, 185:17, 189:16, 190:16, 198:22, 198:24, 199:4, 199:5, 199:13, 201:2

**documents** [13] - 153:15, 174:5, 184:20, 185:18, 186:1, 194:1, 194:3, 194:5, 196:6, 201:3, 201:5, 201:6, 201:15

**dodge** [1] - 70:17

**dollar** [2] - 177:24, 178:5

**dollars** [3] - 140:21, 147:5, 171:17

**domino** [2] - 9:20, 9:24

**done** [42] - 6:6, 14:11, 18:2, 30:10, 40:9, 43:20, 54:7, 54:8, 54:13, 54:14, 62:20, 66:16, 68:20, 68:23, 69:21, 70:5, 99:2, 100:6, 103:10, 103:11, 114:24, 115:1, 115:2, 120:9, 120:12, 133:13, 152:20, 152:21, 152:23, 158:9, 159:24, 160:5, 168:1, 182:4, 182:9, 197:4, 207:18, 210:18, 211:2, 211:5

**door** [9] - 6:8, 6:9, 6:17, 6:18, 8:2, 86:19, 119:6, 120:10, 176:18

**doors** [9] - 5:10, 5:17, 6:4, 6:14, 6:17, 53:6, 141:15, 168:14, 168:20

**double** [3] - 93:17, 168:20, 198:18

**double-check** [1] - 198:18

**doubt** [2] - 17:9, 129:2

**Dover** [1] - 109:10

**down** [46] - 3:4, 3:5, 6:16, 7:13, 7:22, 8:2, 24:25, 32:8, 32:9, 34:7, 49:4, 59:20, 79:12, 81:6, 83:12, 83:13, 86:16, 88:17, 95:9, 95:18, 101:22, 103:23, 122:6,

123:14, 123:25, 130:8, 132:8, 133:6, 137:3, 138:4, 145:12, 148:14, 156:15, 163:11, 163:12, 163:13, 171:14, 188:3, 189:21, 190:21, 193:21, 194:18, 204:12, 204:14, 204:20, 211:11

**download** [1] - 210:5

**downloaded** [3] - 67:5, 67:23, 68:1

**downloading** [1] - 68:3

**downstairs** [3] - 50:5, 50:7, 167:12

**downtown** [2] - 21:17, 211:7

**draft** [1] - 117:5

**drafter** [5] - 111:19, 111:20, 111:21, 111:23, 123:3

**drafting** [2] - 107:10, 116:25

**draftsmen** [3] - 97:17, 99:6, 100:4

**draftsmen's** [1] - 101:1

**dragged** [1] - 58:13

**drastically** [2] - 64:17, 65:3

**draw** [8] - 11:9, 72:8, 72:18, 75:8, 111:24, 116:25, 117:5, 121:23

**drawing** [14] - 11:18, 14:5, 19:21, 26:12, 26:17, 48:3, 64:20, 67:15, 107:10, 108:5, 108:9, 108:12, 122:21, 188:19

**drawings** [17] - 10:10, 10:18, 10:19, 11:6, 11:17, 12:11, 12:17, 12:19, 12:23, 12:25, 18:21, 19:1, 26:15, 57:11, 61:7, 61:8, 188:17

**drawn** [4] - 73:3, 73:7, 107:24, 116:21

**draws** [1] - 69:16

**dressing** [1] - 58:25

**drew** [3] - 107:11, 108:3, 108:9

**dried** [1] - 52:17

**drive** [1] - 149:21

**dropped** [1] - 144:12

**dropping** [1] - 162:19
**dual** [2] - 37:4, 37:6
**due** [3] - 32:12, 124:24, 150:17
**duplicated** [4] - 17:10, 55:20, 55:23, 162:6
**duplicates** [2] - 61:19, 63:12
**during** [10] - 78:21, 99:8, 105:23, 106:25, 129:4, 129:13, 132:10, 138:10, 205:20, 209:16
**DWG** [2] - 156:10, 156:12
**DWGs** [3] - 122:19, 122:20, 122:24

# E

**e-mail** [20] - 71:17, 71:24, 72:1, 72:2, 72:10, 72:12, 72:13, 72:17, 72:21, 73:13, 73:17, 73:21, 73:23, 74:7, 74:8, 121:13, 125:25, 133:20, 159:16, 159:19
**e-mailed** [1] - 162:16
**e-mails** [1] - 207:7
**EaDo** [10] - 84:7, 180:13, 180:16, 180:17, 183:19, 196:21, 197:2, 197:8, 197:14
**earliest** [1] - 202:5
**early** [8] - 27:20, 29:11, 38:14, 42:24, 107:21, 115:11, 140:4, 175:15
**earn** [9] - 141:19, 142:7, 142:11, 147:18, 148:5, 148:7, 148:14, 173:15, 182:6
**earned** [2] - 83:22, 170:22
**earning** [2] - 146:3, 171:20
**earns** [2] - 171:16, 176:23
**ease** [1] - 102:7
**easel** [3] - 179:8, 179:13, 192:12
**easier** [1] - 20:21
**easiest** [1] - 184:25
**easily** [1] - 14:14
**Eastern** [1] - 35:12
**eat** [1] - 101:10

**eclectic** [1] - 46:12
**eclecticism** [1] - 46:17
**economy** [2] - 54:9, 156:24
**educate** [1] - 45:7
**Educators** [2] - 40:1, 41:23
**effect** [4] - 9:20, 9:25, 10:5, 48:19
**efficient** [1] - 8:10
**effort** [2] - 68:12, 195:22
**egregious** [1] - 46:19
**Eiffel** [1] - 55:9
**eight** [2] - 44:3, 171:17
**either** [16] - 19:12, 38:2, 51:1, 73:1, 77:7, 80:16, 111:6, 122:6, 124:8, 151:21, 155:20, 158:5, 164:3, 168:12, 172:24, 196:5
**Either** [1] - 87:25
**elaborate** [3] - 52:16, 56:4, 69:12
**elected** [1] - 81:1
**electrical** [2] - 42:13, 64:24
**electronic** [1] - 194:5
**elegant** [2] - 52:20, 53:17
**elements** [16] - 8:21, 9:6, 11:14, 31:22, 37:19, 45:4, 48:6, 48:8, 48:15, 48:16, 48:22, 51:16, 54:18, 55:20, 55:23, 60:23
**elevation** [9] - 10:16, 13:12, 14:8, 26:15, 47:21, 48:17, 134:11, 134:12
**elevations** [11] - 10:8, 11:2, 19:17, 24:19, 28:5, 28:12, 28:21, 45:22, 64:10, 64:16, 64:17
**eliminate** [1] - 52:21
**eliminates** [1] - 53:24
**Ellen** [1] - 38:16
**Ellison** [1] - 35:3
**elsewhere** [1] - 190:8
**embellish** [1] - 14:1
**employee** [14] - 82:2, 90:21, 117:18, 117:23, 128:18, 128:22, 129:4, 130:1, 130:20, 147:15, 163:1,

173:19, 176:18, 176:22
**employees** [14] - 88:22, 89:13, 90:10, 93:9, 93:15, 100:13, 118:5, 124:15, 129:9, 132:23, 143:9, 155:7, 172:21
**employer's** [1] - 90:17
**employment** [1] - 90:20
**emptying** [1] - 23:22
**enabled** [1] - 5:1
**encountered** [1] - 99:2
**end** [21] - 18:16, 50:24, 51:10, 51:12, 57:5, 74:14, 82:20, 83:6, 90:7, 103:11, 106:6, 139:17, 141:3, 148:3, 164:12, 177:16, 186:7, 189:1, 195:13, 197:25, 211:1
**ended** [9] - 46:9, 59:4, 72:8, 72:18, 121:23, 146:14, 156:19, 170:7, 188:7
**endorsed** [1] - 42:3
**energy** [2] - 43:19, 44:8
**Energy** [1] - 43:9
**engineer** [2] - 126:15, 157:4
**engineering** [2] - 158:9, 158:19
**engineers** [2] - 154:9
**England** [1] - 46:18
**enjoy** [1] - 153:18
**enlarge** [1] - 9:19
**enter** [2] - 140:9, 148:2
**entered** [3] - 139:17, 152:8, 199:7
**entering** [2] - 5:9, 148:22
**enters** [1] - 6:4
**entire** [2] - 49:3, 49:10
**entirely** [3] - 49:21, 56:25, 121:25
**entitled** [2] - 189:14, 211:22
**entrepreneurial** [1] - 143:25
**entry** [7] - 49:25, 50:1, 59:10, 59:23, 59:25, 109:22, 166:23
**entryway** [1] - 60:8
**envelope** [1] - 59:14

**Environment** [1] - 44:1
**environmental** [1] - 42:11
**epochs** [1] - 46:7
**equal** [2] - 54:12, 149:23
**equals** [3] - 92:14, 92:16, 173:25
**equipment** [1] - 139:21
**error** [6] - 32:24, 88:13, 88:15, 88:17, 105:13
**especially** [3] - 9:16, 46:8, 210:17
**essence** [1] - 70:6
**essential** [1] - 49:23
**essentially** [6] - 17:10, 65:9, 82:5, 162:6, 177:7, 203:14
**established** [1] - 35:8
**estate** [11] - 139:7, 139:16, 139:19, 140:2, 140:4, 140:14, 140:24, 141:3, 143:15, 171:10, 181:1
**ethics** [1] - 76:13
**events** [1] - 208:24
**evidence** [23] - 3:23, 29:21, 29:22, 30:7, 30:10, 31:13, 33:20, 35:20, 76:25, 87:9, 95:16, 106:2, 113:17, 178:18, 184:14, 184:15, 206:19, 206:21, 207:3, 207:14, 208:7, 208:8, 208:12
**evident** [1] - 61:6
**evolving** [1] - 143:8
**exact** [11] - 8:7, 11:17, 14:3, 22:12, 141:25, 147:4, 151:15, 155:8, 155:11, 161:5, 203:23
**exactly** [3] - 17:19, 116:4, 152:10
**exam** [5] - 41:10, 107:15, 108:23, 108:24, 176:5
**EXAMINATION** [12] - 3:8, 16:4, 39:5, 65:21, 79:23, 95:1, 106:20, 127:19, 134:21, 136:1, 136:11, 138:14
**Examination** [12] - 2:5, 2:5, 2:11, 2:12,

2:13, 2:14, 2:16, 2:17, 2:17, 2:18, 2:18, 2:21
**examination** [1] - 78:21
**examine** [1] - 162:23
**example** [10] - 9:11, 9:24, 10:23, 13:1, 34:20, 69:16, 73:11, 194:12, 195:6, 197:20
**excel** [1] - 144:5
**Excel** [3] - 83:7, 87:13, 93:1
**except** [3] - 12:22, 184:11, 184:23
**excluded** [1] - 92:3
**excluding** [1] - 26:13
**excused** [3] - 25:1, 79:13, 101:23
**executed** [2] - 86:1, 128:14
**exhibit** [17] - 10:14, 62:10, 71:10, 133:22, 166:12, 166:14, 169:22, 174:6, 174:24, 179:2, 185:9, 189:11, 202:23, 206:13, 207:18, 208:19, 209:1
**Exhibit** [39] - 40:12, 40:14, 47:2, 62:7, 62:11, 71:8, 71:12, 71:18, 86:10, 87:10, 89:19, 95:5, 95:17, 95:19, 166:12, 166:15, 169:25, 174:21, 174:22, 176:11, 176:13, 176:20, 177:11, 177:12, 177:13, 177:25, 178:7, 178:17, 178:21, 179:5, 184:8, 184:10, 193:24, 194:22, 198:25, 200:11, 201:8, 201:17, 210:2
**exhibits** [7] - 86:11, 89:17, 154:13, 166:8, 173:4, 173:19, 194:24
**exist** [1] - 209:15
**existed** [3] - 72:10, 120:9, 207:16
**existing** [2] - 69:7, 71:1
**exit** [1] - 50:22
**expect** [3] - 46:15,

48:7, 48:16
**expenditures** [1] -
174:18
**expense** [8] - 53:24,
92:10, 99:18, 172:7,
173:22, 196:5,
201:7, 201:16
**expenses** [33] - 29:22,
31:22, 33:21, 37:19,
38:1, 82:19, 83:23,
88:5, 88:6, 88:7,
92:1, 92:3, 92:5,
92:16, 96:13, 97:8,
98:15, 98:16, 98:24,
172:1, 172:13,
172:25, 173:8,
173:9, 173:11,
174:3, 174:15,
175:8, 184:1,
184:11, 195:14,
198:1, 200:3
**expensive** [3] - 19:24,
20:22, 117:2
**experience** [3] -
42:19, 77:17, 140:13
**expert** [7] - 21:6,
23:14, 76:12, 77:1,
98:8, 191:15, 191:25
**expertise** [3] - 140:18,
151:1, 182:17
**experts** [2] - 16:17,
77:2
**explain** [6] - 25:22,
27:19, 41:5, 61:4,
91:17, 188:13
**explained** [4] - 4:22,
35:5, 90:23, 179:22
**explaining** [2] - 77:16,
176:21
**exported** [2] - 194:6,
194:7
**expression** [4] -
51:21, 52:3, 54:20,
55:2
**extended** [1] - 58:18
**extent** [4] - 54:21,
70:23, 71:2, 71:6
**exterior** [2] - 19:7,
167:17
**external** [1] - 20:25
**extra** [4] - 8:14, 9:23,
64:25, 194:24
**extra-step** [1] - 9:23
**eye** [2] - 19:16, 49:8
**eyebrow** [1] - 48:11

**F**

**F.3d** [1] - 30:1
**facade** [1] - 14:1

**facing** [1] - 168:14
**fact** [6] - 54:7, 54:17,
66:14, 81:21,
180:19, 199:8
**factor** [1] - 20:21
**factors** [3] - 20:25,
31:23, 37:20
**factory** [3] - 148:13,
167:25, 168:1
**facts** [5] - 31:4, 36:8,
36:10, 199:15,
199:19
**factual** [1] - 191:25
**factually** [1] - 62:8
**Fair** [1] - 35:13
**fair** [6] - 21:22, 60:17,
92:4, 92:7, 113:12,
193:3
**Fairfield** [1] - 141:5
**fairly** [8] - 16:8, 22:10,
48:12, 152:25,
153:4, 157:1,
170:22, 205:2
**faith** [2] - 34:2, 68:12
**false** [1] - 73:2
**familiar** [5] - 24:16,
44:14, 47:7, 119:9,
180:15
**familiarity** [1] - 78:16
**familiarize** [1] - 66:18
**family** [8] - 43:21,
77:17, 109:12,
113:21, 140:11,
143:19, 152:24,
153:6
**famous** [1] - 52:13
**Fannin** [2] - 1:16, 1:18
**far** [5] - 42:21, 82:2,
91:22, 111:11,
156:22
**fashion** [1] - 84:7
**fast** [2] - 110:20,
115:15
**faucets** [1] - 169:2
**favor** [1] - 73:6
**feature** [5] - 19:10,
19:17, 19:20, 20:23,
21:17
**features** [3] - 22:3,
22:5, 44:8
**federal** [4] - 30:18,
30:21, 31:16, 34:22
**fee** [4] - 87:8, 92:8,
159:3, 159:5
**feet** [17] - 5:2, 5:3,
9:15, 14:24, 15:3,
15:4, 15:10, 15:13,
15:14, 20:13, 59:18,
59:19, 112:8,
149:20, 150:18

**fell** [1] - 43:4
**felt** [8] - 141:8, 141:12,
141:17, 142:10,
142:15, 148:4,
153:12, 154:17
**fence** [1] - 167:17
**few** [20] - 42:6, 43:16,
44:16, 72:15, 102:3,
102:20, 104:1,
109:19, 112:13,
114:10, 114:15,
114:24, 115:1,
116:17, 153:1,
153:14, 153:15,
166:7, 179:4, 191:6
**FF&E** [2] - 139:21,
140:13, 169:12
**FICA** [1] - 90:16
**field** [1] - 144:12
**fifth** [1] - 40:8
**Fifth** [3] - 35:1, 35:14,
103:2
**figure** [3] - 89:4,
161:3, 200:16
**figured** [4] - 20:1,
119:18, 122:18,
123:11
**file** [6] - 72:7, 132:11,
134:15, 136:6,
208:3, 210:5
**filed** [9] - 66:17,
102:19, 127:4,
137:19, 163:17,
164:13, 165:12,
207:12
**files** [13] - 67:4, 67:23,
74:25, 75:1, 75:9,
75:14, 87:12,
122:21, 133:16,
134:14, 137:11,
137:17
**filing** [1] - 132:13
**Fina** [12] - 121:13,
122:6, 122:10,
122:25, 126:1,
153:23, 155:6,
156:18, 157:2,
157:3, 162:15
**final** [1] - 120:8
**finally** [1] - 158:1
**finance** [1] - 142:21
**financial** [1] - 84:5
**fine** [8] - 7:8, 39:8,
48:2, 80:7, 105:15,
139:11, 148:18,
179:15
**fingers** [1] - 166:13
**finish** [6] - 169:8,
186:5, 190:22,
208:10

**finished** [7] - 41:1,
43:22, 126:13,
126:14, 158:10,
166:18, 211:3
**finishes** [9] - 139:24,
145:3, 169:13,
182:22, 182:23,
182:25, 183:3,
183:7, 183:10
**finishing** [2] - 106:2,
180:4
**Firm** [1] - 1:20
**firm** [6] - 42:25, 43:3,
99:13, 100:24,
109:7, 172:15
**first** [74] - 18:8, 20:2,
28:3, 28:10, 28:19,
34:16, 39:1, 40:23,
41:6, 47:3, 47:20,
47:25, 48:24, 56:10,
59:7, 64:9, 65:6,
66:10, 66:20, 70:6,
71:18, 78:9, 81:18,
84:5, 87:21, 87:23,
88:11, 89:3, 89:8,
89:19, 91:23, 94:8,
97:22, 107:23,
108:1, 108:5,
108:25, 109:3,
109:15, 109:17,
110:3, 112:13,
114:24, 116:2,
119:5, 119:8,
119:25, 121:21,
122:22, 123:4,
132:2, 136:15,
136:17, 139:7,
142:15, 145:24,
149:22, 151:10,
154:25, 160:8,
161:24, 166:3,
167:3, 167:7,
167:16, 169:23,
173:15, 177:3,
178:10, 179:18,
195:8, 196:23,
201:18, 210:1
**First** [1] - 130:4
**fit** [3] - 108:11, 110:16,
113:16
**five** [13] - 12:11, 41:7,
41:13, 41:18, 76:12,
108:21, 137:24,
138:1, 147:1, 161:7,
171:17, 186:12,
204:1
**five-minute** [1] -
186:12
**five-year** [1] - 41:7,
41:13, 41:18, 108:21

**fix** [3] - 120:12,
120:14, 124:10
**fixed** [1] - 123:10
**fixing** [1] - 166:2
**fixtures** [2] - 139:21,
183:4
**flat** [5] - 7:24, 10:17,
10:18, 14:4, 14:25
**flattering** [1] - 144:2
**flip** [4] - 6:12, 22:11,
50:18, 103:1
**flipped** [4] - 6:22,
20:3, 57:8, 59:4
**flipping** [2] - 10:2,
103:24
**flood** [1] - 43:5
**flood-plain-safe** [1] -
43:5
**floor** [62] - 3:12, 3:19,
3:20, 3:25, 4:15,
4:17, 4:18, 4:23,
7:15, 7:23, 9:24,
10:8, 13:12, 13:19,
14:17, 14:18, 18:15,
19:1, 26:15, 26:22,
27:2, 28:4, 28:11,
28:20, 48:21, 48:24,
50:8, 50:10, 50:11,
51:8, 51:24, 52:11,
52:20, 53:20, 56:7,
56:8, 56:11, 56:12,
57:22, 58:5, 58:6,
58:7, 58:22, 59:5,
59:10, 59:12, 64:16,
64:24, 65:6, 65:16,
119:21, 167:7,
167:8, 167:16,
167:23, 168:12,
168:16, 169:17,
169:18, 203:23,
210:5
**floors** [3] - 3:16,
60:10, 65:12
**flow** [2] - 52:25, 57:24
**focus** [7] - 42:10,
86:9, 96:2, 143:14,
144:20, 144:24,
164:25
**focused** [3] - 42:7,
98:21, 153:6
**focuses** [1] - 176:18
**follow** [5] - 9:22, 46:3,
135:23, 165:3,
197:23
**follow-up** [1] - 135:23
**followed** [1] - 64:18
**following** [4] - 27:22,
32:9, 84:7, 125:23
**follows** [1] - 111:23
**font** [7] - 11:20, 11:22,

12:8, 12:13, 12:16, 12:24, 13:2
**fonts** [5] - 12:1, 12:5, 12:8, 12:12, 12:16
**foolish** [2] - 182:7, 182:12
**foot** [4] - 14:25, 15:3, 109:22, 109:23
**footage** [5] - 15:5, 15:10, 15:11, 15:13, 150:12
**footprint** [2] - 50:4, 122:19
**FOR** [1] - 1:1
**forced** [1] - 146:6
**foregoing** [1] - 211:20
**foremost** [1] - 210:2
**foresee** [1] - 207:1
**forget** [1] - 106:7
**forgot** [1] - 52:1
**form** [6] - 24:2, 76:14, 77:3, 84:6, 160:9, 183:14
**formal** [3] - 23:12, 23:22, 69:24
**formal-looking** [1] - 23:22
**formatted** [1] - 104:4
**formed** [2] - 114:3, 141:22
**forms** [1] - 105:15
**fort** [2] - 108:2, 108:3
**forth** [8] - 10:25, 22:9, 33:19, 103:4, 151:13, 156:11, 187:25, 188:5
**forward** [3] - 76:5, 138:8, 139:12
**forwarded** [2] - 206:3, 206:7
**foundations** [1] - 110:1
**four** [14] - 36:9, 41:11, 48:18, 51:5, 94:10, 104:23, 107:8, 137:24, 138:1, 161:7, 174:12, 175:14, 210:20, 210:24
**four-digit** [1] - 174:12
**four-story** [2] - 48:18, 51:5
**four-year** [1] - 41:11
**foyer** [1] - 60:2
**frame** [2] - 169:14, 173:7
**Frank** [7] - 52:10, 52:13, 52:19, 53:2, 53:8, 53:16, 53:18
**frankly** [2] - 69:22,

210:4
**freaked** [1] - 39:10
**free** [4] - 25:1, 79:13, 101:23, 143:24
**friend** [5] - 117:21, 117:23, 118:8, 128:6, 128:24
**friends** [2] - 146:10, 187:14
**frieze** [1] - 48:9
**friezes** [1] - 48:9
**front** [22] - 6:14, 7:15, 7:17, 10:2, 10:16, 14:8, 20:3, 20:4, 47:21, 48:17, 50:1, 52:8, 58:24, 64:9, 109:22, 123:9, 129:21, 131:2, 145:13, 146:7, 159:12, 182:1
**full** [12] - 39:17, 48:1, 73:19, 73:23, 75:10, 100:13, 141:11, 159:25, 161:10, 163:7, 163:19, 172:3
**full-time** [3] - 100:13, 141:11, 172:3
**fully** [2] - 88:13, 157:24
**fun** [1] - 110:2
**function** [2] - 49:24, 179:25
**functions** [1] - 51:12
**funny** [2] - 80:10, 80:11
**furniture** [1] - 139:21

**G**

**gadgets** [1] - 44:8
**game** [1] - 58:8
**Gap** [3] - 30:1, 34:5, 37:24
**garage** [5] - 6:14, 18:15, 49:23, 59:10, 167:8
**garages** [2] - 52:21, 59:18, 59:19
**Gary** [1] - 172:13
**gas** [3] - 162:19, 163:11, 172:14
**general** [6] - 12:4, 50:4, 172:6, 172:7, 174:10, 174:11
**generally** [6] - 15:8, 46:15, 92:13, 102:23, 120:16, 191:4
**generate** [1] - 182:13
**generated** [3] - 95:20,

96:3, 96:6
**generic** [6] - 48:23, 49:9, 49:20, 49:21, 51:21, 54:21
**gentleman** [1] - 186:23
**George** [4] - 42:23, 42:25, 43:3
**given** [10] - 8:11, 23:16, 51:21, 54:19, 60:14, 104:14, 126:20, 148:10, 192:5, 205:14
**glass** [1] - 80:4
**glitch** [1] - 39:9
**Global** [2] - 139:20, 140:25
**go-round** [1] - 208:16
**go-to** [1] - 146:25
**goal** [1] - 142:4
**good-faith** [2] - 34:2, 68:12
**good-looking** [1] - 102:11
**goodness** [1] - 107:7
**Google** [2] - 97:23, 97:24
**googled** [1] - 88:5
**government** [1] - 103:1
**grade** [1] - 80:14
**grand** [2] - 50:13, 168:11
**graphics** [1] - 145:10
**great** [6] - 53:6, 55:12, 58:2, 143:25, 146:8, 146:23
**Greek** [2] - 45:18, 46:18
**Greene** [1] - 172:13
**grew** [1] - 107:8
**grief** [1] - 107:24
**gross** [19] - 15:7, 30:2, 30:8, 31:14, 31:19, 33:4, 33:5, 33:9, 35:18, 36:2, 83:21, 170:17, 170:24, 171:22, 173:16, 177:6, 199:6, 199:8, 200:9
**Gross** [1] - 177:9
**ground** [1] - 59:5
**group** [3] - 102:11, 154:20, 157:5
**grouped** [2] - 174:13, 196:20
**guess** [15] - 18:15, 19:16, 20:25, 21:9, 21:23, 52:4, 75:5, 100:19, 129:6,

163:17, 164:9, 167:17, 173:13, 193:1, 196:10
**guest** [1] - 50:5
**guy** [3] - 69:17, 119:16, 119:19
**guys** [2] - 125:15, 150:18

**H**

**H-16-CV-1427** [1] - 1:4
**habitually** [1] - 94:20
**half** [5] - 38:15, 57:15, 59:11, 93:20
**hallway** [1] - 5:8
**Hampton** [1] - 139:23
**hand** [9] - 4:12, 12:19, 79:17, 107:11, 117:5, 138:11, 142:7, 202:23, 205:16
**handed** [1] - 34:19
**handle** [3] - 157:6, 201:12, 206:24
**hands** [3] - 42:19, 43:14, 108:4
**hands-on** [1] - 42:19
**hang** [8] - 4:7, 30:25, 79:21, 191:2, 194:23, 196:12, 197:22, 198:5
**happy** [5] - 115:23, 185:12, 190:9, 200:15, 201:19
**harmless** [1] - 105:13
**harmonious** [1] - 46:16
**Harris** [7] - 117:17, 128:4, 129:13, 130:13, 130:25, 136:3, 187:12
**HCAD** [1] - 150:9
**head** [4] - 57:13, 94:2, 112:19, 164:4
**heading** [2] - 196:15, 197:1
**headroom** [4] - 17:18, 17:22, 57:12, 60:5
**hear** [6] - 17:9, 29:9, 78:21, 137:25, 194:10, 200:15
**heard** [23] - 8:25, 17:8, 21:16, 45:14, 45:17, 54:4, 76:25, 77:17, 78:8, 80:24, 81:12, 84:12, 85:16, 85:22, 105:18, 107:19, 107:21, 150:21, 158:19, 159:3,

162:5, 180:12
**hearing** [4] - 45:16, 79:4, 208:8, 210:22
**hearsay** [3] - 135:2, 135:4, 160:23
**heating** [1] - 42:12
**heavily** [2] - 156:25, 169:10
**heavy** [1] - 48:12
**heels** [1] - 211:7
**height** [2] - 4:21, 4:24
**Heights** [4] - 43:12, 43:16, 43:21, 77:18
**help** [13] - 6:10, 33:1, 44:7, 68:14, 128:9, 141:8, 145:1, 145:14, 147:12, 147:21, 169:13, 176:17, 183:9
**helped** [1] - 141:1
**helpful** [4] - 61:3, 70:7, 70:15, 176:25
**helping** [3] - 128:24, 140:16, 140:23
**helps** [1] - 144:5
**hence** [1] - 143:20
**here'** [1] - 156:5
**Heritage** [1] - 53:14
**hide** [4] - 88:14, 154:16, 154:18, 154:19
**high** [3] - 7:24, 144:13, 193:3
**high-density** [1] - 144:13
**higher** [3] - 5:1, 151:14, 170:6
**highlighted** [2] - 30:14, 32:5
**hindsight** [1] - 162:14
**hire** [1] - 158:6
**hired** [5] - 86:22, 119:16, 119:19, 120:18, 155:6
**historic** [3] - 43:15, 45:21, 69:24
**historical** [2] - 45:25, 46:6
**historically** [1] - 52:10
**history** [2] - 21:14, 162:20
**HITTNER** [1] - 1:11
**hmm** [1] - 114:23
**hold** [17] - 106:9, 112:17, 131:7, 135:19, 151:15, 155:8, 162:21, 162:22, 163:10, 163:15, 164:6, 164:8, 191:16,

196:22, 202:10, 202:16, 205:4
**Hold** [1] - 202:10
**home** [19] - 9:7, 9:8, 9:9, 38:3, 38:5, 42:5, 43:13, 49:18, 77:19, 140:12, 141:4, 144:13, 144:23, 177:16, 182:23, 183:7, 183:10, 204:8
**homebuyer** [3] - 23:15, 23:23, 150:3
**homes** [17] - 43:5, 43:15, 52:14, 77:17, 77:18, 114:13, 141:15, 143:19, 151:9, 151:23, 152:24, 170:7, 170:10, 172:25, 173:7, 173:8
**Honor** [119] - 3:5, 15:19, 15:21, 24:22, 24:24, 25:3, 25:21, 26:7, 28:25, 29:1, 29:5, 29:17, 31:1, 32:1, 32:10, 32:16, 32:19, 32:25, 33:25, 36:6, 36:17, 36:25, 37:9, 37:23, 38:11, 38:21, 39:2, 41:19, 60:13, 62:12, 64:3, 64:6, 65:19, 71:13, 74:17, 76:11, 76:19, 76:22, 79:9, 79:11, 79:15, 79:19, 80:19, 85:1, 85:9, 85:15, 101:20, 102:1, 106:1, 106:15, 121:14, 127:18, 130:15, 131:2, 133:24, 134:19, 135:2, 135:16, 136:25, 138:6, 138:9, 139:10, 139:15, 140:6, 149:1, 149:6, 160:22, 164:18, 166:9, 175:13, 178:15, 178:17, 179:7, 179:13, 182:11, 184:2, 184:10, 184:13, 184:14, 184:17, 185:2, 185:6, 185:11, 185:15, 186:14, 186:20, 189:8, 189:18, 189:25, 190:23, 191:6, 191:14, 191:19, 191:21,

193:5, 193:22, 194:21, 195:5, 196:20, 197:15, 197:18, 198:11, 198:22, 199:18, 200:2, 200:21, 201:13, 202:1, 202:6, 202:9, 202:20, 203:2, 205:19, 207:6, 207:20, 209:7, 209:21, 211:16, 211:17
**HONORABLE** [1] - 1:11
**hope** [3] - 21:7, 68:14, 141:9
**hopefully** [1] - 119:23
**horizontal** [1] - 52:15
**horse** [1] - 180:8
**hotel** [1] - 139:21
**hotels** [4] - 140:17, 140:20, 140:24, 146:2
**hour** [5] - 38:15, 93:8, 105:23, 152:7, 210:23
**hours** [21] - 88:18, 88:19, 89:14, 89:16, 90:3, 90:8, 90:14, 93:2, 93:8, 97:12, 97:13, 97:16, 99:5, 99:11, 100:7, 100:11, 100:20, 101:1, 210:20, 210:24
**house** [12] - 7:15, 26:14, 26:16, 26:23, 36:12, 43:22, 53:6, 53:17, 53:18, 82:4, 170:24, 172:16
**houses** [2] - 42:23, 53:13
**housing** [2] - 46:9, 50:12
**Housing** [1] - 43:8
**HOUSTON** [1] - 1:2
**Houston** [18] - 1:16, 1:19, 1:21, 21:17, 39:14, 40:20, 43:4, 43:12, 44:11, 44:13, 44:15, 45:20, 45:21, 48:6, 76:1, 77:25, 98:1, 98:5
**Houstonian** [1] - 107:7
**HUD** [3] - 177:15, 178:6, 194:9
**HUD-1** [1] - 201:2
**huge** [1] - 109:21

**hundred** [4] - 120:20, 120:21, 120:22, 171:17
**hundreds** [1] - 110:12
**Hunt** [2] - 81:2, 81:5
**hurt** [1] - 193:13
**husband** [1] - 84:23

**I**

**idea** [14] - 51:20, 51:24, 52:3, 52:7, 52:20, 53:8, 53:14, 54:18, 54:19, 55:1, 58:19, 70:6, 76:4, 181:19
**ideal** [1] - 149:20
**ideas** [2] - 70:5, 70:6
**identical** [7] - 12:12, 12:24, 13:2, 13:8, 15:12, 66:21, 66:23
**identically** [1] - 11:6
**identified** [6] - 28:2, 28:9, 28:18, 132:16, 133:4, 137:7
**identify** [10] - 25:15, 26:11, 44:7, 45:4, 55:19, 62:18, 63:3, 129:25, 132:21, 178:19
**identifying** [1] - 190:12
**II** [1] - 52:17
**illegal** [1] - 50:22
**illegible** [1] - 174:7
**image** [1] - 6:11
**imagine** [1] - 108:6
**imitators** [1] - 143:21
**immediately** [1] - 104:18
**impact** [1] - 105:23
**impeachment** [2] - 130:16, 209:22
**imploding** [1] - 162:19
**important** [6] - 142:16, 143:8, 143:11, 154:17, 174:24, 183:6
**impression** [3] - 12:4, 16:22, 159:23
**impressions** [1] - 77:1
**imprint** [1] - 45:21
**improper** [2] - 130:15, 209:22
**IN** [1] - 1:1
**in-house** [1] - 170:24
**inaudible** [1] - 205:3
**INC** [2] - 1:6, 1:7
**Inc** [1] - 27:8
**inch** [1] - 57:15

**inches** [1] - 20:13
**incidentally** [1] - 24:9
**inclination** [1] - 207:3
**include** [8] - 8:16, 22:5, 26:17, 26:21, 28:13, 90:16, 91:24, 98:16, 98:24, 99:5, 99:11, 131:23
**included** [8] - 10:9, 26:22, 28:4, 28:11, 28:20, 31:10, 100:11, 147:7
**includes** [2] - 40:7, 90:17
**including** [4] - 26:15, 40:5, 194:5, 210:4
**income** [7] - 92:14, 92:16, 99:15, 173:25, 182:13, 184:1, 201:6
**incoming** [3] - 178:2, 178:4, 178:9
**incorporated** [1] - 141:25
**incorrect** [4] - 87:23, 88:11, 92:22, 94:24
**incorrectly** [1] - 58:13
**incurred** [2] - 98:17, 99:1
**indeed** [1] - 211:3
**independent** [2] - 171:4, 177:21
**independently** [2] - 61:7, 61:9
**indicated** [4] - 101:3, 116:9, 131:14, 133:13
**indicates** [1] - 129:24
**indicating]** [1] - 173:17
**indication** [2] - 17:17, 57:21
**indirect** [8] - 34:5, 34:10, 34:11, 34:20, 35:14, 38:1, 99:16, 99:17
**individual** [2] - 99:17, 172:12
**industry** [2] - 98:13, 141:10
**inferences** [1] - 21:12
**informal** [1] - 42:4
**information** [29] - 28:14, 65:1, 156:5, 175:19, 177:24, 184:3, 184:11, 189:3, 190:1, 190:4, 197:17, 201:16, 202:18, 203:10, 203:11, 203:14,

203:16, 203:22, 205:24, 206:2, 206:4, 206:9, 208:4, 208:14, 209:3, 209:18, 210:6, 210:9
**infringed** [1] - 47:12
**infringement** [5] - 30:9, 31:24, 32:13, 83:18, 183:23
**infringement"** [1] - 30:3
**infringing** [16] - 26:14, 26:16, 26:23, 34:24, 34:25, 35:7, 35:15, 35:19, 36:4, 36:11, 36:12, 36:21, 38:5, 130:2, 132:24
**ing** [1] - 187:8
**inherent** [1] - 121:10
**initial** [5] - 61:17, 62:22, 63:12, 154:25, 157:10
**initials** [1] - 160:17
**ink** [1] - 125:19
**Inn** [1] - 139:23
**inner** [3] - 140:12, 143:18, 143:19
**innovative** [1] - 51:17
**input** [2] - 82:19, 150:24
**inputted** [1] - 172:9
**inquiries** [1] - 27:23
**inside** [4] - 107:8, 140:24, 141:6, 143:18
**insight** [1] - 140:14
**inspector** [2] - 160:20, 176:17
**install** [2] - 118:9, 134:24
**installation** [1] - 135:15
**installed** [1] - 119:9
**installing** [1] - 68:4
**instead** [9] - 5:2, 5:3, 8:8, 35:10, 94:17, 100:12, 141:3, 165:17, 206:3
**Instead** [1] - 155:4
**Institute** [3] - 40:4, 43:25, 77:23
**instruct** [4] - 8:19, 69:5, 124:15, 165:23
**instructed** [1] - 112:16
**instructions** [3] - 104:5, 104:6, 111:23
**insurance** [1] - 142:22
**integral** [1] - 147:11
**integration** [1] - 42:17
**intend** [1] - 178:18

**intended** [2] - 26:21, 56:17
**intense** [1] - 152:22
**intent** [2] - 102:17, 203:9
**intentional** [2] - 56:22, 114:18
**intentions** [1] - 67:10
**interest** [1] - 107:20
**interested** [1] - 107:22
**interesting** [5] - 5:5, 5:25, 6:7, 110:17, 193:17
**interestingly** [1] - 15:6
**interim** [1] - 39:19
**interior** [5] - 46:4, 49:25, 139:24, 169:9, 183:8
**internet** [5] - 98:6, 182:3, 205:15, 205:17
**interns** [1] - 104:23
**internship** [1] - 41:9
**Interplan** [1] - 35:3
**interrogatories** [3] - 25:13, 26:4, 129:23
**interrogatories"** [1] - 26:1
**Interrogatory** [7] - 2:7, 25:12, 129:22, 129:24, 131:15, 131:17, 132:17
**interrogatory** [8] - 25:11, 25:15, 25:22, 26:11, 26:21, 96:7, 132:21, 185:25
**interrupt** [2] - 116:22, 163:23
**introduce** [4] - 39:11, 79:25, 115:8, 138:16
**introduced** [1] - 86:24
**invent** [1] - 52:8
**invented** [1] - 52:24
**investment** [1] - 43:14
**invisible** [1] - 177:7
**invited** [2] - 43:24, 44:3
**invoices** [1] - 196:6
**involve** [2] - 34:23, 38:2
**involved** [13] - 30:22, 34:3, 34:10, 44:16, 84:6, 140:15, 163:22, 169:10, 170:19, 182:22, 203:23, 204:1, 207:11
**involvement** [3] - 179:5, 179:20, 180:25

**irrelevant** [2] - 130:22, 208:25
**irritated** [1] - 125:21
**irritating** [1] - 144:3
**issue** [11] - 33:13, 47:21, 60:5, 156:3, 157:3, 163:6, 165:2, 178:13, 188:1, 208:21, 209:16
**issued** [1] - 162:17
**issues** [7] - 72:7, 121:19, 122:12, 163:21, 163:24, 164:15, 187:6
**issuing** [1] - 157:21
**it'd** [1] - 182:7
**it'll** [5] - 29:11, 104:11, 177:22, 178:4, 183:15
**It'll** [1] - 178:10
**italics** [1] - 104:11
**item** [1] - 177:20
**items** [2] - 34:25, 172:7
**iteration** [3] - 26:22, 26:23, 112:14
**itself** [1] - 46:4

## J

**Jack** [2] - 92:9, 92:10
**January** [7] - 28:22, 40:15, 82:21, 130:2, 132:23, 184:12, 194:13
**JMOL** [1] - 2:9
**job** [2] - 148:3, 148:19
**John** [1] - 172:12
**joint** [2] - 102:19, 150:23
**journals** [2] - 40:10, 40:11
**JPW** [1] - 124:19
**judge** [3] - 81:1, 81:3, 204:3
**Judge** [10] - 30:20, 35:3, 62:18, 77:10, 81:4, 81:5, 189:24, 190:18, 194:17, 194:19
**jumped** [1] - 12:6
**June** [1] - 163:13
**junior** [1] - 40:24
**juror** [1] - 103:19
**JURY** [1] - 1:11
**jury** [41] - 8:19, 10:12, 16:12, 25:22, 38:16, 39:12, 44:2, 44:5, 44:7, 45:7, 62:6, 63:3, 69:5, 76:25,

77:4, 77:8, 80:1, 81:17, 83:20, 84:1, 88:13, 102:8, 103:15, 107:5, 110:21, 120:3, 123:23, 137:2, 137:4, 138:17, 144:18, 166:21, 176:13, 177:13, 183:3, 186:16, 193:19, 208:3, 210:3, 210:15, 210:16
**Jury** [7] - 3:1, 29:14, 38:23, 102:6, 106:12, 175:24, 193:20
**just...** [1] - 25:19
**Justin** [1] - 1:20

## K

**keep** [13] - 90:2, 105:4, 115:23, 117:24, 125:22, 143:11, 143:12, 148:12, 157:19, 170:4, 176:5, 178:23
**keeps** [2] - 143:10, 174:14
**Keith** [11] - 89:20, 111:6, 111:18, 119:16, 120:2, 120:10, 124:4, 124:8, 124:10, 124:19, 125:22
**Keith's** [1] - 120:4
**kept** [2] - 59:20, 114:11
**Kevin** [1] - 104:7
**KEWALRAMANI** [2] - 2:20, 138:12
**Kewalramani** [2] - 138:18, 138:22
**key** [6] - 143:10, 147:14, 175:1, 200:17, 200:18, 210:14
**kick** [1] - 189:21
**kickback** [1] - 147:18
**kicking** [1] - 190:21
**kicks** [1] - 37:4
**kid** [1] - 107:25
**kind** [30] - 9:20, 12:20, 16:11, 17:3, 42:4, 43:5, 45:21, 46:9, 46:12, 48:11, 50:5, 50:6, 51:24, 53:11, 55:24, 61:3, 64:20, 68:12, 106:25,

107:11, 108:20, 109:13, 111:23, 113:21, 114:21, 119:1, 122:10, 124:1, 143:14, 157:14
**kinds** [1] - 118:15
**kit** [4] - 150:10, 155:1, 157:8, 162:15
**kitchen** [17] - 4:23, 10:23, 11:3, 11:8, 50:14, 50:17, 50:18, 50:19, 50:21, 50:23, 50:24, 56:25, 57:2, 57:3, 58:1, 167:23
**kitchen/dining** [1] - 51:1
**kitchens** [1] - 52:22
**kits** [1] - 150:7
**know...** [1] - 121:3
**knowledge** [7] - 61:9, 68:11, 68:24, 148:2, 150:2, 182:5, 196:5
**known** [4] - 26:1, 53:13, 138:21, 138:22
**knows** [2] - 62:15, 102:16

## L

**Labarthe** [6] - 3:10, 15:16, 16:6, 41:3, 44:17, 45:17
**LABARTHE** [1] - 2:4
**labeled** [1] - 185:6
**lacking** [1] - 141:12
**Lamar** [1] - 107:9
**land** [9] - 32:3, 122:16, 149:23, 150:7, 155:1, 155:2, 157:8, 162:15
**landing** [4] - 7:23, 8:3, 8:5, 18:15
**language** [3] - 74:12, 152:10, 154:5
**laptop** [3] - 79:20, 138:10, 166:10
**large** [5] - 5:18, 43:18, 52:15, 104:4, 114:12
**largely** [1] - 57:18
**larger** [3] - 4:5, 100:12, 163:3
**laser** [2] - 46:21, 87:15
**last** [13] - 81:7, 104:20, 110:15, 131:16, 134:5, 138:20, 169:22, 198:4, 198:8, 199:22, 199:23,

205:10, 208:15
**laundry** [1] - 5:7
**law** [13] - 29:24, 33:17, 34:4, 35:6, 36:20, 37:7, 69:23, 70:2, 81:21, 99:13, 100:24, 112:7
**Law** [2] - 1:15, 1:20
**lawsuit** [30] - 66:16, 74:1, 78:19, 84:12, 87:3, 96:6, 113:2, 113:3, 113:6, 113:9, 127:4, 130:5, 132:3, 132:11, 132:13, 132:19, 132:25, 137:19, 163:16, 164:13, 165:12, 165:18, 165:23, 183:25, 185:22, 201:4, 207:11, 208:22, 209:16
**lawsuit-created** [1] - 201:4
**lawyer** [5] - 35:11, 80:11, 81:18, 84:23, 94:2
**lawyers** [1] - 80:20
**lay** [2] - 155:22, 157:2
**layering** [3] - 187:8, 187:18, 188:8
**layers** [2] - 116:21, 117:10
**laying** [1] - 155:13
**layout** [4] - 11:7, 123:7, 155:23, 158:10
**layperson** [1] - 45:11
**lead** [6] - 35:13, 44:9, 105:2, 144:13, 149:9, 149:10
**leading** [4] - 5:17, 60:1, 60:3, 190:15
**leads** [2] - 13:23, 144:7
**lean** [1] - 139:13
**learn** [6] - 16:19, 17:6, 119:16, 119:18, 135:12, 165:11
**learned** [3] - 53:1, 161:4, 161:13
**learning** [1] - 79:2
**leasing** [1] - 43:15
**least** [9] - 20:25, 22:6, 61:23, 102:9, 169:6, 176:5, 196:4, 202:24, 203:3
**leave** [9] - 25:1, 38:9, 42:5, 77:4, 79:13, 95:7, 101:23, 193:18
**leaves** [2] - 51:1,

59:14
**led** [5] - 21:11, 107:11, 108:7, 113:24, 208:2
**ledger** [4] - 172:6, 172:7, 174:10, 174:11
**ledgers** [1] - 173:3
**left** [16] - 4:4, 4:12, 11:11, 11:25, 19:2, 43:3, 56:21, 58:10, 58:15, 64:24, 88:8, 89:24, 110:7, 155:8, 161:20
**left-hand** [1] - 4:12
**legal** [9] - 8:17, 60:14, 60:20, 69:5, 70:24, 74:5, 86:1, 138:20, 153:18
**LeJune** [1] - 35:12
**length** [1] - 129:11
**Lennar** [1] - 109:10
**Leonard** [2] - 39:3, 39:13
**LEONARD** [2] - 2:10, 39:4
**less** [10] - 9:16, 16:10, 19:24, 20:22, 23:12, 51:10, 100:18, 159:5, 173:25, 181:17
**lettering** [1] - 12:21
**letters** [1] - 158:20
**level** [8] - 22:7, 39:25, 52:15, 140:18, 141:9, 141:18, 142:5, 142:10
**Liang** [1] - 1:18
**library** [2] - 50:5, 156:1
**license** [7] - 41:8, 68:10, 132:9, 133:5, 152:8, 154:22, 157:16
**licensed** [3] - 41:11, 109:4, 172:21
**licensing** [4] - 134:25, 135:12, 137:8, 166:4
**lie** [1] - 96:25
**life** [1] - 42:13
**lighting** [2] - 42:12, 64:25
**lights** [2] - 3:5, 127:15
**likely** [3] - 83:21, 169:20, 169:21
**likewise** [1] - 15:14
**limit** [1] - 112:10
**limitations** [1] - 155:17
**limited** [5] - 14:2, 16:9, 54:14, 57:22,

106:3
**line** [15] - 55:11, 71:20, 77:11, 132:5, 152:5, 152:6, 170:9, 172:7, 173:21, 176:25, 177:20, 186:22, 188:19, 188:21, 211:6
**Line** [1] - 129:17
**lines** [2] - 9:18, 188:22
**links** [1] - 44:7
**List** [1] - 53:14
**list** [6] - 88:8, 144:19, 170:3, 170:5, 174:22, 176:10
**list"** [1] - 144:21
**listed** [3] - 24:2, 91:4, 104:10
**listen** [2] - 76:8, 108:17
**listening** [1] - 34:7
**listing** [1] - 145:15
**listings** [2] - 172:15, 172:16
**litigation** [5] - 130:7, 133:4, 137:7, 137:12, 185:20
**live** [1] - 190:9
**Live** [2] - 196:25, 197:1
**lived** [3] - 44:11, 107:8, 141:4
**Living** [63] - 25:11, 25:13, 27:7, 33:6, 72:4, 72:14, 72:17, 74:24, 75:3, 87:6, 92:20, 99:3, 111:3, 112:25, 114:22, 115:2, 115:7, 115:8, 115:20, 116:1, 116:10, 123:21, 126:21, 128:14, 130:3, 130:18, 132:25, 133:9, 141:1, 141:22, 142:2, 142:14, 143:2, 143:4, 143:7, 143:14, 143:20, 144:7, 145:15, 145:17, 151:11, 153:16, 157:19, 158:23, 165:23, 166:6, 170:25, 172:16, 174:18, 179:25, 180:2, 180:3, 181:7, 181:14, 181:16, 182:16, 183:12, 183:16, 183:22, 191:22, 192:9,

203:9, 206:8
**living** [30] - 4:15, 10:24, 13:21, 19:7, 20:3, 20:12, 22:7, 22:15, 22:21, 22:22, 23:16, 23:17, 23:18, 50:4, 50:11, 50:14, 50:17, 50:20, 51:2, 56:24, 57:6, 57:25, 78:3, 79:2, 80:9, 123:8, 123:23, 168:4, 168:14, 188:23
**LIVING** [1] - 1:7
**Living's** [17] - 27:24, 32:2, 115:4, 120:18, 162:10, 174:2, 179:4, 179:20, 180:25, 184:1, 191:13, 192:4, 192:10, 192:16, 194:4, 200:9, 203:15
**living/dining/kitchen** [1] - 51:1
**LLC** [1] - 1:3
**Lloyd** [7] - 52:10, 52:13, 52:19, 53:2, 53:8, 53:16, 53:18
**LLP** [1] - 1:18
**loaded** [1] - 12:9
**local** [1] - 194:24
**located** [1] - 20:7
**location** [4] - 65:8, 65:13, 149:22, 155:25
**locations** [2] - 140:16, 178:13
**Lodholz** [1] - 43:1
**logic** [1] - 57:24
**logical** [1] - 124:2
**logo** [5] - 67:6, 67:24, 145:13, 204:24, 209:18
**logos** [1] - 145:11
**look** [54] - 6:11, 13:20, 17:15, 17:23, 20:1, 20:12, 45:3, 45:8, 46:20, 46:23, 47:2, 47:23, 47:25, 56:1, 59:5, 68:14, 68:18, 84:1, 87:16, 88:17, 89:17, 103:2, 105:10, 109:20, 112:19, 127:8, 129:15, 141:4, 142:18, 142:20, 149:19, 150:21, 153:20, 154:12, 155:25, 158:3, 161:17, 162:19,

166:21, 172:24, 174:5, 177:11, 178:5, 178:8, 178:9, 182:19, 182:24, 184:7, 187:11, 190:24, 196:9, 197:13, 199:18, 202:24
**looked** [11] - 10:15, 11:1, 11:23, 12:10, 17:18, 18:11, 66:19, 109:18, 161:6, 173:6, 176:10
**looking** [45] - 10:12, 10:18, 11:21, 11:23, 12:4, 20:17, 20:23, 22:11, 23:22, 24:17, 26:3, 26:8, 34:6, 34:8, 34:13, 36:23, 45:23, 46:24, 57:11, 60:10, 62:13, 78:23, 102:11, 132:5, 140:10, 141:15, 161:21, 162:14, 167:22, 168:3, 168:13, 168:19, 170:2, 170:22, 174:9, 194:14, 195:4, 196:23, 199:16, 199:17, 199:21, 199:22, 200:22, 204:7
**looks** [7] - 44:4, 64:19, 106:6, 158:4, 197:7, 198:4, 211:9
**loop** [3] - 44:15, 107:9, 143:18
**lose** [3] - 105:19, 105:20
**loss** [3] - 88:24, 92:15, 94:16
**losses** [1] - 95:25
**lost** [1] - 52:1
**loud** [1] - 7:6
**louder** [1] - 204:13
**Louis** [1] - 1:17
**love** [1] - 165:3
**loved** [1] - 12:15
**lower** [4] - 4:24, 185:10
**lunch** [1] - 105:23
**Lunch** [1] - 106:11

**M**

**ma'am** [3] - 7:5, 24:25, 101:22
**machine** [2] - 25:16, 148:13
**magic** [1] - 52:9

**magnificent** [1] - 55:7
**Mahal** [1] - 55:10
**Mai** [1] - 122:7
**mail** [20] - 71:17, 71:24, 72:1, 72:2, 72:10, 72:12, 72:13, 72:17, 72:21, 73:13, 73:17, 73:21, 73:23, 74:7, 74:8, 121:13, 125:25, 133:20, 159:16, 159:19
**mailed** [1] - 162:16
**mails** [1] - 207:7
**main** [5] - 8:6, 14:25, 22:6, 50:3, 56:24
**maintained** [1] - 27:12
**maintenance** [1] - 27:11
**major** [11] - 7:9, 19:17, 20:3, 20:19, 58:19, 58:20, 72:7, 105:7, 121:19, 122:12, 187:6
**majority** [5] - 143:17, 144:4, 144:24, 146:22, 150:24
**manage** [1] - 156:18
**managed** [1] - 79:2
**management** [12] - 28:14, 180:6, 190:1, 190:3, 203:10, 203:16, 203:22, 206:4, 206:9, 208:13, 209:3, 210:6, 210:8
**Management** [2] - 145:19, 180:2
**Management"** [1] - 145:25
**manager** [1] - 99:14
**managing** [3] - 99:14, 99:15, 146:1
**manners** [1] - 26:19
**Marion** [3] - 109:5, 109:6, 110:4
**marked** [2] - 189:12, 194:21
**marked-up** [1] - 194:21
**market** [10] - 21:1, 21:2, 23:24, 140:12, 141:20, 143:18, 143:20, 144:8, 145:7, 149:24
**marketed** [1] - 31:10
**marketing** [25] - 20:15, 21:5, 21:6, 23:14, 26:16, 27:9, 27:11, 28:4, 28:11, 28:20, 140:19,

140:23, 141:19, 145:10, 153:19, 154:18, 181:2, 183:18, 188:16, 188:18, 188:25, 203:15, 205:18, 208:13, 210:5
**marketing-wise** [1] - 20:15
**marketplace** [1] - 149:25
**markets** [1] - 162:18
**married** [2] - 80:2, 81:25
**masonry** [1] - 48:14
**mass** [2] - 43:5, 46:9
**mass-produce** [1] - 43:5
**mass-produced** [1] - 46:9
**master** [21] - 5:6, 5:9, 5:21, 6:5, 6:13, 6:16, 7:17, 8:1, 10:2, 10:25, 14:24, 51:10, 51:25, 58:20, 58:24, 123:9, 168:17, 168:20, 168:22, 168:24
**master's** [6] - 41:2, 41:4, 41:12, 41:14, 41:16, 41:17
**match** [2] - 178:4, 178:10
**matching** [1] - 90:20
**material** [5] - 34:21, 35:15, 178:16, 203:15, 207:8
**materials** [9] - 27:1, 27:5, 27:12, 28:4, 28:11, 28:20, 32:4, 169:8, 190:2
**Materna** [2] - 31:20, 32:12
**math** [3] - 40:23, 89:1, 89:6
**mathematical** [1] - 192:20
**mathematically** [1] - 192:13
**mathematician** [1] - 94:3
**matriculation** [1] - 65:15
**matter** [4] - 73:15, 126:5, 202:22, 211:22
**mattress** [1] - 146:4
**maximum** [1] - 207:25
**meals** [1] - 174:14
**mean** [78] - 11:16,

20:4, 20:8, 20:15, 21:14, 22:24, 29:25, 46:5, 50:16, 55:6, 59:12, 61:4, 68:1, 68:23, 70:9, 73:18, 77:7, 86:4, 92:6, 92:8, 102:15, 102:24, 108:9, 109:9, 112:1, 113:2, 113:20, 115:14, 116:19, 118:16, 120:21, 121:8, 123:6, 123:9, 123:19, 124:2, 124:14, 124:23, 125:5, 125:7, 126:16, 126:20, 127:1, 137:13, 137:15, 140:15, 141:13, 143:16, 143:24, 144:3, 144:9, 145:12, 146:7, 146:11, 148:13, 148:14, 150:23, 153:9, 153:18, 154:23, 158:20, 161:10, 161:17, 162:19, 163:2, 165:22, 169:19, 170:5, 171:21, 181:23, 182:6, 183:3, 191:4, 206:23, 207:25, 210:17
**meaning** [11] - 37:6, 60:14, 60:20, 120:25, 122:5, 125:12, 126:4, 156:4, 163:17, 170:23, 172:16
**meaningful** [1] - 65:11
**means** [7] - 10:21, 30:2, 60:22, 68:3, 80:12, 84:25, 124:19
**meant** [1] - 115:1
**meantime** [1] - 95:12
**measure** [1] - 22:25
**measured** [1] - 57:14
**mechanical** [1] - 1:24
**media** [4] - 27:6, 27:10, 27:12, 27:14
**Medicare** [1] - 90:22
**Mediterranean** [4] - 45:24, 145:4, 149:20, 150:18
**Mediterranean"** [1] - 45:15
**meet** [5] - 32:23, 142:20, 142:24, 147:7, 161:15

**meeting** [6] - 65:23, 122:22, 123:21, 147:3, 157:11, 157:14
**meetings** [3] - 149:12, 150:1, 157:17
**member** [3] - 12:15, 77:22
**membership** [1] - 42:3
**Memo** [1] - 176:25
**Memorial** [1] - 43:21
**memorized** [1] - 93:21
**memory** [4] - 24:10, 56:5, 68:15, 182:25
**mention** [3] - 45:15, 129:13, 130:25
**mentioned** [10] - 12:14, 21:5, 24:5, 40:19, 41:22, 128:4, 146:15, 150:7, 152:20, 161:19
**mentor** [1] - 42:23
**menu** [12] - 116:20, 117:9, 118:11, 118:12, 119:9, 124:20, 128:10, 128:25, 134:24, 186:24, 187:8, 188:8
**Menu** [1] - 117:8
**menu-ing** [1] - 187:8
**merely** [2] - 54:15, 66:25
**mess** [1] - 86:8
**met** [6] - 33:15, 78:9, 114:23, 123:4, 123:15
**methodology** [2] - 97:19, 98:13
**methods** [1] - 42:15
**mic** [2] - 7:5, 139:9
**microphone** [2] - 139:13, 182:10
**middle** [2] - 50:19, 71:17
**might** [17] - 5:13, 18:22, 18:23, 45:23, 48:13, 52:4, 57:6, 61:10, 68:24, 69:25, 135:18, 145:13, 153:5, 155:10, 166:12, 180:8, 207:3
**million** [2] - 140:21, 207:21
**millions** [1] - 147:5
**millwork** [3] - 10:21, 11:2, 11:5
**mind** [4] - 80:17, 127:9, 149:8, 178:23
**minimum** [1] - 59:20
**minor** [3] - 13:10,

14:5, 14:16
**minus** [2] - 92:14, 92:16
**minute** [6] - 70:16, 76:12, 96:14, 104:20, 179:12, 186:12
**minutes** [7] - 16:10, 29:12, 29:13, 38:19, 72:15, 102:3, 175:18
**mirror** [2] - 6:11, 6:12
**misplaced** [1] - 160:18
**misread** [1] - 71:15
**miss** [5] - 79:25, 80:4, 121:9, 125:15, 203:4
**Miss** [17] - 3:10, 16:6, 33:16, 41:3, 44:17, 45:17, 135:14, 136:15, 137:16, 149:14, 187:2, 188:13, 189:15, 203:2, 203:5, 206:16, 208:2
**mission** [1] - 142:4
**mistake** [8] - 57:15, 61:25, 62:21, 89:6, 160:4, 160:7, 161:17, 162:23
**mistakes** [2] - 120:9, 163:7
**misunderstanding** [2] - 34:2, 146:13
**mix** [5] - 46:18, 145:5, 149:15, 151:8, 152:19
**Mock** [1] - 205:14
**model** [1] - 153:8
**modern** [1] - 50:12
**modifications** [1] - 7:4
**modified** [2] - 11:8, 113:16
**modify** [1] - 75:18
**mom** [2] - 82:3, 87:24
**mom-and-pop** [2] - 82:3, 87:24
**moment** [2] - 56:9, 61:24, 63:22, 88:14, 96:2, 151:2, 179:8, 202:13
**Monday** [9] - 89:14, 104:24, 191:5, 193:10, 193:15, 193:17, 211:4, 211:14, 211:15
**money** [13] - 85:23, 86:19, 87:6, 88:1, 91:21, 147:18, 148:8, 148:17, 166:1, 172:18,

182:6, 182:8, 182:13
**monstrosities** [1] - 110:2
**month** [12] - 27:16, 172:8, 172:19, 173:9, 173:22, 174:19, 174:23, 176:11, 195:14, 195:23, 196:7, 201:9
**months** [7] - 155:9, 161:7, 198:16, 198:23, 199:2, 199:12
**Monticello** [1] - 55:10
**morning** [7] - 3:10, 3:11, 16:6, 16:7, 39:7, 65:25, 202:18
**mortgage** [1] - 177:18
**Most** [1] - 80:24
**most** [14] - 50:12, 52:13, 53:1, 55:13, 101:11, 119:20, 119:23, 119:25, 122:11, 138:10, 169:20, 169:21, 179:22, 183:6
**mostly** [2] - 117:5, 179:19
**Motion** [1] - 2:9
**motion** [2] - 29:5, 38:7
**motions** [1] - 29:9
**motivation** [1] - 33:2
**Mount** [35] - 13:4, 17:11, 61:12, 61:15, 61:16, 61:17, 63:8, 63:9, 63:12, 66:11, 66:20, 84:13, 84:16, 85:5, 85:24, 101:3, 110:19, 110:21, 110:24, 112:11, 112:14, 113:24, 162:1, 162:2, 162:7, 164:17, 164:25, 165:11, 165:16, 179:21, 179:23, 179:25, 180:9, 183:19
**mounted** [1] - 5:15
**move** [25] - 5:5, 7:5, 7:15, 22:10, 23:13, 29:18, 38:25, 58:6, 69:18, 77:12, 77:13, 97:2, 110:19, 118:6, 123:12, 123:23, 136:6, 141:5, 141:6, 143:4, 144:16, 165:7, 186:4, 186:13, 191:5
**moved** [5] - 6:13, 57:20, 118:5,

128:20, 193:10
**moving** [6] - 21:25,
106:10, 115:22,
156:25, 186:15,
193:17
**MSA** [1] - 114:9
**multiple** [2] - 146:11,
187:10
**multiply** [3] - 94:1,
97:16, 100:21
**must** [5] - 20:1, 39:22,
171:4, 206:3, 206:4

## N

**Nagle** [54] - 3:14, 3:24,
9:24, 17:7, 18:9,
27:1, 28:2, 28:9,
28:18, 36:7, 47:7,
47:12, 47:17, 47:22,
55:22, 62:1, 67:19,
70:21, 70:25, 71:21,
73:7, 86:9, 86:12,
86:14, 89:16, 90:4,
90:7, 93:9, 97:17,
98:18, 99:2, 99:20,
100:11, 101:12,
107:2, 118:17,
121:11, 122:9,
134:7, 159:2,
166:18, 166:23,
169:24, 170:10,
174:2, 177:2,
179:19, 180:7,
181:5, 183:19,
184:12, 184:23,
198:13
**name** [17] - 47:7, 48:4,
80:2, 85:17, 85:21,
85:22, 86:16,
138:18, 138:20,
143:20, 147:16,
153:3, 160:17,
180:19, 180:21
**named** [2] - 119:16,
158:19
**names** [1] - 109:11
**narrative** [1] - 149:2
**narrow** [1] - 51:6
**National** [1] - 53:14
**national** [5] - 39:25,
40:5, 40:6, 42:3,
43:6
**nearly** [1] - 13:7
**neater** [1] - 6:1
**necessary** [4] - 27:15,
50:14, 50:16, 207:3
**necessitated** [1] -
57:16
**necessitates** [1] -

59:22
**necessity** [1] - 50:10
**need** [40] - 13:13,
13:15, 17:21, 36:16,
37:9, 37:11, 49:7,
64:21, 76:23, 80:4,
87:15, 87:18, 89:22,
93:13, 102:23,
103:7, 103:21,
103:22, 104:20,
104:25, 122:19,
127:15, 127:17,
133:19, 133:24,
140:10, 157:9,
164:18, 164:21,
169:25, 174:8,
186:16, 191:2,
195:18, 197:19,
197:20, 201:11,
201:15, 205:6,
208:17
**needed** [9] - 7:20,
41:14, 115:23,
117:8, 123:8, 124:1,
142:11, 145:6, 152:1
**needing** [2] - 10:2,
72:5
**needs** [4] - 32:9,
40:17, 105:3, 113:16
**negotiated** [1] -
151:13
**negotiation** [1] - 170:6
**neighborhood** [1] -
145:5
**Net** [1] - 177:9
**net** [13] - 88:23, 94:16,
94:17, 166:7, 171:8,
171:22, 173:11,
173:24, 173:25,
174:2, 192:16,
195:12
**never** [9] - 72:11,
80:5, 84:12, 86:3,
126:17, 141:14,
184:10, 184:17,
184:23
**nevertheless** [1] -
6:25
**new** [25] - 40:16,
62:20, 70:2, 70:3,
96:19, 112:16,
112:25, 113:16,
113:17, 122:22,
124:18, 124:19,
124:23, 126:6,
134:7, 134:10,
134:16, 134:17,
141:15, 144:10,
148:1, 153:8,
204:16, 205:2,

207:10
**New** [1] - 46:18
**newer** [1] - 102:20
**newspaper** [2] -
49:18, 54:23
**next** [30] - 6:19, 25:2,
27:17, 55:9, 55:10,
69:17, 79:14, 83:9,
83:10, 85:14, 97:2,
103:14, 103:15,
106:14, 123:22,
124:17, 126:15,
131:16, 138:5,
157:23, 164:10,
170:9, 170:16,
171:24, 173:21,
176:12, 177:11,
208:17, 210:22
**next-to-the** [1] -
131:16
**nice** [1] - 6:3
**niche** [2] - 11:1,
109:14
**night** [1] - 109:16
**Nimmer** [5] - 32:14,
32:15, 32:18, 37:24
**NO** [1] - 1:4
**nobody** [2] - 157:16,
163:6
**nobody's** [2] - 66:4,
141:9
**non** [1] - 183:11
**non-UPM** [1] - 183:11
**none** [1] - 197:9
**nonstandard** [1] -
52:3
**nook** [1] - 57:1
**normal** [2] - 118:25,
145:15
**not-always-very-
successful** [1] -
46:12
**note** [3] - 37:8, 37:9,
37:11
**notes** [1] - 56:4
**Nothing** [1] - 123:6
**nothing** [15] - 51:14,
51:16, 51:19, 53:23,
55:14, 69:10, 74:8,
137:11, 138:3,
145:23, 183:1,
196:4, 196:16,
207:10, 211:7
**notice** [5] - 13:9,
126:16, 190:5,
204:21, 207:8
**noticeable** [1] - 22:4
**noticed** [3] - 12:24,
17:17, 20:5
**notices** [1] - 190:8

**notified** [1] - 161:25
**notify** [1] - 27:14
**number** [41] - 19:24,
26:24, 54:14, 54:24,
71:11, 88:20, 89:11,
89:16, 90:10, 90:15,
93:4, 93:6, 93:13,
93:17, 93:19, 94:4,
94:10, 97:12, 97:13,
97:16, 99:5, 100:7,
100:12, 103:22,
104:25, 142:4,
151:14, 151:15,
155:24, 172:24,
172:25, 174:12,
174:16, 174:17,
177:5, 192:20,
198:8, 198:12,
199:16, 208:20
**numbers** [11] - 87:13,
91:2, 93:1, 100:17,
173:5, 173:13,
173:14, 174:11,
200:7, 200:12, 201:7

## O

**o'clock** [2] - 101:24,
175:14
**Oak** [2] - 196:25,
197:1
**oath** [2] - 106:18,
128:18
**object** [8] - 76:11,
80:19, 103:4,
105:21, 130:15,
130:21, 189:11,
208:19
**objection** [19] - 60:13,
76:19, 76:22, 77:4,
85:1, 85:9, 85:12,
135:2, 135:16,
149:1, 160:22,
164:18, 178:15,
184:2, 184:9,
191:14, 192:6,
208:15, 210:11
**objections** [3] - 33:16,
103:13, 103:16
**objects** [1] - 105:8
**observations** [1] -
3:15
**obviously** [1] - 59:11
**occasionally** [1] -
117:2
**occupy** [1] - 6:25
**occurred** [4] - 14:9,
20:10, 208:24,
209:17
**occurs** [2] - 10:20,
11:18

**OF** [1] - 1:1
**of"** [1] - 73:6
**Off-the-record** [3] -
16:3, 131:8, 202:14
**offer** [2] - 16:24, 44:21
**offered** [2] - 161:22,
202:25
**offering** [2] - 143:12,
206:13
**offhand** [1] - 40:16
**Office** [1] - 24:6
**office** [23] - 114:25,
117:13, 127:5,
127:10, 128:8,
134:24, 135:15,
136:13, 136:16,
136:20, 143:4,
147:2, 147:3,
150:20, 153:22,
155:4, 174:15,
187:13, 187:17,
187:24, 188:7,
188:10, 188:21
**oft** [2] - 43:18, 45:10
**often** [1] - 34:1
**oil** [2] - 156:23, 163:11
**old** [2] - 63:25, 131:6
**old-school** [2] - 63:25,
131:6
**once** [8] - 57:22,
105:6, 105:17,
114:7, 126:14,
157:16, 157:23,
158:1
**one** [146] - 5:10, 6:1,
6:19, 9:7, 9:12, 9:21,
9:24, 12:15, 19:1,
19:2, 19:4, 19:6,
19:24, 20:19, 21:20,
24:5, 24:15, 25:24,
29:18, 32:19, 32:20,
34:12, 34:16, 34:19,
35:1, 35:13, 36:2,
39:21, 41:19, 43:6,
43:10, 43:21, 48:4,
49:19, 50:24, 52:8,
53:2, 53:18, 54:24,
55:1, 56:9, 56:10,
56:21, 56:25, 58:10,
58:11, 58:14, 58:15,
60:7, 65:4, 65:11,
68:15, 69:6, 70:10,
78:5, 79:21, 80:8,
81:1, 82:8, 83:5,
83:9, 83:10, 83:20,
87:24, 88:11, 88:17,
89:6, 89:19, 91:13,
91:15, 92:18, 96:22,
101:24, 102:19,
102:20, 103:6,

103:18, 103:21,
104:22, 108:25,
109:1, 110:15,
111:12, 113:19,
115:4, 117:2,
117:11, 119:8,
120:17, 120:19,
121:8, 123:21,
124:4, 128:8,
128:25, 131:22,
133:3, 134:5,
134:14, 137:6,
141:13, 142:4,
143:1, 143:8, 143:9,
143:25, 144:10,
147:14, 152:15,
154:4, 154:7,
154:13, 155:7,
166:23, 166:25,
168:8, 171:19,
173:12, 176:24,
177:2, 178:10,
178:11, 180:13,
183:5, 186:4,
186:17, 187:6,
187:17, 190:21,
194:8, 196:10,
196:14, 196:17,
197:6, 198:3, 199:5,
201:9, 203:13,
204:1, 205:23, 206:2
**ones** [7] - 16:23,
45:23, 66:6, 95:23,
97:9, 98:19, 103:7
**online** [1] - 188:25
**op** [1] - 170:18
**open** [8] - 6:10, 50:12,
52:25, 53:4, 53:20,
54:3, 141:14, 176:17
**opened** [1] - 91:20
**operating** [5] - 83:8,
101:10, 171:25,
173:23, 173:25
**opine** [2] - 61:11, 67:2
**opinion** [16] - 16:13,
16:24, 19:19, 24:7,
24:15, 35:2, 35:4,
49:10, 49:15, 51:3,
63:19, 74:3, 75:6,
81:6, 134:6, 191:19
**opinions** [11] - 16:17,
24:2, 24:3, 24:16,
24:17, 35:2, 44:19,
44:21, 44:24, 45:6,
47:4
**Oppidan** [9] - 86:16,
160:10, 160:12,
160:16, 181:4,
181:8, 181:19
**opportunity** [4] -

141:20, 148:18,
153:5, 153:13
**opposed** [2] - 22:22,
99:16
**opposing** [3] - 33:1,
84:18, 165:14
**opposite** [1] - 51:11
**or..** [3] - 120:21,
145:21, 201:13
**order** [7] - 96:7,
102:19, 156:3,
156:4, 157:3,
158:22, 162:17
**ordering** [4] - 137:11,
137:17, 145:12,
156:4
**orders** [1] - 157:21
**ordinary** [1] - 95:20,
96:3, 96:22
**organization** [3] -
41:24, 42:1, 43:4
**organizations** [1] -
39:24
**organize** [1] - 51:4
**orientation** [1] - 56:16
**oriented** [1] - 56:17
**original** [6] - 57:12,
60:24, 102:19,
112:13, 113:19,
127:5
**Originally** [1] - 167:14
**originally** [4] - 118:17,
140:9, 151:14, 167:1
**Osha** [1] - 1:18
**otherwise** [6] - 28:6,
28:13, 28:22, 54:13,
171:6, 189:17
**outside** [5] - 50:7,
163:24, 170:19,
170:23, 183:9
**oven** [1] - 11:4
**overall** [2] - 7:1, 49:10
**overdrawn** [1] - 64:25
**overhead** [27] - 64:4,
88:4, 88:11, 90:11,
90:24, 91:5, 92:4,
92:8, 93:7, 93:10,
96:9, 96:10, 96:20,
97:4, 98:5, 98:15,
98:22, 99:16, 99:18,
100:18, 121:14,
131:9, 136:25,
174:18, 198:8,
198:12, 200:3
**overlap** [1] - 153:10
**overlooking** [2] - 4:13,
6:15
**overruled** [3] - 38:7,
130:23, 135:8
**owing** [1] - 70:6

**own** [19] - 43:2, 43:13,
43:22, 51:10, 57:1,
67:6, 67:7, 67:25,
68:4, 68:5, 75:15,
75:19, 77:18, 110:7,
114:3, 114:8,
126:21, 171:19,
182:21
**owned** [1] - 139:20
**owner** [5] - 80:3,
81:25, 123:4,
123:15, 191:21
**owns** [2] - 190:5,
190:12

## P

**package** [2] - 122:16,
140:21
**page** [27] - 11:21,
11:23, 17:3, 26:22,
26:24, 27:15, 27:16,
47:20, 47:25, 71:18,
81:7, 83:15, 91:23,
103:3, 131:16,
175:3, 177:3, 195:8,
196:23, 198:4,
199:22, 199:23,
204:4, 204:8,
204:24, 205:23,
205:25
**Page** [8] - 2:3, 31:1,
129:17, 131:13,
174:6, 185:7,
195:12, 196:18
**pages** [8] - 27:11,
27:13, 35:4, 89:22,
102:13, 103:24,
177:14, 205:23
**PAGES** [1] - 1:13
**paid** [17] - 16:13,
16:17, 44:18, 68:9,
86:3, 86:5, 86:12,
86:23, 90:15, 91:14,
91:16, 92:9, 92:19,
100:20, 101:5,
101:12, 173:19
**paint** [1] - 69:17
**pair** [4] - 5:9, 5:17,
6:4, 6:17
**palm** [1] - 48:19
**pantries** [1] - 52:22
**paper** [1] - 46:23
**papers** [3] - 40:9,
80:12, 80:14
**paperwork** [2] -
112:20, 122:17
**Paragraph** [7] - 28:3,
28:10, 28:15, 28:19,
130:4, 132:25,

133:10
**pardon** [1] - 122:24
**Park** [4] - 27:2, 47:7,
47:12, 62:2
**part** [22] - 24:7, 27:6,
30:21, 30:23, 48:7,
82:3, 92:4, 96:22,
99:15, 114:19,
118:6, 119:25,
121:17, 137:4,
140:25, 147:11,
149:8, 154:25,
158:9, 169:9,
176:19, 189:13
**participation** [1] -
122:4
**particular** [14] - 21:18,
33:10, 33:11, 33:12,
46:14, 49:12, 54:11,
83:1, 88:6, 91:5,
92:2, 97:9, 174:18,
176:10
**particularly** [1] - 162:5
**partner** [5] - 99:14,
99:15, 152:13,
154:8, 157:4
**partnering** [4] -
145:23, 154:17,
156:13, 156:19
**partners** [1] - 157:4
**partnership** [7] -
147:17, 148:7,
153:13, 153:14,
153:17, 153:18,
154:14
**parts** [1] - 9:9
**pass** [7] - 15:17,
65:18, 94:25,
101:19, 127:14,
134:18, 138:2
**past** [4] - 41:22, 54:4,
130:1, 132:22
**patent** [1] - 34:21
**patents** [1] - 30:22
**patience** [1] - 193:16
**patio** [4] - 53:6,
140:11, 143:19,
144:13
**Patrick** [1] - 1:15
**pattern** [1] - 103:2
**Patterson** [5] - 84:8,
180:14, 180:21,
183:20, 197:9
**pause** [1] - 67:15
**pay** [8] - 82:5, 84:15,
87:6, 126:7, 161:22,
166:3, 170:24,
177:23
**paying** [4] - 16:19,
16:23, 151:11, 166:1

**payments** [1] - 88:9
**payroll** [9] - 82:23,
89:9, 90:17, 90:23,
92:2, 92:3, 98:19,
174:13, 174:14
**payroll-type** [1] - 92:3
**PDF** [1] - 183:15
**pedimented** [1] - 48:9
**peek** [2] - 211:9,
211:10
**pen** [2] - 125:10,
125:12
**pencil** [1] - 108:10
**pencils** [2] - 117:3,
117:4
**pennies** [1] - 94:10
**people** [24] - 5:25,
16:16, 41:25, 42:1,
46:14, 52:14, 53:10,
86:8, 111:7, 111:10,
111:17, 122:8,
137:16, 141:10,
144:2, 144:11,
146:12, 148:1,
148:20, 154:16,
154:20, 156:25,
157:5, 174:14
**people's** [1] - 67:10
**per** [5] - 27:16, 88:18,
151:11, 175:8, 208:1
**percent** [27] - 33:3,
86:19, 90:21, 90:22,
92:21, 94:24, 97:25,
98:10, 128:21,
142:8, 142:13,
143:16, 143:17,
144:9, 144:11,
155:19, 170:21,
170:23, 171:19,
171:20, 172:22,
173:15, 192:18,
192:21, 192:24,
193:2
**perfect** [1] - 110:16
**perform** [1] - 17:20
**performed** [3] -
152:24, 153:21,
178:12
**perhaps** [3] - 23:13,
55:1, 55:4
**period** [8] - 35:17,
155:10, 173:6,
198:17, 206:14,
207:5, 207:11,
209:15
**peripheral** [1] - 48:1
**permission** [3] -
75:14, 75:21, 76:3
**permit** [10] - 120:13,
125:16, 126:14,

158:6, 158:7,
158:12, 158:22,
161:9, 161:11,
182:16
**permits** [1] - 126:16
**permitted** [3] - 63:17,
64:12, 112:6
**person** [9] - 6:1, 6:2,
29:8, 72:13, 79:6,
99:23, 137:3, 150:1,
176:16
**person's** [2] - 76:2,
99:15
**personal** [2] - 77:16,
82:6
**personally** [3] - 34:7,
78:4, 119:12
**perspective** [1] -
162:11
**pertinent** [1] - 40:18
**petition** [1] - 133:10
**phone** [1] - 78:15
**phonetic** [1] - 48:1
**photographs** [2] -
26:13, 166:18
**photos** [2] - 18:11,
18:19
**phrase** [2] - 60:20,
68:16
**physicians** [3] - 31:5,
31:7, 31:8
**pick** [10] - 12:15, 51:2,
54:23, 56:1, 108:10,
147:12, 148:15,
157:3, 183:10,
204:10
**picked** [2] - 110:17,
123:5
**picking** [1] - 199:3
**picture** [5] - 81:2,
168:1, 168:2,
169:19, 169:22
**pie** [2] - 192:13,
192:15
**piece** [5] - 55:7, 55:15,
78:23, 208:8, 208:12
**pieces** [1] - 142:25
**pin** [1] - 39:15
**pioneer** [1] - 42:24
**pipeline** [2] - 147:20,
148:12
**place** [9] - 20:2, 22:12,
22:14, 50:1, 142:23,
144:18, 200:12,
203:16, 206:16
**Place** [9] - 27:2, 47:8,
47:12, 62:2, 84:7,
180:16, 196:21,
197:2, 197:14
**placement** [1] -

179:13
**plain** [2] - 43:5, 46:10
**Plaintiff** [14] - 1:4,
1:15, 2:8, 26:4, 29:2,
30:5, 30:6, 33:18,
35:16, 37:25,
102:25, 132:11,
163:18, 194:10
**plaintiff** [1] - 29:3
**Plaintiff's** [7] - 71:8,
71:12, 71:18, 87:10,
104:11, 106:25,
192:3
**Plaintiffs** [3] - 29:20,
31:13, 47:10
**plaintiffs** [1] - 33:19
**plan** [152] - 3:19, 3:25,
4:12, 4:22, 6:12,
6:24, 7:10, 8:8, 8:12,
9:24, 11:19, 13:3,
13:4, 13:9, 13:19,
13:20, 13:22, 14:18,
15:2, 15:9, 15:12,
17:7, 17:10, 17:21,
19:18, 19:20, 20:3,
20:9, 20:11, 20:18,
20:21, 21:18, 22:1,
22:11, 22:12, 22:13,
26:12, 26:15, 45:16,
45:18, 47:5, 47:11,
47:13, 47:16, 47:17,
47:21, 47:23, 48:21,
49:3, 49:5, 49:16,
49:20, 55:21, 57:18,
58:10, 58:11, 58:15,
58:16, 58:19, 58:21,
59:4, 59:7, 59:8,
59:11, 61:12, 64:10,
64:11, 64:18, 64:19,
64:24, 65:9, 66:19,
66:21, 67:7, 67:20,
68:20, 68:23, 71:23,
72:8, 72:9, 72:18,
72:23, 73:7, 73:10,
73:12, 74:8, 74:15,
75:7, 92:2, 92:9,
92:10, 93:9, 110:24,
111:5, 112:13,
112:14, 112:16,
112:24, 113:10,
113:14, 113:17,
113:18, 113:25,
118:17, 119:6,
121:23, 122:1,
122:16, 122:17,
124:18, 124:19,
124:23, 127:6,
127:11, 134:7,
134:10, 134:16,
134:17, 137:23,

149:16, 151:12,
155:13, 155:23,
157:2, 157:8, 158:4,
158:8, 158:10,
158:14, 160:8,
162:6, 162:16,
164:14, 165:16,
165:17, 167:1,
188:25, 191:12,
191:25, 205:19,
208:13, 208:18,
210:5, 211:2
**Plan** [1] - 72:6
**plane** [1] - 10:20
**planner** [1] - 3:21
**planning** [4] - 46:4,
53:1, 55:16, 78:24
**plans** [139] - 4:3, 8:24,
8:25, 9:1, 9:2, 10:9,
12:1, 13:6, 16:25,
18:9, 20:1, 20:6,
21:19, 23:16, 24:17,
24:19, 26:22, 27:3,
27:8, 27:9, 28:4,
28:11, 28:20, 33:11,
36:4, 46:20, 46:22,
49:17, 52:15, 52:20,
53:1, 54:24, 56:1,
57:12, 60:11, 61:10,
61:16, 61:17, 61:18,
61:20, 62:1, 62:2,
62:5, 62:9, 62:19,
62:20, 62:22, 62:24,
63:5, 63:6, 63:9,
63:12, 63:13, 63:15,
63:16, 63:20, 63:23,
64:16, 65:6, 66:2,
66:8, 66:11, 66:12,
66:15, 67:19, 71:21,
73:1, 78:1, 86:5,
86:20, 99:23, 99:24,
113:15, 115:9,
115:17, 116:6,
116:10, 116:18,
116:20, 117:8,
117:14, 118:10,
119:19, 120:15,
120:19, 120:24,
121:8, 123:5, 125:8,
126:1, 126:6, 126:7,
126:24, 127:4,
133:14, 136:16,
136:19, 137:11,
137:17, 146:23,
147:12, 150:17,
150:22, 151:19,
152:2, 152:9,
152:11, 153:10,
155:5, 155:15,
156:1, 157:23,

158:1, 160:18,
161:6, 166:22,
169:4, 170:13,
170:14, 180:10,
181:17, 181:19,
181:23, 181:24,
182:8, 183:12,
183:16, 187:7,
188:17, 188:18,
188:22, 192:2,
192:3, 192:4,
203:23, 207:6
**plans"** [1] - 63:4
**plate** [4] - 50:10,
57:22, 59:10, 59:12
**play** [2] - 93:6, 179:25
**PLLC** [1] - 1:20
**plumbing** [2] - 42:13,
183:4
**plus** [4] - 111:18,
171:17, 209:1,
209:18
**pocket** [1] - 6:18
**point** [24] - 13:10,
15:21, 17:19, 29:19,
30:13, 37:3, 46:23,
47:17, 55:25, 76:11,
78:12, 87:18, 105:7,
118:8, 124:21,
126:19, 145:6,
148:21, 149:21,
150:11, 151:6,
168:8, 175:7, 186:17
**pointed** [2] - 19:15,
61:25
**pointer** [3] - 19:5,
46:21, 87:15
**pointing** [2] - 18:16,
205:23
**points** [1] - 102:9
**pool** [1] - 157:5
**pop** [2] - 82:3, 87:24
**portion** [5] - 31:18,
32:5, 33:20, 90:20,
192:13
**position** [8] - 8:7,
10:4, 29:16, 57:2,
73:25, 74:4, 184:14,
200:16, 200:22
**positioned** [1] - 7:12
**possibility** [1] -
151:10
**possible** [7] - 5:22,
51:24, 113:9,
197:25, 208:3,
210:3, 210:7
**possibly** [1] - 171:1
**post** [1] - 130:7
**post-litigation** [1] -
130:7

**postdates** [1] - 208:24
**potential** [3] - 20:9,
20:11, 21:4
**pour** [1] - 22:15
**powder** [1] - 167:14
**practical** [1] - 59:2
**practice** [1] - 81:21
**practicing** [2] - 39:19,
41:10
**prairie** [1] - 52:14
**prairie-style** [1] -
52:14
**pre** [5] - 69:7, 71:1,
133:4, 137:7, 147:4
**pre-existing** [2] - 69:7,
71:1
**pre-litigation** [2] -
133:4, 137:7
**pre-UPM** [1] - 147:4
**precedent** [4] - 69:23,
70:2, 76:4
**precedents** [3] -
69:24, 69:25
**precipitated** [1] - 8:7
**precise** [1] - 29:19
**precursor** [1] - 135:23
**prefer** [3] - 23:21,
138:23, 138:24
**preliminary** [1] - 104:5
**prelitigation** [1] -
132:6
**prenatal** [1] - 30:22
**prepared** [5] - 61:9,
63:16, 87:24,
177:21, 201:16
**prescribed** [2] - 59:10,
59:12
**prescription** [1] - 14:3
**presence** [1] - 50:3
**present** [9] - 3:1,
29:14, 38:23, 102:6,
106:12, 130:1,
132:23, 175:24,
193:20
**presented** [1] - 184:3
**preserve** [1] - 207:17
**president** [3] - 39:25,
41:23, 191:22
**Pressler** [1] - 81:4
**Preston** [75] - 3:13,
3:19, 4:12, 4:21, 8:8,
8:12, 8:24, 9:2,
10:23, 11:5, 11:12,
11:17, 11:21, 13:3,
13:20, 14:4, 14:12,
14:17, 15:12, 17:10,
19:1, 20:8, 25:13,
27:25, 45:3, 47:5,
47:12, 47:16, 47:21,
56:11, 56:21, 56:22,

58:11, 58:15, 59:7, 60:23, 63:13, 64:10, 64:18, 66:7, 66:19, 67:4, 67:20, 67:23, 68:1, 68:9, 70:21, 71:1, 72:5, 72:17, 73:11, 74:2, 74:25, 75:1, 78:10, 78:22, 115:20, 117:18, 117:23, 118:4, 120:15, 128:9, 128:13, 129:9, 133:8, 136:5, 146:8, 146:25, 148:7, 148:21, 151:11, 155:17, 163:18, 189:2, 203:18
**PRESTON** [1] - 1:3
**presumes** [3] - 31:17, 32:6, 32:11
**pretrial** [2] - 102:19, 184:14
**pretty** [13] - 5:5, 5:24, 22:18, 43:11, 107:7, 108:6, 119:2, 120:23, 124:14, 128:15, 128:20, 153:25, 207:15
**previously** [1] - 41:3
**PREVIOUSLY** [1] - 106:19
**price** [12] - 118:25, 145:6, 145:8, 149:21, 149:24, 150:11, 170:3, 170:4, 170:5, 170:7, 173:14, 177:18
**primarily** [3] - 109:7, 112:1, 114:12
**primary** [1] - 50:10
**print** [2] - 12:19, 203:18
**printed** [1] - 40:15
**printing** [2] - 82:24, 125:8
**printout** [1] - 201:9
**printouts** [1] - 189:6
**private** [2] - 51:9, 51:10
**problem** [18] - 73:24, 86:7, 105:14, 106:9, 112:2, 120:25, 121:5, 121:9, 122:9, 124:5, 124:11, 124:25, 160:2, 161:22, 165:11, 166:2, 187:11, 187:20
**problems** [7] - 17:16, 108:11, 111:25,

120:24, 126:2, 164:3, 187:8
**procedure** [2] - 101:10, 135:22
**procedures** [1] - 189:13
**proceed** [5] - 15:19, 29:4, 38:10, 65:19, 81:14
**proceedings** [1] - 211:21
**Proceedings** [1] - 1:24
**proceeds** [1] - 25:24
**process** [5] - 78:18, 152:1, 154:24, 157:15
**produce** [2] - 43:5, 195:17
**produced** [21] - 1:24, 46:9, 153:23, 183:25, 184:4, 184:11, 184:17, 184:24, 185:17, 185:22, 187:18, 189:9, 189:12, 196:8, 197:11, 198:20, 198:23, 199:2, 199:13, 201:1, 201:3
**product** [11] - 140:12, 140:24, 144:10, 144:13, 144:5, 149:15, 150:12, 151:8, 151:22, 163:9
**products** [3] - 130:3, 132:24, 153:4
**profession** [1] - 39:22
**professional** [7] - 41:6, 41:7, 41:10, 41:13, 41:18, 92:8, 154:20
**professionally** [1] - 44:14
**professions** [1] - 39:21
**Professor** [5] - 39:2, 41:22, 47:1, 48:20, 62:14
**professor** [4] - 39:13, 63:25, 65:17, 65:23
**proffered** [3] - 208:19, 209:1, 209:18
**proficient** [1] - 155:12
**profit** [11] - 35:7, 37:20, 88:24, 92:15, 92:16, 94:17, 166:7, 173:11, 174:1, 174:2, 198:13
**Profit** [1] - 92:15

**profits** [19] - 31:22, 33:21, 34:2, 34:5, 34:11, 34:20, 34:23, 35:6, 35:14, 35:21, 36:13, 95:24, 191:13, 191:23, 192:5, 192:10, 192:16
**program** [6] - 40:6, 43:8, 76:16, 82:11, 117:1, 117:2
**programs** [2] - 12:7, 40:5
**prohibitive** [1] - 50:4
**project** [45] - 11:13, 15:5, 20:6, 26:23, 28:2, 28:5, 28:9, 28:12, 28:18, 28:21, 84:13, 84:16, 85:6, 86:9, 87:7, 88:6, 89:16, 90:4, 91:5, 97:17, 99:17, 99:20, 100:11, 109:15, 109:17, 110:19, 110:24, 112:17, 119:5, 162:21, 162:22, 163:10, 164:5, 164:8, 164:14, 169:24, 179:18, 179:21, 179:23, 180:6, 192:5, 196:21, 197:4, 198:13
**Project** [3] - 145:19, 145:24, 180:2
**projected** [1] - 14:20, 14:21
**projecting** [3] - 13:22, 14:6, 14:8
**projection** [2] - 14:24, 15:3
**projector** [1] - 121:15
**projects** [41] - 12:5, 13:7, 36:9, 40:7, 43:18, 84:7, 84:11, 84:12, 92:5, 96:13, 97:9, 100:4, 115:14, 120:20, 126:21, 127:1, 133:13, 133:16, 163:2, 163:3, 163:4, 163:22, 178:13, 179:4, 180:12, 180:15, 180:23, 180:25, 181:3, 181:8, 182:14, 182:17, 182:18, 183:2, 183:11, 183:23, 196:7, 198:16, 200:10,

204:1
**promised** [2] - 101:5, 101:12
**promote** [1] - 154:14
**proof** [6] - 29:8, 31:19, 31:21, 35:23, 37:1, 103:1
**proper** [2] - 74:15, 93:14
**properties** [2] - 18:7, 195:11
**property** [5] - 9:18, 20:13, 144:14, 144:19, 182:1
**proportion** [1] - 168:19
**proposed** [3] - 104:11, 104:12, 176:4
**protect** [2] - 103:17, 209:11
**protectable** [2] - 74:4, 74:5
**protectable'** [1] - 74:8
**proud** [1] - 43:11
**prove** [2] - 31:21, 31:22
**proves** [1] - 189:16
**provide** [5] - 16:17, 142:5, 172:1, 181:7, 182:16
**provided** [3] - 66:15, 181:16, 181:19
**Prudential** [1] - 172:12
**public** [9] - 28:6, 28:13, 28:22, 49:25, 50:11, 50:15, 56:24, 59:22, 60:1
**published** [3] - 40:8, 43:9, 203:9
**pull** [7] - 129:16, 139:9, 139:12, 139:13, 150:17, 182:10, 185:1
**pulled** [2] - 89:15, 91:1
**purchase** [6] - 156:3, 156:4, 157:3, 157:21, 162:16, 177:16
**purchased** [1] - 68:6
**purely** [1] - 185:20
**purpose** [1] - 114:20
**purposes** [2] - 46:25, 183:18
**push** [1] - 9:18
**pushed** [1] - 50:11
**pushing** [2] - 103:20, 143:12, 175:14
**put** [50] - 7:17, 22:14,

29:20, 29:22, 30:7, 30:8, 30:9, 31:13, 33:19, 34:21, 49:18, 50:1, 50:18, 55:9, 56:6, 56:10, 56:25, 61:13, 61:23, 62:3, 62:6, 65:6, 67:6, 67:24, 71:8, 83:14, 90:7, 91:21, 99:17, 100:21, 102:22, 112:17, 150:10, 155:14, 155:20, 156:5, 156:7, 159:16, 162:21, 162:22, 163:10, 163:14, 164:5, 164:8, 167:15, 179:10, 183:17, 186:3, 189:14
**putting** [5] - 8:10, 82:23, 129:21, 142:8, 189:1
**PW** [2] - 209:1, 209:18
**PW&A** [1] - 190:3
**PW&A"** [1] - 190:12
**PWA** [63] - 19:11, 22:11, 28:15, 110:24, 112:13, 115:9, 115:20, 116:10, 117:13, 117:14, 117:25, 118:8, 118:10, 119:6, 119:9, 120:24, 122:21, 126:24, 127:6, 128:16, 128:18, 128:22, 129:4, 130:1, 130:3, 130:18, 130:19, 132:23, 132:24, 133:9, 133:14, 134:25, 135:7, 135:12, 136:4, 136:16, 136:19, 137:17, 151:4, 152:1, 152:9, 153:9, 154:18, 154:21, 156:1, 156:3, 157:14, 157:19, 162:6, 162:17, 165:17, 170:14, 180:10, 181:17, 191:12, 192:4, 203:9, 204:15, 205:15, 206:18, 206:21
**PWA's** [7] - 115:16, 130:4, 155:4, 203:19, 203:20,

204:11, 204:24
**PWA-UL** [1] - 28:15
**PWA-Urban** [4] -
130:3, 130:18,
132:24, 133:9
**PX** [1] - 133:21
**PX-103** [1] - 133:19

## Q

**qualify** [1] - 82:9
**quarters** [1] - 52:23
**quasi** [1] - 45:25
**quasi-historical** [1] -
45:25
**questioning** [1] -
186:22
**questions** [23] - 16:8,
17:4, 24:21, 25:25,
26:5, 61:14, 63:2,
79:8, 79:11, 83:20,
84:18, 84:22, 94:19,
99:19, 101:21,
135:23, 149:10,
159:4, 165:14,
179:4, 191:7, 202:8
**quick** [2] - 84:22,
169:1
**QuickBooks** [3] -
185:21, 185:25,
198:21
**Quicken** [5] - 82:16,
87:11, 92:25, 172:3
**Quicken"** [1] - 82:11
**quickly** [9] - 84:14,
89:17, 106:10,
131:11, 139:25,
166:20, 170:10,
170:22, 186:13
**quite** [4] - 6:16, 7:21,
112:17, 125:21
**quote** [2] - 30:2, 32:14
**quotes** [1] - 182:20

## R

**R&T** [1] - 107:14
**race** [1] - 107:17
**Rader** [2] - 30:17,
30:20
**radiators** [1] - 52:23
**radical** [1] - 65:14
**radius** [2] - 18:12,
18:14
**raise** [2] - 79:17,
138:11
**Rajesh** [1] - 162:3
**Ramani** [15] - 106:5,
122:6, 138:7,
138:16, 138:20,
138:23, 138:24,

163:23, 170:1,
185:23, 191:12,
191:21, 193:6,
198:7, 205:13
**RAMANI** [2] - 1:7,
201:24
**Ramani"** [3] - 138:19,
138:24, 139:1
**Ramani's** [1] - 199:14
**ramifications** [1] -
17:20
**ran** [1] - 35:18
**ranch** [1] - 53:5
**Randy** [1] - 30:17
**rapidly** [2] - 191:5,
193:10
**rate** [2] - 118:14,
123:23
**rather** [7] - 23:18,
49:12, 57:1, 68:6,
71:5, 108:7, 193:12
**Rather** [1] - 14:20
**Raynor** [1] - 27:6
**RDZ** [1] - 160:17
**reach** [2] - 24:3, 166:3
**read** [3] - 25:4, 25:7,
26:10, 27:17, 59:21,
78:17, 81:9, 99:13,
100:24, 108:12,
137:4, 191:17,
191:18
**reading** [1] - 24:5
**reads** [1] - 152:10
**ready** [11] - 3:15, 29:4,
38:10, 38:18, 38:24,
81:14, 102:4,
103:21, 104:13,
157:24, 175:21
**real** [15] - 52:5, 105:7,
110:20, 112:4,
139:7, 139:16,
139:19, 140:2,
140:4, 140:14,
140:23, 141:3,
143:15, 171:10,
181:1
**realize** [1] - 92:22
**realized** [4] - 72:7,
121:19, 122:23,
123:5
**really** [27] - 8:7, 14:9,
22:4, 22:23, 23:24,
48:14, 51:3, 58:22,
59:1, 61:11, 74:13,
74:24, 75:8, 84:13,
88:20, 89:17, 107:1,
117:5, 119:24,
125:23, 148:4,
150:8, 153:6,
163:13, 168:10,

170:10, 207:2
**realtor** [9] - 141:9,
170:19, 170:24,
171:20, 172:11,
172:12, 173:20,
176:17, 180:3
**realtors** [6] - 141:7,
141:11, 141:18,
171:19, 172:11,
172:22
**reason** [3] - 20:2,
20:22, 54:8
**reasonably** [3] - 30:3,
30:8, 206:25
**reasons** [2] - 20:19,
209:10
**rebuttal** [3] - 189:14,
202:23, 207:2
**receivable** [2] - 101:8,
101:17
**receive** [1] - 183:12
**received** [5] - 32:3,
87:7, 111:5, 199:6,
200:1
**receiving** [1] - 72:6
**recess** [3] - 38:22,
106:11, 175:23
**recognize** [4] - 18:25,
85:17, 85:21, 86:16
**recollection** [1] -
64:13
**recommend** [2] -
107:16, 145:2
**recommending** [1] -
155:2
**reconfiguration** [1] -
57:18
**reconfigured** [2] -
55:25, 57:17
**reconsidered** [1] -
38:8
**record** [16] - 16:3,
25:4, 26:10, 35:25,
47:15, 103:14,
103:17, 131:8,
194:16, 199:7,
202:11, 202:13,
202:14, 202:15,
208:16, 211:21
**recorded** [1] - 100:7
**records** [2] - 84:1,
209:11
**rectify** [1] - 208:5
**red** [3] - 125:10,
125:12, 125:19
**redesign** [2] - 17:23,
123:11
**REDIRECT** [2] -
134:21, 136:11
**redirect** [2] - 24:24,

134:19
**Redirect** [2] - 2:17,
2:18
**redistributed** [1] -
11:3
**redline** [4] - 120:8,
125:6, 150:21,
150:22
**redlines** [3] - 117:6,
120:12, 125:5
**redlining** [2] - 125:7,
125:22
**redo** [1] - 89:1
**redraw** [1] - 124:15
**redrawn** [1] - 124:14,
126:9, 160:3
**reduced** [2] - 118:14,
119:3
**refer** [2] - 53:20,
199:16
**reference** [1] - 71:23
**referenced** [1] - 40:11
**referral** [2] - 87:8,
147:19
**referred** [4] - 34:17,
63:4, 148:20, 200:5
**referring** [4] - 5:11,
18:14, 45:16, 61:20
**reflective** [2] - 11:16,
11:18
**reflects** [1] - 188:19
**reformulated** [3] -
31:9, 31:20, 32:12
**refresh** [3] - 24:10,
64:13, 68:15
**refrigerator** [1] - 11:4
**regard** [6] - 17:15,
21:19, 84:1, 142:13,
143:14, 169:6
**regarding** [10] - 26:24,
84:19, 106:2, 132:9,
132:23, 133:5,
133:9, 137:8, 154:5,
186:23
**register** [8] - 82:13,
82:21, 83:5, 87:14,
91:4, 91:8, 91:17,
96:1
**register-type** [1] -
82:13
**registration** [1] -
41:10
**reinventing** [1] -
143:12
**Reisinger** [2] - 121:13,
122:6
**reiteration** [1] - 14:10
**relate** [1] - 200:23
**related** [5] - 30:3,
30:8, 126:23, 151:3,

180:10
**relation** [1] - 57:5
**relationship** [6] -
115:7, 146:23,
146:25, 147:19,
148:23, 154:21
**release** [3] - 84:19,
84:25, 86:1
**relevance** [1] - 190:19
**relevant** [9] - 26:5,
206:25, 208:21,
209:6, 209:8,
209:10, 209:14,
209:17, 210:1
**remain** [1] - 6:16
**remaining** [2] - 62:25,
101:17
**remember** [30] -
19:10, 19:12, 23:8,
24:1, 24:14, 35:11,
45:15, 45:16, 65:23,
70:12, 81:2, 85:7,
94:21, 107:23,
109:17, 109:18,
109:25, 111:1,
114:24, 115:13,
116:3, 117:16,
119:5, 119:8,
136:23, 147:14,
147:16, 159:22,
188:15, 208:8
**remind** [1] - 35:23
**remodeled** [1] - 43:13
**remodeling** [2] -
43:15, 77:18
**remodels** [1] - 43:20
**removal** [1] - 19:19
**removed** [3] - 203:11,
206:5, 206:8
**removing** [1] - 210:8
**render** [2] - 44:24,
47:4
**rendered** [1] - 49:16
**rendering** [2] - 10:17,
12:20
**renditions** [1] - 113:20
**renew** [1] - 184:9
**rent** [1] - 98:24
**rental** [1] - 34:23
**reoccurring** [1] -
151:17
**repair** [1] - 114:25
**repeating** [1] - 85:17
**repercussions** [1] -
206:22
**rephrase** [5] - 60:16,
74:19, 153:21,
160:25, 178:22
**replatters** [1] - 154:10
**replatting** [1] - 154:10

**replay** [1] - 164:4
**replicating** [1] - 69:15
**report** [13] - 24:2, 24:11, 24:12, 82:17, 82:21, 82:25, 185:21, 195:13, 195:22, 196:5, 198:15, 201:8, 201:9
**reported** [1] - 1:24
**REPORTER** [2] - 156:20, 194:19
**Reporter** [1] - 1:22
**reporter** [4] - 32:9, 98:9, 103:12, 191:18
**REPORTER'S** [1] - 211:19
**reports** [10] - 83:2, 87:14, 87:25, 91:4, 91:8, 91:18, 95:6, 95:16, 95:22, 96:1
**represent** [1] - 47:20
**representation** [2] - 26:13, 26:18
**represented** [2] - 132:10, 170:25
**representing** [1] - 171:5
**represents** [1] - 192:23
**request** [5] - 28:1, 28:8, 28:17, 157:7, 201:19
**requests** [2] - 27:18, 27:25
**require** [5] - 9:8, 37:1, 191:25, 194:25, 206:1
**required** [3] - 33:22, 35:20, 155:16
**requirement** [1] - 49:23
**requirements** [2] - 157:12, 209:2
**requires** [2] - 9:21, 158:22
**resale** [1] - 144:23
**resales** [1] - 144:22
**Research** [1] - 40:2
**research** [3] - 42:15, 139:16, 142:20
**researching** [1] - 140:2
**resemblance** [1] - 11:7
**residence** [2] - 45:8, 45:9
**residences** [1] - 46:8
**residential** [9] - 40:7, 42:19, 43:20, 45:19, 50:12, 52:25, 109:7,

112:10, 152:22
**resolve** [1] - 186:12
**respect** [2] - 101:3, 146:8
**respond** [2] - 26:2, 75:12
**responding** [1] - 74:6
**response** [13] - 28:7, 28:16, 28:24, 33:24, 33:25, 37:22, 53:22, 88:3, 130:6, 132:16, 185:24, 204:2, 209:25
**responses** [4] - 25:4, 27:17, 27:25, 29:1
**Responses** [1] - 2:7
**responsibility** [6] - 42:11, 120:4, 148:19, 159:25, 163:1, 163:8
**rest** [4] - 8:3, 17:3, 199:9, 204:3
**restaurant** [1] - 115:5
**restaurants** [1] - 127:3
**rested** [1] - 33:18
**restricted** [1] - 9:17
**rests** [2] - 29:2, 29:3
**Rests** [1] - 2:8
**result** [3] - 10:1, 59:9, 88:23
**resulted** [2] - 8:15, 57:18
**resume** [4] - 38:18, 38:24, 102:4, 175:21
**retail** [3] - 139:22, 142:16, 146:2
**retained** [5] - 16:24, 44:21, 68:10, 84:10, 110:23
**retreats** [1] - 42:4
**retrieved** [1] - 206:2
**revenue** [6] - 30:2, 30:7, 30:8, 31:14, 175:5
**revenues** [15] - 29:21, 29:25, 30:9, 30:10, 31:19, 33:4, 33:5, 33:9, 35:17, 35:18, 36:2, 36:19, 38:4, 83:21
**reverse** [1] - 81:9
**reversed** [2] - 81:8
**reversible** [1] - 105:13
**review** [7] - 12:1, 24:8, 44:4, 47:5, 154:1, 154:6
**reviewed** [2] - 24:3, 47:4
**revise** [5] - 115:16,

119:7, 120:18, 152:9, 152:11
**revised** [1] - 157:24
**revising** [2] - 116:10, 126:24
**revision** [1] - 152:5
**revisions** [8] - 118:15, 119:13, 119:15, 120:2, 120:5, 120:9, 134:7, 152:2
**Rewind** [1] - 162:4
**reworked** [1] - 57:19
**reworking** [1] - 57:20
**rich** [1] - 52:14
**riser** [1] - 57:14
**road** [2] - 189:21, 190:21
**role** [1] - 181:1
**rolling** [1] - 115:12
**roof** [7] - 48:11, 119:20, 120:11, 120:14, 143:1, 150:22
**room** [37] - 10:24, 13:21, 19:7, 20:12, 22:7, 22:15, 22:21, 22:22, 23:4, 23:17, 23:18, 23:22, 50:5, 50:13, 50:20, 50:25, 53:3, 53:6, 57:1, 59:25, 60:6, 123:8, 123:23, 167:6, 167:10, 168:4, 168:5, 168:7, 168:13, 168:14, 168:18, 170:6, 188:23, 193:19
**rooms** [6] - 21:25, 49:21, 51:4, 53:3, 54:1, 128:1
**Ross** [1] - 27:6
**roughly** [1] - 171:21
**round** [1] - 208:16
**rounding** [1] - 173:10
**routinely** [1] - 211:2
**row** [2] - 44:3, 173:12
**RPR** [2] - 1:22, 211:24
**rugs** [1] - 145:13
**rule** [5] - 80:18, 185:1, 186:7, 208:16, 209:12
**Rule** [3] - 178:16, 184:3, 184:20
**rules** [1] - 194:24
**ruling** [1] - 208:17
**rulings** [1] - 193:6
**run** [8] - 82:16, 83:5, 104:17, 105:1, 120:25, 158:6, 176:3, 210:24

**rundown** [1] - 31:3
**runner** [4] - 126:15, 158:6, 158:12, 182:17
**running** [1] - 114:11
**runs** [2] - 82:25, 103:18

## S

**s/Bruce** [1] - 211:24
**safe** [1] - 43:5
**safety** [1] - 42:13
**salaried** [2] - 172:21, 176:22
**salaries** [1] - 172:20
**salary** [2] - 171:13, 171:18
**sale** [8] - 34:23, 35:6, 36:11, 36:20, 38:3, 38:5, 144:19, 192:10
**sales** [19] - 27:10, 27:14, 31:14, 31:19, 32:7, 32:12, 36:3, 141:3, 145:11, 146:3, 149:24, 170:4, 170:7, 171:4, 173:14, 174:25, 177:18, 181:2, 201:2
**saleslady** [1] - 153:23
**salesperson** [1] - 38:4
**Sam** [14] - 116:2, 116:3, 146:8, 147:13, 148:23, 151:13, 154:3, 160:21, 161:14, 187:10, 187:16, 187:20, 187:23, 188:10
**Samantha** [6] - 72:4, 131:24, 132:7, 132:10, 133:5, 137:8
**San** [1] - 40:24
**Sapp** [1] - 89:20
**satisfactorily** [1] - 54:15
**satisfied** [1] - 37:16
**satisfies** [2] - 190:15, 209:2
**save** [2] - 129:7, 146:22
**saw** [4] - 61:7, 113:21, 141:20, 188:21
**scans** [2] - 194:8, 194:9
**scared** [1] - 80:5
**scheduling** [2] - 106:2, 188:1
**school** [3] - 40:19, 63:25, 131:6

**science** [1] - 108:11
**Science** [2] - 40:1, 41:23
**scoot** [1] - 90:2
**Scott** [15] - 117:17, 128:4, 129:13, 130:13, 130:25, 134:23, 135:7, 135:14, 136:3, 136:13, 187:12, 187:23, 188:7, 188:10
**scratch** [13] - 62:20, 68:21, 68:23, 72:9, 72:14, 72:19, 73:3, 73:8, 75:8, 126:9, 159:17, 159:24, 161:18
**scratch..** [1] - 121:23
**screen** [9] - 3:4, 15:22, 25:18, 26:9, 56:11, 61:13, 61:24, 125:25, 203:18
**screenshot** [4] - 206:7, 206:15, 208:21, 209:14
**scroll** [3] - 49:4, 204:12, 204:20
**seal** [5] - 77:20, 78:1, 78:6, 99:23, 99:24
**seat** [2] - 138:13, 206:10
**seated** [4] - 3:2, 29:15, 106:13, 175:25
**second** [41] - 4:15, 7:15, 7:23, 13:18, 14:13, 14:15, 14:16, 18:25, 19:25, 25:14, 27:24, 39:10, 50:8, 50:11, 51:4, 51:25, 52:11, 53:20, 56:8, 56:11, 56:12, 58:5, 58:22, 65:12, 66:7, 66:11, 66:15, 68:15, 79:21, 88:21, 131:7, 132:5, 133:10, 135:19, 167:23, 168:16, 169:17, 169:18, 179:22, 196:12, 211:8
**Second** [1] - 30:1
**second-most** [1] - 179:22
**Section** [1] - 209:2
**section** [3] - 17:17, 49:18, 109:1
**Security** [1] - 90:22
**See** [1] - 109:21
**see** [88] - 6:2, 6:13, 12:17, 12:22, 13:1,

13:18, 15:6, 29:13, 31:2, 34:1, 37:7, 38:19, 45:20, 46:15, 48:7, 48:16, 49:3, 49:5, 50:8, 52:25, 54:24, 56:6, 56:23, 57:23, 58:18, 63:21, 65:2, 65:8, 66:1, 70:14, 71:20, 71:22, 71:23, 72:1, 72:3, 72:13, 72:20, 72:21, 72:22, 72:24, 81:7, 87:16, 89:24, 90:3, 91:17, 102:4, 103:5, 104:22, 105:22, 106:6, 110:1, 120:8, 127:16, 129:24, 130:11, 131:17, 132:11, 156:1, 163:20, 164:15, 167:13, 167:17, 171:21, 173:4, 174:16, 175:9, 175:21, 177:24, 182:19, 182:24, 184:5, 185:19, 186:11, 186:16, 189:19, 189:23, 190:6, 193:17, 195:8, 197:1, 197:20, 202:21, 202:24, 204:21, 210:14, 211:14, 211:15

**seeing** [3] - 94:15, 123:9, 140:10
**seek** [2] - 85:23, 130:7
**seeking** [4] - 33:17, 33:22, 36:2, 86:4
**seem** [1] - 7:6
**select** [1] - 169:13
**selection** [3] - 54:11, 153:9, 169:2
**sell** [9] - 144:9, 144:24, 145:7, 148:9, 148:16, 148:17, 151:9, 155:23, 182:7
**seller** [3] - 142:6, 171:1, 177:19
**sellers** [1] - 143:13
**selling** [3] - 140:13, 170:8, 183:6
**sells** [1] - 143:15
**semi** [2] - 51:9, 60:7
**semi-combined** [1] - 60:7
**semi-private** [1] - 51:9
**send** [14] - 25:24, 83:15, 117:10,

122:19, 122:24, 126:12, 135:14, 150:6, 150:14, 156:18, 157:7, 187:12, 187:16
**sending** [2] - 187:23, 207:7
**sense** [7] - 6:10, 20:16, 53:25, 54:2, 115:10, 145:9, 153:8
**sent** [12] - 26:4, 117:13, 118:8, 120:13, 130:19, 133:18, 136:13, 147:6, 153:24, 154:3, 156:7, 162:15
**sentence** [3] - 52:1, 115:10, 121:18
**separate** [6] - 5:22, 6:20, 52:22, 60:6, 91:20, 103:7
**separated** [1] - 51:12
**separation** [3] - 51:9, 55:3, 58:23
**separations** [1] - 54:1
**sequence** [1] - 66:18
**series** [2] - 57:17, 95:6
**serious** [1] - 208:2
**servant** [1] - 52:22
**server** [1] - 68:5
**service** [5] - 141:8, 141:9, 141:13, 141:18, 142:5
**services** [3] - 142:11, 143:13, 169:9
**set** [20] - 18:8, 62:20, 63:3, 63:15, 66:7, 66:10, 66:11, 66:15, 114:7, 117:11, 117:13, 126:6, 129:1, 142:2, 142:14, 171:9, 186:24, 187:17, 188:7
**setbacks** [1] - 59:14
**sets** [5] - 10:10, 12:10, 45:1, 61:7, 61:8
**setting** [1] - 4:20
**settling** [1] - 43:12
**setup** [1] - 128:1
**seven** [3] - 12:11, 12:12, 57:15
**seven-and-a-half-inch** [1] - 57:15
**several** [5] - 21:19, 33:15, 52:24, 113:19, 115:14
**shall** [1] - 57:9
**shape** [1] - 23:16
**share** [1] - 6:1

**sheets** [2] - 12:11, 12:12
**shelf** [2] - 181:25, 182:3
**shift** [5] - 29:22, 37:3, 38:5, 109:16, 114:18
**shifted** [1] - 31:20, 38:12, 114:13
**shifting** [1] - 10:1
**shifts** [1] - 33:23
**shocked** [1] - 16:19
**shoot** [1] - 80:21
**short** [4] - 6:23, 6:24, 25:3, 29:9
**shortened** [1] - 138:22
**shorter** [3] - 5:11, 6:21, 155:10
**show** [24] - 18:21, 24:11, 30:4, 32:14, 37:18, 53:16, 53:17, 58:8, 62:5, 64:9, 64:16, 86:10, 87:9, 130:20, 134:3, 136:22, 141:14, 166:7, 174:21, 175:4, 176:12, 189:7, 192:12, 204:3
**showed** [3] - 171:6, 198:7, 201:8
**shower** [7] - 5:15, 6:21, 6:23, 167:13, 167:15, 167:18, 167:20
**showing** [4] - 95:23, 97:17, 136:23, 137:2
**shown** [3] - 37:7, 37:25, 209:22
**showroom** [6] - 142:16, 142:20, 142:25, 157:12, 172:17, 181:24
**shows** [3] - 190:3, 206:6, 207:10
**side** [47] - 4:12, 5:14, 5:19, 10:24, 12:10, 12:11, 14:17, 25:24, 26:1, 29:10, 42:10, 42:18, 49:18, 55:17, 56:4, 56:6, 56:25, 57:25, 58:6, 59:23, 63:21, 64:10, 65:14, 66:6, 77:7, 89:24, 102:16, 103:18, 105:2, 144:20, 144:25, 145:10, 145:12, 152:25, 169:21, 180:6, 193:3, 202:5
**side's** [1] - 102:17
**sides** [1] - 67:9

**sides'** [1] - 209:11
**sideways** [1] - 63:24
**sign** [1] - 142:8
**signed** [2] - 86:15, 157:16
**significance** [3] - 22:19, 22:24, 23:1
**significant** [4] - 22:10, 22:18, 54:25, 56:2
**significantly** [2] - 49:2, 110:13
**silly** [1] - 16:11
**similar** [12] - 4:14, 6:16, 7:3, 11:22, 12:5, 18:22, 18:23, 60:12, 61:1, 63:6, 65:11, 113:22
**similar"** [1] - 60:21
**similarities** [3] - 23:2, 45:1, 67:20
**similarity** [3] - 60:22, 61:5, 63:19
**similarly** [2] - 67:18, 101:12
**simple** [8] - 20:21, 52:20, 74:21, 89:6, 115:19, 170:4, 188:19, 188:23
**simpler** [1] - 8:14
**simplicity** [2] - 53:17, 54:9
**simplified** [1] - 188:24
**simply** [2] - 58:21, 110:2
**single** [12] - 6:17, 51:20, 52:15, 77:17, 77:25, 109:12, 140:11, 143:19, 152:24, 153:6, 164:14
**single-family** [6] - 77:17, 109:12, 140:11, 143:19, 152:24, 153:6
**sink** [1] - 11:4
**sinks** [1] - 169:3
**sit** [6] - 24:14, 103:11, 103:23, 105:3, 107:15, 108:22
**site** [25] - 20:1, 20:6, 20:9, 21:8, 21:9, 21:10, 21:16, 56:16, 56:18, 59:13, 122:16, 122:17, 145:2, 149:15, 149:16, 150:8, 155:13, 155:14, 155:15, 155:23, 157:2, 157:13, 158:3, 160:19

**site-specific** [1] - 21:8
**sites** [1] - 140:10
**sitting** [1] - 156:24
**situation** [1] - 152:4
**six** [14] - 36:7, 47:17, 55:22, 62:24, 155:9, 159:9, 159:10, 161:7, 166:25, 170:10, 170:13, 174:2, 195:11
**size** [4] - 22:14, 150:9, 168:19, 169:20
**sketch** [2] - 26:12, 26:18
**skip** [2] - 133:6, 137:3
**skipped** [1] - 137:5
**SLAVIN** [2] - 211:20, 211:24
**Slavin** [1] - 1:22, 211:24
**sleight** [1] - 205:16
**slightly** [3] - 4:24, 59:23, 60:3
**slow** [7] - 32:8, 123:14, 130:8, 132:8, 156:15, 171:14, 188:3
**slowed** [1] - 163:12
**slower** [1] - 156:20
**slowing** [1] - 163:13
**small** [6] - 6:17, 13:9, 14:24, 43:18, 48:11, 53:3
**smaller** [2] - 171:16, 176:23
**smoothly** [1] - 120:1
**snapped** [1] - 206:7
**so...** [2] - 23:2, 39:16
**Social** [1] - 90:22
**Society** [2] - 39:25, 41:23
**society** [1] - 98:8
**software** [2] - 82:10, 82:12
**soil** [1] - 154:11
**solar** [1] - 42:24
**sold** [13] - 31:10, 35:20, 139:20, 144:14, 146:14, 146:16, 146:18, 155:9, 170:11, 173:1, 173:7, 173:9, 180:3
**solid** [2] - 55:15, 78:23
**solution** [8] - 7:19, 8:12, 8:15, 9:23, 10:6, 124:13, 148:15, 148:24
**solutions** [1] - 10:6
**solve** [3] - 111:25,

112:1, 113:16
**solving** [1] - 108:11
**someone** [8] - 20:17,
  48:16, 85:7, 110:23,
  117:13, 206:6,
  210:3, 210:7
**sometimes** [12] - 9:8,
  12:6, 59:19, 123:19,
  123:20, 144:2,
  144:3, 147:1, 170:5,
  182:20, 183:8,
  188:20
**somewhat** [1] - 146:6
**somewhere** [2] -
  115:11, 142:1
**soon** [1] - 210:16
**sorry** [29] - 18:18,
  39:9, 40:14, 56:21,
  63:23, 70:5, 75:4,
  93:1, 93:4, 130:9,
  137:25, 139:10,
  140:1, 141:9, 149:5,
  156:16, 156:21,
  159:3, 160:15,
  164:11, 170:3,
  171:15, 182:11,
  188:4, 195:1, 195:9,
  202:1, 208:10
**sort** [15] - 8:4, 8:12,
  12:18, 50:14, 50:16,
  142:16, 142:18,
  146:1, 146:4,
  148:12, 149:14,
  150:15, 151:18,
  154:23, 156:17
**sorts** [1] - 190:8
**sounds** [2] - 58:8,
  94:9
**soup** [1] - 69:16
**sources** [1] - 36:2
**SOUTHERN** [1] - 1:1
**Southwest** [1] - 83:10
**space** [18] - 5:20,
  6:10, 6:19, 6:25,
  9:16, 14:2, 50:6,
  52:25, 53:5, 53:25,
  54:1, 54:3, 56:24,
  57:6, 58:2, 58:19,
  59:15, 60:1
**spaces** [8] - 3:20,
  8:21, 9:6, 20:3, 50:3,
  50:5, 54:19, 58:23
**span** [1] - 48:13
**Spears** [3] - 109:5,
  109:6, 110:4
**spec** [1] - 169:6
**special** [1] - 19:10
**specialized** [2] -
  109:8, 148:4
**specialty** [1] - 42:16

**specific** [9] - 21:8,
  29:19, 42:7, 45:6,
  57:11, 96:13, 96:22,
  97:9, 157:13
**specifically** [5] -
  21:20, 24:13, 96:6,
  154:7, 156:6
**specificity** [4] - 21:9,
  21:10, 21:16, 36:23
**specs** [2] - 109:10,
  109:13
**speculate** [1] - 5:18
**speculation** [1] - 85:1
**speculative** [2] - 46:9,
  50:12, 53:1
**speech** [1] - 205:3
**speed** [1] - 161:10
**spelled** [1] - 154:23
**spend** [2] - 88:1,
  172:17
**spent** [4] - 79:1, 90:3,
  93:9, 99:25
**spills** [1] - 22:9
**split** [3] - 7:21, 8:5
**spoliated** [2] - 206:18,
  206:21
**spoliation** [1] - 207:14
**spreadsheet** [14] -
  83:7, 87:13, 87:20,
  87:23, 88:21, 89:3,
  89:7, 90:6, 90:12,
  96:18, 96:19, 96:20,
  96:21
**spreadsheets** [2] -
  96:1, 96:2
**square** [11] - 15:4,
  15:5, 15:10, 15:11,
  15:12, 15:13, 15:14,
  112:8, 149:20,
  150:12, 150:18
**stack** [1] - 158:11
**staff** [9] - 12:15,
  103:22, 104:18,
  152:3, 152:12,
  157:17, 159:1,
  169:10, 172:5
**stair** [25] - 4:25, 7:11,
  7:12, 8:5, 8:8, 10:5,
  17:16, 22:6, 22:8,
  22:9, 22:12, 23:22,
  57:8, 57:13, 57:14,
  57:19, 60:1, 60:3,
  65:8, 119:21, 121:2,
  124:5, 124:11,
  124:25
**staircase** [1] - 168:10
**stairs** [13] - 4:16,
  18:12, 18:14, 23:3,
  23:11, 23:17, 57:9,
  72:8, 122:13,

  122:14, 123:12,
  160:2, 167:4
**stairs"** [1] - 7:21
**stairs..** [1] - 121:20
**stairtower** [1] - 65:13
**stairway** [1] - 50:22
**stairwell** [2] - 22:14,
  22:15
**stand** [8] - 22:4, 39:3,
  79:16, 106:16,
  106:18, 106:24,
  138:7, 209:24
**standard** [7] - 45:4,
  48:22, 49:9, 54:20,
  101:10, 105:15
**standardization** [1] -
  54:10
**standardized** [2] -
  49:21, 51:22
**standpoint** [1] - 84:5
**Stanford** [6] - 84:8,
  180:13, 180:19,
  183:20, 196:15,
  197:9
**start** [21] - 3:12, 9:13,
  32:8, 38:14, 49:4,
  49:12, 56:7, 66:2,
  73:4, 91:1, 102:22,
  103:24, 109:2,
  114:21, 115:19,
  122:14, 124:21,
  126:5, 149:22, 151:6
**started** [28] - 7:14,
  17:7, 39:14, 58:22,
  60:4, 87:3, 97:8,
  107:25, 110:7,
  114:4, 114:8,
  115:11, 115:12,
  115:13, 115:14,
  116:17, 120:13,
  136:6, 139:16,
  141:7, 148:24,
  151:3, 156:17,
  161:21, 162:18,
  162:19, 163:13,
  164:13
**starting** [5] - 47:16,
  55:25, 104:24,
  110:9, 175:7
**starts** [1] - 7:22
**State** [1] - 80:17
**state** [5] - 37:24,
  80:25, 81:1, 208:15,
  208:16
**statement** [6] - 27:21,
  73:5, 96:16, 142:5,
  177:15, 177:21
**statements** [3] - 73:2,
  194:9, 201:2
**States** [2] - 30:16,

  53:10
**STATES** [1] - 1:1
**stations** [1] - 109:17
**status** [1] - 102:8
**statute** [2] - 30:2,
  190:15
**stay** [1] - 80:12
**steal** [1] - 163:6
**stenography** [1] - 1:24
**step** [11] - 4:18, 9:23,
  24:25, 79:12,
  101:22, 126:15,
  138:4, 155:3,
  157:23, 193:21
**Stephen** [10] - 72:7,
  72:18, 76:10, 76:18,
  76:21, 80:2, 106:15,
  121:19, 153:2,
  165:23
**STEPHEN** [3] - 1:7,
  2:15, 106:19
**Stephen..** [1] - 121:18
**steps** [4] - 7:20, 7:25,
  8:10, 8:14
**stewing** [1] - 210:22
**still** [27] - 6:20, 23:1,
  33:18, 53:13, 57:4,
  62:7, 62:11, 81:2,
  87:15, 106:18,
  117:24, 118:1,
  118:4, 126:22,
  128:22, 130:21,
  146:9, 149:12,
  151:25, 156:24,
  161:20, 182:21,
  183:9, 183:22,
  184:15, 210:25,
  211:4
**stipulated** [4] - 36:8,
  36:10, 199:15,
  199:19
**stipulation** [2] - 36:6,
  200:20
**stipulations** [1] -
  154:6
**stock** [21] - 49:20,
  51:21, 52:6, 110:24,
  111:5, 113:15,
  113:18, 113:25,
  115:9, 115:17,
  116:6, 126:7,
  133:14, 146:23,
  150:17, 151:19,
  152:2, 155:5,
  155:25, 165:17
**stolen** [1] - 160:18
**stop** [2] - 103:3,
  210:13
**stopped** [1] - 163:14
**stops** [2] - 120:7,

  148:13
**storage** [1] - 51:13
**store** [3] - 35:13, 82:3,
  87:24
**story** [7] - 48:17,
  48:18, 51:4, 51:5,
  81:13, 107:19,
  107:21
**Street** [9] - 17:7, 28:2,
  28:9, 28:18, 36:7,
  84:8, 196:15, 197:9
**street** [1] - 49:24
**stretch** [3] - 55:16,
  78:24, 130:21
**Strike** [1] - 63:10
**string** [1] - 69:17
**Strother** [50] - 1:20,
  1:20, 2:5, 2:11, 2:13,
  2:16, 2:17, 2:21,
  16:5, 25:9, 34:16,
  39:6, 41:21, 60:18,
  62:17, 64:8, 66:3,
  77:16, 79:24, 81:16,
  85:4, 85:20, 95:23,
  106:21, 121:16,
  125:17, 127:21,
  134:22, 135:11,
  136:12, 137:1,
  138:15, 139:5,
  139:18, 149:7,
  161:2, 164:24,
  165:10, 166:17,
  176:8, 179:1,
  179:17, 182:15,
  186:21, 188:9,
  191:11, 192:8,
  192:19, 195:21,
  202:3
**STROTHER** [141] -
  15:19, 15:21, 15:24,
  16:1, 24:21, 29:5,
  29:17, 30:6, 30:19,
  30:21, 31:1, 31:3,
  31:7, 32:10, 32:16,
  32:18, 32:22, 33:6,
  33:8, 33:12, 33:15,
  37:23, 38:11, 39:2,
  60:17, 62:11, 62:14,
  64:3, 64:6, 65:17,
  76:11, 76:19, 76:22,
  79:11, 79:15, 79:19,
  79:22, 81:15, 85:3,
  85:15, 94:25,
  101:20, 102:1,
  102:11, 102:14,
  102:16, 103:9,
  106:1, 106:5, 106:8,
  106:15, 121:14,
  127:14, 130:15,
  130:21, 134:19,

135:6, 135:18, 136:25, 138:2, 138:6, 138:9, 139:4, 149:6, 160:24, 164:20, 164:23, 165:2, 165:5, 165:9, 166:9, 166:15, 176:2, 178:17, 178:21, 179:7, 179:11, 179:16, 184:7, 184:13, 185:6, 185:9, 185:11, 185:16, 185:23, 186:2, 186:6, 186:9, 186:14, 186:20, 189:10, 189:14, 190:9, 190:14, 190:23, 191:6, 191:9, 191:21, 192:4, 192:16, 193:5, 194:2, 194:4, 195:1, 196:11, 198:20, 198:25, 199:2, 199:11, 199:18, 200:6, 200:9, 200:15, 200:18, 200:21, 200:24, 201:13, 201:18, 201:22, 202:1, 202:6, 202:9, 202:12, 202:17, 203:2, 203:5, 203:7, 203:13, 203:21, 203:25, 205:13, 205:18, 205:22, 206:18, 206:21, 207:20, 207:24, 208:7, 208:11, 210:1, 211:17
**structural** [6] - 154:9, 157:4, 158:19, 158:19, 180:6, 183:1
**structures** [1] - 109:25
**struggled** [1] - 119:17
**student** [1] - 39:18
**students** [3] - 76:6, 76:9, 76:17
**studied** [2] - 8:24, 40:23
**study** [2] - 50:6, 108:8
**stuff** [11] - 12:16, 32:3, 114:9, 117:6, 123:3, 124:19, 124:20, 125:22, 155:21, 205:15
**style** [14] - 12:21, 22:10, 45:9, 45:14, 46:14, 46:15, 48:3,

48:6, 48:7, 52:14, 53:10, 53:11, 113:1, 145:4
**styles** [2] - 45:19, 46:18
**stylistic** [2] - 22:10, 46:10
**Subject** [1] - 71:20
**subject** [1] - 73:15
**subjects** [1] - 193:14
**submissions** [1] - 44:4
**submit** [2] - 158:11, 210:2
**subsequent** [2] - 61:17, 62:1
**subsequently** [1] - 64:12
**substantial** [5] - 23:2, 60:22, 61:6, 140:19, 172:18
**substantially** [6] - 13:16, 60:11, 60:21, 61:1, 61:11, 63:6
**subtract** [2] - 173:13, 173:18
**suburban** [1] - 53:5
**successful** [2] - 46:12, 79:3
**sued** [3] - 83:18, 86:6, 183:23
**sufficient** [6] - 35:24, 36:15, 36:16, 36:22, 36:25, 37:7
**suggesting** [1] - 94:20
**suggestive** [1] - 48:8
**suggests** [2] - 165:15, 208:9
**suing** [1] - 207:20
**suit** [1] - 46:25
**suite** [10] - 5:7, 5:9, 6:6, 6:13, 8:1, 14:24, 51:10, 51:25, 58:20, 58:24
**Suite** [3] - 1:16, 1:18, 1:21
**suited** [1] - 145:5
**sum** [1] - 92:14
**summaries** [1] - 201:7
**summary** [7] - 15:8, 15:11, 15:13, 185:22, 193:25, 198:18, 201:4
**summation** [1] - 77:8
**Sunday** [3] - 49:18, 54:23, 202:18
**supervised** [1] - 99:25
**supplied** [1] - 185:4
**support** [2] - 42:1, 152:12

**supporting** [2] - 173:4, 177:24
**supposed** [5] - 29:21, 101:2, 124:18, 156:10, 156:12
**Supreme** [1] - 30:16
**surprise** [2] - 16:16, 206:24
**surprised** [1] - 16:9
**surveyors** [1] - 154:10
**sustain** [1] - 77:4, 192:6, 192:7, 210:11
**sustained** [6] - 76:14, 76:20, 76:24, 85:2, 149:3, 191:20
**SUZANNE** [1] - 2:4
**SWA** [1] - 83:9
**swear** [1] - 97:25
**switch** [5] - 15:22, 25:16, 64:3, 79:19, 95:12
**switching** [1] - 64:25
**SWORN** [4] - 39:4, 79:18, 106:19, 138:12
**sworn** [1] - 138:11
**system** [14] - 116:20, 117:8, 117:9, 119:10, 119:12, 128:9, 128:10, 130:20, 136:7, 154:22, 174:12, 187:9, 187:18, 188:8
**systems** [2] - 42:12, 42:16

## T

**table** [8] - 15:9, 103:11, 103:14, 142:11, 150:2, 151:1, 177:19
**tabs** [1] - 195:2
**Tackett** [1] - 43:1
**tagged** [1] - 31:2
**Taj** [1] - 55:10
**talker** [1] - 108:14
**Tamisha** [1] - 27:6
**taught** [2] - 12:18, 76:17
**tax** [2] - 96:18, 96:19
**taxes** [5] - 82:15, 83:16, 90:17, 96:17
**teach** [7] - 39:22, 41:14, 42:1, 42:15, 76:1, 76:6, 76:9
**teaching** [3] - 39:15, 42:7, 42:11
**team** [8] - 27:6, 27:10, 27:12, 27:14,

147:13, 150:25, 157:17, 159:1
**Tech** [2] - 107:12, 108:19
**technical** [8] - 40:6, 42:10, 44:4, 44:6, 48:1, 69:24, 73:13, 155:21
**technically** [1] - 118:2
**technology** [2] - 42:1, 42:17
**telephone** [1] - 42:5
**teller** [1] - 94:20
**ten** [4] - 29:12, 29:13, 61:8, 62:25
**Ten** [1] - 44:2
**tender** [1] - 185:12
**term** [7] - 8:17, 45:24, 60:15, 69:1, 69:2, 69:5, 72:14
**terminal** [1] - 41:15
**terminated** [1] - 166:5
**terms** [8] - 51:15, 51:16, 69:4, 70:10, 98:12, 100:18, 116:23, 196:5
**testified** [10] - 41:4, 80:5, 85:12, 112:12, 189:15, 189:25, 203:3, 203:7, 203:13, 205:15
**testify** [3] - 21:16, 81:18, 205:13
**testifying** [1] - 129:8, 191:22
**testimony** [21] - 16:14, 19:9, 23:3, 77:1, 78:17, 84:20, 94:16, 94:21, 128:16, 128:17, 129:3, 162:5, 191:3, 191:15, 191:19, 191:25, 192:1, 193:9, 204:25, 205:14, 210:23
**testing** [2] - 154:11
**TEXAS** [1] - 1:1
**Texas** [4] - 35:12, 42:23, 107:12, 108:18
**text** [1] - 71:24
**themselves** [2] - 34:24, 35:20
**then...** [1] - 21:8
**theory** [1] - 69:10
**thereby** [1] - 210:6
**therefore** [1] - 100:17
**they've** [4] - 30:7, 30:9, 30:10, 197:11
**think"** [1] - 161:14

**thinking** [3] - 55:15, 78:23, 189:20
**third** [23] - 3:12, 3:16, 3:19, 3:20, 3:25, 4:17, 4:18, 7:15, 9:24, 14:16, 14:17, 51:8, 51:24, 58:7, 63:15, 66:7, 68:19, 119:21, 133:10, 168:16, 169:17, 169:18, 209:21
**thorough** [1] - 35:2
**thousand** [1] - 110:12
**thousands** [1] - 127:22
**three** [32] - 36:9, 48:17, 51:4, 53:3, 60:10, 84:7, 89:14, 90:3, 100:14, 100:15, 104:22, 107:8, 108:22, 147:2, 150:19, 155:21, 180:12, 180:13, 180:15, 180:23, 181:3, 181:8, 182:17, 182:18, 183:2, 183:11, 183:23, 200:10, 203:25, 210:20, 210:23
**three-story** [1] - 48:17
**throughout** [2] - 110:10, 172:8
**throwing** [1] - 38:4
**tie** [2] - 177:22, 178:11
**tied** [1] - 99:16
**tight** [1] - 57:21
**tile** [2] - 167:21, 183:5
**timely** [1] - 206:25
**times'd** [1] - 93:9
**timesheet** [4] - 89:13, 89:19, 89:23, 99:12
**timesheets** [2] - 89:15, 90:9
**Tires** [1] - 139:23
**title** [3] - 177:17, 177:22
**to...** [1] - 20:24
**Toby** [2] - 155:7, 157:2
**today** [11] - 24:14, 52:25, 68:17, 106:3, 106:7, 107:17, 146:9, 175:15, 191:5, 207:19, 211:4
**together** [8] - 46:20, 56:1, 60:10, 117:24, 146:3, 147:12, 150:10, 154:20
**toilet** [3] - 5:16, 6:9, 50:15

**took** [14] - 13:8, 67:4, 68:7, 80:25, 90:6, 90:14, 93:2, 93:8, 96:13, 97:8, 108:25, 114:19, 173:7, 190:20
**tool** [1] - 116:25
**Top** [1] - 44:2
**top** [10] - 19:21, 57:14, 64:25, 91:13, 112:19, 182:25, 190:12, 204:24, 209:2, 209:19
**topic** [2] - 187:3, 187:15
**toss** [1] - 81:10
**total** [12] - 57:18, 89:10, 90:10, 90:14, 91:12, 173:21, 174:17, 174:25, 175:9, 198:1, 198:16, 200:3
**totaled** [2] - 36:8, 90:13
**totals** [3] - 91:21, 91:22, 200:10
**touch** [1] - 117:24
**toward** [3] - 7:14, 91:5, 159:9
**Tower** [1] - 55:9
**towers** [1] - 119:21
**townhome** [6] - 48:18, 51:5, 51:25, 140:11, 144:13, 153:3
**townhomes** [18] - 18:8, 33:12, 36:3, 36:7, 36:9, 44:15, 55:22, 79:2, 79:3, 109:17, 110:9, 110:11, 114:13, 114:15, 143:18, 152:24, 153:12, 169:6
**townhouse** [5] - 9:17, 20:7, 51:15, 77:25, 78:3
**townhouses** [2] - 127:22, 128:2
**trade** [2] - 52:6, 143:24
**traditional** [1] - 172:10
**transaction** [9] - 142:25, 144:18, 170:18, 175:1, 175:8, 175:10, 176:15, 176:16, 178:5
**transactions** [6] - 170:21, 171:3, 171:18, 173:22,

175:1, 175:6
**transcript** [1] - 211:21
**transcription** [1] - 1:25
**transfer** [1] - 34:24
**transferred** [1] - 91:22
**trash** [1] - 81:10
**treatment** [1] - 48:10
**tree** [2] - 48:19, 113:21
**tremendously** [1] - 163:12
**trends** [1] - 169:14
**trial** [7] - 1:10, 32:22, 80:13, 81:4, 185:22, 189:12, 207:4
**trick** [1] - 56:13
**tried** [3] - 35:12, 35:16, 103:25
**tries** [1] - 111:24
**true** [15] - 16:14, 16:18, 29:20, 50:11, 52:5, 73:2, 73:3, 73:5, 73:21, 80:22, 86:22, 131:20, 160:24, 165:20, 172:23
**trust** [1] - 143:6
**truth** [1] - 94:20
**truth-teller** [1] - 94:20
**Try** [1] - 133:24
**try** [20] - 16:2, 17:23, 19:5, 21:24, 44:7, 54:24, 74:21, 74:23, 99:19, 101:4, 101:7, 101:17, 110:20, 129:7, 131:10, 141:7, 143:9, 161:13, 166:3, 182:13
**trying** [21] - 23:23, 43:4, 53:9, 53:23, 66:4, 66:10, 70:12, 70:16, 70:19, 101:6, 119:18, 148:24, 154:18, 154:19, 161:3, 162:25, 163:6, 193:3, 197:22, 201:12, 209:11
**tub** [4] - 5:15, 6:21, 6:24, 169:16
**tucked** [1] - 5:7
**turn** [2] - 81:7, 89:22
**turned** [2] - 148:23, 149:1
**Tuscan** [5] - 45:24, 48:6, 48:8, 48:13, 48:18
**Tuscan"** [1] - 48:5

**TWC** [1] - 90:20
**twice** [2] - 109:1, 171:1
**two** [55] - 4:2, 10:10, 10:17, 10:18, 12:4, 12:10, 13:6, 13:7, 13:9, 13:17, 18:25, 19:3, 20:6, 20:20, 20:25, 23:2, 23:15, 26:13, 26:18, 36:2, 39:15, 40:23, 43:22, 51:3, 56:1, 60:11, 61:1, 61:7, 73:1, 77:1, 77:19, 88:21, 89:13, 89:14, 89:17, 93:15, 97:17, 99:6, 100:13, 100:25, 104:22, 106:3, 109:21, 111:7, 111:17, 117:11, 147:2, 150:18, 155:20, 163:3, 169:9, 172:3, 180:13, 187:25, 188:12
**two-car** [1] - 109:21
**two-dimensional** [4] - 10:17, 10:18, 26:13, 26:18
**TX** [3] - 1:16, 1:19, 1:21
**type** [8] - 82:13, 91:7, 91:11, 92:3, 140:11, 140:12, 155:13, 195:13
**typed** [1] - 98:3
**typical** [4] - 5:2, 51:15, 53:5, 171:9
**typically** [7] - 154:10, 157:11, 161:9, 167:15, 170:17, 183:15, 189:1
**Typically** [1] - 158:5

# U

**U.S** [1] - 143:24
**UH** [1] - 42:24
**UL** [8] - 1:7, 28:15, 91:20, 91:21, 134:25, 135:7, 135:12, 157:19
**UL-PWA** [3] - 134:25, 135:7, 135:12
**ultimate** [1] - 23:15
**ultimately** [8] - 27:9, 64:12, 80:16, 120:10, 126:10, 127:5, 143:2, 188:6
**umm..** [1] - 186:2

**unclutter** [1] - 53:23
**uncomfortable** [1] - 67:11
**under** [14] - 9:3, 29:19, 30:21, 31:21, 37:7, 106:18, 111:8, 111:10, 128:18, 142:25, 159:23, 178:15, 184:2, 196:15
**Under** [1] - 184:20
**undergraduate** [6] - 41:1, 41:7, 41:11, 42:22, 43:11, 44:12
**underlie** [1] - 184:21
**underlying** [9] - 184:19, 185:18, 186:1, 196:6, 201:3, 201:5, 201:6, 201:15, 202:17
**underneath** [1] - 90:4
**understood** [4] - 23:25, 66:14, 106:8, 180:18
**underway** [1] - 175:12
**undisclosed** [1] - 191:15
**undisputed** [1] - 36:1
**unfair** [1] - 199:11
**unhighlighted** [1] - 31:18
**unit** [7] - 28:5, 28:12, 28:21, 64:5, 155:20, 159:8, 166:18
**United** [2] - 30:16, 53:10
**UNITED** [1] - 1:1
**units** [16] - 47:11, 47:18, 62:24, 62:25, 118:17, 118:24, 120:21, 155:20, 155:21, 159:5, 159:7, 159:9, 166:23, 166:25, 174:2, 180:9
**university** [4] - 31:18, 32:13, 32:23, 43:3
**University** [8] - 30:13, 31:7, 34:22, 39:14, 40:19, 42:24, 44:13, 75:25
**university's** [3] - 31:16, 32:6, 32:11
**unless** [2] - 20:12, 146:24
**unrecognizable** [1] - 65:10
**unrelated** [1] - 30:9
**untruthful** [1] - 137:2
**up** [120] - 4:17, 7:13,

7:19, 7:22, 7:23, 8:3, 8:13, 11:11, 13:19, 15:1, 23:25, 25:18, 26:9, 31:17, 35:24, 38:4, 46:9, 46:25, 52:17, 53:4, 55:11, 56:10, 57:13, 59:4, 59:7, 59:11, 60:1, 61:13, 61:24, 62:3, 62:22, 65:15, 68:15, 69:20, 71:8, 72:8, 72:18, 75:8, 81:3, 82:17, 82:25, 83:12, 83:14, 87:15, 88:16, 90:8, 90:15, 92:23, 93:4, 93:10, 95:7, 96:9, 96:14, 98:3, 104:20, 106:24, 107:8, 107:18, 108:10, 109:24, 112:8, 113:13, 115:12, 117:11, 117:14, 121:23, 122:18, 129:1, 129:15, 129:16, 133:20, 133:23, 134:9, 135:23, 141:3, 142:9, 145:23, 146:14, 148:15, 148:24, 151:10, 151:18, 152:13, 154:17, 156:19, 157:19, 159:16, 163:16, 164:16, 164:21, 165:3, 170:8, 171:9, 172:23, 174:7, 177:16, 179:10, 185:12, 186:5, 186:17, 186:24, 187:17, 188:7, 188:8, 189:1, 190:22, 191:5, 193:14, 194:21, 194:25, 202:23, 203:7, 204:6, 204:9, 204:10, 204:13, 206:1, 211:4, 211:14
**updates** [1] - 27:15
**UPM** [16] - 145:16, 145:18, 145:24, 147:4, 151:3, 151:6, 153:23, 169:9, 179:23, 180:5, 180:23, 182:7, 182:14, 183:11, 183:19
**UPM"** [1] - 144:16
**upper** [1] - 65:15
**upstairs** [2] - 50:3,

169:17
**URBAN** [1] - 1:7
**urban** [2] - 33:6, 140:11
**Urban** [83] - 25:11, 25:13, 27:7, 27:24, 32:2, 43:8, 72:4, 72:13, 72:17, 74:24, 75:3, 87:6, 92:20, 99:3, 111:3, 112:25, 114:21, 115:2, 115:4, 115:7, 115:8, 115:19, 116:1, 116:10, 120:17, 123:21, 126:21, 128:14, 130:3, 130:18, 132:24, 133:9, 141:1, 141:22, 142:2, 142:14, 143:2, 143:4, 143:7, 143:14, 143:20, 144:7, 145:15, 145:17, 145:18, 145:24, 151:11, 153:16, 157:19, 158:23, 162:10, 165:23, 166:6, 170:25, 172:16, 174:2, 174:18, 179:4, 179:20, 179:25, 180:2, 180:3, 180:25, 181:7, 181:14, 181:16, 182:16, 183:12, 183:16, 183:22, 183:25, 191:12, 191:22, 192:4, 192:9, 192:16, 194:4, 200:9, 203:9, 203:15, 206:7
**urbanliving.com** [1] - 72:2
**usable** [1] - 11:16
**USC** [1] - 208:25
**useful** [2] - 50:6, 61:23, 179:3
**uses** [1] - 72:14
**Usonia** [1] - 53:11
**Usonian** [2] - 53:9, 53:17
**usual** [1] - 68:13
**utility** [1] - 123:12

**V**

**value** [6] - 142:7, 148:5, 150:25, 191:12, 191:24, 192:2

**Vane** - 35:13
**vanities** [1] - 6:1
**vanity** [6] - 5:10, 5:11, 6:20, 6:21, 6:23, 6:24
**variation** [1] - 14:5
**vary** [2] - 59:19, 170:20
**vendors** [1] - 146:2
**verbose** [2] - 73:23, 75:10
**verdict** [1] - 29:18
**Vernon** [35] - 13:4, 17:11, 61:12, 61:15, 61:16, 61:17, 61:18, 63:8, 63:9, 63:12, 66:11, 66:21, 84:13, 84:16, 85:6, 85:24, 101:3, 110:19, 110:22, 110:24, 112:11, 112:14, 113:24, 162:1, 162:2, 162:7, 164:17, 164:25, 165:11, 165:16, 179:21, 179:23, 180:1, 180:9, 183:19
**version** [10] - 11:15, 66:20, 67:19, 68:4, 68:19, 70:20, 138:22, 188:24, 208:23, 209:14
**versions** [1] - 150:19
**versus** [5] - 6:17, 83:3, 83:4, 99:18, 136:6
**vertical** [2] - 10:19, 10:20
**vetted** [3] - 44:6, 102:14, 102:15
**view** [14] - 20:9, 20:11, 21:4, 21:8, 21:17, 23:15, 53:4, 56:20, 56:22, 56:23, 58:3, 58:20, 167:14, 168:7
**views** [2] - 26:24, 27:15
**VINOD** [3] - 1:7, 2:20, 138:12
**Vinod** [5] - 116:3, 138:6, 138:18, 138:25
**violation** [4] - 57:12, 208:1, 208:25, 209:17
**violations** [3] - 125:15, 207:25
**virtual** [1] - 63:12
**virtue** [1] - 4:25
**visit** [1] - 142:20

**vitamin** [7] - 30:22, 31:5, 31:6, 31:10, 31:11, 31:15, 31:20
**vocabulary** [2] - 45:11, 45:12
**voir** [1] - 135:20
**Voir** [1] - 2:18
**VOIR** [1] - 136:1
**volume** [4] - 5:20, 54:2, 151:18, 175:10
**VOLUME** [1] - 1:12

**W**

**wait** [1] - 193:12
**waited** [1] - 199:11
**waiting** [2] - 189:24, 210:23
**walk** [6] - 5:15, 5:18, 6:21, 14:23, 93:12, 181:24
**walk-in** [4] - 5:15, 5:18, 6:21, 14:23
**wall** [19] - 4:13, 5:10, 5:11, 6:9, 7:2, 9:19, 13:21, 13:23, 14:4, 14:18, 14:19, 14:25, 19:7, 19:8, 19:25, 20:10, 22:8, 65:14
**War** [1] - 52:17
**was..** [1] - 151:23
**Washington** [1] - 143:5
**wastewater** [1] - 158:20
**watch** [1] - 175:20
**water** [1] - 80:4
**ways** [10] - 6:7, 10:3, 51:3, 54:7, 54:14, 54:25, 65:11, 70:1, 105:21, 203:13
**wealthy** [1] - 52:14
**wear** [1] - 211:6
**web** [6] - 26:22, 27:11, 27:13, 27:16, 145:11, 208:23
**website** [27] - 181:23, 182:3, 183:18, 189:2, 189:6, 190:7, 190:9, 203:19, 203:20, 204:4, 204:11, 204:15, 204:16, 204:17, 204:18, 205:1, 205:2, 205:20, 206:15, 207:7, 207:10, 207:15, 207:16, 207:17, 208:23, 209:15
**websites** [1] - 181:24

**weeds** [1] - 70:14
**week** [8] - 88:19, 93:2, 110:15, 147:1, 147:2, 172:8, 204:16, 208:17
**weekend** [2] - 141:13, 201:24
**Weekley** [10] - 115:22, 118:1, 118:6, 128:17, 128:23, 136:6, 146:15, 146:17, 147:16, 148:22
**weeks** [4] - 88:19, 93:2, 187:25, 188:12
**welcome** [2] - 80:13, 102:24
**Weslayan** [1] - 1:21
**West** [2] - 107:9, 152:23
**Western** [1] - 139:23
**whatsoever** [1] - 78:16
**whereas** [3] - 6:15, 58:1, 60:7
**whiteboard** [1] - 179:3
**whole** [5] - 46:7, 49:5, 57:24, 142:10, 158:21
**wide** [2] - 14:24, 109:22
**widely** [1] - 42:3
**wider** [1] - 13:24
**width** [4] - 14:3, 14:7, 14:10, 50:2
**wife** [3] - 43:12, 127:3, 146:10
**willing** [1] - 115:23
**Wilmer** [1] - 81:2
**win** [1] - 105:20
**window** [1] - 167:18
**windows** [1] - 48:12
**winners** [1] - 43:10
**wire** [2] - 178:4, 178:9
**wise** [1] - 20:15
**wish** [3] - 25:4, 52:9, 117:3
**WITNESS** [25] - 4:8, 4:10, 7:7, 7:9, 39:18, 41:18, 74:17, 80:14, 80:22, 125:14, 134:1, 135:10, 139:10, 139:15, 140:6, 146:18, 149:5, 156:16, 156:21, 171:15, 179:9, 182:11, 188:4, 188:7, 193:22
**witness** [21] - 15:17, 16:20, 16:23, 25:2,

39:1, 60:13, 65:18, 77:11, 79:14, 94:25, 101:19, 106:14, 127:14, 134:18, 138:2, 138:5, 176:5, 190:22, 193:15, 209:23, 211:3
**witnesses** [2] - 106:3, 165:15
**won** [1] - 43:6
**wondered** [1] - 19:22
**Wood** [81] - 3:13, 3:19, 4:12, 4:21, 8:8, 8:12, 8:24, 9:2, 10:23, 11:5, 11:13, 11:18, 11:21, 13:3, 13:20, 14:4, 14:12, 14:17, 15:12, 17:10, 19:1, 20:9, 25:13, 33:16, 45:3, 47:5, 47:12, 47:16, 47:21, 56:11, 56:21, 56:22, 58:11, 58:15, 59:7, 60:23, 63:13, 64:10, 64:18, 66:7, 66:19, 67:5, 67:20, 67:23, 68:2, 68:9, 71:1, 72:5, 72:17, 73:11, 78:10, 78:22, 115:20, 116:8, 117:18, 117:23, 120:15, 128:9, 128:13, 129:9, 131:24, 132:7, 132:10, 133:5, 133:8, 135:14, 136:15, 137:8, 137:16, 146:25, 149:14, 151:11, 163:18, 187:2, 188:13, 189:15, 203:2, 203:5, 206:16, 208:2
**wood** [15] - 8:25, 12:14, 21:16, 33:2, 45:14, 78:18, 107:20, 118:5, 121:13, 128:17, 147:8, 149:12, 149:13, 151:25, 209:23
**WOOD** [5] - 1:3, 205:3, 205:6, 205:9, 205:11
**Wood's** [8] - 27:25, 70:21, 74:2, 74:25, 75:1, 151:3, 189:2, 203:18
**Woodlands** [2] - 43:6, 78:5
**woodwork** [1] - 52:16

**Wooten** [14] - 61:20, 62:1, 62:5, 62:9, 62:18, 62:24, 63:4, 63:5, 68:20, 181:11, 181:12, 181:14, 181:16, 181:20
**word** [8] - 45:17, 54:4, 98:4, 148:10, 150:21, 151:7, 153:14, 172:4
**wording** [1] - 105:14
**words** [4] - 15:11, 27:20, 35:22, 105:12
**workable** [1] - 54:18
**works** [4] - 9:3, 61:1, 69:7, 69:14
**works"** [1] - 69:25
**workweek** [1] - 97:13
**World** [1] - 52:17
**world** [4] - 55:7, 78:4, 144:1, 190:4
**worry** [1] - 70:17
**would've** [1] - 211:4
**wounded** [1] - 80:21
**wrap** [4] - 186:17, 191:5, 193:14, 211:14
**wrapped** [1] - 211:4
**wrapping** [1] - 23:25
**Wray** [1] - 42:23
**Wright** [6] - 52:10, 52:13, 52:19, 53:2, 53:16, 53:19
**Wright's** [1] - 53:8
**write** [5] - 80:12, 82:4, 82:5, 125:18, 211:10
**writing** [2] - 125:14, 142:9
**writings** [1] - 31:11
**written** [3] - 25:25, 153:22, 159:25
**wrote** [2] - 92:20, 128:25
**www.har.com** [1] - 27:3
**www.urbanliving. com** [2] - 27:3, 27:16

## Y

**year** [29] - 40:9, 41:7, 41:11, 41:13, 41:18, 41:19, 82:14, 82:19, 82:20, 82:24, 83:6, 88:10, 88:18, 93:3, 108:21, 110:17, 112:21, 113:17, 113:24, 114:1, 114:4, 114:16, 141:24, 155:9,

156:23, 161:6, 161:11, 172:8, 197:10
**years** [23] - 40:3, 40:23, 41:17, 43:22, 44:3, 69:20, 77:19, 79:1, 79:4, 81:3, 104:8, 107:15, 108:22, 113:20, 113:22, 146:21, 156:22, 156:23, 198:17, 210:18, 211:3
**yes"** [2] - 101:9, 152:11
**yesterday** [15] - 3:14, 4:16, 6:12, 8:25, 10:16, 11:20, 11:25, 12:6, 17:5, 23:3, 85:7, 85:16, 86:25, 203:19, 206:15
**Young** [1] - 104:7
**young** [1] - 108:6
**yourself** [6] - 39:11, 79:25, 108:14, 138:16, 143:11, 143:12

## Z

**zoom** [7] - 4:11, 48:24, 49:2, 49:7, 167:21, 169:25, 174:7
**zoom-in** [1] - 167:21
**zoomed** [1] - 4:8
**Zummo** [10] - 1:15, 2:5, 2:12, 3:9, 65:22, 71:16, 74:20, 76:15, 77:5, 77:15
**ZUMMO** [99] - 3:4, 15:1, 15:17, 24:24, 29:1, 32:19, 32:21, 33:25, 34:10, 34:14, 34:16, 34:19, 36:1, 36:6, 36:16, 36:19, 36:25, 37:4, 37:9, 37:11, 37:14, 37:16, 37:19, 38:21, 60:13, 65:19, 71:8, 71:12, 71:15, 77:10, 77:13, 79:8, 80:19, 149:1, 160:22, 164:18, 165:3, 175:13, 178:15, 184:2, 184:9, 184:17, 184:20, 184:23, 185:2, 185:12, 185:15, 185:19, 189:8, 189:11, 191:14, 191:19, 194:12, 194:15,

194:21, 195:5, 195:8, 195:11, 195:16, 195:20, 195:25, 196:2, 196:4, 196:15, 196:18, 196:20, 196:24, 197:1, 197:4, 197:6, 197:11, 197:15, 197:18, 197:20, 197:25, 198:3, 198:7, 198:11, 198:15, 199:10, 199:13, 200:2, 200:14, 201:1, 201:15, 202:20, 204:3, 205:1, 206:13, 207:5, 207:14, 207:23, 208:6, 208:19, 209:6, 209:9, 209:13, 209:21, 211:16