```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE SOUTHERN DISTRICT OF TEXAS
 2                            HOUSTON DIVISION

 3
     PRESTON WOOD & ASSOCIATES, LLC,    )
 4                                      )
              Plaintiff,                )   NO. H-16-CV-1427
 5                                      )
     v.                                 )   August 27, 2018
 6                                      )
     CAMERON ARCHITECTS, INC.,          )
 7   STEPHEN CAMERON, UL, INC., d/b/a   )
     URBAN LIVING, and VINOD RAMANI     )
 8                                      )
              Defendants.               )
 9

10
                                TRIAL
11               BEFORE THE HONORABLE DAVID HITTNER
                           AND A JURY
12
                             VOLUME 4
13                     PAGES 4-1 - 4-163

14

15   For the Plaintiff:           Patrick A. Zummo
                                  Attorney at Law
16                                909 Fannin, Suite 3500
                                  Houston, TX 77010
17
                                  Louis K. Bonham
18                                Califf T. Cooper
                                  Osha Liang, LLP
19                                909 Fannin, Suite 3500
                                  Houston, TX 77010
20
     For the Defendants:          Justin Strother
21                                Strother Law Firm, PLLC
                                  3000 Weslayan, Suite 348
22                                Houston, TX  77027

23   Court Reporter:             Bruce Slavin, RPR, CMR

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

1                          I N D E X

2

3                                                    Page

4

5      **VINOD KEWALRAMANI**

6      Direct Examination Continued by Mr. Strother      4-5

7      Cross-Examination by Mr. Zummo                    4-16

8      Redirect Examination by Mr. Strother             4-51

9

10     Defendants Rests                                  4-56

11     Plaintiff Rests and Closes                        4-56

12     Charge Conference                                 4-77

13

14

15

16

17

18

19

20

21

22

23

24

25

         1              (Jury not present)
         2              THE COURT:  You wanted to talk about some stuff.
         3    Right?
         4              MR. ZUMMO:  Just the exhibits that we were
10:15    5    discussing at the end of the day Friday.
         6              THE COURT:  All right.  Let me tell the jury we're
         7    here.
         8              [At the jury room door]  We're here and it will be
         9    about five more minutes.
10:15   10              THE COURT:  All right.  This is Plaintiff's.
        11    What's your position?  What do you got?
        12                  Be seated, everybody.
        13              MR. ZUMMO:  In Plaintiff's Exhibit 117, Your Honor,
        14    when we left on Friday we had objected that backup --
10:16   15              THE COURT:  Is it 117 or 17?
        16              MR. ZUMMO:  Defendant's 117.
        17              MR. BONHAM:  No.  17.
        18              MR. STROTHER:  I believe it was just 17.
        19              MR. ZUMMO:  Oh.  17.
10:16   20              THE COURT:  I think it's 17.
        21              MR. ZUMMO:  17.  When we left on Friday we had
        22    raised the objection that we had not been provided any form
        23    of backup information for the bulk of the items on that
        24    exhibit, Your Honor.
10:16   25                  Over the weekend, pursuant to the Court's

1    order, Mr. Strother and his client did deliver to us a

2    series of monthly reports of expenses and monthly summaries

3    of closings.

4                What I gave Ms. Alexander to give to the Court

10:16    5    before we started today -- I have marked on that Exhibit 17

6    in red the particular closings where we still don't have any

7    support in even the form of a summary-type report, and they

8    all involve 2017 and 2018 closing dates.

9                THE COURT:  All right.

10:17   10                MR. ZUMMO:  But I want to tell the Court that.

11    Because the Court admitted Exhibit 17, pretrial, over our

12    objection that we thought all backup information needed to

13    be provided and all they have given us was a summary

14    report -- I just want to tell the Court that those type of

10:17   15    summary reports have been provided for the things we were

16    complaining about on Friday.

17                THE COURT:  So, what are you complaining about now?

18                MR. ZUMMO:  I'm not complaining, Your Honor.  I

19    wanted to tell the Court that I am assuming that -- since

10:17   20    the Court admitted it before -- now that they have provided

21    those summary reports to fill the gaps, that I am assuming

22    the Court is not going to change its ruling.

23                THE COURT:  That's true.

24                MR. ZUMMO:  We just want to make sure the record is

10:18   25    clear that we still believe that they were required to

 1   provide the backup that is behind those summary reports.

 2           THE COURT:  Is that in the form of an objection to

 3   what exhibit?

 4           MR. ZUMMO:  Exhibit 17.  And it's the same

10:18  5   objection we made before trial that the Court has already

 6   overruled.

 7           THE COURT:  Okay.  The ruling remains.  It's

 8   overruled.

 9               All right.  Let's call the jury in, please.

10:18  10              (Jury present)

11           THE COURT:  All right.  Be seated.

12           Let's get the witness back on the stand,

13   please.

14           MR. STROTHER:  May I proceed, Your Honor?

10:19  15          THE COURT:  Yes.  Go on.

16               DIRECT EXAMINATION CONTINUED

17   By Mr. Strother:

18   Q.  Mr. Ramani, good morning.

19   A.  Good morning.

10:19  20  Q.  Let's pick up where we left off.

21               I believe one of the things we were talking

22   about was Urban Living's profit earned from the sale of the

23   homes that are at issue in this lawsuit.

24               Can you tell the jury what it is Urban Living

10:19  25  does to earn a profit?

1    A.    I am going to start with -- There's two sides of it, the

2    buyer's side and the seller's side, meaning if you have a

3    developer/builder building a home or thinking about building

4    a home you have to -- or at least what Urban Living does is

10:20    5    we take them through the consulting process, finding the

6    land, finding the correct location of that land and then

7    working through the process of what product and price point

8    will sell in that location or that market, what the finishes

9    and details in the home will be, what the actual square

10:20    10    footage should be, and we walk them through the whole

11    process from also, then, coming up with the creative

12    identity for it, the logos, their company name.

13            So, it's an entire process from beginning to

14    end on the sell side in order to get that home sold.

10:20    15            On the buyer's side I think it fits more into,

16    you know, we have the showroom that's open seven days a

17    week, aggressive advertising, which falls on both sides.  I

18    mean getting the seller onboard with us, but then spending a

19    tremendous amount of money on marketing, print, brochures,

10:21    20    website, graphics, logos, manpower, staff.

21            I think the key part of what's going to

22    differentiate us from the majority of what -- you know,

23    realtors out there is that we have close to 40 to 50

24    employees on salary that are focused on selling the homes,

10:21    25    the entire staff from our marketing team to the sales team.

*Ramani - Direct by Mr. Strother*

1           So, any time if you were out at six o'clock,

2     seven o'clock -- The showroom is open from 9:00 to 7:00

3     seven days a week.  We close about three or four days out of

4     an entire year on the key holidays.  So, that support staff

10:22  5     and sales team and the company is focused on getting the

6     customer into our showroom or one of the open houses on

7     Saturday and Sunday.  Some of the communities are open seven

8     days a week.

9           And, so, the main area of our profits are

10:22 10     derived from selling the home and earning those commissions

11     through that program.

12     Q.  Is having a showroom floor like Urban Living's typical

13     in the industry?

14     A.  No.  I was just trying to think if there's anybody else.

10:22 15     I think Greenwood King, one of the other inner loop

16     realtors, probably about, I think, eight years ago redid

17     their offices and then opened a showroom, but it's not

18     really open to the public on a day-to-day basis where it's

19     staffed and the realtors are there.

10:22 20           If you look at all these other companies or

21     the more traditional real estate companies, they do have

22     offices, but it's -- The idea behind that is most of the

23     time the realtor is going to meet the customer at the

24     property.

10:23 25           Our system is set up to where they actually

*Ramani - Direct by Mr. Strother*

1    come to our showroom.  I am a big believer on, you know, to

2    really help somebody buy a house you need to interview them,

3    sit down and understand what their needs are and by having

4    the brochures there and having the tools to help the client.

10:23    5    The buyer or our realtors sit down and get interviewed.  We

6    have conference rooms where the customer can come in and sit

7    down and sort of go through that process.  So, then, when

8    you take them out, you're helping them save time instead of,

9    you know, just driving them out and showing them the wrong

10:23    10    type of house or wrong type of location.

11              So, it's not typical.

12    Q.  And do I understand that for your new properties there

13    are open houses Saturday and Sunday every week?

14    A.  Our contracts to our developers/sellers are that every

10:23    15    single finished home is staffed and open Saturday and Sunday

16    1:00 to 5:00.

17    Q.  Is that normal?

18    A.  I mean, I think some realtors try to open their houses,

19    but usually it will be like 3:00 to 5:00.  I mean, it's not

10:24    20    consistent and it's definitely not every single weekend.

21    Q.  Okay.  Back to the profit.

22              You testified that Urban Living's commission

23    is 3 to 6 percent.  How is that calculated?

24    A.  I can't say it's standard in the industry because it's

10:24    25    negotiated on every transaction.  Sometimes it's 5, but the

*Ramani - Direct by Mr. Strother*

1    average is between 5 to 6 percent, which is the entire gross

2    commission, but then you have to split that if there's what

3    they call a "co-op agent".

4    Q.  And, to be clear, 5 to 6 percent of what?

10:24    5    A.  Of the sales price, the negotiated sales price on the

6    contract.

7    Q.  So I interrupted you about what a co-op deal is.

8    A.  A co-op transaction is -- basically, what it means is

9    you're splitting that transaction with a co-op realtor, an

10:25    10    outside realtor.

11            So, for example, I mean, if Prudential Gary

12    Greene brought a client to us we would pay them 3 percent.

13    Even if it was 5 you would still pay them 3; otherwise, they

14    wouldn't sell your home.  And then we would earn the

10:25    15    2 or 3 depending if it was at 5 or 6 and then pay our agent

16    or pay the support staff or the expenses that come out of

17    that.

18    Q.  You testified on Friday, I think, that 1 to 2 percent of

19    Urban Living's profits would be due to underlying stock

10:25    20    plans, but I didn't ask you this question.

21            How important are the plans to Urban Living's

22    profit?

23    A.  I mean, inside the loop I don't think -- If you have

24    looked at product out there, there's only so much you can do

10:25    25    on these footprints.  I think Preston mentioned earlier that

*Ramani - Direct by Mr. Strother*

1    there is a requirement or the City requires it to be

2    60 percent of that lot size, which is typically a 20-by-40

3    basis.

4              If you look at the base foundation of a house,

10:26   5    20 by 20 of it has to go to a garage.  So, all that's left

6    is you can put one bedroom down and then living, dining,

7    kitchen on the second floor, and then two bedrooms on the

8    third.  Now, there are times where you might only do two

9    units, and then you have the depth and then you can do

10:26   10   living, dining room and then three bedrooms on the second

11   floor.

12             But if you go through -- And I have sold

13   thousands of these.  Okay?  And this is not a -- I don't

14   know what the right word is.  I mean, I'm not trying to

10:26   15   punish any architect, any designer, but there's only so much

16   you can do to these boxes and -- It's a box and, typically,

17   you want to try to put three bedrooms and three and a half

18   baths and a garage in it.

19             So, I -- Look.  I mean, that's why we

10:26   20   negotiated this deal with them.  I mean, there's only so

21   many things you can do.  And I don't think it's the

22   architecture or the plan.

23             And why does so many builders and developers

24   come to us and why we have so much of the market share?

10:27   25   It's what we do.  It's the showroom.  It's the marketing,

*Ramani - Direct by Mr. Strother*

1    location, the land.  It's all the other things that come

2    along with this.

3                And I'm not saying there is not some

4    importance to it, but it's not significant.

10:27    5                THE COURT:  You mean what?  The contribution of the

6    architect?

7                THE WITNESS:  Correct, sir.

8                THE COURT:  All right.  Go on.

9                THE WITNESS:  I don't think that's significant.

10:27    10               THE COURT:  It's not that significant.

11               All right.  Go on.

12   By Mr. Strother:

13   Q.  With regard to contribution of the architect, were the

14   PWA stock plans ever used right out of the box?  And let me

10:27    15   strike that.  Let me ask you about the ones in this case.

16               Nagle.

17   A.  Okay.

18   Q.  How much effort, if you know, had to be put in by a

19   different architect to make the plans workable?

10:27    20   A.  Well, I don't know how much you have gone into the

21   payment made versus the credit --

22               THE COURT:  Hold it.  That's not the question.

23               You asked a question.  Ask it again, please.

24   I tell you what.

10:27    25               Bruce, can you read it back.

Ramani - Direct by Mr. Strother

1                (Question read back by the court reporter)

2      A.   A substantial amount.

3      Q.   Let me show you Defendant's Exhibit No. 17.  Your Honor,

4      may I please use the laptop screen?

10:28   5               THE COURT:  Okay.  Is that on?  Yeah.  There it is.

6                MR. STROTHER:  Yes, Your Honor.

7      By Mr. Strother:

8      Q.   What three properties appear on Defendant's Exhibit 17?

9      A.   I'm sorry.  What --

10:28  10      Q.   I'm sorry.

11      A.   I don't understand the question.  I apologize.

12      Q.   This lawsuit is about five different projects.

13      A.   Correct.

14      Q.   So, I would like you to look at Defendant's Exhibit 17

10:28  15      and tell the jury what information is on there about which

16      projects.

17      A.   Here you have EaDo place, which was referred to as

18      "EaDo" at the beginning, Stanford Street, which was

19      "Stanford", and then Patterson Street.

10:29  20      Q.   What does this financial record show?

21      A.   The total sales price of each one of those homes in that

22      community and then the gross commissions and then the close

23      date.

24      Q.   Okay.  Would this help the jury calculate sales price

10:29  25      minus deductible expenses?

Ramani - Direct by Mr. Strother

1    A.   You will have to scroll down to the bottom because this

2    is going to reflect the cost or average cost for each month

3    on what those expenses were towards those commissions, yes.

4    Q.   Can you point the jury to where you're talking about on

10:29   5    this exhibit?

6    A.   Yes.   Month -- On the bottom, the last box where it

7    says, "month", "year", "closed homes", "monthly overhead"

8    and "cost per home".

9    Q.   Okay.   And, so, this column over here is the cost per

10:30   10    home of overhead for that particular month?

11    A.   Correct.

12    Q.   On Friday we saw a spreadsheet about this regarding

13    Nagle.   Is this the same kind of information?

14    A.   Correct.

10:30   15    Q.   This spreadsheet -- I am going to turn to Page 2 -- it

16    stops having information around February 17.   Can you

17    explain what that's about?

18    A.   Yes.   We were very concerned of providing numbers that

19    weren't reviewed by our CPA that aren't -- because you have

10:30   20    to put everything coded to the general ledger account

21    properly.

22              We haven't closed out '17 and '18 yet; so,

23    that hasn't been provided.   But, again, the averages here

24    are fairly consistent from Nagle.   And, also, in '15 and

10:30   25    '16, they average around 5,700 per house, which is pretty

Ramani - Direct by Mr. Strother

1    consistent year after year.  We haven't had too much

2    inconsistency.  I think in here you will see it ranges from

3    5,500 to 6,000 being on the high side.

4    Q.  Okay.  Let me ask you about the three projects that are

10:31  5    on this spreadsheet, and they're the ones we put on the

6    easel on Friday, and you described them as "non-UPM plans".

7    That's Patterson, Stanford and EaDo.

8    A.  Correct.

9    Q.  Are you aware that Plaintiff is suing Urban Living for

10:31  10   altering or removing copyright information regarding those

11   three projects?

12   A.  Yes, I do.

13   Q.  Tell me, with regard to the marketing materials, where

14   did any depictions of what was built come from?

10:31  15   A.  Pictures or the plans?

16   Q.  Good question.

17           So, if there were photographs on marketing

18   materials of those three projects, where did those come

19   from?

10:31  20   A.  Our team would go out and take the pictures and then

21   sometimes the developer would send them to us depending on a

22   case-by-case basis.

23   Q.  Okay.  What about any marketing plans?

24   A.  Those were provided by the builder or the builder's

10:32  25   designer/architect.

*Ramani - Direct by Mr. Strother*

1    Q.   The architect on those three projects was Bill Wooten.

2    Right?

3    A.   Correct.

4    Q.   Did Urban Living ever have anything to do with Bill

10:32   5    Wooten?

6    A.   No, not in a direct basis where we provided them

7    anything.

8    Q.   Once Urban Living received marketing plans from the

9    builder or Mr. Wooten, did Urban Living alter or remove

10:32   10   anything from those?

11   A.   No.

12   Q.   And I guess my question should be more precise.

13            Did Urban Living alter or remove copyright

14   management information from those marketing plans?

10:32   15   A.   No.

16   Q.   Do you believe that the builder or Wooten altered or

17   removed that stuff?

18   A.   I wouldn't know.

19   Q.   Did you have any reason to believe that they had?

10:32   20   A.   No.

21   Q.   Was Urban Living in any way involved with the selection

22   of those plans?

23   A.   No.  They were brought to us from Aviv and Bill Wooten,

24   and Aviv was the owner and running that company.

10:33   25            MR. STROTHER:  Mr. Ramani, Thank you.

*Ramani - Cross by Mr. Zummo*

1          I pass the witness.

2          MR. ZUMMO:  May I proceed, Your Honor?

3          THE COURT:  All right.  What are you going to need?

4          MR. ZUMMO:  We will still need the screen.  Sorry.

10:33   5          THE COURT:  Okay.

6                          CROSS-EXAMINATION

7   By Mr. Zummo:

8   Q.  Mr. Ramani, I want to start with the subject that

9   Mr. Strother asked you about, which is the distributions of

10:33   10  marketing materials.

11  A.  Okay.

12  Q.  Did you distribute at Urban Living marketing materials

13  by sending e-mails to potential customers?

14  A.  Yes, we did.

10:33   15  Q.  And did you refer to these as "blast e-mails"?

16  A.  E-mail blasts.  Yes, sir.

17  Q.  When you sent --

18              Can we have Exhibit No. 105 please,

19  Plaintiff's Exhibit 105.

10:34   20              Do you recognize the first page of Plaintiff's

21  Exhibit 105?

22  A.  Yes, sir.

23  Q.  Is this the first page of a set of marketing materials

24  that Urban Living would have used for Nagle Park Place?

10:34   25  A.  I mean, it's -- I think we created this to provide to

*Ramani - Cross by Mr. Zummo*

1    you.  It's the logo.

2    Q.  Okay.

3           MR. ZUMMO:  Pull up Page 2, please.

4    By Mr. Zummo:

10:34   5    Q.  Page 2 of this Urban Living document -- at the top the

6    title is "E-Mail blast".  And is the material that's shown

7    on this page material that would have gone out in an e-mail

8    to a list of your customers?

9    A.  Yes, sir, it is.

10:34  10    Q.  And on this particular e-mail blast, which includes EaDo

11    Place in the middle and Nagle Park Place at the bottom --

12    was it your estimate that this went out to between 8,000 and

13    15,000 individual e-mail recipients?

14    A.  Sir, I would have to ask my media team.  I'm not sure.

10:35  15    Q.  Do you remember giving your deposition in this case?

16    A.  I do, sir.

17    Q.  Let's do this.  I am going to give you a copy of the

18    condensed copy of your deposition.

19           THE COURT:  [To the Witness]  You can turn that

10:36  20    little light on there if you want.

21    By Mr. Zummo:

22    Q.  What I am going to be asking about is this part of that

23    page.

24    A.  Okay.

10:36  25    Q.  Mr. Ramani, I am offering you this deposition to allow

*Ramani - Cross by Mr. Zummo*

1    you to look at Pages 79 and 80 through about the fifth line

2    of Page 80.  And, if you read that, tell me if it refreshes

3    your recollection of what you said at your deposition about

4    how many were sent out.

10:36   5    A.  [Reading]  Okay.

6    Q.  Does that refresh your recollection that you testified

7    that somewhere between 8,000 and 15,000 e-mails were sent

8    out with this particular EaDo place and Nagle Park Place

9    drawing?

10:36   10   A.  Correct.  Yes, sir.

11   Q.  And can we go back to Page 2 of Exhibit 105.

12              On the EaDo Place drawing there's no mention

13   of Preston Wood & Associates, is there?

14   A.  No, sir.

10:37   15   Q.  On the Nagle Park Place drawing there is no mention of

16   Preston Wood & Associates, is there?

17   A.  No, sir.

18   Q.  And there is no copyright notice of Preston Wood &

19   Associates on either the Nagle Park Place drawing or the

10:37   20   EaDo Place drawing?

21   A.  Correct.

22   Q.  Now, do you send blast e-mails like this out on all of

23   the properties that you are trying to sell?

24   A.  I think we try to.  Yes, sir.

10:37   25   Q.  So, would you have sent out an e-mail on the Patterson

*Ramani - Cross by Mr. Zummo*

1    Street Landing project?

2    A.   I don't know, because I think several -- or the majority

3    of that development sold out before we actually got to this

4    point.  So, I'm not sure.  Again, I'd have to ask media.  Or

10:38   5    if you have supporting documentation.  I don't want to

6    answer that.

7    Q.   Well, the only place we got documents is from you.

8    So --

9    A.   Right.  But, if it's in there, then, yes, we did.

10:38  10           We have a marketing team that does this.  So,

11   I don't know every e-mail blast that goes out.  I apologize.

12   Q.   Did you send out any e-mails like this on the Stanford

13   Street Landing project?

14   A.   Again, if they were provided, yes.  If they're not --

10:38  15           THE COURT:  Who would know that if it's not you?

16           THE WITNESS:  Sir, we have almost 50 people.  We

17   have a marketing team that does that.  So, I'm not involved

18   in every e-mail blast that goes out, Your Honor.  So, I

19   apologize.  I wouldn't know off the top of my head right

10:38  20   now.

21           If it's not provided here, then it wouldn't

22   have gone out.

23           THE COURT:  Is the sound carrying?

24           MR. ZUMMO:  Could you try pulling the microphone a

10:38  25   little closer.

*Ramani - Cross by Mr. Zummo*

1          THE WITNESS:  Yeah.  Sure.

2          THE COURT:  Yeah, it is.

3          THE WITNESS:  If it's not provided in the exhibits,

4    then I would say "no", because they went through everything

10:38  5    and provided it to you.

6               But I don't remember every single exhibit and

7    I haven't gone through every single exhibit.  So, I'm sorry

8    about that.

9    By Mr. Zummo:

10:38  10   Q.  But there is no question that at least the EaDo Place

11   and Nagle Park Place e-mail blast did go out?

12   A.  Yes.  If they provided you that, it went out, yes, sir.

13   Q.  Now, another place that you provide examples, drawings,

14   that show the properties you have for sale is on the Urban

10:39  15   Living website.  Correct?

16   A.  Correct.

17   Q.  And on that website --

18               Can we go to Plaintiff's Exhibit 108, please.

19               Is Plaintiff's Exhibit 108 a printout of what

10:39  20   was, for a time, on your website for Nagle Park Place?

21   A.  Yes, it is.

22          MR. ZUMMO:  Can you go to Page 2 of the exhibit,

23   please.  I am going to give your rotation skills a workout

24   on this one.

10:39  25   By Mr. Zummo:

Ramani - Cross by Mr. Zummo

1    Q.  On Page 2 does that show the footprints and the first

2    floor site plans for Nagle Park Place?

3    A.  Yes, sir, it does.

4            MR. ZUMMO:  And then can we go to Page 4, please.

10:40    5    By Mr. Zummo:

6    Q.  On Page 4 does it show all three floor plans for Nagle

7    Park Place?

8    A.  I think this is the first phase of that, yes, sir, at

9    the early stages.  Correct.

10:40   10    Q.  And is this Nagle Park Place portion of your website

11    representative of how you present the projects on your

12    website?

13    A.  Sir, could you scroll up, because I don't know if this

14    is from the brochure or from the website.

10:40   15            If it's all part of that, it would be from the

16    website, yes.

17    Q.  And, typically, on your website what you try to do is

18    show maybe a photograph of the interior, you show a

19    representation of what it looks like from the outside and

10:41   20    you show the floor plans?

21    A.  Correct.

22            MR. ZUMMO:  Would you please bring up Plaintiff's

23    Exhibit 113.

24    By Mr. Zummo:

10:41   25    Q.  Do you recognize Plaintiff's Exhibit 113 as a Google

*Ramani - Cross by Mr. Zummo*

1    analytics report that Urban Living produced in this lawsuit?

2    A.  I don't know if it's from Google, sir.  Again, I think

3    our media provided you that.  So, I apologize.  I'm not sure

4    exactly what it is.

10:41    5    Q.  You know what a Google analytics report is?

6    A.  I do know that, yes.

7    Q.  Do you use those in your business?

8    A.  I don't, but my marketing team does, yes.

9    Q.  In your deposition you explained that Urban Living uses

10:41   10    them in this --

11    A.  Yes.

12    Q.  It's my mistake.  I meant -- By "you" I was asking about

13    Urban Living.

14    A.  Yes.

10:42   15    Q.  And I will try to be more specific.

16    A.  Yes.

17    Q.  And these Google analytics reports for the time period

18    that's covered by the report -- Is one of the things that's

19    reported the total number of times a computer, a remote

10:42   20    computer, has connected to your website and opened that

21    page?

22    A.  Correct.

23    Q.  And is that what's called a "unique page view"?

24    A.  If you can zoom in, please, so I can look at it.

10:42   25    Q.  Let's look at the first one for Nagle Park Place.

*Ramani - Cross by Mr. Zummo*

1    A.   Okay.

2    Q.   And we'll pull that up.

3              So, you see on the left-hand side it gives the

4    actual URL address.

10:42   5    A.   Correct.

6    Q.   Would that be your website for the Nagle Park Place

7    page?

8    A.   Correct.

9    Q.   Then it has properties and then unique page views -- or

10:42   10   page views and unique page views.

11             And you understand the difference between a

12   "page view" and a "unique page view"?

13   A.   I think so.  Yes, sir.

14   Q.   And a "unique page view" means that for one day a

10:43   15   computer with a specific address opened that page.  It may

16   have looked at it several times, which is why there's more

17   page views?

18   A.   Correct, sir.

19   Q.   So, as far as whether a computer, for example, at

10:43   20   somebody's house is connecting to your website and getting

21   images from your website of this Nagle Park Place page, the

22   unique page views tells us that that was 8,578 times for the

23   time period on this report?

24   A.   Yes, sir.

10:43   25   Q.   And let's go to the next entry on this report, which is

Ramani - Cross by Mr. Zummo

1    still Plaintiff's Exhibit 113, and this would be the page

2    that for some time Urban Living showed Patterson Street

3    Landing.   Correct?

4    A.  Yes, sir.

10:44  5    Q.  And how many unique page views were shown during that

6    period of time?

7    A.  3,752.

8    Q.  And let's go to the third entry.

9              Is this the Google analytics report for the

10:44 10    Urban Living website for the page that showed EaDo Place?

11    A.  Yes, sir.

12    Q.  And how many unique page views were there for EaDo

13    Place?

14    A.  7,087.

10:44 15    Q.  7,087?

16    A.  Yes, sir.

17    Q.  And let's go to the next one, please.

18              Now, is this the Google analytics report for

19    the Urban Living website web page that for a time showed

10:45 20    Stanford Street Landing?

21    A.  Yes, sir.

22    Q.  And how many unique page views were there for Stanford

23    Street Landing?

24    A.  439.

10:45 25    Q.  439?

*Ramani - Cross by Mr. Zummo*

1    A.   Yes, sir.

2    Q.   Thank you.

3              On any of the Urban Living pages for those

4    four projects -- Nagle, Patterson Street, EaDo, Stanford

10:45  5    Street Landing -- was there any mention of Preston Wood &

6    Associates?

7    A.   No.

8    Q.   Were there any copyright notices of Preston Wood &

9    Associates?

10:45  10   A.   No.

11   Q.   The next thing I'd like to do, Mr. Ramani, is talk to

12   you, I hope briefly, about some aspects of the accounting

13   records that you discussed with Mr. Strother.

14   A.   Okay.

10:46  15   Q.   Now, the Exhibit 17 that was on the screen right before

16   I started asking you questions -- did you personally prepare

17   that exhibit?

18   A.   No.  Our accountant/bookkeeper did.

19   Q.   And did you do the calculations at the bottom of the

10:46  20   page to do the average overhead cost per closing that you

21   had summarized at the bottom of the page and at the top of

22   Page 2?

23   A.   I did some of them with her at the beginning, yes.

24   Q.   Did you do all of them or was it a shared effort?

10:46  25   A.   Shared effort.

*Ramani - Cross by Mr. Zummo*

1    Q.  Now, Exhibit 17 was -- I believe --

2                    Can we put up Exhibit 17, please.

3                    Do you recall when this exhibit was

4    actually -- this particular printout was prepared?

10:47  5    A.  I don't know exactly right now, but it was somewhere

6    when you had sent the questions over to our attorney

7    requesting this type of supporting documentation.

8    Q.  So, you prepared it for the purpose of preparing

9    information in this lawsuit?

10:47  10   A.  Yes.  Correct.

11   Q.  It was not a record that was created back at the time

12   that these closings were taking place?

13   A.  Sir, the top half is because, on a monthly and weekly

14   basis, I go through our reports to see where the company is

10:47  15   on revenue and also sales.

16                    And then the expenses -- they're not broken

17   out on average like this, but the monthly overhead on those

18   expenses I review on a weekly and monthly basis.

19   Q.  I'm not sure you understand my question.

10:48  20                    This particular page was not prepared and

21   printed back at the time the closings took place?

22   A.  No.

23   Q.  Now, the -- what bookkeeping software or system do you

24   use at Urban Living?

10:48  25   A.  Quicken.

Ramani - Cross by Mr. Zummo

1   Q.   Quicken.   The Quicken program that you use, does it do

2   what's called "lock the books" at any point in time?

3   A.   Correct.   When we close out the end of the year we

4   typically try to -- I have to ask my CPA that question, but

10:48   5   I think you asked me in the deposition.   I don't know for

6   sure, but I think, particularly, what ends up having is at

7   the end of the year it gets locked.

8   Q.   And you gave your deposition in April of this year?

9   A.   I don't remember the exact time frame.

10:48   10          THE COURT:   What's the date?

11   By Mr. Zummo:

12   Q.   If you look at the -- that's in front of you, that

13   deposition was April 12.   Correct?

14   A.   Yes.

10:49   15   Q.   When you gave your deposition on April 12 you were not

16   sure whether the books were ever locked.   Correct?

17   A.   Right.   Because I didn't know what years were closed out

18   and what were still open.

19   Q.   And, in fact, what -- And "locking the books" means

10:49   20   you -- for that accounting period no one can go back in and

21   make revisions and changes anymore?

22   A.   Yes.

23   Q.   And you told us in your deposition, didn't you, that

24   you, in fact, knew that, since this lawsuit was filed, some

10:49   25   revisions had been made?

*Ramani - Cross by Mr. Zummo*

1    A.  Yes, sir.  If there's mistakes made or something is not

2    posted accurately, we do go back in and correct it, yes.

3    Q.  So, at least the books for the time periods when these

4    closings took place had not been locked as of the time this

10:49    5    lawsuit was filed?

6    A.  Sir, I still don't know that.

7         MR. ZUMMO:  Can we look at Defendant's Exhibit 1,

8    please.  And can you expand the top so we can see the --

9    That's good.  Thank you.

10:50    10    By Mr. Zummo:

11    Q.  Now, Defendant's Exhibit 1 is a list of closings with

12    some information about the sales of six units at Nagle

13    Street.  Correct?

14    A.  Yes, sir.

10:50    15    Q.  And what I want to ask you about is the concept of a

16    direct cost.  And I believe you have explained that you had

17    individuals that were called "transaction coordinators" at

18    Urban Living.

19    A.  Correct, sir.

10:50    20    Q.  And those transaction coordinators got a portion of the

21    commission directly paid to them?

22    A.  $50, sir, and a salary.

23    Q.  So, is the difference between the gross commission and

24    the net commission on this Exhibit 1 the amount that's paid

10:51    25    to those transaction coordinators?

Ramani - Cross by Mr. Zummo

1    A.  No.  There's multiple pieces of that.

2                   As I said earlier, there is a developer

3    consultant that would come out of that portion, and I think

4    the 50 is out of that portion.  I would have to do the math

10:51   5    and look at the checks that you have there.  Or the general

6    ledger we could look at and back into it.

7    Q.  So, let me back up.  I will try to ask the question more

8    generally.

9                   Is the difference between gross commission and

10:51  10    net commission what you at Urban Living considered to be the

11    direct expenses that are paid to individuals who assisted

12    with the sales?

13    A.  No.  I see all of these expenses somewhat related -- I

14    mean, our business is all sales.  So, the showroom, the

10:51  15    brochures, the media, the staff -- everything is directly

16    related to these sales.

17    Q.  Let me -- What I am trying to do is see if you make a

18    distinction between directs expense and overhead.

19    A.  I think we were asked to provide it that way.  But I

10:52  20    don't know.  I think all the sales, expenses in our

21    company -- everything is based on sales.  The whole company.

22    We don't have any part of the company that is not there

23    focused on selling.

24    Q.  Let's look at some information that you provided.  It's

10:52  25    Defendant's Exhibit 16.

*Ramani - Cross by Mr. Zummo*

1    A.   Okay.

2    Q.   Now, Exhibit 16 starts with the same page that we just

3    looked at.  Correct?

4    A.   Okay.  Yes, sir.

10:52    5         MR. ZUMMO:  Can we go to Page 2, please.

6    By Mr. Zummo:

7    Q.   Now, do you recognize what starts on Page 2 of

8    Exhibit 16 as a report from your Quicken program for all of

9    Urban Living's expenses for the month of December 2016?

10:52   10    A.   Sir, if you could please zoom in.  I can't -- I mean, I

11    know it's a general ledger report, but I don't know what's

12    there.

13    Q.   What I may be able to do, Mr. Ramani, is give you a copy

14    of that.  That might be helpful to you.

10:53   15    A.   Thank you.

16    Q.   Do you recognize Defendant's Exhibit 16, starting on

17    Page 2, as a report of all of your company's expenses for

18    the month of December 2016?

19    A.   Yes.

10:53   20    Q.   And the way it's organized you have expense codes and

21    they're presented in the order of those codes?

22    A.   Yes, sir.

23    Q.   And the codes go along with particular categories of

24    expenses?

10:53   25    A.   Chart of accounts.  Yes, sir.

*Ramani - Cross by Mr. Zummo*

1  Q.  So, I would like you just to look on -- I think it's the

2  page you're looking at, Page 2 of Exhibit 16 -- the

3  automobile expense.

4  A.  Okay.

10:53  5  Q.  And I just have some general questions about this to

6  give an example for the Court and jury for how this works.

7  A.  Okay.

8  Q.  Now, you use automobiles -- you have some automobiles

9  that Urban Living leases.  Correct?

10:54  10  A.  Yes, sir.

11  Q.  And your employees use those to get around to the

12  different properties for various business purposes?

13  A.  To put the brochures out --

14          THE COURT:  Could you speak up, sir, please.

10:54  15  A.  Sorry, Your Honor.

16              "Yes."

17  Q.  So, are you able to tell us whether any of the

18  automobile expenses shown on the December 2016 report

19  actually was used for the sales of the six units at Nagle

10:54  20  Park Place?

21  A.  Yes, sir.

22  Q.  So, do you keep records for your auto expense of going

23  out to that location?

24  A.  They have a weekly log and a binder and a spreadsheet

10:54  25  that they go from property to property at least two to three

Ramani - Cross by Mr. Zummo

1   times a week to check the signs, to check the banners, to

2   check the brochures.

3              So, yes.  I mean, they do have a system that

4   they have to follow to maintain every single one of these

10:55   5   properties.  It's a standard operating procedure that we

6   have on a weekly basis.

7   Q.  But those logs were not produced in this lawsuit, were

8   they?

9   A.  I don't know, sir.

10:55   10              THE COURT:  Well, who would know?

11              THE WITNESS:  The attorney, sir.  I don't know.  I

12   apologize.  There's a lot of exhibits, Your Honor.  I don't

13   know if every single thing was provided or they asked for

14   that.

10:55   15              But there is an average if you take --

16              THE COURT:  Go on.  Next question.

17              THE WITNESS:  Okay.

18   By Mr. Zummo:

19   Q.  Now, did you -- so we're clear:  Did you personally

10:55   20   produce the report that's Exhibit 16?

21   A.  No.  My bookkeeper did.

22   Q.  And you don't know the specific steps your bookkeeper

23   took to produce that report?

24   A.  Yes, sir.  I run the reports out of Quicken, too.  I

10:55   25   mean, you export it, you print it and you provide it.  I

Ramani - Cross by Mr. Zummo

1    mean, it's not very difficult.

2    Q.  Do you know whether or not your bookkeeper went and

3    looked at every log of every vehicle when your bookkeeper

4    presented this report?

10:56    5    A.  I mean, she's very detailed and accurate.  So, I don't

6    know what she did behind the scenes, sir, but the reports

7    that we provided you are accurate.

8            MR. ZUMMO:  Objection.  Nonresponsive, Your Honor.

9            THE COURT:  Sustained.

10:56    10    By Mr. Zummo:

11    Q.  Do you know if your --

12    A.  I --

13    Q.  -- bookkeeper checked the vehicle logs when your

14    bookkeeper produced Exhibit 16?

10:56    15    A.  I don't know, sir.

16    Q.  Would the expenses for automobile expense on Exhibit 16

17    have been incurred whether or not you sold the six units at

18    Nagle Park Place?

19    A.  Yes, sir.

10:56    20    Q.  And I want to go to another example of some of these

21    expenses and ask you the same kinds of questions.  I just

22    want to pick a couple of these to talk about.

23            Can you turn to the next page, and it's code

24    number, I believe, 5260 -- or 6260.

10:57    25    A.  I am having a really hard time seeing this, but, if you

Ramani - Cross by Mr. Zummo

1   ask me, I will try to back into it.  I apologize.

2   Q.  If you can look up on the screen and see if you can find

3   that on the page and tell me which one you would rather work

4   from.

10:57   5   A.  This one is clear.  Thank you.

6   Q.  The legal fees that are shown on here --

7   A.  Yes, sir.

8   Q.  -- according to your Quicken report, these are legal

9   fees that were spent in December 2016.  Correct?

10:57   10   A.  Yes, sir.

11   Q.  Did -- And each of these entries refers to a different

12   legal matter.  Correct?

13   A.  Yes, sir.

14   Q.  Is it your position that all of these legal fees were

10:57   15   incurred to assist in the marketing or sale of the Nagle,

16   Patterson Street, EaDo or Stanford Street houses?

17   A.  I think the Aspire, the FSLA, the PWA -- those correlate

18   with sales related, lending issues that are averaged.

19   Legion and Legend would not be directly related on sales.

10:58   20   Q.  And the total legal fees -- you may have to refer to the

21   written copy -- the total legal fees were $9,580.50?

22   A.  $9,680.  Yes, sir.

23   Q.  And that includes $4,049.50 for the PWA entry?

24   A.  Yes, sir.

10:58   25   Q.  That's this lawsuit.  Correct?

*Ramani - Cross by Mr. Zummo*

1    A.  I think so.  Yes, sir.

2    Q.  So, you think that you're entitled to deduct the legal

3    fees spent in defending this lawsuit as a cost in reaching

4    the net profits for purposes of recovery in this case?

10:59  5    A.  Sir, we were asked to provide all our expenses and --

6                THE COURT:  Hold it.  That's not answering the

7    question.

8    A.  Yes, I do.

9                    Sorry, Your Honor.

10:59  10   Q.  And, as far as you're concerned, these legal fees

11   represent a cost of doing your business?

12   A.  Yes.  On average, it does.

13   Q.  Then the last one I want to ask about is on -- it would

14   be Page 5 of the exhibit that's in front of you, and the

10:59  15   code -- the whole category is "Travel and Entertainment".

16   A.  Yes, sir.

17   Q.  This also includes meals?

18   A.  Yes, sir.

19   Q.  And is it true that your printout, the report,

10:59  20   Exhibit 16, has entries for meals for just about every day

21   of December?

22   A.  Yes, sir.

23   Q.  They're La Madeleine, H.E.B., Pinkberry, Starbucks,

24   Whataburger.

11:00  25   A.  Right.

Ramani - Cross by Mr. Zummo

1    Q.  The total travel meals and entertainment expenses for

2    that month were $27,378?

3    A.  Correct, sir.

4    Q.  And it is your position in this case that that $27,378

11:00  5    is a proper deduction from your revenues to calculate the

6    net profits in this case?

7    A.  Yes, sir.  That's all for the staff, gifts for the

8    awards for their sales and also lunches and things that we

9    buy for our team every day.  Yes.  We do it all the time.

11:00  10    Q.  And are you saying that all of these daily meal

11    expenses, the travel expenses, the gifts that are the last

12    three entries on here directly assisted in the marketing or

13    sale of the Nagle, Patterson Street, EaDo and Stanford

14    Street houses?

11:01  15    A.  A prorated portion of it, yes.  We're not allocating all

16    of it, but if you divide it by the total amount of

17    transactions and if you go back up and read the detailed

18    descriptions it does show that, that it's correlated

19    directly to sales.

11:01  20    Q.  Would you have incurred all of these 27,000 dollars'

21    worth of expenses if you hadn't sold a single unit at Nagle,

22    Patterson, EaDo or Stanford Street?

23    A.  It would be a prorated less amount, yes, because if we

24    don't have the sales staff, the teams, the things going

11:01  25    on -- So, they do correlate directly to the sales of those

*Ramani - Cross by Mr. Zummo*

1    properties, yes, sir.  A portion of it does, yes, sir.

2    That's why we averaged it this way.

3              In fact, there's certain things we took out

4    that didn't correlate directly to it.  That's why I think we

11:01  5    did the advertising a little different.

6              But it's very detailed, yes.

7    Q.  Well, let's look at how you allocated it.

8              Can we go back to Defendant's 17, please.

9              And, in particular, I'd like to look at the

11:02  10   box at the bottom, the graph.

11   A.  Sure.  I think, if you're going to dial this in, you

12   should go up because that report directly correlated to the

13   Nagle one.  So, we should go back to the spreadsheet from

14   Nagle.  That supports that information.

11:02  15   Q.  Well, let's -- I will do that for you.  I am going to

16   agree with you.  Let's go back to Exhibit 16 and Page 1.

17             Is this what you're looking for?

18   A.  Yes, sir.

19   Q.  So, let's go to the top.

11:02  20             And, Mr. Ramani, just so -- I think

21   Mr. Strother covered this with you -- but what you did to

22   get this net income from the net commission is you

23   subtracted something called "operating costs" and not

24   including advertisements?

11:03  25   A.  Correct.

*Ramani - Cross by Mr. Zummo*

1    Q.  And this number for the units that were sold in 2016,

2    it's the same number for each one.  Right?

3    A.  It's an average.  Correct.

4    Q.  And I was going to ask that.  It's the same number

11:03   5    because it's an average for the whole month?

6    A.  Correct.

7    Q.  And you reached that average -- you calculated it by

8    taking the total expenses from Exhibit 16, which were

9    $237,000, and dividing by the number of closings in

11:03   10   December 2016?

11   A.  Correct.

12   Q.  And when whoever did that calculation did it, the number

13   turned out to be $6,077 per closing?

14   A.  Yes, sir.

11:03   15   Q.  So, now I'd like to go back to Exhibit 17.  And, again,

16   I want to look at the bottom of the page.

17             Did you do the same process to come up with

18   costs per home for each month that's summarized on

19   Exhibit 17?

11:04   20   A.  Yes, we did, sir.

21   Q.  So, in other words, you took for this line -- the first

22   line which goes with October 2015, you divided $81,529 by

23   33 closings and got to $5,500.  Correct?

24   A.  Correct, sir.

11:04   25   Q.  And, as we said earlier, either you or your accountant/

*Ramani - Cross by Mr. Zummo*

1    bookkeeper did that division?

2    A.   Yes, sir.

3    Q.   And you believe it's correct and reliable?

4    A.   Sir, I mean, I haven't actually personally divided all

11:04   5    of these out.  She used Excel and a formula; so, I am going

6    to assume they are correct.  But if there are some that are

7    off I apologize, but they should all be accurate.

8              MR. ZUMMO:  Your Honor, I want to work with this

9    pad for one of these calculations for a couple of them.  Can

11:05  10    the Court -- How does the Court want to position it?

11             THE COURT:  Say again.

12             MR. ZUMMO:  Can everybody see the pad?

13             THE COURT:  Just ask the jury.  I can.

14                  Can everybody see it?

11:05  15                  (Jurors indicate affirmatively)

16             THE COURT:  All right.

17   By Mr. Zummo:

18   Q.   Mr. Ramani, I want to ask you about this third entry.

19   A.   Okay.

11:05  20   Q.   So, to do the math:

21                  It was $225,010 for the total overhead

22   expenses for that month?

23   A.   Right.

24   Q.   And divided by 38 closings?

11:05  25   A.   Okay.

*Ramani - Cross by Mr. Zummo*

1   Q.  Do you want to do it long division here or do you want

2   to use your phone or --

3   A.  I don't have my phone with me.

4   Q.  The 38 is going to go into 225 how many times?

11:06   5   A.  I'd rather just use a calculator.  Can we just get a

6   calculator real quick?  There's no need to go through all

7   this and bore them.

8       THE COURT:  Mr. Zummo, come up.  Grab this

9   [calculator].

11:06   10      MR. ZUMMO:  Thank you, Your Honor [hands calculator

11   to the witness].

12      THE WITNESS:  Okay.

13   By Mr. Zummo:

14   Q.  What's the result?

11:06   15   A.  5,921.

16   Q.  What's the result that's shown on Line 3 of Exhibit 17?

17   A.  1,618.

18   Q.  You're showing a cost per home of $900 more than what

19   the actual average is?

11:06   20   A.  It does show that.  Yes, sir.

21   Q.  Let's go to page -- the next page.  Mr. Ramani --

22      MR. ZUMMO:  Your Honor, could we turn the lights

23   down just long enough to see that page.

24   By Mr. Zummo:

11:07   25   Q.  The very top line, which reports 42 closings and an

Ramani - Cross by Mr. Zummo

1   average of $6,566 per closing -- Can you divide the $216,692

2   by 42?

3   A.  Yes, sir.

4   Q.  What do you get?

11:07   5   A.  5,159.

6   Q.  So, the calculator that you just used had $5,159, but

7   your exhibit says $6,566.  Correct?

8   A.  Correct, sir.

9   Q.  Can we agree that at least some of the numbers on

11:08   10   Exhibit 17 are not accurate?

11   A.  Yes, sir.  I agree.

12   Q.  Now, another thing I'd like to talk about, sir, is the

13   idea of which expenses produced which income.

14   A.  Okay.

11:08   15   Q.  What you did, in attempting to come up with an average

16   expense to deduct from your commissions, was take all of the

17   expenses for a given month and divide by the total closings

18   for that given month?

19   A.  We did it that way and we also, I think, did it on an

11:08   20   annual basis.

21   Q.  What you have presented in the courtroom is the one

22   that's monthly.  Correct?

23   A.  I was under the impression -- Okay.  I'm sorry.  I know

24   what we did.  We took all the months and then divided that

11:09   25   on an average and it came out to 5,750.

Ramani - Cross by Mr. Zummo

1    Q.  But we don't have that calculation anywhere in evidence,

2    do we?

3    A.  I think we do.  I'm not sure.

4    Q.  We don't have any documents that show all of your

11:09   5    closings and all of your expenses, do we?

6    A.  I think if you take all of the information that was

7    provided and all the months below --

8            THE COURT:  Hold it.  The answer is "yes" or "no".

9            THE WITNESS:  "Yes."

11:09   10           THE COURT:  By the way, if you can't answer it

11    "yes" or "no" just say so.

12            He said, "Yes".  Go on.

13            THE WITNESS:  "Yes."

14    By Mr. Zummo:

11:09   15    Q.  Well, I will leave it to your counsel to show where that

16    information was presented.

17    A.  If you take those spread --

18    Q.  No.

19    A.  Sorry.

11:09   20    Q.  And the way you have done it on Exhibit 17, you took all

21    expenses for a given month and divided that by all closings

22    for that month?

23    A.  Correct.

24    Q.  Now, in your business, the marketing efforts that lead

11:09   25    up to a sale and a closing and a commission actually take

*Ramani - Cross by Mr. Zummo*

1  place before the closing.  Right?

2  A.  No.

3  Q.  I will try to be clearer.

4      Do you do the marketing work before the sale?

11:10  5  A.  No.  I mean, we're --

6  Q.  For a particular house.

7  A.  No.  The marketing continues -- There are multiple units

8  in that development.  So, no.  The marketing continues even

9  after the sale of the house.

11:10  10  Q.  But to get a commission on a sale of one specific house

11  the marketing that results in that sale is going to happen

12  before the closing on that house.  Right?

13  A.  No.  We don't actually just market the one house.  We're

14  marketing a community.  So, no, the marketing continues on

11:10  15  that development and it sometimes can go even after.

16      I mean -- And then you said overhead, too.

17  But we have to deal with the customer, the warranty.  It

18  goes on for years.  I mean, we have sometimes customers that

19  call us three years after the house closes.

11:11  20  Q.  I think I can work with the way you're trying to answer

21  my question.

22  A.  Okay.

23  Q.  When closings happen, for example, in December 2016 --

24  A.  Okay.

11:11  25  Q.  -- they produce commissions that you earn and get paid

*Ramani - Cross by Mr. Zummo*

1    in December of 2016?

2    A.   Correct.

3    Q.   But the expenses and the marketing efforts that were

4    involved in creating those sales and earning those

11:11    5    commissions didn't all happen in December 2016?

6    A.   Some of them do.  Some of them roll over into the next

7    month also, sir, because -- I am trying to answer this as

8    accurately as I can.

9              If you get an invoice for advertising and you

11:11   10    advertise every single month, some of it could carry over to

11    the month before.  Some of them are paid three months in

12    advance.  So, it's an average.

13    Q.   And some of them could happen before the month where the

14    closings happen?

11:12   15    A.   Yes, sir.  Yes.  Definitely.

16    Q.   And, so, your method is not one that specifically

17    matches the revenues in a month with the expenses that

18    created those revenues?

19    A.   I don't agree with that.  I think it's pretty accurate,

11:12   20    sir.  We have been very detailed to provide you everything

21    we can to give you an accurate number on what those expenses

22    are.  So, no, I don't agree with your statement.

23    Q.   We don't have any calculation in any exhibit that you

24    have presented to us that shows any expenses outside of the

11:12   25    month when the commissions occurred.  Does it?

Ramani - Cross by Mr. Zummo

1   A.  Sir, we provided you hundreds and hundreds of pages.

2   Yes, you do have supporting --

3           THE COURT:  No.  The answer is "yes" or "no".

4           THE WITNESS:  "Yes."

11:12  5         THE COURT:  Yeah.  I don't mean to jump in, but if

6   you can't answer a question "yes" or "no" let me know or the

7   attorney know.  He's going to have to rephrase it or move

8   on.

9   A.  Okay.  I would think, with all the general ledger stuff,

11:13 10  yes, you do have it.

11  Q.  Where is the calculation in an exhibit that you have

12  presented in this lawsuit in this courtroom?

13  A.  I don't understand the question.  I apologize.

14  Q.  The last thing I want to talk about is an e-mail that we

11:13 15  have seen before in this case.  It was Plaintiff's

16  Exhibit 103.

17           Now, you remember -- I believe you talked

18  about this e-mail on Friday.

19  A.  Correct.

11:13 20  Q.  And did you tell us on Friday that the statement that

21  "Mr. Cameron ended up having to draw a plan from scratch;

22  so, we didn't even use this plan" was not accurate?

23  A.  Yes, sir.

24  Q.  Now, do you remember being asked about whether the

11:14 25  Cameron Nagle Street design was done from scratch in your

*Ramani - Cross by Mr. Zummo*

1  deposition?

2  A.  I do.  Yes, sir.

3  Q.  Can we go to Page 37, please.

4           And do you see at Line 4 I asked you:  "So, is

11:14  5  it still your affidavit testimony that Mr. Cameron prepared

6  the design shown in Exhibit 5 from scratch?"

7           And what was your answer?

8  A.  "Yes," sir.

9  Q.  And then I asked:  "What do you mean when you use the

11:15  10  term 'from scratch'?"

11          And your answer was what?

12  A.  "That he went to CAD and designed it himself."

13  Q.  And my next question was:  "With absolutely no use of a

14  prior design from Preston Wood?"

11:15  15          And what did you say?

16  A.  "Correct."

17  Q.  And my next question was:  "And that is your sworn

18  testimony today?"

19  A.  "Yes."  Correct.

11:15  20  Q.  And the "today" was April 12, 2018.  Correct?

21  A.  Correct.

22  Q.  And then down at Line 22 I asked:  "Even though you can

23  acknowledge that the Preston Wood title block and Preston

24  Wood copyright notice are on what Mr. Cameron claims to be

11:15  25  his design for the Nagle Street townhouse, Exhibit 5?"

*Ramani - Cross by Mr. Zummo*

1            And what was your answer?

2   A.  "Yes."

3        MR. ZUMMO:  Can we go back to the e-mail, please.

4   By Mr. Zummo:

11:16  5   Q.  You were copied on this e-mail from Fina Reisinger; are

6   you not?

7   A.  Yes, sir, I was.

8   Q.  Mr. Cameron was copied on this e-mail from Fina

9   Reisinger, wasn't he?

11:16  10  A.  Yes, he was.

11  Q.  But between the date of this e-mail, May 5th, 2014,

12  until Friday last week, you never told Sam Wood or Preston

13  Wood that it wasn't accurate that "Mr. Cameron ended up

14  having to draw a plan from scratch; so, we didn't even use

11:16  15  this plan"?

16  A.  I haven't been able to speak to them directly for a long

17  time.  So, you are correct on that.

18  Q.  In fact, you didn't do it before this lawsuit was filed?

19  A.  At that time, sir, and over and over I was told that it

11:16  20  was drawn from scratch.  And when we did all the research,

21  all the overlays, it showed that it was a completely

22  different plan.  So, I assumed that at that time, yes.

23  Q.  Mr. Cameron saw this e-mail, but he didn't do anything,

24  to your knowledge, to correct the false statement that the

11:17  25  plan ended up having to be drawn from scratch and he didn't

*Ramani - Cross by Mr. Zummo*

1    even use this plan?

2    A.  I agree, sir, yes.  It was a mistake.

3    Q.  And you never asked Mr. Cameron to make that correction,

4    did you?

11:17    5    A.  Yes, I did.  That's why we all sat down and decided and

6    talked to the builder about redesigning the rest of the

7    units; because it was a mistake that was made.  Yes, I did.

8    Q.  I mean the correction of the false statement in this

9    e-mail.

11:17    10    A.  Sir, at that time I didn't think it was false.

11                   And I had a conversation with Sam asking for

12    the credit, also, based on this e-mail and what I was told,

13    and she did accept the credit.

14                   It was a mistake made and I apologize.

11:17    15    Q.  When did you decide -- when did you realize that this

16    May 5th, 2014, e-mail was false?

17    A.  I think after the lawsuit was filed.  We started

18    realizing it after April.

19    Q.  The lawsuit was filed in 2016.  Correct?

11:18    20    A.  It was, sir, but I was under the impression that it was

21    still from scratch.  Even in my deposition at that point I

22    thought that he had drawn it.  I was told it was drawn from

23    scratch.  And I think he also thought it was drawn from

24    scratch.

11:18    25    Q.  And sometime between April 12 and Friday, August 24, you

*Ramani - Cross by Mr. Zummo*

1    decided that this May 5th e-mail was false?

2    A.   No.   You're plugging -- I never said that, and I am not

3    going to let you trick me into answering that.   I never said

4    that.   I never said Friday, August 24.   So, you're wrong,

11:18    5    sir.

6    Q.   I am talking about last Friday, the first time you have

7    ever said that this e-mail was --

8    A.   No, sir.   You don't know what I said to my attorney and

9    Cameron.   So, you're false and making up stuff again.

11:18   10    You're not going to trick me into answering that.

11    Q.   You --

12    A.   No.   Wrong.

13    Q.   When was it between --

14    A.   I don't know the exact date --

11:19   15         THE COURT:   Hold it a second.   One question at a

16    time.

17    By Mr. Zummo:

18    Q.   When was it between your sworn deposition testimony on

19    April 12, 2018, and last Friday that you decided this e-mail

11:19   20    was false?

21    A.   I would think a little bit after the deposition was

22    taken.   I don't know the exact date, sir.

23    Q.   You had the opportunity to read and sign your

24    deposition, didn't you?

11:19   25    A.   Yes, sir.

Ramani - Cross by Mr. Zummo

1  Q.  And that included a chance to make corrections if

2  anything was stated incorrectly?

3  A.  Correct.  So, that would be a good time to look at that

4  date, when I signed it, and then we'll be able to match up

11:19   5  exactly when I probably made that decision.

6  Q.  Well, you never made a correction to the deposition, did

7  you?

8  A.  I don't know, sir.  My attorney handles that.  So, I

9  apologize.

11:19  10       THE COURT:  Wait a second.  You never made any

11  correction to the deposition?

12       THE WITNESS:  I don't know, sir.  I don't think

13  there was any updates or changes that needed to be made to

14  it, Your Honor.

11:20  15       THE COURT:  All right.  Go on.

16  By Mr. Zummo:

17  Q.  When you testified on Friday that this whole thing is

18  just a big misunderstanding -- Do you think you might have

19  fewer misunderstandings if you didn't wait more than four

11:20  20  years to tell Preston Wood and Sam Wood that this e-mail

21  that you sent that said "We aren't going to use your

22  design" --

23  A.  Yes.  If you weren't involved, then you would have let

24  me speak to them.  I tried to call them and text them

11:20  25  multiple times, yes.  This is about greed from your side.

*Ramani - Redirect by Mr. Strother*

1    So, yes, I do.  I tried to text her.

2         MR. ZUMMO:  Your Honor, no further questions.

3    A.  I tried to reach out to her and I tried to apologize.

4         THE COURT:  Pardon me?

11:20  5    MR. ZUMMO:  No further questions.

6         MR. STROTHER:  Your Honor, I do have a brief

7    redirect.

8         THE COURT:  Sure go on.

9              REDIRECT EXAMINATION

11:20  10  By Mr. Strother:

11   Q.  Mr. Ramani, let me first draw your attention back to

12   accounting to Defendant's Exhibit 17.

13   A.  Okay.

14        MR. STROTHER:  Your Honor, may I please have the

11:20  15  laptop screen.

16        THE COURT:  All right.  Do you want your --

17        MR. STROTHER:  Yes, Your Honor.

18        THE COURT:  Hang on one second.

19        MR. STROTHER:  Thank you.

11:21  20  By Mr. Strother:

21   Q.  Mr. Zummo pointed out an error in Defendant's Exhibit 17

22   that I wanted to ask you about.

23        Thank you for your patience while I find it

24   here.

11:22  25        I am going to use my laser pointer to ask you

*Ramani - Redirect by Mr. Strother*

1    about the portion at the bottom of Defendant's Exhibit 17.

2    A.  Okay.

3    Q.  Is the cost per home, over here in this column, supposed

4    to be monthly overhead divided by closed homes in that

11:22   5    month?

6    A.  It should be.  Yes, sir.

7    Q.  I'd like you to pull out a calculator.

8    A.  All right.

9    Q.  Divide $162,475 --

11:22   10   A.  Okay.

11   Q.  -- by 33.

12   A.  That should be 25.

13   Q.  Tell me what that number is.

14   A.  Wait.  It should be 25.

11:22   15   Q.  I know.  Divide it by 33 and tell me what that number

16   is.

17   A.  4,923.

18   Q.  Now divide $225,010 by 33.

19   A.  Right.

11:22   20   Q.  What's that number?

21   A.  6,818.

22   Q.  Okay.  Now divide $162,475 by the correct number, the

23   number 25.

24   A.  6,499.

11:23   25   Q.  6,499 instead of 4,923?

*Ramani - Redirect by Mr. Strother*

1    A.  We did a line item error.  Sorry.

2    Q.  So, in that case, the number in this column is lower.

3              But would you do the calculation for 225.

4    What is $225,010 divided by 38?

11:23   5    A.  5,921.

6    Q.  That is lower.  Correct?

7    A.  Yes.

8    Q.  So, whenever the homes that should be divided from are

9    lower than 33 the cost per home would go up, and whenever

11:23  10    it's higher than 33 the cost will go down.  Correct?

11    A.  Right.

12    Q.  Were you aware of that error before you took the stand

13    today?

14    A.  No.  I did not.  And I apologize for that.

11:24  15    Q.  Regarding the meals that appear in your monthly

16    overhead, why do you believe that that is a proper

17    deduction?

18    A.  The meals are all related to the sales staff and the

19    team, again, because we have our showroom and they come in

11:24  20    pretty much seven days a week.  We try to provide benefits

21    to them and incentives for them to be at the showroom.  So,

22    we will buy them Starbucks or buy them lunch.

23              We do things for our team to back into the

24    sales.  So, that's why it's calculated that way.  And

11:24  25    they're all line-itemed and very detailed to show that.

*Ramani - Redirect by Mr. Strother*

1  Q.  Are those meals that are provided, essentially, on the

2  showroom for the various employees and independent

3  contractors?

4  A.  The majority of them are.  Or if a builder was taken out

11:24  5  to lunch or dinner, then some of that would take place also.

6  Q.  Just a couple of quick more questions.

7          You were asked about e-mail blasts.

8          Am I correct in my understanding that an

9  e-mail blast is a one-time e-mail sent; essentially press a

11:25  10  button and it goes to a bunch of people?

11  A.  Correct.

12  Q.  It's not a few hundred e-mails sent out individually?

13  A.  Correct.

14  Q.  And, finally, I'd like you to look at Plaintiff's

11:25  15  Exhibit 13.  This is the document Mr. Zummo was asking you

16  about regarding some of the data that appears here.

17  A.  Right.

18  Q.  Do you know whether the bounce rate here is the

19  percentage of people that didn't click on anything on the

11:25  20  page before leaving?

21  A.  Correct.  And this also doesn't show -- I will let you

22  answer [verbatim] -- the staff views and the team views

23  internally in our office.

24  Q.  Well, let me ask you that.

11:25  25          So, these unique page views -- this number

1   doesn't break out the people working on the page or the

2   salespeople using the page on the showroom floor?

3   A.  Right.

4   Q.  Back to bounce rate.

5              Does this mean that 63 percent of the unique

6   page views ended up with the people leaving the page without

7   clicking on anything?

8   A.  Correct.

9   Q.  Such as floor plans?

10  A.  Correct.

11  Q.  And that's the same for each of these percentages that

12  appears on this document?

13  A.  Yes, sir.

14             MR. STROTHER:  Thank you, Mr. Ramani.  I pass the

15  witness.

16             MR. ZUMMO:  Just to follow up on that.

17             THE COURT:  Sure.

18             MR. ZUMMO:  If you'd leave that up, please.

19             MR. STROTHER:  Mr. Zummo, let me know if you need

20  to zoom in.

21                     RECROSS-EXAMINATION

22  By Mr. Zummo:

23  Q.  Exhibit 13 [verbatim] --

24             THE COURT:  Do you want to go back to yours?

25  Q.  -- Exhibit 103 --

*Ramani - Recross by Mr. Zummo*

1           This is good, Your Honor.

2           THE COURT:   Okay.

3    Q.  -- this is the only page of any documentation that Urban

4    Living produced to us in this case involving records of who

5    looked at your website and when.   Correct?

6    A.   Correct, sir.

7           MR. ZUMMO:   Nothing else, Your Honor.

8           THE COURT:   Anything further?

9           MR. STROTHER:   No further questions from

10   Mr. Ramani.

11          THE COURT:   Thank you, sir.   You may step down.

12               Call your next witness.

13          MR. STROTHER:   Your Honor, at this time Defendants

14   rest.

15          THE COURT:   Defendants rest.

16               What says the Plaintiff?

17          MR. ZUMMO:   We have no -- Well, actually, Your

18   Honor, we offer Plaintiff's Exhibits 80, 81, 82, 83, 84 and

19   85 in rebuttal to the statements by Mr. Ramani that there

20   were only -- there's only a couple of ways or one way to

21   design a townhome.

22          THE COURT:   What are those exhibits?   I have got

23   them here, but tell me what they are.

24          MR. ZUMMO:   Those exhibits are collections, just a

25   sample, of townhome designs done over the years by Preston

1    Wood & Associates, Your Honor.

2              THE COURT:  What is it again?

3              MR. ZUMMO:  Starting with Exhibit 80.

4              THE COURT:  Okay.  80 through?

11:27   5              MR. ZUMMO:  80 through 85.

6              THE COURT:  Any objection?

7              MR. STROTHER:  Yes, Your Honor.  Same as it was

8    pretrial.

9              THE COURT:  All right.  Ladies and gentlemen, the

11:28  10    testimony is over.

11              Let me rule on that one set of exhibits.

12    That's all we have.  In other words, if they're in, they'll

13    consider it; if they're not, they won't.

14              MR. ZUMMO:  Exactly.

11:28  15              THE COURT:  So, we don't need the jury to remain.

16    Correct?

17              MR. ZUMMO:  Correct, Your Honor.

18              THE COURT:  We're going to take about a five-minute

19    break.  Five-minute break.  Let me see what the rest of the

11:28  20    schedule is going to be and then we'll get back with you.

21              So, we'll see you in about five minutes.

22                    (Jury not present)

23              THE COURT:  We're talking about scheduling and then

24    I'll get...

11:28  25                    (Court and law clerk confer)

```
 1            THE COURT:  All right.  Let's take a look at those
 2   exhibits and then we'll talk about scheduling.  Okay?
 3            Let the record reflect the jury is out of the
 4   room.
11:29  5            Now, I think there was a conditional ruling
 6   ahead of time.  Correct?
 7            MR. ZUMMO:  Correct, Your Honor.
 8            THE COURT:  Now, why do those come in now?
 9            MR. ZUMMO:  Your Honor excluded them on a relevance
11:29 10   objection but said that they could be offered in rebuttal if
11   certain statements were made by the Defendants.
12            We originally told the Court that we were
13   presenting them because it was the Defendant's position in
14   this case that there was only one or only a couple of ways
11:30 15   to design a townhome.  We understood the Court's ruling
16   pretrial, but that statement has now been made in evidence
17   by Mr. Ramani.
18            THE COURT:  Where he said what?
19            MR. ZUMMO:  Where he said there is -- for these
11:30 20   townhomes there was only one way to design the townhomes;
21   you had to put a bedroom and garage on the first floor,
22   living areas on the second floor, two bedrooms on the third
23   floor, and there was only one way to do that.  So, we
24   believe that --
11:30 25            THE COURT:  And, therefore, what, was his point?
```

1          MR. ZUMMO:  His point is, as I understood it and I

2     think the Court clarified, that he believed that the

3     architect's design had little or no impact on the value of

4     the homes or the revenues that they derived from

11:30   5     commissions.

6          THE COURT:  What's the response from the defense,

7     please?

8          MR. STROTHER:  Yes, Your Honor.

9               These exhibits, together, look like a giant

11:31  10     catalog of plans.  Some of them are completely unrelated to

11     plans in this case.  For example, there are some that have a

12     28-wide footprint.

13               What Mr. Ramani testified is, when you have a

14     footprint like 20 by 40, there are only a few different ways

11:31  15     to do that.  He listed two of them on the stand.  He said,

16     well, if you have double the length, you can put two floors

17     and you can put more bedrooms downstairs and make it a

18     two-story.

19               So, he didn't say there was only one way to do

11:31  20     this.  Because of that, these are not just irrelevant, but

21     if they were offered into evidence or accepted into

22     evidence, they would be unduly prejudicial.

23          THE COURT:  Why?

24          MR. STROTHER:  Because it's a giant collection of

11:31  25     townhome designs that have nothing to do with the case and

         1    haven't been testified to.

         2           THE COURT:  Let's go back, because I made that

         3    point.  Let's talk about it, because this is the last major

         4    ruling we have got, and then we'll talk about scheduling.

11:31    5           But go on.  No.  The Plaintiff.

         6           MR. ZUMMO:  Plaintiff.

         7           THE COURT:  How do you get that in?  Why do you

         8    need them in and how are you going to get around that, in

         9    other words, where they have a different footprint?

11:32   10           MR. ZUMMO:  Well, first of all, Your Honor, the

        11    footprint that Mr. Ramani is talking about is a choice that

        12    Urban Living makes or the developer makes, because, as the

        13    Court can see from the exhibits we already have, these

        14    tracts of land where the townhomes were built are built on

11:32   15    multiple lots.  So, it's your choice how many you want to

        16    put on.  And the fact that you can do different

        17    footprints -- you can even have different footprints in the

        18    same development.  You don't have to have identical units --

        19           THE COURT:  All right.  Were any of those

11:32   20    specifically copied in that series, that 80 to what?

        21           MR. ZUMMO:  80 to 85.  No, Your Honor.  We're not

        22    alleging that those were directly coped by Urban Living; and

        23    that's why we offer them, to show that there are many, many

        24    ways to design these townhomes.

11:32   25           THE COURT:  Well, is there any contest on that

1    point?

2              MR. ZUMMO:  They just testified -- he just

3    testified that there was only one or a limited number of

4    ways to do it, and that meant that the architect or the

11:33  5    designer offers very little value.

6              MR. STROTHER:  Your Honor, I disagree with what

7    Mr. Zummo said regarding the testimony.  Not just Mr. Ramani

8    but Mr. Bachman and Mr. Cameron testified that the footprint

9    is dictated not by -- by the market -- and I believe

11:33  10    Ms. Wood as well -- that that is a product of what the City

11    limits you to with regard to setbacks.  And, so, the 20 by

12    40 is what is set by extraneous --

13              But that's important because, sure, when

14    you're allowed to increase your footprint by another eight

11:33  15    feet vertically and another six feet horizontally, you can

16    do many more different things.

17              But, again, I understand the purpose is to

18    rebut Mr. Ramani's testimony, and his testimony is being

19    misquoted.  He did not say there was only one way to do

11:34  20    this.

21              MR. ZUMMO:  Mr. Ramani testified "just a box",

22    that's all this is, and these show that there is a lot more

23    than a box to townhouse design.

24              THE COURT:  All right.  Now, you're offering this

11:34  25    in rebuttal for what limited purpose?

1          MR. ZUMMO:  For the limited purpose, Your Honor, of

2     showing that there are many, many ways to design an urban

3     townhome and that those many, many ways represent exactly

4     the kind of creativity and selection among different design

11:34  5     choices that copyright protection is meant to afford to

6     these designs.

7          THE COURT:  That's 80 to what?

8          MR. ZUMMO:  80 to 85.

9          THE COURT:  All right.  Objection is overruled for

11:34  10     that very limited purpose.

11          And what I am going to do is get the jury back

12     in and say I have admitted Exhibits 80 to 85 which are --

13     and then you can mention what they are and you're offering

14     for what limited purpose only, and I say that's the limited

11:35  15     purpose.

16          But I am also -- because I know this is not

17     summation -- I am going to allow you to get up and say why

18     you object to it.  And then I am going to say the jury can

19     give whatever weight, if any, it gives to this.

11:35  20          But I am going to allow both of you to get

21     that in, to limit it down that narrowly.  It's unusual, but

22     that's all right.  I am going to allow you to get up and

23     what's the objection to it and you give me the objection

24     just like you stated it, which is right to the point.  They

11:35  25     may buy either one or neither.

1          MR. STROTHER:  Yes, Your Honor.

2          MR. ZUMMO:  Your Honor, just so I don't misspeak, I

3    stated my limited purpose.  Can I have the court reporter

4    give me that so that I don't say it in a different way?

11:35    5          THE COURT:  I made some notes -- but, yes, Bruce,

6    if you would read it back -- because that's the limited

7    purpose.  He's going to read it back and then we'll get the

8    jury back in.

9          (Statement by Mr. Zummo read by court reporter)

11:38   10          THE COURT:  And then, counsel, you get up, give

11   basically the objection you have, which is a speaking

12   objection, but I understand that, just so we get it in the

13   record and both of you -- the narrowness is coming in and

14   your objection is also voiced to the jury.

11:38   15          MR. STROTHER:  Yes, Your Honor.

16          THE COURT:  Now, let's talk about as far as what

17   time the jury comes back in.

18              Now, let me ask you this, because it's now --

19   We're about to just cut off the clock.

11:38   20              How much time does the Plaintiff want to sum

21   up this case?  Because, don't forget, we begin at 11:30 on

22   Tuesdays.

23          MR. ZUMMO:  Your Honor, maximum 45 minutes.

24          THE COURT:  What do you think?

11:38   25          MR. STROTHER:  I will take 45 as well, Your Honor.

```
 1            MR. ZUMMO:  I don't know if I have that much left
 2   on the Court's clock, but...
 3            THE COURT:  Oh, no.  No.  The closing doesn't count
 4   on your time, no.  Once we end now, that's the end.
```
11:38
```
 5            Hang on one second.  Let me just talk about --
 6   And we have a long charge and, generally, it's like reading
 7   a deposition.  Sometimes it's a minute a page.
 8            So, let me see my staff up here.  I am going
 9   to stop the clock completely now and let me just work on
```
11:39
```
10   time.
11            (Court confers with staff)
12            THE COURT:  Let me talk to the attorneys about
13   this.
14            We get underway, let's say, as close as we can
```
11:41
```
15   to 11:30.  I don't think it will take 45 minutes to read
16   that charge, because it gets narrowed down.  But, right now,
17   we're about 43 pages, I think.  And that may work out.  I
18   may add some.
19            But looking at max time, max time, if I begin
```
11:41
```
20   reading at 11:30, that means my reading is over at 12:15.
21   Okay?  Then the Plaintiff starts.  And then we always take
22   a -- we always take a -- When you take your break --
23            Let's say you take 30 minutes and reserve
24   15 minutes.  That would take us to 12:45.  We take a
```
11:41
```
25   15-minute break.  We get back in at one o'clock.  We go to
```

1    1:45, plus another 15 minutes.  It will bring it to two

2    o'clock.

3              I am going to tell the jurors to eat lunch

4    early and we'll have snacks for them, some cookies or

11:42    5    whatever, in there.  That way, we can go straight through.

6    I'm not talking about my schedule, but I'm talking about

7    everybody --

8              Does that seem workable to you?

9         MR. ZUMMO:  Yes, Your Honor.

11:42   10         THE COURT:  That way, they'll get it if I tell them

11    to eat an early lunch.

12         MR. ZUMMO:  I think that works fine.

13         THE COURT:  Okay.  Or if they want to just wait and

14    eat a sandwich in that one little break or whatever they

11:42   15    want.  And then, after that, I don't have anything else set.

16              Now, as far as today' schedule, I will talk to

17    you as soon as we let the jury go and we get through with

18    that evidentiary matter.  Okay?

19         MR. ZUMMO:  Yes, sir.

11:42   20         THE COURT:  All right.  Let's call the jury back

21    in.

22                   (Jury present)

23         THE COURT:  There was a matter on the table when

24    you left.  I have made a ruling with Exhibits 80 to 85.

11:43   25    They're in pure rebuttal.  I am admitting them for a very

1    narrow purpose only.

2              So, for what limited purpose is the Plaintiff

3    offering these?

4              You notice it's written down because it was

11:43   5    actually dictated in.

6              For what limited purpose am I admitting 80 to

7    85?

8         MR. ZUMMO:  Your Honor, for the limited purpose of

9    showing that there are many ways to design an urban townhome

11:44  10    and these many ways represent exactly the kinds of

11    creativity and collections among different choices that

12    copyright protection is meant to afford to these designs.

13         THE COURT:  Now, the Defendant objects to that and

14    I am going to allow him to sound his objection.

11:44  15              There is objection to that offer.  Is that

16    correct, sir?

17         MR. STROTHER:  Yes, Your Honor.

18         THE COURT:  What's your objection, sir?

19         MR. STROTHER:  We object that those five exhibits

11:44  20    include much irrelevant information because they include

21    plans that are not confined to the typical 20-by-40-foot

22    footprint that the parties have been testifying about.

23         THE COURT:  All right.  Now, you see the limited

24    offer and what the objection is.  I am overruling the

11:44  25    objection.  It's a limited reason that I am entering it, but

1    I am saying it goes to the weight, not to the basic

2    admissibility.

3                    You have heard the offer.  You have heard the

4    objection.  You give it whatever weight, if any, you think

11:45    5    those five sets of plans deserve.

6                    I am leaving it to the jury but with the

7    strict limited offer, and you have heard a pretty strong

8    objection to that.

9                    Now, with that, anything further from the

11:45    10    Plaintiff?

11            MR. ZUMMO:  No, Your Honor.  Plaintiff has no

12    further evidence.

13            THE COURT:  Anything further?

14            MR. STROTHER:  No, Your Honor.

11:45    15            THE COURT:  All right.  The case is over.

16                    Let me tell you what we'll be doing.

17                    Do you have a copy of those proposed

18    instructions?

19                    I want to show you something.  I do this in

11:45    20    every case.

21                    Now, in every case that goes to a jury it goes

22    on a number of instructions and then questions.

23                    I am looking at this.  I see this is

24    single-spaced.  I want mine double-spaced, as we mentioned.

11:45    25    So, it's going to be longer than this.  Everything I am

1    looking at here, at least on this one.

2              But, in any event, these are the proposed jury

3    instructions.  It's the closest thing to pure academics that

4    you get at the courthouse.

11:46   5              When I get back in with the attorneys --

6    They'll try to agree on as much as they can with all of

7    this.  Then I'll be sitting at the head of that center table

8    with the court reporter down there in that corner, the

9    attorneys on each side, and we're going to discuss all of

11:46  10    the proposed instructions.

11              They can dictate in and object to any they

12    want.  They may say, Well, we think it should be in this way

13    or that way, and I will rule on that, we'll redraft it and

14    we'll have it all ready for you.

11:46  15              You notice there's a whole bunch of blanks to

16    fill in, if any, when you get there.  And the last page

17    needs to be the verdict, but we don't have a form yet on

18    here, but we'll talk about that.

19              So, what we're going to do, we're going to

11:46  20    adjourn for the day.  It's a long afternoon.

21              In fact, when I was in state court there used

22    to be windows at the back of the courtroom, at the back

23    doors, and in situations like that I always invited the

24    jurors.  If they want to hang around and make sure we're in

11:47  25    here working, they're welcome to come in and look through

1    the windows.  Well, you can do the same thing with that back

2    door, because we'll be working quite a bit.

3              You can't get -- A case like this does not

4    come directly out of a form book; so, some of it has to be

11:47    5    independent drafting, and that's what we'll be doing.

6              So, we're going to take a break at this time.

7    The attorneys and I -- once you leave, we'll be talking

8    about when I need them back to go over all of this stuff.

9    And we'll be working on it.

11:47    10              So, tomorrow and, don't forget, every Tuesday

11    we begin at 11:30.

12              So, this is what we're going to do.  We're

13    going to get this case to you as quick as we can without

14    putting a rush on the lawyers.  It's somewhat complex.  Each

11:47    15    side has requested and I have given them 45 minutes each to

16    sum up the case.

17              So, when you get back in here tomorrow the

18    first thing is I will read the instructions, and you will

19    have a copy right on your chair.  That's another thing; we

11:48    20    need to run all the copies.  All right.  You will follow

21    along.

22              And then we'll hear from the Plaintiff.

23    Remember, they've got the burden of proof.  After that, we

24    hear from the defense.  And usually the Plaintiff, in their

11:48    25    45 minutes, will reserve a little bit of time, maybe five

1    minutes or ten minutes, to wrap up.  But it's a total of

2    45 minutes each.

3              So, I will -- generally, the schedule is:  I

4    will read it to you.  Sometimes it takes about a minute a

11:48    5    page to read this, maybe less, because some of it is

6    shorter.  We'll hear the Plaintiff opening and they'll stop

7    whenever they want within that 45-minute bracket.  Then we

8    hear from the defense.  But we'll take a ten-minute break in

9    between.

11:48    10             So, I will read it to you.  You will hear the

11    Plaintiff and we'll take a ten-minute break.  Then we'll

12    hear all the defense 45 minutes and maybe the ten-minute

13    wrap-up of the Plaintiff.  Then you will have the case.

14             My suggestion to you is to have an early

11:49    15    lunch.  I'm getting in right at 11:30 and I am going right

16    into this.  Okay?  So, we'll have some snacks or something,

17    some of Stephanie Leigh's cookies or something like that,

18    after you get back, but I do suggest that you eat lunch

19    first, or you will have a short break if you want to grab a

11:49    20    quick sandwich in that ten minutes, or if you want to hold

21    it until later on, but we will have a little something for

22    you.  I do suggest you do it ahead of time.  That way, we'll

23    get the maximum in.

24             At that point you set your own schedule.  You

11:49    25    take breaks when you want.  You decide when you break for

1  the day, within certain limits that I will give you tomorrow

2  that I have given every jury since I have been on state

3  court also, as to dates, as to times, that you can

4  deliberate.

11:50  5         If anybody is sticking around this

6  afternoon -- and you don't have to -- I am doing a pretty

7  hot sentencing at 2:15.

8         You know these folks that call up and say that

9  they're from the IRS and they're going to come -- I have the

11:50  10  worldwide case.

11              (Off-the-record discussion)

12         THE COURT:  We need you back here ready to resume

13  tomorrow at 11:30, at which time we'll wrap the case up.

14         So, with our appreciation, it's short.  The

11:50  15  lawyers did a super job.  They're under their time

16  estimates, which is fine.

17         It's an interesting case.  It's going to be a

18  lot of technology going into the three days of testimony.

19  So, we'll be working on that, too.

11:51  20         So, ladies and gentlemen, thank you.  We'll

21  see you tomorrow ready to resume at 11:30 a.m.  Thank you

22  and good afternoon.

23              (Jury not present)

24         THE COURT:  I'll have these time sheets.  I always

11:51  25  give you a copy of the timesheets.  I will work them up

```
  1    later, but you did fine time-wise.

  2               All right.  Let's talk about scheduling.

  3               The first thing, since we're down here, we

  4    might as well do at this point.  Let's talk about the

11:52  5    notices that you want for summation.  So, give me a second

  6    to do my little diagram here.

  7               All right.  Plaintiff, when you begin I will

  8    give you notice on your opening after how much time has gone

  9    past?  Then you sit down whenever you want.  But I will give

11:52 10    you one notice after how much time has gone past on your

 11    opening?

 12          MR. ZUMMO:  I'd like 30 minutes, Your Honor, and

 13    the plan is to spend 35 in the first part.

 14          THE COURT:  That's up to you.  Stop whenever you

11:53 15    want.

 16               All right.  Now, on the defense closing,

 17    summation, I will give you two notices.  The first one after

 18    how much time has gone past?

 19          MR. STROTHER:  40 minutes, Your Honor.

11:53 20          THE COURT:  And then how much time left?

 21          MR. STROTHER:  43 -- You're asking how much time to

 22    elapse?

 23          THE COURT:  Well, no.  In other words, your first

 24    notice is after how much time has gone past?  You want a

11:53 25    40-minute notice and then how much time before you have to
```

        1   sit down?  You don't have much time left.  Two minutes or --
        2               MR. STROTHER:  I'd like two more minutes.
        3               THE COURT:  Okay.  So, what?  Do you want a three-
        4   minute notice?
11:53   5               MR. STROTHER:  Right.  So, 40 and then 43, Your
        6   Honor.
        7               THE COURT:  Well, 40 and 43 minutes.  So, that's a
        8   two-minute notice before you sit down.  Two minutes left.
        9               MR. STROTHER:  Yes, Your Honor.
11:53  10               THE COURT:  On your last go-round I will give you
       11   one notice after how much time is left before you sit down?
       12               MR. ZUMMO:  Eight minutes, Your Honor.  So, that
       13   would be a two-minute warning as well.
       14               THE COURT:  Well, I'm not sure.  You just tell me.
11:54  15   Two minutes left?
       16               MR. ZUMMO:  Two minutes left, Your Honor, yes.
       17               THE COURT:  All right.  What's the status of the
       18   charge as you see it?
       19               MR. ZUMMO:  We --
11:54  20               THE COURT:  By the way, for whatever it's worth,
       21   one side used -- the Plaintiff used 54 minutes, the defense
       22   27 minutes.  And I'll have this all for you when we're all
       23   done.
       24               MR. ZUMMO:  Judge, the first time I ever tried a
11:54  25   case on the clock was with Judge Werlein, and there were

         1    out-of-state lawyers on the other side and they apparently
         2    didn't believe it.  So, when they got into their case they
         3    had, I think, 43 minutes left total and he cut them off at
         4    43 minutes and said, "You can sit down."  And I think they
11:54    5    paid attention to those time limits.
         6              THE COURT:  They say the U.S. Supreme Court is just
         7    like that, especially with Rehnquist, that you finish even
         8    mid-sentence.  "Sit down."
         9              MR. ZUMMO:  We traded some e-mails over the
11:54   10    weekend, Your Honor, and I think we're just going to have to
        11    go through with what we've submitted to the Court.  We
        12    weren't able to reach any further agreements.
        13              THE COURT:  Okay.  Realistically, the easiest thing
        14    to do would be to have me look through this and for us to
11:55   15    get together after the noon hour.  Okay?
        16              MR. ZUMMO:  Yes, sir.
        17              THE COURT:  I mean, realistically.
        18              MR. BONHAM:  You were saying about "I do notice
        19    that it is not double-spaced."  We can print that
11:55   20    double-spaced for you right now.
        21              THE COURT:  It doesn't matter.  I can work from
        22    this, but when it comes time to do the actual reading I want
        23    it double-spaced.
        24              MR. BONHAM:  Will do.
11:55   25              THE COURT:  So, for the last go-round I want it

1    double-spaced.  Don't forget you want a corrected title on

2    this case.  I am looking here.  I see it doesn't have that

3    here at the top.

4             And for sure you know to knock out all the

11:55    5    footnotes when it comes time to give it to the jury.

6             And you do have it paginated.  It's real

7    important for you arguing the case to have it paginated.

8             The last page, by the way -- you don't have to

9    have it now -- but the last page is a separate page for the

11:56    10    verdict.  In other words, it just says the title of the case

11    and then you say "Verdict".  And I will quote.  This is

12    exactly what it says.  "We, the jury, return the foregoing

13    as our unanimous verdict."

14             Then you jump down and there is a line for the

11:56    15    presiding juror.  And in federal court, as you know, you

16    must have a date line.

17             So, why don't we do that.  In other words, see

18    if you can narrow it down.  You will have the run of the

19    courtroom.

11:56    20             I have a meeting with the Chief Judge and a

21    couple -- one circuit judge on some housekeeping matters at

22    1:30.

23             I'll be here at 2:15 and do that sentencing,

24    and then as soon as that's done we'll get underway here.

11:57    25             So, literally, and what I am going to do -- I

1   assume everything in italics is that you don't agree with.

2   Right?

3        MR. ZUMMO:  That's correct, Your Honor.

4        THE COURT:  How does it work once I start reading?

11:57   5   It says "Submitted by the Plaintiff" and --

6        MR. ZUMMO:  Usually, "The Defendant objects and

7   submits the following."

8        MR. STROTHER:  Sometimes I would say "The Defendant

9   objects to this entire instruction."  However, if the Court

11:57   10   is going to let it in --

11       THE COURT:  Like No. 16 submitted by Plaintiffs:

12   "The Defendant objects and submits Instruction 17 as a

13   replacement," and on the next page is what you think is a

14   replacement.  Correct?

11:57   15       MR. STROTHER:  Right.

16       THE COURT:  "No. 18 submitted by Plaintiff."

17            And, Defendant, you object to all of No. 18.

18   Correct?

19       MR. STROTHER:  Yes, Your Honor, but I would like to

11:57   20   call the Court's attention to No. 18.  We actually filed an

21   alternative Instruction 18 this morning at 6:00-something.

22       THE COURT:  Where is it?

23       MR. STROTHER:  I have 11 or so courtesy copies in

24   the breakout room across the hallway.

11:58   25       THE COURT:  You got that?  All right.  So, I will

Charge Conference

1    just put this right behind.

2              MR. STROTHER:  Thank you, Your Honor.

3              THE COURT:  All right.  That's the sort of thing.

4    Why don't you sit down and give it one more shot to see if

11:58  5    you can narrow it down.

6                   Aside from that, when we get in, don't forget

7    all your objections are going to be made around that table,

8    nothing tomorrow morning.

9                   When I get in here, one side or the other is

11:58  10   going to have all copies run and they will be on Ellen's

11   desk at a certain time, and I'll get in and we'll start

12   reading.

13                  All right.  Is there anything else you need to

14   get on the record before we adjourn until 2:30?

11:58  15             MR. ZUMMO:  Not from Plaintiff.

16             MR. STROTHER:  I have a question, Your Honor.

17             THE COURT:  Yes, sir.

18             MR. STROTHER:  May the parties and witnesses be

19   fully excused?

11:58  20             THE COURT:  Oh, yeah, they can be excused at that

21   point.  It's just pure academics.

22                  All right.  I'll see you back at 2:30.

23             MR. ZUMMO:  Yes, Your Honor.

24                       (Recess)

14:57  25             THE COURT:  Anybody can join in, as far as other

*Charge Conference*

1    lawyers go, but remember that he can take down just one at a

2    time.

3              All right.  I am going to start looking down.

4    Don't forget about cleaning up that title.  Okay.

14:57    5         MR. COOPER:  Yes, sir.

6              THE COURT:  Also, this is, I guess you could say,

7    "Jury Charge - Proposed" and "Jury Questions".  And in each

8    one of these things knock out the footnote designation and

9    at the bottom.  Those are out on everything as you type up.

14:57   10              I read quickly and, even though it's a

11   standard, I am going to read through everything.  So, give

12   me a moment.

13             MR. BONHAM:  May I stop you, Your Honor.  Again,

14   the first paragraph, because we have, in addition to the

14:58   15   evidence, the Agreed and Stipulated Facts --

16             THE COURT:  Yeah.

17             MR. BONHAM:  -- and, so, what I would propose to

18   add is --

19             THE COURT:  Is it by agreement?

14:58   20         MR. BONHAM:  It is by agreement.

21             THE COURT:  Okay.  Fine.  Keep going.  As long as

22   it's by agreement, unless it's unusual, that's fine.

23             Keep going.  Thank you for telling me.

24             [Reading]  Well, "he".  "He is called..."  "He

14:58   25   or she is called..."

Charge Conference

1          By the way, I am looking at the bottom of this

2     one.  It's not paginated here.  I don't know where you pick

3     up your numbered --

4          MR. STROTHER:  Page 7.

14:58    5          THE COURT:  But everything else here ought to be

6     paginated.  But it's "He or she is called an expert witness"

7     and it's "state his or her opinion", since we had a woman

8     expert in this case.

9          And, again, here's another one.  You can look

14:59   10    where I am making a circle.

11          Okay.  I don't see numbers here either.

12    Anyhow, just make sure everything is sequentially paginated

13    at the bottom.  Okay?

14          MR. BONHAM:  Yes, sir.

14:59   15          THE COURT:  But I am looking up at the upper right.

16    It says Page 5 of 3.

17          MR. BONHAM:  We think we have solved our problem on

18    Instruction No. 1.

19          THE COURT:  On all of No. 1?

15:00   20          MR. BONHAM:  Yes, Your Honor.

21          THE COURT:  Then, I am just going to put "by

22    agreement".

23          Then we move to Proposed No. 2.  Now, this

24    is -- is there still a question now we have to look at

15:00   25    No. 2?

*Charge Conference*

1       MR. BONHAM:  The only question, Your Honor, is --

2  The first two paragraphs are agreed.  We would like the next

3  two added.  Mr. Strother objects and instead wants to put

4  his proposal.

15:00   5       THE COURT:  All right.  Let me take a look.

6            This is Plaintiff's Proposed.  It says:  "An

7  architectural work may be 'copied' by constructing or

8  selling a building that is based on the protected design.

9  To establish infringement of its copyrights Preston Wood

15:01  10  must prove..."

11            The Defendant's proposed language -- That's

12  your proposed language as to the whole thing?  That's all

13  you want, these two?  You don't agree to the Plaintiff's and

14  you want this instead --

15:01  15       MR. STROTHER:  Yes.

16       THE COURT:  -- or you want it in addition?

17       MR. STROTHER:  Instead, Your Honor.

18       THE COURT:  All right.  Let's talk about it.

19            Why does the Plaintiff think that that's

15:01  20  needed and what's wrong with the defense?  And then we'll go

21  the other way.

22       MR. BONHAM:  The reason, Your Honor, is, again, I

23  think we need to have the Court explain to the jury the

24  elements of the claim, which is ownership and copying, and

15:01  25  then you're going to instruct the jury that 'I have already

Charge Conference

```
 1    found ownership of the valid copyrights.'  If you just
 2    present it in this fashion, that copying is the only
 3    element, I don't believe that's accurate under the law.  The
 4    elements are very well established.
15:02   5             THE COURT:  Well, your position is an architect
 6    work may be copied by constructing or selling a building
 7    that is based on the protected design.
 8             MR. BONHAM:  Correct.
 9             THE COURT:  Ordinarily, you look at that -- That's
15:02  10    where you're giving away a bit of what the perception would
11    be.  Right?
12             MR. BONHAM:  Correct.
13             THE COURT:  Then you move to "To establish
14    infringement..."  Okay?
15:02  15             MR. BONHAM:  Correct.
16             THE COURT:  "Infringement based upon..."  They can
17    do this:  "But to establish infringement of its copyrights,
18    they have to prove ownership of a valid copyright in the
19    work and 'copying' of that work by any of the Defendants."
15:02  20             All right.  Now, what the defense wants
21    instead of those two is:  "To establish infringement of its
22    copyrights, Preston Wood must prove 'copying' of its work by
23    any of the Defendants."
24             Again, I am not taking sides.  I am really not
15:03  25    in this thing as it goes forward.  But, in a way, doesn't
```

*Charge Conference*

1    the first two help you more than just putting yours in?  I

2    mean, I am just reading it cold.  I don't do this for a

3    living.  I mean, I do it when a case pops up.

4                   But isn't this, in a way, more helpful to your

15:03  5    case than just that?  Because copying -- All right; they

6    copied it.

7                   MR. STROTHER:  I look at the two Plaintiff's

8    proposed paragraphs as independent.  So, my answer to the

9    Court's question regarding the second paragraph:  It would

15:03  10   be more helpful to me to have those two elements there, but,

11   admittedly, the first element is not an issue.  We have not

12   contested that there is a -- we're not arguing that there is

13   an invalid copyright.  I said it in opening statement.

14   Judge Atlas has ruled that all the copyrights are valid.

15:03  15   So, that's not an issue before the jury.  So, just,

16   procedurally, to weigh them down with unnecessary

17   elements -- I just want it to be clear.

18                   THE COURT:  Well, I think somebody -- Again, let's

19   talk about how you do it practically as a trial lawyer.

15:04  20                  You would say, 'Look.  This is what we've got

21   to prove.  This is what the Judge says on Page 7.  But it's

22   already stipulated; that we would have to ordinarily prove

23   that, but we don't in this case.  It's been agreed and,

24   therefore, No. 2 is the only one we're proceeding on.'

15:04  25                  Is that the point you're trying to make?

Charge Conference

1          MR. STROTHER:  It is.  And I told Mr. Bonham that,

2     if that your philosophy, then I would be quiet about it.  I

3     didn't know which of the various ways --

4          THE COURT:  Well, then, looking at it from that

15:04     5     point of view, it may be easier just to say 'For purposes of

6     this case, it's copying of that work by any of the

7     defendants.'

8               I am trying to run one off against the other.

9     I am going to ask you, eventually, how you feel about it.

15:04    10               By the way, if any time you need to get up and

11     confer on the side, it's all right with me.

12               Let's take a look at that.  Anybody want to

13     talk about it?

14          MR. ZUMMO:  Honestly, Your Honor, I am indifferent

15:05    15     because I am kind of with Mr. Strother.  The issues that the

16     jury needs to decide we certainly have to have detailed

17     instructions on, but to tell the jury there are these other

18     elements where we have already agreed to them -- I don't

19     think it hurts to do that.  I don't think it's necessary to

15:05    20     do that.

21               So, that's my personal feeling about it.

22          THE COURT:  Well, what you might want to do:

23     "...establish infringement of its copyrights in this

24     case..."

15:05    25          MR. STROTHER:  I was thinking that.

*Charge Conference*

```
 1        THE COURT:  "In this case".  And you can say -- you
 2   can argue -- Ordinarily, you would have had to prove
 3   ownership and copying, but it's already been agreed to.
 4   That's why it's only "copying in this case".
 5        MR. BONHAM:  All right.  We can do that.
 6        THE COURT:  So, how does that work, then?  Do you
 7   want to knock yours out and just use his?
 8        MR. BONHAM:  Well, we knock the second blank, the
 9   one that starts "To establish infringement..."  I will take
10   that out and we'll go with Mr. Strother's with those three
11   words added.
12        THE COURT:  Okay.  So, "An architectural work may
13   be 'copied' by constructing or selling a building that's
14   based on the protected design."
15        MR. BONHAM:  Again, Your Honor, it's an accurate
16   statement of the law.
17        THE COURT:  "An architectural work may be 'copied'
18   by constructing or selling..."  Okay.  All right.  Now, why
19   do you want that out?
20        MR. STROTHER:  I think it's clutter.  I don't
21   disagree that that is an accurate statement of the law.
22        THE COURT:  You don't disagree?
23        MR. STROTHER:  I don't.  I just think it's clutter.
24        THE COURT:  All right.  Then, it's going in.
25   That's going in and the last one is going in.
```

15:05 (line 5)
15:06 (line 10)
15:06 (line 15)
15:06 (line 20)
15:06 (line 25)

Charge Conference

1          By the way, some of these I am going to go

2   back and look at myself and maybe look up some of the books,

3   but if it's that close -- I appreciate, you know, your

4   position.  Anytime anybody needs to protect your position,

15:07  5   get it in the record.  But you have been at this business a

6   while.  It shows.  And that's a positive.

7          So, let's move on.

8          The next one -- this is submitted by the

9   Plaintiff.  Okay?

15:07  10         MR. BONHAM:  This one I think is going to -- if

11  we're solving it -- Yeah.  We have solved it on Instruction

12  No. 2; so, 3 is out.

13         THE COURT:  Okay.

14         MR. ZUMMO:  And 4 also.

15:07  15         THE COURT:  4 also out?

16         Don't forget.  You can argue within this.

17  That's the thought I had to some of these.  You can argue

18  within it.  The question is do you need --

19         Okay.  We're now on Page -- upper right,

15:07  20  Page 10 of 43 pages.  What about this one?

21         MR. STROTHER:  It's submitted by Defendants.

22         MR. BONHAM:  5, 6 --

23         THE COURT:  Now, this is by Defendant.  Plaintiff

24  objects to No. 5.

15:07  25         MR. BONHAM:  Correct.  Essentially, 5, 6, 7 and 8

1    are ones that Mr. Strother has submitted, which is basically

2    his view of, you know, what copyright law covers and what it

3    doesn't, and we have got that covered in our Instruction

4    No. 9.  And, so, we essentially have kind of dueling

15:08    5    instructions on that.

6          THE COURT:  So, you're saying Proposed Instructions

7    5, 6, 7 and 8 are all, in your mind, subsumed in your No. 9?

8          MR. BONHAM:  Yes, Your Honor.

9          THE COURT:  Let me look at No. 9 first.  Then we

15:08    10    can go back.  Okay?

11          MR. ZUMMO:  9 is on Page 15, Your Honor.

12          THE COURT:  There it is.  All right.  The whole

13    concept of copying, what you can copy and what you can't

14    copy.  Right?  This is where you're going to have to lay it

15:08    15    out for the jury.

16                Now, that's a Tenth Circuit case, that first

17    one.  Correct?

18          MR. BONHAM:  Correct.  There are others that --

19          THE COURT:  Also, it says, "as I mentioned before".

15:08    20    Is that still "as I mentioned before" --

21          MR. BONHAM:  I believe so.

22          THE COURT:  -- based upon the first few?

23          MR. BONHAM:  Correct.  It's on Instruction No. 2

24    where it says "Copying is a shorthand version..."

15:09    25          THE COURT:  What I usually do, I don't make any

*Charge Conference*

1    comments as to what's going on.  I don't mind.  It'll add to

2    it.  Let's leave it, if I go this route.

3              "As I mentioned before, 'copying' is a

4    shorthand reference to any infringement of the copyright

15:09   5    holder's exclusive rights, not just literal copying."  And

6    "copied" in the second sentence is in quotes.

7              Let me just read through here and then I am

8    going to go back and see what he's got.

9              A lot of this has circuit background.  I have

15:10   10    not farmed that ground anywhere, I guess.

11              "You may find that a party had access to the

12    work if the party had reasonable opportunity..."  Well,

13    didn't they?  Do you need that one?

14         MR. BONHAM:  They have stipulated to access on all

15:10   15    but one and, so, because they're not --

16         THE COURT:  All right.  Got it.

17         MR. STROTHER:  By the way, Your Honor, the portion

18    you're reading we do not object to.  Remember, that if it's

19    not in italics we're okay with the language.

15:10   20         THE COURT:  All right.  So, you say, "That's okay

21    but."

22              Now, why do you need the remainder there, your

23    proposed language?  The case involves -- I will tell you,

24    before I even read what you have, I generally don't go and

15:11   25    get very case-specific.  I try to go just with the law and

Charge Conference

1    the abstract principles rather than say, 'As you recall, in

2    this case you heard this and you heard that.'  I don't do

3    that at all, generally.

4              So, let me look and see what you have.  If you

15:11    5    agree or if it's needed, certainly I will go with it, but,

6    generally, that's the way I am in all my jury charges.

7              All right.  This business about "access to

8    designs", is that a contested matter?

9         MR. ZUMMO:  Only on one with -- You heard the

15:11    10    Stanford Street project.

11         THE COURT:  Boy, you're getting into some weeds

12    here, meaning that there's a possibility for real confusion.

13    Because I listened to it and they did, too.  They may not

14    have...

15:12    15              Of course, you can argue it, but you're going

16    to have to say, 'Now, when you get to this, these last

17    paragraphs refer only to the Stanford Street properties.'

18    It's going to be awkward.  If you can find some way around

19    it...

15:12    20              By the way, we will take a break from time to

21    time where you can discuss to see how you're going to argue

22    it and the effect it has when it comes to answering an

23    objective question.

24         MR. ZUMMO:  My plan would be to argue -- to start

15:12    25    with the agreed facts on this subject, to say we have an

Charge Conference

```
 1   agreed -- we agree that there was access to four of the
 2   five --
 3           THE COURT:  So, why don't you put down this applies
 4   only, if at all, to the Stanford properties?
 5           MR. ZUMMO:  I think that would be helpful, Your
 6   Honor.
 7           THE COURT:  If at all.  If it's applicable, if at
 8   all, it will be to just this one set of plans.  It's just a
 9   thought.  We can come back.  But that's why I was
10   saying --
11               What's your position on that one?
12           MR. STROTHER:  I think that that would soften my
13   objection to some of the language that's in italics, but as
14   it goes further into the next page my objections become
15   stronger.
16           THE COURT:  Applicable to -- what is it? --
17   S-t-a-n --
18           MR. STROTHER:  Stanford.
19           THE COURT:  Stanford Street, is it?
20           MR. ZUMMO:  Stanford Street Landing.
21           THE COURT:  Stanford Street Properties.  Right?
22               Take a look at those.  And if you need time to
23   work with one another when I come back, if there's anything
24   left that you object to -- say, you object to some items
25   later on, where later on?  Which ones?
```

15:12 (line 5)
15:13 (line 10)
15:13 (line 15)
15:13 (line 20)
15:13 (line 25)

Charge Conference

```
 1              MR. STROTHER:  Your Honor --

 2              THE COURT:  Just on Stanford Street now.  So, that

 3       narrows it down.

 4              MR. STROTHER:  Correct.  I would object to the last

 5       two sentences in italics -- the last two photographs.

 6              THE COURT:  All right.  Who is that that you had in

 7       mind?

 8              MR. STROTHER:  I don't know.

 9              MR. BONHAM:  Well, again, in this instance there is

10       no question that Urban Living --

11              THE COURT:  Hold it.  Let's see.  This is

12       Plaintiff's proposed.  I'm sorry.

13                  Okay.  Your position?

14              MR. BONHAM:  Our position on this is that, clearly,

15       Urban Living had access to our work.  Clearly, Cameron had

16       access to our work.  Clearly, Oppidan had access to our

17       work.  Ms. Wood testified to that.

18                  Their argument is that Mr. Wooten created the

19       works for EaDo, Stanford and Patterson, but he somehow did

20       it independently.  Now, he had access to it through all

21       these --

22              THE COURT:  Who did?

23              MR. STROTHER:  But, Mr. Bonham, this is only about

24       Stanford.

25              MR. BONHAM:  Correct.  You're claiming that Wooten
```

Charge Conference

```
 1    created Stanford.

 2              MR. STROTHER:  Correct -- No.  I'm sorry.  I am

 3    claiming that you haven't shown any evidence that Urban

 4    Living or Cameron or Wooten had access.

 5              MR. BONHAM:  Again, we did that Oppidan had access,

 6    we did that Urban Living had access, and we say that's

 7    imputed to Wooten.

 8              MR. STROTHER:  But not Stanford.  I don't believe

 9    you have put on any evidence that Oppidan ever built using

10    the Stanford plans.  That's why I have carved Stanford out.

11    Right?

12                   If you look at your pleadings and look at what

13    you alleged Stanford was copied from, you didn't put on

14    evidence that Oppidan built using those plans for other

15    projects.  So, that's why I am carving out Stanford and

16    mine's different.

17              THE COURT:  You also have in your last paragraph

18    here something that may help you or not.  "You may also

19    infer access if an accused design is so strikingly

20    similar..."  It gives a lot of area for them to drive a

21    truck through with their theory -- I am just looking at

22    it -- if you know what I mean.

23                   "So similar"?  That's what a lot of this

24    alleged copying is.  It's the extent of the copying and they

25    threw in a lot of their "position" -- I was going to say
```

15:15 (line 5)
15:15 (line 10)
15:15 (line 15)
15:16 (line 20)
15:16 (line 25)

1    "skunks" -- into the jury box.

2              You have heard that term before where you

3    said, "It's not so similar."  "So strikingly similar"?

4              Now, I'm not arguing one case or another.  I

15:16  5    am just saying I will let you work it out.  If you can't, I

6    will come back and rule on it.

7         MR. ZUMMO:  I am just going to toss this out for

8    Mr. Strother to consider.

9              If we go back to the agreed last sentence on

15:16  10   Page 15:  "Preston Wood & Associates would only establish

11   that a party had a reasonable opportunity to view the

12   Preston Wood & Associates' work."  If we added a comma,

13   "either directly or through a third party," comma -- Could

14   you agree to that and then we drop our other three

15:17  15   proposed?

16        MR. STROTHER:  Maybe.

17        MR. ZUMMO:  If you want to think it through.

18        THE COURT:  I am going to put this on hold, then.

19   Right?  I am going to put this on hold, this whole section

15:17  20   on hold.

21        MR. STROTHER:  While we're at a pause, are you sure

22   we totally agree on Instruction No. 1?  I thought there was

23   a sentence or two -- You may have decided not to -- I'm

24   sorry to take us backwards.

15:17  25        MR. BONHAM:  Okay.  Just so that we're clear:  What

Charge Conference

```
 1   we had talked about is that on Page 5 of 43 we were going to
 2   go with our language in italics.
 3            MR. STROTHER:  All the way through at 7 on the --
 4            MR. BONHAM:  Oh.  Okay.  I see what you're saying.
 5   You're saying that the stuff after --
 6            MR. STROTHER:  Correct.  Correct.
 7            THE COURT:  What?
 8            MR. BONHAM:  I have to go back to Instruction 1
 9   again.
10            THE COURT:  Okay.
11            MR. STROTHER:  We met and we did a lot of good
12   work, but I think he highlighted what I objected to; so, it
13   looked like I had agreed to it.
14            MR. BONHAM:  It's fairly straightforward, then.
15            THE COURT:  Where is it?
16            MR. BONHAM:  On Page 5 of 43 --
17            THE COURT:  Go on.
18            MR. BONHAM:  -- everything is agreed down to this
19   last language which starts "These are..."  The next two
20   sentences are things that we want in but Mr. Strother does
21   not.
22            THE COURT:  "These are not themselves protected by
23   copyright, but the design of the buildings included in them
24   is protected"?
25            MR. BONHAM:  Correct.
```

15:18   5

15:18   10

15:18   15

15:18   20

15:19   25

```
 1          THE COURT:  And then the next sentence, also, you
 2   want in?
 3          MR. BONHAM:  Yes, sir.
 4          MR. STROTHER:  And I withdraw my objection to that
 5   very last sentence, the one that you just read, that
 6   "copyright protection for an architectural work may
 7   encompass" --
 8          THE COURT:  So, we're looking at that one sentence,
 9   then.
10          MR. BONHAM:  That one sentence, then.
11          MR. STROTHER:  And I don't think it's an incorrect
12   statement of the law.  I think it's in here too many times
13   and it's a comment by itself when it's repeated right there
14   in that context.
15          THE COURT:  "Standard features are staple building
16   components..."
17          MR. STROTHER:  I do think that the word "design" is
18   sloppy.
19          THE COURT:  See if you can work on that.  If not,
20   come back and we'll -- I will give you a ruling on that if
21   you can't agree.  I understand it.
22          Keep in mind, if it's done beforehand, the
23   safest thing to do is "agreed"; you don't need.  If you
24   think you need it, I will rule on it and give you a ruling.
25          So, it's not that I'm not doing it.  "Not
```

Charge Conference

```
        1   agreed."  Mark that down and we'll talk about it while you

        2   see if you can work it out.

        3                 All right.  So, where are we now?  Back on

        4   Page 16?  I have "hold" on Page 16.

15:20   5                 MR. STROTHER:  I think we have to go back to

        6   Page 10.

        7                 THE COURT:  Now Page 10?

        8                 MR. STROTHER:  Right.  Don't we return to mine?

        9                 THE COURT:  Oh.  Yeah.  Yeah.  Okay.  Page 10.

15:20  10   That's right.  You're going to see if you can work on --

       11   Well, you were going to see, if you added "applicable to

       12   Stanford Street properties", that we don't need yours.

       13   Okay?

       14                 MR. BONHAM:  That takes all the --

15:20  15                 THE COURT:  Then, we don't need yours.  Okay?  But

       16   let's go back and look at it.  All right?

       17                 MR. STROTHER:  Okay.

       18                 THE COURT:  Is that correct?

       19                 MR. STROTHER:  When you said, "We don't need

15:21  20   yours," you mean we don't need mine?

       21                 THE COURT:  Yeah.

       22                 MR. STROTHER:  No.  They're very different.

       23                 THE COURT:  Oh.  They are different?

       24                 MR. STROTHER:  Yes.

15:21  25                 THE COURT:  All right.  Now, what, basically, is 5
```

*Charge Conference*

1 through 8, before I start looking?

2          MR. STROTHER:  More than one thing.

3               So, a couple of them are instructions on two

4 of my clients' affirmative defenses.  I'm going to give a

5 quick preview, but let's go back.

6               Instruction 7 is the doctrine of scènes à

7 fàire, which my client has pled --

8          THE COURT:  Now, does it say you have got the

9 burden of proof on that or do you not have the burden of

10 proof?

11          MR. STROTHER:  I do have --

12          THE COURT:  All right.

13          MR. STROTHER:  That's interesting.  The doctrine --

14 While it is pled as an affirmative defense, the doctrine is

15 the doctrine, and it basically says copyright protection is

16 denied to expressions that are standard --

17          THE COURT:  So, it's an instruction without a

18 question.  Correct?

19          MR. STROTHER:  Right.  Correct.

20          THE COURT:  All right.  Go on.

21          MR. STROTHER:  Similarly, Instruction 8 is the

22 merger doctrine.

23          THE COURT:  So, it's a doctrine that they consider,

24 but they don't have a question.

25          MR. STROTHER:  Right.

*Charge Conference*

```
 1              THE COURT:  All right.
 2              MR. STROTHER:  5 and 6 get into the concept of
 3    protected and unprotected elements.
 4              THE COURT:  Where do you get that from?  Ninth
 5    Circuit pattern jury and a Fifth Circuit case.  Right?
 6              MR. STROTHER:  Correct.  No. 5, yes.  So, while the
 7    Fifth Circuit doesn't have a pattern jury charge, the Ninth,
 8    of course, probably would.  There is a lot of copyright
 9    going on.  They have a very clear pattern instruction on
10    ideas of expression.
11              THE COURT:  Okay.
12              MR. STROTHER:  Instruction No. 6.  This comes from
13    United States Supreme Court and Fifth Circuit precedent.
14              THE COURT:  What does is basically say?
15              MR. STROTHER:  You can't use a copyright to protect
16    unprotectable elements.  And then it explains how the jury
17    can determine what is unprotected.
18              THE COURT:  Well, you know, somewhere you're going
19    to have to either argue this or have a clear instruction on
20    it, because it's really tough.  And I have done a lot of
21    copyright cases.  But it's a really tough concept to argue
22    versus having an instruction, if it'll fly.
23              All right.  So, where do you want to begin?
24              MR. STROTHER:  I think Instruction No. 5, Your
25    Honor, which is page 10.
```

*Charge Conference*

1          THE COURT:  That's, what, ideas and expressions.

2                   [Reading]  That's basic copyright law.  Boy,

3      that's tough just reading it with a law audience.

4                   All right.  Read that.  Read that.  Everybody.

15:24   5      I am sure you have.  I am thinking out loud.  That is

6      complicated as hell.

7                   Now, if you need all of that technology in

8      there, all of that technical stuff -- if he's right and I

9      keep it out, he's got a point -- I don't know if it's

15:24  10      reversible or not.  You guys do this work all the time.  I

11      am just saying I understand, barely, what's that -- Because

12      I have done so much of this, from my point of view, not day

13      to day like some of your firms.  But if it's absolutely

14      necessary it'd better be in.  If it's not necessary, it's

15:24  15      almost like you're talking in circles, although I understand

16      it.  When you get down there, they may go off on the wrong

17      tangent.

18                   We're looking at about how juries -- I have

19      talked to every jury in federal court, every one, for 32

15:25  20      years.  I don't mind taking questions.  I don't mind giving

21      them answers to questions.  But if you tell somebody on this

22      one what does that mean -- you know, the standard response

23      is "Please consider the charge as written and the evidence

24      as submitted in court."  You may get people going off on

15:25  25      tangents that you don't want.

Charge Conference

              1          I am saying -- I'm not saying what you're

              2    saying is not correct.  The question is:  Is it necessary?

              3    I don't know.  If it's necessary, then it better be in.  If

              4    it's not necessary, it's very confusing.

     15:25     5          MR. ZUMMO:  I agree a hundred percent.  I think the

              6    problem is an accurate statement of the law in an appellate

              7    opinion may not be the law that the jury needs to be

              8    instructed on.

              9          THE COURT:  Sure.  Absolutely.

     15:26    10          MR. ZUMMO:  And where I think the problem comes --

             11    and Your Honor knows the lingo -- which is the difference

             12    between an idea and an expression of the idea for copyright

             13    law.  I don't know how many paragraphs we go into in a jury

             14    instruction to start explaining that.

     15:26    15          THE COURT:  But it's your position that you need it

             16    in there?

             17          MR. ZUMMO:  I don't think we need it in this form.

             18    And I think the trouble with approaching it as -- For

             19    example, "Ideas and Expression" as a subheading is --

     15:26    20          THE COURT:  How are you going to argue that, both

             21    sides?  How are you going to argue it?

             22          MR. STROTHER:  There's a couple of sentences in

             23    here that I would use to say, 'Listen.  The Court is saying

             24    that it's a violation of copyright law to copy someone's

     15:26    25    expression.  In this case the expression is the plan.'  If

Charge Conference

1      the idea --

2              THE COURT:  Yeah, but you can copy up to a point,

3      right, and, after that, you can't?

4              MR. STROTHER:  Right.  Right.

15:27  5              THE COURT:  I am just throwing it out as if I was a

6      juror.

7              MR. STROTHER:  By way of example, the idea of

8      having a second floor with a kitchen, living room and dining

9      room is an idea; and, so, if one is not exactly replicating

15:27  10     that expression of the idea, that's not a violation of

11     copyright law.

12             MR. BONHAM:  I disagree with that.

13             MR. STROTHER:  They disagree, but that's okay.

14             MR. BONHAM:  The question is, if you had simply

15:27  15     said, for example, the idea of a three-story townhouse --

16     We're not claiming that we have all this, but once you get

17     into, 'Okay.  It's the idea of a three-story townhouse as

18     expressed by putting the rooms in this order,' now you're

19     into the expression side.

15:27  20             And, again, I agree with Mr. Zummo.  Once you

21     start getting into this and you start injecting this, now we

22     have got to start getting in and explaining a lot more and

23     the charge goes from -- it starts to really get out of hand.

24             MR. ZUMMO:  Obviously, the Court knows what I was

15:28  25     doing with Suzanne Labarthe.  I walked through 'Were these

*Charge Conference*

 1    creative decisions?'  'Were those creative decisions?'

 2              I anticipated that there might be some

 3    instruction in this regard, and I'll be arguing that all of

 4    these decisions were creative choices among other choices.

15:28  5              I don't think that some instruction along

 6    these lines somehow is error or hurts my case, but I think,

 7    when we get into the weeds of the copyright terminology,

 8    like "idea" and "expression", it gets very difficult.

 9              THE COURT:  This may be getting into the weeds, but

15:28 10    then, again, if it's a correct statement of the law...

11              I am going to hold on that one, meaning I will

12    hold.  I want to look at it myself.  And I will come back

13    out and see if you have worked it out.  If not, I will rule.

14              MR. STROTHER:  Your Honor, the final thing I'd

15:28 15    point out is the first two paragraphs -- this is not cobbled

16    together from a series of trial courts or even circuit

17    courts.  This is Ninth Circuit pattern model; so, this isn't

18    me writing this trying to make it sensible.  This is what a

19    panel of Ninth Circuit judges wanted to put together.

15:29 20              MR. ZUMMO:  I think it's more like a committee.

21              MR. STROTHER:  That's a bad word.

22              MR. ZUMMO:  That's a bad word.

23              MR. BONHAM:  And the other thing, too:  Is this the

24    most recent Ninth Circuit instruction?  I think they

15:29 25    superceded this one.

*Charge Conference*

1          MR. STROTHER:  I can confirm.

2          MR. BONHAM:  It doesn't matter.

3          THE COURT:  All right.  The next one.  We're

4     looking at No. 6.

15:29   5          MR. STROTHER:  This one I did put together, Your

6     Honor.

7               The idea of protected and unprotected elements

8     absolutely, in my opinion, requires some kind of instruction

9     because, otherwise, it doesn't appear anywhere in the jury

15:29  10     questions.  There is no doubt that, in the Fifth Circuit, a

11     filtering process needs to be undertaken, in my opinion, and

12     you have got to filter out -- the factfinder has to filter

13     out the unprotected elements before deciding whether there's

14     been infringement.

15:30  15          MR. BONHAM:  I disagree, Your Honor.  The *Apple*

16     *Barrel* case directly talks about that.

17          THE COURT:  What's that case?

18          MR. BONHAM:  That is a Fifth Circuit case in 1984.

19     And I highlighted the --

15:30  20          MR. STROTHER:  1984?

21          MR. BONHAM:  Yes.

22          MR. STROTHER:  Your Honor --

23          THE COURT:  What do you got?  You got something

24     more recent?

15:30  25          MR. STROTHER:  Yes, Your Honor.  *Nola Spice* in 2015

*Charge Conference*

```
 1    walks through --
 2              THE COURT:  Which one?
 3              MR. STROTHER:  This is Fifth Circuit.  Nola Spice,
 4    which talks about all of the other Fifth Circuit precedent
 5    and United States Supreme Court precedent.  This originates
 6    from the Feist case in 1991, which is the very first case
 7    we're taught in law school regarding copyright law.
 8                   Kudos to my opposing counsel, but this is
 9    not -- this should not be a hard decision for the Court.
10              MR. BONHAM:  Again, I disagree.
11                   One reason is in Nola Spice you've got a --
12    They discuss copyright.  It was mostly a trademark case.
13    They talk about it in a very narrow point at the end.  I
14    don't believe they talk about Apple Barrel.  Apple Barrel --
15    You know, the idea that you involve abstraction,
16    infiltration in non-computer code cases, I don't believe, is
17    the Fifth Circuit --
18              THE COURT:  You have got those cases.  I know
19    you've got it highlighted.  It was highlighted in orange.  I
20    was watching what you have.
21              MR. STROTHER:  Yes.
22              THE COURT:  Stick it over here because we have got
23    time for us to go look at that also.
24              MR. STROTHER:  There are a lot of cases.  Your
25    Honor, I would like to call your attention to something I
```

15:30  5

15:30  10

15:30  15

15:31  20

15:31  25

Charge Conference

1    thought was a very good writing by Judge Lake on this

2    matter.

3              Judge Lake, in 2015, talks about the cases I

4    have been mentioning -- *Nola Spice*, *Feist Publications* and

15:31    5    other Fifth Circuit opinions such as *Peel* and *Kepner-Tregoe*.

6    He goes through and breaks this down in exquisite detail.

7    So, I am going to give that to you as well.

8              THE COURT:  About what?  What does it say, the

9    bottom line?

15:31    10              MR. STROTHER:  The filtration analysis must be

11    performed by the factfinder -- "filtration" being

12    identifying the protected and the unprotected elements.

13              MR. ZUMMO:  The problem -- and Mr. Strother is

14    correct that this *Nola Spice* decision is more recent than

15:31    15    *Apple Barrel*, but a later panel of the Fifth Circuit cannot

16    overrule a previous panel.

17              THE COURT:  If they're different.

18              MR. ZUMMO:  They are adopting a new principle here

19    that's overruling lots of earlier decisions without even --

15:32    20              THE COURT:  Who was on the panel?

21              MR. STROTHER:  For *Nola Spice*?

22              THE COURT:  Yeah.

23              MR. STROTHER:  By the way, I think *Nola Spice* was

24    actually adopting a United States Supreme Court decision,

15:32    25    the *Feist* case, which was from 1991, which I would have to

Charge Conference

1    compare *Apple Barrel* with *Feist*.

2          THE COURT:   Who was on that panel?

3          MR. STROTHER:   *Nola Spice*, Your Honor, was

4    Judges King, Graves and Higginson and it was written by

15:32  5    Judge Higginson.

6          THE COURT:   Yeah.

7          MR. BONHAM:   Again, as Mr. Zummo points out, I

8    think we actually had this in an architecture case that you

9    decided about 15 years ago, the *King Empire* case, where you

15:33  10   had two Fifth Circuit opinions that conflicted and, as you

11   pointed out, if you have them passing like ships in the

12   night like this, later on it's treated as a nullity.

13          So we're clear again:   I'm not contending --

14   You know, *Feist* is very clear about you only protect things

15:33  15   that are original.   The difference is what *Apple Barrel*

16   points out, is you don't take -- especially graphic work --

17   you don't take it and chop it into little pieces and then

18   say, 'Okay.   This piece is' --

19          THE COURT:   Yeah.   Go on.

15:34  20          MR. BONHAM:   -- 'this piece has been seen before.

21   We don't consider this.'

22          We say, no, it's how you put all the pieces

23   together; it's the entirety of the work.   That's what *Apple*

24   *Barrel* covered and that's what this case involves.

15:34  25          THE COURT:   Say it again.

Charge Conference

1       MR. BONHAM:  Okay.

2       THE COURT:  You don't --

3       MR. BONHAM:  We're saying you don't take a work and

4   chop it into pieces and say, 'Okay.  This kind of door has

15:34   5   been used before.  Don't consider it.  This kind of stair

6   has been used before.  Don't consider it.'  It's how you put

7   the pieces together.

8       THE COURT:  Is it your position, then, that all

9   should not be given?  Correct?

15:34   10       MR. ZUMMO:  All of No. 6.  Correct.

11       MR. BONHAM:  Correct.

12       THE COURT:  Okay.  No. 7.  Scènes à Faire.

13       MR. ZUMMO:  I think we have a jury question on how

14   to pronounce it, Your Honor.

15:35   15       THE COURT:  How do you pronounce it in Texas?

16           (Off-the-record discussion)

17       THE COURT:  Okay.  Let's talk about -- Now we're on

18   Page 13, Proposed Instruction No. 7.  What is this?  Do you

19   need this?

15:36   20       MR. STROTHER:  I do.

21       THE COURT:  Do you agree that he needs it or

22   doesn't he need it?

23       MR. ZUMMO:  I don't think he needs it.  I don't

24   think we are harmed by a proper instruction on scènes à

15:37   25   faire.  I don't think it applies here.

*Charge Conference*

                            1            The doctrine, Your Honor, in general, means --

                            2      In fact, Mr. Bonham and I had a case in your court where

                            3      this came up, as you might remember, a movie script case we

                            4      had ten or twelve years ago.

15:37                       5            THE COURT:  Oh, yeah.

                            6            MR. ZUMMO:  And I picked the example that I wish my

                            7      client had never put --

                            8            THE COURT:  Was that the Schwarzenegger case?

                            9            MR. ZUMMO:  Yes.  In his script he had a bar called

15:37                      10      "Kelly's Bar" and in the movie they had Kelly's Bar, and

                           11      when he put his similarities together that was one of the

                           12      things he picked up.  And I think we ended up all agreeing

                           13      Kelly's Bar is probably a scènes à faire, if you're going to

                           14      have a detective story or downtown-type story, because it's

15:37                      15      pretty often you find a place called "Kelly's Bar".

                           16            Now, if you have a detective or police show,

                           17      there's going to be a car chase.  So, having a car chase,

                           18      just in and of itself, is not evidence of --

                           19            THE COURT:  What was the name of that movie?

15:38                      20            MR. ZUMMO:  The Sixth Day.

                           21            THE COURT:  The Sixth Day.  I went and got the

                           22      movie later on.

                           23            MR. ZUMMO:  That's where it comes in.

                           24            I know what Mr. Strother wants to argue on

15:38                      25      merger is -- there is only one way to do this and, if you

*Charge Conference*

1    say there is a couple of ways to do it, then it's scènes à

2    faire, and I think that's how --

3         THE COURT:  Yeah.  What's your theory on why you

4    needs this?

15:38   5         MR. STROTHER:  Well, it comes straight from

6    Professor Bachman's testimony regarding these are the way

7    things are always done in this situation, and that scènes à

8    faire.  Straight from the Fifth Circuit case law, the scènes

9    à faire doctrine excludes from protection expressions that

15:38   10   are dictated by external factors, including industry demand

11   and practice.

12        THE COURT:  Now, where is it?

13        MR. STROTHER:  That's the third paragraph, the

14   first sentence.

15:38   15        THE COURT:  Where is it?  Down here is that case

16   listed?

17        MR. STROTHER:  Yes.  *Engineering Dynamics*, Your

18   Honor.

19        THE COURT:  Oh.  Yeah, 1994.  'Under the doctrine

15:39   20   of scènes à faire copyright protection is denied" -- so

21   you're saying denied -- "to those expressions that are

22   standard stock or common to a particular topic or that flow

23   necessarily or naturally from a common theme or setting.

24   Furthermore, where a particular expression is common to the

15:39   25   treatment of a particular idea, process or discovery, it is

Charge Conference

1   lacking in the originality that is required for copyright

2   protection."

3           Now, you'd better explain what you just said,

4   if you're going to do it at all.

15:39  5           Hang on.  Then they go down... [Reading]

6           All right.  Where does all that come from?

7      MR. STROTHER:  That paragraph comes from a case out

8   of the Second Circuit, Your Honor, called *Zalewski*.

9      THE COURT:  "Scènes à faire excludes from

15:40 10  protection expressions that are dictated by external

11  factors, including industry demand and practice, regulations

12  and other external design elements attributable to

13  buildings, codes, topography, structures..."

14          All right.  Go ahead.  I have my own idea, but

15:40 15  you tell me.  Tell me what your objection is since you're

16  objecting to it.

17      MR. BONHAM:  Number one, since he's talking about

18  protection is denied -- and this gets back down to if we're

19  not going to instruct that --

15:40 20      THE COURT:  Where does it say that, where it is

21  denied?

22      MR. BONHAM:  If you're saying protection is denied,

23  then I think we have to come back to at least tell the jury

24  the Court has already found that we have valid copyrights,

15:40 25  these are protected works.  The main thing is me saying

*Charge Conference*

1    "dictated by".

2              It's one thing, for example, if you have got

3    something in The Woodlands -- if The Woodlands had a rule

4    that said --

15:40   5         THE COURT:  Where is "dictated by"?  Where is that?

6         MR. BONHAM:  Mr. Strother just read it in terms of

7    dictated by -- Third paragraph, second line, first two

8    words.

9         THE COURT:  "Dictated by".

15:41  10        MR. BONHAM:  Correct.  If you're having something

11   like in The Woodlands where they're saying the townhouses in

12   this neighborhood have to be Georgian, they have to be two

13   stories, no more than three bedrooms, something to where

14   they tell you very much and they constrict what you're

15:41  15   doing, okay, that's one thing.

16             It's another thing to just simply say, well,

17   it's dictated by.  And I don't think there is any evidence

18   that anything was dictated by anything.  So --

19        THE COURT:  Okay.  Now, this word at the

15:41  20   beginning -- I'm sorry for cutting you off, but I am

21   thinking.

22             "Under the doctrine of scènes à faire

23   copyright protection is denied to those expressions..."  You

24   say you have got a problem with that?

15:41  25        MR. BONHAM:  Yes.

Charge Conference

1          THE COURT:  All right.  I want to give you some

2     idea as to where I am thinking -- I'm not there yet -- that

3     maybe perhaps to allow -- if he thinks it's important, allow

4     him to have a shot at that, but you have a concern about the

15:42  5     word "denied".  So, if I -- Again, I am listening to what

6     you have to say, but I'm saying, if that's what he says,

7     that he needs it as part of that defense, my inclination,

8     probably, is to go that route, but I'd look to see if you

9     want to tweak it a little bit where it doesn't blow out your

15:42  10     portion of your case because he's getting that instruction.

11     Or does it?

12          MR. ZUMMO:  What Mr. Bonham is saying is we already

13     have a ruling that we have a protectable copyright --

14          THE COURT:  I understand that.  But what --

15:42  15          And you say you need that.  Right?

16          MR. STROTHER:  Absolutely.  I think it's a -- Yes.

17          THE COURT:  All right.  I am just saying I am going

18     to hold on that one.  I will come back and look.  See if

19     both of you can work out something.

15:42  20          If he thinks he needs it as his affirmative

21     defense, my inclination always is to give it to them.

22          But I understand, for instance, it now goes on

23     where I might not be doing all of this -- There are scènes à

24     faire -- For example, I very often do that neoclassical,

15:43  25     government buildings, Colonial houses, modern -- I usually

1   don't go with all of that type of fluff after that.  If you

2   think you're entitled to it see if you can work it out.

3           Now, you may object to it, but at the bottom

4   line -- and you need to listen to them, where if you want to

15:43   5   modify it some if you think you need it.  Because I don't

6   hesitate to rule and, if you can't agreeing on anything, I

7   am just going to rule on it.

8       MR. ZUMMO:  Well, I am thinking what can we do with

9   "denied".

15:43   10      THE COURT:  If he thinks he has to have a shot at

11   it, I think it would be a concern for the case on appeal to

12   say, 'Well, he said he had to have this and you didn't even

13   give him a shot or instruction on it.'

14      MR. ZUMMO:  Yes, sir.

15:43   15      THE COURT:  Then, of course, the circuit could say,

16   'Well, he could have argued it.'

17           But the question is does he need, at least, an

18   instruction before he can argue.  Because if he starts

19   arguing it and you get up to object, then I am going to have

15:44   20   to make a ruling in the middle of summation.

21           All right.  That's why we take a break.

22           Now, No. 9 is what we talked about already.

23   Correct?  We've already done 9.

24      MR. STROTHER:  Did you skip 8?  That may have

15:44   25   been --

Charge Conference

1      THE COURT:  8 is a short one.  Is it?

2      MR. STROTHER:  Yes.

3      THE COURT:  "Merger.  When an idea can be expressed

4  in very few ways, copyright law does not protect that

15:44   5  expression because doing so would confer a de facto monopoly

6  over the idea.  In such cases, 'idea' and 'expression' are

7  said to be merged."

8      MR. ZUMMO:  Here, Your Honor, we have already got a

9  summary judgment that we own a valid copyright, that the

15:44   10  copyright is valid.  If what he's saying is that copyright

11  law does not protect that expression -- You know, again,

12  unless we go back and get an instruction that we have

13  already been -- The court has already ruled they have valid

14  copyrights.  I think this opens the door to really confuse

15:45   15  the jury.

16      MR. STROTHER:  I disagree.

17          First of all, the United States Supreme Court

18  in *Feist* makes it clear -- and I am going to paraphrase, but

19  I think I am hewing close to the language -- not all the

15:45   20  elements in a valid copyright are protectable.

21      THE COURT:  Well, we know that generally.

22      MR. STROTHER:  Right.  When this says copyright law

23  does not protect that expression, it's not attacking the

24  validity of the copyright.  It's saying that there are

15:45   25  things in the design that are simply not protectable even

1   though they're copyrightable.

2            This is a quote from the Fifth Circuit about

3   what the merger doctrine is.

4            THE COURT:  You cite a case down here, F.3d --

15:45   5            MR. STROTHER:  Yes.  That's a Fifth Circuit case.

6            THE COURT:  That's an old case, though, relatively,

7   isn't it?

8            MR. STROTHER:  It is from 1994.

9            THE COURT:  1991 -- It's amazing that Federal 3d.

15:45  10   went in that long ago.

11            MR. ZUMMO:  Can I just confer with Mr. Bonham just

12   a second?

13            THE COURT:  Absolutely.

14            MR. ZUMMO:  I think the difference here, Your

15:46  15   Honor -- this is the difference between scènes à faire

16   versus merger.

17            Scènes à faire is something courts consider as

18   part of the substantial similarity or probative similarity

19   case.  But the merger doctrine, as I understand it, only

15:46  20   applies to say is this a valid copyright, and that's

21   something that's already been decided.

22            THE COURT:  I got it.  Let's move on.

23            We now jump over 9 and see what the next one

24   is.

15:46  25            "Substantial Similarity".

*Charge Conference*

1        MR. BONHAM:  And here we have again -- we have

2   dueling instructions.  The first five perhaps are what we

3   think the instruction should be.  And, again, I think this

4   instruction largely is drawn from what you did in *Abshire*

15:46   5   many years ago, and then subsequently it's been done in a

6   couple of other cases in the Southern District.  And then

7   you have, essentially, we say toe-may-to; he says

8   toe-ma-toe.

9        THE COURT:  Okay.  These summaries, let me read

15:47   10  them.

11        That's a pretty strong -- it ends on a pretty

12  strong note.  I'm now going to read the defense proposed

13  instruction.

14        I am looking at:  "...substantially similar if

15:48   15  an ordinary reasonable person would find the total concept

16  and feel of the two works to be substantially similar.

17  Substantial similarity only applies for similarity that

18  exists between the protected elements of a work and another

19  work.

15:48   20        "Copying is shown through a detailed

21  side-by-side comparison of the works.  Therefore, to

22  determine whether two works are substantially similar you

23  must make a direct side-by-side comparison between the

24  original architectural work and the copying.  In determining

15:49   25  substantial similarity you should compare only the

*Charge Conference*

1    protectable or copyrightable portions of the two works

2    copyrighted."

3              Okay.  What's the problem with theirs?

4              MR. BONHAM:  Again, first is *Apple Barrel*.  *Apple*

15:49  5    *Barrel* is directly on point on this, that you don't break it

6    into individual pieces; you look at the whole.

7              Secondly, when he talks about, looking at the

8    very last line --

9              THE COURT:  No.  I am talking about the first

15:49  10   paragraph.

11             MR. BONHAM:  First paragraph.

12             THE COURT:  What's wrong with the first paragraph?

13             MR. BONHAM:  Up through Footnote 63, that's fine.

14             The last sentence of that is the problem.  It

15:49  15   says:  "Substantial similarity only applies for similarity

16   that exists between the protected elements of a work and

17   another work."

18             THE COURT:  All right.  Now, look.  I am not

19   touching my paper.  Okay?

15:49  20            Take a look what I have here just in the first

21   one.  Okay?  I have that blocked off already.  I am reading

22   it.  I am looking at it.  Not being attuned to that, it's

23   already blocked off.  Also, we said many times copying, on

24   its own, is not legally actionable.

15:50  25            Again, take a look.  I haven't touched the

*Charge Conference*

1    paper.  I have that blocked there.  Some of this kind of

2    rings true.  I haven't gone as compared to yours.  But keep

3    in mind, from your point of view, the safer thing to do is,

4    if you can go with his, it pulls the possibility of any

15:50   5    objection later on.

6            But I'm not saying I am avoiding it.  Again,

7    some of yours I have marked down.  And that's why we're

8    going to take a break, to see if you can narrow it down.

9            All right.  What about the last paragraph?

15:50  10            MR. BONHAM:  Again, the first sentence is accurate.

11    The second sentence accurate.  It's the third one I have got

12    a problem with, because it's basically saying you chop it

13    into pieces and just look at whether the pieces are the

14    same, and that's not what you do in a copyright case.

15:51  15            THE COURT:  Okay.  Take a look at this.  I'm not

16    saying you're going to go with what they have, but if they

17    go with what you have, you see where they want to chop it

18    up.  See if it hurts you.

19            That's why we take a break.  And I ask for how

15:51  20    much time you need because we need some also.

21            The last thing I want to do -- and I will do

22    it if I have to -- come and say, 'That's granted,' 'That's

23    granted,' 'That's out.'  'I'm going all with No. 10 and your

24    tendered instruction for the defense is denied.'  Or 'The

15:51  25    Plaintiff's is denied.  We go with everything from the

*Charge Conference*

1   Defendant.'

2              It's cut and paste, but it's the safer thing

3   to do for you, to see if you can chop it up.  Otherwise, I

4   will do it, but I may not use my brackets as much as I need

15:51   5   to.

6              MR. BONHAM:  The good news on this is that, other

7   than one toe-may-toe/toe-ma-toe instruction, it's downhill

8   from here.

9              THE COURT:  That's all right.  I like going

15:52   10   downhill.

11              Let's see.  What's the next one?  Defendant

12   objects to No. 11.  Why?

13              MR. BONHAM:  Because there is already summary

14   judgment that says no "innocent infringement" defense.

15:52   15   Judge Atlas has said there's no -- We have got summary

16   judgment on it.

17              MR. STROTHER:  I have a problem.  Mr. Bonham is

18   correct; that's what the summary judgment says.  I think

19   that's not what it was intended to say.  And I'm not saying

15:52   20   that Judge --

21              THE COURT:  Now, I haven't read it.

22              MR. STROTHER:  Okay.

23              THE COURT:  The question is do you need to do it at

24   all if it's already the law of the case?  Again, notice I

15:52   25   haven't gone down and read the thing.  I am just saying,

1   listening to the argument, you say it's already been done;

2   so, the question is why do we go it again?

3         MR. STROTHER:  You may be able to direct me to --

4   It may be that, after you react to what I am about to say, I

15:52   5   withdraw this.  I am uncertain.

6         THE COURT:  It always helps to let me read it

7   first.  Right?

8               The Defendants object to No. 11.

9               "A copyrighted work need not contain a

15:53  10   formal" -- ah!  okay -- "copyright notice to be protected.

11   However, if a copyright notice appears on a copy of the work

12   to which the Defendants had access, then you shall give no

13   weight to any defense or claim of innocent infringement.

14               "In this case the Court has found that a

15:53  15   copyright notice appeared in copies of it to which the

16   Defendant had access.  The Defendant cannot assert a defense

17   of innocent infringement.  You are, therefore, instructed to

18   give no weight to any defense or claim of innocent

19   infringement."

15:53  20               Now, that's a lot of instruction from the way

21   I do jury instructions, that last paragraph.

22         MR. BONHAM:  Where we are on this is, again, you

23   have to kind of jump to the end because Mr. Strother has

24   submitted a question on innocent infringement which, again,

15:53  25   based on the fact that Judge Atlas gave a summary judgment

*Charge Conference*

1  on his affirmative defense of innocent infringement.

2      THE COURT:  "Therefore, Plaintiff is entitled to

3  summary judgment on innocent infringement as an affirmative

4  defense."

15:54  5      MR. BONHAM:  Correct.  So, if he's going to get

6  it -- I don't think he should get an issue on something that

7  we have already gotten a summary judgment on, but, if he is,

8  then we need this instruction.  I don't think we need this

9  instruction because I don't think he gets to add the issue.

15:54  10     MR. STROTHER:  May I explain, in one minute, why I

11  think I am entitled to it?

12     THE COURT:  Yes, sir.

13     MR. STROTHER:  So, this case involves five

14  projects.  Right?  Two of them are Nagle and Mount Vernon

15:54  15  and those are the ones that both experts testified about.

16  They're the ones that there's evidence that Urban Living

17  gave Cameron Architects Preston Wood plans to -- I think

18  that's correct -- Preston Wood plans to create work from.

19  The other three, there is a different route that Plaintiff

15:54  20  gets defense to.

21      So, we pled innocent infringement, and

22  Plaintiff moved for summary judgment and claimed that

23  because we had notice of the copyright on the Mount Vernon

24  and Nagle plan that we weren't entitled to innocent

15:55  25  infringement as a matter of law.  That's the evidence they

 1   have put forth.

 2              And Judge Atlas said, 'Yeah.  You're right.

 3   That's what the law says.  If you have notice of the

 4   copyrights you can't claim to be an innocent infringer,' and

 5   she said no innocent infringement.

 6              However, I don't think that she intended to

 7   and I'm not sure she had the power to grant innocent

 8   infringement as to the other three because Plaintiffs put

 9   forth no evidence that there was any access or notice to the

10   copyright notices on the other three.

11         THE COURT:  So, you say if any of this applies to

12   certain plans and not others?

13         MR. STROTHER:  Yes, Your Honor.

14         MR. BONHAM:  Two reasons why this is wrong.

15              First, innocent infringement is an affirmative

16   defense.  We filed a no-evidence motion for summary

17   judgment.  I then came back and said, 'And on top of that,

18   here's the evidence that they had access to.'  They didn't

19   put on any evidence of innocent infringement.

20              So, saying we didn't put on any evidence -- It

21   was his burden and she's granted summary judgment.

22              Secondly, the evidence that's come in in this

23   case -- "yes" on Nagle, "yes" on Mount Vernon -- there is no

24   question because the plans are in the record.  But,

25   additionally, they have stipulated to access to the plans

```
 1   that are at issue on Patterson and EaDo where we had notices
 2   on everything.
 3           THE COURT:  I have got a question here.  Do you
 4   need Instruction No. 11 based upon the history of the case?
 5           MR. ZUMMO:  Only if he gets his question on the
 6   affirmative defense.
 7           THE COURT:  The question later on?
 8           MR. ZUMMO:  Yes.
 9           MR. BONHAM:  Correct.  If he doesn't get that, we
10   don't need it.
11           THE COURT:  Hang on.  I am going to put this on
12   hold.  I'm going put "See Question No." -- what? --
13           MR. BONHAM:  14.
14           THE COURT:  -- "Question 14."
15           Let's keep moving because, like you say, we're
16   close to the end.
17           MR. BONHAM:  Okay.  We have worked out 12.
18           MR. STROTHER:  I think we have.
19           MR. BONHAM:  We have worked out 12.  There is going
20   to be some language added to it and we'll get that to you.
21           Okay.  And then here's, like I say, the last
22   toe-may-toe/toe-ma-toe.  This is a big one.
23           What we have got is -- essentially, we have
24   submitted 13, 14, 15 and 16.  The form of this is basically
25   from the form that you gave in *Kevin Young v. Abshire*, that
```

15:56 15:56 15:56 15:57 15:57

*Charge Conference*

1    Judge Stacy gave in *Kipp Flores v. Hallmark* and that

2    Judge Werlein gave in the *Hewlett v. Frontier* case.

3              THE COURT:  Any appellate record on any of those

4    cases?

15:57    5              MR. BONHAM:  Yes, both.  In *Hallmark* that was

6    affirmed with the Court complimenting Judge Stacy.  And they

7    also affirmed the *Frontier* one.  And, as you know, in

8    *Abshire*, shortly after you ruled on their post-judgment

9    motions, that case settled; so, there is no appellate record

15:57    10    on that one.

11              But, again, these are very standard

12    instructions in copyright cases.  The problem is that

13    because you have to go through -- the statute has, first,

14    the plaintiff has to prove gross revenues, what are gross

15:58    15    revenues.  Then the defendant proves deductible expenses,

16    what are deductible expenses.  If you're going to go with

17    overhead, there's a dance that you have to do under

18    copyright law, and then you have got the apportionment

19    issue.

15:58    20              And I think, to sum up, the way we have set

21    forth here is accurate under the law.  I think that the

22    Defendants' instruction tries to collapse things down way

23    too far.

24              THE COURT:  All right.  Now, for example -- I don't

15:58    25    give examples, generally, but it may be necessary because

1    this is a complex theory.  It says:  "For example" -- I am

2    in the third paragraph, third sentence up -- "For example,

3    the value of a building constructed in violation of an

4    architectural work copyright can be evidence of gross

15:58    5    revenue even when that building has not been sold."

6    Correct?

7            MR. BONHAM:  Correct.  We use that just because,

8    again, that is an accurate statement of the law.  It's being

9    done to explain the previous sentence, the idea that gross

15:59   10    revenues is not just cash; it's any value.  And the example

11    is proven by the cases cited in Note 13.

12            THE COURT:  Now, "Upon proof of gross revenues, the

13    burden then shifts to the Defendants to prove what expenses,

14    if any, should be deducted from the gross revenues to

15:59   15    establish net profit.  If the Defendants fail to adduce

16    competent evidence of expenses, the gross revenue figure

17    stands as the measure of profits."

18            MR. BONHAM:  That's right out of the *Hewlett* case.

19            MR. STROTHER:  And you can tell by the use of the

15:59   20    word "adduce" -- That's not a word that should appear in a

21    jury charge.

22            MR. ZUMMO:  Thank you.  I keep telling him.

23            MR. STROTHER:  There are some things that are in

24    these four instructions that are correct statements of law

15:59   25    and there are some that are incorrect.  There's some that I

*Charge Conference*

1    have gone and looked at some of the cases and the court has

2    said that and I still think the court is wrong.  There are

3    some things that are nonsensical that some courts have been

4    tricked into saying.

16:00  5            These instructions, together, conflate direct

6    expenses with overhead, and there is a difference at their

7    core between what should be considered direct expense and

8    what should be considered overhead.

9            THE COURT:  I am going to get to it.  You submit

16:00  10   No. 17 as a replacement.  Because we need some instruction

11   on this stuff.  Right?

12           MR. STROTHER:  Well, yes.  And No. 17, Your Honor,

13   is 100 percent the Ninth Circuit pattern charge.

14           THE COURT:  Thank you.  Now you're breaking it

16:00  15   down.  I haven't looked at the Ninth Circuit pattern.  I

16   will ask you now.  Does it break down all these elements

17   that they're talking about with individuals?

18           MR. STROTHER:  Not as granulated as they did, but

19   yes.

16:00  20           THE COURT:  Okay.  Let me just take a quick look.

21   Profits, overhead, expenses.  We've got that.  We pulled the

22   Ninth Circuit pattern.

23           And here's 16.  "...who has profits from

24   copyright infringement is allowed to prove that a portion of

16:01  25   the profits resulted from factors other than an infringer

*Charge Conference*

1    who has" -- claiming you.  Right?

2              MR. STROTHER:  Yes, Your Honor.

3              THE COURT:  "...who has profits from copyright

4    infringement is allowed to prove that a portion of the

16:01  5    profits resulting from factors other than the acts..."

6              Okay.  Now let's see what No. 17 says.  Okay?

7    Look at 17.  Where did you get that from?

8              MR. STROTHER:  The Ninth Circuit.

9              THE COURT:  Ninth Circuit.  I am going to read the

16:01  10   whole thing because, usually -- if it sums it up, let's see

11   what it says.  I do better orally anyhow than I do in

12   writing.

13             "The copyright owner is entitled to any

14   profits of the Defendants attributable to the infringer.  It

16:02  15   may not include, in award of profits, any amount that you

16   took into account to determine actual damages."  Okay.  And

17   that's spelled out later on.  Right?

18             MR. STROTHER:  There are no actual damages at issue

19   for the jury; so, that would have to be struck.

16:02  20             THE COURT:  What do you strike?

21             MR. STROTHER:  That entire sentence.  "You may not

22   include" --

23             THE COURT:  Okay.  All right.  "You may make an

24   award of the Defendants' profits only if you find that the

16:02  25   Plaintiff showed a causal relationship between the

Charge Conference

1    infringement and the Defendants' profits."  A causal

2    relationship.

3            "The Defendants' profit is determined by

4    deducting all expenses from the Defendants' gross revenue.

16:02   5    The Defendants' gross revenue is all of the Defendants'

6    receipts from the sale of a" -- it should be, what,

7    "buildings"?  "Of buildings".

8            MR. STROTHER:  "Building".

9            THE COURT:  -- "of a building."

16:03   10           Let's go again.  "Defendant's gross revenue is

11   all of the Defendant's receipts from the sale of a building

12   associated with the infringement.  The Plaintiff has the

13   burden of proving the Defendants' gross revenue by a

14   preponderance of the evidence."

16:03   15           Now, shift.  "Expenses are all operating

16   costs, overhead costs and production costs incurred in

17   producing the Defendants' gross revenue.  The Defendant has

18   the burden of proving the Defendants' expenses by a

19   preponderance of the evidence."  There is the shift, right,

16:03   20   to the other side?

21           "Unless you find that a portion of the profit

22   from the sale of a building containing or using the

23   copyrighted work is attributable to factors other than use

24   of the copyrighted work, all of the profit is to be

16:04   25   attributable to the infringement.  The Defendant has the

*Charge Conference*

1    burden of proving the portion of the profit, if any,

2    attributable to factors other than copying the copyrighted

3    work."

4              Okay.  What's wrong with that?

16:04   5         MR. BONHAM:  All right.  Let's start at the top.

6              First, the idea of a casual -- causal

7    relationship between the infringement and Defendants'

8    profits -- As set forth in our trial brief that I filed this

9    morning, this gets into the distinction between direct

16:04   10   profits and indirect profits.

11             Judge Ellison addressed this in the *Interplan*

12   *Architects* case where you're talking about direct profits.

13             For example, Cameron Architects' revenues for

14   doing infringing plans, those are direct profits.  We don't

16:04   15   have to prove anything else.

16             Similarly, Urban Living's profits that they

17   made as commissions on the sale of the infringing houses,

18   those are direct profits.

19             The proof of the causal relationship is only

16:05   20   applicable where you're talking about indirect profits.

21         THE COURT:  So, you're saying --

22         MR. BONHAM:  I am saying this is incorrect.  This

23   is not a correct statement of the law.

24         THE COURT:  Is not.  Because it's not applicable to

16:05   25   this case --

*Charge Conference*

1          MR. BONHAM:  Correct.

2          THE COURT:  -- or that it's not applicable to the

3     law?

4          MR. BONHAM:  I think it overstates it because you

16:05   5     do not have to prove a causal relationship where it's direct

6     profits because the proof of that is self-effectuated.

7               Secondly, "The Defendants' profit is

8     determined by deducting all expenses from the Defendants'

9     gross revenue."  Not accurate.  You prove it by proving the

16:05   10    expenses associated with the project.  This is set forth in

11    our Instruction No. 14.

12          THE COURT:  Keep going.

13          MR. BONHAM:  Okay.  "Defendants' gross revenue is

14    all Defendants' rights."  It's not rights.  It's any value.

16:05   15    By using the word "rights" you're implying that it's got to

16    be cash.  It doesn't have to be.

17               "From the sale of a building".  No.  It's

18    from -- as we put it, I think it's from creating the

19    infringing copy or from selling the infringing copy.  This

16:06   20    instruction, for example, would let Mr. Cameron off the hook

21    for his -- in this way.

22               "Defendant has the burden of proving gross

23    revenues by a preponderance of the evidence."  That's, of

24    course, correct.

16:06   25               "Evidence of all operating costs, overhead

1    costs and production costs incurred in producing the

2    Defendants' gross revenue."  That's not a correct statement

3    of the law.

4              THE COURT:  In this case or generally?

16:06    5              MR. ZUMMO:  Generally.  The distinction, Your

6    Honor --

7              THE COURT:  What's the date of this?  It's 2017.

8    Okay.  What I was doing, for the record, looking at the date

9    of the Ninth Circuit pattern.

16:06    10              MR. BONHAM:  On this one, I think, the *Powell v.*

11    *Penhollow* case, which is a Fifth Circuit case which talks

12    about -- also in the -- It's discussed indirectly in the

13    *Hewlett* case, again Fifth Circuit 2015 case, that talks

14    about what you do.

16:06    15              But, again, when you're talking about, for

16    example, overhead costs, what are overhead costs?  There's a

17    special way you have to do it under 504(b) to do overhead.

18    It's not just anything you call overhead.  First, you have

19    got to identify what categories of expenses contributed to

16:07    20    the production or sale of the works in question.  And then

21    you have got to promulgate an appropriate formula -- which

22    there's been no evidence in this case -- and then you have

23    got to accurately apply it.  You can't just simply go in and

24    instruct -- just say "overhead costs" in general.

16:07    25              "The Defendant has burden of proving..."

1    That's okay.

2              The allocation instruction is generally okay,

3    but, again, it leaves out a big part of the story.

4              THE COURT:  Which is?

16:07    5              MR. BONHAM:  The intertwinedness doctrine; and that

6    is, if all of these other factors are so balled up that you

7    can't separate out what is attributable to the infringement

8    and not, then you have to give it to the plaintiff.  And,

9    again, that's from the *Hewlett* case.

16:08    10              The other thing that's not in here which is in

11    the other ones and which I have had you give before is that

12    on all of these, if there is any doubt, the burden -- excuse

13    me -- any doubt as to expenses or factors allocable, you

14    resolve those in favor of the Plaintiff.  And that is from

16:08    15    the Ninth Circuit.  That's from the *Eales* case.

16              THE COURT:  What's your response?

17              MR. STROTHER:  There's a lot to respond to there.

18              I found things that I agree with him on.

19              I think there was the issue that, if it's

16:08    20    limited to just rights from the sale a building, that

21    doesn't include Cameron Architects.  So, that would have to

22    be adjusted.

23              I think that the way the third paragraph is

24    worded -- "The Defendants' profit is determined by deducting

16:08    25    all expenses from the Defendants' gross revenue" -- is

*Charge Conference*

1    misleading when we're reading it quickly.  What the Ninth

2    Circuit committee was doing -- it has this sentence, then

3    broken down into definitions in the next two paragraphs.

4    Defendants' profit would be the paragraph right behind it.

16:09   5    And then "expenses" it defines as operating costs, overhead

6    costs and production costs incurred in producing the

7    Defendants' gross revenue.

8             So, maybe we could tighten it up and tie it

9    better, but, other than that, I disagree with him.  I think

16:09  10    that this is a correct statement of the law and it's

11    captured in all these different cases and it doesn't need to

12    be further fleshed out.

13         THE COURT:  All right.  Let's move to 18.  Any

14    problem with that?

16:09  15             What's your objection to "Integrity of

16    Copyright Management Information"?

17         MR. BONHAM:  I think the only disagreement we have

18    is that, if you look on Page -- actually, this is on the

19    extra one, on Page 2 of that.

16:09  20         THE COURT:  Yeah, I've got it.  Which is what?

21         MR. BONHAM:  This is the Defendants' --

22         THE COURT:  Well, this is submitted by the

23    Plaintiff.  Are you withdrawing it?

24         MR. BONHAM:  No.  What he's done is he's just

16:09  25    simply taken what is in the file version and he's adding one

Charge Conference

1    paragraph.

2              THE COURT:  Oh.  I see.  I see what you're doing

3    here.

4              MR. BONHAM:  Correct.

16:10    5              THE COURT:  In other words -- Hold it.  See...

6    What would you call this?

7              MR. STROTHER:  Alternate instruction.

8              THE COURT:  Alternate Instruction 18.  All right.

9    Let me take a look at this.

16:10   10              MR. STROTHER:  Before you do, Your Honor, to be

11   clear, I am going to have an objection to this one way or

12   the other.  My objection is going to be that they don't have

13   evidence to support an instruction or question on this at

14   all.

16:10   15              THE COURT:  What's this about?

16              MR. BONHAM:  This deals with DMCA 1202(b) and we

17   filed a trial brief on that.  It was in our trial brief.

18   We've also filed a supplemental that really fleshes it out.

19              Under DMCA 1202 you cannot take someone's --

16:10   20   whether it's copyright management information, which can be

21   the name, the copyright notice, the terms and conditions --

22   you can't take that off of a copy.  And, again, we'll talk

23   about what a "copy" is in a second.  If you do it

24   intentionally and you do it with the -- you know, and it

16:11   25   facilitates or encourages or otherwise assists infringement,

1    then it violates 1202.

2           Now, we think the evidence in this case is

3    absolutely clear.  They knew they were not supposed to

4    remove our CMI from our copies.  And, again, a copy is not

16:11  5    just a reproduction that they had.  It's their creation of a

6    derivative work that counts as a copy.  If they removed it

7    and they weren't supposed to and they knew about it -- which

8    they did because it was in the contract, they were on actual

9    notice that they were not supposed to do this and if they

16:11  10   did it -- and, again, this is what Judge Atlas already dealt

11   with on denying their motion for summary judgment -- If

12   that's the case, then each time they violated, you know,

13   1202(b) that's a violation.

14          THE COURT:  All right.  How much is that?  That's

16:12  15   where you've got a lot of money riding on it.  Right?

16          MR. BONHAM:  Could very well be, and that's what

17   we're talking about here.

18          Now, the difference between what we're

19   proposing and what they're proposing is they're wanting to

16:12  20   add this last paragraph on this replacement.

21          THE COURT:  What you're doing, I think, the

22   Plaintiff -- you're tracking just the language of the

23   statute.

24          MR. BONHAM:  Yes, Your Honor.

16:12  25          THE COURT:  Now, what's the difference between what

Charge Conference

1    they have and you have?

2            MR. STROTHER:  There is an additional instruction

3    there about what is a violation, what is an act, that the

4    statute would grab.

16:12    5            THE COURT:  Hang on one second.  Okay.  This last

6    paragraph.  Right?

7            MR. STROTHER:  Yes, Your Honor.

8            THE COURT:  This is "add", a-d-d, question mark.

9    Right?

16:12   10            MR. STROTHER:  Yes, Your Honor.

11            So, what the statute, first of all, requires

12   is that someone intentionally and with knowledge publish or

13   distribute an infringing -- not infringing work -- a work

14   that has had its copyright management information altered or

16:13   15   removed.  So, we're going to be arguing that there's been no

16   evidence of any alteration or removal.

17            If the Court moves past that and wants to give

18   the question and the instruction -- the Court has let in the

19   evidence of page views, which is what Mr. Ramani was being

16:13   20   cross-examined about.

21            The case law is very clear about this, that

22   the number of times someone looks at something online does

23   not constitute a violative act under DMCA.  It's been in

24   front of several courts and they all say, no, that would

16:13   25   lead to -- that's a perversion of the language and it would

*Charge Conference*

1    lead to a windfall for plaintiffs.

2              What this means is, when someone does the

3    actual violative act -- which in that case would be actually

4    uploading the alleged violative work -- that that equals a

5    violation.  But the Court has allowed Plaintiff to put in

6    evidence of 20,000 views and the jury is going to be

7    distracted by that.  So, in this paragraph is an instruction

8    that the jury is not to consider that information when

9    answering a question about how many times the act had been

10   violated.

11        MR. BONHAM:  The case he's referring to is called

12   *McClatchy*, and in *McClatchy* what they -- and this is in my

13   trial brief that I filed this morning.

14        THE COURT:  Yeah.  We've got them all in the back.

15        MR. BONHAM:  Okay.  With *McClatchy* is that the

16   basis of it is saying each violation is somehow ambiguous.

17   It's not.  Each violation means each violation.  The court

18   then went on to say, 'So, therefore, I am interpreting each

19   violation to mean,' you know, 'each violative act committed

20   by the defendant.'

21              As I explained in my trial brief, even under

22   that, I think, we're still -- I don't believe you can then

23   say page views don't count, because what's a page view?

24   It's their computer distributing the image downstream.  Now,

25   that's different from *McClatchy*.  *McClatchy* was a wire

Charge Conference

 1   service case.  That's when they put it up on the wire.  It's

 2   not how many people are grabbing it down.

 3            The bigger question, though, and the more

 4   fundamental one is -- In the Fifth Circuit it is absolutely

16:15  5   clear that when a statute is unambiguous you apply it as

 6   written even when that results in something you might not

 7   like.

 8            You have seen this in DMCA cases before and

 9   you had what were called -- for example, we call it the

16:15  10   "textile secret" line of cases.  Mr. Strother tried to get

 11   Judge Atlas to go with those, just like Judge Ellison before

 12   and just like the Third Circuit in the *Murphy* case.  They

 13   said no because the statute is clear we're not going to then

 14   draft extra language onto it.

16:15  15        THE COURT:  All right.  Let's look at the next one.

 16   No. 19.  Any problem?

 17        MR. BONHAM:  On this one we're actually moving for

 18   a directed verdict and Mr. Strother is not going to -- does

 19   not dispute that.  So that's...

16:15  20        THE COURT:  So, the Plaintiff is granted a judgment

 21   as a matter of law?

 22        MR. BONHAM:  Correct, on vicarious.

 23        THE COURT:  On that one issue?

 24        MR. STROTHER:  Sure.

16:16  25        THE COURT:  Okay.  That's granted.  We have that

*Charge Conference*

```
 1    noted.
 2                All right.  "Contributory Infringement".
 3    Anything right there or not?
 4                MR. STROTHER:  I object to that instruction and the
 5    questions that go along with it.
 6                THE COURT:  Instruction No. 20.  "The Defendant" --
 7    Well, where is that?  "The Defendant can also be liable for
 8    infringement committed by another by intentionally inducing
 9    or encouraging direct infringement."
10                MR. STROTHER:  That cites to the Grokster case, and
11    that's a very small piece of Grokster.  But that's not my
12    main argument.  My main problem with this is I don't
13    understand what additional evidence there is that would get
14    a "Yes" answer --
15                THE COURT:  Where is it?  What's the evidence of
16    that?
17                MR. STROTHER:  And who?  By who?
18                THE COURT:  I am saying, Plaintiff, what's the
19    evidence?
20                MR. ZUMMO:  We have Mr. Ramani giving our work to
21    Mr. Cameron and directing him or asking him to use it to
22    make copies.
23                MR. BONHAM:  To answer a little differently, you
24    have got Urban Living providing the materials to Cameron and
25    inducing him to create them.  So, we believe Urban Living
```

*Charge Conference*

1    is, therefore, contributorily liable for what Cameron did.

2              Similarly, because, in their interrogatory,

3    the Defendants admitted that they created the marketing

4    plans they put up by using Cameron's plans.  So, therefore,

16:17   5    Cameron is as --

6              THE COURT:  You're saying that's not in the case?

7              MR. STROTHER:  I don't belive what he just said is

8    what the evidence shows.  And, right, I don't think that

9    what Mr. Zummo said is significantly enough to warrant a

16:17  10    separate question about contributory infringement.

11              THE COURT:  Got it.

12              No. 21.  Those are just -- What's all that?

13              MR. BONHAM:  That's just instructions, the short

14    forms of everything that are going to be in the actual jury

16:18  15    questions.

16              And the only one is the last one.

17              THE COURT:  Mount Vernon?

18              MR. BONHAM:  No.  No.  Defendants' proposed

19    additional.  It's italicized.

16:18  20              THE COURT:  Oh.  Proposed additional.

21              Deductible expenses, all operating costs,

22    overhead costs, production costs.  Okay.  Now, don't we have

23    an instruction one way or another?

24              MR. STROTHER:  We might.  Yes.

16:18  25              THE COURT:  One way or another.

Charge Conference

1          MR. ZUMMO:  One way or another.

2          MR. BONHAM:  So, I don't think it needs to go here.

3          THE COURT:  All right.  Now let's look at the

4     questions as to the form only.  Okay?

16:18   5          I understand you say it doesn't waive any of

6     your rights to object as to what's in evidence, but which

7     one of these questions do you object --

8          Now, by the way, this is -- any of these

9     predicated?

16:19  10          MR. STROTHER:  Some, yes.

11          THE COURT:  Any of these questions predicated or

12     are they freestanding?

13          MR. STROTHER:  Further down the list some of them.

14          THE COURT:  They are predicated.  Okay.

16:19  15          I am looking here.  Which ones -- Question

16     No. 1, No. 2, submitted by the Plaintiff.  Which ones do you

17     object to for any reason, except that there may not be any

18     evidence or whatever?

19          MR. STROTHER:  Okay.

16:19  20          THE COURT:  Which one do we look at as --

21          MR. STROTHER:  No. 6 has a difference between

22     Plaintiff's and Defendant.

23          THE COURT:  That's what I want to see.

24          MR. STROTHER:  And No. 8 does.

16:19  25          THE COURT:  No. 6 is what?

1    MR. STROTHER:  So, this one, Your Honor, it asks

2    the question that we all agree should be asked:  What's the

3    percent of profit due to factors other than infringement?

4         And the only difference between Plaintiff's

16:19  5    and Defendants' submission is that Plaintiffs say what

6    percentage were attributable to factors other than

7    copyrighted work, and I ask what percentage is attributable

8    to factors other than the protected portions of the

9    copyrighted work.

16:20  10    MR. BONHAM:  I don't believe that's an accurate

11    statement of the law.  The one to look at is *Hewlett v.*

12    *Frontier Homes*.

13    MR. STROTHER:  I wish I could take you on voir dire

14    because how could that not be a correct statement of the

16:20  15    law?  You can't get someone's profits from unprotected

16    portions.

17    MR. ZUMMO:  Look at Section 504(b).  The statute

18    says "Elements of profit attributable to factors other than

19    the copyrighted work."  So, our proposed instruction tracks

16:20  20    the statute in that regard exactly.

21    THE COURT:  And your position is "...were

22    attributable to factors other than protected portions."

23    Right?

24    MR. STROTHER:  Correct.

16:20  25    THE COURT:  Where did you get that language?  Or

*Charge Conference*

1    you say that has to be the rational way of looking at it?

2           MR. STROTHER:  Mr. Strother -- Justice Strother

3    saying that that's the rational way to look at that.

4           MR. BONHAM:  We object to that.

16:21   5           THE COURT:  All right.

6           MR. BONHAM:  It's the same -- 8 is the same issue.

7           MR. STROTHER:  Exactly.

8           THE COURT:  Hang on.  504(b).  All right.  You're

9    saying 504(b) says this.  Right?

16:21  10           MR. BONHAM:  Yes, sir.

11           THE COURT:  Other than the protected portions.  All

12    right.

13           MR. STROTHER:  The next one we have a disagreement

14    on, Your Honor, is No. 9.

16:21  15           THE COURT:  Right.

16           MR. STROTHER:  This is similar to the 6 and 8

17    questions because there's just one tiny difference.  The

18    statute -- the DMCA statute requires that the Defendant have

19    altered or removed or published things that have been --

16:21  20           MR. BONHAM:  We'll go with your --

21           MR. STROTHER:  Sorry about that.

22           THE COURT:  You will go with the Defendants'

23    suggested question?

24           MR. BONHAM:  We'll go with the Defendants'.

16:21  25           THE COURT:  Okay.  No. 10.

4-143

1       MR. STROTHER:  No. 10.  This question, Your Honor,

2  is like the instruction that I am -- No. 18, the alternate

3  instruction regarding the number of page views and what

4  constitutes a violative act.  So, we have crafted from that

16:22   5  case law an addition to the question.

6       THE COURT:  Now, No. 10 right now for Plaintiff:

7  "For each project on which you have answered 'Yes' in

8  Question No. 9 how many times did Urban Living do so?"

9           And your position is "intentionally".  Right?

16:22  10       MR. STROTHER:  "Knowingly and intentionally".

11       THE COURT:  "Knowingly and intentionally".  That's

12  the difference.

13       MR. STROTHER:  That's the difference in that

14  question, yes, and --

16:22  15       THE COURT:  But then you have to keep going with

16  your instruction.  That's the basic ruling that needs to be

17  made if you can't work it out.

18       MR. BONHAM:  Again, our objection to it in

19  Question 10 is that all this is covered by the instruction

16:22  20  on, you know, protection of the integrity of copyright

21  management information.  You don't put instructions in the

22  questions.  That's what instructions are for.

23       MR. ZUMMO:  So, that's an objection to the form as

24  proposed.

16:23  25       THE COURT:  11, 12.

Charge Conference

1          MR. BONHAM:  Again, 11 is moot because we have got

2     a directed verdict on that.

3          THE COURT:  Okay.

4          MR. ZUMMO:  12 is a duplicate.

16:23    5          MR. BONHAM:  11 and 12 are moot.  And 13 is moot.

6               And 14 is the one where, again, Mr. Strother

7     wants an instruction.  We think that there's already summary

8     judgment on this.  We filed a no-evidence motion.  They

9     didn't carry their burden.  It's already been decided.

16:23   10          THE COURT:  Contributory infringement?

11          MR. BONHAM:  No.  Innocence infringement.

12          MR. STROTHER:  I'd like to correct Mr. Bonham.

13               We did meet our burden.  We put forth some

14     evidence of innocent infringement.  What Judge Atlas ruled

16:24   15     was that as matter of law, not because of evidentiary

16     issues, because you have submitted evidence.  He submitted

17     evidence of the Mount Vernon plan and the Nagle plan that

18     showed copyright on that.  And, so, she said, as a matter of

19     law, you can't claim innocent infringement.

16:24   20               So, this instruction only pertains to the

21     remaining three that they did not put forth any evidence on

22     and that we did.

23          THE COURT:  Okay.  Don't forget.  I need one last

24     page.  That's all we need, is the heading of the case,

16:24   25     "Verdict".

*Charge Conference*

1      MR. BONHAM:  "We, the jury" --

2      MR. ZUMMO:  Signature and date.

3      THE COURT:  "...return the foregoing as our

4  unanimous verdict."

16:24   5      Okay.  It's now 4:25.  What time do you want

6  me to be back out?  Because we need to do some work

7  ourselves.  We won't stick around far into the evening, but

8  I'll come back in and, if you haven't resolved anything,

9  I'll be ready to rule.

16:25  10      MR. ZUMMO:  I have got two suggestions to talk to

11  Mr. Strother about on the specifics the Court identified.  I

12  think we can do it in 15 or 20 minutes.

13      MR. STROTHER:  Okay.

14      THE COURT:  As far as we're concerned, I am going

16:25  15  to give myself a half hour.  I'll be back out right about

16  five minutes to 5:00.  If I am running late I will let you

17  know.  And then we'll put it all in the record, maybe get

18  the court reporter out of here early.

19      All right.  Thanks for working on it.

16:55  20      (Recess)

21      THE COURT:  All right.  We're going to go down page

22  by page.  Let's see where you are.

23      Okay.  I am on No. 1.  Have you reached any

24  agreement on No. 1?

17:39  25      MR. BONHAM:  Just that one sentence.

Charge Conference

1          MR. STROTHER:  One sentence.

2          THE COURT:  Which one?  "These are not themselves

3     protected"?

4          MR. STROTHER:  Yes, Your Honor.

17:39  5          MR. BONHAM:  Yes.

6          THE COURT:  Are you still hung up?

7          MR. BONHAM:  We want it in.  He does not.

8          THE COURT:  The rule is that it goes in.  So, your

9     objection is overruled.  That one sentence goes in.

17:39  10             Wait a second.  Then we have the

11    Defendants' -- you're entitled to a ruling because you have

12    Defendant proposed additional language, right, on the second

13    page?

14         MR. STROTHER:  Yes, Your Honor.

17:39  15         THE COURT:  That's refused.

16         MR. STROTHER:  Thank you, Your Honor.

17         THE COURT:  I just want to make sure your record is

18    protected.

19         MR. STROTHER:  Thank you Your Honor.

17:39  20         THE COURT:  Because that's it.  Nothing tomorrow

21    morning.

22             No. 2 you had all worked out.

23         MR. BONHAM:  We had that all worked out.

24         THE COURT:  No. 3 there was no problem.

17:39  25             No. 4 no problem.

*Charge Conference*

1          MR. BONHAM:  Nothing on No. 4.  And this is

2     something that, trying to -- by cutting all this out you're

3     going to have to have something whether you go with his

4     agreed instruction or our -- his instruction or our

17:40    5     instruction.  We notice that there is not a definition of

6     the word "original".  So, what we are proposing is that we

7     change this instruction to just be "Originality" and that we

8     use the --

9          THE COURT:  A definition of that?

17:40    10          MR. BONHAM:  -- a definition of that that's in the

11     third paragraph of that.

12          THE COURT:  Any objection?

13          MR. STROTHER:  No objection?

14          THE COURT:  No objection.  It's in.

17:40    15          MR. BONHAM:  Let me read it in the way that we were

16     discussing.  It will be:  "'Original', as that term is used

17     in copyright law, means only that the work was independently

18     created by the author as opposed to copied from other works

19     and that it possesses at least some minimal degree of

17:40    20     creativity.  It does not need to be unique or novel."

21          MR. STROTHER:  I have a problem with that "It does

22     not need to be unique or novel."

23          MR. BONHAM:  Okay.  Again --

24          THE COURT:  Do you want a ruling on it?

17:41    25          MR. BONHAM:  Please.

1          THE COURT:  It's out.  I think, if you agreed on

2    the other, that that's out.

3              So, in effect, as far as that goes, that's

4    your tender of that additional phrase, that sentence.

17:41    5    Correct?

6          MR. BONHAM:  Yes, sir.

7          THE COURT:  Tender is denied.  Because I'm not

8    going to go back and re-rule, but, if you need protection on

9    your objections, now is the time.

17:41   10              Okay.  No. 5.

11         MR. BONHAM:  Again, we're still -- 5, 6 -- We have

12   the one where he's wanting 5, 6 -- 5 through 8 and we're

13   wanting it to be 9 and 10.  So...

14         THE COURT:  Hang on.  All right.  You can't agree

17:41   15   on No. 5.  Correct?

16         MR. STROTHER:  Correct.

17         MR. BONHAM:  Correct.

18         THE COURT:  This is submitted by the Defendant.

19   Tender is refused.

17:41   20              No. 6.  You still have disagreements on that?

21         MR. ZUMMO:  Yes.

22         THE COURT:  I am going read it in.  Take a look at

23   what I did.  I chopped it up.  I am going to read in what's

24   in.  It's granted, meaning your instruction submitted by the

17:42   25   Defendant is granted, but only to this extent.

*Charge Conference*

```
 1            The paragraph "Although..." and through the
 2   word "protected" is in.
 3            MR. ZUMMO:  That's the Headnote 29.  Correct?
 4            THE COURT:  That's correct.  Yeah.
 5            And then the last sentence of that first
 6   paragraph, "Infringement, therefore, requires copying of
 7   constituent elements of the work that are original..." --
 8   that is in.  Got it?
 9            MR. BONHAM:  Got it.
10            THE COURT:  Also, in the next paragraph -- the only
11   one that's in from the next paragraph is the first sentence.
12   "The protected elements of an architectural work do not
13   include the individual standard features, such as windows,
14   doors and other staple building components."  And my note
15   here is you can argue the rest.
16            MR. BONHAM:  Okay.
17            THE COURT:  The same thing.  Now let's move down to
18   the very last sentence down below, that "To support a claim
19   of copyright infringement the copy must bear a substantial
20   similarity to the protected aspects of the original."  That
21   is in, but I don't want that "protected aspects" bolded.
22            Now, it's submitted by the Defendants.  So,
23   that's what's granted.  All other tender is denied.
24            MR. STROTHER:  Thank you.
25            THE COURT:  Okay.  Let's look at No. 7.  Where are
```

17:42 (line 5)
17:42 (line 10)
17:43 (line 15)
17:43 (line 20)
17:43 (line 25)

*Charge Conference*

 1   you on No. 7?

 2            MR. STROTHER:  We never -- We tried.

 3            MR. BONHAM:  We tried.

 4            MR. STROTHER:  We never got to -- We never

17:43    5   concluded --

 6            THE COURT:  I have one question.  All right.  I

 7   will tell you what I am going to do.  Get ready.

 8            I am granting -- This is submitted by the

 9   Defendants.  Granted as to the first paragraph.  Denied as

17:44   10   to the last two paragraphs.

11            Take a look.  So, your tender is denied on the

12   second and third paragraphs.  However, there was a question

13   about the word "denied".

14            MR. BONHAM:  "Denied".  And also the last sentence

17:44   15   where it says "is lacking in the originality that is

16   required for copyright protection," because that now seems

17   to undercut the fact that we already got a finding that we

18   have valid copyrights.

19            MR. ZUMMO:  What we proposed, Your Honor, and --

17:44   20   Our problem on this paragraph was really that it made what

21   Mr. Strother thought was a very unruly instruction.

22            We believe, as the Plaintiff, that the scènes

23   à faire is a "substantial similarity" concept.

24            It should read that "Under the doctrine of

17:44   25   scènes à faire, the presence of expressions that are

*Charge Conference*

1    standard stock or common to a particular topic or that flow

2    necessarily or naturally from a common theme or setting or

3    are common to the treatment of a particular idea, process or

4    discovery in the works being compared is not, on its own,

17:45    5    evidence of copy."  And I believe that's an accurate

6    statement of how the doctrine works.

7          THE COURT:  Okay.

8          MR. STROTHER:  The "evidence of copying" part of

9    that tender I object to and disagree with.  A solution to

17:45    10   getting rid of the word "deny" I am okay with.

11         THE COURT:  What?  What's your suggestion?  What

12   word can we plug in there?

13              "Under the doctrine of scènes à faire

14   copyright protection is denied..." what?  Well, give me some

17:45    15   suggestions, guys.  That's where we're at.

16         MR. STROTHER:  Your Honor, I am pulling up a

17   thesaurus to see if something --

18         THE COURT:  "Foreclosed" or --

19         MR. STROTHER:  "Copyright is not 'extended' to

17:46    20   those expressions...'

21         MR. BONHAM:  It's still -- This is all sounding

22   like it's undercutting the fact that we have valid

23   copyrights.

24         MR. STROTHER:  But the question of valid copyright

17:46    25   is not even before the jury.  The issue of protectable and

Charge Conference

1  non-protectable elements is.

2          MR. BONHAM:  But, when you talk about the

3  originality that is required for copyright protection or

4  copyright protection is denied, now you're undercutting that

17:46  5  ruling.

6          MR. STROTHER:  I disagree.  I mean, I don't even

7  have a big problem with "copyright protection is denied"

8  because that's a truthful statement and accurate statement

9  of the law.

17:46  10          THE COURT:  Give me an alternative to "denied".

11          MR. ZUMMO:  The concept is these things should not

12  be considered, just on their own, as evidence of similarity,

13  maybe.  Does that work?

14          MR. STROTHER:  No.  No, because this goes, in my

17:46  15  opinion -- well, my opinion -- I'm sorry.  This is case law.

16  The filtration that must be done -- that's when scènes à

17  faire comes into play.  These elements that fall into the

18  doctrine of scènes à faire are filtered out before they do

19  their comparison.

17:47  20          THE COURT:  What alternative do you have to

21  "denied"?  It's coming down to that.  Let me at least

22  listen.

23          MR. ZUMMO:  I think, Your Honor --

24          THE COURT:  Or, if you have an objection, you need

17:47  25  to object to the whole thing in that form without you

*Charge Conference*

1   jumping in with another word.

2          MR. ZUMMO:  With another word, yes, sir.

3                  Well, first, we object to the first paragraph

4   of Defendants' Proposed Instruction No. 7 because it

17:47   5   misstates doctrine of scènes à faire as one that either

6   denies copyright protection or that states that certain

7   things are lacking in the originality that is required for

8   copyright protection.  We --

9          THE COURT:  Okay.  Objection is overruled.

17:47   10          Now, as an alternative -- do you have an

11   alternative relative to that word?  If not, stand on your

12   objection.

13          MR. ZUMMO:  I have an alternative.

14          THE COURT:  Yes, sir.  What is it?

17:48   15          MR. ZUMMO:  The alternative would read:  "Under the

16   doctrine of scènes à faire, the presence of expressions that

17   are standard stock or are common to a particular topic or

18   that flow necessarily or naturally from a common theme or

19   setting or that is common to the treatment of a particular

17:48   20   idea, process or discovery to what it's being compared is

21   not, on its own, evidence of copying."

22          THE COURT:  Tender is denied.  It will stay the way

23   it is, but you certainly can argue around it.

24                  The merger doctrine submitted by the

17:48   25   Defendant.  The Plaintiff objects to it completely.

*Charge Conference*

1   Correct?

2           MR. ZUMMO:  Correct, Your Honor.

3           THE COURT:  Okay.  The entry by Defendant is

4   granted.  Objection is overruled.  It is in.

17:49   5           Okay.  Now we come to No. 9.

6           MR. STROTHER:  I believe we have fixed that one.

7           Do you believe so, Mr. --

8           MR. BONHAM:  We have.

9           THE COURT:  Well, that helps, because I had yellow

17:49  10   and I had -- You have cured -- As far as you're concerned,

11   what you're suggesting is agreed to.  Is that correct?

12           MR. BONHAM:  That is correct.

13           THE COURT:  As to form only.  All right.  As to

14   form.

17:49  15           MR. ZUMMO:  And as revised by agreement.

16           THE COURT:  As revised.

17           MR. STROTHER:  Yes, sir.

18           THE COURT:  All right.  That's granted.  I don't

19   need to see it.  Just do it and put it in.  Because I had

17:49  20   all kinds of rulings on that.

21           So, now we jump to what page?

22           MR. BONHAM:  17.

23           THE COURT:  We jump to Page 17 and this is

24   "Substantial Similarity".

17:49  25           MR. BONHAM:  Correct.

*Charge Conference*

```
 1              THE COURT:  Now, this one, the Plaintiff's proposed
 2    instruction.
 3              MR. BONHAM:  There is a typo on the third line.  It
 4    refers to the wrong party, which will be fixed, of course.
 5              THE COURT:  Okay.  Have you worked anything out on
 6    that?
 7              MR. STROTHER:  No, Your Honor.
 8              MR. BONHAM:  We tried but haven't been able to do
 9    it.
10              THE COURT:  All right.  Your tender of Instruction
11    No. 10, Plaintiff's, is denied.
12              As far as the Defendants' proposed
13    instruction, it's granted, except -- now you can take a
14    look -- except the first sentence is out, that "Copying, on
15    its own, is not legally actionable."  That's out.
16              The last sentence in the first paragraph
17    beginning with "Substantial" and ending with "another work"
18    is out.
19              And in the last paragraph the last sentence is
20    out, "In determining" through the word "to works" is out.
21              All right.  No. 11.
22              MR. BONHAM:  On 11 I guess the real question is:
23    Is Jury Question No. 14 going to be offered?
24              THE COURT:  Hang on a second.  Question No. 14.
25              MR. ZUMMO:  It's the very last page.
```

17:50 (line 5)
17:50 (line 10)
17:50 (line 15)
17:50 (line 20)
17:51 (line 25)

*Charge Conference*

| | | |
|---|---|---|
| | 1 | THE COURT:  That's out. |
| | 2 | MR. BONHAM:  Okay. |
| | 3 | THE COURT:  That is out.  Denied.  Question No. 14 |
| | 4 | submitted by the Defendant is denied.  It's out. |
| 17:51 | 5 | Therefore, No. 11. |
| | 6 | MR. ZUMMO:  We withdraw. |
| | 7 | THE COURT:  Okay.  That's withdrawn.  Let me write |
| | 8 | that.  That is withdrawn. |
| | 9 | MR. BONHAM:  We have got a solution on No. 12. |
| 17:52 | 10 | THE COURT:  Okay. |
| | 11 | MR. BONHAM:  With that -- |
| | 12 | THE COURT:  I don't need the solution if you've |
| | 13 | agreed to it.  Okay. |
| | 14 | 13. |
| 17:52 | 15 | MR. STROTHER:  I don't believe we have reached any |
| | 16 | solutions to any of the -- |
| | 17 | THE COURT:  Now, you notice I have that with a |
| | 18 | paperclip because -- I have all of that going from 13 |
| | 19 | through 16 and then the suggested No. 17.  Okay? |
| 17:52 | 20 | MR. BONHAM:  Okay. |
| | 21 | THE COURT:  Have you agreed on anything here? |
| | 22 | MR. BONHAM:  We have not. |
| | 23 | MR. STROTHER:  No, Your Honor. |
| | 24 | THE COURT:  All right.  Every once in a while you |
| 17:52 | 25 | come across -- in every jury charge you come across |

Charge Conference

          1   something that I think could be a reversible matter.  Again,
          2   I'm not an expert in this, but I am looking at it.  I have
          3   done it a long time, as have you.  Some of you, you earn
          4   your living in this area.
17:52     5              The safer way maybe -- and I am looking at the
          6   Plaintiffs at this point -- is to work with some sort of a
          7   conglomeration of the Defendant.  The damages, the profits
          8   question, they have No. 17.  And we talked about it
          9   beforehand.  Some you can live with, some that you can't.
17:53    10              I am asking now the Plaintiffs:  Do you
         11   absolutely want to go with 13, 14, 15 and 16 and the request
         12   that I deny 17, the tender on 17?
         13        MR. ZUMMO:  Yes, Your Honor, because we were not
         14   able to work out any agreement.
17:53    15        THE COURT:  Okay.  Then, the Defendants' objections
         16   to 13, 14, 15, and 16 are overruled.  It's going in.  And,
         17   therefore, the tender of the Defendants' No. 17 is denied.
         18   I think that protects everybody.
         19              Everybody agree?
17:53    20        MR. ZUMMO:  Yes, Your Honor.
         21        THE COURT:  Are you satisfied with that?
         22        MR. STROTHER:  My record --
         23        THE COURT:  You may not be satisfied with it, but
         24   is your record protected?
17:54    25        MR. STROTHER:  Yes, Your Honor.

```
 1          THE COURT:  You objected to all of those.  Those

 2   objections are overruled.  Those four are coming in.  And

 3   your substitute instruction No. 17 is denied.  Okay?

 4               No. 18 is out.  Correct?

 5          MR. BONHAM:  No.

 6          THE COURT:  Or is it?  "See alternate instruction."

 7          MR. BONHAM:  Correct.

 8          THE COURT:  "See alternate instruction."

 9          MR. BONHAM:  And the question on this is whether or

10   not the last paragraph that the Defendants have offered

11   comes in or not.

12          THE COURT:  Have you agreed on anything here?

13          MR. BONHAM:  We have not.

14          THE COURT:  Okay.  The Plaintiff's submission of

15   No. 18 is granted.  The objection is overruled.

16               Now, I am adding to Instruction 18 the first

17   sentence in the Defendant's submission on the last page

18   where it says -- I am allowing this in -- "To determine the

19   number of violations, you are to consider only the number of

20   individual acts as committed by a defendant that violated

21   this law."  All the other tender, then, of the defense is

22   denied.  Tender is refused.  And that's the only sentence

23   that goes there.  The rest of it is denied.

24               No. 19.

25          MR. BONHAM:  19 we have a directed verdict on that.
```

*Charge Conference*

1    That's out.

2         THE COURT:  Now, "Contributory Infringement".  You

3    object to that on principle.  You object to it --

4         MR. STROTHER:  Yes, Your Honor.

17:55  5         THE COURT:  -- to the whole thing?  That's denied.

6              Instruction No. 20 is in.  It's granted.

7              How about 21?

8         MR. BONHAM:  The only thing is the Defendant's

9    proposed additional language, which I think is now picked up

17:55  10   by the prior rulings.

11        MR. STROTHER:  I will withdraw that, now that we

12   have that definition.

13        THE COURT:  Thank you.  That's withdrawn.  So,

14   granted as to No. 21, but there is no objection to it, in

17:55  15   effect.

16        MR. BONHAM:  Correct.

17        MR. ZUMMO:  Correct, Your Honor.

18        THE COURT:  Now let's take a look.  Now, you needs

19   some rulings on these questions.  Right?

17:56  20        MR. STROTHER:  On 2 and 4.

21        MR. BONHAM:  You're correct.  I apologize.

22        MR. ZUMMO:  2 and 4, yes.

23        THE COURT:  Defendant's objection to the submission

24   of Question No. 2 is denied.  In effect, overruled.

17:56  25   Objection overruled.

*Charge Conference*

```
          1          Objection overruled, by the defense, as to
          2    Question No. 4.
          3          Now we're at No. 6.
          4          MR. BONHAM:  Correct.
17:56     5          THE COURT:  Have you worked anything out?
          6          MR. BONHAM:  We have not.
          7          MR. STROTHER:  No, Your Honor.
          8          THE COURT:  As to No. 6, the Plaintiff's proposed
          9    language is granted.  The Defendants' proposed language is
17:56    10    denied.  It's overruled.  Tender of that is denied.
         11          How about No. 8?
         12          MR. BONHAM:  Same issue.
         13          THE COURT:  Again, same ruling.  Granted as to the
         14    Plaintiff's proposed language.  Denied as to the tender of
17:57    15    the Defendants' proposed language.
         16          You have agreed on No. 9.
         17          MR. BONHAM:  Correct.
         18          THE COURT:  Now we have No. 10.
         19          MR. BONHAM:  We have not.
17:57    20          MR. STROTHER:  Correct.  We haven't figured this
         21    out.
         22          THE COURT:  At that point, the Question No. 10, the
         23    Plaintiff's proposed language is granted.  The Defendants'
         24    tender is overruled as to proposed No. 10.  Granted as to
17:57    25    the Plaintiff.
```

*Charge Conference*

| | |
|---|---|
| 1 | No. 11 is moot. |
| 2 | I think 12 is moot. |
| 3 | MR. ZUMMO:  Yes, Your Honor. |
| 4 | THE COURT:  13 moot.  And No. 14 is out. |
| 17:57  5 | MR. ZUMMO:  Yes, sir. |
| 6 | THE COURT:  Okay. |
| 7 | MR. ZUMMO:  So, we need the verdict form to be |
| 8 | added -- |
| 9 | THE COURT:  Correct. |
| 17:57  10 | MR. ZUMMO:  -- as instructed by the Court. |
| 11 | THE COURT:  Now, let me tell you how many copies |
| 12 | we'll need. |
| 13 | MR. BONHAM:  Ellen told me 15. |
| 14 | THE COURT:  We have got eight on the jury.  Right? |
| 17:58  15 | We have got five of our staff.  Right?  We have got the |
| 16 | court reporter and we have four interns.  Right?  What does |
| 17 | that add up to? |
| 18 | LAW CLERK:  We usually ask for 20, sir. |
| 19 | THE COURT:  More than that.  Right?  Eight for the |
| 17:58  20 | jury.  Five for our full-time staff including the Judge. |
| 21 | Right? |
| 22 | LAW CLERK:  Yes, sir. |
| 23 | THE COURT:  Five.  One for the court reporter.  So, |
| 24 | what is that?  Eight, 13, 14, 18.  Plus, one becomes the |
| 17:58  25 | original or one gets a blue back on it. |

*Charge Conference*

1    So, tomorrow we begin at 11:30.  At eleven

2    o'clock I will need -- Oh, yeah, Judge Atlas.  I talked to

3    her.  I'm keeping her informed.  We'll need 25 on Ellen's

4    desk at eleven o'clock.

17:59    5    MR. ZUMMO:  And, Your Honor, the double-spacing,

6    does that extend to the questions that's being asked?

7    THE COURT:  Oh, yeah.  I think so.

8    MR. ZUMMO:  The whole thing.

9    THE COURT:  The whole thing.

17:59    10    MR. BONHAM:  I think they're pretty much already --

11    I will make sure everything is double-spaced.

12    THE COURT:  Yeah.  It makes it a lot easier.  And

13    that's how we'll do it.

14    They'll grab a bite to eat earlier and we'll

17:59    15    go straight through.

16    I will tell you this.  I will tell this to the

17    jury.  I have done this with every jury since state court,

18    including being downtown late.  I allow the jury to

19    deliberate each day until 6:00 p.m., but we'll not take a

17:59    20    verdict after 5:00 p.m.  So, around 5:05 if there is no

21    indication they're coming out with a verdict yet, then we'll

22    come in and say we're all gone.

23    Like the last case.  They decided the case at

24    about 5:45 and they sealed it up; and, as you know, there is

18:00    25    a procedure on sealing it up.  They seal it and sign it and

*Charge Conference*

1    then the next morning you give it to the presiding juror who

2    opens it up and confirms that's the verdict.

3              So, that's how we're doing it.

4              All right.  It's an interesting case.  It will

18:00  5    be interesting to see how you're going to walk them all

6    through it.

7              Thank you for your work on it.  It's been

8    really a pleasure.  In other words, you have been at each

9    other as advocates, but it's a good professional job.  I

18:00  10   appreciate the guidance you have given to me.

11             Thank you, Bruce, for sticking around.

12        THE COURT REPORTER:  Yes, sir, as always.

13        THE COURT:  Never forget the court reporter.

14             And tomorrow we'll see you at 11:30.

18:00  15        MR. ZUMMO:  Thank you, Your Honor.

16        MR. BONHAM:  Thank you, Your Honor.

17        MR. STROTHER:  Thank you, Your Honor.

18        THE COURT:  Thank you so much.

19

20             COURT REPORTER'S CERTIFICATE

21        I, BRUCE SLAVIN, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above entitled matter, to the best of my ability.

24

25                           *s/Bruce Slavin*
                           BRUCE SLAVIN, RPR, CMR

## $

**$162,475** [2] - 52:9, 52:22
**$216,692** [1] - 41:1
**$225,010** [3] - 39:21, 52:18, 53:4
**$237,000** [1] - 38:9
**$27,378** [2] - 36:2, 36:4
**$4,049.50** [1] - 34:23
**$5,159** [1] - 41:6
**$5,500** [1] - 38:23
**$50** [1] - 28:22
**$6,077** [1] - 38:13
**$6,566** [2] - 41:1, 41:7
**$81,529** [1] - 38:22
**$9,580.50** [1] - 34:21
**$9,680** [1] - 34:22
**$900** [1] - 40:18

## '

**'15** [1] - 13:24
**'16** [1] - 13:25
**'17** [1] - 13:22
**'18** [1] - 13:22
**'and** [1] - 121:17
**'As** [1] - 88:1
**'copied'** [3] - 80:7, 84:13, 84:17
**'copying'** [3] - 81:19, 81:22, 87:3
**'each** [1] - 136:19
**'expression'** [1] - 113:6
**'extended'** [1] - 151:19
**'For** [1] - 83:5
**'from** [1] - 46:10
**'idea'** [1] - 113:6
**'Listen** [1] - 99:23
**'Look** [1] - 82:20
**'Now** [1] - 88:16
**'Okay** [3] - 100:17, 105:18, 106:4
**'original** [1] - 147:16
**'So** [1] - 136:18
**'The** [1] - 117:24
**'this** [1] - 105:20
**'under** [1] - 108:19
**'Well** [2] - 112:12, 112:16
**'were** [2] - 100:25, 101:1
**'yeah** [1] - 121:2
**'Yes'** [1] - 143:7

## 1

**1** [12] - 9:18, 28:7, 28:11, 28:24, 37:16, 79:18, 79:19, 92:22, 93:8, 140:16, 145:23, 145:24
**1,618** [1] - 40:17
**10** [15] - 85:20, 95:6, 95:7, 95:9, 97:25, 117:23, 142:25, 143:1, 143:6, 143:19, 148:13, 155:11, 160:18, 160:22, 160:24
**100** [1] - 125:13
**103** [2] - 45:16, 55:25
**105** [4] - 16:18, 16:19, 16:21, 18:11
**108** [2] - 20:18, 20:19
**11** [11] - 76:23, 118:12, 119:8, 122:4, 143:25, 144:1, 144:5, 155:21, 155:22, 156:5, 161:1
**113** [3] - 21:23, 21:25, 24:1
**117** [3] - 3:13, 3:15, 3:16
**11:30** [9] - 63:21, 64:15, 64:20, 69:11, 70:15, 71:13, 71:21, 162:1, 163:14
**12** [12] - 27:13, 27:15, 46:20, 48:25, 49:19, 122:17, 122:19, 143:25, 144:4, 144:5, 156:9, 161:2
**1202** [2] - 133:19, 134:1
**1202(b** [2] - 133:16, 134:13
**12:15** [1] - 64:20
**12:45** [1] - 64:24
**13** [12] - 54:15, 55:23, 106:18, 122:24, 124:11, 144:5, 156:14, 156:18, 157:11, 157:16, 161:4, 161:24
**14** [12] - 122:13, 122:14, 122:24, 129:11, 144:6, 155:23, 155:24, 156:3, 157:11, 157:16, 161:4, 161:24
**15** [10] - 64:24, 65:1, 86:11, 92:10, 105:9,

122:24, 145:12, 157:11, 157:16, 161:13
**15,000** [2] - 17:13, 18:7
**15-minute** [1] - 64:25
**16** [19] - 29:25, 30:2, 30:8, 30:16, 31:2, 32:20, 33:14, 33:16, 35:20, 37:16, 38:8, 76:11, 95:4, 122:24, 125:23, 156:19, 157:11, 157:16
**17** [38] - 3:15, 3:17, 3:18, 3:19, 3:20, 3:21, 4:5, 4:11, 5:4, 12:3, 12:8, 12:14, 13:16, 25:15, 26:1, 26:2, 37:8, 38:15, 38:19, 40:16, 41:10, 42:20, 51:12, 51:21, 52:1, 76:12, 125:10, 125:12, 126:6, 126:7, 154:22, 154:23, 156:19, 157:8, 157:12, 157:17, 158:3
**18** [11] - 76:16, 76:17, 76:20, 76:21, 132:13, 133:8, 143:2, 158:4, 158:15, 158:16, 161:24
**19** [3] - 137:16, 158:24, 158:25
**1984** [2] - 102:18, 102:20
**1991** [3] - 103:6, 104:25, 114:9
**1994** [2] - 108:19, 114:8
**1:00** [1] - 8:16
**1:30** [1] - 75:22
**1:45** [1] - 65:1

## 2

**2** [24] - 9:15, 9:18, 13:15, 17:3, 17:5, 18:11, 20:22, 21:1, 25:22, 30:5, 30:7, 30:17, 31:2, 79:23, 79:25, 82:24, 85:12, 86:23, 132:19, 140:16, 146:22, 159:20, 159:22, 159:24
**20** [8] - 10:5, 59:14, 61:11, 138:6, 145:12, 159:6, 161:18

**20,000** [1] - 136:6
**20-by-40** [1] - 10:2
**20-by-40-foot** [1] - 66:21
**2014** [2] - 47:11, 48:16
**2015** [4] - 38:22, 102:25, 104:3, 130:13
**2016** [10] - 30:9, 30:18, 31:18, 34:9, 38:1, 38:10, 43:23, 44:1, 44:5, 48:19
**2017** [2] - 4:8, 130:7
**2018** [4] - 1:5, 4:8, 46:20, 49:19
**21** [3] - 139:12, 159:7, 159:14
**22** [1] - 46:22
**225** [2] - 40:4, 53:3
**24** [2] - 48:25, 49:4
**25** [4] - 52:12, 52:14, 52:23, 162:3
**27** [2] - 1:5, 73:22
**27,000** [1] - 36:20
**28-wide** [1] - 59:12
**29** [1] - 149:3
**2:15** [2] - 71:7, 75:23
**2:30** [2] - 77:14, 77:22

## 3

**3** [8] - 8:23, 9:12, 9:13, 9:15, 40:16, 79:16, 85:12, 146:24
**3,752** [1] - 24:7
**30** [2] - 64:23, 72:12
**3000** [1] - 1:21
**32** [1] - 98:19
**33** [6] - 38:23, 52:11, 52:15, 52:18, 53:9, 53:10
**348** [1] - 1:21
**35** [1] - 72:13
**3500** [2] - 1:16, 1:18
**37** [1] - 46:3
**38** [3] - 39:24, 40:4, 53:4
**3:00** [1] - 8:19
**3d** [1] - 114:9

## 4

**4** [11] - 1:12, 21:4, 21:6, 46:4, 85:14, 85:15, 146:25, 147:1, 159:20, 159:22, 160:2
**4,923** [2] - 52:17, 52:25
**4-1** [1] - 1:13

**4-16** [1] - 2:7
**4-163** [1] - 1:13
**4-5** [1] - 2:6
**4-51** [1] - 2:8
**4-56** [2] - 2:10, 2:11
**4-77** [1] - 2:12
**40** [6] - 6:23, 59:14, 61:12, 72:19, 73:5, 73:7
**40-minute** [1] - 72:25
**42** [2] - 40:25, 41:2
**43** [9] - 64:17, 72:21, 73:5, 73:7, 74:3, 74:4, 85:20, 93:1, 93:16
**439** [2] - 24:24, 24:25
**45** [7] - 63:23, 63:25, 64:15, 69:15, 69:25, 70:2, 70:12
**45-minute** [1] - 70:7
**4:25** [1] - 145:5

## 5

**5** [24] - 8:25, 9:1, 9:4, 9:13, 9:15, 35:14, 46:6, 46:25, 79:16, 85:22, 85:24, 85:25, 86:7, 93:1, 93:16, 95:25, 97:2, 97:6, 97:24, 148:10, 148:11, 148:12, 148:15
**5,159** [1] - 41:5
**5,500** [1] - 14:3
**5,700** [1] - 13:25
**5,750** [1] - 41:25
**5,921** [2] - 40:15, 53:5
**50** [3] - 6:23, 19:16, 29:4
**504(b** [2] - 130:17, 142:9
**504(b)** [2] - 141:17, 142:8
**5260** [1] - 33:24
**54** [1] - 73:21
**5:00** [4] - 8:16, 8:19, 145:16, 162:20
**5:05** [1] - 162:20
**5:45** [1] - 162:24
**5th** [3] - 47:11, 48:16, 49:1

## 6

**6** [19] - 8:23, 9:1, 9:4, 9:15, 85:22, 85:25, 86:7, 97:2, 97:12, 102:4, 106:10, 140:21, 140:25, 142:16, 148:11,

148:12, 148:20, 160:3, 160:8
**6,000** [1] - 14:3
**6,499** [2] - 52:24, 52:25
**6,818** [1] - 52:21
**60** [1] - 10:2
**6260** [1] - 33:24
**63** [2] - 55:5, 116:13
**6:00** [1] - 162:19
**6:00-something** [1] - 76:21

## 7

**7** [11] - 79:4, 82:14, 85:25, 86:7, 93:3, 96:6, 106:12, 106:18, 149:25, 150:1, 153:4
**7,087** [2] - 24:14, 24:15
**77010** [2] - 1:16, 1:19
**77027** [1] - 1:21
**79** [1] - 18:1
**7:00** [1] - 7:2

## 8

**8** [11] - 85:25, 86:7, 96:1, 96:21, 112:24, 113:1, 140:24, 142:6, 142:16, 148:12, 160:11
**8,000** [2] - 17:12, 18:7
**8,578** [1] - 23:22
**80** [13] - 18:1, 18:2, 56:18, 57:3, 57:4, 57:5, 60:20, 60:21, 62:7, 62:8, 62:12, 65:24, 66:6
**81** [1] - 56:18
**82** [1] - 56:18
**83** [1] - 56:18
**84** [1] - 56:18
**85** [7] - 56:19, 57:5, 60:21, 62:8, 62:12, 65:24, 66:7

## 9

**9** [12] - 86:4, 86:7, 86:9, 86:11, 112:22, 112:23, 114:23, 142:14, 143:8, 148:13, 154:5, 160:16
**909** [2] - 1:16, 1:18
**9:00** [1] - 7:2

## A

**a.m** [1] - 71:21
**ability** [1] - 163:23
**able** [8] - 30:13, 31:17, 47:16, 50:4, 74:12, 119:3, 155:8, 157:14
**Abshire** [3] - 115:4, 122:25, 123:8
**absolutely** [9] - 46:13, 98:13, 99:9, 102:8, 111:16, 114:13, 134:3, 137:4, 157:11
**abstract** [1] - 88:1
**abstraction** [1] - 103:15
**academics** [2] - 68:3, 77:21
**accept** [1] - 48:13
**accepted** [1] - 59:21
**access** [17] - 87:11, 87:14, 88:7, 89:1, 90:15, 90:16, 90:20, 91:4, 91:5, 91:6, 91:19, 119:12, 119:16, 121:9, 121:18, 121:25
**according** [1] - 34:8
**account** [2] - 13:20, 126:16
**accountant** [1] - 38:25
**accountant/bookkeeper** [1] - 25:18
**accounting** [3] - 25:12, 27:20, 51:12
**accounts** [1] - 30:25
**accurate** [20] - 33:5, 33:7, 39:7, 41:10, 44:19, 44:21, 45:22, 47:13, 81:3, 84:15, 84:21, 99:6, 117:10, 117:11, 123:21, 124:8, 129:9, 141:10, 151:5, 152:8
**accurately** [3] - 28:2, 44:8, 130:23
**accused** [1] - 91:19
**acknowledge** [1] - 46:23
**act** [6] - 135:3, 135:23, 136:3, 136:9, 136:19, 143:4
**actionable** [2] - 116:24, 155:15
**acts** [1] - 158:20
**acts..** [1] - 126:5
**actual** [9] - 6:9, 23:4, 40:19, 74:22, 126:16, 126:18,

134:8, 136:3, 139:14
**ADD** [1] - 135:8
**add** [7] - 64:18, 78:18, 87:1, 120:9, 134:20, 135:8, 161:17
**added** [6] - 80:3, 84:11, 92:12, 95:11, 122:20, 161:8
**adding** [2] - 132:25, 158:16
**addition** [3] - 78:14, 80:16, 143:5
**additional** [7] - 135:2, 138:13, 139:19, 139:20, 146:12, 148:4, 159:9
**additionally** [1] - 121:25
**address** [2] - 23:4, 23:15
**addressed** [1] - 128:11
**adduce** [2] - 124:15, 124:20
**adjourn** [2] - 68:20, 77:14
**adjusted** [1] - 131:22
**admissibility** [1] - 67:2
**admitted** [4] - 4:11, 4:20, 62:12, 139:3
**admittedly** [1] - 82:11
**admitting** [2] - 65:25, 66:6
**adopting** [2] - 104:18, 104:24
**advance** [1] - 44:12
**advertise** [1] - 44:10
**advertisements** [1] - 37:24
**advertising** [3] - 6:17, 37:5, 44:9
**advocates** [1] - 163:9
**affidavit** [1] - 46:5
**affirmatively** [1] - 39:15
**affirmed** [2] - 123:6, 123:7
**afford** [2] - 62:5, 66:12
**afternoon** [3] - 68:20, 71:6, 71:22
**agent** [1] - 9:15
**agent"** [1] - 9:3
**aggressive** [1] - 6:17
**ago** [5] - 7:16, 105:9, 107:4, 114:10, 115:7
**agree** [21] - 37:16, 41:9, 41:11, 44:19, 44:22, 48:2, 68:6, 76:1, 80:13, 88:5,

89:1, 92:14, 92:22, 94:21, 99:5, 100:20, 106:21, 131:18, 141:2, 148:14, 157:19
**Agreed** [1] - 78:15
**agreed** [18] - 80:2, 82:23, 83:18, 84:3, 88:25, 89:1, 92:9, 93:13, 93:18, 94:23, 95:1, 147:4, 148:1, 154:11, 156:13, 156:21, 158:12, 160:16
**agreeing** [2] - 107:12, 112:6
**agreement** [6] - 78:19, 78:20, 78:22, 145:24, 154:15, 157:14
**agreement"** [1] - 79:22
**agreements** [1] - 74:12
**ahead** [3] - 58:6, 70:22, 109:14
**aided** [1] - 1:25
**Alexander** [1] - 4:4
**alleged** [3] - 91:13, 91:24, 136:4
**alleging** [1] - 60:22
**allocable** [1] - 131:13
**allocated** [1] - 37:7
**allocating** [1] - 36:15
**allocation** [1] - 131:2
**allow** [8] - 17:25, 62:17, 62:20, 62:22, 66:14, 111:3, 162:18
**allowed** [4] - 61:14, 125:24, 126:4, 136:5
**allowing** [1] - 158:18
**almost** [2] - 19:16, 98:15
**alter** [2] - 15:9, 15:13
**alteration** [1] - 135:16
**altered** [3] - 15:16, 135:14, 142:19
**altering** [1] - 14:10
**alternate** [3] - 133:7, 133:8, 143:2, 158:6, 158:8
**alternative** [7] - 76:21, 152:10, 152:20, 153:10, 153:11, 153:13, 153:15
**Although..** [1] - 149:1
**amazing** [1] - 114:9
**ambiguous** [1] - 136:16
**amount** [6] - 6:19,

12:2, 28:24, 36:16, 36:23, 126:15
**analysis** [1] - 104:10
**analytics** [5] - 22:1, 22:5, 22:17, 24:9, 24:18
**AND** [1] - 1:11
**annual** [1] - 41:20
**answer** [14] - 19:6, 42:8, 42:10, 43:20, 44:7, 45:3, 45:6, 46:7, 46:11, 47:1, 54:22, 82:8, 138:14, 138:23
**answered** [1] - 143:7
**answering** [5] - 35:6, 49:3, 49:10, 88:22, 136:9
**answers** [1] - 98:21
**anticipated** [1] - 101:2
**anyhow** [2] - 79:12, 126:11
**anytime** [1] - 85:4
**apologize** [13] - 12:11, 19:11, 19:19, 22:3, 32:12, 34:1, 39:7, 45:13, 48:14, 50:9, 51:3, 53:14, 159:21
**appeal** [1] - 112:11
**appear** [4] - 12:8, 53:15, 102:9, 124:20
**appeared** [1] - 119:15
**appellate** [3] - 99:6, 123:3, 123:9
**Apple** [8] - 102:15, 103:14, 104:15, 105:1, 105:15, 105:23, 116:4
**apple** [1] - 103:14
**applicable** [6] - 89:7, 89:16, 95:11, 128:20, 128:24, 129:2
**applies** [6] - 89:3, 106:25, 114:20, 115:17, 116:15, 121:11
**apply** [2] - 130:23, 137:5
**apportionment** [1] - 123:18
**appreciate** [2] - 85:3, 163:10
**appreciation** [1] - 71:14
**approaching** [1] - 99:18
**appropriate** [1] - 130:21
**April** [7] - 27:8, 27:13,

27:15, 46:20, 48:18, 48:25, 49:19
**architect** [7] - 10:15, 11:6, 11:13, 11:19, 15:1, 61:4, 81:5
**architect's** [1] - 59:3
**architects** [3] - 120:17, 128:12, 131:21
**ARCHITECTS** [1] - 1:6
**architects'** [1] - 128:13
**architectural** [7] - 80:7, 84:12, 84:17, 94:6, 115:24, 124:4, 149:12
**architecture** [2] - 10:22, 105:8
**are..** [1] - 93:19
**area** [3] - 7:9, 91:20, 157:4
**areas** [1] - 58:22
**argue** [14] - 84:2, 85:16, 85:17, 88:15, 88:21, 88:24, 97:19, 97:21, 99:20, 99:21, 107:24, 112:18, 149:15, 153:23
**argued** [1] - 112:16
**arguing** [6] - 75:7, 82:12, 92:4, 101:3, 112:19, 135:15
**argument** [3] - 90:18, 119:1, 138:12
**aside** [1] - 77:6
**aspects** [3] - 25:12, 149:20, 149:21
**Aspire** [1] - 34:17
**assert** [1] - 119:16
**assist** [1] - 34:15
**assisted** [2] - 29:11, 36:12
**assists** [1] - 133:25
**associated** [2] - 127:12, 129:10
**Associates** [7] - 18:13, 18:16, 18:19, 25:6, 25:9, 57:1, 92:10
**ASSOCIATES** [1] - 1:3
**Associates'** [1] - 92:12
**assume** [2] - 39:6, 76:1
**assumed** [1] - 47:22
**assuming** [2] - 4:19, 4:21
**Atlas** [8] - 82:14, 118:15, 119:25, 121:2, 134:10,

137:11, 144:14, 162:2
**attacking** [1] - 113:23
**attempting** [1] - 41:15
**attention** [4] - 51:11, 74:5, 76:20, 103:25
**Attorney** [1] - 1:15
**attorney** [5] - 26:6, 32:11, 45:7, 49:8, 50:8
**attorneys** [4] - 64:12, 68:5, 68:9, 69:7
**attributable** [10] - 109:12, 126:14, 127:23, 127:25, 128:2, 131:7, 141:6, 141:7, 141:18, 141:22
**attuned** [1] - 116:22
**audience** [1] - 98:3
**August** [3] - 1:5, 48:25, 49:4
**author** [1] - 147:18
**auto** [1] - 31:22
**automobile** [3] - 31:3, 31:18, 33:16
**automobiles** [2] - 31:8
**average** [15] - 9:1, 13:2, 13:25, 25:20, 26:17, 32:15, 35:12, 38:3, 38:5, 38:7, 40:19, 41:1, 41:15, 41:25, 44:12
**averaged** [2] - 34:18, 37:2
**averages** [1] - 13:23
**Aviv** [2] - 15:23, 15:24
**avoiding** [1] - 117:6
**award** [2] - 126:15, 126:24
**awards** [1] - 36:8
**aware** [2] - 14:9, 53:12
**awkward** [1] - 88:18

---

## B

**Bachman** [1] - 61:8
**Bachman's** [1] - 108:6
**background** [1] - 87:9
**backup** [4] - 3:14, 3:23, 4:12, 5:1
**backwards** [1] - 92:24
**bad** [2] - 101:21, 101:22
**balled** [1] - 131:6
**banners** [1] - 32:1
**bar** [1] - 107:9
**Bar** [3] - 107:10, 107:13
**Bar"** [1] - 107:15

**barely** [1] - 98:11
**Barrel** [9] - 102:16, 103:14, 104:15, 105:1, 105:15, 105:24, 116:4, 116:5
**base** [1] - 10:4
**based** [9] - 29:21, 48:12, 80:8, 81:7, 81:16, 84:14, 86:22, 119:25, 122:4
**basic** [3] - 67:1, 98:2, 143:16
**basis** [9] - 7:18, 10:3, 14:22, 15:6, 26:14, 26:18, 32:6, 41:20, 136:16
**baths** [1] - 10:18
**bear** [1] - 149:19
**become** [1] - 89:14
**becomes** [1] - 161:24
**bedroom** [2] - 10:6, 58:21
**bedrooms** [6] - 10:7, 10:10, 10:17, 58:22, 59:17, 110:13
**BEFORE** [1] - 1:11
**before"** [1] - 86:19
**beforehand** [2] - 94:22, 157:9
**begin** [6] - 63:21, 64:19, 69:11, 72:7, 97:23, 162:1
**beginning** [5] - 6:13, 12:18, 25:23, 110:20, 155:17
**behind** [5] - 5:1, 7:22, 33:6, 77:1, 132:4
**believer** [1] - 8:1
**belive** [1] - 139:7
**below** [2] - 42:7, 149:18
**benefits** [1] - 53:20
**best** [1] - 163:23
**better** [5] - 98:14, 99:3, 109:3, 126:11, 132:9
**between** [25] - 9:1, 17:12, 18:7, 23:11, 28:23, 29:9, 29:18, 47:11, 48:25, 49:13, 49:18, 70:9, 99:12, 114:15, 115:18, 115:23, 116:16, 125:7, 126:25, 128:7, 128:9, 134:18, 134:25, 140:21, 141:4
**big** [5] - 8:1, 50:18, 122:22, 131:3, 152:7
**bigger** [1] - 137:3

**bill** [2] - 15:1, 15:23
**Bill** [1] - 15:4
**binder** [1] - 31:24
**bit** [5] - 49:21, 69:2, 69:25, 81:10, 111:9
**bite** [1] - 162:14
**blank** [1] - 84:8
**blanks** [1] - 68:15
**blast** [7] - 16:15, 17:10, 18:22, 19:11, 19:18, 20:11, 54:9
**blast"** [1] - 17:6
**blasts** [2] - 16:16, 54:7
**block** [1] - 46:23
**blocked** [3] - 116:21, 116:23, 117:1
**blow** [1] - 111:9
**blue** [1] - 161:25
**bolded** [1] - 149:21
**Bonham** [8] - 1:17, 83:1, 90:23, 107:2, 111:12, 114:11, 118:17, 144:12
**BONHAM** [153] - 3:17, 74:18, 74:24, 78:13, 78:17, 78:20, 79:14, 79:17, 79:20, 80:1, 80:22, 81:8, 81:12, 81:15, 84:5, 84:8, 84:15, 85:10, 85:22, 85:25, 86:8, 86:18, 86:21, 86:23, 87:14, 90:9, 90:14, 90:25, 91:5, 92:25, 93:4, 93:8, 93:14, 93:16, 93:18, 93:25, 94:3, 94:10, 95:14, 100:12, 100:14, 101:23, 102:2, 102:15, 102:18, 102:21, 103:10, 105:7, 105:20, 106:1, 106:3, 106:11, 109:17, 109:22, 110:6, 110:10, 110:25, 115:1, 116:4, 116:11, 116:13, 117:10, 118:6, 118:13, 119:22, 120:5, 121:14, 122:9, 122:13, 122:17, 122:19, 123:5, 124:7, 124:18, 128:5, 128:22, 129:1, 129:4, 129:13, 130:10, 131:5, 132:17, 132:21, 132:24, 133:4,

133:16, 134:16, 134:24, 136:11, 136:15, 137:17, 137:22, 138:23, 139:13, 139:18, 140:2, 141:10, 142:4, 142:6, 142:10, 142:20, 142:24, 143:18, 144:1, 144:5, 144:11, 145:1, 145:25, 146:5, 146:7, 146:23, 147:1, 147:10, 147:15, 147:23, 147:25, 148:6, 148:11, 148:17, 149:9, 149:16, 150:3, 150:14, 151:21, 152:2, 154:8, 154:12, 154:22, 154:25, 155:3, 155:8, 155:22, 156:2, 156:9, 156:11, 156:20, 156:22, 158:5, 158:7, 158:9, 158:13, 158:25, 159:8, 159:16, 159:21, 160:4, 160:6, 160:12, 160:17, 160:19, 161:13, 162:10, 163:16
**book** [1] - 69:4
**bookkeeper** [7] - 32:21, 32:22, 33:2, 33:3, 33:13, 33:14, 39:1
**bookkeeping** [1] - 26:23
**books** [5] - 27:2, 27:16, 27:19, 28:3, 85:2
**bore** [1] - 40:7
**bottom** [13] - 13:1, 13:6, 17:11, 25:19, 25:21, 37:10, 38:16, 52:1, 78:9, 79:1, 79:13, 104:9, 112:3
**bounce** [2] - 54:18, 55:4
**box** [7] - 10:16, 11:14, 13:6, 37:10, 61:21, 61:23, 92:1
**boxes** [1] - 10:16
**boy** [2] - 88:11, 98:2
**bracket** [1] - 70:7
**brackets** [1] - 118:4
**break** [17] - 55:1,

57:19, 64:22, 64:25, 65:14, 69:6, 70:8, 70:11, 70:19, 70:25, 88:20, 112:21, 116:5, 117:8, 117:19, 125:16
**breaking** [1] - 125:14
**breakout** [1] - 76:24
**breaks** [2] - 70:25, 104:6
**brief** [6] - 51:6, 128:8, 133:17, 136:13, 136:21
**briefly** [1] - 25:12
**bring** [2] - 21:22, 65:1
**brochure** [1] - 21:14
**brochures** [5] - 6:19, 8:4, 29:15, 31:13, 32:2
**broken** [2] - 26:16, 132:3
**brought** [2] - 9:12, 15:23
**bruce** [1] - 11:25
**BRUCE** [2] - 163:21, 163:25
**Bruce** [3] - 1:22, 63:5, 163:11
**builder** [5] - 14:24, 15:9, 15:16, 48:6, 54:4
**builder's** [1] - 14:24
**builders** [1] - 10:23
**building** [13] - 6:3, 80:8, 81:6, 84:13, 94:15, 124:3, 124:5, 127:9, 127:11, 127:22, 131:20, 149:14
**building"** [2] - 127:8, 129:17
**buildings** [4] - 93:23, 109:13, 111:25, 127:7
**buildings"** [1] - 127:7
**built** [5] - 14:14, 60:14, 91:9, 91:14
**bulk** [1] - 3:23
**bunch** [2] - 54:10, 68:15
**burden** [13] - 69:23, 96:9, 121:21, 124:13, 127:13, 127:18, 128:1, 129:22, 130:25, 131:12, 144:9, 144:13
**business** [7] - 22:7, 29:14, 31:12, 35:11, 42:24, 85:5, 88:7

**but..** [1] - 64:2
**button** [1] - 54:10
**buy** [5] - 8:2, 36:9, 53:22, 62:25
**buyer** [1] - 8:5
**buyer's** [2] - 6:2, 6:15
**by"** [2] - 110:1, 110:9

# C

**CAD** [1] - 46:12
**calculate** [2] - 12:24, 36:5
**calculated** [3] - 8:23, 38:7, 53:24
**calculation** [5] - 38:12, 42:1, 44:23, 45:11, 53:3
**calculations** [2] - 25:19, 39:9
**calculator** [5] - 40:5, 40:6, 40:10, 41:6, 52:7
**calculator]** [1] - 40:9
**called..** [2] - 78:24, 78:25
**Cameron** [20] - 45:21, 45:25, 46:5, 46:24, 47:8, 47:13, 47:23, 48:3, 49:9, 61:8, 90:15, 91:4, 120:17, 128:13, 129:20, 131:21, 138:21, 138:24, 139:1, 139:5
**CAMERON** [2] - 1:6, 1:7
**Cameron's** [1] - 139:4
**cannot** [3] - 104:15, 119:16, 133:19
**captured** [1] - 132:11
**car** [2] - 107:17
**carry** [2] - 44:10, 144:9
**carrying** [1] - 19:23
**carved** [1] - 91:10
**carving** [1] - 91:15
**case** [98] - 11:15, 14:22, 17:15, 35:4, 36:4, 36:6, 45:15, 53:2, 56:4, 58:14, 59:11, 59:25, 63:21, 67:15, 67:20, 67:21, 69:3, 69:13, 69:16, 70:13, 71:10, 71:13, 71:17, 73:25, 74:2, 75:2, 75:7, 75:10, 79:8, 82:3, 82:5, 82:23, 83:6, 86:16, 87:23, 87:25, 88:2, 92:4, 97:5, 99:25,

101:6, 102:16, 102:17, 102:18, 103:6, 103:12, 104:25, 105:8, 105:9, 105:24, 107:2, 107:3, 107:8, 108:8, 108:15, 109:7, 111:10, 112:11, 114:4, 114:5, 114:6, 114:19, 117:14, 118:24, 119:14, 120:13, 121:23, 122:4, 123:2, 123:9, 124:18, 128:12, 128:25, 130:4, 130:11, 130:13, 130:22, 131:9, 131:15, 134:2, 134:12, 135:21, 136:3, 136:11, 137:1, 137:12, 138:10, 139:6, 143:5, 144:24, 152:15, 162:23, 163:4
**case"** [2] - 84:1, 84:4
**case-by-case** [1] - 14:22
**case-specific** [1] - 87:25
**case..** [1] - 83:24
**cases** [14] - 97:21, 103:16, 103:18, 103:24, 104:3, 113:6, 115:6, 123:4, 123:12, 124:11, 125:1, 132:11, 137:8, 137:10
**cash** [2] - 124:10, 129:16
**casual** [1] - 128:6
**catalog** [1] - 59:10
**categories** [2] - 30:23, 130:19
**category** [1] - 35:15
**causal** [5] - 126:25, 127:1, 128:6, 128:19, 129:5
**center** [1] - 68:7
**certain** [6] - 37:3, 58:11, 71:1, 77:11, 121:12, 153:6
**certainly** [3] - 83:16, 88:5, 153:23
**CERTIFICATE** [1] - 163:20
**certify** [1] - 163:21
**chair** [1] - 69:19
**chance** [1] - 50:1

**change** [2] - 4:22, 147:7
**changes** [2] - 27:21, 50:13
**Charge** [2] - 2:12, 78:7
**charge** [9] - 64:6, 64:16, 73:18, 97:7, 98:23, 100:23, 124:21, 125:13, 156:25
**charges** [1] - 88:6
**chart** [1] - 30:25
**chase** [2] - 107:17
**check** [3] - 32:1, 32:2
**checked** [1] - 33:13
**checks** [1] - 29:5
**chief** [1] - 75:20
**choice** [2] - 60:11, 60:15
**choices** [4] - 62:5, 66:11, 101:4
**chop** [5] - 105:17, 106:4, 117:12, 117:17, 118:3
**chopped** [1] - 148:23
**circle** [1] - 79:10
**circles** [1] - 98:15
**circuit** [7] - 75:21, 87:9, 101:16, 112:15, 125:13, 125:15, 137:12
**Circuit** [29] - 86:16, 97:5, 97:7, 97:13, 101:17, 101:19, 101:24, 102:10, 102:18, 103:3, 103:4, 103:17, 104:5, 104:15, 105:10, 108:8, 109:8, 114:2, 114:5, 125:22, 126:8, 126:9, 130:9, 130:11, 130:13, 131:15, 132:2, 137:4
**cite** [1] - 114:4
**cited** [1] - 124:11
**cites** [1] - 138:10
**city** [1] - 61:10
**City** [1] - 10:1
**claim** [6] - 80:24, 119:13, 119:18, 121:4, 144:19, 149:18
**claimed** [1] - 120:22
**claiming** [4] - 90:25, 91:3, 100:16, 126:1
**claims** [1] - 46:24
**clarified** [1] - 59:2
**cleaning** [1] - 78:4
**clear** [16] - 4:25, 9:4,

32:19, 34:5, 82:17, 92:25, 97:9, 97:19, 105:13, 105:14, 113:18, 133:11, 134:3, 135:21, 137:5, 137:13
**clearer** [1] - 43:3
**clearly** [3] - 90:14, 90:15, 90:16
**clerk** [1] - 57:25
**CLERK** [2] - 161:18, 161:22
**click** [1] - 54:19
**clicking** [1] - 55:7
**client** [5] - 4:1, 8:4, 9:12, 96:7, 107:7
**clients'** [1] - 96:4
**clock** [6] - 63:19, 64:2, 64:9, 73:25
**close** [8] - 6:23, 7:3, 12:22, 27:3, 64:14, 85:3, 113:19, 122:16
**closed** [4] - 13:7, 13:22, 27:17, 52:4
**closer** [1] - 19:25
**Closes** [1] - 2:11
**closes** [1] - 43:19
**closest** [1] - 68:3
**closing** [9] - 4:8, 25:20, 38:13, 41:1, 42:25, 43:1, 43:12, 64:3, 72:16
**closings** [15] - 4:3, 4:6, 26:12, 26:21, 28:4, 28:11, 38:9, 38:23, 39:24, 40:25, 41:17, 42:5, 42:21, 43:23, 44:14
**clutter** [2] - 84:20, 84:23
**CMI** [1] - 134:4
**CMR** [2] - 1:22, 163:25
**co** [4] - 9:3, 9:7, 9:8, 9:9
**co-op** [4] - 9:3, 9:7, 9:8, 9:9
**cobbled** [1] - 101:15
**code** [3] - 33:23, 35:15, 103:16
**coded** [1] - 13:20
**codes** [4] - 30:20, 30:21, 30:23, 109:13
**cold** [1] - 82:2
**collapse** [1] - 123:22
**collection** [1] - 59:24
**collections** [2] - 56:24, 66:11
**Colonial** [1] - 111:25
**column** [3] - 13:9, 52:3, 53:2

**coming** [5] - 6:11, 63:13, 152:21, 158:2, 162:21

**comma** [2] - 92:12, 92:13

**comment** [1] - 94:13

**comments** [1] - 87:1

**commission** [10] - 8:22, 9:2, 28:21, 28:23, 28:24, 29:9, 29:10, 37:22, 42:25, 43:10

**commissions** [9] - 7:10, 12:22, 13:3, 41:16, 43:25, 44:5, 44:25, 59:5, 128:17

**committed** [3] - 136:19, 138:8, 158:20

**committee** [2] - 101:20, 132:2

**common** [9] - 108:22, 108:23, 108:24, 151:1, 151:2, 151:3, 153:17, 153:18, 153:19

**communities** [1] - 7:7

**community** [2] - 12:22, 43:14

**companies** [2] - 7:20, 7:21

**company** [7] - 6:12, 7:5, 15:24, 26:14, 29:21, 29:22

**company's** [1] - 30:17

**compare** [2] - 105:1, 115:25

**compared** [3] - 117:2, 151:4, 153:20

**comparison** [3] - 115:21, 115:23, 152:19

**competent** [1] - 124:16

**complaining** [3] - 4:16, 4:17, 4:18

**completely** [4] - 47:21, 59:10, 64:9, 153:25

**complex** [2] - 69:14, 124:1

**complicated** [1] - 98:6

**complimenting** [1] - 123:6

**components** [1] - 149:14

**components..** [1] - 94:16

**computer** [7] - 1:25, 22:19, 22:20, 23:15,

23:19, 103:16, 136:24

**computer-aided** [1] - 1:25

**concept** [7] - 28:15, 86:13, 97:2, 97:21, 115:15, 150:23, 152:11

**concern** [2] - 111:4, 112:11

**concerned** [4] - 13:18, 35:10, 145:14, 154:10

**concluded** [1] - 150:5

**condensed** [1] - 17:18

**conditional** [1] - 58:5

**conditions** [1] - 133:21

**confer** [4] - 57:25, 83:11, 113:5, 114:11

**Conference** [1] - 2:12

**conference** [1] - 8:6

**confers** [1] - 64:11

**confined** [1] - 66:21

**confirm** [1] - 102:1

**confirms** [1] - 163:2

**conflate** [1] - 125:5

**conflicted** [1] - 105:10

**confuse** [1] - 113:14

**confusing** [1] - 99:4

**confusion** [1] - 88:12

**conglomeration** [1] - 157:7

**connected** [1] - 22:20

**connecting** [1] - 23:20

**consider** [10] - 57:13, 92:8, 96:23, 98:23, 105:21, 106:5, 106:6, 114:17, 136:8, 158:19

**considered** [4] - 29:10, 125:7, 125:8, 152:12

**consistent** [3] - 8:20, 13:24, 14:1

**constituent** [1] - 149:7

**constitute** [1] - 135:23

**constitutes** [1] - 143:4

**constrict** [1] - 110:14

**constructed** [1] - 124:3

**constructing** [4] - 80:7, 81:6, 84:13, 84:18

**consultant** [1] - 29:3

**consulting** [1] - 6:5

**contain** [1] - 119:9

**containing** [1] - 127:22

**contending** [1] -

105:13

**contest** [1] - 60:25

**contested** [2] - 82:12, 88:8

**context** [1] - 94:14

**CONTINUED** [1] - 5:16

**Continued** [1] - 2:6

**continues** [3] - 43:7, 43:8, 43:14

**contract** [2] - 9:6, 134:8

**contractors** [1] - 54:3

**contracts** [1] - 8:14

**contributed** [1] - 130:19

**contribution** [2] - 11:5, 11:13

**contributorily** [1] - 139:1

**contributory** [4] - 138:2, 139:10, 144:10, 159:2

**conversation** [1] - 48:11

**cookies** [2] - 65:4, 70:17

**COOPER** [1] - 78:5

**coordinators** [3] - 28:17, 28:20, 28:25

**coped** [1] - 60:22

**copied** [8] - 47:5, 47:8, 60:20, 81:6, 82:6, 87:6, 91:13, 147:18

**copies** [7] - 69:20, 76:23, 77:10, 119:15, 134:4, 138:22, 161:11

**copy** [20] - 17:17, 17:18, 30:13, 34:21, 67:17, 69:19, 71:25, 86:13, 86:14, 99:24, 100:2, 119:11, 129:19, 133:22, 133:23, 134:4, 134:6, 149:19, 151:5

**copying** [17] - 80:24, 81:2, 82:5, 83:6, 84:3, 84:4, 86:13, 87:5, 91:24, 115:20, 115:24, 116:23, 128:2, 149:6, 151:8, 153:21

**Copying** [2] - 86:24, 155:14

**copyright** [65] - 14:10, 15:13, 18:18, 25:8, 46:24, 62:5, 66:12, 81:18, 82:13, 86:2, 87:4, 93:23, 94:6,

96:15, 97:8, 97:15, 97:21, 98:2, 99:12, 99:24, 100:11, 101:7, 103:7, 103:12, 108:20, 109:1, 110:23, 111:13, 113:4, 113:9, 113:10, 113:20, 113:22, 113:24, 114:20, 117:14, 119:10, 119:11, 119:15, 120:23, 121:10, 123:12, 123:18, 124:4, 125:24, 126:3, 126:13, 132:16, 133:20, 133:21, 135:14, 143:20, 144:18, 147:17, 149:19, 150:16, 151:14, 151:19, 151:24, 152:3, 152:4, 152:7, 153:6, 153:8

**copyrightable** [2] - 114:1, 116:1

**copyrighted** [8] - 116:2, 119:9, 127:23, 127:24, 128:2, 141:7, 141:9, 141:19

**copyrights** [11] - 80:9, 81:1, 81:17, 81:22, 82:14, 83:23, 109:24, 113:14, 121:4, 150:18, 151:23

**core** [1] - 125:7

**corner** [1] - 68:8

**correct** [135] - 6:6, 11:7, 12:13, 13:11, 13:14, 14:8, 15:3, 18:10, 18:21, 20:15, 20:16, 21:9, 21:21, 22:22, 23:5, 23:8, 23:18, 24:3, 26:10, 27:3, 27:13, 27:16, 28:2, 28:13, 28:19, 30:3, 31:9, 34:9, 34:12, 34:25, 36:3, 37:25, 38:3, 38:6, 38:11, 38:23, 38:24, 39:3, 39:6, 41:7, 41:8, 41:22, 42:23, 44:2, 45:19, 46:16, 46:19, 46:20, 46:21, 47:17, 47:24, 48:19, 50:3, 52:22, 53:6, 53:10, 54:8, 54:11, 54:13, 54:21, 55:8,

55:10, 56:5, 56:6, 57:16, 57:17, 58:6, 58:7, 66:16, 76:3, 76:14, 76:18, 81:8, 81:12, 81:15, 85:25, 86:17, 86:18, 86:23, 90:4, 90:25, 91:2, 93:6, 93:25, 95:18, 96:18, 96:19, 97:6, 99:2, 101:10, 104:14, 106:9, 106:10, 106:11, 110:10, 112:23, 118:18, 120:5, 120:18, 122:9, 124:6, 124:7, 124:24, 128:23, 129:1, 129:24, 130:2, 132:10, 133:4, 137:22, 141:14, 141:24, 144:12, 148:5, 148:15, 148:16, 148:17, 149:3, 149:4, 154:1, 154:2, 154:11, 154:12, 154:25, 158:4, 158:7, 159:16, 159:17, 159:21, 160:4, 160:17, 160:20, 161:9, 163:22

**corrected** [1] - 75:1

**correction** [4] - 48:3, 48:8, 50:6, 50:11

**corrections** [1] - 50:1

**correlate** [3] - 34:17, 36:25, 37:4

**correlated** [2] - 36:18, 37:12

**cost** [12] - 13:2, 13:8, 13:9, 25:20, 28:16, 35:3, 35:11, 40:18, 52:3, 53:9, 53:10

**costs** [17] - 37:23, 38:18, 127:16, 129:25, 130:1, 130:16, 130:24, 132:5, 132:6, 139:21, 139:22

**counsel** [3] - 42:15, 63:10, 103:8

**count** [2] - 64:3, 136:23

**counts** [1] - 134:6

**couple** [10] - 33:22, 39:9, 54:6, 56:20, 58:14, 75:21, 96:3, 99:22, 108:1, 115:6

**course** [5] - 88:15,

97:8, 112:15,
129:24, 155:4
**Court** [20] - 1:22, 31:6,
39:10, 59:2, 74:6,
74:11, 76:9, 80:23,
97:13, 99:23,
100:24, 103:5,
103:9, 104:24,
109:24, 113:17,
123:6, 145:11,
161:10
**court** [35] - 4:4, 4:10,
4:11, 4:14, 4:19,
4:20, 4:22, 5:5, 12:1,
57:25, 58:12, 60:13,
63:3, 63:9, 64:11,
68:8, 68:21, 71:3,
75:15, 98:19, 98:24,
107:2, 113:13,
119:14, 125:1,
125:2, 135:17,
135:18, 136:5,
136:17, 145:18,
161:16, 161:23,
162:17, 163:13
**court's** [1] - 64:2
**Court's** [4] - 3:25,
58:15, 76:20, 82:9
**courtesy** [1] - 76:23
**courthouse** [1] - 68:4
**courtroom** [4] - 41:21,
45:12, 68:22, 75:19
**courts** [5] - 101:16,
101:17, 114:17,
125:3, 135:24
**covered** [5] - 22:18,
37:21, 86:3, 105:24,
143:19
**covers** [1] - 86:2
**CPA** [2] - 13:19, 27:4
**crafted** [1] - 143:4
**create** [2] - 120:18,
138:25
**created** [7] - 16:25,
26:11, 44:18, 90:18,
91:1, 139:3, 147:18
**creating** [2] - 44:4,
129:18
**creation** [1] - 134:5
**creative** [4] - 6:11,
101:1, 101:4
**creativity** [3] - 62:4,
66:11, 147:20
**credit** [3] - 11:21,
48:12, 48:13
**Cross** [1] - 2:7
**cross** [1] - 135:20
**CROSS** [1] - 16:6
**Cross-Examination**
[1] - 2:7

**CROSS-
EXAMINATION** [1] -
16:6
**cross-examined** [1] -
135:20
**cured** [1] - 154:10
**customer** [4] - 7:6,
7:23, 8:6, 43:17
**customers** [3] - 16:13,
17:8, 43:18
**cut** [3] - 63:19, 74:3,
118:2
**cutting** [2] - 110:20,
147:2

# D

**d/b/a** [1] - 1:7
**daily** [1] - 36:10
**damages** [3] - 126:16,
126:18, 157:7
**dance** [1] - 123:17
**data** [1] - 54:16
**date** [10] - 12:23,
27:10, 47:11, 49:14,
49:22, 50:4, 75:16,
130:7, 130:8, 145:2
**dates** [2] - 4:8, 71:3
**DAVID** [1] - 1:11
**day-to-day** [1] - 7:18
**days** [6] - 6:16, 7:3,
7:8, 53:20, 71:18
**de** [1] - 113:5
**deal** [3] - 9:7, 10:20,
43:17
**deals** [1] - 133:16
**dealt** [1] - 134:10
**December** [9] - 30:9,
30:18, 31:18, 34:9,
35:21, 38:10, 43:23,
44:1, 44:5
**decide** [3] - 48:15,
70:25, 83:16
**decided** [8] - 48:5,
49:1, 49:19, 92:23,
105:9, 114:21,
144:9, 162:23
**deciding** [1] - 102:13
**decision** [4] - 50:5,
103:9, 104:14,
104:24
**decisions** [4] - 101:1,
101:4, 104:19
**deduct** [2] - 35:2,
41:16
**deducted** [1] - 124:14
**deductible** [4] - 12:25,
123:15, 123:16,
139:21
**deducting** [3] - 127:4,

129:8, 131:24
**deduction** [2] - 36:5,
53:17
**defendant** [26] -
66:13, 76:6, 76:8,
76:12, 76:17, 118:1,
118:11, 119:16,
123:15, 127:17,
127:25, 129:22,
130:25, 136:20,
138:6, 138:7,
140:22, 142:18,
146:12, 148:18,
148:25, 153:25,
154:3, 156:4, 158:20
**Defendant** [2] - 85:23,
157:7
**Defendant's** [14] -
3:16, 12:3, 12:8,
28:7, 28:11, 29:25,
30:16, 37:8, 51:21,
52:1, 80:11, 127:10,
127:11, 159:23
**defendant's** [5] -
12:14, 51:12, 58:13,
158:17, 159:8
**Defendants** [6] - 1:8,
1:20, 2:10, 81:19,
81:23, 85:21
**defendants** [13] -
56:13, 56:15, 58:11,
83:7, 119:8, 119:12,
124:13, 124:15,
126:14, 139:3,
149:22, 150:9,
158:10
**Defendants'** [24] -
123:22, 126:24,
127:1, 127:3, 127:5,
127:13, 127:17,
127:18, 128:7,
129:7, 129:8,
129:13, 131:24,
132:4, 132:21,
139:18, 142:24,
146:11, 153:4,
155:12, 157:15,
157:17, 160:9
**defendants'** [9] -
127:4, 129:14,
130:2, 131:25,
132:7, 141:5,
142:22, 160:15,
160:23
**defending** [1] - 35:3
**defense** [24] - 59:6,
69:24, 70:8, 70:12,
72:16, 73:21, 80:20,
81:20, 96:14, 111:7,
111:21, 115:12,

117:24, 118:14,
119:13, 119:16,
119:18, 120:1,
120:4, 120:20,
121:16, 122:6,
158:21, 160:1
**defenses** [1] - 96:4
**defines** [1] - 132:5
**definitely** [2] - 8:20,
44:15
**definition** [4] - 147:5,
147:9, 147:10,
159:12
**definitions** [1] - 132:3
**degree** [1] - 147:19
**deliberate** [2] - 71:4,
162:19
**deliver** [1] - 4:1
**demand** [2] - 108:10,
109:11
**denied** [29] - 96:16,
108:20, 108:21,
109:18, 109:21,
109:22, 110:23,
117:24, 117:25,
148:7, 149:23,
150:9, 150:11,
152:4, 152:7,
152:21, 153:22,
155:11, 156:3,
156:4, 157:17,
158:3, 158:22,
158:23, 159:5,
159:24, 160:10,
160:14
**denied"** [5] - 111:5,
112:9, 150:13,
150:14, 152:10
**denied..** [1] - 151:14
**denies** [1] - 153:6
**deny** [2] - 151:10,
157:12
**denying** [1] - 134:11
**depictions** [1] - 14:14
**deposition** [18] -
17:15, 17:18, 17:25,
18:3, 22:9, 27:5,
27:8, 27:13, 27:15,
27:23, 46:1, 48:21,
49:18, 49:21, 49:24,
50:6, 50:11, 64:7
**depth** [1] - 10:9
**derivative** [1] - 134:6
**derived** [2] - 7:10,
59:4
**described** [1] - 14:6
**descriptions** [1] -
36:18
**deserve** [1] - 67:5
**design** [22] - 45:25,

46:6, 46:14, 46:25,
50:22, 56:21, 58:15,
58:20, 59:3, 60:24,
61:23, 62:2, 62:4,
66:9, 80:8, 81:7,
84:14, 91:19, 93:23,
94:17, 109:12,
113:25
**designation** [1] - 78:8
**designed** [1] - 46:12
**designer** [2] - 10:15,
61:5
**designer/architect** [1]
- 14:25
**designs** [5] - 56:25,
59:25, 62:6, 66:12,
88:8
**desk** [2] - 77:11, 162:4
**detail** [1] - 104:6
**detailed** [7] - 33:5,
36:17, 37:6, 44:20,
53:25, 83:16, 115:20
**details** [1] - 6:9
**detective** [2] - 107:14,
107:16
**determine** [4] - 97:17,
115:22, 126:16,
158:18
**determined** [3] -
127:3, 129:8, 131:24
**determining** [2] -
115:24, 155:20
**developer** [3] - 14:21,
29:2, 60:12
**developer/builder** [1]
- 6:3
**developers** [1] - 10:23
**developers/sellers** [1]
- 8:14
**development** [4] -
19:3, 43:8, 43:15,
60:18
**diagram** [1] - 72:6
**dial** [1] - 37:11
**dictate** [1] - 68:11
**dictated** [10] - 61:9,
66:5, 108:10,
109:10, 110:1,
110:5, 110:7, 110:9,
110:17, 110:18
**difference** [15] -
23:11, 28:23, 29:9,
99:11, 105:15,
114:14, 114:15,
125:6, 134:18,
134:25, 140:21,
141:4, 142:17,
143:12, 143:13
**different** [21] - 11:19,
12:12, 31:12, 34:11,

37:5, 47:22, 59:14,
60:9, 60:16, 60:17,
61:16, 62:4, 63:4,
66:11, 91:16, 95:22,
95:23, 104:17,
120:19, 132:11,
136:25
**differentiate** [1] - 6:22
**differently** [1] - 138:23
**difficult** [2] - 33:1,
101:8
**dining** [3] - 10:6,
10:10, 100:8
**dinner** [1] - 54:5
**dire** [1] - 141:13
**direct** [13] - 15:6,
28:16, 29:11,
115:23, 119:3,
125:5, 125:7, 128:9,
128:12, 128:14,
128:18, 129:5, 138:9
**Direct** [1] - 2:6
**DIRECT** [1] - 5:16
**directed** [3] - 137:18,
144:2, 158:25
**directing** [1] - 138:21
**directly** [14] - 28:21,
29:15, 34:19, 36:12,
36:19, 36:25, 37:4,
37:12, 47:16, 60:22,
69:4, 92:13, 102:16,
116:5
**directs** [1] - 29:18
**disagree** [11] - 61:6,
84:21, 84:22,
100:12, 100:13,
102:15, 103:10,
113:16, 132:9,
151:9, 152:6
**disagreement** [2] -
132:17, 142:13
**disagreements** [1] -
148:20
**discovery** [3] -
108:25, 151:4,
153:20
**discuss** [3] - 68:9,
88:21, 103:12
**discussed** [2] - 25:13,
130:12
**discussing** [2] - 3:5,
147:16
**discussion** [2] -
71:11, 106:16
**dispute** [1] - 137:19
**distinction** [3] - 29:18,
128:9, 130:5
**distracted** [1] - 136:7
**distribute** [2] - 16:12,
135:13

**distributing** [1] -
136:24
**distributions** [1] -
16:9
**District** [1] - 115:6
**DISTRICT** [2] - 1:1,
1:1
**divide** [7] - 36:16,
41:1, 41:17, 52:9,
52:15, 52:18, 52:22
**divided** [8] - 38:22,
39:4, 39:24, 41:24,
42:21, 52:4, 53:4,
53:8
**dividing** [1] - 38:9
**DIVISION** [1] - 1:2
**division** [2] - 39:1,
40:1
**DMCA** [5] - 133:16,
133:19, 135:23,
137:8, 142:18
**doctrine** [20] - 96:6,
96:13, 96:14, 96:15,
96:22, 96:23, 107:1,
108:9, 108:19,
110:22, 114:3,
114:19, 131:5,
150:24, 151:6,
151:13, 152:18,
153:5, 153:16,
153:24
**document** [3] - 17:5,
54:15, 55:12
**documentation** [3] -
19:5, 26:7, 56:3
**documents** [2] - 19:7,
42:4
**dollars'** [1] - 36:20
**done** [17] - 42:20,
45:25, 56:25, 73:23,
75:24, 94:22, 97:20,
98:12, 108:7,
112:23, 115:5,
119:1, 124:9,
132:24, 152:16,
157:3, 162:17
**door** [4] - 3:8, 69:2,
106:4, 113:14
**doors** [2] - 68:23,
149:14
**double** [8] - 59:16,
67:24, 74:19, 74:20,
74:23, 75:1, 162:5,
162:11
**double-spaced** [6] -
67:24, 74:19, 74:20,
74:23, 75:1, 162:11
**double-spacing** [1] -
162:5
**doubt** [3] - 102:10,

131:12, 131:13
**down** [50] - 8:3, 8:5,
8:7, 10:6, 13:1,
40:23, 46:22, 48:5,
53:10, 56:11, 62:21,
64:16, 66:4, 68:8,
72:3, 72:9, 73:1,
73:8, 73:11, 74:4,
74:8, 75:14, 75:18,
77:4, 77:5, 78:1,
78:3, 82:16, 89:3,
90:3, 93:18, 95:1,
98:16, 104:6,
108:15, 109:18,
114:4, 117:7, 117:8,
118:25, 123:22,
125:15, 125:16,
132:3, 137:2,
140:13, 145:21,
149:17, 149:18,
152:21
**down..** [1] - 109:5
**downhill** [2] - 118:7,
118:10
**downstairs** [1] - 59:17
**downstream** [1] -
136:24
**downtown** [2] -
107:14, 162:18
**downtown-type** [1] -
107:14
**draft** [1] - 137:14
**drafting** [1] - 69:5
**draw** [3] - 45:21,
47:14, 51:11
**drawing** [5] - 18:9,
18:12, 18:15, 18:19,
18:20
**drawings** [1] - 20:13
**drawn** [6] - 47:20,
47:25, 48:22, 48:23,
115:4
**drive** [1] - 91:20
**driving** [1] - 8:9
**drop** [1] - 92:14
**due** [2] - 9:19, 141:3
**dueling** [2] - 86:4,
115:2
**duplicate** [1] - 144:4
**during** [1] - 24:5
**Dynamics** [1] - 108:17

**E**

**e-mail** [25] - 16:16,
17:7, 17:10, 17:13,
18:25, 19:11, 19:18,
20:11, 45:14, 45:18,
47:3, 47:5, 47:8,
47:11, 47:23, 48:9,

48:12, 48:16, 49:1,
49:7, 49:19, 50:20,
54:7, 54:9
**E-Mail** [1] - 17:6
**e-mails** [7] - 16:13,
16:15, 18:7, 18:22,
19:12, 54:12, 74:9
**EaDo** [16] - 12:17,
12:18, 14:7, 17:10,
18:8, 18:12, 18:20,
20:10, 24:10, 24:12,
25:4, 34:16, 36:13,
36:22, 90:19, 122:1
**Eales** [1] - 131:15
**early** [5] - 21:9, 65:4,
65:11, 70:14, 145:18
**earn** [4] - 5:25, 9:14,
43:25, 157:3
**earned** [1] - 5:22
**earning** [2] - 7:10,
44:4
**easel** [1] - 14:6
**easier** [2] - 83:5,
162:12
**easiest** [1] - 74:13
**eat** [5] - 65:3, 65:11,
65:14, 70:18, 162:14
**effect** [4] - 88:22,
148:3, 159:15,
159:24
**effectuated** [1] - 129:6
**effort** [3] - 11:18,
25:24, 25:25
**efforts** [2] - 42:24,
44:3
**eight** [6] - 7:16, 61:14,
73:12, 161:14,
161:19, 161:24
**either** [7] - 18:19,
38:25, 62:25, 79:11,
92:13, 97:19, 153:5
**elapse** [1] - 72:22
**element** [2] - 81:3,
82:11
**Elements** [1] - 141:18
**elements** [19] - 80:24,
81:4, 82:10, 82:17,
83:18, 97:3, 97:16,
102:7, 102:13,
104:12, 109:12,
113:20, 115:18,
116:16, 125:16,
149:7, 149:12,
152:1, 152:17
**eleven** [2] - 162:1,
162:4
**Ellen** [1] - 161:13
**Ellen's** [2] - 77:10,
162:3
**Ellison** [2] - 128:11,

137:11
**Empire** [1] - 105:9
**employees** [3] - 6:24,
31:11, 54:2
**encompass** [1] - 94:7
**encourages** [1] -
133:25
**encouraging** [1] -
138:9
**end** [9] - 3:5, 6:14,
27:3, 27:7, 64:4,
103:13, 119:23,
122:16
**ended** [5] - 45:21,
47:13, 47:25, 55:6,
107:12
**ending** [1] - 155:17
**ends** [2] - 27:6, 115:11
**engineering** [1] -
108:17
**entering** [1] - 66:25
**entertainment** [1] -
36:1
**Entertainment"** [1] -
35:15
**entire** [6] - 6:13, 6:25,
7:4, 9:1, 76:9,
126:21
**entirety** [1] - 105:23
**entitled** [8] - 35:2,
112:2, 120:2,
120:11, 120:24,
126:13, 146:11,
163:23
**entries** [3] - 34:11,
35:20, 36:12
**entry** [5] - 23:25, 24:8,
34:23, 39:18, 154:3
**equals** [1] - 136:4
**error** [4] - 51:21, 53:1,
53:12, 101:6
**especially** [2] - 74:7,
105:16
**essentially** [6] - 54:1,
54:9, 85:25, 86:4,
115:7, 122:23
**establish** [8] - 80:9,
81:13, 81:17, 81:21,
83:23, 84:9, 92:10,
124:15
**established** [1] - 81:4
**estate** [1] - 7:21
**estimate** [1] - 17:12
**estimates** [1] - 71:16
**evening** [1] - 145:7
**event** [1] - 68:2
**eventually** [1] - 83:9
**evidence** [47] - 42:1,
58:16, 59:21, 59:22,
67:12, 78:15, 91:3,

91:9, 91:14, 98:23, 107:18, 110:17, 120:16, 120:25, 121:9, 121:16, 121:18, 121:19, 121:20, 121:22, 124:4, 124:16, 127:14, 127:19, 129:23, 129:25, 130:22, 133:13, 134:2, 135:16, 135:19, 136:6, 138:13, 138:15, 138:19, 139:8, 140:6, 140:18, 144:8, 144:14, 144:16, 144:17, 144:21, 151:5, 151:8, 152:12, 153:21
**evidentiary** [2] - 65:18, 144:15
**exact** [3] - 27:9, 49:14, 49:22
**exactly** [10] - 22:4, 26:5, 50:5, 57:14, 62:3, 66:10, 75:12, 100:9, 141:20, 142:7
**EXAMINATION** [4] - 5:16, 16:6, 51:9, 55:21
**Examination** [3] - 2:6, 2:7, 2:8
**examined** [1] - 135:20
**example** [20] - 9:11, 23:19, 31:6, 33:20, 43:23, 59:11, 99:19, 100:7, 100:15, 107:6, 110:2, 111:24, 123:24, 124:1, 124:2, 124:10, 128:13, 129:20, 130:16, 137:9
**examples** [2] - 20:13, 123:25
**Excel** [1] - 39:5
**except** [3] - 140:17, 155:13, 155:14
**excluded** [1] - 58:9
**excludes** [2] - 108:9, 109:9
**exclusive** [1] - 87:5
**excuse** [1] - 131:12
**excused** [2] - 77:19, 77:20
**Exhibit** [46] - 3:13, 4:5, 4:11, 5:4, 12:8, 12:14, 16:18, 16:19, 16:21, 18:11, 20:18, 20:19, 21:23, 21:25, 24:1, 25:15, 26:1, 26:2, 28:7, 28:11, 28:24, 29:25, 30:2, 30:8, 30:16, 31:2, 32:20, 33:14, 33:16, 35:20, 37:16, 38:8, 38:15, 38:19, 40:16, 41:10, 42:20, 45:16, 46:6, 46:25, 51:12, 51:21, 52:1, 55:23, 55:25, 57:3
**exhibit** [14] - 3:24, 5:3, 12:3, 13:5, 20:6, 20:7, 20:22, 25:17, 26:3, 35:14, 41:7, 44:23, 45:11, 54:15
**exhibits** [13] - 3:4, 20:3, 32:12, 56:18, 56:22, 56:24, 57:11, 58:2, 59:9, 60:13, 62:12, 65:24, 66:19
**exists** [2] - 115:18, 116:16
**expand** [1] - 28:8
**expense** [7] - 29:18, 30:20, 31:3, 31:22, 33:16, 41:16, 125:7
**expenses** [46] - 4:2, 9:16, 12:25, 13:3, 26:16, 26:18, 29:11, 29:13, 29:20, 30:9, 30:17, 30:24, 31:18, 33:16, 33:21, 35:5, 36:1, 36:11, 36:21, 38:8, 39:22, 41:13, 41:17, 42:5, 42:21, 44:3, 44:17, 44:21, 44:24, 123:15, 123:16, 124:13, 124:16, 125:6, 125:21, 127:4, 127:15, 127:18, 129:8, 129:10, 130:19, 131:13, 131:25, 132:5, 139:21
**expert** [3] - 79:6, 79:8, 157:2
**experts** [1] - 120:15
**explain** [5] - 13:17, 80:23, 109:3, 120:10, 124:9
**explained** [3] - 22:9, 28:16, 136:21
**explaining** [2] - 99:14, 100:22
**explains** [1] - 97:16
**export** [1] - 32:25
**expressed** [2] - 100:18, 113:3
**expression** [11] - 97:10, 99:12, 99:25, 100:10, 100:19, 101:8, 108:24, 113:5, 113:11, 113:23
**Expression** [1] - 99:19
**expressions** [7] - 96:16, 98:1, 108:9, 108:21, 109:10, 150:25, 153:16
**expressions..** [2] - 110:23, 151:20
**exquisite** [1] - 104:6
**extend** [1] - 162:6
**extent** [2] - 91:24, 148:25
**external** [3] - 108:10, 109:10, 109:12
**extra** [2] - 132:19, 137:14
**extraneous** [1] - 61:12

## F

**F.3d** [1] - 114:4
**facilitates** [1] - 133:25
**fact** [10] - 27:19, 27:24, 37:3, 47:18, 60:16, 68:21, 107:2, 119:25, 150:17, 151:22
**factfinder** [2] - 102:12, 104:11
**facto** [1] - 113:5
**factors** [13] - 108:10, 109:11, 125:25, 126:5, 127:23, 128:2, 131:6, 131:13, 141:3, 141:6, 141:8, 141:18, 141:22
**Facts** [1] - 78:15
**facts** [1] - 88:25
**fail** [1] - 124:15
**Faire** [1] - 106:12
**faire** [18] - 106:25, 107:13, 108:2, 108:8, 108:9, 108:20, 109:9, 110:22, 111:24, 114:15, 114:17, 150:23, 150:25, 151:13, 152:17, 152:18, 153:5, 153:16
**fairly** [2] - 13:24, 93:14
**fall** [1] - 152:17
**falls** [1] - 6:17
**false** [7] - 47:24, 48:8, 48:10, 48:16, 49:1, 49:9, 49:20
**Fannin** [2] - 1:16, 1:18
**far** [11] - 23:19, 35:10, 63:16, 65:16, 77:25, 123:23, 145:7, 145:14, 148:3, 154:10, 155:12
**farmed** [1] - 87:10
**fashion** [1] - 81:2
**favor** [1] - 131:14
**features** [2] - 94:15, 149:13
**February** [1] - 13:16
**federal** [3] - 75:15, 98:19, 114:9
**fees** [7] - 34:6, 34:9, 34:14, 34:20, 34:21, 35:3, 35:10
**feet** [2] - 61:15
**Feist** [6] - 103:6, 104:4, 104:25, 105:1, 105:14, 113:18
**few** [4] - 54:12, 59:14, 86:22, 113:4
**fewer** [1] - 50:19
**fifth** [1] - 18:1
**Fifth** [17] - 97:5, 97:7, 97:13, 102:10, 102:18, 103:3, 103:4, 103:17, 104:5, 104:15, 105:10, 108:8, 114:2, 114:5, 130:11, 130:13, 137:4
**figure** [1] - 124:16
**figured** [1] - 160:20
**file** [1] - 132:25
**filed** [12] - 27:24, 28:5, 47:18, 48:17, 48:19, 76:20, 121:16, 128:8, 133:17, 133:18, 136:13, 144:8
**fill** [2] - 4:21, 68:16
**filter** [2] - 102:12
**filtered** [1] - 152:18
**filtering** [1] - 102:11
**filtration** [3] - 104:10, 104:11, 152:16
**Fina** [2] - 47:5, 47:8
**final** [1] - 101:14
**finally** [1] - 54:14
**financial** [1] - 12:20
**fine** [6] - 65:12, 71:16, 72:1, 78:21, 78:22, 116:13
**finish** [1] - 74:7
**finished** [1] - 8:15
**finishes** [1] - 6:8
**Firm** [1] - 1:20
**firms** [1] - 98:13
**first** [50] - 16:20, 16:23, 21:1, 21:8, 22:25, 38:21, 49:6, 51:11, 58:21, 60:10, 69:18, 70:19, 72:3, 72:13, 72:17, 72:23, 73:24, 78:14, 80:2, 82:1, 82:11, 86:9, 86:16, 86:22, 101:15, 103:6, 108:14, 110:7, 113:17, 115:2, 116:4, 116:9, 116:11, 116:12, 116:20, 117:10, 119:7, 121:15, 123:13, 128:6, 130:18, 135:11, 149:5, 149:11, 150:9, 153:3, 155:14, 155:16, 158:16
**fits** [1] - 6:15
**five** [15] - 3:9, 12:12, 57:18, 57:19, 57:21, 66:19, 67:5, 69:25, 89:2, 115:2, 120:13, 145:16, 161:15, 161:20, 161:23
**five-minute** [2] - 57:18, 57:19
**fixed** [2] - 154:6, 155:4
**fleshed** [1] - 132:12
**fleshes** [1] - 133:18
**floor** [12] - 7:12, 10:7, 10:11, 21:2, 21:6, 21:20, 55:2, 55:9, 58:21, 58:22, 58:23, 100:8
**floors** [1] - 59:16
**Flores** [1] - 123:1
**flow** [3] - 108:22, 151:1, 153:18
**fluff** [1] - 112:1
**fly** [1] - 97:22
**focused** [3] - 6:24, 7:5, 29:23
**folks** [1] - 71:8
**follow** [3] - 32:4, 55:16, 69:20
**following** [1] - 76:7
**footage** [1] - 6:10
**footnote** [2] - 78:8, 116:13

**footnotes** [1] - 75:5
**footprint** [7] - 59:12, 59:14, 60:9, 60:11, 61:8, 61:14, 66:22
**footprints** [4] - 9:25, 21:1, 60:17
**FOR** [1] - 1:1
**foreclosed** [1] - 151:18
**foregoing** [3] - 75:12, 145:3, 163:21
**forget** [8] - 63:21, 69:10, 75:1, 77:6, 78:4, 85:16, 144:23, 163:13
**form** [14] - 3:22, 4:7, 5:2, 68:17, 69:4, 99:17, 122:24, 122:25, 140:4, 143:23, 152:25, 154:13, 154:14, 161:7
**formal** [1] - 119:10
**forms** [1] - 139:14
**formula** [2] - 39:5, 130:21
**forth** [7] - 121:1, 121:9, 123:21, 128:8, 129:10, 144:13, 144:21
**forward** [1] - 81:25
**foundation** [1] - 10:4
**four** [7] - 7:3, 25:4, 50:19, 89:1, 124:24, 158:2, 161:16
**frame** [1] - 27:9
**freestanding** [1] - 140:12
**Friday** [15] - 3:5, 3:14, 3:21, 4:16, 9:18, 13:12, 14:6, 45:18, 45:20, 47:12, 48:25, 49:4, 49:6, 49:19, 50:17
**front** [3] - 27:12, 35:14, 135:24
**Frontier** [3] - 123:2, 123:7, 141:12
**FSLA** [1] - 34:17
**full** [1] - 161:20
**full-time** [1] - 161:20
**fully** [1] - 77:19
**fundamental** [1] - 137:4
**furthermore** [1] - 108:24
**fàire** [1] - 96:7

## G

**gaps** [1] - 4:21
**garage** [3] - 10:5, 10:18, 58:21
**Gary** [1] - 9:11
**general** [7] - 13:20, 29:5, 30:11, 31:5, 45:9, 107:1, 130:24
**generally** [11] - 29:8, 64:6, 70:3, 87:24, 88:3, 88:6, 113:21, 123:25, 130:4, 130:5, 131:2
**gentlemen** [2] - 57:9, 71:20
**Georgian** [1] - 110:12
**get..** [1] - 57:24
**giant** [2] - 59:9, 59:24
**gifts** [2] - 36:7, 36:11
**given** [8] - 4:13, 41:17, 41:18, 42:21, 69:15, 71:2, 106:9, 163:10
**go-round** [2] - 73:10, 74:25
**Google** [6] - 21:25, 22:2, 22:5, 22:17, 24:9, 24:18
**government** [1] - 111:25
**grab** [4] - 40:8, 70:19, 135:4, 162:14
**grabbing** [1] - 137:2
**grant** [1] - 121:7
**granted** [19] - 117:22, 117:23, 121:21, 137:20, 137:25, 148:24, 148:25, 149:23, 150:9, 154:4, 154:18, 155:13, 158:15, 159:6, 159:14, 160:9, 160:13, 160:23, 160:24
**granting** [1] - 150:8
**granulated** [1] - 125:18
**graph** [1] - 37:10
**graphic** [1] - 105:16
**graphics** [1] - 6:20
**Graves** [1] - 105:4
**greed** [1] - 50:25
**Greene** [1] - 9:12
**greenwood** [1] - 7:15
**Grokster** [2] - 138:10, 138:11
**gross** [22] - 9:1, 12:22, 28:23, 29:9, 123:14, 124:4, 124:9, 124:12, 124:14,
124:16, 127:4, 127:5, 127:10, 127:13, 127:17, 129:9, 129:13, 129:22, 130:2, 131:25, 132:7
**ground** [1] - 87:10
**guess** [4] - 15:12, 78:6, 87:10, 155:22
**guidance** [1] - 163:10
**guys** [2] - 98:10, 151:15

## H

**H-16-CV-1427** [1] - 1:4
**H.E.B** [1] - 35:23
**half** [3] - 10:17, 26:13, 145:15
**Hallmark** [1] - 123:1
**hallmark** [1] - 123:5
**hallway** [1] - 76:24
**hand** [2] - 23:3, 100:23
**handles** [1] - 50:8
**hands** [1] - 40:10
**hang** [9] - 51:18, 64:5, 68:24, 109:5, 122:11, 135:5, 142:8, 148:14, 155:24
**hard** [1] - 33:25, 103:9
**harmed** [1] - 106:24
**have..** [1] - 88:14
**he"** [1] - 78:24
**head** [2] - 19:19, 68:7
**heading** [1] - 144:24
**Headnote** [1] - 149:3
**hear** [6] - 69:22, 69:24, 70:6, 70:8, 70:10, 70:12
**heard** [7] - 67:3, 67:7, 88:2, 88:9, 92:2
**hell** [1] - 98:6
**help** [5] - 8:2, 8:4, 12:24, 82:1, 91:18
**helpful** [4] - 30:14, 82:4, 82:10, 89:5
**helping** [1] - 8:8
**helps** [2] - 119:6, 154:9
**hesitate** [1] - 112:6
**hewing** [1] - 113:19
**Hewlett** [5] - 123:2, 124:18, 130:13, 131:9, 141:11
**Higginson** [2] - 105:4, 105:5
**high** [1] - 14:3
**higher** [1] - 53:10

**highlighted** [4] - 93:12, 102:19, 103:19
**himself** [1] - 46:12
**history** [1] - 122:4
**HITTNER** [1] - 1:11
**hold** [15] - 11:22, 35:6, 42:8, 49:15, 70:20, 90:11, 92:18, 92:19, 92:20, 95:4, 101:11, 101:12, 111:18, 122:12, 133:5
**holder's** [1] - 87:5
**holidays** [1] - 7:4
**home** [12] - 6:3, 6:4, 6:9, 6:14, 7:10, 8:15, 9:14, 13:10, 38:18, 40:18, 52:3, 53:9
**home"** [1] - 13:8
**homes** [8] - 5:23, 6:24, 12:21, 13:7, 52:4, 53:8, 59:4, 141:12
**honestly** [1] - 83:14
**Honor** [115] - 3:13, 3:24, 4:18, 5:14, 12:3, 12:6, 16:2, 19:18, 31:15, 32:12, 33:8, 35:9, 39:8, 40:10, 40:22, 50:14, 51:2, 51:6, 51:14, 51:17, 56:1, 56:7, 56:13, 56:18, 57:1, 57:7, 57:17, 58:7, 58:9, 59:8, 60:10, 60:21, 61:6, 62:1, 63:1, 63:2, 63:15, 63:23, 63:25, 65:9, 66:8, 66:17, 67:11, 67:14, 72:12, 72:19, 73:6, 73:9, 73:12, 73:16, 74:10, 76:3, 76:19, 77:2, 77:16, 77:23, 78:13, 79:20, 80:1, 80:17, 80:22, 83:14, 84:15, 86:8, 86:11, 87:17, 89:6, 90:1, 97:25, 99:11, 101:14, 102:6, 102:15, 102:22, 102:25, 103:25, 105:3, 106:14, 107:1, 108:18, 109:8, 113:8, 114:15, 121:13, 125:12, 126:2, 130:6, 133:10, 134:24, 135:7, 135:10, 141:1, 142:14, 143:1,

146:4, 146:14, 146:16, 146:19, 150:19, 151:16, 152:23, 154:2, 155:7, 156:23, 157:13, 157:20, 157:25, 159:4, 159:17, 160:7, 161:3, 162:5, 163:15, 163:16, 163:18
**HONORABLE** [1] - 1:11
**hook** [1] - 129:20
**hope** [1] - 25:12
**horizontally** [1] - 61:15
**hot** [1] - 71:7
**hour** [2] - 74:15, 145:15
**house** [11] - 8:2, 8:10, 10:4, 13:25, 23:20, 43:6, 43:9, 43:10, 43:12, 43:13, 43:19
**housekeeping** [1] - 75:21
**houses** [7] - 7:6, 8:13, 8:18, 34:16, 36:14, 111:25, 128:17
**HOUSTON** [1] - 1:2
**Houston** [3] - 1:16, 1:19, 1:21
**hundred** [2] - 54:12, 99:5
**hundreds** [2] - 45:1
**hung** [1] - 146:6
**hurts** [3] - 83:19, 101:6, 117:18

## I

**idea** [22] - 7:22, 41:13, 99:12, 100:1, 100:7, 100:9, 100:10, 100:15, 100:17, 101:8, 102:7, 103:15, 108:25, 109:14, 111:2, 113:3, 113:6, 124:9, 128:6, 151:3, 153:20
**ideas** [2] - 97:10, 98:1
**Ideas** [1] - 99:19
**identical** [1] - 60:18
**identified** [1] - 145:11
**identify** [1] - 130:19
**identifying** [1] - 104:12
**identity** [1] - 6:12
**image** [1] - 136:24
**images** [1] - 23:21

**impact** [1] - 59:3
**implying** [1] - 129:15
**importance** [1] - 11:4
**important** [4] - 9:21, 61:13, 75:7, 111:3
**impression** [2] - 41:23, 48:20
**imputed** [1] - 91:7
**IN** [1] - 1:1
**INC** [2] - 1:6, 1:7
**incentives** [1] - 53:21
**inclination** [2] - 111:7, 111:21
**include** [6] - 66:20, 126:15, 126:22, 131:21, 149:13
**included** [2] - 50:1, 93:23
**includes** [3] - 17:10, 34:23, 35:17
**including** [5] - 37:24, 108:10, 109:11, 161:20, 162:18
**income** [2] - 37:22, 41:13
**inconsistency** [1] - 14:2
**incorrect** [3] - 94:11, 124:25, 128:22
**incorrectly** [1] - 50:2
**increase** [1] - 61:14
**incurred** [6] - 33:17, 34:15, 36:20, 127:16, 130:1, 132:6
**independent** [3] - 54:2, 69:5, 82:8
**independently** [2] - 90:20, 147:17
**indicate** [1] - 39:15
**indication** [1] - 162:21
**indifferent** [1] - 83:14
**indirect** [2] - 128:10, 128:20
**indirectly** [1] - 130:12
**individual** [4] - 17:13, 116:6, 149:13, 158:20
**individually** [1] - 54:12
**individuals** [3] - 28:17, 29:11, 125:17
**inducing** [2] - 138:8, 138:25
**industry** [4] - 7:13, 8:24, 108:10, 109:11
**infer** [1] - 91:19
**infiltration** [1] - 103:16
**information** [19] - 3:23, 4:12, 12:15,

13:13, 13:16, 14:10, 15:14, 26:9, 28:12, 29:24, 37:14, 42:6, 42:16, 66:20, 132:16, 133:20, 135:14, 136:8, 143:21
**informed** [1] - 162:3
**infringement** [38] - 80:9, 81:16, 81:17, 81:21, 83:23, 87:4, 102:14, 118:14, 119:13, 119:17, 119:19, 119:24, 120:1, 120:3, 120:21, 120:25, 121:5, 121:8, 121:15, 121:19, 125:24, 126:4, 127:1, 127:12, 127:25, 128:7, 131:7, 133:25, 138:8, 138:9, 139:10, 141:3, 144:10, 144:11, 144:14, 144:19, 149:6, 149:19
**infringement"** [2] - 138:2, 159:2
**infringement..** [2] - 81:14, 84:9
**infringer** [3] - 121:4, 125:25, 126:14
**infringing** [6] - 128:14, 128:17, 129:19, 135:13
**injecting** [1] - 100:21
**inner** [1] - 7:15
**innocence** [1] - 144:11
**innocent** [16] - 118:14, 119:13, 119:17, 119:18, 119:24, 120:1, 120:3, 120:21, 120:24, 121:4, 121:5, 121:7, 121:15, 121:19, 144:14, 144:19
**inside** [1] - 9:23
**instance** [2] - 90:9, 111:22
**instead** [6] - 8:8, 52:25, 80:3, 80:14, 80:17, 81:21
**instruct** [3] - 80:25, 109:19, 130:24
**instructed** [3] - 99:8, 119:17, 161:10
**instruction** [64] - 76:9, 76:12, 76:21, 96:6,

96:17, 97:9, 97:12, 97:19, 97:22, 99:14, 101:3, 101:5, 101:24, 102:8, 106:24, 111:10, 112:13, 112:18, 113:12, 115:3, 115:4, 115:13, 117:24, 118:7, 119:20, 120:8, 120:9, 122:4, 123:22, 125:10, 129:11, 129:20, 131:2, 133:7, 133:8, 133:13, 135:2, 135:18, 136:7, 138:4, 138:6, 139:23, 141:19, 143:2, 143:3, 143:16, 143:19, 144:7, 144:20, 147:4, 147:5, 147:7, 148:24, 150:21, 153:4, 155:2, 155:10, 155:13, 158:3, 158:6, 158:8, 158:16, 159:6
**Instruction** [9] - 79:18, 85:11, 86:3, 86:23, 92:22, 93:8, 96:21, 97:24, 106:18
**instructions** [16] - 67:18, 67:22, 68:3, 68:10, 69:18, 83:17, 86:5, 96:3, 115:2, 119:21, 123:12, 124:24, 125:5, 139:13, 143:21, 143:22
**Instructions** [1] - 86:6
**integrity** [2] - 132:15, 143:20
**intended** [2] - 118:19, 121:6
**intentionally** [3] - 133:24, 135:12, 138:8
**intentionally"** [3] - 143:9, 143:10, 143:11
**interesting** [4] - 71:17, 96:13, 163:4, 163:5
**interior** [1] - 21:18
**internally** [1] - 54:23
**interns** [1] - 161:16
**Interplan** [1] - 128:11
**interpreting** [1] - 136:18
**interrogatory** [1] - 139:2

**interrupted** [1] - 9:7
**intertwinedness** [1] - 131:5
**interview** [1] - 8:2
**interviewed** [1] - 8:5
**invalid** [1] - 82:13
**invited** [1] - 68:23
**invoice** [1] - 44:9
**involve** [2] - 4:8, 103:15
**involved** [4] - 15:21, 19:17, 44:4, 50:23
**involves** [3] - 87:23, 105:24, 120:13
**involving** [1] - 56:4
**irrelevant** [2] - 59:20, 66:20
**IRS** [1] - 71:9
**is'** [1] - 105:18
**issue** [13] - 5:23, 82:11, 82:15, 120:6, 120:9, 122:1, 123:19, 126:18, 131:19, 137:23, 142:6, 151:25, 160:12
**issues** [3] - 34:18, 83:15, 144:16
**it'd** [1] - 98:14
**it'll** [2] - 87:1, 97:22
**it..** [1] - 88:19
**italicized** [1] - 139:19
**italics** [5] - 76:1, 87:19, 89:13, 90:5, 93:2
**item** [1] - 53:1
**itemed** [1] - 53:25
**items** [2] - 3:23, 89:24
**itself** [2] - 94:13, 107:18

## J

**job** [2] - 71:15, 163:9
**join** [1] - 77:25
**judge** [9] - 73:24, 75:20, 75:21, 118:20, 123:1, 123:6, 128:11, 137:11, 161:20
**Judge** [14] - 73:25, 82:14, 82:21, 104:1, 104:3, 105:5, 118:15, 119:25, 121:2, 123:2, 134:10, 137:11, 144:14, 162:2
**judges** [1] - 101:19
**Judges** [1] - 105:4
**judgment** [14] - 113:9,

118:14, 118:16, 118:18, 119:25, 120:3, 120:7, 120:22, 121:17, 121:21, 123:8, 134:11, 137:20, 144:8
**jump** [6] - 45:5, 75:14, 114:23, 119:23, 154:21, 154:23
**jumping** [1] - 153:1
**juries** [1] - 98:18
**juror** [3] - 75:15, 100:6, 163:1
**jurors** [3] - 39:15, 65:3, 68:24
**JURY** [1] - 1:11
**Jury** [7] - 3:1, 5:10, 57:22, 65:22, 71:23, 78:7
**jury** [57] - 3:6, 3:8, 5:9, 5:24, 12:15, 12:24, 13:4, 31:6, 39:13, 57:15, 58:3, 62:11, 62:18, 63:8, 63:14, 63:17, 65:17, 65:20, 67:6, 67:21, 68:2, 71:2, 75:5, 75:12, 80:23, 80:25, 82:15, 83:16, 83:17, 86:15, 88:6, 92:17, 97:5, 97:7, 97:16, 98:19, 99:7, 99:13, 102:9, 106:13, 109:23, 113:15, 119:21, 124:21, 126:19, 136:6, 136:8, 139:14, 145:1, 151:25, 155:23, 156:25, 161:14, 161:20, 162:17, 162:18
**justice** [1] - 142:2
**Justin** [1] - 1:20

## K

**keep** [10] - 31:22, 78:21, 78:23, 94:22, 98:9, 117:2, 122:15, 124:22, 129:12, 143:15
**keeping** [1] - 162:3
**Kelly's** [1] - 107:10, 107:13, 107:15
**Kepner** [1] - 104:5
**Kepner-Tregoe** [1] - 104:5
**Kevin** [1] - 122:25
**KEWALRAMANI** [1] - 2:5

**key** [2] - 6:21, 7:4
**kind** [9] - 13:13, 62:4, 83:15, 86:4, 102:8, 106:4, 106:5, 117:1, 119:23
**kinds** [3] - 33:21, 66:10, 154:20
**King** [2] - 105:4, 105:9
**king** [1] - 7:15
**Kipp** [1] - 123:1
**kitchen** [2] - 10:7, 100:8
**knock** [4] - 75:4, 78:8, 84:7, 84:8
**knowingly** [2] - 143:10, 143:11
**knowledge** [2] - 47:24, 135:12
**knows** [2] - 99:11, 100:24
**kudos** [1] - 103:8

**L**

**Labarthe** [1] - 100:25
**lacking** [3] - 109:1, 150:15, 153:7
**ladies** [2] - 57:9, 71:20
**Lake** [2] - 104:1, 104:3
**land** [4] - 6:6, 11:1, 60:14
**Landing** [7] - 19:1, 19:13, 24:3, 24:20, 24:23, 25:5, 89:20
**language** [20] - 80:11, 80:12, 87:19, 87:23, 89:13, 93:2, 93:19, 113:19, 122:20, 134:22, 135:25, 137:14, 141:25, 146:12, 159:9, 160:9, 160:14, 160:15, 160:23
**laptop** [2] - 12:4, 51:15
**largely** [1] - 115:4
**laser** [1] - 51:25
**last** [42] - 13:6, 35:13, 36:11, 45:14, 47:12, 49:6, 49:19, 60:3, 68:16, 73:10, 74:25, 75:8, 75:9, 84:25, 88:16, 90:4, 90:5, 91:17, 92:9, 93:19, 94:5, 116:8, 116:14, 117:9, 117:21, 119:21, 122:21, 134:20, 135:5, 139:16, 144:23, 149:5, 149:18,

150:10, 150:14, 155:16, 155:19, 155:25, 158:10, 158:17, 162:23
**late** [2] - 145:16, 162:18
**LAW** [2] - 161:18, 161:22
**Law** [2] - 1:15, 1:20
**law** [42] - 57:25, 81:3, 84:16, 84:21, 86:2, 87:25, 94:12, 98:2, 98:3, 99:6, 99:7, 99:13, 99:24, 100:11, 103:7, 108:8, 113:4, 113:11, 113:22, 118:24, 120:25, 121:3, 123:18, 123:21, 124:8, 124:24, 128:23, 129:3, 130:3, 132:10, 135:21, 137:21, 141:11, 141:15, 143:5, 144:15, 144:19, 147:17, 152:9, 152:15, 158:21
**law..** [1] - 101:10
**lawsuit** [13] - 5:23, 12:12, 22:1, 26:9, 27:24, 28:5, 32:7, 34:25, 35:3, 45:12, 47:18, 48:17, 48:19
**lawyer** [1] - 82:19
**lawyers** [4] - 69:14, 71:15, 74:1, 78:1
**lay** [1] - 86:14
**lead** [3] - 42:24, 135:25, 136:1
**leases** [1] - 31:9
**least** [10] - 6:4, 20:10, 28:3, 31:25, 41:9, 68:1, 109:23, 112:17, 147:19, 152:21
**leave** [4] - 42:15, 55:18, 69:7, 87:2
**leaves** [1] - 131:3
**leaving** [3] - 54:20, 55:6, 67:6
**ledger** [4] - 13:20, 29:6, 30:11, 45:9
**left** [15] - 3:14, 3:21, 5:20, 10:5, 23:3, 64:1, 65:24, 72:20, 73:1, 73:8, 73:11, 73:15, 73:16, 74:3, 89:24
**left-hand** [1] - 23:3

**legal** [8] - 34:6, 34:8, 34:12, 34:14, 34:20, 34:21, 35:2, 35:10
**legally** [2] - 116:24, 155:15
**Legend** [1] - 34:19
**legion** [1] - 34:19
**Leigh's** [1] - 70:17
**lending** [1] - 34:18
**length** [1] - 59:16
**less** [2] - 36:23, 70:5
**liable** [2] - 138:7, 139:1
**Liang** [1] - 1:18
**light** [1] - 17:20
**lights** [1] - 40:22
**limit** [1] - 62:21
**limited** [15] - 61:3, 61:25, 62:1, 62:10, 62:14, 63:3, 63:6, 66:2, 66:6, 66:8, 66:23, 66:25, 67:7, 131:20
**limits** [3] - 61:11, 71:1, 74:5
**line** [14] - 18:1, 38:21, 38:22, 40:25, 53:1, 53:25, 75:14, 75:16, 104:9, 110:7, 112:4, 116:8, 137:10, 155:3
**Line** [3] - 40:16, 46:4, 46:22
**line-itemed** [1] - 53:25
**lines** [1] - 101:6
**lingo** [1] - 99:11
**list** [3] - 17:8, 28:11, 140:13
**listed** [2] - 59:15, 108:16
**listen** [2] - 112:4, 152:22
**listened** [1] - 88:13
**listening** [2] - 111:5, 119:1
**literal** [1] - 87:5
**literally** [1] - 75:25
**live** [1] - 157:9
**living** [6] - 10:6, 10:10, 58:22, 82:3, 100:8, 157:4
**Living** [34] - 5:24, 6:4, 14:9, 15:4, 15:8, 15:9, 15:13, 15:21, 16:12, 16:24, 17:5, 20:15, 22:1, 22:9, 22:13, 24:2, 24:10, 24:19, 25:3, 26:24, 28:18, 29:10, 31:9, 56:4, 60:12, 60:22, 90:10, 90:15, 91:4,

91:6, 120:16, 138:24, 138:25, 143:8
**LIVING** [1] - 1:7
**Living's** [7] - 5:22, 7:12, 8:22, 9:19, 9:21, 30:9, 128:16
**LLC** [1] - 1:3
**LLP** [1] - 1:18
**location** [5] - 6:6, 6:8, 8:10, 11:1, 31:23
**lock** [1] - 27:2
**locked** [3] - 27:7, 27:16, 28:4
**locking** [1] - 27:19
**log** [2] - 31:24, 33:3
**logo** [1] - 17:1
**logos** [2] - 6:12, 6:20
**logs** [2] - 32:7, 33:13
**look** [61] - 7:20, 10:4, 12:14, 18:1, 22:24, 22:25, 27:12, 28:7, 29:5, 29:6, 29:24, 31:1, 34:2, 37:7, 37:9, 38:16, 50:3, 54:14, 58:1, 59:9, 68:25, 74:14, 79:9, 79:24, 80:5, 81:9, 82:7, 83:12, 85:2, 86:9, 88:4, 89:22, 91:12, 95:16, 101:12, 103:23, 111:8, 111:18, 116:6, 116:18, 116:20, 116:25, 117:13, 117:15, 125:20, 126:7, 132:18, 133:9, 137:15, 140:3, 140:20, 141:11, 141:17, 142:3, 148:22, 149:25, 150:11, 155:14, 159:18
**Look** [1] - 10:19
**looked** [8] - 9:24, 23:16, 30:3, 33:3, 56:5, 93:13, 125:1, 125:15
**looking** [23] - 31:2, 37:17, 64:19, 67:23, 68:1, 75:2, 78:3, 79:1, 79:15, 83:4, 91:21, 94:8, 96:1, 98:18, 102:4, 115:14, 116:7, 116:22, 130:8, 140:15, 142:1, 157:2, 157:5
**looks** [2] - 21:19,

135:22
**loop** [2] - 7:15, 9:23
**loud** [1] - 98:5
**Louis** [1] - 1:17
**lower** [3] - 53:2, 53:6, 53:9
**lunch** [6] - 53:22, 54:5, 65:3, 65:11, 70:15, 70:18
**lunches** [1] - 36:8

**M**

**Madeleine** [1] - 35:23
**mail** [25] - 16:16, 17:7, 17:10, 17:13, 18:25, 19:11, 19:18, 20:11, 45:14, 45:18, 47:3, 47:5, 47:8, 47:11, 47:23, 48:9, 48:12, 48:16, 49:1, 49:7, 49:19, 50:20, 54:7, 54:9
**Mail** [1] - 17:6
**mails** [7] - 16:13, 16:15, 18:7, 18:22, 19:12, 54:12, 74:9
**main** [4] - 7:9, 109:25, 138:12
**maintain** [1] - 32:4
**major** [1] - 60:3
**majority** [3] - 6:22, 19:2, 54:4
**management** [5] - 15:14, 132:16, 133:20, 135:14, 143:21
**manpower** [1] - 6:20
**mark** [2] - 95:1, 135:8
**marked** [2] - 4:5, 117:7
**market** [4] - 6:8, 10:24, 43:13, 61:9
**marketing** [25] - 6:19, 6:25, 10:25, 14:13, 14:17, 14:23, 15:8, 15:14, 16:10, 16:12, 16:23, 19:10, 19:17, 22:8, 34:15, 36:12, 42:24, 43:4, 43:7, 43:8, 43:11, 43:14, 44:3, 139:3
**match** [1] - 50:4
**matches** [1] - 44:17
**material** [2] - 17:6, 17:7
**materials** [6] - 14:13, 14:18, 16:10, 16:12, 16:23, 138:24
**math** [2] - 29:4, 39:20

**matter** [13] - 34:12, 65:18, 65:23, 74:21, 88:8, 102:2, 104:2, 120:25, 137:21, 144:15, 144:18, 157:1, 163:23
**matters** [1] - 75:21
**max** [2] - 64:19
**maximum** [2] - 63:23, 70:23
**McClatchy** [5] - 136:12, 136:15, 136:25
**meal** [1] - 36:10
**meals** [6] - 35:17, 35:20, 36:1, 53:15, 53:18, 54:1
**mean** [32] - 6:18, 8:18, 8:19, 9:11, 9:23, 10:14, 10:19, 10:20, 11:5, 16:25, 29:14, 30:10, 32:3, 32:25, 33:1, 33:5, 39:4, 43:5, 43:16, 43:18, 45:5, 46:9, 48:8, 55:5, 74:17, 82:2, 82:3, 91:22, 95:20, 98:22, 136:19, 152:6
**meaning** [4] - 6:2, 88:12, 101:11, 148:24
**means** [8] - 9:8, 23:14, 27:19, 64:20, 107:1, 136:2, 136:17, 147:17
**meant** [4] - 22:12, 61:4, 62:5, 66:12
**measure** [1] - 124:17
**mechanical** [1] - 1:24
**media** [4] - 17:14, 19:4, 22:3, 29:15
**meet** [2] - 7:23, 144:13
**meeting** [1] - 75:20
**mention** [4] - 18:12, 18:15, 25:5, 62:13
**mentioned** [5] - 9:25, 67:24, 86:19, 86:20, 87:3
**mentioning** [1] - 104:4
**merged** [1] - 113:7
**merger** [7] - 96:22, 107:25, 113:3, 114:3, 114:16, 114:19, 153:24
**met** [1] - 93:11
**method** [1] - 44:16
**microphone** [1] - 19:24
**mid** [1] - 74:8
**mid-sentence** [1] -

74:8
**middle** [2] - 17:11, 112:20
**might** [10] - 10:8, 30:14, 50:18, 72:4, 83:22, 101:2, 107:3, 111:23, 137:6, 139:24
**mind** [7] - 86:7, 87:1, 90:7, 94:22, 98:20, 117:3
**mine** [3] - 67:24, 95:8, 95:20
**mine's** [1] - 91:16
**minimal** [1] - 147:19
**minus** [1] - 12:25
**minute** [11] - 57:18, 57:19, 64:7, 70:4, 70:8, 70:11, 70:12, 73:4, 73:8, 73:13, 120:10
**minutes** [29] - 3:9, 57:21, 63:23, 64:15, 64:23, 64:24, 65:1, 69:15, 69:25, 70:1, 70:2, 70:12, 70:20, 72:12, 72:19, 73:1, 73:2, 73:7, 73:8, 73:12, 73:15, 73:16, 73:21, 73:22, 74:3, 74:4, 145:12, 145:16
**misleading** [1] - 132:1
**misquoted** [1] - 107:1
**misspeak** [1] - 63:2
**misstates** [1] - 153:5
**mistake** [4] - 22:12, 48:2, 48:7, 48:14
**mistakes** [1] - 28:1
**misunderstanding** [1] - 50:18
**misunderstandings** [1] - 50:19
**model** [1] - 101:17
**modern** [1] - 111:25
**modify** [1] - 112:5
**moment** [1] - 78:12
**money** [2] - 6:19, 134:15
**monopoly** [1] - 113:5
**month** [21] - 13:2, 13:6, 13:7, 13:10, 30:9, 30:18, 36:2, 38:5, 38:18, 39:22, 41:17, 41:18, 42:21, 42:22, 44:7, 44:10, 44:11, 44:13, 44:17, 44:25, 52:5
**monthly** [9] - 4:2, 13:7, 26:13, 26:17, 26:18, 41:22, 52:4,

53:15
**months** [3] - 41:24, 42:7, 44:11
**moot** [6] - 144:1, 144:5, 161:1, 161:2, 161:4
**morning** [8] - 5:18, 5:19, 76:21, 77:8, 128:9, 136:13, 146:21, 163:1
**most** [2] - 7:22, 101:24
**mostly** [1] - 103:12
**motion** [3] - 121:16, 134:11, 144:8
**motions** [1] - 123:9
**Mount** [4] - 120:14, 120:23, 121:23, 144:17
**mount** [1] - 139:17
**move** [7] - 45:7, 79:23, 81:13, 85:7, 114:22, 132:13, 149:17
**moved** [1] - 120:22
**moves** [1] - 135:17
**movie** [4] - 107:3, 107:10, 107:19, 107:22
**moving** [2] - 122:15, 137:17
**multiple** [4] - 29:1, 43:7, 50:25, 60:15
**Murphy** [1] - 137:12
**must** [7] - 75:16, 80:10, 81:22, 104:10, 115:23, 149:19, 152:16

---

## N

**Nagle** [31] - 11:16, 13:13, 13:24, 16:24, 17:11, 18:8, 18:15, 18:19, 20:11, 20:20, 21:2, 21:6, 21:10, 22:25, 23:6, 23:21, 25:4, 28:12, 31:19, 33:18, 34:15, 36:13, 36:21, 37:13, 37:14, 45:25, 46:25, 120:14, 120:24, 121:23, 144:17
**name** [3] - 6:12, 107:19, 133:21
**narrow** [5] - 66:1, 75:18, 77:5, 103:13, 117:8
**narrowed** [1] - 64:16
**narrowly** [1] - 62:21
**narrowness** [1] -

63:13
**narrows** [1] - 90:3
**naturally** [3] - 108:23, 151:2, 153:18
**necessarily** [3] - 108:23, 151:2, 153:18
**necessary** [7] - 83:19, 98:14, 99:2, 99:3, 99:4, 123:25
**need** [56] - 8:2, 16:3, 16:4, 40:6, 55:19, 57:15, 60:8, 69:8, 69:20, 71:12, 77:13, 80:23, 83:10, 85:18, 87:13, 87:22, 89:22, 94:23, 94:24, 95:12, 95:15, 95:19, 95:20, 98:7, 99:15, 99:17, 106:19, 106:22, 111:15, 112:4, 112:5, 112:17, 117:20, 118:4, 118:23, 119:9, 120:8, 122:4, 122:10, 125:10, 132:11, 144:23, 144:24, 145:6, 147:20, 147:22, 148:8, 152:24, 154:19, 156:12, 161:7, 161:12, 162:2, 162:3
**needed** [4] - 4:12, 50:13, 80:20, 88:5
**needs** [14] - 8:3, 68:17, 83:16, 85:4, 99:7, 102:11, 106:21, 106:23, 108:4, 111:7, 111:20, 140:2, 143:16, 159:18
**negotiated** [3] - 8:25, 9:5, 10:20
**neighborhood** [1] - 110:12
**neoclassical** [1] - 111:24
**net** [7] - 28:24, 29:10, 35:4, 36:6, 37:22, 124:15
**never** [12] - 47:12, 48:3, 49:2, 49:3, 49:4, 50:6, 50:10, 107:7, 150:2, 150:4, 163:13
**new** [2] - 8:12, 104:18
**news** [1] - 118:6
**next** [25] - 23:25, 24:17, 25:11, 32:16,

63:13
**Ninth** [10] - 97:4, 97:7, 101:17, 101:19, 101:24, 125:13, 125:22, 130:9, 131:15, 132:1
**ninth** [3] - 125:15, 126:8, 126:9
**NO** [1] - 1:4
**no"** [2] - 42:8, 45:3
**no-evidence** [2] - 121:16, 144:8
**Nola** [8] - 102:25, 103:3, 103:11, 104:4, 104:14, 104:21, 104:23, 105:3
**non** [3] - 14:6, 103:16, 152:1
**non-computer** [1] - 103:16
**non-protectable** [1] - 152:1
**non-UPM** [1] - 14:6
**nonresponsive** [1] - 33:8
**nonsensical** [1] - 125:3
**noon** [1] - 74:15
**normal** [1] - 8:17
**note** [3] - 115:12, 124:11, 149:14
**noted** [1] - 138:1
**notes** [1] - 63:5
**nothing** [5] - 56:7, 59:25, 77:8, 146:20, 147:1
**notice** [23] - 18:18, 46:24, 66:4, 68:15, 72:8, 72:10, 72:24, 72:25, 73:4, 73:8, 73:11, 74:18, 118:24, 119:10, 119:11, 119:15, 120:23, 121:3, 121:9, 133:21, 134:9, 147:5, 156:17
**notices** [1] - 25:8, 72:5, 72:17, 121:10, 122:1
**novel** [2] - 147:20,

147:22
**nullity** [1] - 105:12
**number** [22] - 22:19, 33:24, 38:1, 38:2, 38:4, 38:9, 38:12, 44:21, 52:13, 52:15, 52:20, 52:22, 52:23, 53:2, 54:25, 61:3, 67:22, 109:17, 135:22, 143:3, 158:19
**numbered** [1] - 79:3
**numbers** [3] - 13:18, 41:9, 79:11

**O**

**o'clock** [6] - 7:1, 7:22, 64:25, 65:2, 162:2, 162:4
**object** [21] - 62:18, 66:19, 68:11, 76:17, 87:18, 89:24, 90:4, 112:3, 112:19, 119:8, 138:4, 140:6, 140:7, 140:17, 142:4, 151:9, 152:25, 153:3, 159:3
**objected** [3] - 3:14, 93:12, 158:1
**objecting** [1] - 109:16
**objection** [42] - 3:22, 4:12, 5:2, 5:5, 33:8, 57:6, 58:10, 62:9, 62:23, 63:11, 63:12, 63:14, 66:14, 66:15, 66:18, 66:24, 66:25, 67:4, 67:8, 89:13, 94:4, 109:15, 117:5, 132:15, 133:11, 133:12, 143:18, 143:23, 146:9, 147:12, 147:13, 147:14, 152:24, 153:9, 153:12, 154:4, 158:15, 159:14, 159:23, 159:25, 160:1
**objections** [5] - 77:7, 89:14, 148:9, 157:15, 158:2
**objective** [1] - 88:23
**objects** [8] - 66:13, 76:6, 76:9, 76:12, 80:3, 85:24, 118:12, 153:25
**obviously** [1] - 100:24
**occurred** [1] - 44:25
**October** [1] - 38:22
**OF** [1] - 1:1
**off-the-record** [1] -

106:16
**Off-the-record** [1] - 71:11
**offer** [6] - 56:18, 60:23, 66:15, 66:24, 67:3, 67:7
**offered** [4] - 58:10, 59:21, 155:23, 158:10
**offering** [4] - 17:25, 61:24, 62:13, 66:3
**offers** [1] - 61:5
**office** [1] - 54:23
**offices** [2] - 7:17, 7:22
**often** [2] - 107:15, 111:24
**old** [1] - 114:6
**onboard** [1] - 6:18
**once** [7] - 15:8, 64:4, 69:7, 76:4, 100:16, 100:20, 156:24
**one** [128] - 5:21, 7:6, 7:15, 10:6, 12:21, 20:24, 22:18, 22:25, 23:14, 24:17, 27:20, 32:4, 34:3, 34:5, 35:13, 37:13, 38:2, 39:9, 41:21, 43:10, 43:13, 44:16, 49:15, 51:18, 54:9, 56:20, 57:11, 58:14, 58:20, 58:23, 59:19, 61:3, 61:19, 62:25, 64:5, 64:25, 65:14, 68:1, 72:10, 72:17, 73:11, 73:21, 75:21, 77:4, 77:9, 78:1, 78:8, 79:2, 79:9, 82:24, 83:8, 84:9, 84:25, 85:8, 85:10, 85:20, 86:17, 87:13, 87:15, 88:9, 89:8, 89:11, 89:23, 92:4, 94:5, 94:8, 94:10, 96:2, 98:19, 98:22, 100:9, 101:11, 101:25, 102:3, 102:5, 103:2, 103:11, 107:11, 107:25, 109:17, 110:2, 110:15, 111:18, 113:1, 114:23, 116:21, 117:11, 118:7, 118:11, 120:10, 122:22, 123:7, 123:10, 130:10, 132:19, 132:25, 133:11, 135:5, 137:4, 137:15, 137:17, 137:23,

139:16, 139:23, 139:25, 140:1, 140:7, 140:20, 141:1, 141:11, 142:13, 142:17, 144:6, 144:23, 145:25, 146:1, 146:2, 146:9, 148:12, 149:11, 150:6, 153:5, 154:6, 155:1, 161:23, 161:24, 161:25
**one-time** [1] - 54:9
**ones** [9] - 11:15, 14:5, 86:1, 89:25, 120:15, 120:16, 131:11, 140:15, 140:16
**online** [1] - 135:22
**op** [4] - 9:3, 9:7, 9:8, 9:9
**open** [9] - 6:16, 7:2, 7:6, 7:7, 7:18, 8:13, 8:15, 8:18, 27:18
**opened** [3] - 7:17, 22:20, 23:15
**opening** [4] - 70:6, 72:8, 72:11, 82:13
**opens** [2] - 113:14, 163:2
**operating** [6] - 32:5, 37:23, 127:15, 129:25, 132:5, 139:21
**opinion** [6] - 79:7, 99:7, 102:8, 102:11, 152:15
**opinions** [2] - 104:5, 105:10
**Oppidan** [4] - 90:16, 91:5, 91:9, 91:14
**opportunity** [2] - 49:23, 92:11
**opportunity..** [1] - 87:12
**opposed** [1] - 147:18
**opposing** [1] - 103:8
**orally** [1] - 126:11
**orange** [1] - 103:19
**order** [4] - 4:1, 6:14, 30:21, 100:18
**ordinarily** [2] - 81:9, 82:22
**Ordinarily** [1] - 84:2
**ordinary** [1] - 115:15
**organized** [1] - 30:20
**original** [4] - 105:15, 115:24, 149:20, 161:25
**original"** [1] - 147:6
**original..** [1] - 149:7

**originality** [4] - 109:1, 150:15, 152:3, 153:7
**Originality** [1] - 147:7
**originally** [1] - 58:12
**originates** [1] - 103:5
**Osha** [1] - 1:18
**otherwise** [4] - 9:13, 102:9, 118:3, 133:25
**ought** [1] - 79:5
**ourselves** [1] - 145:7
**out-of-state** [1] - 74:1
**outside** [3] - 9:10, 21:19, 44:24
**overhead** [22] - 13:7, 13:10, 25:20, 26:17, 29:18, 39:21, 43:16, 52:4, 53:16, 123:17, 125:6, 125:8, 125:21, 127:16, 129:25, 130:16, 130:17, 130:18, 130:24, 132:5, 139:22
**overlays** [1] - 47:21
**overrule** [1] - 104:16
**overruled** [14] - 5:6, 5:8, 62:9, 146:9, 153:9, 154:4, 157:16, 158:2, 158:15, 159:24, 159:25, 160:1, 160:10, 160:24
**overruling** [2] - 66:24, 104:19
**overstates** [1] - 129:4
**own** [8] - 70:24, 109:14, 113:9, 116:24, 151:4, 152:12, 153:21, 155:15
**owner** [2] - 15:24, 126:13
**ownership** [4] - 80:24, 81:1, 81:18, 84:3

**P**

**p.m** [2] - 162:19, 162:20
**pad** [2] - 39:9, 39:12
**page** [62] - 16:20, 16:23, 17:7, 17:23, 22:21, 22:23, 23:7, 23:9, 23:10, 23:12, 23:14, 23:15, 23:17, 23:21, 23:22, 24:1, 24:5, 24:10, 24:12, 24:19, 24:22, 25:20, 25:21, 26:20, 30:2, 31:2, 33:23, 34:3,

38:16, 40:21, 40:23, 54:20, 54:25, 55:1, 55:2, 55:6, 56:3, 64:7, 68:16, 70:5, 75:8, 75:9, 76:13, 89:14, 97:25, 132:18, 135:19, 136:23, 143:3, 144:24, 145:21, 145:22, 146:13, 154:21, 155:25, 158:17
**Page** [35] - 2:3, 13:15, 17:3, 17:5, 18:2, 18:11, 20:22, 21:1, 21:4, 21:6, 25:22, 30:5, 30:7, 30:17, 31:2, 35:14, 37:16, 46:3, 79:4, 79:16, 82:21, 85:19, 85:20, 86:11, 92:10, 93:1, 93:16, 95:4, 95:6, 95:7, 95:9, 106:18, 132:19, 154:23
**pages** [4] - 25:3, 45:1, 64:17, 85:20
**PAGES** [1] - 1:13
**Pages** [1] - 18:1
**paginated** [5] - 75:6, 75:7, 79:2, 79:6, 79:12
**paid** [6] - 28:21, 28:24, 29:11, 43:25, 44:11, 74:5
**panel** [5] - 101:19, 104:15, 104:16, 104:20, 105:2
**paper** [2] - 116:19, 117:1
**paperclip** [1] - 156:18
**paragraph** [29] - 78:14, 82:9, 91:17, 108:13, 109:7, 110:7, 116:10, 116:11, 116:12, 117:9, 119:21, 124:2, 131:23, 132:4, 133:1, 134:20, 135:6, 136:7, 147:11, 149:1, 149:6, 149:10, 149:11, 150:9, 150:20, 153:3, 155:16, 155:19, 158:10
**paragraphs** [8] - 80:2, 82:8, 88:17, 99:13, 101:15, 132:3, 150:10, 150:12
**paraphrase** [1] -

113:18
**pardon** [1] - 51:4
**Park** [15] - 16:24, 17:11, 18:8, 18:15, 18:19, 20:11, 20:20, 21:2, 21:7, 21:10, 22:25, 23:6, 23:21, 31:20, 33:18
**part** [9] - 6:21, 17:22, 21:15, 29:22, 72:13, 111:7, 114:18, 131:3, 151:8
**particular** [16] - 4:6, 13:10, 17:10, 18:8, 26:4, 26:20, 30:23, 37:9, 43:6, 108:22, 108:24, 108:25, 151:1, 151:3, 153:17, 153:19
**particularly** [1] - 27:6
**parties** [2] - 66:22, 77:18
**party** [5] - 87:11, 87:12, 92:11, 92:13, 155:4
**pass** [2] - 16:1, 55:14
**passing** [1] - 105:11
**past** [5] - 72:9, 72:10, 72:18, 72:24, 135:17
**paste** [1] - 118:2
**patience** [1] - 51:23
**Patrick** [1] - 1:15
**pattern** [8] - 97:5, 97:7, 97:9, 101:17, 125:13, 125:15, 125:22, 130:9
**Patterson** [10] - 12:19, 14:7, 18:25, 24:2, 25:4, 34:16, 36:13, 36:22, 90:19, 122:1
**pause** [1] - 92:21
**pay** [4] - 9:12, 9:13, 9:15, 9:16
**payment** [1] - 11:21
**Peel** [1] - 104:5
**Penhollow** [1] - 130:11
**people** [7] - 19:16, 54:10, 54:19, 55:1, 55:6, 98:24, 137:2
**per** [10] - 13:8, 13:9, 13:25, 25:20, 38:13, 38:18, 40:18, 41:1, 52:3, 53:9
**percent** [10] - 8:23, 9:1, 9:4, 9:12, 9:18, 10:2, 55:5, 99:5, 125:13, 141:3
**percentage** [3] - 54:19, 141:6, 141:7

**percentages** [1] - 55:11
**perception** [1] - 81:10
**performed** [1] - 104:11
**perhaps** [2] - 111:3, 115:2
**period** [4] - 22:17, 23:23, 24:6, 27:20
**periods** [1] - 28:3
**person** [1] - 115:15
**personal** [1] - 83:21
**personally** [3] - 25:16, 32:19, 39:4
**pertains** [1] - 144:20
**perversion** [1] - 135:25
**phase** [1] - 21:8
**philosophy** [1] - 83:2
**phone** [2] - 40:2, 40:3
**photograph** [1] - 21:18
**photographs** [2] - 14:17, 90:5
**phrase** [1] - 148:4
**pick** [3] - 5:20, 33:22, 79:2
**picked** [3] - 107:6, 107:12, 159:9
**pictures** [2] - 14:15, 14:20
**piece** [3] - 105:18, 105:20, 138:11
**pieces** [8] - 29:1, 105:17, 105:22, 106:4, 106:7, 116:6, 117:13
**Pinkberry** [1] - 35:23
**Place** [21] - 16:24, 17:11, 18:8, 18:12, 18:15, 18:19, 18:20, 20:10, 20:11, 20:20, 21:2, 21:7, 21:10, 22:25, 23:6, 23:21, 24:10, 24:13, 31:20, 33:18
**place** [10] - 12:17, 18:8, 19:7, 20:13, 26:12, 26:21, 28:4, 43:1, 54:5, 107:15
**plaintiff** [34] - 14:9, 56:16, 60:5, 60:6, 63:20, 64:21, 67:10, 67:11, 69:22, 69:24, 70:6, 70:11, 72:7, 73:21, 76:5, 76:16, 77:15, 85:23, 120:2, 120:19, 120:22, 123:14, 127:12, 131:8, 132:23,

134:22, 136:5, 137:20, 138:18, 140:16, 143:6, 150:22, 153:25, 160:25
**Plaintiff** [9] - 1:4, 1:15, 2:11, 66:2, 70:13, 80:19, 85:9, 126:25, 131:14
**plaintiff's** [12] - 3:10, 3:13, 54:14, 56:18, 117:25, 140:22, 141:4, 155:1, 155:11, 158:14, 160:8, 160:23
**Plaintiff's** [13] - 16:19, 16:20, 20:18, 20:19, 21:22, 21:25, 24:1, 45:15, 80:6, 80:13, 82:7, 90:12, 160:14
**plaintiffs** [6] - 76:11, 121:8, 136:1, 141:5, 157:6, 157:10
**plan** [14] - 10:22, 45:21, 45:22, 47:14, 47:15, 47:22, 47:25, 48:1, 72:13, 88:24, 99:25, 120:24, 144:17
**plans** [28] - 9:20, 9:21, 11:14, 11:19, 14:15, 14:23, 15:8, 15:14, 15:22, 21:2, 21:6, 21:20, 55:9, 59:10, 59:11, 66:21, 67:5, 89:8, 91:10, 91:14, 120:17, 120:18, 121:12, 121:24, 121:25, 128:14, 139:4
**plans"** [1] - 14:6
**play** [1] - 152:17
**pleadings** [1] - 91:12
**pleasure** [1] - 163:8
**pled** [3] - 96:7, 96:14, 120:21
**PLLC** [1] - 1:20
**plug** [1] - 151:12
**plugging** [1] - 49:2
**plus** [2] - 65:1, 161:24
**point** [24] - 6:7, 13:4, 19:4, 27:2, 48:21, 58:25, 59:1, 60:3, 61:1, 62:24, 70:24, 72:4, 77:21, 82:25, 83:5, 98:9, 98:12, 100:2, 101:15, 103:13, 116:5, 117:3, 157:6, 160:22
**pointed** [2] - 51:21,

105:11
**pointer** [1] - 51:25
**points** [2] - 105:7, 105:16
**police** [1] - 107:16
**pops** [1] - 82:3
**portion** [13] - 21:10, 28:20, 29:3, 29:4, 36:15, 37:1, 52:1, 87:17, 111:10, 125:24, 126:4, 127:21, 128:1
**portions** [5] - 116:1, 141:8, 141:16, 141:22, 142:11
**position** [16] - 3:11, 34:14, 36:4, 39:10, 58:13, 81:5, 85:4, 89:11, 90:13, 90:14, 91:25, 99:15, 106:8, 141:21, 143:9
**positive** [1] - 85:6
**possesses** [1] - 147:19
**possibility** [2] - 88:12, 117:4
**post** [1] - 123:8
**post-judgment** [1] - 123:8
**posted** [1] - 28:2
**potential** [1] - 16:13
**Powell** [1] - 130:10
**power** [1] - 121:7
**practically** [1] - 82:19
**practice** [2] - 108:11, 109:11
**precedent** [3] - 97:13, 103:4, 103:5
**precise** [1] - 15:12
**predicated** [3] - 140:9, 140:11, 140:14
**prejudicial** [1] - 59:22
**prepare** [1] - 25:16
**prepared** [4] - 26:4, 26:8, 26:20, 46:5
**preparing** [1] - 26:8
**preponderance** [3] - 127:14, 127:19, 129:23
**presence** [2] - 150:25, 153:16
**present** [7] - 3:1, 5:10, 21:11, 57:22, 65:22, 71:23, 81:2
**presented** [6] - 30:21, 33:4, 41:21, 42:16, 44:24, 45:12
**presenting** [1] - 58:13
**presiding** [2] - 75:15, 163:1

**press** [1] - 54:9
**Preston** [18] - 9:25, 18:13, 18:16, 18:18, 25:5, 25:8, 46:14, 46:23, 47:12, 50:20, 56:25, 80:9, 81:22, 92:10, 92:12, 120:17, 120:18
**PRESTON** [1] - 1:3
**pretrial** [2] - 4:11, 57:8, 58:16
**pretty** [9] - 13:25, 44:19, 53:20, 67:7, 71:6, 107:15, 115:11, 162:10
**preview** [1] - 96:5
**previous** [2] - 104:16, 124:9
**price** [5] - 6:7, 9:5, 12:21, 12:24
**principle** [2] - 104:18, 159:3
**principles** [1] - 88:1
**print** [3] - 6:19, 32:25, 74:19
**printed** [1] - 26:21
**printout** [3] - 20:19, 26:4, 35:19
**probative** [1] - 114:18
**problem** [18] - 79:17, 99:6, 99:10, 104:13, 110:24, 116:3, 116:14, 117:12, 118:17, 123:12, 132:14, 137:16, 138:12, 146:24, 146:25, 147:21, 150:20, 152:7
**procedurally** [1] - 82:16
**procedure** [2] - 32:5, 162:25
**proceed** [2] - 5:14, 16:2
**proceeding** [1] - 82:24
**Proceedings** [1] - 1:24
**proceedings** [1] - 163:22
**process** [10] - 6:5, 6:7, 6:11, 6:13, 8:7, 38:17, 102:11, 108:25, 151:3, 153:20
**produce** [3] - 32:20, 32:23, 43:25
**produced** [6] - 1:24, 22:1, 32:7, 33:14, 41:13, 56:4
**producing** [3] -

127:17, 130:1, 132:6
**product** [3] - 6:7, 9:24, 61:10
**production** [5] - 127:16, 130:1, 130:20, 132:6, 139:22
**professional** [1] - 163:9
**Professor** [1] - 108:6
**profit** [14] - 5:22, 5:25, 8:21, 9:22, 124:15, 127:3, 127:21, 127:24, 128:1, 129:7, 131:24, 132:4, 141:3, 141:18
**profits** [25] - 7:9, 9:19, 35:4, 36:6, 124:17, 125:21, 125:23, 125:25, 126:3, 126:5, 126:14, 126:15, 126:24, 127:1, 128:8, 128:10, 128:12, 128:14, 128:16, 128:18, 128:20, 129:6, 141:15, 157:7
**program** [3] - 7:11, 27:1, 30:8
**project** [5] - 19:1, 19:13, 88:10, 129:10, 143:7
**projects** [10] - 12:12, 12:16, 14:4, 14:11, 14:18, 15:1, 21:11, 25:4, 91:15, 120:14
**promulgate** [1] - 130:21
**pronounce** [2] - 106:14, 106:15
**proof** [6] - 69:23, 96:9, 96:10, 124:12, 128:19, 129:6
**proper** [3] - 36:5, 53:16, 106:24
**properly** [1] - 13:21
**properties** [11] - 8:12, 12:8, 18:23, 20:14, 23:9, 31:12, 32:5, 37:1, 88:17, 89:4, 95:12
**Properties** [1] - 89:21
**property** [3] - 7:24, 31:25
**proposal** [1] - 80:4
**propose** [1] - 78:17
**proposed** [26] - 67:17, 68:2, 68:10, 80:11, 80:12, 82:8, 87:23, 90:12, 92:15,

115:12, 139:18, 139:20, 141:19, 143:24, 146:12, 150:19, 153:4, 155:1, 155:12, 159:9, 160:8, 160:9, 160:14, 160:15, 160:23, 160:24
**Proposed** [5] - 78:7, 79:23, 80:6, 86:6, 106:18
**proposing** [3] - 134:19, 147:6
**prorated** [2] - 36:15, 36:23
**protect** [6] - 85:4, 97:15, 105:14, 113:4, 113:11, 113:23
**protectable** [6] - 111:13, 113:20, 113:25, 116:1, 151:25, 152:1
**protected** [22] - 80:8, 81:7, 84:14, 93:22, 93:24, 97:3, 102:7, 104:12, 109:25, 115:18, 116:16, 119:10, 141:8, 141:22, 142:11, 146:3, 146:18, 149:2, 149:12, 149:20, 149:21, 157:24
**protection** [20] - 62:5, 66:12, 94:6, 96:15, 108:9, 108:20, 109:2, 109:10, 109:18, 109:22, 110:23, 143:20, 148:8, 150:16, 151:14, 152:3, 152:4, 152:7, 153:6, 153:8
**protects** [1] - 157:18
**prove** [12] - 81:18, 81:22, 82:21, 82:22, 84:2, 123:14, 124:13, 125:24, 126:4, 128:15, 129:5, 129:9
**prove..** [1] - 80:10
**proven** [1] - 124:11
**proves** [1] - 123:15
**provide** [8] - 5:1, 16:25, 20:13, 29:19, 32:25, 35:5, 44:20, 53:20
**provided** [19] - 3:22, 4:13, 4:15, 4:20,

13:23, 14:24, 15:6, 19:14, 19:21, 20:3, 20:5, 20:12, 22:3, 29:24, 32:13, 33:7, 42:7, 45:1, 54:1
**providing** [2] - 13:18, 138:24
**proving** [5] - 127:13, 127:18, 128:1, 129:9, 129:22
**proving..** [1] - 130:25
**Prudential** [1] - 9:11
**public** [1] - 7:18
**Publications** [1] - 104:4
**publish** [1] - 135:12
**published** [1] - 142:19
**pull** [3] - 17:3, 23:2, 52:7
**pulled** [1] - 125:21
**pulling** [2] - 19:24, 151:16
**pulls** [1] - 117:4
**punish** [1] - 10:15
**pure** [3] - 65:25, 68:3, 77:21
**purpose** [13] - 26:8, 61:17, 61:25, 62:1, 62:10, 62:14, 62:15, 63:3, 63:7, 66:1, 66:2, 66:6, 66:8
**purposes** [3] - 31:12, 35:4, 83:5
**pursuant** [1] - 3:25
**put** [40] - 10:6, 10:17, 11:18, 13:20, 14:5, 26:2, 31:13, 58:21, 59:16, 59:17, 60:16, 77:1, 79:21, 80:3, 89:3, 91:9, 91:13, 92:18, 92:19, 101:19, 102:5, 105:22, 106:6, 107:7, 107:11, 121:1, 121:8, 121:19, 121:20, 122:11, 122:12, 129:18, 136:5, 137:1, 139:4, 143:21, 144:13, 144:21, 145:17, 154:19
**putting** [3] - 69:14, 82:1, 100:18
**PWA** [3] - 11:14, 34:17, 34:23

## Q

**questions** [21] - 25:16,

26:6, 31:5, 33:21, 51:2, 51:5, 54:6, 56:9, 67:22, 98:20, 98:21, 102:10, 138:5, 139:15, 140:4, 140:7, 140:11, 142:17, 143:22, 159:19, 162:6
**Questions"** [1] - 78:7
**quick** [5] - 40:6, 54:6, 69:13, 70:20, 96:5, 125:20
**Quicken** [5] - 26:25, 27:1, 30:8, 32:24, 34:8
**quicken** [1] - 27:1
**quickly** [2] - 78:10, 132:1
**quiet** [1] - 83:2
**quite** [1] - 69:2
**quote** [2] - 75:11, 114:2
**quotes** [1] - 87:6

## R

**raised** [1] - 3:22
**RAMANI** [1] - 1:7
**Ramani** [19] - 5:18, 15:25, 16:8, 17:25, 25:11, 30:13, 37:20, 39:18, 40:21, 51:11, 55:14, 56:10, 56:19, 58:17, 59:13, 60:11, 61:7, 61:21, 138:20
**ramani** [1] - 135:19
**Ramani's** [1] - 61:18
**ranges** [1] - 14:2
**rate** [2] - 54:18, 55:4
**rather** [2] - 34:3, 40:5, 88:1
**rational** [2] - 142:1, 142:3
**re** [1] - 148:8
**re-rule** [1] - 148:8
**reach** [2] - 51:3, 74:12
**reached** [2] - 38:7, 145:23, 156:15
**reaching** [1] - 35:3
**react** [1] - 119:4
**read** [32] - 11:25, 12:1, 18:2, 36:17, 49:23, 63:6, 63:7, 63:9, 64:15, 69:18, 70:4, 70:5, 70:10, 78:10, 78:11, 87:7, 87:24, 94:5, 98:4, 110:6, 115:9, 115:12, 118:21, 118:25,

119:6, 126:9, 147:15, 148:22, 148:23, 150:24, 153:15
**reading** [14] - 18:5, 64:6, 64:20, 74:22, 76:4, 77:12, 78:24, 82:2, 87:18, 98:2, 98:3, 116:21, 132:1
**Reading** [1] - 109:5
**ready** [5] - 68:14, 71:12, 71:21, 145:9, 150:7
**real** [5] - 7:21, 40:6, 75:6, 88:12, 155:22
**realistically** [2] - 74:13, 74:17
**realize** [1] - 48:15
**realizing** [1] - 48:18
**really** [11] - 7:18, 8:2, 33:25, 81:24, 97:20, 97:21, 100:23, 113:14, 133:18, 150:20, 163:8
**realtor** [3] - 7:23, 9:9, 9:10
**realtors** [5] - 6:23, 7:16, 7:19, 8:5, 8:18
**reason** [5] - 15:19, 66:25, 80:22, 103:11, 140:17
**reasonable** [3] - 87:12, 92:11, 115:15
**reasons** [1] - 121:14
**rebut** [1] - 61:18
**rebuttal** [4] - 56:19, 58:10, 61:25, 65:25
**receipts** [2] - 127:6, 127:11
**received** [1] - 15:8
**recent** [3] - 101:24, 102:24, 104:14
**recess** [2] - 77:24, 145:20
**recipients** [1] - 17:13
**recognize** [4] - 16:20, 21:25, 30:7, 30:16
**recollection** [2] - 18:3, 18:6
**record** [18] - 4:24, 12:20, 26:11, 58:3, 63:13, 71:11, 77:14, 85:5, 106:16, 121:24, 123:3, 123:9, 130:8, 145:17, 146:17, 157:22, 157:24, 163:22
**records** [3] - 25:13, 31:22, 56:4

**recovery** [1] - 35:4
**RECROSS** [1] - 55:21
**RECROSS-**
 **EXAMINATION** [1] -
 55:21
**red** [1] - 4:6
**redesigning** [1] - 48:6
**redid** [1] - 7:16
**Redirect** [1] - 2:8
**redirect** [1] - 51:7
**REDIRECT** [1] - 51:9
**redraft** [1] - 68:13
**refer** [3] - 16:15,
 34:20, 88:17
**reference** [1] - 87:4
**referred** [1] - 12:17
**referring** [1] - 136:11
**refers** [2] - 34:11,
 155:4
**reflect** [1] - 13:2, 58:3
**refresh** [1] - 18:6
**refreshes** [1] - 18:2
**refused** [3] - 146:15,
 148:19, 158:22
**regard** [5] - 11:13,
 14:13, 61:11, 101:3,
 141:20
**regarding** [9] - 13:12,
 14:10, 53:15, 54:16,
 61:7, 82:9, 103:7,
 108:6, 143:3
**regulations** [1] -
 109:11
**Rehnquist** [1] - 74:7
**Reisinger** [2] - 47:5,
 47:9
**related** [5] - 29:13,
 29:16, 34:18, 34:19,
 53:18
**relationship** [5] -
 126:25, 127:2,
 128:7, 128:19, 129:5
**relative** [1] - 153:11
**relatively** [1] - 114:6
**relevance** [1] - 58:9
**reliable** [1] - 39:3
**remain** [1] - 57:15
**remainder** [1] - 87:22
**remaining** [1] - 144:21
**remains** [1] - 5:7
**remember** [9] - 17:15,
 20:6, 27:9, 45:17,
 45:24, 69:23, 78:1,
 87:18, 107:3
**remote** [1] - 22:19
**removal** [1] - 135:16
**remove** [3] - 15:9,
 15:13, 134:4
**removed** [4] - 15:17,
 134:6, 135:15,

142:19
**removing** [1] - 14:10
**repeated** [1] - 94:13
**rephrase** [1] - 45:7
**replacement** [4] -
 76:13, 76:14,
 125:10, 134:20
**replicating** [1] - 100:9
**report** [19] - 4:7, 4:14,
 22:1, 22:5, 22:18,
 23:23, 23:25, 24:9,
 24:18, 30:8, 30:11,
 30:17, 31:18, 32:20,
 32:23, 33:4, 34:8,
 35:19, 37:12
**reported** [2] - 1:24,
 22:19
**REPORTER** [1] -
 163:12
**reporter** [8] - 12:1,
 63:3, 63:9, 68:8,
 145:18, 161:16,
 161:23, 163:13
**Reporter** [1] - 1:22
**REPORTER'S** [1] -
 163:20
**reports** [9] - 4:2, 4:15,
 4:21, 5:1, 22:17,
 26:14, 32:24, 33:6,
 40:25
**represent** [3] - 35:11,
 62:3, 66:10
**representation** [1] -
 21:19
**representative** [1] -
 21:11
**reproduction** [1] -
 134:5
**request** [1] - 157:11
**requested** [1] - 69:15
**requesting** [1] - 26:7
**required** [5] - 4:25,
 109:1, 150:16,
 152:3, 153:7
**requirement** [1] - 10:1
**requires** [5] - 10:1,
 102:8, 135:11,
 142:18, 149:6
**research** [1] - 47:20
**reserve** [2] - 64:23,
 69:25
**resolve** [1] - 131:14
**resolved** [1] - 145:8
**respond** [1] - 131:17
**response** [3] - 59:6,
 98:22, 131:16
**rest** [6] - 48:6, 56:14,
 56:15, 57:19,
 149:15, 158:23
**Rests** [2] - 2:10, 2:11

**result** [2] - 40:14,
 40:16
**resulted** [1] - 125:25
**resulting** [1] - 126:5
**results** [2] - 43:11,
 137:6
**resume** [2] - 71:12,
 71:21
**return** [3] - 75:12,
 95:8, 145:3
**revenue** [13] - 26:15,
 124:5, 124:16,
 127:4, 127:5,
 127:10, 127:13,
 127:17, 129:9,
 129:13, 130:2,
 131:25, 132:7
**revenues** [11] - 36:5,
 44:17, 44:18, 59:4,
 123:14, 123:15,
 124:10, 124:12,
 124:14, 128:13,
 129:23
**reversible** [2] - 98:10,
 157:1
**review** [1] - 26:18
**reviewed** [1] - 13:19
**revised** [2] - 154:15,
 154:16
**revisions** [2] - 27:21,
 27:25
**rid** [1] - 151:10
**riding** [1] - 134:15
**rights** [6] - 87:5,
 129:14, 129:15,
 131:20, 140:6
**rings** [1] - 117:2
**roll** [1] - 44:6
**room** [6] - 3:8, 10:10,
 58:4, 76:24, 100:8,
 100:9
**rooms** [2] - 8:6,
 100:18
**rotation** [1] - 20:23
**round** [2] - 73:10,
 74:25
**route** [3] - 87:2, 111:8,
 120:19
**RPR** [2] - 1:22, 163:25
**rule** [11] - 57:11,
 68:13, 92:6, 94:24,
 101:13, 110:3,
 112:6, 112:7, 145:9,
 146:8, 148:8
**ruled** [4] - 82:14,
 113:13, 123:8,
 144:14
**ruling** [15] - 4:22, 5:7,
 58:5, 58:15, 60:4,
 65:24, 94:20, 94:24,

111:13, 112:20,
 143:16, 146:11,
 147:24, 152:5,
 160:13
**rulings** [3] - 154:20,
 159:10, 159:19
**run** [5] - 32:24, 69:20,
 75:18, 77:10, 83:8
**running** [2] - 15:24,
 145:16
**rush** [1] - 69:14

---

**S**

**s/Bruce** [1] - 163:25
**safer** [3] - 117:3,
 118:2, 157:5
**safest** [1] - 94:23
**salary** [2] - 6:24, 28:22
**sale** [16] - 5:22, 20:14,
 34:15, 36:13, 42:25,
 43:4, 43:9, 43:10,
 43:11, 127:6,
 127:11, 127:22,
 128:17, 129:17,
 130:20, 131:20
**sales** [23] - 6:25, 7:5,
 9:5, 12:21, 12:24,
 26:15, 28:12, 29:12,
 29:14, 29:16, 29:20,
 29:21, 31:19, 34:18,
 34:19, 36:8, 36:19,
 36:24, 36:25, 44:4,
 53:18, 53:24
**salespeople** [1] - 55:2
**Sam** [3] - 47:12,
 48:11, 50:20
**sample** [1] - 56:25
**sandwich** [2] - 65:14,
 70:20
**sat** [1] - 48:5
**satisfied** [2] - 157:21,
 157:23
**Saturday** [3] - 7:7,
 8:13, 8:15
**save** [1] - 8:8
**saw** [2] - 13:12, 47:23
**scenes** [1] - 33:6
**schedule** [5] - 57:20,
 65:6, 65:16, 70:3,
 70:24
**scheduling** [4] -
 57:23, 58:2, 60:4,
 72:2
**school** [1] - 103:7
**Schwarzenegger** [1] -
 107:8
**scratch** [9] - 45:21,
 45:25, 46:6, 47:14,
 47:20, 47:25, 48:21,

48:23, 48:24
**scratch'** [1] - 46:10
**screen** [5] - 12:4,
 16:4, 25:15, 34:2,
 51:15
**script** [2] - 107:3,
 107:9
**scroll** [2] - 13:1, 21:13
**scènes** [17] - 96:6,
 106:24, 107:13,
 108:1, 108:7, 108:8,
 108:20, 110:22,
 111:23, 114:15,
 150:22, 150:25,
 151:13, 152:16,
 152:18, 153:5,
 153:16
**Scènes** [3] - 106:12,
 109:9, 114:17
**seal** [1] - 162:25
**sealed** [1] - 162:24
**sealing** [1] - 162:25
**seated** [2] - 3:12, 5:11
**Second** [1] - 109:8
**second** [21] - 10:7,
 10:10, 49:15, 50:10,
 51:18, 58:22, 64:5,
 72:5, 82:9, 84:8,
 87:6, 100:8, 110:7,
 114:12, 117:11,
 133:23, 135:5,
 146:10, 146:12,
 150:12, 155:24
**secondly** [3] - 116:7,
 121:22, 129:7
**secret** [1] - 137:10
**section** [1] - 92:19
**Section** [1] - 141:17
**See** [1] - 122:12
**see** [55] - 14:2, 23:3,
 26:14, 28:8, 29:13,
 29:17, 34:2, 39:12,
 39:14, 40:23, 46:4,
 57:19, 57:21, 60:13,
 64:8, 66:23, 67:23,
 71:21, 73:18, 75:2,
 75:17, 77:4, 77:22,
 79:11, 87:8, 88:4,
 88:21, 90:11, 93:4,
 94:19, 95:2, 95:10,
 95:11, 101:13,
 111:8, 111:18,
 112:2, 114:23,
 117:8, 117:17,
 117:18, 118:3,
 118:11, 126:6,
 126:10, 133:2,
 140:23, 145:22,
 151:17, 154:19,
 158:6, 158:8, 163:5,

163:14
**see..** [1] - 133:5
**seeing** [1] - 33:25
**seem** [1] - 65:8
**selection** [2] - 15:21, 62:4
**self** [1] - 129:6
**self-effectuated** [1] - 129:6
**sell** [4] - 6:8, 6:14, 9:14, 18:23
**seller** [1] - 6:18
**seller's** [1] - 6:2
**selling** [7] - 6:24, 7:10, 29:23, 80:8, 81:6, 84:13, 129:19
**selling..** [1] - 84:18
**send** [3] - 14:21, 18:22, 19:12
**sending** [1] - 16:13
**sensible** [1] - 101:18
**sent** [8] - 16:17, 18:4, 18:7, 18:25, 26:6, 50:21, 54:9, 54:12
**sentence** [29] - 74:8, 87:6, 92:9, 92:23, 94:1, 94:5, 94:8, 94:10, 108:14, 116:14, 117:10, 117:11, 124:2, 124:9, 126:21, 132:2, 145:25, 146:1, 146:9, 148:4, 149:5, 149:11, 149:18, 150:14, 155:14, 155:16, 155:19, 158:17, 158:22
**sentences** [3] - 90:5, 93:20, 99:22
**sentencing** [2] - 71:7, 75:23
**separate** [2] - 75:9, 131:7, 139:10
**sequentially** [1] - 79:12
**series** [3] - 4:2, 60:20, 101:16
**service** [1] - 137:1
**set** [10] - 7:25, 16:23, 57:11, 61:12, 65:15, 70:24, 89:8, 123:20, 128:8, 129:10
**setbacks** [1] - 61:11
**sets** [1] - 67:5
**setting** [3] - 108:23, 151:2, 153:19
**settled** [1] - 123:9
**seven** [5] - 6:16, 7:2, 7:3, 7:7, 53:20

**several** [3] - 19:2, 23:16, 135:24
**shall** [1] - 119:12
**share** [1] - 10:24
**shared** [2] - 25:24, 25:25
**sheets** [1] - 71:24
**shift** [2] - 127:15, 127:19
**shifts** [1] - 124:13
**ships** [1] - 105:11
**short** [4] - 70:19, 71:14, 113:1, 139:13
**shorter** [1] - 70:6
**shorthand** [2] - 86:24, 87:4
**shortly** [1] - 123:8
**shot** [4] - 77:4, 111:4, 112:10, 112:13
**show** [18] - 12:3, 12:20, 20:14, 21:1, 21:6, 21:18, 21:20, 36:18, 40:20, 42:4, 42:15, 53:25, 54:21, 60:23, 61:22, 67:19, 107:16
**showed** [6] - 24:2, 24:10, 24:19, 47:21, 126:25, 144:18
**showing** [4] - 8:9, 40:18, 62:2, 66:9
**shown** [8] - 17:6, 24:5, 31:18, 34:6, 40:16, 46:6, 91:3, 115:20
**showroom** [12] - 6:16, 7:2, 7:6, 7:12, 7:17, 8:1, 10:25, 29:14, 53:19, 53:21, 54:2, 55:2
**shows** [3] - 44:24, 85:6, 139:8
**side** [19] - 6:2, 6:14, 6:15, 14:3, 23:3, 50:25, 68:9, 69:15, 73:21, 74:1, 77:9, 83:11, 100:19, 115:21, 115:23, 127:20
**side-by-side** [2] - 115:21, 115:23
**sides** [4] - 6:1, 6:17, 81:24, 99:21
**sign** [2] - 49:23, 162:25
**signature** [1] - 145:2
**signed** [1] - 50:4
**significant** [2] - 11:4, 11:9, 11:10
**significantly** [1] - 139:9

**signs** [1] - 32:1
**similar** [7] - 91:23, 92:3, 115:14, 115:16, 115:22, 142:16
**similar..** [1] - 91:20
**similarities** [1] - 107:11
**similarity** [10] - 114:18, 115:17, 115:25, 116:15, 149:20, 150:23, 152:12
**similarity"** [2] - 114:25, 154:24
**similarly** [3] - 96:21, 128:16, 139:2
**simply** [5] - 100:14, 110:16, 113:25, 130:23, 132:25
**single** [9] - 8:15, 8:20, 20:6, 20:7, 32:4, 32:13, 36:21, 44:10, 67:24
**single-spaced** [1] - 67:24
**sit** [10] - 8:3, 8:5, 8:6, 72:9, 73:1, 73:8, 73:11, 74:4, 74:8, 77:4
**site** [1] - 21:2
**sitting** [1] - 68:7
**situation** [1] - 108:7
**situations** [1] - 68:23
**six** [5] - 7:1, 28:12, 31:19, 33:17, 61:15
**Sixth** [2] - 107:20, 107:21
**size** [1] - 10:2
**skills** [1] - 20:23
**skip** [1] - 112:24
**skunks** [1] - 92:1
**SLAVIN** [2] - 163:21, 163:25
**Slavin** [2] - 1:22, 163:25
**sloppy** [1] - 94:18
**small** [1] - 138:11
**snacks** [2] - 65:4, 70:16
**so..** [1] - 148:13
**soften** [1] - 89:12
**software** [1] - 26:23
**sold** [6] - 6:14, 10:12, 19:3, 33:17, 36:21, 38:1, 124:5
**solution** [3] - 151:9, 156:9, 156:12
**solutions** [1] - 156:16
**solved** [2] - 79:17,

85:11
**solving** [1] - 85:11
**someone** [3] - 135:12, 135:22, 136:2
**sometime** [1] - 48:25
**sometimes** [7] - 8:25, 14:21, 43:15, 43:18, 64:7, 70:4, 76:8
**somewhat** [2] - 29:13, 69:14
**somewhere** [3] - 18:7, 26:5, 97:18
**soon** [2] - 65:17, 75:24
**sorry** [15] - 12:9, 12:10, 16:4, 20:7, 31:15, 35:9, 41:23, 42:19, 53:1, 90:12, 91:2, 92:24, 110:20, 142:21, 152:15
**sort** [3] - 8:7, 77:3, 157:6
**sound** [2] - 19:23, 66:14
**sounding** [1] - 151:21
**Southern** [1] - 115:6
**SOUTHERN** [1] - 1:1
**spaced** [7] - 67:24, 74:19, 74:20, 74:23, 75:1, 162:11
**spacing** [1] - 162:5
**speaking** [1] - 63:11
**special** [1] - 130:17
**specific** [5] - 22:15, 23:15, 32:22, 43:10, 87:25
**specifically** [2] - 44:16, 60:20
**specifics** [1] - 145:11
**spelled** [1] - 126:17
**spend** [1] - 72:13
**spending** [1] - 6:18
**spent** [2] - 34:9, 35:3
**Spice** [8] - 102:25, 103:3, 103:11, 104:4, 104:14, 104:21, 104:23, 105:3
**split** [1] - 9:2
**splitting** [1] - 9:9
**spread** [1] - 42:17
**spreadsheet** [5] - 13:12, 13:15, 14:5, 31:24, 37:13
**square** [1] - 6:9
**Stacy** [2] - 123:1, 123:6
**staff** [13] - 6:20, 6:25, 7:4, 9:16, 29:15, 36:7, 36:24, 53:18,

54:22, 64:8, 64:11, 161:15, 161:20
**staffed** [2] - 7:19, 8:15
**stages** [1] - 21:9
**stair** [1] - 106:5
**STAN** [1] - 89:17
**stand** [4] - 5:12, 53:12, 59:15, 153:11
**standard** [11] - 8:24, 32:5, 78:11, 94:15, 96:16, 98:22, 108:22, 123:11, 149:13, 151:1, 153:17
**stands** [1] - 124:17
**Stanford** [27] - 12:18, 12:19, 14:7, 19:12, 24:20, 24:22, 25:4, 34:16, 36:13, 36:22, 88:10, 88:17, 89:4, 89:18, 89:19, 89:20, 89:21, 90:2, 90:19, 90:24, 91:1, 91:8, 91:10, 91:13, 91:15, 95:12
**staple** [2] - 94:15, 149:14
**Starbucks** [2] - 35:23, 53:22
**start** [12] - 6:1, 16:8, 76:4, 77:11, 78:3, 88:24, 96:1, 99:14, 100:21, 100:22, 128:5
**started** [3] - 4:5, 25:16, 48:17
**starting** [2] - 30:16, 57:3
**starts** [7] - 30:2, 30:7, 64:21, 84:9, 93:19, 100:23, 112:18
**state** [5] - 68:21, 71:2, 74:1, 79:7, 162:17
**statement** [21] - 44:22, 45:20, 47:24, 48:8, 58:16, 63:9, 82:13, 84:16, 84:21, 94:12, 99:6, 101:10, 124:8, 128:23, 130:2, 132:10, 141:11, 141:14, 151:6, 152:8
**statements** [3] - 56:19, 58:11, 124:24
**states** [1] - 153:6
**STATES** [1] - 1:1
**States** [4] - 97:13, 103:5, 104:24, 113:17
**status** [1] - 73:17

**statute** [10] - 123:13, 134:23, 135:4, 135:11, 137:5, 137:13, 141:17, 141:20, 142:18
**stay** [1] - 153:22
**stenography** [1] - 1:24
**step** [1] - 56:11
**Stephanie** [1] - 70:17
**STEPHEN** [1] - 1:7
**steps** [1] - 32:22
**stick** [2] - 103:22, 145:7
**sticking** [2] - 71:5, 163:11
**still** [17] - 4:6, 4:25, 9:13, 16:4, 24:1, 27:18, 28:6, 46:5, 48:21, 79:24, 86:20, 125:2, 136:22, 146:6, 148:11, 148:20, 151:21
**Stipulated** [1] - 78:15
**stipulated** [3] - 82:22, 87:14, 121:25
**stock** [5] - 9:19, 11:14, 108:22, 151:1, 153:17
**stop** [4] - 64:9, 70:6, 72:14, 78:13
**stops** [1] - 13:16
**stories** [1] - 110:13
**story** [6] - 59:18, 100:15, 100:17, 107:14, 131:3
**straight** [4] - 65:5, 108:5, 108:8, 162:15
**straightforward** [1] - 93:14
**street** [1] - 12:18
**Street** [23] - 12:19, 19:1, 19:13, 24:2, 24:20, 24:23, 25:4, 25:5, 28:13, 34:16, 36:13, 36:14, 36:22, 45:25, 46:25, 88:10, 88:17, 89:19, 89:20, 89:21, 90:2, 95:12
**strict** [1] - 67:7
**strike** [2] - 11:15, 126:20
**strikingly** [2] - 91:19, 92:3
**strong** [3] - 67:7, 115:11, 115:12
**stronger** [1] - 89:15
**STROTHER** [183] - 3:18, 5:14, 12:6, 15:25, 51:6, 51:14, 51:17, 51:19, 55:14,

55:19, 56:9, 56:13, 57:7, 59:8, 59:24, 61:6, 63:1, 63:15, 63:25, 66:17, 66:19, 67:14, 72:19, 72:21, 73:2, 73:5, 73:9, 76:8, 76:15, 76:19, 76:23, 77:2, 77:16, 77:18, 79:4, 80:15, 80:17, 82:7, 83:1, 83:25, 84:20, 84:23, 85:21, 87:17, 89:12, 89:18, 90:1, 90:4, 90:8, 90:23, 91:2, 91:8, 92:16, 92:21, 93:3, 93:6, 93:11, 94:4, 94:11, 94:17, 95:5, 95:8, 95:17, 95:19, 95:22, 95:24, 96:2, 96:11, 96:13, 96:19, 96:21, 96:25, 97:2, 97:6, 97:12, 97:15, 97:24, 99:22, 100:4, 100:7, 100:13, 101:14, 101:21, 102:1, 102:5, 102:20, 102:22, 102:25, 103:3, 103:21, 103:24, 104:10, 104:21, 104:23, 105:3, 106:20, 108:5, 108:13, 108:17, 109:7, 111:16, 112:24, 113:2, 113:16, 113:22, 114:5, 114:8, 118:17, 118:22, 119:3, 120:10, 120:13, 121:13, 122:18, 124:19, 124:23, 125:12, 125:18, 126:2, 126:8, 126:18, 126:21, 127:8, 131:17, 133:7, 133:10, 135:2, 135:7, 135:10, 137:24, 138:4, 138:10, 138:17, 139:7, 139:24, 140:10, 140:13, 140:19, 140:21, 140:24, 141:1, 141:13, 141:24, 142:2, 142:7, 142:13, 142:16, 142:21, 143:1, 143:10, 143:13, 144:12, 145:13, 146:1,

146:4, 146:14, 146:16, 146:19, 147:13, 147:21, 148:16, 149:24, 150:2, 150:4, 151:8, 151:16, 151:19, 151:24, 152:6, 152:14, 154:6, 154:17, 155:7, 156:15, 156:23, 157:22, 157:25, 159:4, 159:11, 159:20, 160:7, 160:20, 163:17
**strother** [3] - 110:6, 137:10, 145:11
**Strother** [26] - 1:20, 1:20, 2:6, 2:8, 4:1, 5:17, 11:12, 12:7, 16:9, 25:13, 37:21, 51:10, 51:20, 80:3, 83:15, 86:1, 92:8, 93:20, 104:13, 107:24, 119:23, 137:18, 142:2, 144:6, 150:21
**Strother's** [1] - 84:10
**struck** [1] - 126:19
**structures..** [1] - 109:13
**stuff** [8] - 3:2, 15:17, 45:9, 49:9, 69:8, 93:5, 98:8, 125:11
**subheading** [1] - 99:19
**subject** [2] - 16:8, 88:25
**submission** [4] - 141:5, 158:14, 158:17, 159:23
**submit** [1] - 125:9
**submits** [2] - 76:7, 76:12
**submitted** [20] - 74:11, 76:5, 76:11, 76:16, 85:8, 85:21, 86:1, 98:24, 119:24, 122:24, 132:22, 140:16, 144:16, 148:18, 148:24, 149:22, 150:8, 153:24, 156:4
**subsequently** [1] - 115:5
**substantial** [10] - 12:2, 114:18, 114:25, 115:17, 115:25, 116:15, 149:19, 150:23, 154:24, 155:17

**substantially** [3] - 115:14, 115:16, 115:22
**substitute** [1] - 158:3
**subsumed** [1] - 86:7
**subtracted** [1] - 37:23
**suggest** [2] - 70:18, 70:22
**suggested** [2] - 142:23, 156:19
**suggesting** [1] - 154:11
**suggestion** [2] - 70:14, 151:11
**suggestions** [2] - 145:10, 151:15
**suing** [1] - 14:9
**Suite** [3] - 1:16, 1:18, 1:21
**sum** [3] - 63:20, 69:16, 123:20
**summaries** [2] - 4:2, 115:9
**summarized** [2] - 25:21, 38:18
**summary** [17] - 4:7, 4:13, 4:15, 4:21, 5:1, 113:9, 118:13, 118:15, 118:18, 119:25, 120:3, 120:7, 120:22, 121:16, 121:21, 134:11, 144:7
**summary-type** [1] - 4:7
**summation** [4] - 62:17, 72:5, 72:17, 112:20
**sums** [1] - 126:10
**Sunday** [3] - 7:7, 8:13, 8:15
**super** [1] - 71:15
**superceded** [1] - 101:25
**supplemental** [1] - 133:18
**support** [5] - 4:7, 7:4, 9:16, 133:13, 149:18
**supporting** [2] - 19:5, 26:7, 45:2
**supports** [1] - 37:14
**supposed** [4] - 52:3, 134:3, 134:7, 134:9
**Supreme** [5] - 74:6, 97:13, 103:5, 104:24, 113:17
**sustained** [1] - 33:9
**Suzanne** [1] - 100:25
**sworn** [2] - 46:17, 49:18

**system** [3] - 7:25, 26:23, 32:3

## T

**table** [3] - 65:23, 68:7, 77:7
**talks** [6] - 102:16, 103:4, 104:3, 116:7, 130:11, 130:13
**tangent** [1] - 98:17
**tangents** [1] - 98:25
**taught** [1] - 103:7
**team** [12] - 6:25, 7:5, 14:20, 17:14, 19:10, 19:17, 22:8, 36:9, 53:19, 53:23, 54:22
**teams** [1] - 36:24
**technical** [1] - 98:8
**technology** [2] - 71:18, 98:7
**ten** [6] - 70:1, 70:8, 70:11, 70:12, 70:20, 107:4
**ten-minute** [3] - 70:8, 70:11, 70:12
**tender** [15] - 148:4, 148:7, 148:19, 149:23, 150:11, 151:9, 153:22, 155:10, 157:12, 157:17, 158:21, 158:22, 160:10, 160:14, 160:24
**tendered** [1] - 117:24
**Tenth** [1] - 86:16
**term** [3] - 46:10, 92:2, 147:16
**terminology** [1] - 101:7
**terms** [2] - 110:6, 133:21
**testified** [12] - 8:22, 9:18, 18:6, 50:17, 59:13, 60:1, 61:2, 61:3, 61:8, 61:21, 90:17, 120:15
**testifying** [1] - 66:22
**testimony** [9] - 46:5, 46:18, 49:18, 57:10, 61:7, 61:18, 71:18, 108:6
**TEXAS** [1] - 1:1
**Texas** [1] - 106:15
**text** [2] - 50:24, 51:1
**textile** [1] - 137:10
**that's..** [1] - 137:19
**theirs** [1] - 116:3
**theme** [3] - 108:23, 151:2, 153:18

**themselves** [2] - 93:22, 146:2
**theory** [3] - 91:21, 108:3, 124:1
**therefore** [11] - 58:25, 82:24, 115:21, 119:17, 120:2, 136:18, 139:1, 139:4, 149:6, 156:5, 157:17
**thesaurus** [1] - 151:17
**they've** [1] - 69:23
**thinking** [6] - 6:3, 83:25, 98:5, 110:21, 111:2, 112:8
**thinks** [3] - 111:3, 111:20, 112:10
**third** [13] - 10:8, 24:8, 39:18, 58:22, 92:13, 108:13, 117:11, 124:2, 131:23, 147:11, 150:12, 155:3
**Third** [2] - 110:7, 137:12
**thousands** [1] - 10:13
**three** [25] - 7:3, 10:10, 10:17, 12:8, 14:4, 14:11, 14:18, 15:1, 21:6, 31:25, 36:12, 43:19, 44:11, 71:18, 73:3, 84:10, 92:14, 100:15, 100:17, 110:13, 120:19, 121:8, 121:10, 144:21
**three-story** [2] - 100:15, 100:17
**threw** [1] - 91:25
**throwing** [1] - 100:5
**tie** [1] - 132:8
**tighten** [1] - 132:8
**time-wise** [1] - 72:1
**timesheets** [1] - 71:25
**tiny** [1] - 142:17
**title** [5] - 17:6, 46:23, 75:1, 75:10, 78:4
**today** [4] - 4:5, 46:18, 46:20, 53:13
**today'** [1] - 65:16
**toe** [7] - 115:7, 115:8, 118:7, 122:22
**toe-ma-toe** [1] - 115:8
**toe-may-to** [1] - 115:7
**toe-may-toe/toe-ma-toe** [2] - 118:7, 122:22
**toe/toe** [2] - 118:7, 122:22
**together** [9] - 59:9,

74:15, 101:16, 101:19, 102:5, 105:23, 106:7, 107:11, 125:5
**tomorrow** [9] - 69:10, 69:17, 71:1, 71:13, 71:21, 77:8, 146:20, 162:1, 163:14
**took** [9] - 26:21, 28:4, 32:23, 37:3, 38:21, 41:24, 42:20, 53:12, 126:16
**tools** [1] - 8:4
**top** [10] - 17:5, 19:19, 25:21, 26:13, 28:8, 37:19, 40:25, 75:3, 121:17, 128:5
**topic** [3] - 108:22, 151:1, 153:17
**topography** [1] - 109:13
**toss** [1] - 92:7
**total** [12] - 12:21, 22:19, 34:20, 34:21, 36:1, 36:16, 38:8, 39:21, 41:17, 70:1, 74:3, 115:15
**totally** [1] - 92:22
**touched** [1] - 116:25
**touching** [1] - 116:19
**tough** [3] - 97:20, 97:21, 98:3
**towards** [1] - 13:3
**townhome** [6] - 56:21, 56:25, 58:15, 59:25, 62:3, 66:9
**townhomes** [4] - 58:20, 60:14, 60:24
**townhouse** [4] - 46:25, 61:23, 100:15, 100:17
**townhouses** [1] - 110:11
**tracking** [1] - 134:22
**tracks** [1] - 141:19
**tracts** [1] - 60:14
**traded** [1] - 74:9
**trademark** [1] - 103:12
**traditional** [1] - 7:21
**transaction** [6] - 8:25, 9:8, 9:9, 28:17, 28:20, 28:25
**transactions** [1] - 36:17
**transcript** [1] - 163:22
**transcription** [1] - 1:25
**Travel** [1] - 35:15
**travel** [2] - 36:1, 36:11
**treated** [1] - 105:12

**treatment** [3] - 108:25, 151:3, 153:19
**Tregoe** [1] - 104:5
**tremendous** [1] - 6:19
**trial** [9] - 1:10, 5:5, 82:19, 101:16, 128:8, 133:17, 136:13, 136:21
**trick** [2] - 49:3, 49:10
**tricked** [1] - 125:4
**tried** [9] - 50:24, 51:1, 51:3, 73:24, 137:10, 150:2, 150:3, 155:8
**tries** [1] - 123:22
**trouble** [1] - 99:18
**truck** [1] - 91:21
**true** [3] - 4:23, 35:19, 117:2
**truthful** [1] - 152:8
**try** [13] - 8:18, 10:17, 18:24, 19:24, 21:17, 22:15, 27:4, 29:7, 34:1, 43:3, 53:20, 68:6, 87:25
**trying** [10] - 7:14, 10:14, 18:23, 29:17, 43:20, 44:7, 82:25, 83:8, 101:18, 147:2
**Tuesday** [1] - 69:10
**Tuesdays** [1] - 63:22
**turn** [4] - 13:15, 17:19, 33:23, 40:22
**turned** [1] - 38:13
**tweak** [1] - 111:9
**twelve** [1] - 107:4
**two** [41] - 6:1, 10:7, 10:8, 31:25, 58:22, 59:15, 59:16, 59:18, 65:1, 72:17, 73:1, 73:2, 73:8, 73:13, 73:15, 73:16, 80:2, 80:3, 80:13, 81:21, 82:1, 82:7, 82:10, 90:5, 92:23, 93:19, 96:3, 101:15, 105:10, 110:7, 110:12, 115:16, 115:22, 116:1, 120:14, 121:14, 132:3, 145:10, 150:10
**two-minute** [2] - 73:8, 73:13
**two-story** [1] - 59:18
**TX** [3] - 1:16, 1:19, 1:21
**type** [8] - 4:7, 4:14, 8:10, 26:7, 78:9, 107:14, 112:1
**typical** [3] - 7:12, 8:11,

66:21
**typically** [4] - 10:2, 10:16, 21:17, 27:4
**typo** [1] - 155:3

**U**

**U.S** [1] - 74:6
**UL** [1] - 1:7
**unambiguous** [1] - 137:5
**unanimous** [2] - 75:13, 145:4
**uncertain** [1] - 119:5
**under** [14] - 41:23, 48:20, 71:15, 81:3, 110:22, 123:17, 123:21, 130:17, 133:19, 135:23, 136:21, 150:24, 151:13, 153:15
**undercut** [1] - 150:17
**undercutting** [2] - 151:22, 152:4
**underlying** [1] - 9:19
**understood** [2] - 58:15, 59:1
**undertaken** [1] - 102:11
**underway** [2] - 64:14, 75:24
**unduly** [1] - 59:22
**unique** [13] - 22:23, 23:9, 23:10, 23:12, 23:14, 23:22, 24:5, 24:12, 24:22, 54:25, 55:5, 147:20, 147:22
**unit** [1] - 36:21
**UNITED** [1] - 1:1
**United** [4] - 97:13, 103:5, 104:24, 113:17
**units** [8] - 10:9, 28:12, 31:19, 33:17, 38:1, 43:7, 48:7, 60:18
**unless** [3] - 78:22, 113:12, 127:21
**unnecessary** [1] - 82:16
**unprotectable** [1] - 97:16
**unprotected** [6] - 97:3, 97:17, 102:7, 102:13, 104:12, 141:15
**unrelated** [1] - 59:10
**unruly** [1] - 150:21
**unusual** [2] - 62:21, 78:22
**up** [69] - 5:20, 6:11,

7:25, 17:3, 21:13, 21:22, 23:2, 26:2, 27:6, 29:7, 31:14, 34:2, 36:17, 37:12, 38:17, 40:8, 41:15, 42:25, 45:21, 47:13, 47:25, 49:9, 50:4, 53:9, 55:6, 55:16, 55:18, 62:17, 62:22, 63:10, 63:21, 64:8, 69:16, 70:1, 70:13, 71:8, 71:13, 71:25, 72:14, 78:4, 78:9, 79:3, 79:15, 82:3, 83:10, 85:2, 100:2, 107:3, 107:12, 112:19, 116:13, 117:18, 118:3, 123:20, 124:2, 126:10, 131:6, 132:8, 137:1, 139:4, 146:6, 148:23, 151:16, 159:9, 161:17, 162:24, 162:25, 163:2
**updates** [1] - 50:13
**uploading** [1] - 136:4
**UPM** [1] - 14:6
**upon..** [1] - 81:16
**upper** [2] - 79:15, 85:19
**URBAN** [1] - 1:7
**urban** [2] - 62:2, 66:9
**Urban** [41] - 5:22, 5:24, 6:4, 7:12, 8:22, 9:19, 9:21, 14:9, 15:4, 15:8, 15:9, 15:13, 15:21, 16:12, 16:24, 17:5, 20:14, 22:1, 22:9, 22:13, 24:2, 24:10, 24:19, 25:3, 26:24, 28:18, 29:10, 30:9, 31:9, 56:3, 60:12, 60:22, 90:10, 90:15, 91:3, 91:6, 120:16, 128:16, 138:24, 138:25, 143:8
**URL** [1] - 23:4
**uses** [1] - 22:9

**V**

**valid** [12] - 81:1, 81:18, 82:14, 109:24, 113:9, 113:10, 113:13, 113:20, 114:20, 150:18, 151:22, 151:24
**validity** [1] - 113:24

4-20

**value** [5] - 59:3, 61:5, 124:3, 124:10, 129:14
**various** [3] - 31:12, 54:2, 83:3
**vehicle** [2] - 33:3, 33:13
**verbatim** [2] - 54:22, 55:23
**verdict** [11] - 68:17, 75:10, 75:13, 137:18, 144:2, 145:4, 158:25, 161:7, 162:20, 162:21, 163:2
**verdict"** [1] - 75:11
**Verdict"** [1] - 144:25
**Vernon** [5] - 120:14, 120:23, 121:23, 139:17, 144:17
**version** [1] - 132:25
**version..** [1] - 86:24
**versus** [3] - 11:21, 97:22, 114:16
**vertically** [1] - 61:15
**vicarious** [1] - 137:22
**view** [10] - 22:23, 23:12, 23:14, 83:5, 86:2, 92:11, 98:12, 117:3, 136:23
**views** [16] - 23:9, 23:10, 23:17, 23:22, 24:5, 24:12, 24:22, 54:22, 54:25, 55:6, 135:19, 136:6, 136:23, 143:3
**VINOD** [2] - 1:7, 2:5
**violated** [3] - 134:12, 136:10, 158:20
**violates** [1] - 134:1
**violation** [10] - 99:24, 100:10, 124:3, 134:13, 135:3, 136:5, 136:16, 136:17, 136:19
**violations** [1] - 158:19
**violative** [5] - 135:23, 136:3, 136:4, 136:19, 143:4
**voiced** [1] - 63:14
**voir** [1] - 141:13
**VOLUME** [1] - 1:12

---

## W

**wait** [5] - 50:10, 50:19, 52:14, 65:13, 146:10
**waive** [1] - 140:5
**walk** [2] - 6:10, 163:5
**walked** [1] - 100:25

**walks** [1] - 103:1
**wants** [5] - 80:3, 81:20, 107:24, 135:17, 144:7
**warning** [1] - 73:13
**warrant** [1] - 139:9
**warranty** [1] - 43:17
**watching** [1] - 103:20
**ways** [12] - 56:20, 58:14, 59:14, 60:24, 61:4, 62:2, 62:3, 66:9, 66:10, 83:3, 108:1, 113:4
**web** [1] - 24:19
**website** [16] - 6:20, 20:15, 20:17, 20:20, 21:10, 21:12, 21:14, 21:16, 21:17, 22:20, 23:6, 23:20, 23:21, 24:10, 24:19, 56:5
**weeds** [3] - 88:11, 101:7, 101:9
**week** [7] - 6:17, 7:3, 7:8, 8:13, 32:1, 47:12, 53:20
**weekend** [3] - 3:25, 8:20, 74:10
**weekly** [4] - 26:13, 26:18, 31:24, 32:6
**weigh** [1] - 82:16
**weight** [5] - 62:19, 67:1, 67:4, 119:13, 119:18
**welcome** [1] - 68:25
**Werlein** [2] - 73:25, 123:2
**Weslayan** [1] - 1:21
**Whataburger** [1] - 35:24
**whole** [15] - 6:10, 29:21, 35:15, 38:5, 50:17, 68:15, 80:12, 86:12, 92:19, 116:6, 126:10, 152:25, 159:5, 162:8, 162:9
**windfall** [1] - 136:1
**windows** [3] - 68:22, 69:1, 149:13
**wire** [2] - 136:25, 137:1
**wise** [1] - 72:1
**wish** [2] - 107:6, 141:13
**withdraw** [4] - 94:4, 119:5, 156:6, 159:11
**withdrawing** [1] - 132:23
**withdrawn** [3] - 156:7, 156:8, 159:13
**WITNESS** [12] - 11:7,

11:9, 19:16, 20:1, 20:3, 32:11, 32:17, 40:12, 42:9, 42:13, 45:4, 50:12
**witness** [5] - 5:12, 16:1, 55:15, 56:12, 79:6
**Witness** [1] - 17:19
**witness]** [1] - 40:11
**witnesses** [1] - 77:18
**woman** [1] - 79:7
**wood** [1] - 61:10
**WOOD** [1] - 1:3
**Wood** [20] - 18:13, 18:16, 18:18, 25:5, 25:8, 46:14, 46:23, 46:24, 47:12, 47:13, 50:20, 57:1, 80:9, 81:22, 90:17, 92:10, 92:12, 120:17, 120:18
**Woodlands** [3] - 110:3, 110:11
**Wooten** [8] - 15:1, 15:5, 15:9, 15:16, 15:23, 90:25, 91:4, 91:7
**wooten** [1] - 90:18
**word** [18] - 10:14, 94:17, 101:21, 101:22, 110:19, 111:5, 124:20, 129:15, 147:6, 149:2, 150:13, 151:10, 151:12, 153:1, 153:2, 153:11, 155:20
**worded** [1] - 131:24
**words** [10] - 38:21, 57:12, 60:9, 72:23, 75:10, 75:17, 84:11, 110:8, 133:5, 163:8
**workable** [2] - 11:19, 65:8
**workout** [1] - 20:23
**works** [13] - 31:6, 65:12, 90:19, 109:25, 115:16, 115:21, 115:22, 116:1, 130:20, 147:18, 151:4, 151:6, 155:20
**worldwide** [1] - 71:10
**worth** [2] - 36:21, 73:20
**wrap** [3] - 70:1, 70:13, 71:13
**wrap-up** [1] - 70:13
**write** [1] - 156:7
**writing** [3] - 101:18,

104:1, 126:12
**written** [5] - 34:21, 66:4, 98:23, 105:4, 137:6

---

## Y

**year** [7] - 7:4, 13:7, 14:1, 27:3, 27:7, 27:8
**years** [10] - 7:16, 27:17, 43:18, 43:19, 50:20, 56:25, 98:20, 105:9, 107:4, 115:5
**yellow** [1] - 154:9
**Yes"** [1] - 42:12
**Young** [1] - 122:25

---

## Z

**Zalewski** [1] - 109:8
**zoom** [3] - 22:24, 30:10, 55:20
**ZUMMO** [129] - 3:4, 3:13, 3:16, 3:19, 3:21, 4:10, 4:18, 4:24, 5:4, 16:2, 16:4, 17:3, 19:24, 20:22, 21:4, 21:22, 28:7, 30:5, 33:8, 39:8, 39:12, 40:10, 40:22, 47:3, 51:2, 51:5, 55:16, 55:18, 56:7, 56:17, 56:24, 57:3, 57:5, 57:14, 57:17, 58:7, 58:9, 58:19, 59:1, 60:6, 60:10, 60:21, 61:2, 61:21, 62:1, 62:8, 63:2, 63:23, 64:1, 65:9, 65:12, 65:19, 66:8, 67:11, 72:12, 73:12, 73:16, 73:19, 73:24, 74:9, 74:16, 76:3, 76:6, 77:15, 77:23, 83:14, 85:14, 86:11, 88:9, 88:24, 89:5, 89:20, 92:7, 92:17, 99:5, 99:10, 99:17, 100:24, 101:20, 101:22, 104:13, 104:18, 106:10, 106:13, 106:23, 107:6, 107:9, 107:20, 107:23, 111:12, 112:8, 112:14, 113:8, 114:11, 114:14, 122:5, 122:8, 124:22, 130:5, 138:20, 140:1,

141:17, 143:23, 144:4, 145:2, 145:10, 148:21, 149:3, 150:19, 152:11, 152:23, 153:2, 153:13, 153:15, 154:2, 154:15, 155:25, 156:6, 157:13, 157:20, 159:17, 159:22, 161:3, 161:5, 161:7, 161:10, 162:5, 162:8, 163:15
**Zummo** [30] - 1:15, 2:7, 16:7, 17:4, 17:21, 20:9, 20:25, 21:5, 21:24, 27:11, 28:10, 30:6, 32:18, 33:10, 39:17, 40:8, 40:13, 40:24, 42:14, 47:4, 49:17, 50:16, 51:21, 54:15, 55:22, 61:7, 63:9, 100:20, 105:7, 119:9
**zummo** [1] - 155:19

---

## À

**à** [20] - 96:6, 106:12, 106:24, 107:13, 108:1, 108:7, 108:9, 108:20, 109:9, 110:22, 111:23, 114:15, 114:17, 150:23, 150:25, 151:13, 152:16, 152:18, 153:5, 153:16