```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE SOUTHERN DISTRICT OF TEXAS
 2                            HOUSTON DIVISION

 3
     PRESTON WOOD & ASSOCIATES, LLC,    )
 4                                      )
              Plaintiff,                )   NO. H-16-CV-1427
 5                                      )
     v.                                 )   August 28, 2018
 6                                      )
     CAMERON ARCHITECTS, INC.,          )
 7   STEPHEN CAMERON, UL, INC., d/b/a    )
     URBAN LIVING, and VINOD RAMANI     )
 8                                      )
              Defendants.               )
 9

10
                              TRIAL
11              BEFORE THE HONORABLE DAVID HITTNER
                          AND A JURY
12
                            VOLUME 5
13                      PAGES 5-1 to 5-87

14

15   For the Plaintiff:          Patrick A. Zummo
                                  Attorney at Law
16                                909 Fannin, Suite 3500
                                  Houston, TX 77010
17
                                  Louis K. Bonham
18                                Califf T. Cooper
                                  Osha Liang, LLP
19                                909 Fannin, Suite 3500
                                  Houston, TX 77010
20
     For the Defendants:          Justin Strother
21                                Strother Law Firm, PLLC
                                  3000 Weslayan, Suite 348
22                                Houston, TX  77027

23   Court Reporter:             Bruce Slavin, RPR, CMR

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

1               I N D E X

2

3                                                    Page

4

5    Jury Charge                                     5-4

6    Jury Questions                                  5-23

7

8    Closing Argument by Mr. Zummo                    5-27

9    Closing Argument by Mr. Strother                 5-51

10   Rebuttal Argument by Mr. Zummo                   5-78

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       THE COURT:  Please be seated.

2               Well, everything you see in front of you this

3       morning was put together yesterday afternoon.  This is not

4       in the form books.  I can tell you that.

11:44   5               Okay.  So, what we'll be doing is I am going

6       to read this and you follow along.  Then the Plaintiff

7       opens -- I have Plaintiff opens, reserves some time.  Then

8       we'll take a short break and then pick up with the defense

9       and then the Plaintiff will wrap up.

11:44  10               One thing before I get going.

11               It looks pretty formidable when you take a

12      look at it, but some of the pages are not complete and it's

13      all double-spaced.

14               As you know, during the trial I have said many

11:45  15      times, "Slow down," "Slow down."  Occasionally, I will pick

16      up the speed a little bit when we read the charge because

17      you have got a copy and the court reporter has got a copy.

18               But I need to read it to you.  I know we have

19      the stipulations in here.  I'm not going to read it all

11:45  20      because they have been summarized to you, but we'll look at

21      them and we'll discuss it briefly.  So, it's all in here for

22      you.  And then we'll talk about the very last page, which is

23      the verdict form.

24               The original that the presiding juror will

11:46  25      sign has the blue back on it.  So, you will get that and

1    take it in with you.  But you may mark that up, make any

2    kind of notes or highlighting that you want as you go along,

3    and after the case is over, certainly, you may take that

4    home with you.

11:46    5         All right.  With that as a background --

6    People say, 'How do you eat an elephant?'  One bite at a

7    time.  So, I have learned doing this you can't complete it

8    unless you start it.  And, hopefully, you will find it

9    interesting.  And then it's up to the attorneys if they have

11:46   10    anything they want to bring to your attention.  That's what

11    summation is, look back at the evidence in the case and then

12    what they may want to direct you to.

13         I understand there's one page blank here.

14    What is it?  Page 27.

11:47   15         MR. BONHAM:  Yes, sir.

16         THE COURT:  Page 27 is blank.  Don't worry about

17    that.  We just had to get it in sequence.  And then that was

18    committed, whatever was there, but it still had numbers.

19    So, it's purposely left blank, 27.

11:47   20         With that, we're going to begin.

21         You have heard the evidence in the case.  I

22    will now instruct you on the law that you must apply.  It's

23    your duty to follow the law as I give it to you.  On the

24    other hand, you, the jury, are the judges of the facts.  Do

11:47   25    not consider any statement that I have made in the course of

 1   the trial or make in these instruction as an indication that

 2   I have any opinion about the facts of this case.

 3              After I instruct you on the law, the attorneys

 4   will have the opportunity to make their closing arguments.

 5   Statements and arguments of the attorneys are not evidence

 6   and are not instructions on the law.  They are intended only

 7   to assist the jury in understanding the evidence and the

 8   parties' contentions.

 9              Answer each question from the facts as you

10   find them.  Do not decide who you think should win and then

11   answer the questions accordingly.  Your answers and your

12   verdict must be unanimous.  In federal court, civil and

13   criminal verdicts are unanimous.

14              You must answer all the questions from a

15   preponderance of the evidence.  By this is meant the greater

16   weight and degree of the credible evidence before you.  In

17   other words, a "preponderance of the evidence" just means

18   the amount of evidence that persuades you that a claim is

19   more likely so than not so.  In determining whether any fact

20   has been proved by a preponderance of the evidence in the

21   case, you may, unless otherwise instructed, consider the

22   testimony of all the witnesses, regardless of who may have

23   called them, and all exhibits received in evidence,

24   regardless of who may have produced them.  This includes the

25   Agreed and Stipulated Facts that's attached to this jury set

*Jury Charge*

1    of instructions.

2              In determining the weight to be given to the

3    testimony of a witness, you should ask yourself whether

4    there was evidence tending to prove that the witness

11:49   5    testified falsely concerning some important fact or whether

6    there was evidence that at some other time the witness said

7    or did something or failed to say or do something that was

8    different from the testimony the witness gave before you

9    during the trial.

11:49   10    You should keep in mind, of course, that a

11    simple mistake by a witness does not necessarily mean that

12    the witness was not telling the truth as he or she remembers

13    it, because people may forget some things or remember other

14    things inaccurately.  So, if a witness has made a

11:49   15    misstatement, you need to consider whether that misstatement

16    was an intentional falsehood or simply an innocent lapse of

17    memory; and the significance of that may depend upon whether

18    it has to do with an important fact or with only an

19    unimportant detail.

11:50   20    While you should consider only the evidence in

21    the case, you are permitted to draw such reasonable

22    inferences from the testimony and exhibits as you feel are

23    justified in the light of common experience.  In other

24    words, you may make deductions and reach conclusions that

11:50   25    reason and common sense leads you to draw from the facts

1    that have been established by the testimony and the evidence

2    in the case.

3                The testimony of a single witness may be

4    sufficient to prove any fact, even if a greater number of

11:50    5    witnesses may have testified to the contrary if, after

6    considering all the other evidence, you believe that single

7    witness.

8                There are two types of evidence that you may

9    consider in properly finding the truth as to the facts in

11:50   10    the case.  One is direct evidence, such as testimony of an

11    eyewitness.  The other is indirect or circumstantial

12    evidence, the proof of a chain of circumstances that

13    indicates the existence or nonexistence of certain other

14    facts.  As a general rule, the law makes no distinction

11:51   15    between direct and circumstantial evidence, but simply

16    requires that you find the facts from a preponderance of all

17    the evidence, both direct and circumstantial.

18                When knowledge of a technical subject matter

19    may be helpful to the jury, a person who has special

11:51   20    training or experience in that technical field -- he or she

21    is called an expert witness -- is permitted to state his or

22    her opinion on those technical matters.  However, you're not

23    required to accept that opinion.  As with any other witness,

24    it's up to you to decide whether to rely upon it.

11:51   25                In deciding whether to accept or rely upon the

*Jury Charge*

1   opinion of an expert witness, you may consider any bias the

2   witness -- any bias of the witness, including any bias you

3   may infer from the evidence that the expert has been or will

4   be paid for reviewing the case and testifying, or from

11:52   5   evidence that he or she testifies regularly as an expert

6   witness and his or her income from such testimony represents

7   a significant portion of his or her income.

8            Any notes that you have taken during the trial

9   are only aids to memory.  If your memory should differ from

11:52   10   the notes, you should rely on your memory and not on the

11   notes.  The notes are not evidence.  A juror who has not

12   taken notes should rely on his or her independent

13   recollection of the evidence and should not be unduly

14   influenced by the notes of other jurors.  Notes are not

11:52   15   entitled to any greater weight than the recollection or

16   impression of each juror about the testimony.

17            When you retire to the jury room to deliberate

18   on your verdict, you may take this charge with you as well

19   as the exhibits which the Court has admitted into evidence.

11:52   20   Select your foreperson and conduct your deliberations.

21            If you recess during your deliberations,

22   follow all the instructions that the Court has give to you

23   about or on your conduct during the trial.  After you have

24   reached a unanimous verdict your foreperson is to fill it in

11:53   25   on the form your answers to the -- no -- fill in on the form

1    your answers to the questions.  Do not reveal your answers

2    until such time as you are discharged, unless so otherwise

3    directed by me.  You must never disclose to anyone, not even

4    to me, your numerical division on any question.

11:53    5            If you want to communicate with me at any time

6    please give a written message or question to the bailiff,

7    who will bring it to me.  I will then respond as promptly as

8    possible, either in writing or by having you brought into

9    the courtroom so that I can address you orally.  I will

11:53   10    always first disclose to the attorneys your question and my

11    response before I answer your questions.

12            After you have reached a verdict, you're not

13    required to talk with anyone about the case unless I order

14    otherwise.

11:54   15            We're now at Instruction No. 1 on Page 7.

16            "Copyright" is the name for the protection

17    that the law extends to an author of an original work

18    against the unauthorized appropriation of that work by

19    others.  You are probably accustomed to hearing the word

11:54   20    "author" used for writing, such as a novel, but under the

21    copyright law any creator of an original work that is

22    protectable under the copyright laws is referred to as an

23    "author".  That is the term we use in copyright law for the

24    creator of an original work.

11:54   25            The owner of a copyright, generally, has the

1    right to exclude any other person from reproducing,

2    preparing derivative works, distributing, performing,

3    displaying or using the work covered by a copyright for a

4    specific period of time.  One who produces a copyright work

5    or prepares derivative works during the term of the

6    copyright infringes the copyright unless given permission to

7    do so by the copyright owner.

8              A copyrightable work can be a literary work,

9    architectural work, musical work, dramatic work, pantomime

10   work, choreographic work, pictorial work, graphic work,

11   sculptural work, works fixed in a semiconductor chip product

12   or even a computer program.

13             This case involves copyright in "architectural

14   works".  "Architectural works" are designs of buildings as

15   embodied in any tangible medium of expression, including the

16   building itself, as well as the architectural plans or

17   drawings for the building.  The work includes the overall

18   form as well as the arrangement and composition of spaces

19   and elements in the design, but does not include individual

20   standard features.  "Standard features" are staple building

21   components, such as doors, windows and staircases,

22   et cetera.  These are not themselves protected by copyright,

23   but the design of the building including them is protected.

24   Copyright protection for an architectural work may encompass

25   both architectural plans and constructed buildings.

*Jury Charge*

1          This case also involves copyrights and

2     "technical drawings".  "Technical drawings" are two-

3     dimensional drawings, which can be architectural plans.  The

4     subject matter depicted in the technical drawings need not

11:56     5     itself be protected by copyright for the technical drawing

6     to be protected, nor must the technical drawings meet any

7     particular artistic or technical quality or level of detail

8     to enjoy legal protection.

9          Now we talk about Elements of Copyright

11:57    10     Infringement.

11          Preston Wood & Associates, LLC, contends that

12     the Defendants infringed its copyrights in its architectural

13     works and technical drawings.  Copyright is the exclusive

14     right to "copy".

11:57    15          As used in this charge, "copying" is a

16     shorthand reference to any infringement of the copyright

17     holder's exclusive right, not just a literal copying.  You

18     are instructed that a copyright holder has the exclusive

19     rights to do and to authorize others to do the following:

11:57    20     to reproduce the copyrighted work, to prepare derivative

21     works that are based on the copyrighted work, and to

22     distribute copies of the copyrighted work to the public by

23     sale, rental, lease or lending.  A "derivative work" is a

24     work that's based upon one or more pre-existing works,

11:57    25     including a revision, transformation or adaptation of that

1    preexisting work.  A work may be "copied" by creating a

2    derivative work -- that is, a work that revises, transforms

3    or adopts the work.

4              Architectural work may be "copied" by

5    constructing or selling a building that is based on the

6    protected design.

7              To establish infringement of its copyrights in

8    this case, Preston Wood & Associates, LLC, must prove

9    copying of its works by the Defendant.

10             Originality.  "Original", as that term is used

11   in copyright law, means only that the work was independently

12   created by the author as opposed to copied from other works

13   and that it possesses at least some minimal degree of

14   creativity.

15             Now, what's Protected and Unprotected

16   Elements?

17             Although a work may be copyrightable as a

18   whole, not every portion or aspect of a copyrighted work is

19   given copyright law's protection.  Not all copying is

20   copyright infringement.  The mere fact that a work is

21   copyrighted does not mean that every element of the work may

22   be protected.  Infringement, therefore, requires copying of

23   "constituent elements of the work that are original."

24             The protected elements of an "architectural

25   work" do not include individual standard features, such as

*Jury Charge*

windows, doors and other staple building components.  To

support a claim of copyright infringement, the copy must

bear a substantial similarity to the protected aspects of

the original.

11:59   Under the doctrine of scènes à faire copyright

protection is denied for those expressions that are

standard, stock or common to a particular topic or that flow

necessarily or naturally from a common theme or setting.

Furthermore, where a particular expression is common to the

12:00   treatment of a particular idea, process or discovery, it is

lacking in the originality that is required for copyright

protection.

When an idea can be expressed in very few

ways, copyright law does not protect that expression,

12:00   because doing so would confer a de facto monopoly over the

idea.  In such cases idea and expression are said to be

"merged".

As I mentioned before, "copying" is a

shorthand reference to any infringement of the copyright

12:00   holder's exclusive rights, not just literal copying.

In order to prevail on its copyrighted claim

Preston Wood & Associates must prove that a Defendant

"copied" its works.

Such copying can be proved by direct or

12:01   indirect evidence.  An example of direct evidence would be

1     an admission by a Defendant that the Defendant copied

2     Preston Wood & Associates's work or testimony of someone who

3     saw the work being copied or who was directed to copy the

4     work.  However, proof of that nature is often not available

12:01   5     in copyright cases.  Preston Wood & Associates may create a

6     presumption of copying by evidence establishing that the

7     Defendant had access to the copyrighted work and that the

8     Defendant's work is probatively similar to the copyrighted

9     work.

12:01   10    You may find that a party had "access" to a

11    Preston Wood work if that party had a reasonable opportunity

12    to view that Preston Wood work, directly or through third

13    parties, before the accused work was created.

14    Preston Wood does not need to prove that a

12:02   15    party actually viewed a Preston Wood work in order to

16    establish access to it.  Rather, Preston Wood need only

17    establish that a party had a reasonable opportunity to view

18    a Preston Wood -- the Preston Wood work before it created

19    the accused work.

12:02   20    "Probative similarities" are those

21    similarities that, in the normal course of events, would not

22    be expected to arise independently in the two works.

23    In evaluating whether there are probative

24    similarities, you should consider all aspects of the works

12:02   25    and not just the aspects of the copyrighted work protected.

*Jury Charge*

1    You are not required to find that the whole of a defendant's

2    work largely replicates the whole of a copyrighted work.

3              These are not the only questions that may

4    arise on the issue.  You may consider any relevant

12:03  5    circumstances -- that is, any circumstances from which you

6    may draw the inference either that the copying has taken

7    place or that copying has not taken place.

8              If you find, however, considering all the

9    circumstances, that copying has taken place by a

12:03  10   preponderance of the evidence, then Preston Wood has

11   sustained its burden on that particular issue.

12             Now we're at No. 8 and we're looking at

13   substantial similarity.

14             I am going to -- I'll say "Preston Wood".

12:03  15   That's the Plaintiff in the case.  I am going to just -- It

16   will move along a little quicker.

17             In order for the Plaintiff to recover for

18   copyright infringement, it must also prove that any copies

19   or derivative works made by Defendants are substantially

12:03  20   similar to the Plaintiff's architectural work.  "Substantial

21   similarity" means "copying of a constituent elements of the

22   work that are original."  The works are substantially

23   similar if an ordinary, reasonable person would find the

24   total concept and feel of the two works to be substantially

12:04  25   similar.

*Jury Charge*

1          Copying is shown through a detailed

2      side-by-side comparison of the copyrighted and allegedly

3      infringing works.  Therefore, to determine whether the two

4      works are substantially similar, you must make a direct

12:04   5      side-by-side comparison between the original architectural

6      work and the copy.

7          The following instruction implies to

8      Questions 1 through 8.  It does not apply to Questions 9 and

9      10.  So, keep in mind as you go through it these are

12:04   10     Questions 1 through 8, not instructions.  The questions come

11     later, and you will see that's where you fill in the

12     blanks "yes", "no", maybe an amount of money or something

13     like that.

14          So, what we're reading now is Instruction

12:05   15     No. 9, but we're referring, later on when you start the

16     questions -- Questions 1 through 8 does not apply to 9 and

17     10.

18          As to 1 through 8:  Once a plaintiff has

19     proven that it owns the copyright on an particular work and

12:05   20     that a party has infringed upon those exclusive rights, that

21     party is liable for the infringement and this liability is

22     absolute.  Even where a party believes in good faith that he

23     is not infringing a copyright, he may be found liable.  A

24     party is liable for "innocent" and "accidental"

12:05   25     copyrights -- copyright infringements.

*Jury Charge*

1              Now we move on.  We're talking about profits
2    and gross revenue.
3              As to profits on gross revenue:
4              If you find that there has been copyright
12:06  5    infringement, you must next determine the amount of all
6    profits that resulted from copyright infringement.  Profits
7    are awarded to prevent the infringer from unfairly
8    benefitting from a wrongful act.
9              An infringer's profits consist of the amount
12:06  10   of money it made or value it received due to the
11   infringement after deducting the expenses of producing and
12   marketing the infringing work.
13             In a copyright infringement action the
14   copyright owner must only prove the gross revenue that the
12:06  15   infringer has earned or will earn from the creation, sales
16   or rentals of the infringing item.  Gross revenues are not
17   limited to actual money received but also include all value
18   received by the infringer.  For example, the value of a
19   building constructed in violation of an architectural works
12:07  20   copyright can be evidence of gross revenue even when the
21   building has not been sold.
22             Upon proof of gross revenue, the burden then
23   shifts to the Defendant to prove what expenses, if any,
24   should be deducted from the gross revenues to establish net
12:07  25   profit.  So, there's a shift there if you get to that.  If

Jury Charge

1    the Defendants fail to adduce competent evidence of

2    expenses, the gross revenue figure stands as the measure of

3    profits.

4              Let's talk profits now relative to direct

12:07  5    expenses.

6              Defendants each bear the burden of proving

7    their direct expenses.  If Defendants fail to prove such

8    direct expenses, you must find the amount of gross revenue

9    as the amount of profits.

12:07  10             For an amount to be a deductible expense, it

11   must be shown that it was actually incurred in the creation

12   of the infringing copy and that such expenditures actually

13   assisted in the creation of the infringing copy.

14             You should not consider evidence of average or

12:08  15   overall profit margins in determining direct expenses.  In

16   determining the direct expenses to deduct from gross

17   revenue, you should rely only on evidence of specific

18   expenses actually incurred.

19             Now we continue.  Profits - Overhead Expenses.

12:08  20             Under certain circumstances a Defendant may

21   deduct from gross revenues certain overhead expenses.  Each

22   Defendant bears the burden of proving three elements to do

23   this.

24             First, each Defendant must prove that the

12:08  25   overhead expenses it wishes to deduct were actually incurred

1  in the construction, marketing, rental or sale of the

2  infringing copy.  Stated differently, if the expense would

3  have been incurred regardless of whether the Defendant made

4  the infringing copy, you should not include it.

12:09  5           Second, for a category of indirect or overhead

6  expenses to have been incurred in this creation of the

7  infringing copy, a Defendant must prove that such category

8  of expenses was of actual assist in the creation of the

9  infringing copy.  If you cannot find, by a preponderance of

12:09  10  the evidence, that a Defendant has proven that a category of

11  indirect or overhead expenses actually assisted in the

12  creation of the infringing copy, you should not include it.

13          Third, a Defendant must proffer a "fair and

14  acceptable formula" for determining how much of the claimed

12:09  15  overhead expenses should be allocated to the infringing

16  activity.

17          Now No. 13.  Now we're talking profits on the

18  concept of "apportionment".

19          An infringer who has profits from copyright

12:10  20  infringement is allowed to prove that a portion of the

21  profits resulted from factors other than the acts of the

22  infringement.

23          Each defendant bears the burden of proving by

24  specific evidence what portions of profits are attributable

12:10  25  to factors other than copyright infringement.  To carry this

*Jury Charge*

1    burden, a defendant must prove what profits were

2    attributable solely to the efforts of others exclusive of

3    any effect of Preston Wood & Associates' copyrighted work.

4    Moreover, if non-infringing factors are so intertwined with

12:10    5    infringing factors that it is impossible to apportion

6    profits, then no apportionment is allowed.

7            All profits from the infringement in question

8    should be deemed attributable to the infringement, unless a

9    defendant proves by a preponderance of the evidence that

12:11    10    they are not.  If a defendant fails to adduce competent

11    evidence that a portion of their profits was due solely to

12    factors other than the infringement, you should find that

13    all of defendants' profits from the infringement at issue

14    are the result of copyright infringement.

12:11    15            Page 27 is the blank.  So, we save the page

16    there and we keep moving.

17            We're now at Instruction No. 14 on Page 28.

18    Integrity of Copyright Management Information.

19            Copyright law also protects the integrity of

12:11    20    copyright management information.  "Copyright management

21    information" means any of the following information conveyed

22    in connection with copies of a work, including in digital

23    form:  the title and other information identifying the work,

24    including the information set forth on a notice of

12:12    25    copyright; the name of and other identifying information

*Jury Charge*

1    about the author of the work; the name of and other

2    identifying information about the copyright owner of the

3    work, including the information set forth in a notice of

4    copyright; terms and conditions for use of the work; and

12:12   5    identifying numbers or symbols referring to such information

6    or links to such information.

7                Copyright law protects the integrity of

8    copyright management information by prohibiting the

9    intentional removal or alteration of copyright management

12:12   10    information, the distribution of altered or removed

11    copyright management information and the distribution of

12    copies of the works with altered or removed copyright

13    management information.

14                If a defendant intentionally does any of these

12:12   15    things and knows or has reasonable grounds to know that

16    doing so would induce, enable, facilitate or conceal

17    copyright infringement, the Defendant has violated the law

18    protecting the integrity of copyright management

19    information.

12:13   20                To determine the number of violations you are

21    to consider only the number of individual acts committed by

22    a defendant that violate this law.

23                On Page 30:

24                A defendant can also be liable for

12:13   25    infringement committed by another by intentionally inducing

1    or encouraging direct infringement.

2              All right.  Here's some definitions.  I will

3    move through them quickly.

4              As used in the following jury questions --

12:13  5    we're not there yet, but the questions -- "Preston Wood &

6    Associates" means the Plaintiff.  "Preston Wood &

7    Associates, LLC."

8              "Urban Living" means Defendant UL, Inc., doing

9    business as Urban Living and doing business as Urban Project

12:14  10   Management.

11             "Cameron Architects" means Defendant Cameron

12   Architects, Inc.

13             "Nagle Park Place" means the real estate

14   development located at 403 to 411 North Nagle Street,

12:14  15   Houston, Texas.

16             "Patterson Street Landing" means the real

17   estate development located at 1026 through -34 Center

18   Street, Houston, Texas.

19             "Stanford Street Landing" means the real

12:14  20   estate development located at 4312-A and B Stanford Street,

21   Houston, Texas.

22             "EaDo Place" means the real estate development

23   located at 1206 through -10 Polk Street, Houston, Texas.

24             "Mount Vernon" means the real estate

12:14  25   development located at 4504 Mount Vernon, Houston, Texas.

1          Now we come to the questions.

2          Question No. 1.  Did Urban Living infringe the

3    copyrights of Preston Wood & Associates?

4          Answer "Yes" or "No" to each of the following

12:15    5    projects -- I will say them one time because we're going to

6    be repeating them -- Nagle Park, Patterson, Stanford, EaDo

7    and Mount Vernon.  Answer "Yes" or "No" for each of the

8    following projects.

9          Did Urban Living contribute -- did Urban

12:15   10   Living contributorily infringe the copyrights of Preston

11   Wood & Associates?  Answer "Yes" or "No" for each of the

12   following projects and there are the five projects.

13         Question No. 3.  Did Cameron Architects

14   infringe the copyrights of Preston Wood & Associates?

12:15   15   Answer "Yes" or "No" for each of the following:  Nagle Park

16   and Mount Vernon.

17         Did Cameron Architects contributorily infringe

18   the copyrights of Preston Wood & Associates?  Answer "Yes"

19   or "No" for each.  Nagle Park and Mount Vernon.

12:16   20         For each -- Now No. 5.  For each project for

21   which you have found that Urban Living infringed or

22   contributorily infringed Preston Wood's copyrights, what

23   were Urban Living's gross revenues and deductible expenses,

24   if any?  And depending upon your answers before, you put the

12:16   25   gross amount and the deductible amount into those projects

1        that you have found do apply in your prior answers.

2                    I want to make sure that's correct.  Everybody

3        agree?

4                    MR. STROTHER:  Yes.

5                    MR. ZUMMO:  Yes, Your Honor.

6                    THE COURT:  Question No. 6.  For each project for

7        which you have found that Urban Living infringed or

8        contributorily infringed Preston Wood's copyrights, what

9        percentage, if any, of Urban Living's products were

10       attributable to factors other than the copyrighted work?

11       Answer in percentage of profits due to factors other than

12       infringement for those five or any of those that are

13       applicable.

14                   We're on Page 39.  Question No. 7.  For each

15       project for which you have found that Cameron Architects

16       infringed or contributorily infringed Preston Wood's

17       copyrights, what are Cameron Architects' gross revenues and

18       deductible expenses?  Answer in dollars and cents as to each

19       and answer -- fill in the blank for those that you find

20       applicable.

21                   Question No. 8.  For each project for which

22       you have found that Cameron Architects infringed or

23       contributorily infringed Preston Wood's copyrights, what

24       percentage, if any, of Cameron Architects' projects were

25       attributable to factors other than copyrighted works?  And

Agreed Stipulations

1    there are two that you fill in as applicable.

2             Now we go Question No. 9.  Did Urban Living

3    knowingly or intentionally and with the intent to induce,

4    enable, facilitate or conceal infringement create or

12:18    5    distribute copies or derivatives of Preston Wood's

6    copyrighted works from which Preston Wood & Associates'

7    copyright management information had been altered or

8    removed?

9             Now, there are four there.  Answer "Yes" or

12:18    10    "No" as applicable to those four, if any.  Well, you need to

11    answer "Yes" or "No" as to each.

12             No. 10.  For each project on which you have

13    answered "Yes" to No. 9 -- So, this is what we call

14    "predicated".  Assuming, you say, for each project you have

12:18    15    answered "Yes" on 9, how many times did Urban Living do so?

16    So, you look at 9 and you see if it's a positive answer and

17    then you answer the number of violations to that respective

18    property.

19             The next thing we have is Agreed Stipulations.

12:19    20    Remember, those -- one of the attorneys read in all those

21    stipulations and I said it was in abbreviated form?  We have

22    on Pages 1, 2, 3, 4, 5 -- Do we have 5?  Well, let's see.

23    1, 2, 3 -- Oh!  Here it is -- 4, 5, 6, 7, 8.  And then we

24    move on and there's on Pages 7, 9, 10, 11, 12, 13, 14, 15,

12:19    25    16, 17 and it goes through to 34 -- You can see you need to

1    read them or at least get a feel for them.

2            So, technically, I am supposed to say make

3    sure you read them.  It was generally summarized and a lot

4    of it was referred to during the trial.  I put this in here

12:20    5    so, at least in the record, the jury had a copy of what was

6    agreed and didn't need to be independently proved.  So,

7    that's why we put that in there for you.

8            Now, once you have reached a unanimous verdict

9    as to all the answers or lack of an answer, depending upon

12:20    10   what it is -- but once you reach your unanimous agreement,

11   then you look to the last page.  The very last page is the

12   verdict form.  Then, at that point, after everything is

13   filled in correctly, the presiding juror will sign it and

14   date it and then inform the marshal -- you will have a U.S.

12:21    15   marshal outside the door -- that you have reached a verdict,

16   and then you come back in here and return the verdict.

17           I want to thank the attorneys for working on

18   this yesterday.  It was quite an academic exercise.  Now, of

19   course, some of it you may have questions about, but the

12:21    20   attorneys now will be going in and they'll fill you in on

21   what they feel is important, their interpretation of what's

22   in there; but, remember, the law -- that's my department and

23   the facts are your department.

24           So, what we have now is -- each side has 45

12:21    25   minutes -- well, we said that it takes about a minute a

*Closing Argument by Mr. Zummo*

1   page.  In any event, we're now at 12:20.  The Plaintiff goes

2   first.  Remember, they have the burden of proof, except on

3   some things you notice I said in there the Defendant has got

4   the burden of proof.  But, generally, in every case the

12:21   5   larger burden of proof or the more burden of proof is on

6   plaintiff.  They bring the case.  So, they'll go and they'll

7   reserve a little bit of time.  So, now the clock is back on

8   just for the purpose of the voir dire.

9                    And, counsel, go right ahead.

12:22   10            MR. ZUMMO:  Thank you, Your Honor.

11            THE COURT:  I know you want the screen.  You want

12   the light out or tell me when you want it?

13            MR. ZUMMO:  Yes, it can go down.

14            THE COURT:  Is your unit on?

12:22   15            MR. BONHAM:  You're good.

16            THE COURT:  I have the time.  Go right ahead.

17            MR. ZUMMO:  On behalf of Preston Wood & Associates,

18   Sam and Preston Wood, I want to thank you for being here

19   today for serving on this jury and for the very close

12:22   20   attention that we can tell that you have paid to all of the

21   witnesses and all of the documents that have been presented

22   to you so far.

23                    We know that you have done your duty up to now

24   in this case.  It's not always easy to pay attention when

12:22   25   you just have to sit and watch what other people do, but I

1    have been -- as you can probably tell from the color of my

2    hair, I have been doing this for a little while.  It's been

3    a little bit more than 35 years.  And oftentimes we see at

4    least one juror who looks like they're working double shifts

12:23    5    and they might be dozing in the jury box, but you all have

6    been paying very close attention and we thank you very much

7    for that.  We know you have done your duty so far.  We know

8    you will continue to do your duty in deliberating in this

9    case in reaching a fair verdict.

12:23    10    This is a case about architectural copyrights.

11    And what we'd like to do is just go straight to the Court's

12    jury charge, and I am just going to talk about some of the

13    definitions that Judge Hittner has read to you and we're

14    going to cover this in the order of the questions that are

12:23    15    at the end.  What we're going to do on behalf of Preston

16    Wood is try to summarize the evidence that we think is

17    important on these different questions that you have to

18    answer.

19    The case involves architectural works and, as

12:23    20    Judge Hittner said, 'architectural works are the designs of

21    buildings as embodied in any tangible medium with

22    expression, including the building itself, as well as

23    architectural plans or drawings.'  It includes 'the overall

24    form, as well as the arrangement and composition of spaces

12:24    25    and elements in the design, but does not include individual

1    standard features, such as doors, windows and staircases.'

2              Now, these are not protected themselves by

3    copyright.  And Preston Wood is not here saying, 'If you use

4    a stair in a building you have violated our copyrights.  If

12:24  5    you use a door you have violated our copyrights.'

6              What we hope we have shown in this case -- and

7    it's consistent with the law -- is what's protected is the

8    way you use doors and stairways and arrange rooms.  It's the

9    arrangement and composition.  And that's where the

12:24  10   creativity comes in.  And we think that the evidence that

11   has been presented to you has shown that.

12             Now, what was it that we -- how did we get

13   started in this case?  We had a contract and it had --

14             Well, let's go here.  This is Question No. 1

12:25  15   on Page 33.  The first question is:  Did Urban Living

16   infringe the copyrights of Preston Wood?  What should we

17   think about to answer that question?

18             Well, first, let's go to the license

19   agreement.  It's going to be Plaintiff's Exhibit No. 1 that

12:25  20   you will have to look at as you deliberate.  And that

21   agreement had a term right up front about what Urban Living

22   had to do to have the right to use these designs, and we

23   think the evidence has shown that they didn't do that for

24   the five designs that they copied to create the five

12:25  25   projects that we have presented evidence to you here.

*Closing Argument by Mr. Zummo*

1          In this, there's an agreed fact, at the end of

2     your jury charge, that Preston Wood never gave any written

3     permission to allow Urban Living to sublicense the

4     modification of Preston Wood's works by other builders.

5          You heard testimony from Sam Wood about why it

6     was important that anyone who got access to our works from

7     Urban Living had to acknowledge and agree to follow the

8     rules in this agreement.  And it's an agreed fact that,

9     whether they were builders or architects or other designers,

10    Urban Living never provided us any proof that these people

11    had agreed to follow our rules.  We now know that they

12    didn't.

13         Now, in the jury charge this is a term that we

14    think is important.  It's from Page 10.  It's a "derivative

15    work".  "A 'derivative work' is a work that's based upon one

16    or more pre-existing works, including a revision,

17    transformation or adaptation..."

18         And here's what's important.  A work may be

19    copied by making a derivative if you make the derivative

20    without permission.

21         Another important concept in this case is that

22    you can copy an architectural work by constructing or

23    selling a building that's based on that design.  And it's

24    infringement to do that, if you build or sell a building

25    based on a protected design, without getting the copyright

*Closing Argument by Mr. Zummo*

1    owner's permission.

2              Now, we know, because it's agreed and

3    Mr. Cameron admitted to it on the witness stand, that he

4    copied the D5-214 to create what he called Nagle Park Place.

12:27    5    He had our CAD files.  He copied them onto his computer and

6    then he used those CAD files and modified them to create the

7    drawings that he called his design.

8              This is a word that's going to come up, I

9    think, a lot during my remarks and in Mr. Strother's

12:27   10    remarks.  It's the concept of what is "original".

11              "Original" is the only thing that's protected

12    by copyright.  Things have to be original.  And, as that

13    term is used, it has a very special meaning.  It "means only

14    that the work was independently created by the author, as

12:28   15    opposed to copied from some other work, and that it

16    possesses at least some minimal degree of creativity."

17              When you're asked the question about

18    infringement you have to find substantial similarity between

19    the Defendants' works and our works, and the key terms

12:28   20    there, we think, are on Page 19 of the charge, because

21    "'Substantial similarity' means 'copying of constituent

22    elements of the work that are original.'"

23              Then, when you compare those parts that are

24    original, "the works are 'substantially' similar if an

12:28   25    ordinary person would find that the total concept and feel

*Closing Argument by Mr. Zummo*

1    of the two works is substantially similar."

2         And the law says "copying is shown through a

3    detailed, side-by-side comparison of the...works."  We did

4    that for you.

12:29    5         And let's just look at these very quickly.

6    You're going to remember them.  And what we've tried to do

7    on these slides -- if you look on the bottom corner, these

8    are the exhibit numbers to compare that we went through with

9    Preston Wood and Susan Labarthe.

12:29   10         Comparing the Preston Wood D5-214 and

11   Mr. Cameron and Urban Living's Nagle, the first obvious

12   thing is that they took our copyright notice and put it in

13   the bottom corner.  Strangely, they took the word "Copyright

14   2005" off, but they left the terms of the copyright notice

12:29   15   on there.  This is proof, as Mr. Cameron admitted, that he

16   was using our CAD file and this just got copied over.

17        But the rearrangement of it was never

18   explained, but that's what gave -- that's what started all

19   of this.  That's why Sam got that phone call from somebody

12:30   20   at Oppidan saying, 'We need your permission to get a set of

21   these from the city and they won't give it to us because

22   your copyright notice is on there.'  That's how we found out

23   well over a year and a half after they told us, 'We're not

24   using this plan.'

12:30   25        We saw -- and I will flash through these

*Closing Argument by Mr. Zummo*

1    quickly, but we don't need to spend a lot of time on them.

2            We saw the comparisons of the elevations, the

3    first floor plan, the second floor plan, the third floor

4    plan.  And what we went through with Preston, we did a lot

12:30  5    with these plans.  And you remember that.  Preston explained

6    his design process, all of his thinking, all of his reasons

7    for doing what he did to design this plan.  He made creative

8    decisions and he had to choose between lots of different

9    things that could have been done to fit this 20-by-40-foot

12:31  10   footprint or slab.

11            When Susan Labarthe testified before you she

12   confirmed that the things that Preston did were in fact

13   creative, that they were in fact design decisions among

14   other options, that they didn't have to be done this way.

12:31  15   And she also confirmed that in these side-by-side

16   comparisons; that the Urban Living designs copied not just

17   the door or the staircase as a standard stock element, but

18   they copied the creative things that Preston had put into

19   his designs.

12:31  20           We think that proves copyright infringement.

21   It proves "substantial similarity" as defined by

22   Judge Hittner in this charge.  And that goes on for all of

23   the plans that you see here.

24           I want to look right now -- What we're looking

12:32  25   at right now are the comparisons between the Preston Wood

*Closing Argument by Mr. Zummo*

1    plan and the Nagle advertising from Urban Living.  As you

2    can see here, we have flipped it so that you can tell that

3    the master matches the master, that the stairway is in the

4    same general place.  But I'm on this third floor plan

12:32    5    because of an issue that has been raised, and we believe

6    it's an issue that is a false issue.

7              There was a claim made back in that e-mail --

8    and we'll look at that in a minute -- that Mr. Cameron had

9    to redesign the whole plan because he found a mistake in the

12:32    10    stairway detail on the Preston Wood plan.  Now, Preston

11    talked about that and, all they had to do -- and he's done

12    it in other plans where that's happened -- is move a beam

13    that's up above the stairway about 9 or 10 inches and that

14    solves the whole issue.  It gives you the head clearance

12:33    15    that you need.

16              And what was interesting during the testimony

17    of Mr. Cameron is -- Mr. Strother asked, 'Did you have to

18    design the stair because of that mistake?'  And I don't know

19    if you caught this, but what Mr. Cameron said was, 'Well, we

12:33    20    were already redesigning the stairs when we found the

21    mistake.'  And the reason for that is, when they decided to

22    flip the plan -- because, remember -- this is to show you

23    the comparison -- but in their design the master bedroom and

24    the living room are on this side over the garage.  When they

12:33    25    flipped that, they had to rearrange the third floor and

*Closing Argument by Mr. Zummo*

1   that's where they came up with this goofy walk down, you

2   know, six or eight steps to a landing, walk back up to get

3   across.

4           They were doing that before they ever found

12:33   5   the mistake, and that's evidence that they were not telling

6   the truth about what they did and why they did it.  And we

7   think that is going to be evidence later, when you're asked

8   the question about whether things were done intentionally

9   here, because that falsehood, trying to pick a mistake and

12:34   10  blame this whole redesign when the redesign is because you

11  wanted to flip it front to back -- By not telling the truth

12  about that, we think that's evidence of an intentional

13  copyright infringement which factors into one of the last

14  questions that you're going to be asked.

12:34   15          Remember this?  Susan Labarthe talked about

16  it.  Cabinet details.  Now, a cabinet is one of those things

17  that you might call a standard feature.  Why are these

18  important?  Well, these were identical.  They were taken

19  straight from our design.  They show up exactly the same way

12:34   20  in the Nagle Street design of Mr. Cameron.  And the kitchen

21  is different.  It's arranged differently; so, they don't

22  have these cabinets.  They don't have the fixtures and the

23  sinks and stuff in the same place, but the details they

24  copied straight over.  Absolute proof that they were

12:35   25  directly copying the Preston Wood plans.

*Closing Argument by Mr. Zummo*

1          Now, you saw all of these.  I am going to go
2    through them pretty quickly.  But the same thing is true for
3    the 175 plan and the Patterson Street Urban Living design.
4    The elevations are similar.  The first and second floor
5    plans are similar.  The third floor plan is similar.  The
6    roof plan is similar.
7          Same thing for EaDo.  First floor, second
8    floor, third floor, the roof.
9          The same thing for 6050 and Stanford Street
10   Landing.
11         But I am going to stop here for a second
12   because there is one difference about this one in our case.
13         One of the instructions that you have is an
14   instruction that you can presume that there was copying if
15   there is access and substantial similarity.  On all, except
16   for Stanford, it is agreed that Defendants had access to
17   Preston Wood's work, for Patterson, EaDo, Nagle, Mount
18   Vernon.  The one that is not agreed is Stanford.
19         Now, access -- you can find access if there is
20   a reasonable opportunity to view the Preston Wood &
21   Associates' work.  Here's what's important:  directly or
22   through third parties.
23         Now, what was the evidence on access to
24   Stanford?  Well, you remember the name of the company
25   O-pi-dan or Oe-pie-dan.  We're going to show you and you saw

1    the Exhibit 17 from the Defendants where they listed their

2    commissions that they received from Patterson, EaDo and

3    Stanford.  Those were projects that were built by Oppidan.

4    And the evidence is that Oppidan had access to the Preston

12:37    5    Wood plans.  Ms. Wood testified that they were licensed to

6    use the plans.

7             These three plans are in this case because

8    Urban Living copied our designs and put their versions on

9    their website.  And the reason that we believe there's

12:37   10    access to the Stanford Street -- to the 6050 that became

11    Stanford Street is because they got it through a third

12    party, Oppidan.

13             And something very important that Mr. Ramani

14    said -- it was one of his answers to Mr. Strother's

12:38   15    questions -- is all of the designs that Urban Living has

16    used are available in the Urban Living showroom that he told

17    you about for anybody to pick up.  So, all of those

18    marketing materials, including Stanford Street, which is an

19    unauthorized derivative of an infringing copy of Preston

12:38   20    Wood's plans, are there for anybody to pick up.  And we

21    don't know who has them.  We don't know what they're doing

22    with them.  We don't know where they're being built.

23             That's the reason that we have to bring

24    copyright lawsuits like this; to keep control of our

12:38   25    copyrights, both for the value they represent to Preston

*Closing Argument by Mr. Zummo*

1    Wood & Associates and the value they represent to the

2    customers who have already played by the rules and paid us

3    properly for them.

4              Now, also, we went through these -- This is

12:39   5    the comparison of Stanford Street.  And you saw this

6    comparison with Preston.  The first floor plans are similar.

7    The second floor plans are similar.

8              The Mount Vernon is so identical that it was

9    impossible to even find any big differences, although the

12:39  10    one that was there they didn't use -- Remember, they didn't

11    change the square footage total even though they added

12    square footage.  On Mount Vernon, like Nagle, they admit

13    that they used our CAD files to make their copies.

14              So, these are -- You saw the evidence of this.

12:39  15    These are so similar that it was impossible to find real

16    changes.

17              Can we go back.

18              Now, Preston Wood, as I said, described the

19    process, his creative decisions that he made.  Suzanne

12:39  20    Labarthe testified, as an architect, that these were in fact

21    creative decisions and that for each of these side-by-sides

22    what was copied was the creativity, not just the standard

23    features.

24              We believe that the evidence here is enough,

12:40  25    that we have more than carried our burden for you to find

*Closing Argument by Mr. Zummo*

1    that there was infringement on all five of those projects.

2            Now, what do they say about all this?

3            One thing, they brought Professor Bachman

4    here.  And I know I took him to task on it because it,

12:40  5    frankly, offended me to have somebody who had never met

6    Preston Wood, never talked to Preston Wood, didn't come to

7    the courtroom to listen to his testimony and never heard any

8    description of how Preston designed all of these plans, but

9    what he was sure of is:  To say that the D5-214 is a solid

12:40 10    piece of thinking, design and planning is a stretch.

11            Well, you heard Preston Wood testify and you

12    can decide for yourself.  Because, while Professor Bachman

13    is an architecture professor and falls under that category

14    that Judge Hittner described as an expert witness, expert

12:41 15    witnesses are just like any other witnesses when it comes to

16    evaluating their credibility.  You can decide whether

17    Professor Bachman's opinions are credible when he's willing

18    to say that Preston Wood's work did not involve thinking,

19    designing or planning.

12:41 20            Professor Bachman is an interesting case for

21    me and I think it's, actually, sad because he's a professor

22    of architecture.  You have got to assume he got into that

23    field because he likes architecture.  And he's a professor

24    of architecture at the University of Houston in Houston, but

12:42 25    he's obviously not impressed with the architecture of homes

1  that people actually live in in Houston.  Remember, he said

2  they all have these sort of fake decorative elements on the

3  front, but, otherwise, they're not really architecture.

4          I hope for his sake that, you know, if he gets

12:42  5  to the point where he can retire, that he finds a place to

6  live where he actually enjoys looking at the architecture

7  around him and living in houses that other people -- that

8  his neighbor and other people in the community make their

9  homes.  But he certainly doesn't seem to be very happy with

12:42  10  the architecture of his own city now, and I think that's

11  very sad.

12          What else do they say?

13          Mr. Ramani just said, well, design is not

14  important; design is just a tiny bit of the value of any

12:43  15  kind of house.

16          And in evaluating the credibility of

17  Mr. Ramani on that statement, I would ask you just to ask

18  some questions, and those questions have to do with is what

19  he's saying in this courtroom consistent with what he's

12:43  20  actually done in his business.  Because if it's true that

21  all of these townhouses are the same, well, why isn't every

22  Urban Living townhouse the same design?  It works for

23  McDonald's.  Why aren't they just taking the same thing and

24  cookie-cutter building it everywhere?  They wouldn't have to

12:43  25  worry about architects or license agreements or designers.

*Closing Argument by Mr. Zummo*

1           What they really did -- and he testified to

2      this -- is that they had licensed designs in the past from

3      Preston Wood.  I think his total was 40 or 50 designs that

4      they had licensed, 40 or 50 different ones they chose to pay

12:44  5      separately for every time.

6           And then why did they do this agreement?  As

7      everybody said, this is an unusual custom agreement that

8      neither side had done before.

9           He wanted access to the thousands of Preston

12:44  10     Wood designs, the townhouses that Preston has been designing

11     in Houston since the early 1980s, more than 35 years.  They

12     wanted access to that.  He wanted first dibs on those for

13     anything that was going to be built inside the beltway.  Why

14     would he do that if design wasn't important?  And why would

12:44  15     he do that if they're all the same?

16          Now, are all these designs the same?  We're

17     going to get to that in one second, but let's look at this

18     exhibit which you saw and you know that we have asked a lot

19     of questions about.

12:45  20          This is the e-mail where they told Sam that

21     they wanted their money back for the D5-214 because they had

22     designed a new plan from scratch and 'We didn't even use

23     this plan.'  Well, those statements are false.  We know

24     they're false.  Everybody admitted that they were false.

12:45  25          But the question is why did they wait so long

*Closing Argument by Mr. Zummo*

1    to admit that they were false?  Why did they wait until this

2    lawsuit and the Friday of testimony before they admitted

3    that they were false?

4              The thing that is telling about this is, if it

12:45   5    is true, as Urban Living and its counsel want you to

6    believe -- if it is true that it's okay to copy as long as

7    you don't copy protected elements -- and that's their

8    case -- why did they tell these lies in this e-mail?  Why

9    didn't they say, 'Sam, we want a credit back for Plan D5-214

12:46   10   because it doesn't have any protectable elements'?  'And,

11   Sam, by the way, we're going to go ahead and use Plan D5-214

12   because we're only going to copy the non-protectable

13   elements?'  'And we're telling you this up front because

14   that's what we're going to say later if there's a lawsuit.'

12:46   15   'And we're just going to tell you the same thing in 2014, in

16   an e-mail, so that we're going to be consistent if you ever

17   say anything differently and we have to prove this in a

18   lawsuit.'

19             They didn't tell Sam in 2014 what they're

12:46   20   telling us in this courtroom.  And I would suggest to you

21   that they didn't do that because what they're telling us in

22   this courtroom is not true.  They knew that they were

23   infringing and they didn't want Preston Wood to investigate

24   and find out.

12:47   25             Because if you had -- if it was true that

*Closing Argument by Mr. Zummo*

1    Stephen realized there were some major issues with the

2    stairs -- and we know what that is -- it was the stair

3    detail that Preston said you move the beam 9 inches and you

4    solve it -- wouldn't it have made more sense to have just

12:47    5    said, 'We found this little problem.  Preston, did you know

6    it was here?  What would you do about it?'  Why not go back

7    to the person that actually designed it before you say to

8    yourself, oh, we have to draw a completely new design?

9            Obviously, if they had done that, that would

12:47    10    have said, 'We're going to use your design.'  It's going to

11    say, 'We're not drawing the plan from scratch and we are

12    going to use this plan.'

13            The fact that they didn't come back to Preston

14    to say, 'We found this mistake.  Is there a fix for this?'

12:48    15    is because they wanted to conceal what they were doing, and

16    that's evidence not just of infringement but of intentional

17    infringement.

18            What else do they say about the copyrightable

19    elements?

12:48    20            The Court read you these two defenses, these

21    two instructions that are on Page 14 and 15.

22            Now, they had Professor Bachman, but nobody

23    used the term "scènes à faire".  Nobody used the term

24    "merger".  There is no evidence directly on that.  But what

12:48    25    do they say that these terms are?  This is really the core

*Closing Argument by Mr. Zummo*

1   of Urban Living's defense here.

2                    There is no copyright protection for

3   expressions that are standard stock, common, particular

4   expressions common to the treatment of a particular idea,

12:49   5   when an idea can be expressed in very few ways.

6                    And then what do they say?  Whether it's

7   Mr. Ramani or Professor Bachman, it's, 'Well, you can drive

8   around Houston and see designs just like this.'  Well, maybe

9   one reason you can see designs just like this when you drive

12:49   10   around Houston is because Preston Wood has been doing them

11   since the early 1980s and there are thousands of people

12   living in his townhouse designs all over inside the loop in

13   the city.

14                    And then the other statement I think from

12:49   15   Mr. Bachman was you can look in the *Houston Chronicle* on

16   Sunday and see those floor plans, but they didn't bring you

17   one single example of any of these supposedly common

18   designs.  If there's all this stuff out there that's just

19   like the designs in this lawsuit, don't you think they would

12:50   20   have been able to bring you some examples of that?

21                    The difference between their approach and

22   ours -- because we say they're not all the same, they are

23   not all identical.  The difference is that we presented

24   evidence -- it was the last thing that came in, Exhibits 80

12:50   25   through 84 -- where you do have different designs.  And what

*Closing Argument by Mr. Zummo*

1    we have got here are just a handful of examples from those

2    exhibits because we wanted to pick the ones that have that

3    40-foot-by-20-foot footprint.

4              This is Exhibit 80-C.  You can see that's not

12:50  5    the same as the designs in this case.

6              This is 80-H, another different design.

7              80-J, a four-story different design.

8              80-L, four-story different design.  You see it

9    has not just a straight rectangle.

12:50  10             80-M, very different design.  It's 20 by 36.

11             82-B.

12             84-C.  And 84 has several different floor

13    plans, all in the same development, and they're different

14    designs, even though they fit that 20-by-40-foot slab.

12:51  15             We bring these to you because --

16        THE COURT:  30 minutes has gone past.

17        MR. ZUMMO:  Yes, Your Honor.  Thank you.

18             -- it's not true that they're all the same,

19    that all townhouse designs are the same.  But we also bring

12:51  20    these to you to show you that, if somebody is going to tell

21    you all designs are different, all designs are the same, we

22    need to see actual evidence of that.  And we have tried to

23    bring that evidence to you so that you can decide for

24    yourselves, not just taking somebody's word for it that they

12:51  25    have looked in the *Houston Chronicle*.

1    When we get to the question did Urban Living

2    infringe we think the answer is "Yes" on all five projects.

3    Now, the next thing is this "gross revenue -

4    deductible expense" question, and here's where it's easy.

12:52   5    For our side, we have to prove the revenues,

6    and on the first four, for Urban Living, you will see the

7    commissions totaled in the Agreed Facts.  Those are the

8    gross revenues.

9    They did have no commissions on Mount Vernon;

12:52   10    so, they have no gross revenues, Urban Living does, on

11    Mount Vernon.

12    When it comes to deductions -- or for Cameron

13    there's only two at issue, and you have evidence in

14    Exhibits 93 and 102 where it sets out what Cameron agreed

12:52   15    that he would be paid.  And he's testified and Mrs. Cameron

16    has testified he didn't actually get that or they didn't try

17    to get it fully paid, but that's the right that they had to

18    get paid.  And the instructions say it's the value, not just

19    the receipts.  But it's up to you to decide how to fill that

12:53   20    in.

21    On expenses -- this is the meal section, but

22    remember that they have to bring you documentation for their

23    expenses.  They have to bring you backup and they have to be

24    believable documents.  The problem they have is there is no

12:53   25    backup for the summaries they have provided to you.  And in

*Closing Argument by Mr. Zummo*

1   accounting Quicken terms, they didn't even lock that

2   database.  They were still making changes to it after this

3   lawsuit was filed.

4         As an example of expenses that they claim they

12:53  5   can deduct but we disagree:  the legal fees, including legal

6   fees for this case, PWA, over $4,000 for that month.

7         I look -- I, really, actually didn't believe

8   that he would answer the question that way, but when I asked

9   Mr. Ramani, "Legal fees to defend copyright infringement

12:54 10  suits like this are just a cost of doing business for you,

11  aren't they?", he said, "Yes."  And they want to be able to

12  not just infringe the copyrights, but reduce what they're

13  supposed to pay based on what they spend to defend the case

14  in court.

12:54 15         Now, to deduct the overhead-type expenses one

16  of the requirements is that they have to offer a fair and

17  acceptable formula.  Well, we saw their formula, if you

18  remember the little math exercise we went through.

19         The first one is right.  33 goes into that and

12:54 20  you get $5,500.  Well, when we kept grading the paper, none

21  of the rest of them were right.  You can get your own

22  calculator and test it.  You will find there is not a single

23  correct calculation.

24         It's their burden to bring this evidence to

12:55 25  you and bring evidence of expenses.  They haven't done that.

Closing Argument by Mr. Zummo

1    And it's up to you; if you find anything in there that you

2    think they did prove, fill in the number.  But it's their

3    burden and it's their burden to do it in a way that's

4    believable.

12:55    5        The next question that you have is:  Is there

6    a percentage of profit due to factors other than

7    infringement?  And the instruction here is in terms of

8    "factors other than copyright infringement".

9        There is not a single factor that was provided

12:55    10    to you.  They didn't testify to any factor in the terms of

11    this instruction.  And, very importantly in the law, if the

12    non-infringing factors are so intertwined with infringing

13    factors that it's impossible to apportion profits, then no

14    apportionment is allowed.

12:56    15        There is not a single thing, in terms of value

16    that they sell to their customers, that doesn't require the

17    townhouse to be there.  There is no value to the location.

18    There is no value to anything else if there is no townhouse

19    there.

12:56    20        And the townhouses were based on our designs.

21    They are infringing copies.  If there is anything, it's

22    intertwined, and we believe the answer to that question

23    should be "Zero".

24        Now, this is the question about copyright

12:56    25    management information, and what you will see here is:  "Did

1  Urban Living, knowingly or intentionally and with intent to

2  induce, enable, facilitate or conceal infringement, create

3  or distribute copies or derivatives of Preston Wood &

4  Associates' copyrighted works from which Preston Wood &

12:57  5  Associates' copyright management information had been

6  altered or removed?"

7       We walked through this.  Mr. Ramani said there

8  was no mention of Preston Wood or its copyright notice on

9  those marketing materials.  So, we believe the answer to

12:57  10  this should be "Yes" on every one of these projects, of

11  these four.

12       The copyright management information is

13  defined in the license agreement, Paragraph 4.  It includes

14  our copyright notice.  And the reason this is the law is,

12:57  15  when these things are out there, when they're distributed

16  without our knowledge, not only do we not know who has them

17  and what they're doing with them and what they're building;

18  the people who receive these don't know that they belong --

19  the designs belong to Preston Wood.  There are people who

12:57  20  could be out there who got these communications, got these

21  distributions from Urban Living and who think they have

22  every right to use our plan when, in fact, that's not the

23  right thing.

24       Now, how many times?  That's the last

12:58  25  question.

Closing Argument by Mr. Zummo

1       It's an agreed fact that they distributed

2   these.  It's an agreed fact that they said that they created

3   the plans and that they put them on their website.  They

4   also sent e-mails.  Now, how many -- We think the answer

12:58   5   should be "Yes", as I said.

6       How many times?  Well, for the e-mails,

7   Mr. Ramani testified 8- to 15,000 times for that Nagle

8   distribution.  And what I'd ask you to do is either answer

9   this with this number for either Nagle or EaDo but not for

12:58  10   both because it was one -- they were both sent out together.

11   So, it's not a separate -- it's not a double-dip situation.

12       And then, for the website, this is the

13   Plaintiff's Exhibit 113.  It has the page views and 8,500

14   for Nagle, 3,700 for Patterson, 7,000 for EaDo.

12:59  15       And this "bounce rate" testimony from

16   Mr. Ramani -- I'm not sure I followed it, but if you believe

17   that this bounce rate means that 63 percent of the people

18   who got on the website didn't actually look at it -- if

19   that's what you believe the evidence shows, you're welcome

12:59  20   to discount those main numbers by whatever the bounce rate

21   is.  We're not trying to get the biggest number possible

22   here.  We're trying to get the accurate and truthful number.

23       Now, what we are here about is protecting the

24   lifetime of work that Sam and Preston have put into this

12:59  25   company and into their designs.  And we do appreciate your

*Closing Argument by Mr. Strother*

1    attention and the time you have spent with us, and we know

2    that you're going to do your job, and I thank you very much.

3            THE COURT:  You have got seven minutes left.  You

4    started at 12:20 and it's now 12:58.  So, you have got seven

13:00   5    minutes left.

6                It's now right at about 12:59.  Let's take a

7    break.  Everybody has been here for a while.  Let's take a

8    break until 1:15, and then we'll wrap up and then it will be

9    your decision.

13:00   10                So, we'll see you back in 15 minutes.  You may

11    stand.  You can leave your books or take them with you.  But

12    we'll see you back in 15 minutes.

13                        (Brief recess)

14            THE COURT:  Now we'll hear from the defense.

13:20   15                Go right ahead, sir.

16            MR. STROTHER:  May I please the Court, counsel.

17                I echo Mr. Zummo's thanks to you as a jury for

18    spending almost a week with us and bearing with us through a

19    lot of evidence and a few witnesses.  We appreciate the

13:21   20    effort you're putting into this.

21                Let me begin with a couple of rhetorical

22    questions that Mr. Zummo asked and then gave answers to that

23    I think we have different answers to.

24                Not surprisingly, we have different positions.

13:21   25    And the counselor's job, the advocate's job, is to

*Closing Argument by Mr. Strother*

1    articulate to you what the client's position is.  And

2    sometimes that makes us diametrically opposed.  Sometimes,

3    surprisingly, not so much.

4              One of the questions he asked was:  Why did

13:21  5    Urban Living do the agreement?  Why did Urban Living enter

6    into an agreement with PWA where Urban Living would pay only

7    $250 a pop to use these plans?

8              I'm not sure what Mr. Zummo's answer was.  My

9    client's answer would be $250.  Plans are necessary.  No one

13:22  10   is arguing that plans aren't necessary to build a building.

11   You don't even need an architect's plans.  You can use a

12   designer's plans.  They're necessary.

13             But the reason Urban Living went into that

14   agreement was because of the relative inexpense compared to

13:22  15   what was going on.  We're talking about townhomes that cost

16   between 300- and $500,000.  So, it makes sense to pay

17   someone $250.

18             Another question was about the "from scratch"

19   e-mail.  He said why did they lie at that point, why did

13:22  20   Fina Reisinger lie and say that that was from scratch.

21             I don't think that the logical conclusion is

22   that it had to have been a lie at that point and that

23   there's some giant scheme to save $1,500 on six townhomes at

24   that point.  That is not logical.

13:23  25             What is logical is what Mr. Cameron testified

1    to and what Mr. Ramani testified to; that there was a

2    mistake made that they own up to, but it was a mistake,

3    starting with Mr. Cameron's employees, beginning with the

4    Plan D5-214 and then failing to just start it all over when

13:23    5    they realized that they needed to do bigger overhauls than

6    anticipated.  And, remember, they spent 109 hours reworking

7    that plan.

8        The second mistake was then Mr. Cameron

9    communicating to Urban Living that that was done from

13:23    10    scratch and then Ms. Reisinger saying, 'We paid you for this

11    plan.  We're not using it.  There were problems with the

12    stairs.  We're doing it from scratch.'  Logic suggests that

13    that was a mistake and not an intentional lie involving a

14    number of witnesses, a number of people, none of whom are

13:23    15    here before you today.

16        Mr. Zummo said why didn't they just go to

17    Preston and say, 'Hey.  There are stair problems.  Let's fix

18    this'?  The answer was given by Mr. Ramani and Mr. Wood.

19    Mr. Wood was no longer there.  That's what generated this

13:24    20    agreement in the first place.  There was no one at Preston

21    Wood that redesigned these plans.  That's why Urban Living

22    was hiring people like Cameron Architects to have the plans

23    redone.  So, they couldn't have gone there to correct the

24    problem should they have chosen to do so.

13:24    25        I said early on that I didn't think this case

*Closing Argument by Mr. Strother*

1     was so much about the copying; my client was admitting to

2     some duplication.  I don't think my client has hidden the

3     ball on that.  And I think that the attempts to argue that

4     this is a recent position are unfair.

13:24  5          The evidence before the Court, which is

6     uncontroverted, is that when Mr. Ramani was alerted that

7     there were problems with the Nagle Street plan and with the

8     Mount Vernon plan he attempted to the pay for them and that

9     effort was rebuffed.  He attempted to pay the $250 apiece to

13:25  10    use those plans and it was rebuffed.

11          The evidence, which is also uncontroverted, is

12    that Mr. Ramani then made several attempts to talk with

13    Ms. Wood and those attempts were denied.

14          So, Mr. Zummo, on Day 1, said he thought this

13:25  15    was a case involving trust or a lack of trust, and I don't

16    believe that either.  We're talking about a case where, if

17    Urban Living and Cameron Architects could have made this

18    right, that attempt was rebuffed.

19          This is no longer a case, from Plaintiff's

13:25  20    perspective, about trying to get paid for the value of the

21    plans.  This is a case about Urban Living and Cameron

22    Architects giving up their profits earned from other aspects

23    of the townhomes.

24          I have been thinking all during the trial why

13:26  25    is Plaintiff spending so much time focusing on things that

*Closing Argument by Mr. Strother*

1    have been agreed to.  Because you have them in evidence.

2    You have the agreed facts.  Those were agreed before trial.

3    They didn't just happen here in the middle of trial.

4                    Why spend so much time parading in front of

13:26   5    you, the jury, that there was duplication on D5-214?  Why

6    talk about Mount Vernon at all?  What does Mount Vernon have

7    to do with it?  They weren't used.  There were new plans

8    done.  Mr. Cameron admits that it was practically an exact

9    duplicate.  There was no revenue from it.

13:26   10                    I figured it out.  And it's not rocket

11    science.  I think everyone else has probably figured it out,

12    too.  They want to show that Urban Living and Cameron

13    Architects are bad, are bad guys, bad people with evil

14    intent, and that somehow that should persuade you that you

13:26   15    should give more than the law allows, that somehow because

16    they are bad people that you should ignore the Court's

17    instructions and look at the questions and say, 'We don't

18    really care about percent of apportionment.  These are bad

19    people.  Zero.'

13:27   20                    Intent doesn't matter.  I believe I said that

21    on Day 1 to you, the jury, and the Court has now instructed

22    you that.  Intent doesn't matter.  Innocence doesn't matter.

23    But we spent a lot of time going through that anyway.

24                    Urban Living's and Cameron Architects'

13:27   25    reaction to finding out that the plans were infringing was a

Closing Argument by Mr. Strother

1    natural one; to try to pay for it, to make it better, and

2    then to stop construction the best they could.

3            On Nagle there was supposed to be 16 units.

4    They were able to instruct the builder to stop.  They only

13:28  5    built six of them, and then the builder hired a separate

6    architect to design ten others and they built those.

7            Mount Vernon.  I'll be frank.  Defendants got

8    lucky that something about the market caused the builder to

9    put the project on hold so that, by the time that Preston

13:28  10   Wood & Associates made the problem known, no construction

11   had started and it was easy to stop.  It would have been

12   easy to accept $250 for each of the plan's use and then let

13   the building be erected.  That was rebuffed.  And, so, the

14   builder restarted, and Mr. Cameron gave the builder a set of

13:28  15   stock plans that he had created.

16           When preparing for closing argument, I debated

17   one of two ways to handle going through the jury charge with

18   you.  The way I was going to do it is kind of like the way

19   Mr. Zummo did it, which is go through in order, and then I

13:28  20   realized that would be spending time on some of the things

21   that I think are less important.

22           So, I want to spend the time, initially, on

23   the things that I thought or that I think are of crucial

24   importance.  That's why I am going to show you a couple of

13:29  25   questions, an instruction, first.

*Closing Argument by Mr. Strother*

1          Let me have you look at Question No. 6.

2          Your Honor, may I dim the lights -- have you

3    dim the lights, please.

4          This is showing you two pages.  Let me see if

13:29  5    I can rectify that.

6          There.  Question 6 is identical in every

7    way -- That's not true.  It's a companion to Question No. 8.

8    Question 6 asks this question for Urban Living.  Question 8

9    asks the same question for Cameron Architects.  So, they

13:30  10   differ in having different names there, but they also differ

11   in having different sets of properties listed.

12          This is the question that I called your

13   attention to during my opening statement.  When I pulled out

14   the board over here, I told the jury -- I told you that this

13:30  15   was probably going to take away from architecture and go to

16   accounting.  And I regretted that, but this is what's

17   important.

18          By the way, the question preceding this is the

19   one that goes into gross revenues and deductible expenses.

13:30  20   This percentage of profit due to factors other than

21   infringement is where the evidence in this case should

22   naturally take you.  I have proposed responses for the other

23   questions regarding whether there was infringement,

24   regarding the amount of the deductible expenses.  But I can

13:31  25   understand how reasonable people could disagree with me and

1    disagree with my clients and find answers to the

2    infringement questions or the expense questions that we

3    believe are the wrong answers.

4                  This one, there's only one set of evidence

13:31   5    that you have in front of you about.

6                  I asked both Mr. Wood and Ms. Wood if they

7    were seeking 100 percent of the profits that Urban Living

8    had gained and 100 percent of the profits that Cameron

9    Architects had gained.  Time and time I asked, met with

13:31   10   objection.

11                 Finally, I got Ms. Wood -- she's the only one

12   who answered the question -- and she didn't say "Yes" or

13   "No."  What she said is, "We're seeking is what the law

14   allows."  And she should.  But what the law allows is for

13:31   15   this jury to decide what factors -- what percentage of the

16   profit is due to factors other than infringement.

17                 Mr. Ramani testified about how Urban Living --

18   And, by the way, the answers regarding profits on Urban

19   Living and Cameron Architects, you get there in a different

13:32   20   way.  So, I am going to start with Urban Living.

21                 Mr. Ramani testified and everyone agreed, I

22   think, that was asked that the way Urban Living earns a

23   profit is you start with the sales price first and you

24   calculate the commission based upon what that sales price

13:32   25   is.  It's generally between 3 and 6 percent.  No one is

*Closing Argument by Mr. Strother*

1    arguing about that 3 to 6 percent, and you have the evidence

2    in front of you what the actual commission was on each

3    closing.  So, you can back-out the percentage, if you like,

4    but generally -- not generally -- specifically, the parties

13:32   5    are agreeing as to what the total amount of commissions

6    earned actually was.

7              Mr. Ramani then gave evidence -- gave

8    testimony that his commission, Urban Living's commission,

9    is, therefore, based upon the sales price and that as a

13:33   10   portion of his profit the amount charged for the plans was

11   only $250, only $250, and that the other factors -- there

12   were other factors that went into determining the sales

13   price and, therefore, his profit.

14             He mentioned land.  He mentioned the materials

13:33   15   and he gave a subset of those materials that he thought were

16   of crucial importance in determining the sales price:  the

17   finishes, the sinks, the hardwood floors, things like that.

18   Those things would necessarily constitute the rest of that

19   piece of pie.

13:33   20             I asked him to break down what percentage of

21   profit would those plans be responsible for and he said

22   1 to 2 percent.  I showed him one example that would get

23   higher if you're dealing with a lower commission.  I showed

24   him one that was 2.5 percent.  And he said, generally, 1 to

13:34   25   2 percent of the profits earned by Urban Living, that's what

*Closing Argument by Mr. Strother*

1     is associated with the plans.  Everything else comes from

2     the land, the materials and the finish.  That's how the

3     price of a home is determined.

4              The instructions and our judge have called

13:34  5     your attention to the burden of proof required; and it's

6     been pointed out to you that, generally, the burden of proof

7     is on Plaintiffs on most of the evidence, but it's not true

8     on all of the questions.

9              Question No. 6, Question No. 8, undeniably the

13:34  10    burden of proof is on us, the Defendants.  Let me talk about

11    what that burden of proof requires.

12             The burden of proof is a preponderance of the

13    evidence.  And I don't remember if it was after you had been

14    seated in the box or whether it was during the voir dire

13:35  15    process.  The Judge used an example that attorneys like to

16    use, which is you look at the scales of justice that are

17    evenly balanced, and a preponderance of evidence is that

18    amount of evidence that causes the scales to tip; some

19    amount of evidence in this hand and this hand, and the

13:35  20    preponderance of the evidence causes them to tip.

21             So, what do you do when you have empty scales?

22    What causes the scales to tip when looking at the

23    preponderance of the evidence?  I don't mean to minimize the

24    amount of evidence that my clients have brought forth with

13:35  25    regard to Questions No. 6 and 8, but very little is

1    required.  A feather tips these.  A paperclip tips these.  I

2    contend we have much more than feathers and paperclips over

3    here, but a feather or a paperclip is all that we need,

4    because Plaintiffs put on no evidence whatsoever of any

13:36   5    other factors that Urban Living's profits came from or that

6    Cameron Architects' profits came from.

7            Now, Mr. Zummo is going to get up here and

8    correctly say, 'We didn't have to.  We're Plaintiffs.  The

9    burden of proof is on them.  They have got to prove it by a

13:36   10   preponderance of the evidence.'  And he's absolutely right.

11   He doesn't have to do anything to cause those scales to tip,

12   until there is a feather, until there is a paperclip; and

13   then it's incumbent upon the Plaintiffs, in a case like

14   this, to put on evidence to rebut it and get those scales

13:36   15   tipped on the other side so that no longer can Defendants

16   have met their burden.

17           This is an important point to me, this is an

18   important point to the charge and I believe it's an

19   important point to Plaintiffs on their issues.  So, please

13:36   20   remember what's required here and remember that, when there

21   is zero evidence on the other side, a preponderance is just

22   a little bit of evidence.

23           Regarding this $250 and other factors -- I

24   have a ten-year-old daughter and I was driving her to school

13:37   25   this week, and she's shown an interest in what lawyers do.

*Closing Argument by Mr. Strother*

1    I don't know how much she gets because she's pretty smart.

2    She asks interesting questions.  And when I knew she got

3    this argument is when she understood that there are things

4    that go into selling a home, marketing a home, building a

13:37    5    home, and that you can assign dollar amounts to how much

6    those things cost.

7    So, we started about what else cost $250.

8    What else could cost $250?  She's not gone shopping.  And I

9    couldn't come up with something exactly that cost $250, but,

13:37   10    in the ballpark, logic, common sense, says that things like

11    disposals to sinks, the sinks themselves, hardware for a

12    couple of doors in a room, maybe the amount of paint that it

13    takes to paint a foyer, shower heads and fixtures in a

14    shower.  These things cost $250.

13:38   15    And if someone walked into this courtroom and

16    said, 'I provided the windows for the bedroom and those cost

17    $250; and, therefore, I am entitled to all of the profit

18    that people made off of the sale of that home,' that would

19    sound crazy.  That would sound crazy.

13:38   20    But I believe that is exactly what Plaintiffs

21    are doing in this case, and they have done it because they

22    have refused to give you any other information about things

23    that they agree are factors that didn't cause the

24    infringement, because, truth be told, they have got to agree

13:38   25    that part of the profit came from something else.

Closing Argument by Mr. Strother

1        Mr. Zummo said people don't go out and buy

2    homes that are just pieces of dirt that don't have homes on

3    them; the plans are necessary.  That's absolutely true.  But

4    people don't go out looking for a place to live, a place to

13:39   5    put their children so they're zoned to an appropriate school

6    and decide that they're just going to buy a 250-dollar plan

7    and then sit on the sidewalk with it.  That doesn't happen.

8        People require those plans to actually be put

9    in place by builders.  They require those builders to use

13:39   10   concrete, to use plywood, to use two-by-fours and drywall to

11   make these things happen.  That's where profits come from.

12   That's where sales price comes from.

13       Cameron Architects has a slightly different

14   approach.  Just to be clear, I am going to turn to Question

13:39   15   No. 8.

16       Necessarily, Cameron Architects only is

17   being -- you're only being asked this question about Nagle

18   Park Place and Mount Vernon.

19       Cameron Architects doesn't sell the

13:39   20   properties; and, so, they earn a sum much differently than

21   Urban Living does.  And they provided their accounting

22   information.  The accounting information is pretty clear

23   about how much they got paid.

24       They received one check from the builder.

13:40   25   That was an 11,450-dollar check.  That's Exhibit 7.

1    Mr. Zummo says, 'But, hey, the builder promised to pay

2    more.'  That's true, but Ms. Cameron told you that that's

3    not something that Cameron Architects is going to be able to

4    seek because of this lawsuit.  That's not money that you

13:40    5    need to be looking at as actual gross revenue.

6         With this, Cameron Architects provided a check

7    back to Urban Living, $5,725, which is half of that amount.

8    So, therefore, the gross revenue that Cameron Architects

9    earned was only $5,725,000.  That was meant to go to 16

13:41    10    units, not the six that were actually built.

11         And, finally, Cameron Architects provided

12    their calculations.  They have some direct costs on here,

13    some direct costs that you should pay attention to, and

14    those are the payroll costs of $1,727 which went to,

13:41    15    specifically, the 109 hours that they paid their employees

16    to work on the Nagle Street plans.  Those expenses should

17    come out of the $5,725.

18         Then you're left with overhead.  Overhead is

19    in your ballpark.  We contend that the overhead that was

13:41    20    incurred here should be deducted.  It was associated with

21    the Cameron Architects' operation and it was prorated.

22    That's the fair and reasonable formula or, maybe, fair and

23    appropriate formula that went to deciding what portion of

24    those actually go.

13:42    25         There was an error, my error, in producing

1   this one.  Ms. Cameron testified that when you double --

2   because you have two employees -- when you double this

3   number, you half this number, which goes over here; and, so,

4   therefore, your overhead costs are, actually, half of what

13:42   5   is presented here.  Instead of $7,500 you're talking in the

6   ballpark of 3,750; and, so, therefore, you're talking about

7   a net profit, after overhead, of approximately $200.

8                We haven't talked about the percent question

9   yet.  That's 100 percent of the net profits.

13:42   10                But there were factors that Mr. Cameron

11   testified to and Ms. Cameron testified to that you need to

12   take into account:  the 109 hours of work that went into

13   making those plans something that could be used to build six

14   townhomes.

13:43   15                So, if you make a pie chart and you find out

16   what is the payroll of 1,727 compared to the 250, you get to

17   a ballpark number of 87 percent.  87 percent of Cameron

18   Architects' meager profits were due to Cameron Architects'

19   direct efforts, not to the 250-dollar plans.

13:43   20                Let me show you the same information about

21   Urban Living.  Nagle is where both parties have spent most

22   of their time; so, you have a little bit more information on

23   Nagle.

24                Urban Living has provided what their operating

13:44   25   costs are, which is their overhead per house getting to a

1    specific net income for Nagle.

2              Plaintiff has an argument -- I understand

3    it -- is that there were things, perhaps, that Urban Living

4    had to pay for that maybe it would have paid for anyway.

13:44    5              Mr. Ramani said that's not entirely true.

6    These things are prorated by the number of the staff that we

7    were buying dinners for or lunches for or whatever.  These

8    people were working there at the showroom.  They were all

9    working on selling all of the different properties.

13:44   10              And, so, the only appropriate and fair formula

11    you can do in that situation is to look at the number of

12    houses that were sold in a given month and then break your

13    operating costs, your overhead costs, into a per-house cost

14    and then just apply it to how much the net commission was.

13:44   15              They did this in high detail for Nagle and

16    they provided other information for the other properties.

17    I'm sorry.  Wrong -- That was an error.  Pardon me.

18              This would be Defendant's Exhibit 17, which

19    does the calculation for the remaining three properties.

13:45   20    The calculation is the same.  The number of closed houses

21    are provided and then you have this erroneous cost per home.

22    This column is the only column that has incorrect

23    information.  And, thankfully, we were able to determine on

24    the fly what this error was so, when Mr. Zummo said you can

13:45   25    go into your jury room, pull out the calculator and

*Closing Argument by Mr. Strother*

1    determine it as an error, you can.

2              You can also just take this column and divide

3    it by this column and get the correct number.  When you do

4    that, you will find this was an error that works in Preston

13:46  5    Wood & Associates' favor.

6              The actual cost per home on the majority of

7    these go up, and when you add them all together it's

8    actually a 940-dollar difference in Preston Wood &

9    Associates' favor, if you were to use these numbers.  We

13:46  10   would prefer you use the correct numbers, but we understand

11   the burden is on us and we messed up this sheet.  But the

12   data is intact and the data is accurate.

13             Now I'd like to go through some of the other

14   instructions, and I am going to try to do these in order, I

13:46  15   believe.

16             The first one I'd like you to look at is

17   Instruction No. 4 with me.  This is an instruction that you

18   never heard Plaintiffs address in evidence at all, and this

19   happens to be something that I think should have been

13:47  20   addressed.

21             This says very clearly that the mere fact that

22   a work is copyrighted doesn't mean that every element of the

23   work is protected.  These instructions altogether -- To say

24   it's a mouthful is not the right way to put it.  There is a

13:47  25   lot for you to digest and synthesize and figure out what

*Closing Argument by Mr. Strother*

1    these instructions are -- how you are to apply them to the

2    evidence.

3              The point of this instruction is to let you

4    know that, even in a copyrighted plan, such as the ones by

13:48    5    PWA, there can be pieces in there that the law actually

6    doesn't protect even if the copyright is valid.  There can

7    be things in there that aren't protectable.  The kind of

8    things that are not protectable are the kinds of things that

9    Professor Bachman called your attention to, the things that

13:48    10   are standard or common or routine.  He didn't use the word

11   "clichéd".  Same thing.

12             He also said that to some of these solutions

13   there were only a couple of ways to solve the problem.  And,

14   so, while it's true, Mr. Zummo pointed out, that no one said

13:48    15   "scènes à faire" and no one said "merger", that's because

16   witnesses don't use legal terms.  Witnesses give the

17   information so the Court can instruct you on the law, and

18   you can look at what the witnesses said and see if it fits

19   the law.

13:48    20             We come back to Professor Bachman's testimony

21   in a minute.  Mr. Zummo came down really hard on Professor

22   Bachman and suggested that, perhaps, he doesn't like Houston

23   and is going to be happy when he can retire somewhere that

24   is a prettier city or something like that.  I think that's a

13:49    25   misconstruction of what Professor Bachman was saying.

*Closing Argument by Mr. Strother*

1       He acknowledged that townhomes are needed.  He

2   acknowledged that things that are insignificant

3   architecture-wise are needed.  He called them part of the

4   background.  That's not an insult.  That's not an insult.

13:49  5       And when -- he was cross-examined and he was

6   asked if he felt bad, essentially, for talking poorly about

7   Mr. Wood when he criticized Mr. Wood.  He very clearly said,

8   'Wait a second.  I'm not criticizing a human here.  I am

9   criticizing a plan.'  That's it.  He looked at the plan and,

13:49  10  as a professor of architecture working as long he has, he

11  pointed out the elements that he thought were standard and

12  routine and necessary given the external factors there, the

13  20-by-40 footprint, for example.

14       People live in townhomes.  People live in

13:50  15  houses that may look like their neighbors' houses.  We're

16  not criticizing that.  But that doesn't mean that the law

17  protects those identical situations, and it doesn't protect

18  a standard configuration of standard rooms that flow

19  naturally and logically.

13:50  20       I objected to Plaintiff's Exhibits 80 through

21  85, I think, which came in right at the end after Mr. Ramani

22  had testified nothing else happened.  His Honor called you

23  back in.  Mr. Zummo, I believe -- it could have been

24  Mr. Bonham -- read something in about what it was being

13:50  25  offered for.  I put my objection into the record.

*Closing Argument by Mr. Strother*

1    I thought more about it, and I think you
2    should look at it.  Look at them.  Look at the 20-by-40
3    ones.  I think Mr. Zummo was playing a little hard and fast
4    when he put in L-shaped ones that were 36 feet or 46 feet.
13:51  5    That can make a significant difference because, when you're
6    talking about something larger than 20 by 40, you can start
7    to do something interesting with the shapes.
8        But look at all of these that we built.
9    They're boxes.  They're boxes.  Even Nagle didn't have the
13:51  10    bowed window.  Every single one of them is a box.
11        So, why do I want you to look at 80 through
12    85?  I think you will find them all substantially similar.
13    I think you will find that -- Even if PWA has a catalog of
14    however many they put into evidence, when you're talking
13:51  15    about those are the same size, do you know what you're going
16    to find?  Do you know what you'll find on the second floor
17    every time?  An open kitchen, dining room and living room.
18    You'll find a balcony.  You will find a bathroom up there.
19    And they're not going to be organized in a significantly
13:52  20    different manner.
21        You know what you're going to find on the
22    bottom floor because physics requires it?  The garage.
23    There will be a two-car garage.  There will be an entrance,
24    and there will be a stairwell, and there will be one
13:52  25    bedroom, one closet and one bathroom.  And they're going to

*Closing Argument by Mr. Strother*

1    look very much alike, all of the other plans that you're

2    going to look at in this case.  So, look at them.

3              Mr. Zummo test -- I'm sorry -- he didn't

4    testify.  Mr. Zummo called your attention to the other plans

13:52   5    in this case, not Nagle and not Mount Vernon, but the ones

6    that were non-UPM projects -- Stanford, Patterson and EaDo.

7    And my ears perked up when he called them "Urban Living

8    designs".  There is not a lick of evidence that Urban Living

9    had anything to do with those designs.

13:53   10              To the contrary, everyone that was asked

11    agreed the builder, Oppidan, hired an architect, Bill

12    Wooten, neither of whom are here.  The builder had

13    Mr. Wooten design plans and then Urban Living was hired for

14    one sole purpose and that was to sell those properties.

13:53   15              Urban Living didn't receive the construction

16    plans.  Urban Living received marketing plans from the

17    builder, which are different.  They're not the drawings that

18    have the dimensions and elevations and all of that.  They

19    are simple floor plans.

13:53   20              The reason that's important is because the

21    Plaintiffs are trying to confuse you.  And I rarely suggest

22    that the other side is trying to confuse anyone.  This time

23    they are.  They are focusing and generating the idea of

24    intent because, as you know from the charge, intent doesn't

13:54   25    matter with copyright infringement.  Innocence doesn't

*Closing Argument by Mr. Strother*

1   matter.

2            But where intent does matter is where the

3   Court has called your attention to.  Yes, this does not

4   apply to Questions 9 and 10.  Intent, absolutely, is needed

13:54   5   for those last two questions because those are different.

6   That regards the alteration and removal of copyright

7   management information.  To find Urban Living has done that

8   you have to find that they knowingly did it and they

9   intended to trick people out there and to obscure copyright

13:54   10   management information.  There is no evidence the burden is

11   on them this time.  There is no evidence that Urban Living

12   knew or should have known that those plans could have

13   possibly infringed on PWA's plans.  They received those from

14   the builder and it was hired only to sell them.

13:55   15            There is an important sentence in this

16   instruction, which I think is Instruction 14(?)  Yes.  This

17   sentence stands out there alone and this helps you, if you

18   ever have to answer the very last question.  And I am going

19   to show you the question in a moment, but I want to call

13:55   20   your attention to it now.

21            "To determine the number of violations

22   regarding copyright management infringement you, the jury,

23   are to consider only the number of individual acts committed

24   by a Defendant that violated this law."  Only look at the

13:56   25   Defendant's acts, each individual act.

*Closing Argument by Mr. Strother*

1          It's why I asked Mr. Ramani about the e-mails.

2          "Are you sending out 8,000 e-mails?"

3          He said, "No.  It's one.  We put one up

4     there."

13:56   5          "Are you delivering to 20,000 people marketing

6     plans on line?"

7          "No.  They upload it one time."

8          These are individual acts.  And if you

9     wondered if this case was about trust and if you think it's

13:56  10     not about money, ask yourself why Plaintiffs are asking you

11     to write something like 20,000 times for the number of times

12     that copyright management information was circulated.  This

13     case is about money.

14          Plaintiff said in the closing, 'Oh, but we

13:56  15     want you to do what you think is right.  We don't want to

16     double-dip.'  They don't want to double-dip.  They want to

17     dip in 20,000 times, 8,000 times, 10,000 times, whatever

18     they've pled the number is.  What they told you in closing

19     is directly contradictory to that sentence.

13:57  20          I have about nine minutes left to go through

21     the charge with you.

22          Did Urban Living infringe?  Urban Living

23     doesn't deny that there was copying, duplication, on Nagle

24     Park Place.  As its advocate, I can tell you the answer to

13:57  25     that one is still "No" because the instructions tell you

*Closing Argument by Mr. Strother*

1    that non-protected elements can be copied.

2              And Professor Bachman, with no rebuttal from

3    anyone else, testified about what was standard.  Plaintiffs

4    had the opportunity to call rebuttal witnesses after they

13:57  5    heard Mr. Bachman testify.  They put on no other evidence.

6    So, you can answer "No" to that question.

7              Patterson Street Landing and Stanford Street

8    Landing and EaDo Place -- they're required to show you that

9    there are infringing plans.  They don't even show you plans.

13:58  10    They showed you marketing plans.  They simplified floor

11    plans that were not the construction drawings used by the

12    builder or the architect.  You have to say "No" to those.

13              And Mount Vernon -- of course, Mount Vernon

14    was not sold.  There was no money earned from the drawings

13:58  15    that did infringe.  So, therefore, there could be no

16    infringement for the plans that were actually used.  Again,

17    one of these many uncontested facts.

18              The answer to Question 2 would be the same.

19    You're getting a different question for contributorily

13:58  20    infringing, but the information and the data, the evidence,

21    you have there is exactly the same.

22              I am going to stand here while I look at the

23    others so I'm not going back and forth.

24              Cameron Architects is only being asked --

13:59  25    You're only being asked about two plans.

*Closing Argument by Mr. Strother*

1      Mount Vernon does not infringe.  That plan

2  wasn't used.  No money was earned from it.

3      Nagle Park Place.  I understand why you would

4  say "Yes".  He doesn't deny that Cameron Architects used

13:59  5  D5-214 as the starting point.  The evidence is, however,

6  that D5-214 were full of standard, routine, common

7  arrangements of standard things; so, therefore, it's not

8  entitled to protection.  We still say "No."

9      The same for Question No. 4.

13:59  10      For Question No. 5, all of that information

11  appears in the exhibits.  If you get here, the information

12  regarding gross revenues is in the Agreed Facts, and the

13  deductible expenses are on the couple of exhibits which are

14  Exhibits 16 and 17 for Urban Living.

14:00  15      Here's the answer.  I want to call your

16  attention -- or the question.  I want to call your attention

17  to something very important here.  This asks you for the

18  percent of profit due to factors other than infringement,

19  not percent of profit due to the infringement.

14:00  20      So, if you agree with what my position has

21  been that 1 to 2 percent is the amount of profit due to

22  infringement, that's not what you write there.  You write

23  the 99 percent, the 98 percent, on this one, Question No. 6.

24      Question No. 7.  This information comes

14:00  25  directly from the Cameron Architects' accounting documents,

*Closing Argument by Mr. Strother*

1    which are Exhibit 11.

2         Mount Vernon, of course, has zero.

3         THE COURT:  40 minutes has gone past.

4         MR. STROTHER:  Thank you, Your Honor.

14:00  5         I walked you through how to calculate the

6    percentage of profits due to other factors for Cameron

7    Architects.  That was 87 percent.

8         I am now back to the page views, the 20,000

9    page views.

14:01  10        I have highlighted a lot of provisions here

11   that I want to finish with.  I mentioned that.  Did Urban

12   Living knowingly or intentionally with the intent to induce,

13   enable, facilitate or conceal infringement?  There's no

14   evidence of that.  You could stop there.

14:01  15        Did it distribute copies or derivatives of the

16   copyrighted works from which the copyright management

17   information had been altered or removed?  You don't have

18   that.  You don't have that.

19        What the evidence is that they presented to

14:01  20   you are marketing plans.  It could be photographs.  How do

21   you remove copyright management information from a

22   photograph or other things?

23        What they are alleging is that the floor plans

24   that made it through as marketing plans somehow had the

14:02  25   copyright management information altered or removed.

*Closing Argument by Mr. Strother*

1          Mr. Ramani gave testimony at the very end of

2    his testimony that, when you go online, you can get the

3    stuff without the copyright.  And Plaintiffs had an

4    opportunity to cross-examine him on that.  They had an

14:02    5    opportunity to take you live to PWA's website and show you

6    that that was untrue.  There is a reason they didn't do

7    that.

8          The answer to all of these questions has to be

9    "No."  Even if you think there was copyright infringement,

14:02    10   the answer to this question has to be "No" because there is

11   no evidence that the copyright management information has

12   been altered or removed.

13         And, so, therefore, we believe you shouldn't

14   answer this question.  If you must, the answer isn't in the

14:02    15   realm of 20,000 or even 10,000.  You're talking about one

16   e-mail.  You're talking about uploading once.  In fact, for

17   Nagle Park Place and EaDo you're talking about half an

18   e-mail because they were on the same e-mail.

19         With that, I am finished.  I appreciate your

14:03    20   time.  You're almost there.  I look forward to you spending

21   some time reading the legal treatise that is in front of you

22   and delving through the multiple binders of information.

23         We appreciate it.  Thank you.

24         THE COURT:  All right.  You've got seven minutes

14:03    25   left.

*Rebuttal Argument by Mr. Zummo*

1       MR. ZUMMO:  Your Honor, I will need the screen.

2  Thank you.

3               When we heard both of the Defendants talk

4  about how mistakes were made, it was kind of interesting.

14:03   5  Mr. Strother asked both of his clients, 'Are you taking

6  responsibility for your employees?'  But it sure sounded

7  like Mr. Cameron was saying it was somebody else's fault

8  that the Preston Wood design got used.  And it sure sounded

9  from Mr. Ramani like he didn't agree with Fina Reisinger's

14:04  10  e-mail and Mr. Cameron didn't agree with it, and she must

11  have made the mistake.

12               If they want to take responsibility for this,

13  maybe waiting until the last day of trial isn't the best

14  time to do it.

14:04  15               But what really got me in the middle of

16  Mr. Strother's argument was, well, he said it wasn't until

17  Preston Wood made the problem known.

18               Can we see Exhibit 103 again, please.

19       MR. COOPER:  You're going to have to look up here.

14:04  20  I think the projector turned off.

21       MR. ZUMMO:  Okay.

22               This is the e-mail we've talked about so much.

23  And the reason we made the problem known years later is

24  that's when we first found out about it, because they lied

14:05  25  about what they were doing with our plan.

*Rebuttal Argument by Mr. Zummo*

1    But the whole issue of was Preston still
2    around to makes the changes if there was an error, that's --
3    Sam Wood told them, 'We have looked at it.  They were minor
4    to fix and we have corrected them.'  So, it's not true that
14:05   5    it couldn't be done because Preston was now working for
6    David Weekley Homes.

7    I want to talk -- I don't feel that I need to
8    respond to everything Mr. Strother said and repeat the
9    things I said in the first part of this summation.  I'd like
14:05   10   to talk about his apportionment argument, the answers to
11   Questions No. 6 and No. 8.

12   They have the burden of proof.  They haven't
13   brought you any proof of any factor that accounts for
14   profits other than the infringement of our designs.

14:06   15   And I'd like to call your attention to Page 1
16   of the Court's charge:  that "statements and arguments of
17   the attorneys are not evidence."  That's all this pie chart
18   is.  It's not evidence because that came from Mr. Strother,
19   not from any actual evidence that was ever brought to you.
14:06   20   They haven't met that burden of proof.

21   It's also interesting that they want to tie
22   this case to the $250 per plan per use that the contract
23   called for them to pay, because they didn't pay that back
24   when they decided to use the plan.

14:06   25   What that argument means, if you actually

*Rebuttal Argument by Mr. Zummo*

1    accept their logic, is 'We cannot follow the contract when

2    we're using the plan.'  'We can lie to you about whether

3    we're using the plan.  We can deny this for years.'  'We can

4    fight you for years in a courtroom, try to deduct the cost

14:07  5    of that from the recovery that the law says you should

6    receive.  And, when it's all over, we're going to ask the

7    jury, oh, well, just award them the $250 that we should have

8    paid them in the first place.'

9         If that's the way you think things should

14:07  10   work, you can accept their argument.  If that's the kind of

11   conduct that you want to approve, you should accept their

12   argument.

13        We're not here to try to paint them as bad

14   guys.  We're here to present the evidence to you.  I never

14:08  15   said that anybody on their side were bad guys.  And it's

16   very interesting that the whole idea that there are bad guys

17   is introduced by their own attorney.

18        When Mr. Strother wanted to talk about the

19   charge on the removal of copyright management information --

14:08  20   I'd like to look at that.  I did talk about this.  I did

21   mention this when we went through this charge, but let's

22   look at the individual acts.  Let's just start with the

23   e-mails.

24        Mr. Ramani testified how many e-mails would go

14:08  25   out.  8,000 to 15,000 e-mails.  Those are individual acts.

*Rebuttal Argument by Mr. Zummo*

1    If you read this charge on that issue, the thing that's a

2    violation is to distribute copies with the removed copyright

3    notices and management information.

4              Does it make any sense that the law would say

14:09    5    it's a violation to distribute, but one distribution because

6    you hit a "send" button on e-mail is the same as 15,000?

7    There's a huge difference between distributing 15,000 and

8    distributing 8,000 or distributing one.

9              And one thing that -- I was very interested

14:09    10    that Mr. Strother wanted to talk about feathers on the

11    burden of proof.  Because, you know, I was ten years old

12    once, too.  I went to a very traditional catholic school.

13        THE COURT:  You have two minutes left.

14        MR. ZUMMO:  And I remember the subject whether it's

14:09    15    right or wrong to gossip was taught.  And the teacher that

16    we had told a story about somebody that went to confession

17    and said, 'I have been gossiping.'  And the priest said,

18    'Well, I am going to give you a two-part penance.  First, I

19    want you to go and take a feather pillow to the top of the

14:10    20    tallest hill in town and rip it open and then come back.'

21              And, so, the person did, ripped it, the

22    feathers start blowing in the wind and he came back.

23              And the priest said, 'Now for the second part

24    of your penance I want you to go get all those feathers.'

14:10    25              This problem of the distribution of our plans

1   is like those feathers in the wind.  We can't go get those

2   feathers.  Mr. Ramani and Mr. Cameron can't go get those

3   feathers.  Nobody knows, after they have sent our plans out

4   to all of these people, what's happening with them.

14:10   5        All we can do is what the law permits us to

6   do.  That's to come here and submit these questions and

7   submit these issues to the eight of you, and whatever the

8   law says happens, whether it's recovery of profits or these

9   violations, that's what we are allowed to do.  That's the

14:11   10   best we can do to try to rectify this.

11        Sam and Preston have a life invested in not

12   these five plans but in the whole library of plans, and the

13   only way to keep that investment, to preserve what they have

14   spent their life -- their married lives, their business

14:11   15   lives together, is for you to answer these questions

16   honestly and enforce the law.

17        Thank you.

18      THE COURT:  Now, ladies and gentlemen, in a minute

19   or two I will give the jury charge to Ellen to escort you

14:11   20   into the jury room.

21        You now set your own schedule.  Take whatever

22   breaks you want or whatever, but I do have some parameters

23   that I've used before I got to this court.  I've used it in

24   state court, being downtown and the hours of the day.

14:12   25        You may deliberate each day up to 6:00 p.m.,

1    but the attorneys and I will be excused, meaning we'll be

2    out of here, at about 5:00.  So, you can go later.

3              So, if you reach a verdict between 5:00 and

4    6:00 there is a procedure, like the last trial we had.  You

14:12    5    seal it up, come back the next day, unseal it.

6              And then I come back and visit with you, and I

7    visit with you -- usually, it averages an hour, or whatever

8    amount of time you want to take, and we can talk about this

9    or anything else that you may have about the federal court

14:12   10    system.

11              Now, as far as getting here tomorrow, you can

12    get here -- if you hold over until tomorrow, you can get

13    here as early as 9:00 but not later than 10:00.  We have got

14    other things going on, but, you know, the jury has got a

14:12   15    priority and we'll fit you in and give everybody plenty of

16    notice.

17              Again, you may deliberate until 6:00 each day,

18    but not later than 5:00.  If you have any question or a

19    verdict we'll take it the next morning when we come back in.

14:13   20              I hope -- Do we have some snacks back there

21    for them or not?

22              CASE MANAGER:  Cookies.

23              THE COURT:  Cookies.  Well, that's better than what

24    they get for the judge and the attorneys.

14:13   25              In any event, thank you so much for your

1     attention.  It was a short case.  It was well tried.  It had

2     a complicated legal theory.  Hopefully, and I found out

3     doing this for all these years, you learn something about

4     somebody else's business and then it comes to a lay jury, in

14:13   5     effect, a cross-section of the community, to put it all

6     together as best you can with these instructions and then to

7     render a verdict.  In a criminal case it's either guilt or

8     innocence, and in a civil case it's answering the questions

9     and filling in the blanks.

14:14   10            Ellen, is there anything else I have missed?

11            CASE MANAGER:  I don't think so.

12            THE COURT:  Okay.  We will go through the exhibits

13     and they will be in to you in a few minutes.  The lawyers

14     are going to go and make sure everything that's in should be

14:14   15     in, but you can immediately start your deliberations.

16            If you take a break during your deliberations,

17     which you may, if anybody leaves the room -- you can't

18     discuss the case unless all eight of you are in there.  And

19     you set your own time for breaks and coming and going.

14:14   20            Again, you can get here as early as 9:00 but

21     not later than 10:00, and you know about the end of day.

22            As I say, you heard it on TV.  It's true.

23     Ladies and gentlemen, please stand and commence your

24     deliberations.

14:15   25                    (Jury not present)

 1          THE COURT:  You can be seated.  I want to just give

 2    you some information.

 3              You don't have to stay at the courthouse or in

 4    the courtroom for sure, if you want to go down to the

14:15  5    cafeteria or anywhere else, the library or whatever.  Make

 6    sure, though, you have your cell phones with you.  If we get

 7    a question or a verdict you need to be back here -- at least

 8    one attorney for each side -- you need to be back here

 9    within ten minutes.  If you're not here in ten minutes I am

14:15  10    going to take the question.

11              It's now 2:14.  We'll let everybody be free,

12    let's say, until 3:15 and let them start working.

13              So, in effect, it's now about 2:15.  The

14    earliest that we'll contact you with a question would be

14:15  15    3:05 and have you back here at 3:15.  In other words, so you

16    need to be ready to get back here at the earliest -- that

17    will give you some time to take a break or if you didn't

18    grab a bite or whatever.  But as of 3:05 you will be on ten

19    minutes' call.  So, at least, we'll give you some freedom

14:16  20    and let the jury do what they need to do and get organized.

21              You need to get all the exhibits together.

22    Once you have that done, just send it back in.  If you

23    really have a disagreement on what's going back in, I'll be

24    in there, certainly, for the foreseeable future.  We have

14:16  25    got work to do at the desk, as I am sure you do.

```
 1                    Any other questions?
 2              MR. ZUMMO:  Your Honor, I have to be in Dallas
 3    tomorrow morning and, so, I was going --
 4              THE COURT:  Oh.  Bonham is going to --
 5              MR. ZUMMO:  I am going to have to leave this in
 6    Mr. Bonham's hands.  So, I would ask that I can be excused.
 7              THE COURT:  Absolutely.
 8              MR. ZUMMO:  Thank you, Judge.
 9              THE COURT:  Anything else you want to talk about?
10              MR. STROTHER:  Just to clarify, are the parties
11    excused without --
12              THE COURT:  The parties are excused.
13              MR. STROTHER:  Thank you.
14              THE COURT:  You may want them here if any questions
15    come in.  You may not.  Some people say -- I usually don't
16    bring the jury back in unless there is a verdict.  Okay?
17    Occasionally, on rare occasions, do I bring them back in.
18                    But, no, as far as you're concerned it's up to
19    you.  You can excuse your clients or you can have them
20    remain here if you think it looks better, if the jury comes
21    back, if I have to give them an instruction in here.  I
22    don't require that at that point.
23                    That's a good question.
24                    Anything else?
25              MR. ZUMMO:  Not from us, Your Honor.
```

1          THE COURT:  All right.  Then, if you would, get

2    together on the exhibits.  Given them to Ellen.  If there is

3    a problem just come get me.

4               All right.  We'll stand adjourned.

5

6               COURT REPORTER'S CERTIFICATE

7          I, BRUCE SLAVIN, certify that the foregoing is a

8    correct transcript from the record of proceedings in the

9    above-entitled matter, to the best of my ability.

10

11

12                         *s/Bruce Slavin*
                         BRUCE SLAVIN, RPR, CMR
13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,500** [1] - 52:23
**$1,727** [1] - 64:14
**$200** [1] - 65:7
**$250** [15] - 52:7, 52:9, 52:17, 54:9, 56:12, 59:11, 61:23, 62:7, 62:8, 62:9, 62:14, 62:17, 79:22, 80:7
**$4,000** [1] - 47:6
**$5,500** [1] - 47:20
**$5,725** [2] - 64:7, 64:17
**$5,725,000** [1] - 64:9
**$500,000** [1] - 52:16
**$7,500** [1] - 65:5

## '

**'and** [3] - 42:10, 42:13, 42:15
**'architectural** [1] - 28:20
**'Are** [1] - 78:5
**'But** [1] - 64:1
**'copying** [1] - 31:21
**'derivative** [1] - 30:15
**'did** [1] - 34:17
**'Hey** [1] - 53:17
**'How** [1] - 4:6
**'if** [1] - 29:3
**'Now** [1] - 81:23
**'Oh** [1] - 73:14
**'Sam** [1] - 42:9
**'Substantial** [1] - 31:21
**'substantially'** [1] - 31:24
**'the** [1] - 28:23
**'Wait** [1] - 69:8
**'we** [11] - 32:20, 41:22, 43:5, 43:14, 53:10, 55:17, 61:8, 79:3, 80:1, 80:2, 80:3
**'we're** [3] - 32:23, 43:10, 43:11
**'well** [3] - 34:19, 44:7, 81:18

## 1

**1** [16] - 9:15, 16:8, 16:10, 16:16, 16:18, 23:2, 25:22, 25:23, 29:14, 29:19, 54:14, 55:21, 59:22, 59:24, 75:21, 79:15
**1,727** [1] - 65:16
**10** [8] - 16:9, 16:17,

22:23, 25:12, 25:24, 30:14, 34:13, 72:4
**10,000** [2] - 73:17, 77:15
**100** [3] - 58:7, 58:8, 65:9
**102** [1] - 46:14
**1026** [1] - 22:17
**103** [1] - 78:18
**109** [3] - 53:6, 64:15, 65:12
**10:00** [2] - 83:13, 84:21
**11** [2] - 25:24, 76:1
**11,450-dollar** [1] - 63:25
**113** [1] - 50:13
**12** [1] - 25:24
**1206** [1] - 22:23
**12:20** [2] - 27:1, 51:4
**12:58** [1] - 51:4
**12:59** [1] - 51:6
**13** [2] - 19:17, 25:24
**14** [4] - 20:17, 25:24, 43:21, 72:16
**15** [4] - 25:24, 43:21, 51:10, 51:12
**15,000** [4] - 50:7, 80:25, 81:6, 81:7
**16** [4] - 25:25, 56:3, 64:9, 75:14
**17** [4] - 25:25, 37:1, 66:18, 75:14
**175** [1] - 36:3
**19** [1] - 31:20
**1980s** [2] - 41:11, 44:11
**1:15** [1] - 51:8

## 2

**2** [6] - 25:22, 25:23, 59:22, 59:25, 74:18, 75:21
**2.5** [1] - 59:24
**20** [2] - 45:10, 70:6
**20,000** [5] - 73:5, 73:11, 73:17, 76:8, 77:15
**20-by-40** [2] - 69:13, 70:2
**20-by-40-foot** [2] - 33:9, 45:14
**2005** [1] - 32:14
**2014** [2] - 42:15, 42:19
**2018** [1] - 1:5
**250** [1] - 65:16
**250-dollar** [2] - 63:6, 65:19
**27** [4] - 4:14, 4:16,

4:19, 20:15
**28** [2] - 1:5, 20:17
**2:14** [1] - 85:11
**2:15** [1] - 85:13

## 3

**3** [5] - 23:13, 25:22, 25:23, 58:25, 59:1
**3,700** [1] - 50:14
**3,750** [1] - 50:14
**30** [2] - 21:23, 45:16
**300** [1] - 52:16
**3000** [1] - 1:21
**33** [2] - 29:15, 47:19
**34** [2] - 22:17, 25:25
**348** [1] - 1:21
**35** [2] - 28:3, 41:11
**3500** [2] - 1:16, 1:19
**36** [2] - 45:10, 70:4
**39** [1] - 24:14
**3:05** [2] - 85:15, 85:18
**3:15** [2] - 85:12, 85:15

## 4

**4** [5] - 25:22, 25:23, 49:13, 67:17, 75:9
**40** [4] - 41:3, 41:4, 70:6, 76:3
**40-foot-by-20-foot** [1] - 45:3
**403** [1] - 22:14
**411** [1] - 22:14
**4312-A** [1] - 22:20
**45** [1] - 26:24
**4504** [1] - 22:25
**46** [1] - 70:4

## 5

**5** [6] - 1:12, 23:20, 25:22, 25:23, 75:10
**5-1** [1] - 1:13
**5-23** [1] - 2:6
**5-27** [1] - 2:8
**5-4** [1] - 2:5
**5-51** [1] - 2:9
**5-78** [1] - 2:10
**5-87** [1] - 1:13
**50** [2] - 41:3, 41:4
**5:00** [3] - 83:2, 83:3, 83:18

## 6

**6** [11] - 24:6, 25:23, 57:1, 57:6, 57:8, 58:25, 59:1, 60:9, 60:25, 75:23, 79:11

**6050** [2] - 36:9, 37:10
**63** [1] - 50:17
**6:00** [3] - 82:25, 83:4, 83:17

## 7

**7** [6] - 9:15, 24:14, 25:23, 25:24, 63:25, 75:24
**7,000** [1] - 50:14
**77010** [2] - 1:16, 1:19
**77027** [1] - 1:22

## 8

**8** [14] - 15:12, 16:8, 16:10, 16:16, 16:18, 24:21, 25:23, 50:7, 57:7, 57:8, 60:9, 60:25, 63:15, 79:11
**8,000** [4] - 73:2, 73:17, 80:25, 81:8
**8,500** [1] - 50:13
**80** [3] - 44:24, 69:20, 70:11
**80-C** [1] - 45:4
**80-H** [1] - 45:6
**80-J** [1] - 45:7
**80-L** [1] - 45:8
**80-M** [1] - 45:10
**82-B** [1] - 45:11
**84** [2] - 44:25, 45:12
**84-C** [1] - 45:12
**85** [2] - 69:21, 70:12
**87** [3] - 65:17, 76:7

## 9

**9** [11] - 16:8, 16:15, 16:16, 25:2, 25:13, 25:15, 25:16, 25:24, 34:13, 43:3, 72:4
**909** [2] - 1:16, 1:19
**93** [1] - 46:14
**940-dollar** [1] - 67:8
**98** [1] - 75:23
**99** [1] - 75:23
**9:00** [2] - 83:13, 84:20

## A

**abbreviated** [1] - 25:21
**ability** [1] - 87:9
**able** [5] - 44:20, 47:11, 56:4, 64:3, 66:23
**above-entitled** [1] - 87:9
**absolute** [2] - 16:22,

35:24
**absolutely** [4] - 61:10, 63:3, 72:4, 86:7
**academic** [1] - 26:18
**accept** [6] - 7:23, 7:25, 56:12, 80:1, 80:10, 80:11
**acceptable** [2] - 19:14, 47:17
**access** [13] - 14:7, 14:10, 14:16, 30:6, 36:15, 36:16, 36:19, 36:23, 37:4, 37:10, 41:9, 41:12
**accidental** [1] - 16:24
**accordingly** [1] - 5:11
**account** [1] - 65:12
**accounting** [5] - 47:1, 57:16, 63:21, 63:22, 75:25
**accounts** [1] - 79:13
**accurate** [2] - 50:22, 67:12
**accused** [2] - 14:13, 14:19
**accustomed** [1] - 9:19
**acknowledge** [1] - 30:7
**acknowledged** [2] - 69:1, 69:2
**act** [2] - 17:8, 72:25
**action** [1] - 17:13
**activity** [1] - 19:16
**acts** [7] - 19:21, 21:21, 72:23, 72:25, 73:8, 80:22, 80:25
**actual** [7] - 17:17, 19:8, 45:22, 59:2, 64:5, 67:6, 79:19
**adaptation** [1] - 11:25
**adaptation..** [1] - 30:17
**add** [1] - 67:7
**added** [1] - 38:11
**address** [2] - 9:9, 67:18
**addressed** [1] - 67:20
**adduce** [2] - 18:1, 20:10
**adjourned** [1] - 87:4
**admission** [1] - 14:1
**admit** [2] - 38:12, 42:1
**admits** [1] - 55:8
**admitted** [5] - 8:19, 31:3, 32:15, 41:24, 42:2
**admitting** [1] - 54:1
**adopts** [1] - 12:3
**advertising** [1] - 34:1
**advocate** [1] - 73:24

**advocate's** [1] - 51:25
**afternoon** [1] - 3:3
**agree** [7] - 24:3, 30:7,
62:23, 62:24, 75:20,
78:9, 78:10
**agreed** [18] - 5:25,
26:6, 30:1, 30:8,
30:11, 31:2, 36:16,
36:18, 46:7, 46:14,
50:1, 50:2, 55:1,
55:2, 58:21, 71:11,
75:12
**Agreed** [1] - 25:19
**agreeing** [1] - 59:5
**agreement** [11] -
26:10, 29:19, 29:21,
30:8, 41:6, 41:7,
49:13, 52:5, 52:6,
52:14, 53:20
**agreements** [1] -
40:25
**ahead** [4] - 27:9,
27:16, 42:11, 51:15
**aided** [1] - 1:25
**aids** [1] - 8:9
**alerted** [1] - 54:6
**alike** [1] - 71:1
**allegedly** [1] - 16:2
**alleging** [1] - 76:23
**allocated** [1] - 19:15
**allow** [1] - 30:3
**allowed** [4] - 19:20,
20:6, 48:14, 82:9
**allows** [3] - 55:15,
58:14
**almost** [2] - 51:18,
77:20
**alone** [1] - 72:17
**alteration** [2] - 21:9,
72:6
**altered** [7] - 21:10,
21:12, 25:7, 49:6,
76:17, 76:25, 77:12
**altogether** [1] - 67:23
**amount** [19] - 5:18,
16:12, 17:5, 17:9,
18:8, 18:9, 18:10,
23:25, 57:24, 59:5,
59:10, 60:18, 60:19,
60:24, 62:12, 64:7,
75:21, 83:8
**amounts** [1] - 62:5
**AND** [1] - 1:11
**answer** [38] - 5:9,
5:11, 5:14, 9:11,
23:4, 23:7, 23:11,
23:15, 23:18, 24:11,
24:18, 24:19, 25:9,
25:11, 25:16, 25:17,
26:9, 28:18, 29:17,

46:2, 47:8, 48:22,
49:9, 50:4, 50:8,
52:8, 52:9, 53:18,
72:18, 73:24, 74:6,
74:18, 75:15, 77:8,
77:10, 77:14, 82:15
**answered** [3] - 25:13,
25:15, 58:12
**answering** [1] - 84:8
**answers** [14] - 5:11,
8:25, 9:1, 23:24,
24:1, 26:9, 37:14,
51:22, 51:23, 58:1,
58:3, 58:18, 79:10
**anticipated** [1] - 53:6
**anyway** [2] - 55:23,
66:4
**apiece** [1] - 54:9
**applicable** [4] - 24:13,
24:20, 25:1, 25:10
**apply** [7] - 4:22, 16:8,
16:16, 24:1, 66:14,
62:1, 72:4
**apportion** [2] - 20:5,
48:13
**apportionment** [4] -
20:6, 48:14, 55:18,
79:10
**apportionment"** [1] -
19:18
**appreciate** [4] - 50:25,
51:19, 77:19, 77:23
**approach** [2] - 44:21,
63:14
**appropriate** [3] - 63:5,
64:23, 66:10
**appropriation** [1] -
9:18
**approve** [1] - 80:11
**architect** [4] - 38:20,
56:6, 71:11, 74:12
**architect's** [1] - 52:11
**ARCHITECTS** [1] - 1:3
**architects** [2] - 30:9,
40:25
**Architects** [23] -
22:11, 22:12, 23:13,
23:17, 24:15, 24:22,
53:22, 54:17, 54:22,
55:13, 57:9, 58:9,
58:19, 63:13, 63:16,
63:19, 64:3, 64:6,
64:8, 64:11, 74:24,
75:4, 76:7
**Architects'** [8] - 24:17,
24:24, 55:24, 61:6,
64:21, 65:18, 75:25
**architectural** [17] -
10:9, 10:13, 10:14,
10:16, 10:24, 10:25,

11:3, 11:12, 12:4,
12:24, 15:20, 16:5,
17:19, 28:10, 28:19,
28:23, 30:22
**architecture** [11] -
39:13, 39:22, 39:23,
39:24, 39:25, 40:3,
40:6, 40:10, 57:15,
69:3, 69:10
**architecture-wise** [1]
- 69:3
**argue** [1] - 54:3
**arguing** [2] - 52:10,
59:1
**argument** [8] - 56:16,
62:3, 66:2, 78:16,
79:10, 79:25, 80:10,
80:12
**Argument** [3] - 2:8,
2:9, 2:10
**arguments** [3] - 5:4,
5:5, 79:16
**arise** [2] - 14:22, 15:4
**arrange** [1] - 29:8
**arranged** [1] - 35:21
**arrangement** [3] -
10:18, 28:24, 29:9
**arrangements** [1] -
75:7
**articulate** [1] - 52:1
**artistic** [1] - 11:7
**aspect** [1] - 12:18
**aspects** [4] - 13:3,
14:24, 14:25, 54:22
**assign** [1] - 62:5
**assist** [2] - 5:7, 19:8
**assisted** [2] - 18:13,
19:11
**associated** [2] - 60:1,
64:20
**ASSOCIATES** [1] - 1:3
**Associates** [13] -
11:11, 12:8, 13:22,
14:5, 22:6, 22:7,
23:3, 23:11, 23:14,
23:18, 27:17, 38:1,
56:10
**Associates'** [7] - 20:3,
25:6, 36:21, 49:4,
49:5, 67:5, 67:9
**Associates's** [1] -
14:2
**assume** [1] - 39:22
**assuming** [1] - 25:14
**attached** [1] - 5:25
**attempt** [1] - 54:18
**attempted** [2] - 54:8,
54:9
**attempts** [3] - 54:3,
54:12, 54:13

**attention** [16] - 4:10,
27:20, 27:24, 28:6,
51:1, 57:13, 60:5,
64:13, 68:9, 71:4,
72:3, 72:20, 75:16,
79:15, 84:1
**attorney** [2] - 80:17,
85:8
**Attorney** [1] - 1:15
**attorneys** [11] - 4:9,
5:3, 5:5, 9:10, 25:20,
26:17, 26:20, 60:15,
79:17, 83:1, 83:24
**attributable** [5] -
19:24, 20:2, 20:8,
24:10, 24:25
**August** [1] - 1:5
**author** [5] - 9:17, 9:20,
12:12, 21:1, 31:14
**author"** [1] - 9:23
**authorize** [1] - 11:19
**available** [2] - 14:4,
37:16
**average** [1] - 18:14
**averages** [1] - 83:7
**award** [1] - 80:7
**awarded** [1] - 17:7

## B

**Bachman** [11] - 39:3,
39:12, 39:20, 43:22,
44:7, 44:15, 68:9,
68:22, 68:25, 74:2,
74:5
**Bachman's** [2] -
39:17, 68:20
**back-out** [1] - 59:3
**background** [2] - 4:5,
69:4
**backup** [2] - 46:23,
46:25
**bad** [9] - 55:13, 55:16,
55:18, 69:6, 80:13,
80:15, 80:16
**bailiff** [1] - 9:6
**balanced** [1] - 60:17
**balcony** [1] - 70:18
**ball** [1] - 54:3
**ballpark** [4] - 62:10,
64:19, 65:6, 65:17
**based** [10] - 11:21,
11:24, 12:5, 30:15,
30:23, 30:25, 47:13,
48:20, 58:24, 59:9
**bathroom** [2] - 70:18,
70:25
**beam** [2] - 34:12, 43:3
**bear** [2] - 13:3, 18:6
**bearing** [1] - 51:18

**bears** [2] - 18:22,
19:23
**became** [1] - 37:10
**bedroom** [3] - 34:23,
62:16, 70:25
**BEFORE** [1] - 1:11
**begin** [2] - 4:20, 51:21
**beginning** [1] - 53:3
**behalf** [2] - 27:17,
28:15
**believable** [2] - 46:24,
48:4
**believes** [1] - 16:22
**belong** [2] - 49:18,
49:19
**beltway** [1] - 41:13
**benefitting** [1] - 17:8
**best** [5] - 56:2, 78:13,
82:10, 84:6, 87:9
**better** [3] - 56:1,
83:23, 86:20
**between** [10] - 7:15,
16:5, 31:18, 33:8,
33:25, 44:21, 52:16,
58:25, 81:7, 83:3
**bias** [3] - 8:1, 8:2
**big** [1] - 38:9
**bigger** [1] - 53:5
**biggest** [1] - 50:21
**Bill** [1] - 71:11
**binders** [1] - 77:22
**bit** [6] - 3:16, 27:7,
28:3, 40:14, 61:22,
65:22
**bite** [2] - 4:6, 85:18
**blame** [1] - 35:10
**blank** [5] - 4:13, 4:16,
4:19, 20:15, 24:19
**blanks** [2] - 16:12,
84:9
**blowing** [1] - 81:22
**blue** [1] - 3:25
**board** [1] - 57:14
**bonham** [1] - 86:4
**Bonham** [2] - 1:17,
69:24
**BONHAM** [2] - 4:15,
27:15
**Bonham's** [1] - 86:6
**books** [2] - 3:4, 51:11
**bottom** [3] - 32:7,
32:13, 70:22
**bounce** [2] - 50:15,
50:17, 50:20
**bowed** [1] - 70:10
**box** [3] - 28:5, 60:14,
70:10
**boxes** [2] - 70:9
**break** [7] - 3:8, 51:7,
51:8, 59:20, 66:12,

84:16, 85:17
**breaks** [2] - 82:22, 84:19
**Brief** [1] - 51:13
**briefly** [1] - 3:21
**bring** [15] - 4:10, 9:7, 27:6, 37:23, 44:16, 44:20, 45:15, 45:19, 45:23, 46:22, 46:23, 47:24, 47:25, 86:16, 86:17
**brought** [5] - 9:8, 39:3, 60:24, 79:13, 79:19
**BRUCE** [2] - 87:7, 87:12
**Bruce** [1] - 1:23
**build** [3] - 30:24, 52:10, 65:13
**builder** [12] - 56:4, 56:5, 56:8, 56:14, 63:24, 64:1, 71:11, 71:12, 71:17, 72:14, 74:12
**builders** [4] - 30:4, 30:9, 63:9
**building** [17] - 10:16, 10:17, 10:20, 10:23, 12:5, 13:1, 17:19, 17:21, 28:22, 29:4, 30:23, 30:24, 40:24, 49:17, 52:10, 56:13, 62:4
**buildings** [3] - 10:14, 10:25, 28:21
**built** [7] - 37:3, 37:22, 41:13, 56:5, 56:6, 64:10, 70:8
**burden** [26] - 15:11, 17:22, 18:6, 18:22, 19:23, 20:1, 27:2, 27:4, 27:5, 38:25, 47:24, 48:3, 60:5, 60:6, 60:10, 60:11, 60:12, 61:9, 61:16, 67:11, 72:10, 79:12, 79:20, 81:11
**business** [6] - 22:9, 40:20, 47:10, 82:14, 84:4
**button** [1] - 81:6
**buy** [2] - 63:1, 63:6
**buying** [1] - 66:7

**C**

**cabinet** [2] - 35:16
**cabinets** [1] - 35:22
**CAD** [4] - 31:5, 31:6, 32:16, 38:13

**cafeteria** [1] - 85:5
**calculate** [2] - 58:24, 76:5
**calculation** [3] - 47:23, 66:19, 66:20
**calculations** [1] - 64:12
**calculator** [2] - 47:22, 66:25
**Califf** [1] - 1:18
**Cameron** [50] - 22:11, 23:13, 23:17, 24:15, 24:17, 24:22, 24:24, 31:3, 32:11, 32:15, 34:8, 34:17, 34:19, 35:20, 46:12, 46:14, 46:15, 53:8, 53:22, 54:17, 54:21, 55:8, 55:12, 55:24, 56:14, 57:9, 58:8, 58:19, 61:6, 63:13, 63:16, 63:19, 64:2, 64:3, 64:6, 64:8, 64:11, 64:21, 65:1, 65:10, 65:11, 65:17, 65:18, 74:24, 75:4, 75:25, 76:6, 78:7, 78:10
**CAMERON** [2] - 1:6, 1:7
**cameron** [2] - 52:25, 82:2
**Cameron's** [1] - 53:3
**cannot** [2] - 19:9, 80:1
**car** [1] - 70:23
**care** [1] - 55:18
**carried** [1] - 38:25
**carry** [1] - 19:25
**CASE** [2] - 83:22, 84:11
**case** [47] - 4:3, 4:11, 4:21, 5:2, 5:21, 6:21, 7:2, 7:10, 8:4, 9:13, 10:13, 11:1, 12:8, 15:15, 27:4, 27:6, 27:24, 28:9, 28:10, 28:19, 29:6, 29:13, 30:21, 36:12, 37:7, 39:20, 42:8, 45:5, 47:6, 47:13, 53:25, 54:15, 54:16, 54:19, 54:21, 57:21, 61:13, 62:21, 71:2, 71:5, 73:9, 73:13, 79:22, 84:1, 84:7, 84:8, 84:18
**cases** [2] - 13:16, 14:5
**catalog** [1] - 70:13
**category** [4] - 19:5, 19:7, 19:10, 39:13
**catholic** [1] - 81:12

**caught** [1] - 34:19
**caused** [1] - 56:8
**causes** [3] - 60:18, 60:20, 60:22
**cell** [1] - 85:6
**Center** [1] - 22:17
**cents** [1] - 24:18
**certain** [3] - 7:13, 18:20, 18:21
**certainly** [3] - 4:3, 40:9, 85:24
**CERTIFICATE** [1] - 87:6
**certify** [1] - 87:7
**cetera** [1] - 10:22
**chain** [1] - 7:12
**change** [1] - 38:11
**changes** [3] - 38:16, 47:2, 79:2
**Charge** [1] - 2:5
**charge** [17] - 3:16, 8:18, 11:15, 28:12, 30:2, 30:13, 31:20, 33:22, 56:17, 61:18, 71:24, 73:21, 79:16, 80:19, 80:21, 81:1, 82:19
**charged** [1] - 59:10
**chart** [2] - 65:15, 79:17
**check** [3] - 63:24, 63:25, 64:6
**children** [1] - 63:5
**chip** [1] - 10:11
**choose** [1] - 33:8
**choreographic** [1] - 10:10
**chose** [1] - 41:4
**chosen** [1] - 53:24
**chronicle** [2] - 44:15, 45:25
**circulated** [1] - 73:12
**circumstances** [5] - 7:12, 15:5, 15:9, 18:20
**circumstantial** [3] - 7:11, 7:15, 7:17
**city** [4] - 32:21, 40:10, 44:13, 68:24
**civil** [2] - 5:12, 84:8
**claim** [5] - 5:18, 13:2, 13:21, 34:7, 47:4
**claimed** [1] - 19:14
**clarify** [1] - 86:10
**clear** [2] - 63:14, 63:22
**clearance** [1] - 34:14
**clearly** [2] - 67:21, 69:7
**clichéd"** [1] - 68:11
**client** [2] - 54:1, 54:2

**client's** [2] - 52:1, 52:9
**clients** [4] - 58:1, 60:24, 78:5, 86:19
**clock** [1] - 27:7
**close** [2] - 27:19, 28:6
**closed** [1] - 86:20
**closet** [1] - 70:25
**Closing** [2] - 2:8, 2:9
**closing** [5] - 5:4, 56:16, 59:3, 73:14, 73:18
**CMR** [2] - 1:23, 87:12
**color** [1] - 28:1
**column** [4] - 66:22, 67:2, 67:3
**coming** [1] - 84:19
**commence** [1] - 84:23
**commission** [6] - 58:24, 59:2, 59:8, 59:23, 66:14
**commissions** [4] - 37:2, 46:7, 46:9, 59:5
**committed** [4] - 4:18, 21:21, 21:25, 72:23
**common** [11] - 6:23, 6:25, 13:7, 13:8, 13:9, 44:3, 44:4, 44:17, 62:10, 68:10, 75:6
**communicate** [1] - 9:5
**communicating** [1] - 53:9
**communications** [1] - 49:20
**community** [2] - 40:8, 84:5
**companion** [1] - 57:7
**company** [2] - 36:24, 50:25
**compare** [2] - 31:23, 32:8
**compared** [2] - 52:14, 65:16
**comparing** [1] - 32:10
**comparison** [6] - 16:2, 16:5, 32:3, 34:23, 38:5, 38:6
**comparisons** [3] - 33:2, 33:16, 33:25
**competent** [2] - 18:1, 20:10
**complete** [2] - 3:12, 4:7
**completely** [1] - 43:8
**complicated** [1] - 84:2
**components** [2] - 10:21, 13:1
**composition** [3] - 10:18, 28:24, 29:9

**computer** [3] - 1:25, 10:12, 31:5
**computer-aided** [1] - 1:25
**conceal** [5] - 21:16, 25:4, 43:15, 49:2, 76:13
**concept** [5] - 15:24, 19:18, 30:21, 31:10, 31:25
**concerned** [1] - 86:18
**concerning** [1] - 6:5
**conclusion** [1] - 52:21
**conclusions** [1] - 6:24
**concrete** [1] - 63:10
**conditions** [1] - 21:4
**conduct** [3] - 8:20, 8:23, 80:11
**confer** [1] - 13:15
**confession** [1] - 81:16
**configuration** [1] - 69:18
**confirmed** [2] - 33:12, 33:15
**confuse** [2] - 71:21, 71:22
**connection** [1] - 20:22
**consider** [11] - 4:25, 5:21, 6:15, 6:20, 7:9, 8:1, 14:24, 15:4, 18:14, 21:21, 72:23
**considering** [2] - 7:6, 15:8
**consist** [1] - 17:9
**consistent** [3] - 29:7, 40:19, 42:16
**constituent** [3] - 12:23, 15:21, 31:21
**constitute** [1] - 59:18
**constructed** [2] - 10:25, 17:19
**constructing** [2] - 12:5, 30:22
**construction** [5] - 19:1, 56:2, 56:10, 71:15, 74:11
**contact** [1] - 85:14
**contend** [2] - 61:2, 64:19
**contends** [1] - 11:11
**contentions** [1] - 5:8
**continue** [2] - 18:19, 28:8
**contract** [3] - 29:13, 79:22, 80:1
**contradictory** [1] - 73:19
**contrary** [2] - 7:5, 71:10
**contribute** [1] - 23:9

**contributorily** [7] - 23:10, 23:17, 23:22, 24:8, 24:16, 24:23, 74:19
**control** [1] - 37:24
**conveyed** [1] - 20:21
**cookie** [1] - 40:24
**cookie-cutter** [1] - 40:24
**cookies** [2] - 83:22, 83:23
**COOPER** [1] - 78:19
**Cooper** [1] - 1:18
**copied** [18] - 12:1, 12:4, 12:12, 13:23, 14:1, 14:3, 29:24, 30:19, 31:4, 31:5, 31:15, 32:16, 33:16, 33:18, 35:24, 37:8, 38:22, 74:1
**copies** [10] - 11:22, 15:18, 20:22, 21:12, 25:5, 38:13, 48:21, 49:3, 76:15, 81:2
**copy** [18] - 3:17, 13:2, 14:3, 16:6, 18:12, 18:13, 19:2, 19:4, 19:7, 19:9, 19:12, 26:5, 30:22, 37:19, 42:6, 42:7, 42:12
**copy"** [1] - 11:14
**copying** [19] - 11:15, 11:17, 12:9, 12:19, 12:22, 13:18, 13:20, 13:24, 14:6, 15:6, 15:7, 15:9, 15:21, 16:1, 32:2, 35:25, 36:14, 54:1, 73:23
**copyright** [83] - 9:16, 9:21, 9:22, 9:23, 9:25, 10:3, 10:4, 10:6, 10:7, 10:13, 10:22, 10:24, 11:5, 11:13, 11:16, 11:18, 12:11, 12:19, 12:20, 13:2, 13:5, 13:11, 13:14, 13:19, 14:5, 15:18, 16:19, 16:23, 16:25, 17:4, 17:6, 17:13, 17:14, 17:20, 19:19, 19:25, 20:14, 20:19, 20:20, 20:25, 21:2, 21:4, 21:7, 21:8, 21:9, 21:11, 21:12, 21:17, 21:18, 25:7, 29:3, 30:25, 31:12, 32:12, 32:14, 32:22, 33:20, 35:13, 37:24, 44:2, 47:9, 48:8, 48:24, 49:5,

49:8, 49:12, 49:14, 68:6, 71:25, 72:6, 72:9, 72:22, 73:12, 76:16, 76:21, 76:25, 77:3, 77:9, 77:11, 80:19, 81:2
**Copyright** [3] - 11:9, 20:18, 32:13
**copyrightable** [3] - 10:8, 12:17, 43:18
**copyrighted** [19] - 11:20, 11:21, 11:22, 12:18, 12:21, 13:21, 14:7, 14:8, 14:25, 15:2, 16:2, 20:3, 24:10, 24:25, 25:6, 49:4, 67:22, 68:4, 76:16
**copyrights** [18] - 11:1, 11:12, 12:7, 16:25, 23:10, 23:14, 23:18, 23:22, 24:8, 24:17, 24:23, 28:10, 29:4, 29:5, 29:16, 37:25, 47:12
**core** [1] - 43:25
**corner** [2] - 32:7, 32:13
**correct** [6] - 24:2, 47:23, 53:23, 67:3, 67:10, 87:8
**corrected** [1] - 79:4
**correctly** [2] - 26:13, 61:8
**cost** [12] - 47:10, 52:15, 62:6, 62:7, 62:8, 62:9, 62:14, 62:16, 66:13, 66:21, 67:6, 80:4
**costs** [7] - 64:12, 64:13, 64:14, 65:4, 65:25, 66:13
**counsel** [2] - 27:9, 42:5, 51:16
**counselor's** [1] - 51:25
**couple** [5] - 51:21, 56:24, 62:12, 68:13, 75:13
**course** [6] - 4:25, 6:10, 14:21, 26:19, 74:13, 76:2
**court** [7] - 3:17, 5:12, 43:20, 47:14, 82:23, 82:24, 83:9
**COURT** [24] - 1:1, 3:1, 4:16, 24:6, 27:11, 27:14, 27:16, 45:16, 51:3, 51:14, 76:3, 77:24, 81:13, 82:18,

83:23, 84:12, 85:1, 86:4, 86:7, 86:9, 86:12, 86:14, 87:1, 87:6
**Court** [8] - 1:23, 8:19, 8:22, 51:16, 54:5, 55:21, 68:17, 72:3
**Court's** [3] - 28:11, 55:16, 79:16
**courthouse** [1] - 85:3
**courtroom** [5] - 9:9, 39:7, 40:19, 42:20, 42:22, 62:15, 80:4, 85:4
**cover** [1] - 28:14
**covered** [1] - 10:3
**crazy** [2] - 62:19
**create** [6] - 14:5, 25:4, 29:24, 31:4, 31:6, 49:2
**created** [6] - 12:12, 14:13, 14:18, 31:14, 50:2, 56:15
**creating** [1] - 12:1
**creation** [6] - 17:15, 18:11, 18:13, 19:6, 19:8, 19:12
**creative** [5] - 33:7, 33:13, 33:18, 38:19, 38:21
**creativity** [4] - 12:14, 29:10, 31:16, 38:22
**creator** [2] - 9:21, 9:24
**credibility** [2] - 39:16, 40:16
**credible** [2] - 5:16, 39:17
**credit** [1] - 42:9
**criminal** [2] - 5:13, 84:7
**criticized** [1] - 69:7
**criticizing** [3] - 69:8, 69:9, 69:16
**cross** [3] - 69:5, 77:4, 84:5
**cross-examine** [1] - 77:4
**cross-examined** [1] - 69:5
**cross-section** [1] - 84:5
**crucial** [2] - 56:23, 59:16
**custom** [1] - 41:7
**customers** [2] - 38:2, 48:16
**cutter** [1] - 40:24

**D**

**d/b/a** [1] - 1:7
**D5-214** [10] - 31:4, 32:10, 39:9, 41:21, 42:9, 42:11, 53:4, 55:5, 75:5, 75:6
**Dallas** [1] - 86:2
**dan** [2] - 36:25
**data** [3] - 67:12, 74:20
**database** [1] - 47:2
**date** [1] - 26:14
**daughter** [1] - 61:24
**David** [1] - 79:6
**DAVID** [1] - 1:11
**de** [1] - 13:15
**dealing** [1] - 59:23
**debated** [1] - 56:16
**decide** [8] - 5:10, 7:24, 39:12, 39:16, 45:23, 46:19, 58:15, 63:19
**decided** [2] - 34:21, 79:24
**deciding** [2] - 7:25, 64:23
**decision** [1] - 51:9
**decisions** [4] - 33:8, 33:13, 38:19, 38:21
**decorative** [1] - 40:2
**deduct** [6] - 18:16, 18:21, 18:25, 47:5, 47:15, 80:4
**deducted** [2] - 17:24, 64:20
**deductible** [8] - 18:10, 23:23, 23:25, 24:18, 46:4, 57:19, 57:24, 75:13
**deducting** [1] - 17:11
**deductions** [2] - 6:24, 46:12
**deemed** [1] - 20:8
**defend** [2] - 47:9, 47:13
**Defendant** [6] - 12:9, 14:1, 14:7, 17:23, 22:11, 27:3
**defendant** [19] - 13:22, 14:1, 18:20, 18:22, 18:24, 19:3, 19:7, 19:10, 19:13, 19:23, 20:1, 20:9, 20:10, 21:14, 21:17, 21:22, 21:24, 22:8, 72:24
**Defendant's** [3] - 14:8, 66:18, 72:25
**defendant's** [1] - 15:1
**Defendants** [7] - 1:8, 1:20, 15:19, 18:1,

18:7, 60:10, 78:3
**defendants** [6] - 11:12, 18:6, 36:16, 37:1, 56:7, 61:15
**Defendants'** [1] - 31:19
**defendants'** [1] - 20:13
**defense** [3] - 3:8, 44:1, 51:14
**defenses** [1] - 43:20
**defined** [2] - 33:21, 49:13
**definitions** [2] - 22:2, 28:13
**degree** [3] - 5:16, 12:13, 31:16
**deliberate** [4] - 8:17, 39:20, 82:25, 83:17
**deliberating** [1] - 28:8
**deliberations** [5] - 8:20, 8:21, 84:15, 84:16, 84:24
**delivering** [1] - 73:5
**delving** [1] - 77:22
**denied** [2] - 13:6, 54:13
**deny** [5] - 73:23, 75:4, 80:3
**department** [2] - 26:22, 26:23
**depicted** [1] - 11:4
**derivative** [10] - 10:2, 10:5, 11:20, 11:23, 12:2, 15:19, 30:14, 30:19, 37:19
**derivatives** [3] - 25:5, 49:3, 76:15
**described** [2] - 38:18, 39:14
**description** [1] - 39:8
**design** [29] - 10:19, 10:23, 12:6, 28:25, 30:23, 30:25, 31:7, 33:6, 33:7, 33:13, 34:18, 34:23, 35:19, 35:20, 36:3, 39:10, 40:13, 40:14, 40:22, 41:14, 43:8, 43:10, 45:6, 45:7, 45:8, 45:10, 56:6, 71:13, 78:8
**designed** [3] - 39:8, 41:22, 43:7
**designer's** [1] - 52:12
**designers** [2] - 30:9, 40:25
**designing** [2] - 39:19, 41:10
**designs** [28] - 10:14,

28:20, 29:22, 29:24, 33:16, 33:19, 37:8, 37:15, 41:2, 41:3, 41:10, 41:16, 44:8, 44:9, 44:12, 44:18, 44:19, 44:25, 45:5, 45:14, 45:19, 45:21, 48:20, 49:19, 50:25, 71:9, 79:14

**designs"** [1] - 71:8

**desk** [1] - 85:25

**detail** [5] - 6:19, 11:7, 34:10, 43:3, 66:15

**detailed** [2] - 16:1, 32:3

**details** [2] - 35:16, 35:23

**determine** [6] - 16:3, 17:5, 21:20, 66:23, 67:1, 72:21

**determined** [1] - 60:3

**determining** [7] - 5:19, 6:2, 18:15, 18:16, 19:14, 59:12, 59:16

**development** [6] - 22:14, 22:17, 22:20, 22:22, 22:25, 45:13

**diametrically** [1] - 52:2

**dibs** [1] - 41:12

**differ** [3] - 8:9, 57:10

**difference** [6] - 36:12, 44:21, 44:23, 67:8, 70:5, 81:7

**differences** [1] - 38:9

**different** [24] - 6:8, 28:17, 33:8, 35:21, 41:4, 44:25, 45:6, 45:7, 45:8, 45:10, 45:12, 45:13, 45:21, 51:23, 51:24, 57:10, 57:11, 58:19, 63:13, 66:9, 70:20, 71:17, 72:5, 74:19

**differently** [4] - 19:2, 35:21, 42:17, 63:20

**digest** [1] - 67:25

**digital** [1] - 20:22

**dim** [2] - 57:2, 57:3

**dimensional** [1] - 11:3

**dimensions** [1] - 71:18

**dining** [1] - 70:17

**dinners** [1] - 66:7

**dip** [4] - 50:11, 73:16, 73:17

**dire** [2] - 27:8, 60:14

**direct** [16] - 4:12, 7:10, 7:15, 7:17, 13:24,

13:25, 16:4, 18:4, 18:7, 18:8, 18:15, 18:16, 22:1, 64:12, 64:13, 65:19

**directed** [2] - 9:3, 14:3

**directly** [6] - 14:12, 35:25, 36:21, 43:24, 73:19, 75:25

**dirt** [1] - 63:2

**disagree** [3] - 47:5, 57:25, 58:1

**disagreement** [1] - 85:23

**discharged** [1] - 9:2

**disclose** [2] - 9:3, 9:10

**discount** [1] - 50:20

**discovery** [1] - 13:10

**discuss** [2] - 3:21, 84:18

**displaying** [1] - 10:3

**disposals** [1] - 62:11

**distinction** [1] - 7:14

**distribute** [6] - 11:22, 25:5, 49:3, 76:15, 81:2, 81:5

**distributed** [2] - 49:15, 50:1

**distributing** [4] - 10:2, 81:7, 81:8

**distribution** [5] - 21:10, 21:11, 50:8, 81:5, 81:25

**distributions** [1] - 49:21

**DISTRICT** [2] - 1:1, 1:1

**divide** [1] - 67:2

**division** [1] - 9:4

**DIVISION** [1] - 1:2

**doctrine** [1] - 13:5

**documentation** [1] - 46:22

**documents** [3] - 27:21, 46:24, 75:25

**dollar** [1] - 62:5

**dollars** [1] - 24:18

**done** [16] - 27:23, 28:7, 33:9, 33:14, 34:11, 35:8, 40:20, 41:8, 43:9, 47:25, 53:9, 55:8, 62:21, 72:7, 79:5, 85:22

**door** [3] - 26:15, 29:5, 33:17

**doors** [5] - 10:21, 13:1, 29:1, 29:8, 62:12

**double** [7] - 3:13, 28:4, 50:11, 65:1, 65:2, 73:16

**double-dip** [3] - 50:11,

73:16

**double-spaced** [1] - 3:13

**down** [7] - 3:15, 27:13, 35:1, 59:20, 68:21, 85:4

**downtown** [1] - 82:24

**dozing** [1] - 28:5

**dramatic** [1] - 10:9

**draw** [4] - 6:21, 6:25, 15:6, 43:8

**drawing** [2] - 11:5, 43:11

**drawings** [11] - 10:17, 11:2, 11:3, 11:4, 11:6, 11:13, 28:23, 31:7, 71:17, 74:11, 74:14

**drawings"** [1] - 11:2

**drive** [2] - 44:7, 44:9

**driving** [1] - 61:24

**drywall** [1] - 63:10

**due** [11] - 17:10, 20:11, 24:11, 48:6, 57:20, 58:16, 65:18, 75:18, 75:19, 75:21, 76:6

**duplicate** [1] - 55:9

**duplication** [3] - 54:2, 55:5, 73:23

**during** [13] - 3:14, 6:9, 8:8, 8:21, 8:23, 10:5, 26:4, 31:9, 34:16, 54:24, 57:13, 60:14, 84:16

**duty** [4] - 4:23, 27:23, 28:7, 28:8

## E

**e-mail** [11] - 34:7, 41:20, 42:8, 42:16, 52:19, 77:16, 77:18, 78:10, 78:22, 81:6

**e-mails** [7] - 50:4, 50:6, 73:1, 73:2, 80:23, 80:24, 80:25

**EaDo** [12] - 22:22, 23:6, 36:7, 36:17, 37:2, 50:9, 50:14, 71:6, 74:8, 77:17

**earliest** [2] - 85:14, 85:16

**early** [5] - 41:11, 44:11, 53:25, 83:13, 84:20

**earn** [2] - 17:15, 63:20

**earned** [7] - 17:15, 54:22, 59:6, 59:25, 64:9, 74:14, 75:2

**earns** [1] - 58:22

**ears** [1] - 71:7

**easy** [4] - 27:24, 46:4, 56:11, 56:12

**eat** [1] - 4:6

**echo** [1] - 51:17

**effect** [3] - 20:3, 84:5, 85:13

**effort** [2] - 51:20, 54:9

**efforts** [2] - 20:2, 65:19

**eight** [3] - 35:2, 82:7, 84:18

**either** [6] - 9:8, 15:6, 50:8, 50:9, 54:16, 84:7

**element** [3] - 12:21, 33:17, 67:22

**elements** [14] - 10:19, 12:16, 12:23, 12:24, 15:21, 18:22, 28:25, 31:22, 40:2, 42:7, 42:13, 43:19, 69:11, 74:1

**Elements** [1] - 11:9

**elements'** [1] - 42:10

**elephant** [1] - 4:6

**elevations** [3] - 33:2, 36:4, 71:18

**Ellen** [3] - 82:19, 84:10, 87:2

**embodied** [2] - 10:15, 28:21

**employees** [4] - 53:3, 64:15, 65:2, 78:6

**empty** [1] - 60:21

**enable** [4] - 21:16, 25:4, 49:2, 76:13

**encompass** [1] - 10:24

**encouraging** [1] - 22:1

**end** [5] - 28:15, 30:1, 69:21, 77:1, 84:21

**enforce** [1] - 82:16

**enjoy** [1] - 11:8

**enjoys** [1] - 40:6

**enter** [1] - 52:5

**entirely** [1] - 66:5

**entitled** [4] - 8:15, 62:17, 75:8, 87:9

**entrance** [1] - 70:23

**erected** [1] - 56:13

**erroneous** [1] - 66:21

**error** [7] - 64:25, 66:17, 66:24, 67:1, 67:4, 79:2

**escort** [1] - 82:19

**essentially** [1] - 69:6

**establish** [4] - 12:7,

14:16, 14:17, 17:24

**established** [1] - 7:1

**establishing** [1] - 14:6

**estate** [5] - 22:13, 22:17, 22:20, 22:22, 22:24

**et** [1] - 10:22

**evaluating** [3] - 14:23, 39:16, 40:16

**evenly** [1] - 60:17

**event** [2] - 27:1, 83:25

**events** [1] - 14:21

**everywhere** [1] - 40:24

**evidence** [94] - 4:11, 4:21, 5:5, 5:7, 5:15, 5:16, 5:17, 5:18, 5:20, 5:23, 6:4, 6:6, 6:20, 7:1, 7:6, 7:8, 7:10, 7:12, 7:15, 7:17, 8:3, 8:5, 8:11, 8:13, 8:19, 13:25, 14:6, 15:10, 17:20, 18:1, 18:14, 18:17, 19:10, 19:24, 20:9, 20:11, 28:16, 29:10, 29:23, 29:25, 35:5, 35:7, 35:12, 36:23, 37:4, 38:14, 38:24, 43:16, 43:24, 44:24, 45:22, 45:23, 46:13, 47:24, 47:25, 50:19, 51:19, 54:5, 54:11, 55:1, 57:21, 58:4, 59:1, 59:7, 60:7, 60:13, 60:17, 60:18, 60:19, 60:20, 60:23, 60:24, 61:4, 61:10, 61:14, 61:21, 61:22, 67:18, 68:2, 70:14, 71:8, 72:10, 72:11, 74:5, 74:20, 75:5, 76:14, 76:19, 77:11, 79:17, 79:18, 79:19, 80:14

**evil** [1] - 55:13

**exact** [1] - 55:8

**exactly** [4] - 35:19, 62:9, 62:20, 74:21

**examine** [1] - 77:4

**examined** [1] - 69:5

**example** [7] - 13:25, 17:18, 44:17, 47:4, 59:22, 60:15, 69:13

**examples** [2] - 44:20, 45:1

**except** [2] - 27:2, 36:15

**exclude** [1] - 10:1

**exclusive** [6] - 11:13,

11:17, 11:18, 13:20,
16:20, 20:2
**excuse** [1] - 86:19
**excused** [4] - 83:1,
86:6, 86:11, 86:12
**exercise** [2] - 26:18,
47:18
**Exhibit** [8] - 29:19,
37:1, 45:4, 50:13,
63:25, 66:18, 76:1,
78:18
**exhibit** [2] - 32:8,
41:18
**Exhibits** [4] - 44:24,
46:14, 69:20, 75:14
**exhibits** [9] - 5:23,
6:22, 8:19, 45:2,
75:11, 75:13, 84:12,
85:21, 87:2
**existence** [1] - 7:13
**existing** [2] - 11:24,
30:16
**expected** [1] - 14:22
**expenditures** [1] -
18:12
**expense** [4] - 18:10,
19:2, 46:4, 58:2
**expenses** [26] - 17:11,
17:23, 18:2, 18:5,
18:7, 18:8, 18:15,
18:16, 18:18, 18:21,
18:25, 19:6, 19:8,
19:11, 19:15, 23:23,
24:18, 46:21, 46:23,
47:4, 47:15, 47:25,
57:19, 57:24, 64:16,
75:13
**Expenses** [1] - 18:19
**experience** [2] - 6:23,
7:20
**expert** [6] - 7:21, 8:1,
8:3, 8:5, 39:14
**explained** [2] - 32:18,
33:5
**expressed** [2] - 13:13,
44:5
**expression** [5] -
10:15, 13:9, 13:14,
13:16, 28:22
**expressions** [3] -
13:6, 44:3, 44:4
**extends** [1] - 9:17
**external** [1] - 69:12
**eyewitness** [1] - 7:11

## F

**facilitate** [4] - 21:16,
25:4, 49:2, 76:13
**fact** [16] - 5:19, 6:5,

6:18, 7:4, 12:20,
30:1, 30:8, 33:12,
33:13, 38:20, 43:13,
49:22, 50:1, 50:2,
67:21, 77:16
**facto** [1] - 13:15
**factor** [4] - 48:9,
48:10, 79:13
**factors** [25] - 19:21,
19:25, 20:4, 20:5,
20:12, 24:10, 24:11,
24:25, 35:13, 48:6,
48:8, 48:12, 48:13,
57:20, 58:15, 58:16,
59:11, 59:12, 61:5,
61:23, 62:23, 65:10,
69:12, 75:18, 76:6
**facts** [13] - 4:24, 5:2,
5:9, 5:25, 6:25, 7:9,
7:14, 7:16, 26:23,
46:7, 55:2, 74:17,
75:12
**fail** [2] - 18:1, 18:7
**failed** [1] - 6:7
**failing** [1] - 53:4
**fails** [1] - 20:10
**fair** [6] - 19:13, 28:9,
47:16, 64:22, 66:10
**faire** [2] - 13:5, 68:15
**faire"** [1] - 43:23
**faith** [1] - 16:22
**fake** [1] - 40:2
**falls** [1] - 39:13
**false** [6] - 34:6, 41:23,
41:24, 42:1, 42:3
**falsehood** [2] - 6:16,
35:9
**falsely** [1] - 6:5
**Fannin** [2] - 1:16, 1:19
**far** [4] - 27:22, 28:7,
83:11, 86:18
**fast** [1] - 70:3
**fault** [1] - 78:7
**favor** [2] - 67:5, 67:9
**feather** [4] - 61:1,
61:3, 61:12, 81:19
**feathers** [7] - 61:2,
81:10, 81:22, 81:24,
82:1, 82:2, 82:3
**feature** [1] - 35:17
**features** [5] - 10:20,
12:25, 29:1, 38:23
**federal** [2] - 5:12, 83:9
**fees** [3] - 47:5, 47:6,
47:9
**feet** [2] - 70:4
**felt** [1] - 69:6
**few** [4] - 11:13, 44:5,
51:19, 84:13
**field** [2] - 7:20, 39:23

**fight** [1] - 80:4
**figure** [2] - 18:2, 67:25
**figured** [2] - 55:10,
55:11
**file** [1] - 32:16
**filed** [1] - 47:3
**files** [3] - 31:5, 31:6,
38:13
**fill** [8] - 8:24, 8:25,
16:11, 24:19, 25:1,
26:20, 46:19, 48:2
**filled** [1] - 26:13
**filling** [1] - 84:9
**Fina** [2] - 52:20, 78:9
**finally** [2] - 58:11,
64:11
**finish** [2] - 60:2, 76:11
**finished** [1] - 77:19
**finishes** [1] - 59:17
**Firm** [1] - 1:21
**first** [21] - 9:10, 18:24,
27:2, 29:15, 29:18,
32:11, 33:3, 36:4,
36:7, 38:6, 41:12,
46:6, 47:19, 53:20,
56:25, 58:23, 67:16,
78:24, 79:9, 80:8,
81:18
**fit** [3] - 33:9, 45:14,
83:15
**fits** [1] - 68:18
**five** [7] - 23:12, 24:12,
29:24, 39:1, 46:2,
82:12
**fix** [3] - 43:14, 53:17,
79:4
**fixed** [1] - 10:11
**fixtures** [2] - 35:22,
62:13
**flash** [1] - 32:25
**flip** [2] - 34:22, 35:11
**flipped** [2] - 34:2,
34:25
**floor** [19] - 33:3, 34:4,
34:25, 36:4, 36:5,
36:7, 36:8, 38:6,
38:7, 44:16, 45:12,
70:16, 70:22, 71:19,
74:10, 76:23
**floors** [1] - 59:17
**flow** [2] - 13:7, 69:18
**fly** [1] - 66:24
**focusing** [2] - 54:25,
71:23
**follow** [6] - 3:6, 4:23,
8:22, 30:7, 30:11,
80:1
**followed** [1] - 50:16
**following** [8] - 11:19,
16:7, 20:21, 22:4,

23:4, 23:8, 23:12,
23:15
**footage** [2] - 38:11,
38:12
**footprint** [2] - 33:10,
43:3, 69:13
**FOR** [1] - 1:1
**foregoing** [1] - 87:7
**foreperson** [2] - 8:20,
8:24
**foreseeable** [1] -
85:24
**forget** [1] - 6:13
**form** [9] - 3:4, 3:23,
8:25, 10:18, 20:23,
25:21, 26:12, 28:24
**formidable** [1] - 3:11
**formula** [6] - 19:14,
47:17, 64:22, 64:23,
66:10
**forth** [4] - 20:24, 21:3,
60:24, 74:23
**forward** [1] - 77:20
**four** [6] - 25:9, 25:10,
45:7, 45:8, 46:6,
49:11
**four-story** [2] - 45:7,
45:8
**fours** [1] - 63:10
**foyer** [1] - 62:13
**frank** [1] - 56:7
**frankly** [1] - 39:5
**free** [1] - 85:11
**freedom** [1] - 85:19
**Friday** [1] - 42:2
**front** [9] - 3:2, 29:21,
35:11, 40:3, 42:13,
55:4, 58:5, 59:2,
77:21
**full** [1] - 75:6
**fully** [1] - 46:17
**furthermore** [1] - 13:9
**future** [1] - 85:24

## G

**gained** [2] - 58:8, 58:9
**garage** [3] - 34:24,
70:22, 70:23
**general** [2] - 7:14,
34:4
**generally** [8] - 9:25,
26:3, 27:4, 58:25,
59:4, 59:24, 60:6
**generated** [1] - 53:19
**generating** [1] - 71:23
**gentlemen** [2] - 82:18,
84:23
**giant** [1] - 52:23
**given** [7] - 6:2, 10:6,

12:19, 53:18, 66:12,
69:12, 87:2
**goofy** [1] - 35:1
**gossip** [1] - 81:15
**gossiping** [1] - 81:17
**grab** [1] - 85:18
**grading** [1] - 47:20
**graphic** [1] - 10:10
**greater** [3] - 5:15, 7:4,
8:15
**gross** [21] - 17:2, 17:3,
17:14, 17:16, 17:20,
17:22, 17:24, 18:2,
18:8, 18:16, 18:21,
23:23, 23:25, 24:17,
46:3, 46:8, 46:10,
57:19, 64:5, 64:8,
75:12
**grounds** [1] - 21:15
**guilt** [1] - 84:7
**guys** [4] - 55:13,
80:14, 80:15, 80:16

## H

**H-16-CV-1427** [1] - 1:4
**hair** [1] - 28:2
**half** [5] - 32:23, 64:7,
65:3, 65:4, 77:17
**hand** [3] - 4:24, 60:19
**handful** [1] - 45:1
**handle** [1] - 56:17
**hands** [1] - 86:6
**happy** [2] - 40:9, 68:23
**hard** [2] - 68:21, 70:3
**hardware** [1] - 62:11
**hardwood** [1] - 59:17
**head** [1] - 34:14
**heads** [1] - 62:13
**hear** [1] - 51:14
**heard** [8] - 4:21, 30:5,
39:7, 39:11, 67:18,
74:5, 78:3, 84:22
**hearing** [1] - 9:19
**helpful** [1] - 7:19
**helps** [1] - 72:17
**hidden** [1] - 54:2
**high** [1] - 66:15
**higher** [1] - 59:23
**highlighted** [1] - 76:10
**highlighting** [1] - 4:2
**hill** [1] - 81:20
**hired** [4] - 56:5, 71:11,
71:13, 72:14
**hiring** [1] - 53:22
**hit** [1] - 81:6
**HITTNER** [1] - 1:11
**Hittner** [4] - 28:13,
28:20, 33:22, 39:14
**hold** [2] - 56:9, 83:12

**holder** [1] - 11:18
**holder's** [2] - 11:17, 13:20
**home** [8] - 4:4, 60:3, 62:4, 62:5, 62:18, 66:21, 67:6
**homes** [4] - 39:25, 40:9, 63:2
**Homes** [1] - 79:6
**honestly** [1] - 82:16
**Honor** [9] - 24:5, 27:10, 45:17, 57:2, 69:22, 76:4, 78:1, 86:2, 86:25
**HONORABLE** [1] - 1:11
**hope** [3] - 29:6, 40:4, 83:20
**hopefully** [2] - 4:8, 84:2
**hour** [1] - 83:7
**hours** [4] - 53:6, 64:15, 65:12, 82:24
**house** [3] - 40:15, 65:25, 66:13
**houses** [5] - 40:7, 66:12, 66:20, 69:15
**HOUSTON** [1] - 1:2
**Houston** [17] - 1:16, 1:19, 1:22, 22:15, 22:18, 22:21, 22:23, 22:25, 39:24, 40:1, 41:11, 44:8, 44:10, 44:15, 45:25, 68:22
**huge** [1] - 81:7
**human** [1] - 69:8

## I

**idea** [8] - 13:10, 13:13, 13:16, 44:4, 44:5, 71:23, 80:16
**identical** [5] - 35:18, 38:8, 44:23, 57:6, 69:17
**identifying** [4] - 20:23, 20:25, 21:2, 21:5
**ignore** [1] - 55:16
**immediately** [1] - 84:15
**implies** [1] - 16:7
**importance** [2] - 56:24, 59:16
**important** [21] - 6:5, 6:18, 26:21, 28:17, 30:6, 30:14, 30:18, 30:21, 35:18, 36:21, 37:13, 40:14, 41:14, 56:21, 57:17, 61:17, 61:18, 61:19, 71:20,

72:15, 75:17
**importantly** [1] - 48:11
**impossible** [4] - 20:5, 38:9, 38:15, 48:13
**impressed** [1] - 39:25
**impression** [1] - 8:16
**IN** [1] - 1:1
**inaccurately** [1] - 6:14
**Inc** [2] - 22:8, 22:12
**INC** [2] - 1:6, 1:7
**inches** [2] - 34:13, 43:3
**include** [6] - 10:19, 12:25, 17:17, 19:4, 19:12, 28:25
**includes** [4] - 5:24, 10:17, 28:23, 49:13
**including** [11] - 8:2, 10:15, 10:23, 11:25, 20:22, 20:24, 21:3, 28:22, 30:16, 37:18, 47:5
**income** [3] - 8:6, 8:7, 66:1
**incorrect** [1] - 66:22
**incumbent** [1] - 61:13
**incurred** [6] - 18:11, 18:18, 18:25, 19:3, 19:6, 64:20
**independent** [1] - 8:12
**independently** [4] - 12:11, 14:22, 26:6, 31:14
**indicates** [1] - 7:13
**indication** [1] - 5:1
**indirect** [4] - 7:11, 13:25, 19:5, 19:11
**individual** [2] - 10:19, 12:25, 21:21, 28:25, 72:23, 72:25, 73:8, 80:22, 80:25
**induce** [4] - 21:16, 25:3, 49:2, 76:12
**inducing** [1] - 21:25
**inexpense** [1] - 52:14
**infer** [1] - 8:3
**inference** [1] - 15:6
**inferences** [1] - 6:22
**influenced** [1] - 8:14
**inform** [1] - 26:14
**Information** [1] - 20:18
**information** [42] - 20:20, 20:21, 20:23, 20:24, 20:25, 21:2, 21:3, 21:5, 21:6, 21:8, 21:10, 21:11, 21:13, 21:19, 25:7, 48:25, 49:5, 49:12, 62:22, 63:22, 65:20,

65:22, 66:16, 66:23, 68:17, 72:7, 72:10, 73:12, 74:20, 75:10, 75:11, 75:24, 76:17, 76:21, 76:25, 77:11, 77:22, 80:19, 81:3, 85:2
**infringe** [10] - 23:2, 23:10, 23:14, 23:17, 29:16, 46:2, 47:12, 73:22, 74:15, 75:1
**infringed** [11] - 11:12, 16:20, 23:21, 23:22, 24:7, 24:8, 24:16, 24:22, 24:23, 72:13
**Infringement** [1] - 11:10
**infringement** [49] - 11:16, 12:7, 12:20, 12:22, 13:2, 13:19, 15:18, 16:21, 17:5, 17:6, 17:11, 17:13, 19:20, 19:22, 19:25, 20:7, 20:8, 20:12, 20:13, 20:14, 21:17, 21:25, 22:1, 24:12, 25:4, 30:24, 31:18, 33:20, 35:13, 39:1, 43:16, 43:17, 47:9, 48:7, 49:2, 57:21, 57:23, 58:2, 58:16, 62:24, 71:25, 72:22, 74:16, 75:18, 75:19, 75:22, 76:13, 77:9, 79:14
**infringement"** [1] - 48:8
**infringements** [1] - 16:25
**infringer** [4] - 17:7, 17:15, 17:18, 19:19
**infringer's** [1] - 17:9
**infringes** [1] - 10:6
**infringing** [22] - 16:3, 16:23, 17:12, 17:16, 18:12, 18:13, 19:2, 19:4, 19:7, 19:9, 19:12, 19:15, 20:4, 20:5, 37:19, 42:23, 48:12, 48:21, 55:25, 74:9, 74:20
**innocence** [3] - 55:22, 71:25, 84:8
**innocent** [2] - 6:16, 16:24
**inside** [2] - 41:13, 44:12
**insignificant** [1] - 69:2
**instead** [1] - 65:5
**instruct** [4] - 4:22, 5:3,

56:4, 68:17
**instructed** [3] - 5:21, 11:18, 55:21
**Instruction** [5] - 9:15, 16:14, 20:17, 67:17, 72:16
**instruction** [10] - 5:1, 16:7, 36:14, 48:7, 48:11, 56:25, 67:17, 68:3, 72:16, 86:21
**instructions** [14] - 5:6, 6:1, 8:22, 16:10, 36:13, 43:21, 46:18, 55:17, 60:4, 67:14, 67:23, 68:1, 73:25, 84:6
**insult** [2] - 69:4
**intact** [1] - 67:12
**integrity** [4] - 20:18, 20:19, 21:7, 21:18
**intended** [2] - 5:6, 72:9
**intent** [10] - 25:3, 49:1, 55:14, 55:20, 55:22, 71:24, 72:2, 72:4, 76:12
**intentional** [5] - 6:16, 21:9, 35:12, 43:16, 53:13
**intentionally** [6] - 21:14, 21:25, 25:3, 35:8, 49:1, 76:12
**interest** [1] - 61:25
**interested** [1] - 81:9
**interesting** [8] - 4:9, 34:16, 39:20, 62:2, 70:7, 78:4, 79:21, 80:16
**interpretation** [1] - 26:21
**intertwined** [3] - 20:4, 48:12, 48:22
**introduced** [1] - 80:17
**invested** [1] - 82:11
**investigate** [1] - 42:23
**investment** [1] - 82:13
**involve** [1] - 39:18
**involves** [3] - 10:13, 11:1, 28:19
**involving** [2] - 53:13, 54:15
**issue** [10] - 15:4, 15:11, 20:13, 34:5, 34:6, 34:14, 46:13, 79:1, 81:1
**issues** [3] - 43:1, 61:19, 82:7
**item** [1] - 17:16
**itself** [3] - 10:16, 11:5, 28:22

## J

**job** [3] - 51:2, 51:25
**judge** [3] - 33:22, 60:4, 83:24
**Judge** [5] - 28:13, 28:20, 39:14, 60:15, 86:8
**judges** [1] - 4:24
**juror** [5] - 3:24, 8:11, 8:16, 26:13, 28:4
**jurors** [1] - 8:14
**Jury** [2] - 2:5, 2:6
**jury** [29] - 4:24, 5:7, 5:25, 7:19, 8:17, 22:4, 26:5, 27:19, 28:5, 28:12, 30:2, 30:13, 51:17, 55:5, 55:21, 56:17, 57:14, 58:15, 66:25, 72:22, 80:7, 82:19, 82:20, 83:14, 84:4, 84:25, 85:20, 86:16, 86:20
**JURY** [1] - 1:11
**justice** [1] - 60:16
**justified** [1] - 6:23
**Justin** [1] - 1:20

## K

**keep** [5] - 6:10, 16:9, 20:16, 37:24, 82:13
**kept** [1] - 47:20
**key** [1] - 31:19
**kind** [6] - 4:2, 40:15, 56:18, 68:7, 78:4, 80:10
**kinds** [1] - 68:8
**kitchen** [2] - 35:20, 70:17
**knowingly** [4] - 25:3, 49:1, 72:8, 76:12
**knowledge** [2] - 7:18, 49:16
**known** [4] - 56:10, 72:12, 78:17, 78:23
**knows** [2] - 21:15, 82:3

## L

**L-shaped** [1] - 70:4
**Labarthe** [4] - 32:9, 33:11, 35:15, 38:20
**lack** [2] - 26:9, 54:15
**lacking** [1] - 13:11
**ladies** [2] - 82:18, 84:23
**land** [2] - 59:14, 60:2
**landing** [1] - 35:2

**Landing** [5] - 22:16, 22:19, 36:10, 74:7, 74:8
**lapse** [1] - 6:16
**largely** [1] - 15:2
**larger** [2] - 27:5, 70:6
**last** [10] - 3:22, 26:11, 35:13, 44:24, 49:24, 72:5, 72:18, 78:13, 83:4
**Law** [2] - 1:15, 1:21
**law** [32] - 4:22, 4:23, 5:3, 5:6, 7:14, 9:17, 9:21, 9:23, 12:11, 13:14, 20:19, 21:7, 21:17, 21:22, 26:22, 29:7, 32:2, 48:11, 49:14, 55:15, 58:13, 58:14, 68:5, 68:17, 68:19, 69:16, 72:24, 80:5, 81:4, 82:5, 82:8, 82:16
**law's** [1] - 12:19
**laws** [1] - 9:22
**lawsuit** [6] - 42:2, 42:14, 42:18, 44:19, 47:3, 64:4
**lawsuits** [1] - 37:24
**lawyers** [2] - 61:25, 84:13
**lay** [1] - 84:4
**leads** [1] - 6:25
**learn** [1] - 84:3
**learned** [1] - 4:7
**lease** [1] - 11:23
**least** [7] - 12:13, 26:1, 26:5, 28:4, 31:16, 85:7, 85:19
**leave** [2] - 51:11, 86:5
**leaves** [1] - 84:17
**left** [8] - 4:19, 32:14, 51:3, 51:5, 64:18, 73:20, 77:25, 81:13
**Legal** [1] - 47:9
**legal** [6] - 11:8, 47:5, 68:16, 77:21, 84:2
**lending** [1] - 11:23
**less** [1] - 56:21
**level** [1] - 11:7
**liability** [1] - 16:21
**liable** [4] - 16:21, 16:23, 16:24, 21:24
**Liang** [1] - 1:18
**library** [2] - 82:12, 85:5
**license** [3] - 29:18, 40:25, 49:13
**licensed** [1] - 37:5, 41:2, 41:4
**lick** [1] - 71:8

**lie** [5] - 52:19, 52:20, 52:22, 53:13, 80:2
**lied** [1] - 78:24
**lies** [1] - 42:8
**life** [2] - 82:11, 82:14
**lifetime** [1] - 50:24
**light** [2] - 6:23, 27:12
**lights** [2] - 57:2, 57:3
**likely** [1] - 5:19
**limited** [1] - 17:17
**line** [1] - 73:6
**links** [1] - 21:6
**listed** [2] - 37:1, 57:11
**listen** [1] - 39:7
**literal** [2] - 11:17, 13:20
**literary** [1] - 10:8
**live** [6] - 40:1, 40:6, 63:4, 69:14, 77:5
**lives** [2] - 82:14, 82:15
**Living** [59] - 22:8, 22:9, 23:2, 23:9, 23:10, 23:21, 24:7, 25:2, 25:15, 29:15, 29:21, 30:3, 30:7, 30:10, 33:16, 34:1, 36:3, 37:8, 37:15, 37:16, 40:22, 42:5, 46:1, 46:6, 46:10, 49:1, 49:21, 52:5, 52:6, 52:13, 53:9, 53:21, 54:17, 54:21, 55:12, 57:8, 58:7, 58:17, 58:19, 58:20, 58:22, 59:25, 63:21, 64:7, 65:21, 65:24, 66:3, 71:7, 71:8, 72:7, 72:11, 73:22, 75:14, 76:12
**LIVING** [1] - 1:7
**living** [4] - 34:24, 40:7, 44:12, 70:17
**Living's** [7] - 23:23, 24:9, 32:11, 44:1, 55:24, 59:8, 61:5
**LLC** [4] - 1:3, 11:11, 12:8, 22:7
**LLP** [1] - 1:18
**located** [5] - 22:14, 22:17, 22:20, 22:23, 22:25
**location** [1] - 48:17
**lock** [1] - 47:1
**logic** [3] - 53:12, 62:10, 80:1
**logical** [3] - 52:21, 52:24, 52:25
**logically** [1] - 69:19
**look** [35] - 3:12, 3:20,

4:11, 25:16, 26:11, 29:20, 32:5, 32:7, 33:24, 34:8, 41:17, 44:15, 47:7, 50:18, 55:17, 57:1, 60:16, 66:11, 67:16, 68:18, 69:15, 70:2, 70:8, 70:11, 71:1, 71:2, 72:24, 74:22, 77:20, 78:19, 80:20, 80:22
**looked** [3] - 45:25, 69:9, 79:3
**looking** [6] - 15:12, 33:24, 40:6, 60:22, 63:4, 64:5
**looks** [3] - 3:11, 28:4, 86:20
**loop** [1] - 44:12
**Louis** [1] - 1:17
**lower** [1] - 59:23
**lucky** [1] - 56:8
**lunches** [1] - 66:7

## M

**mail** [11] - 34:7, 41:20, 42:8, 42:16, 52:19, 77:16, 77:18, 78:10, 78:22, 81:6
**mails** [7] - 50:4, 50:6, 73:1, 73:2, 80:23, 80:24, 80:25
**main** [1] - 50:20
**major** [1] - 43:1
**majority** [1] - 67:6
**Management** [2] - 20:18, 22:10
**management** [21] - 20:20, 21:8, 21:9, 21:11, 21:13, 21:18, 25:7, 48:25, 49:5, 49:12, 72:7, 72:10, 72:22, 73:12, 76:16, 76:21, 76:25, 77:11, 80:19, 81:3
**MANAGER** [2] - 83:22, 84:11
**manner** [1] - 70:20
**margins** [1] - 18:15
**mark** [1] - 4:1
**market** [1] - 56:8
**marketing** [10] - 17:12, 19:1, 37:18, 49:9, 62:4, 71:16, 73:5, 74:10, 76:20, 76:24
**married** [1] - 82:14
**marshal** [2] - 26:14, 26:15
**master** [3] - 34:3,

34:23
**matches** [1] - 34:3
**materials** [5] - 37:18, 49:9, 59:14, 59:15, 60:2
**math** [1] - 47:18
**matter** [9] - 7:18, 11:4, 55:20, 55:22, 71:25, 72:1, 72:2, 87:9
**matters** [1] - 7:22
**McDonald's** [1] - 40:23
**meager** [1] - 65:18
**meal** [1] - 46:21
**mean** [5] - 6:11, 12:21, 60:23, 67:22, 69:16
**meaning** [2] - 31:13, 83:1
**means** [16] - 5:17, 12:11, 15:21, 20:21, 22:6, 22:8, 22:11, 22:13, 22:16, 22:19, 22:22, 22:24, 31:13, 31:21, 50:17, 79:25
**meant** [2] - 5:15, 64:9
**measure** [1] - 18:2
**mechanical** [1] - 1:24
**medium** [2] - 10:15, 28:21
**meet** [1] - 11:6
**memory** [4] - 6:17, 8:9, 8:10
**mention** [2] - 49:8, 80:21
**mentioned** [4] - 13:18, 59:14, 76:11
**mere** [2] - 12:20, 67:21
**merged"** [1] - 13:17
**merger** [1] - 68:15
**merger"** [1] - 43:24
**message** [1] - 9:6
**messed** [1] - 67:11
**met** [4] - 39:5, 58:9, 61:16, 79:20
**middle** [2] - 55:3, 78:15
**might** [2] - 28:5, 35:17
**mind** [2] - 6:10, 16:19
**minimal** [2] - 12:13, 31:16
**minimize** [1] - 60:23
**minor** [1] - 79:3
**minute** [4] - 26:25, 34:8, 68:21, 82:18
**minutes** [13] - 26:25, 45:16, 51:3, 51:5, 51:10, 51:12, 73:20, 76:3, 77:24, 81:13, 84:13, 85:9
**minutes'** [1] - 85:19

**misconstruction** [1] - 68:25
**missed** [1] - 84:10
**misstatement** [2] - 6:15
**mistake** [12] - 6:11, 34:9, 34:18, 34:21, 35:5, 35:9, 43:14, 53:2, 53:8, 53:13, 78:11
**mistakes** [1] - 78:4
**modification** [1] - 30:4
**modified** [1] - 31:6
**moment** [1] - 72:19
**money** [9] - 16:12, 17:10, 17:17, 41:21, 64:4, 73:10, 73:13, 74:14, 75:2
**monopoly** [1] - 13:15
**month** [2] - 47:6, 66:12
**moreover** [1] - 20:4
**morning** [3] - 3:3, 83:19, 86:3
**most** [2] - 60:7, 65:21
**mount** [1] - 22:24
**Mount** [19] - 22:25, 23:7, 23:16, 23:19, 36:17, 38:8, 38:12, 46:9, 46:11, 54:8, 55:6, 56:7, 63:18, 71:5, 74:13, 75:1, 76:2
**mouthful** [1] - 67:24
**move** [6] - 15:16, 17:1, 22:3, 25:24, 34:12, 43:3
**moving** [1] - 20:16
**MR** [20] - 4:15, 24:4, 24:5, 27:10, 27:13, 27:15, 27:17, 45:17, 51:16, 76:4, 78:1, 78:19, 78:21, 81:14, 86:2, 86:5, 86:8, 86:10, 86:13, 86:25
**multiple** [1] - 77:22
**musical** [1] - 10:9
**must** [20] - 4:22, 5:12, 5:14, 9:3, 11:6, 12:8, 13:2, 13:22, 15:18, 16:4, 17:5, 17:14, 18:8, 18:11, 18:24, 19:7, 19:13, 20:1, 77:14, 78:10

## N

**Nagle** [27] - 22:13, 22:14, 23:6, 23:15, 23:19, 31:4, 32:11,

34:1, 35:20, 36:17,
38:12, 50:7, 50:9,
50:14, 54:7, 56:3,
63:17, 64:16, 65:21,
65:23, 66:1, 66:15,
70:9, 71:5, 73:23,
75:3, 77:17
**name** [4] - 9:16, 20:25,
21:1, 36:24
**names** [1] - 57:10
**natural** [1] - 56:1
**naturally** [3] - 13:8,
57:22, 69:19
**nature** [1] - 14:4
**necessarily** [4] - 6:11,
13:8, 59:18, 63:16
**necessary** [5] - 52:9,
52:10, 52:12, 63:3,
69:12
**need** [23] - 3:18, 6:15,
11:4, 14:14, 14:16,
25:10, 25:25, 26:6,
32:20, 33:1, 34:15,
45:22, 52:11, 61:3,
64:5, 65:11, 78:1,
79:7, 85:7, 85:8,
85:16, 85:20, 85:21
**needed** [4] - 53:5,
69:1, 69:3, 72:4
**neighbor** [1] - 40:8
**neighbors'** [1] - 69:15
**net** [5] - 17:24, 65:7,
65:9, 66:1, 66:14
**never** [9] - 9:3, 30:2,
30:10, 32:17, 39:5,
39:6, 39:7, 67:18,
80:14
**new** [3] - 41:22, 43:8,
55:7
**next** [6] - 17:5, 25:19,
46:3, 48:5, 83:5,
83:19
**nine** [1] - 73:20
**NO** [1] - 1:4
**nobody** [3] - 43:22,
43:23, 82:3
**non** [5] - 20:4, 42:12,
48:12, 71:6, 74:1
**non-infringing** [2] -
20:4, 48:12
**non-protectable** [1] -
42:12
**non-protected** [1] -
74:1
**non-UPM** [1] - 71:6
**none** [2] - 47:20,
53:14
**nonexistence** [1] -
7:13
**normal** [1] - 14:21

**North** [1] - 22:14
**notes** [8] - 4:2, 8:8,
8:10, 8:11, 8:12,
8:14
**nothing** [1] - 69:22
**notice** [9] - 20:24,
21:3, 27:3, 32:12,
32:14, 32:22, 49:8,
49:14, 83:16
**notices** [1] - 81:3
**novel** [1] - 9:20
**number** [21] - 7:4,
21:20, 21:21, 25:17,
48:2, 50:9, 50:21,
50:22, 53:14, 65:3,
65:17, 66:6, 66:11,
66:20, 67:3, 72:21,
72:23, 73:11, 73:18
**numbers** [6] - 4:18,
21:5, 32:8, 50:20,
67:9, 67:10
**numerical** [1] - 9:4

# O

**O-pi-dan** [1] - 36:25
**objected** [1] - 69:20
**objection** [2] - 58:10,
69:25
**obscure** [1] - 72:9
**obvious** [1] - 9:9
**obviously** [2] - 39:25,
43:9
**occasionally** [2] -
3:15, 86:17
**occasions** [1] - 86:17
**Oe** [1] - 36:25
**Oe-pie-dan** [1] - 36:25
**OF** [1] - 1:1
**offended** [1] - 39:5
**offer** [1] - 47:16
**offered** [1] - 69:25
**often** [1] - 14:4
**oftentimes** [1] - 28:3
**old** [2] - 61:24, 81:11
**once** [6] - 16:18, 26:8,
26:10, 77:16, 81:12,
85:22
**one** [59] - 3:10, 4:6,
4:13, 7:10, 10:4,
11:24, 23:5, 25:20,
28:4, 30:15, 35:13,
35:16, 36:12, 36:13,
36:18, 37:14, 38:10,
39:3, 41:17, 44:9,
44:17, 47:15, 47:19,
49:10, 50:10, 52:4,
52:9, 53:20, 56:1,
56:17, 57:19, 58:4,
58:11, 58:25, 59:22,

59:24, 63:24, 65:1,
67:16, 68:14, 68:15,
70:10, 70:24, 70:25,
71:14, 73:3, 73:7,
73:25, 74:17, 75:23,
77:15, 81:5, 81:8,
81:9, 85:8
**ones** [6] - 41:4, 45:2,
68:4, 70:3, 70:4,
71:5
**online** [1] - 77:2
**open** [2] - 70:17,
81:20
**opening** [1] - 57:13
**opens** [2] - 3:7
**operating** [2] - 65:24,
66:13
**operation** [1] - 64:21
**opinion** [4] - 5:2, 7:22,
7:23, 8:1
**opinions** [1] - 39:17
**Oppidan** [5] - 32:20,
37:3, 37:4, 37:12,
71:11
**opportunity** [7] - 5:4,
14:11, 14:17, 36:20,
74:4, 77:4, 77:5
**opposed** [3] - 12:12,
31:15, 52:2
**options** [1] - 33:14
**orally** [1] - 9:9
**order** [7] - 9:13, 13:21,
14:15, 15:17, 28:14,
56:19, 67:14
**ordinary** [2] - 15:23,
31:25
**organized** [2] - 70:19,
85:20
**original** [13] - 3:24,
9:17, 9:21, 9:24,
12:10, 12:23, 13:4,
15:22, 16:5, 31:11,
31:12, 31:22, 31:24
**original"** [1] - 31:10
**originality** [2] - 12:10,
13:11
**Osha** [1] - 1:18
**otherwise** [4] - 5:21,
9:2, 9:14, 40:3
**outside** [1] - 26:15
**overall** [3] - 10:17,
18:15, 28:23
**overhauls** [1] - 53:5
**Overhead** [1] - 18:19
**overhead** [13] - 18:21,
18:25, 19:5, 19:11,
19:15, 47:15, 64:18,
64:19, 65:4, 65:7,
65:25, 66:13
**overhead-type** [1] -

47:15
**own** [6] - 40:10, 47:21,
53:2, 80:17, 82:21,
84:19
**owner** [4] - 9:25, 10:7,
17:14, 21:2
**owner's** [1] - 31:1
**owns** [1] - 16:19

# P

**p.m** [1] - 82:25
**Page** [13] - 2:3, 4:14,
4:16, 9:15, 20:15,
20:17, 21:23, 24:14,
29:15, 30:14, 31:20,
43:21, 79:15
**page** [9] - 3:22, 4:13,
20:15, 26:11, 27:1,
50:13, 76:8, 76:9
**pages** [2] - 3:12, 57:4
**PAGES** [1] - 1:13
**Pages** [2] - 25:22,
25:24
**paid** [12] - 8:4, 27:20,
38:2, 46:15, 46:17,
46:18, 53:10, 54:20,
63:23, 64:15, 66:4,
80:8
**paint** [3] - 62:12,
62:13, 80:13
**pantomime** [1] - 10:9
**paper** [1] - 47:20
**paperclip** [2] - 61:1,
61:3, 61:12
**paperclips** [1] - 61:2
**parading** [1] - 55:4
**Paragraph** [1] - 31:23
**parameters** [1] - 82:22
**pardon** [1] - 66:17
**Park** [9] - 22:13, 23:6,
23:15, 23:19, 31:4,
63:18, 73:24, 75:3,
77:17
**part** [5] - 62:25, 69:3,
79:9, 81:18, 81:23
**particular** [8] - 11:7,
13:7, 13:9, 13:10,
15:11, 16:19, 44:3,
44:4
**parties** [6] - 14:13,
36:22, 59:4, 65:21,
86:10, 86:12
**parties'** [1] - 5:8
**parts** [1] - 31:23
**party** [9] - 14:10,
14:11, 14:15, 14:17,
16:20, 16:21, 16:22,
16:24, 37:12
**past** [3] - 41:2, 45:16,

76:3
**Patrick** [1] - 1:15
**Patterson** [8] - 22:16,
23:6, 36:3, 36:17,
37:2, 50:14, 71:6,
74:7
**pay** [13] - 27:24, 41:4,
47:13, 52:6, 52:16,
54:8, 54:9, 56:1,
64:1, 64:13, 66:4,
79:23
**paying** [1] - 28:6
**payroll** [2] - 64:14,
65:16
**penance** [2] - 81:18,
81:24
**people** [28] - 4:6, 6:13,
27:25, 30:10, 40:1,
40:7, 40:8, 44:11,
49:18, 49:19, 50:17,
53:14, 53:22, 55:13,
55:16, 55:19, 57:25,
62:18, 63:1, 63:4,
63:8, 66:8, 69:14,
72:9, 73:5, 82:4,
86:15
**per** [6] - 65:25, 66:13,
66:21, 67:6, 79:22
**per-house** [1] - 66:13
**percent** [19] - 50:17,
55:18, 58:7, 58:8,
58:25, 59:1, 59:22,
59:24, 59:25, 65:8,
65:9, 65:17, 75:18,
75:19, 75:21, 75:23,
76:7
**percentage** [9] - 24:9,
24:11, 24:24, 48:6,
57:20, 58:15, 59:3,
59:20, 76:6
**performing** [1] - 10:2
**perhaps** [2] - 66:3,
68:22
**period** [1] - 10:4
**perked** [1] - 71:7
**permission** [5] - 10:6,
30:3, 30:20, 31:1,
32:20
**permits** [1] - 82:5
**permitted** [2] - 6:21,
7:21
**person** [6] - 7:19,
10:1, 15:23, 31:25,
43:7, 81:21
**perspective** [1] -
54:20
**persuade** [1] - 55:14
**persuades** [1] - 5:18
**phone** [1] - 32:19
**phones** [1] - 85:6

**photograph** [1] - 76:22
**photographs** [1] - 76:20
**physics** [1] - 70:22
**pi** [1] - 36:25
**pick** [6] - 3:8, 3:15, 35:9, 37:17, 37:20, 45:2
**pictorial** [1] - 10:10
**pie** [4] - 36:25, 59:19, 65:15, 79:17
**piece** [2] - 39:10, 59:19
**pieces** [2] - 63:2, 68:5
**pillow** [1] - 81:19
**place** [11] - 15:7, 15:9, 34:4, 35:23, 40:5, 53:20, 63:4, 63:9, 80:8
**Place** [8] - 22:13, 22:22, 31:4, 63:18, 73:24, 74:8, 75:3, 77:17
**Plaintiff** [9] - 1:4, 1:15, 3:6, 3:7, 3:9, 15:17, 22:6, 27:1, 54:25
**plaintiff** [5] - 15:15, 16:18, 27:6, 66:2, 73:14
**Plaintiff's** [5] - 15:20, 29:19, 50:13, 54:19, 69:20
**plaintiffs** [4] - 60:7, 61:8, 61:13, 74:3
**Plaintiffs** [7] - 61:4, 61:19, 62:20, 67:18, 71:21, 73:10, 77:3
**Plan** [1] - 53:4
**plan** [34] - 32:24, 33:3, 33:4, 33:7, 34:1, 34:4, 34:9, 34:10, 34:22, 36:3, 36:5, 36:6, 41:22, 41:23, 42:9, 42:11, 43:11, 43:12, 49:22, 53:7, 53:11, 54:7, 54:8, 63:6, 68:4, 69:9, 75:1, 78:25, 79:22, 79:24, 80:2, 80:3
**plan's** [1] - 56:12
**planning** [2] - 39:10, 39:19
**plans** [61] - 10:16, 10:25, 11:3, 28:23, 33:5, 33:23, 34:12, 35:25, 36:5, 37:5, 37:6, 37:7, 37:20, 38:6, 38:7, 39:8, 44:16, 45:13, 50:3,

52:7, 52:9, 52:10, 52:11, 52:12, 53:21, 53:22, 54:10, 54:21, 55:7, 55:25, 56:15, 59:10, 59:21, 60:1, 63:3, 63:8, 64:16, 65:13, 65:19, 71:1, 71:4, 71:13, 71:16, 71:19, 72:12, 72:13, 73:6, 74:9, 74:10, 74:11, 74:16, 74:25, 76:20, 76:23, 76:24, 81:25, 82:3, 82:12
**played** [1] - 38:2
**playing** [1] - 70:3
**pled** [1] - 73:18
**plenty** [1] - 83:15
**PLLC** [1] - 1:21
**plywood** [1] - 63:10
**point** [11] - 26:12, 40:5, 52:19, 52:22, 52:24, 61:17, 61:18, 61:19, 68:3, 75:5, 86:22
**pointed** [3] - 60:6, 68:14, 69:11
**Polk** [1] - 22:23
**poorly** [1] - 69:6
**pop** [1] - 52:7
**portion** [6] - 8:7, 12:18, 19:20, 20:11, 59:10, 64:23
**portions** [1] - 19:24
**position** [3] - 52:1, 54:4, 75:20
**positions** [1] - 51:24
**positive** [1] - 25:16
**possesses** [2] - 12:13, 31:16
**possible** [2] - 9:8, 50:21
**possibly** [1] - 72:13
**practically** [1] - 55:8
**pre** [2] - 11:24, 30:16
**pre-existing** [2] - 11:24, 30:16
**preceding** [1] - 57:18
**predicated"** [1] - 25:14
**preexisting** [1] - 12:1
**prefer** [1] - 67:10
**prepare** [1] - 11:20
**prepares** [1] - 10:5
**preparing** [2] - 10:2, 56:16
**preponderance** [13] - 5:15, 5:17, 5:20, 7:16, 15:10, 19:9, 20:9, 60:12, 60:17, 60:20, 60:23, 61:10,

61:21
**present** [2] - 80:14, 84:25
**presented** [6] - 27:21, 29:11, 29:25, 44:23, 65:5, 76:19
**preserve** [1] - 82:13
**presiding** [2] - 3:24, 26:13
**Preston** [79] - 11:11, 12:8, 13:22, 14:2, 14:5, 14:11, 14:12, 14:14, 14:15, 14:16, 14:18, 15:10, 15:14, 20:3, 22:5, 22:6, 23:3, 23:10, 23:14, 23:18, 23:22, 24:8, 24:16, 24:23, 25:5, 25:6, 27:17, 27:18, 28:15, 29:3, 29:16, 30:2, 30:4, 32:9, 32:10, 33:4, 33:5, 33:12, 33:18, 33:25, 34:10, 35:25, 36:17, 36:20, 37:4, 37:19, 37:25, 38:6, 38:18, 39:6, 39:8, 39:11, 39:18, 41:3, 41:9, 41:10, 42:23, 43:3, 43:5, 43:13, 44:10, 49:3, 49:4, 49:8, 49:19, 50:24, 53:17, 53:20, 56:9, 67:4, 67:8, 78:8, 78:17, 79:1, 79:5, 82:11
**PRESTON** [1] - 1:3
**presume** [1] - 36:14
**presumption** [1] - 14:6
**prettier** [1] - 68:24
**pretty** [4] - 3:11, 36:2, 62:1, 63:22
**prevail** [1] - 13:21
**prevent** [1] - 17:7
**price** [7] - 58:23, 58:24, 59:9, 59:13, 59:16, 60:3, 63:12
**priest** [2] - 81:17, 81:23
**priority** [1] - 83:15
**probative** [2] - 14:20, 14:23
**probatively** [1] - 14:8
**problem** [9] - 43:5, 46:24, 53:24, 56:10, 68:13, 78:17, 78:23, 81:25, 87:3
**problems** [3] - 53:11, 53:17, 54:7
**procedure** [1] - 83:4

**Proceedings** [1] - 1:24
**proceedings** [1] - 87:8
**process** [4] - 13:10, 33:6, 38:19, 60:15
**produced** [2] - 1:24, 5:24
**produces** [1] - 10:4
**producing** [2] - 17:11, 64:25
**product** [1] - 10:11
**products** [1] - 24:9
**Professor** [10] - 39:3, 39:12, 39:20, 43:22, 44:7, 68:9, 68:20, 68:21, 68:25, 74:4
**professor** [5] - 39:13, 39:17, 39:21, 39:23, 69:10
**proffer** [1] - 19:13
**profit** [15] - 17:25, 18:15, 48:6, 57:20, 58:16, 58:23, 59:10, 59:13, 59:21, 62:17, 62:25, 65:7, 75:18, 75:19, 75:21
**Profits** [1] - 18:19
**profits** [32] - 17:1, 17:3, 17:6, 17:9, 18:3, 18:4, 18:9, 19:17, 19:19, 19:21, 19:24, 20:1, 20:6, 20:7, 20:11, 20:13, 24:11, 48:13, 54:22, 58:7, 58:8, 58:18, 59:25, 61:5, 61:6, 63:11, 65:9, 65:18, 76:6, 79:14, 82:8
**program** [1] - 10:12
**prohibiting** [1] - 21:8
**project** [7] - 23:20, 24:6, 24:15, 24:21, 25:12, 25:14, 56:9
**Project** [1] - 22:9
**projector** [1] - 78:20
**projects** [12] - 23:5, 23:8, 23:12, 23:25, 24:24, 29:25, 37:3, 39:1, 46:2, 49:10, 71:6
**promised** [1] - 64:1
**promptly** [1] - 9:7
**proof** [20] - 7:12, 14:4, 17:22, 27:2, 27:4, 27:5, 30:10, 32:15, 35:24, 60:5, 60:6, 60:10, 60:11, 60:12, 61:9, 79:12, 79:13, 79:20, 81:11
**properly** [2] - 7:9, 38:3

**properties** [6] - 57:11, 63:20, 66:9, 66:16, 66:19, 71:14
**property** [1] - 25:18
**proposed** [1] - 57:22
**prorated** [2] - 64:21, 66:6
**protect** [2] - 13:14, 68:6, 69:17
**protectable** [5] - 9:22, 42:10, 42:12, 68:7, 68:8
**protected** [17] - 10:22, 10:23, 11:5, 11:6, 12:6, 12:15, 12:22, 12:24, 13:3, 14:25, 29:2, 29:7, 30:25, 31:11, 42:7, 67:23, 74:1
**protecting** [2] - 21:18, 50:23
**protection** [8] - 9:16, 10:24, 11:8, 12:19, 13:6, 13:12, 44:2, 75:8
**protects** [3] - 20:19, 21:7, 69:17
**prove** [17] - 6:4, 7:4, 12:8, 13:22, 14:14, 15:18, 17:14, 17:23, 18:7, 18:24, 19:7, 19:20, 20:1, 42:17, 46:5, 48:2, 61:9
**proved** [5] - 5:20, 13:24, 26:6
**proven** [2] - 16:19, 19:10
**proves** [3] - 20:9, 33:20, 33:21
**provided** [10] - 30:10, 46:25, 48:9, 62:16, 63:21, 64:6, 64:11, 65:24, 66:16, 66:21
**proving** [3] - 18:6, 18:22, 19:23
**provisions** [1] - 76:10
**public** [1] - 11:22
**pull** [1] - 66:25
**pulled** [1] - 57:13
**purpose** [2] - 27:8, 71:14
**purposely** [1] - 4:19
**put** [21] - 3:3, 23:24, 26:4, 26:7, 32:12, 33:18, 37:8, 50:3, 50:24, 56:9, 61:4, 61:14, 63:5, 63:8, 67:24, 69:25, 70:4, 70:14, 73:3, 74:5, 84:5

putting [1] - 51:20
PWA [4] - 47:6, 52:6, 68:5, 70:13
PWA's [2] - 72:13, 77:5

## Q

quality [1] - 11:7
questions [34] - 5:11, 5:14, 9:1, 9:11, 15:3, 16:10, 16:16, 22:4, 22:5, 23:1, 26:19, 28:14, 28:17, 35:14, 37:15, 40:18, 41:19, 51:22, 52:4, 55:17, 56:25, 57:23, 58:2, 60:8, 62:2, 72:5, 77:8, 82:6, 82:15, 84:8, 86:1, 86:14
Questions [8] - 2:6, 16:8, 16:10, 16:16, 60:25, 72:4, 79:11
Quicken [1] - 47:1
quicker [1] - 15:16
quickly [4] - 22:3, 32:5, 33:1, 36:2
quite [1] - 26:18

## R

raised [1] - 34:5
ramani [1] - 59:7
RAMANI [1] - 1:7
Ramani [21] - 37:13, 40:13, 40:17, 44:7, 47:9, 49:7, 50:7, 50:16, 53:1, 53:18, 54:6, 54:12, 58:17, 58:21, 66:5, 69:21, 73:1, 77:1, 78:9, 80:24, 82:2
rare [1] - 86:17
rarely [1] - 71:21
rate [3] - 50:15, 50:17, 50:20
rather [1] - 14:16
reach [3] - 6:24, 26:10, 83:3
reached [4] - 8:24, 9:12, 26:8, 26:15
reaching [1] - 28:9
reaction [1] - 55:25
read [11] - 3:6, 3:16, 3:18, 3:19, 25:20, 26:1, 26:3, 28:13, 43:20, 69:24, 81:1
reading [2] - 16:14, 77:21
ready [1] - 85:16

real [6] - 22:13, 22:16, 22:19, 22:22, 22:24, 38:15
realized [3] - 43:1, 53:5, 56:20
really [8] - 40:3, 41:1, 43:25, 47:7, 55:18, 68:21, 78:15, 85:23
realm [1] - 77:15
rearrange [1] - 34:25
rearrangement [1] - 32:17
reason [10] - 6:25, 34:21, 37:9, 37:23, 44:9, 49:14, 52:13, 71:20, 77:6, 78:23
reasonable [8] - 6:21, 14:11, 14:17, 15:23, 21:15, 36:20, 57:25, 64:22
reasons [1] - 33:6
rebuffed [4] - 54:9, 54:10, 54:18, 56:13
rebut [1] - 61:14
rebuttal [2] - 74:2, 74:4
Rebuttal [1] - 2:10
receipts [1] - 46:19
receive [3] - 49:18, 71:15, 80:6
received [6] - 5:23, 17:10, 17:17, 17:18, 37:2, 63:24, 71:16, 72:13
recent [1] - 54:4
recess [2] - 8:21, 51:13
recollection [2] - 8:13, 8:15
record [3] - 26:5, 69:25, 87:8
recover [1] - 15:17
recovery [2] - 80:5, 82:8
rectangle [1] - 45:9
rectify [2] - 57:5, 82:10
redesign [3] - 34:9, 35:10
redesigned [1] - 53:21
redesigning [1] - 34:20
redone [1] - 53:23
reduce [1] - 47:12
reference [2] - 11:16, 13:19
referred [2] - 9:22, 26:4
referring [2] - 16:15, 21:5

refused [1] - 62:22
regard [1] - 60:25
regarding [6] - 57:23, 57:24, 58:18, 61:23, 72:22, 75:12
regardless [3] - 5:22, 5:24, 19:3
regards [1] - 72:6
regretted [1] - 57:16
regularly [1] - 8:5
Reisinger [2] - 52:20, 53:10
Reisinger's [1] - 78:9
relative [1] - 18:4, 52:14
relevant [1] - 15:4
rely [5] - 7:24, 7:25, 8:10, 8:12, 18:17
remain [1] - 86:20
remaining [1] - 66:19
remarks [2] - 31:9, 31:10
remember [18] - 6:13, 25:20, 26:22, 27:2, 32:6, 33:5, 34:22, 35:15, 36:24, 38:10, 40:1, 46:22, 47:18, 53:6, 60:13, 61:20, 81:14
remembers [1] - 6:12
removal [3] - 21:9, 72:6, 80:19
remove [1] - 76:21
removed [8] - 21:10, 21:12, 25:8, 49:6, 76:17, 76:25, 77:12, 81:2
render [1] - 84:7
rental [2] - 11:23, 19:1
rentals [1] - 17:16
repeat [1] - 79:8
repeating [1] - 23:6
replicates [1] - 15:2
reported [1] - 1:24
reporter [1] - 3:17
Reporter [1] - 1:23
REPORTER'S [1] - 87:6
represent [2] - 37:25, 38:1
represents [1] - 8:6
reproduce [1] - 11:20
reproducing [1] - 10:1
require [4] - 48:16, 63:8, 63:9, 86:22
required [8] - 7:23, 9:13, 13:11, 15:1, 60:5, 61:1, 61:20, 74:8
requirements [1] -

47:16
requires [4] - 7:16, 12:22, 60:11, 70:22
reserve [1] - 27:7
reserves [1] - 3:7
respective [1] - 25:17
respond [2] - 9:7, 79:8
response [1] - 9:11
responses [1] - 57:22
responsibility [2] - 78:6, 78:12
responsible [1] - 59:21
rest [2] - 47:21, 59:18
restarted [1] - 56:14
result [1] - 20:14
resulted [2] - 17:6, 19:21
retire [3] - 8:17, 40:5, 68:23
return [1] - 26:16
reveal [1] - 9:1
revenue [12] - 17:2, 17:3, 17:14, 17:20, 17:22, 18:2, 18:8, 18:17, 46:3, 55:9, 64:5, 64:8
revenues [10] - 17:16, 17:24, 18:21, 23:23, 24:17, 46:5, 46:8, 46:10, 57:19, 75:12
reviewing [1] - 8:4
revises [1] - 12:2
revision [1] - 11:25, 30:16
reworking [1] - 53:6
rhetorical [1] - 51:21
rights [3] - 11:19, 13:20, 16:20
rip [1] - 81:20
ripped [1] - 81:21
rocket [1] - 55:10
roof [2] - 36:6, 36:8
room [8] - 8:17, 34:24, 62:12, 66:25, 70:17, 82:20, 84:17
rooms [2] - 29:8, 69:18
routine [3] - 68:10, 69:12, 75:6
RPR [2] - 1:23, 87:12
rule [1] - 7:14
rules [3] - 30:8, 30:11, 38:2

## S

s/Bruce [1] - 87:12
sad [2] - 39:21, 40:11
sake [1] - 40:4

sale [3] - 11:23, 19:1, 62:18
sales [7] - 17:15, 58:23, 58:24, 59:9, 59:12, 59:16, 63:12
Sam [9] - 27:18, 30:5, 32:19, 41:20, 42:11, 42:19, 50:24, 79:3, 82:11
save [2] - 20:15, 52:23
saw [9] - 14:3, 32:25, 33:2, 36:1, 36:25, 38:5, 38:14, 41:18, 47:17
scales [6] - 60:16, 60:18, 60:21, 60:22, 61:11, 61:14
schedule [1] - 82:21
scheme [1] - 52:23
school [3] - 61:24, 63:5, 81:12
science [1] - 55:11
scratch [6] - 41:22, 43:11, 52:18, 52:20, 53:10, 53:12
screen [2] - 27:11, 78:1
sculptural [1] - 10:11
scènes [3] - 13:5, 43:23, 68:15
seal [1] - 83:5
seated [3] - 3:1, 60:14, 85:1
second [11] - 19:5, 33:3, 36:4, 36:7, 36:11, 38:7, 41:17, 53:8, 69:8, 70:16, 81:23
section [2] - 46:21, 84:5
see [21] - 3:2, 16:11, 25:16, 25:22, 25:25, 28:3, 33:23, 34:2, 44:8, 44:9, 44:16, 45:4, 45:8, 45:22, 46:6, 48:25, 51:10, 51:12, 57:4, 68:18, 78:18
seek [1] - 64:4
seeking [2] - 58:7, 58:13
seem [1] - 40:9
select [1] - 8:20
sell [5] - 30:24, 48:16, 63:19, 71:14, 72:14
selling [4] - 12:5, 30:23, 62:4, 66:9
semiconductor [1] - 10:11
send [2] - 81:6, 85:22

**sending** [1] - 73:2
**sense** [5] - 6:25, 43:4, 52:16, 62:10, 81:4
**sent** [3] - 50:4, 50:10, 82:3
**sentence** [3] - 72:15, 72:17, 73:19
**separate** [2] - 50:11, 56:5
**separately** [1] - 41:5
**sequence** [1] - 4:17
**serving** [1] - 27:19
**set** [8] - 5:25, 20:24, 21:3, 32:20, 56:14, 58:4, 82:21, 84:19
**sets** [2] - 46:14, 57:11
**setting** [1] - 13:8
**seven** [3] - 51:3, 51:4, 77:24
**several** [2] - 45:12, 54:12
**shaped** [1] - 70:4
**shapes** [1] - 70:7
**sheet** [1] - 67:11
**shift** [1] - 17:25
**shifts** [2] - 17:23, 28:4
**shopping** [1] - 62:8
**short** [2] - 3:8, 84:1
**shorthand** [2] - 11:16, 13:19
**show** [11] - 34:22, 35:19, 36:25, 45:20, 55:12, 56:24, 65:20, 72:19, 74:8, 74:9, 77:5
**showed** [3] - 59:22, 59:23, 74:10
**shower** [2] - 62:13, 62:14
**showing** [1] - 57:4
**shown** [7] - 16:1, 18:11, 29:6, 29:11, 29:23, 32:2, 61:25
**showroom** [2] - 37:16, 66:8
**shows** [1] - 50:19
**side** [18] - 16:2, 16:5, 26:24, 32:3, 33:15, 34:24, 38:21, 41:8, 46:5, 61:15, 61:21, 71:22, 80:15, 85:8
**side-by-side** [4] - 16:2, 16:5, 32:3, 33:15
**side-by-sides** [1] - 38:21
**sides** [1] - 38:21
**sidewalk** [1] - 63:7
**sign** [2] - 3:25, 26:13
**significance** [1] - 6:17

**significant** [2] - 8:7, 70:5
**significantly** [1] - 70:19
**similar** [15] - 14:8, 15:20, 15:23, 15:25, 16:4, 31:24, 32:1, 36:4, 36:5, 36:6, 38:6, 38:7, 38:15, 70:12
**similarities** [3] - 14:20, 14:21, 14:24
**similarity** [6] - 13:3, 15:13, 15:21, 31:18, 33:21, 36:15
**similarity'** [1] - 31:21
**simple** [2] - 6:11, 71:19
**simplified** [1] - 74:10
**simply** [2] - 6:16, 7:15
**single** [7] - 7:3, 7:6, 44:17, 47:22, 48:9, 48:15, 70:10
**sinks** [4] - 35:23, 59:17, 62:11
**sit** [2] - 27:25, 63:7
**situation** [2] - 50:11, 66:11
**situations** [1] - 69:17
**six** [5] - 35:2, 52:23, 56:5, 64:10, 65:13
**size** [1] - 70:15
**slab** [2] - 33:10, 45:14
**Slavin** [2] - 1:23, 87:12
**SLAVIN** [2] - 87:7, 87:12
**slides** [1] - 32:7
**slightly** [1] - 63:13
**slow** [1] - 3:15
**Slow** [1] - 3:15
**smart** [1] - 62:1
**snacks** [1] - 83:20
**sold** [3] - 17:21, 66:12, 74:14
**sole** [1] - 71:14
**solely** [2] - 20:2, 20:11
**solid** [1] - 39:9
**solutions** [1] - 68:12
**solve** [2] - 43:4, 68:13
**solves** [1] - 34:14
**someone** [3] - 14:2, 52:17, 62:15
**sometimes** [1] - 52:2
**somewhere** [1] - 68:23
**sorry** [2] - 66:17, 71:3
**sort** [1] - 40:2
**sound** [2] - 62:19
**sounded** [2] - 78:6,

78:8
**SOUTHERN** [1] - 1:1
**spaced** [1] - 3:13
**spaces** [2] - 10:18, 28:24
**special** [2] - 7:19, 31:13
**specific** [4] - 10:4, 18:17, 19:24, 66:1
**specifically** [2] - 59:4, 64:15
**speed** [1] - 3:16
**spend** [4] - 33:1, 47:13, 55:4, 56:22
**spending** [4] - 51:18, 54:25, 56:20, 77:20
**spent** [5] - 51:1, 53:6, 55:23, 65:21, 82:14
**square** [2] - 38:11, 38:12
**staff** [1] - 66:6
**stair** [4] - 29:4, 34:18, 43:2, 53:17
**staircase** [1] - 33:17
**staircases** [1] - 10:21, 29:1
**stairs** [3] - 34:20, 43:2, 53:12
**stairway** [3] - 34:3, 34:10, 34:13
**stairways** [1] - 29:8
**stairwell** [1] - 70:24
**stand** [5] - 31:3, 51:11, 74:22, 84:23, 87:4
**standard** [16] - 10:20, 12:25, 13:7, 29:1, 33:17, 35:17, 38:22, 44:3, 68:10, 69:11, 69:18, 74:3, 75:6, 75:7
**stands** [2] - 18:2, 72:17
**Stanford** [14] - 22:19, 22:20, 23:6, 36:9, 36:16, 36:18, 36:24, 37:3, 37:10, 37:11, 37:18, 38:5, 71:6, 74:7
**staple** [2] - 10:20, 13:1
**start** [10] - 4:8, 16:15, 53:4, 58:20, 58:23, 70:6, 80:22, 81:22, 84:15, 85:12
**started** [5] - 29:13, 32:18, 51:4, 56:11, 62:7
**starting** [2] - 53:3, 75:5
**state** [2] - 7:21, 82:24

**statement** [4] - 4:25, 40:17, 44:14, 57:13
**statements** [3] - 5:5, 41:23, 79:16
**STATES** [1] - 1:1
**stay** [1] - 85:3
**stenography** [1] - 1:24
**STEPHEN** [1] - 1:7
**Stephen** [1] - 43:1
**steps** [1] - 35:2
**still** [5] - 4:18, 47:2, 73:25, 75:8, 79:1
**stipulated** [1] - 5:25
**Stipulations** [1] - 25:19
**stipulations** [2] - 3:19, 25:21
**stock** [4] - 13:7, 33:17, 44:3, 56:15
**stop** [5] - 36:11, 56:2, 56:4, 56:11, 76:14
**story** [3] - 45:7, 45:8, 81:16
**straight** [4] - 28:11, 35:19, 35:24, 45:9
**strangely** [1] - 32:13
**street** [1] - 36:3
**Street** [16] - 22:14, 22:16, 22:18, 22:19, 22:20, 22:23, 35:20, 36:9, 37:10, 37:11, 37:18, 38:5, 54:7, 64:16, 74:7
**stretch** [1] - 39:10
**strother** [1] - 78:5
**Strother** [8] - 1:20, 1:21, 2:9, 34:17, 79:8, 79:18, 80:18, 81:10
**STROTHER** [5] - 24:4, 51:16, 76:4, 86:10, 86:13
**Strother's** [3] - 31:9, 37:14, 78:16
**stuff** [3] - 35:23, 44:18, 77:3
**subject** [3] - 7:18, 11:4, 81:14
**sublicense** [1] - 30:3
**submit** [2] - 82:6, 82:7
**subset** [1] - 59:15
**substantial** [6] - 13:3, 15:13, 15:20, 31:18, 33:21, 36:15
**substantially** [6] - 15:19, 15:22, 15:24, 16:4, 32:1, 70:12
**sufficient** [1] - 7:4
**suggest** [2] - 42:20, 71:21

**suggested** [1] - 68:22
**suggests** [1] - 53:12
**Suite** [3] - 1:16, 1:19, 1:21
**suits** [1] - 47:10
**sum** [1] - 63:20
**summaries** [1] - 46:25
**summarize** [1] - 28:16
**summarized** [2] - 3:20, 26:3
**summation** [2] - 4:11, 79:9
**Sunday** [1] - 44:16
**support** [1] - 13:2
**supposed** [3] - 26:2, 47:13, 56:3
**supposedly** [1] - 44:17
**surprisingly** [2] - 51:24, 52:3
**Susan** [3] - 32:9, 33:11, 35:15
**sustained** [1] - 15:11
**Suzanne** [1] - 38:19
**symbols** [1] - 21:5
**synthesize** [1] - 67:25
**system** [1] - 83:10

## T

**tallest** [1] - 81:20
**tangible** [2] - 10:15, 28:21
**task** [1] - 39:4
**taught** [1] - 81:15
**teacher** [1] - 81:15
**technical** [10] - 7:18, 7:20, 7:22, 11:2, 11:4, 11:5, 11:6, 11:7, 11:13
**technically** [1] - 26:2
**ten** [6] - 56:6, 61:24, 81:11, 85:9, 85:18
**ten-year-old** [1] - 61:24
**tending** [1] - 6:4
**term** [8] - 9:23, 10:5, 12:10, 29:21, 30:13, 31:13, 43:23
**terms** [9] - 21:4, 31:19, 32:14, 43:25, 47:1, 48:7, 48:10, 48:15, 68:16
**test** [2] - 47:22, 71:3
**testified** [19] - 6:5, 7:5, 33:11, 37:5, 38:20, 41:1, 46:15, 46:16, 50:7, 52:25, 53:1, 58:17, 58:21, 65:1, 65:11, 69:22, 74:3,

80:24

**testifies** [1] - 8:5
**testify** [4] - 39:11, 48:10, 71:4, 74:5
**testifying** [1] - 8:4
**testimony** [19] - 5:22, 6:3, 6:8, 6:22, 7:1, 7:3, 7:10, 8:6, 8:16, 14:2, 30:5, 34:16, 39:7, 42:2, 50:15, 59:8, 68:20, 77:1, 77:2
**TEXAS** [1] - 1:1
**Texas** [5] - 22:15, 22:18, 22:21, 22:23, 22:25
**thankfully** [1] - 66:23
**THE** [25] - 1:1, 1:1, 1:11, 3:1, 4:16, 24:6, 27:11, 27:14, 27:16, 45:16, 51:3, 51:14, 76:3, 77:24, 81:13, 82:18, 83:23, 84:12, 85:1, 86:4, 86:7, 86:9, 86:12, 86:14, 87:1
**the...works** [1] - 32:3
**theme** [1] - 13:8
**themselves** [3] - 10:22, 29:2, 62:11
**theory** [1] - 84:2
**therefore** [11] - 12:22, 16:3, 59:9, 59:13, 62:17, 64:8, 65:4, 65:6, 74:15, 75:7, 77:13
**they've** [1] - 73:18
**thinking** [4] - 33:6, 39:10, 39:18, 54:24
**third** [9] - 14:12, 19:13, 33:3, 34:4, 34:25, 36:5, 36:8, 36:22, 37:11
**this'** [1] - 53:18
**thousands** [2] - 41:9, 44:11
**three** [3] - 18:22, 37:7, 66:19
**tie** [1] - 79:21
**tiny** [1] - 40:14
**tip** [4] - 60:18, 60:20, 60:22, 61:11
**tipped** [1] - 61:15
**tips** [2] - 61:1
**title** [1] - 20:23
**today** [2] - 27:19, 53:15
**together** [7] - 3:3, 50:10, 67:7, 82:15, 84:6, 85:21, 87:2

**tomorrow** [3] - 83:11, 83:12, 86:3
**took** [3] - 32:12, 32:13, 39:4
**top** [1] - 81:19
**topic** [1] - 13:7
**total** [5] - 15:24, 31:25, 38:11, 41:3, 59:5
**totaled** [1] - 46:7
**town** [1] - 39:4
**townhomes** [6] - 52:15, 52:23, 54:23, 65:14, 69:1, 69:14
**townhouse** [5] - 40:22, 44:12, 45:19, 48:17, 48:18
**townhouses** [3] - 40:21, 41:10, 48:20
**traditional** [1] - 81:12
**training** [1] - 7:20
**transcript** [1] - 87:8
**transcription** [1] - 1:25
**transformation** [2] - 11:25, 30:17
**transforms** [1] - 12:2
**treatise** [1] - 77:21
**treatment** [2] - 13:10, 44:4
**trial** [12] - 1:10, 3:14, 5:1, 6:9, 8:8, 8:23, 26:4, 54:24, 55:2, 55:3, 78:13, 83:4
**trick** [1] - 72:9
**tried** [3] - 32:6, 45:22, 84:1
**true** [5] - 36:2, 40:20, 42:5, 42:6, 42:22, 42:25, 45:18, 57:7, 60:7, 63:3, 64:2, 66:5, 68:14, 79:4, 84:22
**trust** [3] - 54:15, 73:9
**truth** [5] - 6:12, 7:9, 35:6, 35:11, 62:24
**truthful** [1] - 50:22
**try** [7] - 28:16, 46:16, 56:1, 67:14, 80:4, 80:13, 82:10
**trying** [6] - 35:9, 50:21, 50:22, 54:20, 71:21, 71:22
**turn** [1] - 63:14
**turned** [1] - 78:20
**TV** [1] - 84:22
**two** [20] - 7:8, 11:2, 14:22, 15:24, 16:3, 25:1, 32:1, 43:20, 43:21, 46:13, 56:17,

57:4, 63:10, 65:2, 70:23, 72:5, 74:25, 81:13, 81:18, 82:19
**two-by-fours** [1] - 63:10
**two-car** [1] - 70:23
**two-part** [1] - 81:18
**TX** [3] - 1:16, 1:19, 1:22
**type** [1] - 47:15
**types** [1] - 7:8

---

## U

**U.S** [1] - 26:14
**UL** [2] - 1:7, 22:8
**unanimous** [5] - 5:12, 5:13, 8:24, 26:8, 26:10
**unauthorized** [2] - 9:18, 37:19
**uncontested** [1] - 74:17
**uncontroverted** [2] - 54:6, 54:11
**undeniably** [1] - 60:9
**under** [5] - 9:20, 9:22, 13:5, 18:20, 39:13
**understood** [1] - 62:3
**unduly** [1] - 8:13
**unfair** [1] - 54:4
**unfairly** [1] - 17:7
**unimportant** [1] - 6:19
**unit** [1] - 27:14
**UNITED** [1] - 1:1
**units** [2] - 56:3, 64:10
**university** [1] - 39:24
**unless** [8] - 4:8, 5:21, 9:2, 9:13, 10:6, 20:8, 84:18, 86:16
**unprotected** [1] - 12:15
**unseal** [1] - 83:5
**untrue** [1] - 77:6
**unusual** [1] - 41:7
**up** [32] - 3:8, 3:9, 3:16, 4:1, 4:9, 7:24, 27:23, 29:21, 31:8, 34:13, 35:1, 35:2, 35:19, 37:17, 37:20, 42:13, 46:19, 48:1, 53:8, 53:2, 54:22, 61:7, 62:9, 67:7, 67:11, 70:18, 71:7, 73:3, 78:19, 82:25, 83:5, 86:18
**upload** [1] - 73:7
**uploading** [1] - 77:16
**UPM** [1] - 71:6
**Urban** [67] - 22:8,

22:9, 23:2, 23:9, 23:21, 23:23, 24:7, 24:9, 25:2, 25:15, 29:15, 29:21, 30:3, 30:7, 30:10, 32:11, 33:16, 34:1, 36:3, 37:8, 37:15, 37:16, 40:22, 42:5, 44:1, 46:1, 46:6, 46:10, 49:1, 49:21, 52:5, 52:6, 52:13, 53:9, 53:21, 54:17, 54:21, 55:12, 55:24, 57:8, 58:7, 58:17, 58:18, 58:20, 58:22, 59:8, 59:25, 61:5, 63:21, 64:7, 65:21, 65:24, 66:3, 71:7, 71:8, 71:13, 71:15, 71:16, 72:7, 72:11, 73:22, 75:14, 76:11
**URBAN** [1] - 1:7

---

## V

**valid** [1] - 68:6
**value** [11] - 17:10, 17:17, 17:18, 37:25, 38:1, 40:14, 46:18, 48:15, 48:17, 48:18, 54:20
**verdict** [15] - 3:23, 5:12, 8:18, 8:24, 9:12, 26:8, 26:12, 26:15, 26:16, 28:9, 83:3, 83:19, 84:7, 85:7, 86:16
**verdicts** [1] - 5:13
**Vernon** [20] - 22:24, 22:25, 23:7, 23:16, 23:19, 36:18, 38:8, 38:12, 46:9, 46:11, 54:8, 55:6, 56:7, 63:18, 71:5, 74:13, 75:1, 76:2
**versions** [1] - 37:8
**view** [3] - 14:12, 14:17, 36:20
**viewed** [1] - 14:15
**views** [3] - 50:13, 76:8, 76:9
**VINOD** [1] - 1:7
**violate** [1] - 21:22
**violated** [4] - 21:17, 29:4, 29:5, 72:24
**violation** [3] - 17:19, 81:2, 81:5
**violations** [4] - 21:20, 25:17, 72:21, 82:9
**visit** [2] - 83:6, 83:7

**voir** [2] - 27:8, 60:14
**VOLUME** [1] - 1:12

---

## W

**wait** [2] - 41:25, 42:1
**waiting** [1] - 78:13
**walk** [2] - 35:1, 35:2
**walked** [3] - 49:7, 62:15, 76:5
**watch** [1] - 27:25
**ways** [4] - 13:14, 44:5, 56:17, 68:13
**website** [5] - 37:9, 50:3, 50:12, 50:18, 77:5
**week** [2] - 51:18, 61:25
**Weekley** [1] - 79:6
**weight** [3] - 5:16, 6:2, 8:15
**welcome** [1] - 50:19
**Weslayan** [1] - 1:21
**whatsoever** [1] - 61:4
**whole** [9] - 12:18, 15:1, 15:2, 34:9, 34:14, 35:10, 79:1, 80:16, 82:12
**willing** [1] - 39:17
**win** [1] - 5:10
**wind** [2] - 81:22, 82:1
**window** [1] - 70:10
**windows** [4] - 10:21, 13:1, 29:1, 62:16
**wise** [1] - 69:3
**wishes** [1] - 18:25
**witness** [17] - 6:3, 6:4, 6:6, 6:8, 6:11, 6:12, 6:14, 7:3, 7:7, 7:21, 7:23, 8:1, 8:2, 8:6, 31:3, 39:14
**witnesses** [11] - 5:22, 7:5, 27:21, 39:15, 51:19, 53:14, 68:16, 68:18, 74:4
**wondered** [1] - 73:9
**wood** [8] - 37:5, 53:18, 53:19, 58:6, 58:11, 69:7
**Wood** [56] - 11:11, 12:8, 13:22, 14:2, 14:5, 14:11, 14:12, 14:14, 14:15, 14:16, 14:18, 15:10, 20:3, 22:5, 22:6, 23:3, 23:11, 23:14, 23:18, 25:6, 27:17, 27:18, 28:16, 29:3, 29:16, 30:2, 30:5, 32:9, 32:10, 33:25, 34:10,

35:25, 36:20, 37:5, 38:1, 38:18, 39:6, 39:11, 41:3, 41:10, 42:23, 44:10, 49:3, 49:4, 49:8, 49:19, 53:21, 54:13, 56:10, 67:5, 67:8, 78:8, 78:17, 79:3
**WOOD** [1] - 1:3
**Wood"** [1] - 15:14
**Wood's** [9] - 23:22, 24:8, 24:16, 24:23, 25:5, 30:4, 36:17, 37:20, 39:18
**Wooten** [1] - 71:12
**wooten** [1] - 71:13
**word** [5] - 9:19, 31:8, 32:13, 45:24, 68:10
**words** [3] - 5:17, 6:24, 85:15
**work"** [1] - 30:15
**work'** [1] - 30:15
**works** [34] - 10:2, 10:5, 10:11, 10:14, 11:13, 11:21, 11:24, 12:9, 12:12, 13:23, 14:22, 14:24, 15:19, 15:22, 15:24, 16:3, 16:4, 17:19, 21:12, 24:25, 25:6, 28:19, 28:20, 30:4, 30:6, 30:16, 31:19, 31:24, 32:1, 40:22, 49:4, 67:4, 76:16
**works"** [1] - 10:14
**worry** [2] - 4:16, 40:25
**wrap** [2] - 3:9, 51:8
**write** [3] - 73:11, 75:22
**writing** [2] - 9:8, 9:20
**written** [2] - 9:6, 30:2
**wrongful** [1] - 17:8

## Y

**year** [2] - 32:23, 61:24
**years** [7] - 28:3, 41:11, 78:23, 80:3, 80:4, 81:11, 84:3
**Yes"** [1] - 75:4
**yesterday** [2] - 3:3, 26:18
**yourself** [4] - 6:3, 39:12, 43:8, 73:10
**yourselves** [1] - 45:24

## Z

**zero** [3] - 55:19, 61:21, 76:2
**Zero"** [1] - 48:23

**zoned** [1] - 63:5
**ZUMMO** [12] - 24:5, 27:10, 27:13, 27:17, 45:17, 78:1, 78:21, 81:14, 86:2, 86:5, 86:8, 86:25
**zummo** [2] - 66:24, 69:23
**Zummo** [15] - 1:15, 2:8, 2:10, 51:22, 53:16, 54:14, 56:19, 61:7, 63:1, 64:1, 68:14, 68:21, 70:3, 71:3, 71:4
**Zummo's** [2] - 51:17, 52:8

## À

**à** [3] - 13:5, 43:23, 68:15