```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3
   PRESTON WOOD & ASSOCIATES, LLC,   )
 4                                   )
              Plaintiff,             )   NO. H-16-CV-1427
 5                                   )
   v.                                )   August 29, 2018
 6                                   )
   CAMERON ARCHITECTS, INC.,         )
 7 STEPHEN CAMERON, UL, INC., d/b/a  )
   URBAN LIVING, and VINOD RAMANI    )
 8                                   )
              Defendants.            )
 9

10
                            TRIAL
11            BEFORE THE HONORABLE DAVID HITTNER
                       AND A JURY
12
                         VOLUME 6
13                  PAGES 6-1 to 6-17

14

15

16  For the Plaintiff:        Louis K. Bonham
                              Osha Liang, LLP
17                            909 Fannin, Suite 3500
                              Houston, TX 77010
18
    For the Defendants:       Justin Strother
19                            Strother Law Firm, PLLC
                              3000 Weslayan, Suite 348
20                            Houston, TX  77027

21  Court Reporter:           Bruce Slavin, RPR, CMR

22

23

24
    Proceedings reported by mechanical stenography and produced
25  by computer-aided transcription.
```

1                       I N D E X

2

3                                                       Page

4

5     Jury Note 1                                       6-3

6     Jury Note 2                                       6-5

7     Court reporter readback to jury                   6-17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The Court calls the case civil matter

2     16-1427, Preston Wood & Associates v. Cameron Architects.

3               We have Jury Note No. 1:  "May we see the

4     testimony related to the Stanford design and the

14:53  5     derivatives," parentheses, "family tree," with a question

6     mark.

7               All right.  Plaintiffs, what's your position?

8          MR. BONHAM:  Your Honor, of course, they can't see

9     testimony.

14:54  10          THE COURT:  They could, but we're not reading it

11     all back, for sure.

12          MR. BONHAM:  I think what they may be referring to

13     is Mr. Zummo had a demonstrative up that had said which two

14     plans were involved with the Preston Wood plan.

14:54  15               We can identify what exhibits, you know, are

16     for the Stanford plan and for the two Preston Wood plans at

17     issue.  That's one way we could do it.

18          THE COURT:  Well, what about this "family tree"?

19          MR. BONHAM:  Well, there is really no family tree.

14:54  20     There's one plan and then there's the derivative of it.

21          THE COURT:  Where did they get that term, though?

22          MR. BONHAM:  Mr. Zummo, when he was examining them,

23     for example, on -- Well, for example, the ones involving

24     Nagle, you had the Ashford, which begat Buckingham, which

14:54  25     begat another plan, which, you know, begat D5-217 or D5 --

1          THE COURT:  Right.

2          MR. BONHAM:  But, in this instance, it's just

3    2265-A and Plan 6050, which would be Exhibits 63 and 68.

4    And then the Stanford plan -- the marketing materials on

14:55    5    that are Exhibit 110.

6          THE COURT:  Okay.  What's the defense position?

7          MR. STROTHER:  We object to Mr. Bonham's proposal

8    that the Court instruct them as to the connection between

9    two exhibits.

14:55    10          Regarding testimony, if the Court were to seek

11    clarification about precisely what testimony they're looking

12    for, that might help determine if it's even possible.  As

13    phrased, it seems to be rather broad.  I don't think we

14    should make the connection that they're looking to look at

14:55    15    exhibits that Mr. Bonham wants to telegraph to them.

16          MR. BONHAM:  I have no problem in just simply

17    saying "See Exhibits 63, 68 and 110" without any

18    interpretation.

19          THE COURT:  How about that?

14:55    20          MR. STROTHER:  I don't think so.  They're not

21    asking for exhibit numbers.  They're asking for testimony,

22    which is different than documentary evidence.

23          THE COURT:  Well, the standard response is to

24    narrow it down.  And the complete standard:  'If you would

14:56    25    tell us what areas of testimony are in conflict, we will

1  seek it out for you.'

2           Which do you prefer?

3           MR. BONHAM:  Either is fine with us, Your Honor.

4           MR. STROTHER:  I am also okay with either, Your

14:56  5  Honor.

6                Your Honor, I should also point out I wouldn't

7  be opposed to giving them a statement that they have to rely

8  upon their recollection of the testimony.

9           THE COURT:  Well, I don't mind, if they're having a

14:56  10  conflict like that, giving them a little more of a hint than

11  saying, 'Go back and just consider the evidence,' which is a

12  real standard response.

13                I'll put down, "Please designate the parts of

14  the testimony that you have a conflict about," something

14:56  15  like that.  Any problem with that?

16           MR. BONHAM:  No, Your Honor.

17           THE COURT:  All right.  I have phrased it somewhere

18  in between.

19                "Please designate the portions of testimony

14:58  20  for which more detail is requested."  That will narrow it

21  down tighter and tighter.

22                Okay.  Ellen, if you would, return this to --

23  I know you need to make a copy first.

24           (Proceedings in separate case heard)

15:22  25           THE COURT:  I will read it into the record.  This

1    is Jury Note No. 2.

2                    "Do we have to answer unanimously on each and

3    every project on Questions 1 and 2?"

4                    And the second one is:  "We think Mr. Wood's

15:42  5    testimony on Stanford might help."

6                    All right.  What is the Plaintiff's response?

7               MR. BONHAM:  Well, of course, we believe they have

8    to answer unanimously on everything.  Two thoughts, though.

9                    One is -- I was talking with the court

15:42  10   reporter as to whether or not -- and I gave him some of the

11   key words to try to find a specific portion of the testimony

12   to see if it could be excerpted; but, if it can be and if

13   the Court is willing to send that back, we can do that.

14                    I will also just say, as kind of a macro on

15:42  15   this, if this is the only thing that they're hung on up, if

16   they've basically answered everything else and they're now

17   circling back to one, the last thing -- and Mr. Strother and

18   I talked about this -- the last thing any of us want is for

19   this jury to get hung up and if we have to do it all over

15:42  20   again.

21               THE COURT:  I will say this, that I am on the same

22   page with all the parties on this one.  You don't want to

23   get your people and put them back through the wringer

24   again --

15:43  25               MR. BONHAM:  Right.

1      THE COURT:  -- over and over again.  Because I will

2  tell you this, that I had a hung jury in a criminal case.

3          Remember the one with the fraudulent Cisco

4  parts for communication gear in Iraq and the Marine Corps?

15:43   5  I had people in from all over the place.  I told them to

6  hold them there.  Remember?  I had a mistrial on Thursday.

7  I redid it the next week, started the whole trial all over

8  again.  Everybody is back at it, all the witnesses, because

9  I wanted everything in place; we'll do it again.

15:43  10          I'm not to that point yet.  So, we're all on

11  the same page.

12          MR. BONHAM:  We're on the same page.

13          Worst case scenario, if this is truly the only

14  question, if they have gotten everything else done, then, if

15:43  15  necessary, we'll withdraw our claims on Stanford.

16          THE COURT:  Okay.  You're kind of anticipating

17  where I am at this point.  There is a whole level of steps

18  you go.

19          'We're hung.'

15:43  20          'Please continue your deliberations.'

21          'We're hung.'

22          Then to the *Allen* charge.

23          'We're hung.'

24          And then I have got another gizmo that some

15:44  25  courts have used around the country -- and I picked this up

1    at a judicial conference years ago -- opening it up for

2    further summation.  I don't know if you have ever heard

3    that.  Most people haven't.  I've done it, what, at least

4    once or twice in all my years.

15:44    5              So, I will work with you on seeing if we can

6    get a verdict without being, you know, unduly harsh.

7              But another thing is this may be premature to

8    say, 'You have to answer unanimously,' to give them an

9    absolute answer on that.

15:44    10              What we can do -- I need to answer that

11    question, because if you ever get to the point of taking a

12    partial verdict, there is a way to handle that.

13              One of the ways is what Mr. Bonham just said.

14    Another one is to say, 'If you will sign every one that you

15:44    15    have answered unanimously and follow it all the way through,

16    if you can, on the unanimous ones.'  Then you're dealing

17    with a partial verdict or withdrawing it.

18              But I think, in a way, that's premature.

19    We're talking now down the line a day or so.

15:45    20              Well, you can always ask, I suppose -- Do you

21    want to ask -- have Ellen verbally ask the jury is this the

22    only one they're hung up on?

23         MR. BONHAM:  I think -- if that's possible and

24    acceptable to the Court, I think it'd speed things along.

15:45    25         THE COURT:  What do you think?

```
 1              MR. STROTHER:  I don't object to that.
 2              THE COURT:  Okay.  Then, we're going to sit right
 3    here.
 4                   Ellen, don't ask them anything else.  Say
 5    we're trying to work with this; is this the only one that
 6    they're hung up on -- if not, then we'll answer the
 7    question -- at this point in the deliberation scheme and see
 8    what they do, including that Stanford matter.
 9                   I will tell you what I am going to answer on
10    that one.  I will state 'What portions are' -- or,
11    'Specifically, what areas do you want?' instead of all of
12    Stanford's testimony.  But we'll narrow it down.
13                   The bottom line is we're all on the same page.
14    We may ask Bruce to find it all and read it back, but that's
15    the last point.  Okay?  The narrowing down is important.
16                   Why don't you ask them that one question,
17    Ellen.  Okay?  The one question is:  Is this the only
18    element that they're hanging up on in the whole case?
19              MR. BONHAM:  And they've resolved everything else.
20              THE COURT:  Yeah.
21              MR. STROTHER:  Do you think you should point out --
22    ask if it's the Stanford thing they're hung up on, just to
23    be precise?
24              THE COURT:  That's what I mean.  Correct.
25              MR. BONHAM:  The questions related to the Stanford
```

15:45 (line 5)
15:46 (line 10)
15:46 (line 15)
15:46 (line 20)
15:46 (line 25)

1    project.

2              THE COURT:  Okay.  Yeah.  Ask are the questions

3    related to Stanford the only thing that they're hung up on

4    at this time.  And then we'll wait and get the answer.  And

15:47   5    that's by agreement.

6                   You may go back and ask them.

7              CASE MANAGER:  Yes, sir.

8              THE COURT:  All right.  Off the record.

9                   (Off-the-record discussion)

15:50   10              THE COURT:  Back on the record.

11                   It was related to me -- and, Ellen, if this is

12    not correct as you just stated, let me know.

13                   Apparently, the jury said that they still have

14    some work to do, but Stanford is the sticking point.

15:51   15                   Is that basically what they said, as a

16    summary?

17              CASE MANAGER:  Yes.

18              THE COURT:  Okay.  I tell you what.  Let's go off

19    the record for a minute.  The two of you talk and see what

15:51   20    you want to do.  We can keep them going.  We can get that

21    Stanford information if it will help.  Okay?  You tell me.

22    If they can narrow it down or read back to them what they

23    want.

24                   Okay.  Off the record.

15:52   25                       (Off-the-record discussion)

 1          THE COURT:  Back on the record.

 2          MR. BONHAM:  We have conferred.  I think we have

 3    what may be a little unorthodox, but it may be a solution.

 4               Is it possible for you to ask -- tell the

15:52    5    jury, 'Look.  You say you have other things to deal with.

 6    Can you work on everything else while we try to excerpt the

 7    Stanford testimony?'  And then if they get to the point

 8    where they have solved everything else, then we can either

 9    give them the Stanford testimony or, if they're saying,

15:52   10    'We're still hung up on this,' then we can make a decision

11    about dropping that so that we're not having to look at

12    trial --

13          THE COURT:  No.  I want to get Stanford cleaned up.

14    Let's clean up Stanford first rather than having to go

15:53   15    through the whole thing and then try to backtrack.  Because,

16    again, some of this stuff that they're going to start

17    plugging in, as to costs and so forth, may need as a general

18    overview of all of the answers.  So, if Stanford is going

19    away, fine.

15:53   20               And if they get completely hung up on it, then

21    that would be the time to say that, no, we still have a

22    problem with Stanford; and then, if you want to withdraw

23    Stanford and say go on everything but the Stanford chain, I

24    have no problem with that.

15:53   25               I think we ought to try to get Stanford

1    cleaned up if we can.

2           MR. BONHAM:  I guess the question then becomes how

3    quickly can we excerpt that --

4           THE COURT:  We're in no rush, don't forget.  If it

15:53   5    needs to be tomorrow morning...  That's the question they

6    have.

7           MR. BONHAM:  Again, this is part of what I was

8    saying, is that --

9           MR. STROTHER:  It's almost 4:00.

15:53  10           THE COURT:  They can go two more hours.

11           MR. BONHAM:  They can go two more hours, but,

12    again, they're not going to get the Stanford testimony right

13    now, but we'll --

14           THE COURT:  But we can ask for them to narrow it

15:54  15    down.

16           MR. BONHAM:  True.  Very true.

17           THE COURT:  So, as far as the Part 1 goes, I am

18    going to hold on Part 1.  Correct?  Because they say they

19    can work on it.  Correct?

15:54  20           MR. BONHAM:  Correct.

21           THE COURT:  So, this is "A".  I am going to hold on

22    "A".  And then on "B", Stanford, if they can narrow it down.

23    Okay?

24           MR. BONHAM:  Yes, Your Honor.

15:54  25           THE COURT:  We're going to put "Hold for now..."

1    "Hold for now on Court response."  Correct?

2         MR. STROTHER:  Your Honor, could I inquire a little

3    bit more about the reason for holding on Part A?

4         The way I read this suggests to me that a

15:54  5    simple answer of, 'Look at the instruction regarding the

6    unanimity requirement to guide you,' might be worthwhile.

7         THE COURT:  It may solve it all.  I don't want to

8    go into -- I don't want to say where they're -- you know,

9    what are they stuck on and what's the vote and all of that

15:55  10   business.  I think the safest thing now is to answer that

11   Stanford question.  Let's get --

12        All right.  Ellen, tell them that I am holding

13   on that now; we want to get Stanford resolved.  And just say

14   we'll be here now on "B".

15:55  15        I am going to ask is there a specific area --

16   Okay.  Say "Hold now on Court response for A.  For B, are

17   there specific areas in your question re Wood testimony?"

18        And if they say they need it all -- Ellen, if

19   they say they need it all, so be it.  We'll come back in and

15:56  20   we'll give them a time frame.  Either they can keep going on

21   other questions or we'll try to have it for them tomorrow.

22   Okay?  I don't think this afternoon.

23        It's a lot, is it?

24        THE COURT REPORTER:  It's about 100 pages, Judge.

15:56  25        THE COURT:  That you need to check?

1          THE COURT REPORTER:  Yes, sir.

2          THE COURT:  Okay.  And, if need be, get them off

3    dead center and we'll read all hundred.

4          MR. BONHAM:  I suspect -- Was Mr. Wood's testimony,

15:56  5    the entire testimony, a hundred pages?

6          THE COURT REPORTER:  Yes, sir.

7          MR. BONHAM:  I think the section of Stanford is

8    only going to be maybe four or five pages.

9          THE COURT:  That's what I mean.  You have to check

15:56  10   a hundred pages.  Is that correct?

11         THE COURT REPORTER:  Within the 100 pages would be

12   the four, I guess.

13         THE COURT:  Yeah.

14         MR. BONHAM:  But the good thing is it's going to be

15:57  15   a very specific --

16         THE COURT:  And the three of you can work this

17   afternoon.

18         MR. BONHAM:  Maybe I'll come in here and look over

19   your shoulder with Mr. Strother and we'll find it.

15:57  20         MR. STROTHER:  My recollection of Mr. Wood's

21   testimony regarding Stanford is it's a block.  It's not

22   peppered --

23         MR. BONHAM:  That's correct.

24         THE COURT:  Ellen, tell them if there is a specific

15:57  25   area of Wood's testimony concerning Stanford that they want.

1    Have them narrow it down and tell them we will then try to

2    search the record.

3               All right.  Let's do that for now.  Off the

4    record.

16:08   5               (Off-the-record discussion)

6               THE COURT:  On the record.

7               We have the response to Jury Note No. 2.

8    Written at the bottom of No. 2 is:  "Seeking the chain or

9    family tree of how the Stanford plans were derived from

16:08  10    Mr. Wood's testimony."

11               Who signed that?  Is that the --

12               CASE MANAGER:  The foreperson.

13               THE COURT:  Signed it just his first name?

14               CASE MANAGER:  Yes, sir.

16:08  15               THE COURT:  Okay.

16               MR. STROTHER:  Actually, Your Honor, I think that

17    says "Preston" maybe under Mr. Wood's name.

18               THE COURT:  Oh.  "Preston Wood".  Okay.  Go it.

19               "Seeking the chain or family tree of how the

16:09  20    Stanford plans were derived from Mr. Wood's testimony."

21               All right.  What's the Plaintiff's suggestion

22    on that?

23               MR. BONHAM:  Your Honor, I think the portion of the

24    testimony that relates to Stanford is probably no more than

16:09  25    five, maybe six pages.  I think that we could work with the

1    court reporter and excerpt that fairly quickly if necessary.

2              THE COURT:  What do you think?

3              MR. STROTHER:  I think it's very brief as well,

4    Your Honor.

16:09   5              THE COURT:  And, by the way, they did mention to

6    Ellen that they're moving to other areas; so, they're not

7    hung up, in other words, waiting on this.  So, that worked

8    its way out.  Okay.

9                   My answer on that last portion is:  "We'll

16:10  10    search record of testimony."

11                   Tell them that we're going to get together

12    with the court reporter and try to find the information they

13    desire.

14                   All right.  Good.  Thanks for working together

16:10  15    on this.  We'll send it back in.

16                   Just let us know, you know, what their

17    schedule is.  If they need to come back tomorrow, that's

18    fine.  If we have it before that, fine.  If not --

19                   What time are they going to get in tomorrow?

16:10  20    10:00?

21              CASE MANAGER:  10:00, yes, sir.

22              THE COURT:  About 10:00.  We'll agree.  We can

23    stick around a little later, if we get that area, and just

24    by agreement I'll have the court reporter read it to them in

16:11  25    the morning or as soon as they get here.  But that's yet to

1    be seen.

2                    All right.  Thanks.  See what we can come up

3    with today.  I mean, I'll be here as late as necessary.  If

4    you're searching the record, let's get that done today so we

16:11    5    can have it ready for them in the morning.

6                    All right.  Off the record.

7    (Court reporter read the following excerpt of the testimony

8     of Preston Woods to the jury in the jury room as follows:)

9    By Mr. Zummo:

15:01    10    Q.  Now, did you also -- Is one of the plans that's involved

11    in this case a plan that you call the D6050?

12    A.  Yes, it is.

13    Q.  Did you design the D6050?

14    A.  I did.

15:01    15    Q.  How did you design the D6050?

16    A.  It was a -- It was -- Did a lot of those years ago.

17    Those were some of the first townhouses where we would take

18    a standard 50-by-100 lot in Montrose or wherever and just

19    cut it in half and create two 25-by-100-foot lots and do a

15:01    20    garage in the front.

21                    You walk down the side, come in the entry and

22    it's got a kitchen, dining, living, downstairs with a

23    backyard behind it.

24                    Then the City instituted -- in the '90s

15:02    25    sometime instituted the 17-foot garage door setback, and it

1    made everybody push -- They were building them at 10 feet.

2    Now they had to push the garage door back.  And if you just

3    pushed everything back, you lost half your backyard.  It

4    became barely a courtyard.

15:02    5           So, the 050 was our attempt to take the older

6    plans that were very popular and fit it to the new code and

7    still get that same backyard.

8    Q.  So, did you develop the 6050 from an earlier plan?

9    A.  The idea of it was.  Yes.

15:02   10    Q.  And was that earlier plan one that you called a 2265?

11    A.  Yes.

12           MR. ZUMMO:  So, let's go to that.  And can we go to

13    the first page of the 2265 plan, which is Plaintiff's

14    Exhibit 63.

15:02   15    By Mr. Zummo:

16    Q.  So, tell us what you meant when you said this was an

17    older style design.

18    A.  I mean, the style was more about -- You can tell when we

19    get to the floor plan.  It's an older -- It's a more

15:03   20    traditional style, which was more --

21           THE COURT:  Is that a freestanding house?

22           THE WITNESS:  It's a duplex.

23           So, there's two attached on this common wall.

24    And this guy walks down this side.  The building is roughly

15:03   25    40 feet wide, and there's basically 5 feet on each side to

1    walk down the side to get to the front door.

2            THE COURT:  Is there a firewall in between or is

3    it --

4            THE WITNESS.  Yes.  There's a two-hour firewall

15:03  5    that goes from the foundation all the way to the peak of

6    that roof.  So, one could, technically, burn down and the

7    other one still be there.

8    By Mr. Zummo:

9    Q.  I hope you didn't have that experience.

15:03  10   A.  I have never had that experience.  Knock on some really

11   fine wood here.

12   Q.  So, let's go to the floor plans since you say that will

13   help you explain it.

14   A.  Actually, I was talking out of turn.  But this was the

15:03  15   later version.  What I was talking to was the ones that came

16   before when the garage door was all the way here, 2265.

17            We had already made the adjustments.  So, this

18   already has the condensed.  But this, we were able to get it

19   down to about 63 feet, I think, front to back.  So, we still

15:04  20   had the 17- or 18-by-25 backyard.

21            We used to say that's that standard West U

22   backyard because the people that bought the expensive lots

23   in West U and put a single-family home on the front of it --

24   by the time they got to the back of the front setback and

15:04  25   then they put their detached garage in the backyard, they

1    had a 25-by-20 or -25 backyard.  We had almost the same

2    thing on the townhouse lot.

3         But here's the idea where I said this is the

4    front facing the street.  The garages are in the front.  You

15:04    5    walk down the side, come in the front door.  You've got a

6    big wide-open space, living, dining, kitchen tucked back to

7    the front with a window outside.

8         And then one of the features we did when we

9    created this was -- Staircase.  Again, kind of similar

15:04   10    features you're seeing from our other smaller plans, but

11    that staircase is kind of in the middle tucked against the

12    firewall.  We hide the powder room underneath that stair.

13    So, you don't really see it in the living/dining area.  It

14    just worked.

15:05   15    Q.  So, if we go to the second floor, can you tell us why

16    you designed the second floor of the 2265 the way you did.

17    A.  Well, we had a room in the back -- I mean, yard in the

18    back, and we had street and cars in the front.  So, we put

19    the guest rooms, kids' rooms, usually on the front and the

15:05   20    master overlooking the backyard on the quiet side of the

21    lot.

22         And this was thinking we're selling this to an

23    empty-nester again.  So, it's got a nice bath, big tub,

24    shower, nice sitting room, big master bedroom and a huge

15:05   25    his-and-her closet.

1   Q.  So, can we go to Plaintiff's Exhibit 68, which is your

2   D6050 plan.

3           And can you explain to us what you did to turn

4   the 2265 into this D6050 design.

15:06   5   A.  This builder wanted a very traditional French or almost

6   Georgian elevation, very simple architecture, nice details,

7   windows, shutters, a little false balcony, nice gate going

8   back to the front door.  The first floor plan, when we get

9   to it -- Let's go ahead and shift to it.

15:06   10          MR. ZUMMO:  Let's go to the first floor plan.

11   A.  It's basically identical.  That same powder room tucked

12   under the stair.  You walk in the entry, same kitchen, same

13   living room.  All of this is the same.

14          This 050 was -- We did three homes next to

15:06   15   each other over off TC Jester on this project.  The other

16   project was just a two-unit deal, one duplex.

17          They both were the same plan.  This one,

18   because there were three, we decided to mix it up a little

19   bit.

15:07   20          So, one plan matched the older plan, the 2265.

21   The other plan had a different master bedroom/master bath.

22   We'll get to it in a second.

23   Q.  I think --

24   A.  Yeah.

15:07   25   Q.  We were --

1    A.   This is the newer version.   The other two had the

2    same -- has the 2265.   This one has a full bedroom and

3    bath -- a bedroom and sitting area overlooking the backyard,

4    lots of light and kind of a his-and-her vanity, tub, shower,

15:07   5    toilet, not as big a closet, but a nice-size closet.

6              But we added another room.   We took some of

7    that space and -- It's the same overall dimensions.   The

8    downstairs is the same.   But we now have the game room and

9    the two bedrooms up front.   So, we've added another room.

15:07   10             One plan was more for an empty-nester.   This

11   was for a young couple that has one or two kids.

12   Q.   Did you compare your D6050 plan to what Urban Living

13   called Stanford Street Landing?

14   A.   Yes.

15:08   15   Q.   Are there similarities between the elevations of these

16   two plans?

17   A.   A few.   They changed the elevation.   Same components.

18   Just a little more modern version of it.

19   Q.   Then let's compare the floor plans -- the first floor

15:08   20   plan of this D6050 to Urban Living's Stanford Street

21   Landing.

22             THE COURT:   Which is which?

23   By Mr. Zummo:

24   Q.   Which one is which, Mr. Wood?

15:08   25   A.   This is the 6050.   This is the marketing plan of the

1    Stanford Street Landing.

2    Q.   Just for the record, the court reporter's record --

3    A.   Sorry.

4    Q.   -- the one that's at the top of the page is your 6050?

15:08    5    A.   Correct.

6    Q.   The one on the bottom is the Urban Living Stanford

7    Street Landing?

8    A.   Correct.  Yes.

9    Q.   Did you find similarities?

15:08    10    A.   I mean, powder room location is laid out exactly the

11    same.  The coat closet underneath the stairs.  Powder room

12    across from it.

13            THE COURT REPORTER:  Wait.  Coat closet...?

14            THE WITNESS:  Coat closet on one side.  Powder room

15:09    15    across from it.

16                What was a little unusual was, by shaping and

17    cutting a corner out of the powder room, we were able to

18    tuck the refrigerator in here, which gave us more room to

19    get this centered range so, when you look back in here, you

15:09    20    weren't staring at the fridge.  You were staring at the

21    range and a nice hood over it.

22                The same window on the side, same island, same

23    pantry.  And they pulled the door out a little bit.  But

24    same basic house, same floor plan, same double doors out

15:09    25    back.

By Mr. Zummo:

Q.  Let's compare the second floor plans.

Is this the same alignment on the page?  The 6050 is on the top and the Urban Living Stanford Street is the bottom?

A.  Correct.

Q.  Can you tell us what similarities you found here.

A.  They tried to make little changes.  So, they went back for that empty-nester buyer and gave him a little more closet and changed the arrangement.

The tub and shower are the same, the vanities -- a single vanity instead of two.

Bedroom location is the same.  Much smaller bedroom, but a little bigger bath and closet.

And then they took the game room and turned it into a fourth bedroom.

The other bedroom's very similar.  They flipped the bath to the opposite side.

So, they shuffled things around.  But the main component, the main orientation of the design, the staircase location, all of that's the same.

1              COURT REPORTER'S CERTIFICATE

2          I, BRUCE SLAVIN, certify that the foregoing is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter, to the best of my ability.

5

6

7                              *s/Bruce Slavin*
                               BRUCE SLAVIN, RPR, CMR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25